# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.02-80527-CIV (Judge Ryskamp)

| | |
|---|---|
| SEB S.A., | ) |
| Plaintiff, | ) |
| v. | ) |
| SUNBEAM CORP.  SUNBEAM PRODUCTS, INC., WING SHING INT'L LTD.  (BVI), and PENTALPHA ENTERS., LTD., | ) **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) |
| ——————————————— | ) |
| SUNBEAM CORP., SUNBEAM PRODUCTS, INC., | ) |
| Third-Party Plaintiffs/Counterdefendants, | ) |
| v. | ) |
| WING SHING INT'L, LTD.  (BVI), and GLOBAL-TECH APPLIANCES, INC., | ) |
| Third-Party Defendants, and | ) |
| PENTALPHA ENTERS., LTD., | ) |
| Third-Party Defendant/Counterclaimant. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF SUNBEAM'S CONSOLIDATED MOTION FOR SUMMARY JUDGMENT

Robert L. Byman (admitted *pro hac vice*)
Clark C. Johnson (admitted *pro hac vice*)
Bradley I. Schecter (admitted *pro hac vice*)
JENNER & BLOCK, LLC
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
*Of Counsel*

Mark F. Bideau (Florida Bar No. 564044)
GREENBERG TRAURIG, P.A.
777 South Flagler Drive; Suite 300 East
West Palm Beach, FL 33401
(561) 650-7900

Attorneys for SUNBEAM CORPORATION
and SUNBEAM PRODUCTS, INC.



# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   iii

PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

    I.      SUNBEAM'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

            A.    Pentalpha Breached Its Express Agreements By Failing To Indemnify Sunbeam In The Rival, Black & Decker, And SEB Patent Infringement Litigations . . . . . . . . . . . . . . . . . . . . .   7

            B.    Pentalpha Has Breached Its Implied Warranties Under The Uniform Commercial Code . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

    II.     PENTALPHA'S CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

            A.    Sunbeam Has Not Breached The Product Supply Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

                 1.    Pentalpha Has Failed To Prove That Sunbeam Bought Any Appliances From Other Suppliers In Contravention Of The Product Supply Agreement . . . . .   10

                 2.    Pentalpha Breached The Product Supply Agreement Thereby Excusing Sunbeam's Performance As A Matter Of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

            B.    Sunbeam Did Not Fraudulently Induce Pentalpha To Enter Into The Product Supply Agreement . . . . . . . . . . . . . . . . . . . . . .   15

                 1.    None Of The Alleged False Statements Concerns Any Material Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

                 2.    Pentalpha's Reliance Was Neither Justified Nor Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

                 3.    Sunbeam's Alleged Misrepresentations Were Not The Proximate Or Direct Cause Of Pentalpha's Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

C.    Pentalpha's Fraud In The Performance Claim Is Barred By
      The Economic Loss Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363 (M.D. Fla. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Barnes v. Burger King Corp.*, 932 F. Supp. 1420 (S.D. Fla. 1996) . . . . . . . . . . . . . . . . . 19

*Burger King Corp. v. Hinton, Inc.*, 2002 WL 992238 (S.D. Fla. May 7, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cover v. Hydramatic Packing Co., Inc.*, 83 F.3d 1390 (Fed. Cir. 1996) . . . . . . . . . . . . . . 9

*Dantzler Lumber & Export Co. v. Bullington Lumber Co.*, 968 F. Supp. 1543 (M.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Eclipse Med., Inc. v. American Hydro-Surgical Instruments, Inc.*, 96-8532-C 1999 U.S. Dist. LEXIS 22434 (S.D. Fla. Jan. 20, 1999) . . . . . . . . . . . . . . . . . . . 19

*Jankovich v. Bowen*, 844 F. Supp. 743 (S.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . 16- 18

*Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18-20

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . 5

*PT Indonesia Epson Indus. v. Orient Overseas Container Line, Inc.*, 2002 WL 1008443 (S.D. Fla. May 15, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997) . . . . . . . . . . . . 6, 21, 22

*SEB S.A., v. Global Tech Appliances, Inc.*, 77 F. Supp. 2d 399 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*SEB S.A. v. Montgomery Ward & Co., Inc., et al.*, 77 F. Supp. 2d 399 (S.D.N.Y. 1999), *aff'd*, 243 F. 3d 566 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Schubot v. McDonald's Corp.*, 757 F. Supp. 1351 (S.D. Fla. 1990) . . . . . . . . . . . . . . . . 19

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) . . . . . . . . . . . . . . . . . . . . . 16

*United States v. One Single Family Residence*, 2002 WL 1050544 (S.D. Fla. May 15, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## STATE CASES

*Abruzzo v. Haller*, 603 So. 2d 1338 (Fla. Dist. Ct. App. 1992). . . . . . . . . . . . . . . . . . . . 7

*Allen v. The Stephan Co.*, 784 So. 2d 456 (Fla. Dist. Ct. App. 2000) . . . . . . . . . . . . . 23

*Brod v. Jernigan*, 188 So. 2d 575 (Fla. Dist. Ct. App. 1966) . . . . . . . . . . . . . . . . . 16-18

*Burns v. Barfield*, 732 So. 2d 1202 (Fla. Dist. Ct. App. 1999) . . . . . . . . . . . . . . . . . 10

*Dune I, Inc. v. Palms North Owners Associate, Inc.*, 605 So. 2d 903 (Fla.
    Dist. Ct. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dunham-Bush, Inc. v. Thermo-Air Service, Inc.*, 351 So. 2d 351 (Fla. Dist.
    Ct. App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Escobar v. Bill Currie Ford, Inc.*, 247 So. 2d 311 (Fla. 1971) . . . . . . . . . . . . . . . . . 10

*Florida Power and Light Co. v. Westinghouse Electric Corp.*, 510 So. 2d
    899 (Fla. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*HTP, LTD. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238 (Fla.
    1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74 (Fla. Dist. Ct.
    App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 23

*Johnson v. Davis*, 480 So. 2d 625 (Fla. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 21

*Maroone Chevrolet, Inc. v. Nordstrom*, 587 So. 2d 514 (Fla. Dist. Ct. App.
    1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Marshall Construction, LTD v. Coastal Sheet Metal & Roofing*, 569 So. 2d
    845 (Fla. Dist. Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Maunsell v. American General Life & Accident Insurance Co.*, 707 So. 2d
    916 (Fla. Dist. Ct. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Miller v. Reinhart*, 548 So. 2d 1174 (Fla. Dist. Ct. App. 1989) . . . . . . . . . . . . . . . 6, 14

*Peacock Construction Co. v. Modern Air Conditioning, Inc.*, 353 So. 2d 840
    (Fla. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Richter v. Richter*, 666 So. 2d 559 (Fla. Dist. Ct. App. 1996) . . . . . . . . . . . . . . . 11-12

*Saunders Leasing System, Inc. v. Gulf Central Distributing*, 513 So. 2d 1303
    (Fla. Dist. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

*Sleight v. Sun & Surf Realty, Inc.*, 410 So. 2d 998 (Fla. Dist. Ct. App. 1982) . . . . . . . .  18

*State Farm Fire and Casualty Co. v. Licea*, 685 So. 2d 1285 (Fla. 1996) . . . . . . . . . . . . .  12

## MISCELLANEOUS

Federal Rule of Civil Procedure 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 26

*Restatement (Second) of Contracts* § 203(a) (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Restatement (Second) of Contracts* § 203(c) (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Sunbeam Corporation and Sunbeam Products, Inc. (collectively, "Sunbeam") respectfully submit this memorandum of law in support of their consolidated motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## Procedural Background

This action was originally filed in the District of New Jersey by SEB S.A., a French corporation ("SEB"), alleging that the deep fryer home appliances manufactured for Sunbeam by Pentalpha Enterprises, Ltd. (collectively, with its parent Global-Tech Appliances, Inc., "Pentalpha") infringed SEB's patent(s).   Sunbeam cross-claimed against Pentalpha for indemnification.

Sunbeam, believing SEB's infringement claims to have merit, settled with SEB at about the same time that Pentalpha successfully challenged the sufficiency of service by SEB; SEB chose not to pursue Pentalpha in New Jersey but rather filed a new action in the Southern District of New York, where it soon obtained injunctive relief against Pentalpha.[1]  As a result, the original plaintiff, SEB, was no longer a party; the original cause of action, patent infringement, was no longer at issue; all that was left were Sunbeam's contractual and common law claims against Pentalpha for indemnification.

But some thirteen months after Sunbeam had brought its indemnification claims, Pentalpha expanded the issues, adding claims of its own against Sunbeam for purported breaches of contract and fraud.  Sunbeam filed a motion for summary judgment on its affirmative claims for indemnification; then, after substantial discovery, Sunbeam filed a second motion on Pentalpha's claims.  Sunbeam also filed its motion to transfer the case to Florida. The court stayed further fraud-related discovery pending resolution of Sunbeam's dispositive motions.  On February 6, 2001, Sunbeam filed for Chapter 11 reorganization in the Southern

---

[1]  *See SEB S.A. v. Montgomery Ward & Co., Inc., et al.*, 77 F. Supp. 2d 399 (S.D.N.Y. 1999), *aff'd*, 243 F. 3d 566 (Fed. Cir. 2000).

District of New York. Sunbeam's reorganization, and the automatic bankruptcy stay, caused a delay in the court's ability to address the motions, but soon after the stay was lifted, on May 23, 2002, the New Jersey District Court granted Sunbeam's motion to transfer the case to this Court, leaving the two summary judgment motions to be resolved. For the Court's convenience, Sunbeam has consolidated those motions and addresses them together in this single memorandum.

**Statement of Facts**

Throughout the 1990s, Pentalpha designed and manufactured various appliances, which it sold to Sunbeam pursuant to a series of supply agreements and purchase orders and which Sunbeam resold under its well-known "Sunbeam®" and "Oster®" tradenames. (Ex. 1 at P000119, P000183.)[2]

In the summer of 1997, Sunbeam and Pentalpha entered into a Product Supply Agreement (the "Agreement")[3] under which Pentalpha agreed to pay Sunbeam a rebate of $1 million on past sales to Sunbeam, and Sunbeam agreed to make Pentalpha its exclusive supplier of certain specified products. The products covered by the Product Supply Agreement were specifically identified in Schedule A attached to the Agreement (the "Schedule A Models"):

---

[2] All exhibits referenced throughout this memorandum are found in the accompanying Appendix to Sunbeam's Consolidated Motion for Summary Judgment.

[3] On June 27, 1997, Sunbeam and Pentalpha entered into the Product Supply Agreement ("PSA 1"), a copy of which is attached as Exhibit 2. On or about October 23, 1997, Sunbeam and Pentalpha entered into another version of a Product Supply Agreement ("PSA 2"), a copy of which is attached as Exhibit 3. A third version ("PSA 3") of the agreement was signed later for tax reasons. (Ex. 13, Sham Dep. at 29:3-30:22.) PSA 1, 2 and 3 are substantively identical, except for the fact that the contracting Pentalpha entity is different. Where identification of the specific version is necessary, the document will be referred to as PSA 1 or PSA 2; otherwise the various versions will be referred to collectively as the "Product Supply Agreement" or as the "Agreement."

SCHEDULE A

Products Covered Under Supply Agreement

**PRODUCTS NOT CURRENTLY PRODUCED BY PENTALPHA**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Air Cleaners | 2585 | 2587 | 2588 | 2590 | | | |
| Air Filter Replacements | 6588 | 6612 | 6613 | 6615 | 6617 | 6618 | |
| Ultrasonic Humidifiers | 696 | 1281 | | | | | |
| Hand Mixers | 4450 | 2603 | | | | | |
| Coffeemakers | 5653 | 5654 | 5655 | 3262 | 3263 | 3264 | 3265 |
| | 3270 | 3271 | 3272 | 3273 | 3274 | 3275 | |
| Garment Steamers | 4026 | 4036 | | | | | |
| Irons | 4014 | 4015 | | | | | |
| Rice Cookers | RS-05 | RS-06 | RS-07 | RS-15 | RS-25 | RS-26 | RS-27 |
| Rotisseries | 4780 | 4783 | | | | | |
| Toaster Ovens | 4831 | 4857 | 4877 | 4878 | | | |

**PRODUCTS CURRENTLY PRODUCED BY PENTALPHA**

| | | | | |
|---|---|---|---|---|
| Breadmakers | 5814 | 5815 | 5839 | 5840 |
| Food Steamers | 4710 | 4711 | 4713 | 5710 |
| Travel Irons | 3939 | | | |
| Rice Cookers | 4706 | 4708 | | |
| Deep Fryers | 3240 | 3241 | 3242 | 3243 |

Sunbeam was not obligated to purchase any minimum quantities of any Schedule A Model nor did Sunbeam have any obligation to purchase any product unless and until Pentalpha submitted bids equal to or less than other sources and an acceptable project plans for that product was developed.  (Exs. 2 and 3, at ¶ 3.B.; Ex. 18, Nugent Dep. at 15:10-16:3.):

> **B.**   All items not currently being manufactured by Pentalpha will be quoted by Pentalpha as soon as possible.  If the quoted prices from Pentalpha are equal to or lower than Sunbeam's existing pricing, a project will be started to move tooling from the current supply source to Pentalpha no later than by April 1, 1998.  Sunbeam and Pentalpha agree that time is of the essence and will strive to move as much tooling as possible before the Chinese New Year

If the parties had never done a bit of business with one another after signing the Agreement, it would nevertheless have been a commercial success for both parties.  Sunbeam would have its million dollars.  Pentalpha would have much more.  At about the time that Pentalpha and Sunbeam were negotiating the Agreement, Pentalpha was in the process of an

-3-

Initial Public Offering in which it hoped to raise approximately $80 million in capital.  The existence of a contract with Sunbeam was deemed "critical" to give credibility to Pentalpha's prospects.  (Ex. 5, Howell Dep. at 21:10.)  Thus the true value of the Agreement to Pentalpha was its mere existence; whether Pentalpha ever enjoyed any actual sales was of secondary importance.  For Sunbeam, the million dollar payment was important, but the real value to Sunbeam was the ability to reduce its number of suppliers, thereby reducing its administrative expenses.  (Ex. 18, Nugent. Dep. at 159:20-160:18.)

Although the Agreement contemplated that Pentalpha would submit bids "as soon as possible" so that project plans could be put in place by April 1, 1998, Pentalpha failed to submit bids on 45 of the 59 Schedule A Models – more than a 75% failure rate.  (Ex. 4.)  And for the 14 products it did bid, Pentalpha failed to submit project plans on 12 – in sum, Pentalpha met its conditions precedent under the Product Supply Agreement in a mere 2 out of 59 instances, a 3.9% performance rate.  (Ex. 4.)  And as to the 2 instances where Pentalpha did submit both bids and project plans, Sunbeam did not purchase those models from sources other than Pentalpha until October 1998 – many months after Pentalpha's multiple breaches had made Sunbeam's performance a non-issue.  (Ex. 4.)

At the same time that Pentalpha was failing to perform its obligation in the Agreement to submit bids on Schedule A Products, Pentalpha failed to indemnify Sunbeam on various patent infringement claims for which it was responsible.  In 1995 Sunbeam was named in two patent infringement lawsuits relating to food steamers designed and manufactured by Pentalpha. (Ex. 1 at P000153-154; Ex. 6 at BG0689; Ex. 7 at BG0632; Ex. 8.)  In February 1998, Sunbeam was named in this suit for infringement relating to the deep fryers.  Furthermore, Pentalpha has already admitted – in public securities filings – that it owes a duty of indemnification on the food

-4-

steamers claims.  (Ex. 1 at P000153-154; Ex. 6 at BG0689; Ex. 7 at BG0632.)  Nevertheless, Pentalpha has refused to pay for the defense and settlement of these actions.

## Summary of Argument

There are no genuine disputes over any material facts and summary judgment for Sunbeam is appropriate.[4]

There is no dispute that Sunbeam has incurred expense in the defense and settlement of claims for patent infringement as to appliances supplied by Pentalpha.  Sunbeam's expenditures in the foregoing series of patent infringement cases total $3,746,728.00.  (Ex. 8.)  Pentalpha owes a duty to indemnify Sunbeam for those amounts.  Sunbeam is entitled to summary judgment on its claims against Pentalpha.

Pentalpha's breach of contract claim against Sunbeam fails.  As to 45 of the 59 Schedule A Models, Pentalpha never submitted bids.  (Ex. 4.)  As to 12 of the remaining 14 Pentalpha never submitted an acceptable project plan.  (Ex. 4.)  Having failed to establish its performance of its conditions precedent, Pentalpha cannot prove any breach by Sunbeam on these 57 models.

As to the 2 out of 59 Schedule A Models for which Pentalpha was the low bidder and did submit a plan, Sunbeam did not purchase from other sources until October 1998, long after Pentalpha was in breach of its own obligations by failing to bid on the vast majority of appliances and by failing to provide indemnification.  (Ex. 4.)  Florida law (chosen by the parties) provides that when a contract is breached by one of the parties, the other party is released from

---

[4] Summary judgment is mandated "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There must be evidence from which the jury could reasonably find for the plaintiff.  *Id.* at 252; *see also United States v. One Single Family Residence*, 2002 WL 1050544, at *2 (S.D. Fla. May 15, 2002) ("[i]f the evidence advanced by the non-moving party 'is merely colorable, or is not significantly probative,'" then summary judgment must be granted); *PT Indonesia Epson Indus. v. Orient Overseas Container Line, Inc.*, 2002 WL 1008443, at *1 (S.D. Fla. May 15, 2002) (same)

—

any obligation to perform the contract. *See Miller v. Reinhart*, 548 So. 2d 1174, 1175 (Fla. Dist. Ct. App. 1989).

Pentalpha's fraudulent inducement claim also fails. *First*, the alleged fraudulent statements were made *after* the occurrence of the acts Pentalpha claims it performed in reliance; there is no temporal relationship and no evidence that any alleged misstatement proximately caused any injury. *See Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997). *Second*, none of Sunbeam's alleged misrepresentations could be material because they were not addressed by the actual Agreement. *See Saunders Leasing Sys., Inc. v. Gulf Cent. Distrib.*, 513 So. 2d 1303, 1306-07 (Fla. Dist. Ct. App. 1987). *Third*, it was not justifiable or reasonable for Pentalpha to rely on any of Sunbeam's alleged misrepresentations. *See Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1315 (11th Cir. 1998).

Finally, Pentalpha's fraudulent performance claim fails because the economic loss doctrine bars Pentalpha from bringing such a claim; the facts surrounding Pentalpha's allegations are "interwoven and indistinct" from those surrounding the breach of contract claim. *See Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74, 78 (Fla. Dist. Ct. App. 1997).

Sunbeam is entitled to summary judgment on each of Pentalpha's claims.

## ARGUMENT

### I.   SUNBEAM'S CLAIMS

Sunbeam is entitled to entry of summary judgment on its claims because Pentalpha has breached its express and implied agreements and warranties to indemnify. Sunbeam is entitled to judgment in the amount of $3,746,728.00.

**A.    Pentalpha Breached Its Express Agreements By Failing To Indemnify Sunbeam In The Rival, Black & Decker, And SEB Patent Infringement Litigations.**

In order to establish a breach of contract, the party asserting a breach must show the (1) existence of a contract, (2) its own performance of the contract, (3) the other party's non-performance, and (4) damages. *Abruzzo v. Haller*, 603 So. 2d 1338, 1340 (Fla. Dist. Ct. App. 1992). There is no material factual dispute concerning any of those elements:

Sunbeam and Pentalpha entered into a written food steamer supply agreement in 1996 in which Pentalpha agreed to indemnify Sunbeam from any claims of patent infringement. (Ex. 9 at SB000223.) ("Supplier shall hold harmless, defend and indemnify Sunbeam . . . from all suits which may be brought on account of United States patents or patents or registered designs of any other country charged to have been infringed by such Units or the purchase and resale thereof.") Apart from that agreement, each and every purchase of a food steamer or deep fryer was made by purchase order, which included express terms requiring Pentalpha to defend and indemnify Sunbeam from any claims of infringement concerning those products. (Ex. 10.) (requiring Pentalpha to "defend, protect and save harmless [Sunbeam] . . . from all damages, claims and demands for actual or alleged infringement of any United States or foreign patent . . . and [to] defend, protect, and save harmless [Sunbeam] . . . against any suit or action which may be brought against [Sunbeam] . . . by reason of any such actual or alleged infringement resulting from the purchase, sale, or use of the goods . . . .")

If there was any doubt about the contractual undertakings, all doubt is removed by Pentalpha's repeated and unequivocal admissions in public securities filings (made under penalty of perjury?) that it owed indemnification:

> "Although the Company is not a party to these actions, pursuant to an agreement between the Company and Sunbeam, the Company is obligated to hold harmless, defend and indemnify Sunbeam for any losses and legal fees it may sustain as a result of these lawsuits."

-7-

(Ex. 1 at P000153-154; Ex. 6 at BG0689; Ex. 7 at BG0632.)

There is no record of evidence indicating that Sunbeam did not perform all of its obligations by paying Pentalpha for every product it received.[5] Pentalpha has failed and refused to indemnify Sunbeam's $3,746,728.00 cost of defense and settlement. (Ex. 8.)

### B.    Pentalpha Has Breached Its Implied Warranties Under The Uniform Commercial Code.

Even if there were some question about Pentalpha's express undertakings, Pentalpha remains liable for indemnification under Section 2-312(3) of the Uniform Commercial Code, which provides that as a matter of law "unless otherwise agreed, a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third party by way of infringement or the like" unless the buyer is responsible for the infringing design. To establish a claim for breach of such a UCC warranty, a claimant must show a sale of goods, the warranty created, facts concerning breach of that warranty, notice of that breach, and damages. *See Dunham-Bush, Inc. v. Thermo-Air Service, Inc.*, 351 So. 2d 351, 353 (Fla. Dist. Ct. App. 1977). There is no factual dispute that each of those requirements is met.

Here, the sale of food steamers and deep fryers is undisputed. (*See* Pentalpha Answer to Amended Third-Party Complaint ¶¶ 3, 5.) And Pentalpha cannot dispute that it is a merchant regularly dealing in food steamers, deep fryers, and similar small appliances. (Ex. 1 at P000119.)

---

[5] Pentalpha contends that its indemnification obligations are obviated by Sunbeam's alleged nonperformance of exclusivity obligations in the July 1, 1997 Product Supply Agreement, a different contract entered into at a different time. While the Product Supply Agreement incorporates the standard terms of the purchase orders, the converse is not true. Thus, breach of a purchase order necessarily amounts to breach of the Product Supply Agreement but breach of the Product Supply Agreement does not necessarily amount to breach of a purchase order.

There can be no dispute that Pentalpha designed the products.[6]  Accordingly, as a matter of law, Pentalpha warranted that the food steamers and deep fryers would be "free of the rightful claim . . . of infringement." Neither the fact of the claims (Ex. 14; Ex. 15; SEB Amended Complaint), nor the rightfulness of them can be genuinely disputed. *See Cover v. Hydramatic Packing Co., Inc.*, 83 F.3d 1390, 1394 (Fed. Cir. 1996) ("rightful claim" exists where the claim is settled); Official Cmt. 2-312(3) (purpose of this implied warranty is to impose a duty on a seller "to see that no claim of infringement of a patent . . . by a third party will cloud or mar the buyer's title"); *cf. Maroone Chevrolet, Inc. v. Nordstrom*, 587 So. 2d 514, 518 (Fla. Dist. Ct. App. 1991) (warranty of title is breached wherever there is substantial cloud on title, regardless of whether it eventually develops that third party's title is superior).

The Court should enter summary judgment in favor of Sunbeam in the amount of $3,746,728.00.

## II.   PENTALPHA'S CLAIMS

Sunbeam is entitled to an entry of summary judgment in its favor on Pentalpha's counterclaims because: (a) Sunbeam has not breached the Product Supply Agreement; (b) Sunbeam did not fraudulently induce Pentalpha to enter into the Product Supply Agreement; and (c) Pentalpha's fraud in the performance claim is barred by the economic loss doctrine.

---

[6] Pentalpha has in previous briefing asserted that it has no implied warranty on the deep fryers because Sunbeam designed the product. But that argument cannot stand in light of the deposition of John Sham, Pentalpha's CEO, who testified both as a Rule 30(a)(1) and 30(b)(6) witness. Mr. Sham has admitted that Pentalpha designed the feature – the manner in which the fryer pan is attached to the deep fryer housing – relevant to SEB's claim of infringement. (*See SEB S.A., v. Global Tech Appliances, Inc.*, 77 F. Supp. 2d 399, 401 (S.D.N.Y. 1999); Ex. 13, Sham Dep. at 230.)

### A.   Sunbeam Has Not Breached The Product Supply Agreement.

Pentalpha's counterclaim first alleges that Sunbeam materially breached the Product Supply Agreement by purchasing from other companies products that the Agreement requires Sunbeam to purchase from Pentalpha (Count I).  (*See, e.g.*, Countercl. ¶¶ 31, 32.)  Sunbeam is entitled to summary judgment on this claim for the simple reason that there is no evidence of breach.  The Agreement is limited to specific models of certain appliances.  There is no evidence that Sunbeam *ever* purchased 46 of the 59 covered products from any source other than Pentalpha. (Ex. 4.)  While it is true that Sunbeam did purchase thirteen of the products from other sources, in all but two instances those products were never subject to the Agreement because Pentalpha failed to submit low bids and/or project plans; and for the meager two products that Pentalpha did submit bids and plans, Sunbeam made no purchases until October 1998, long after Pentalpha had materially breached the Agreement by both failing to submit bids and tooling plans on various products and by failing to indemnify Sunbeam for patent infringement. (Ex. 4.)  As a matter of law, Sunbeam was excused from performance.

### 1.   Pentalpha Has Failed To Prove That Sunbeam Bought Any Appliances From Other Suppliers In Contravention Of The Product Supply Agreement.

"[I]nterpretation of a document is a question of law rather than of fact." *Peacock Construction Co. v. Modern Air Conditioning, Inc.*, 353 So. 2d 840, 842 (Fla. 1977) (citing 4 *Williston on Contracts*, § 616 (3d ed.)); *see also Escobar v. Bill Currie Ford, Inc.*, 247 So. 2d 311, 313 (Fla. 1971). Additionally, where the terms of a contract are unambiguous, its plain meaning controls. *See Burns v. Barfield*, 732 So. 2d 1202, 1205 (Fla. Dist. Ct. App. 1999); *see also Dune I, Inc. v. Palms North Owners Assoc., Inc.*, 605 So. 2d 903, 905 (Fla. Dist. Ct. App. 1992) ("[i]t is a cardinal rule of contract construction that the intention of the parties governs"). The parties' intent must be determined from the four corners of the document. *See Burns*, 732 So. 2d at 1205.  Applying

these canons of Florida contract construction, it is apparent that Sunbeam did not breach the Product Supply Agreement.

Pentalpha contends that Sunbeam has purchased products from other companies that the Agreement requires Sunbeam to buy from it. (*See* Countercl. ¶ 31.)  Specifically, Pentalpha makes the general allegation that Sunbeam purchased various generic appliances (i.e. air filters, coffeemakers, irons, etc...) from other suppliers. (*See* Countercl. ¶¶ 19-26.)  However, the Agreement between Sunbeam and Pentalpha provides that "Pentalpha will be the sole supplier to Sunbeam of the Products listed in Schedule A," (Exs. 2 and 3, at ¶ 2) and that "[i]f the quoted prices from Pentalpha are equal to or lower than Sunbeam's existing pricing, a project will be started to move tooling from the current supply source to Pentalpha." (*See id.*, at ¶ 3.B.) Schedule A is attached to the back of the Agreement, and is titled, "Product Covered Under Supply Agreement." (*See id.*)  Schedule A has two subheadings: (1) "Product not currently produced by Pentalpha," and (2) "Product currently produced by Pentalpha." (*Id.*) Within each of these subheadings is a list of specific model numbers of certain appliances. (*See id.*)

Sunbeam does not dispute that it purchased the *types* of products that are addressed in the Product Supply Agreement -- for example, Sunbeam bought a significant number of irons from sources other than Pentalpha.  But Sunbeam did not buy any iron models 3939, 4014 or 4015 – the specific models listed in Schedule A.  Thus, in order for Pentalpha to succeed, the Court would have to read the Agreement as a grant to Pentalpha of exclusive production rights to the generic appliances (e.g., that Pentalpha had the right to produce all irons purchased by Sunbeam).  Such a reading of the Agreement is absurd.  The parties specifically included model numbers in Schedule A for a reason; Sunbeam and Pentalpha obviously intended to create a supply agreement that governed only those listed units. *See Richter v. Richter*, 666 So. 2d 559, 561 (Fla. Dist. Ct. App. 1996) ("[w]here a contract is clear and unambiguous in its terms, the court

-11-

may not give those terms any meaning beyond that expressed"); *State Farm Fire and Cas. Co. v. Licea*, 685 So. 2d 1285, 1287 (Fla. 1996) ("any interpretations of a contract or term which 'gives a reasonable, lawful, and effective meaning to all the terms [in a contract] is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect'"); *Restatement (Second) of Contracts* § 203(a) (1981) (same); *see also Burger King Corp. v. Hinton, Inc.*, 2002 WL 992238, at *4 (S.D. Fla. May 7, 2002) ("general language of a contract must yield to specific language which deals with the matter at issue"); *Restatement (Second) of Contracts* § 203(c) (1981) (in interpreting an agreement, "specific terms and exact terms are given greater weight than general language").

That could not be made more clear than by looking at the listing in Schedule A for Rice Cooker models. A specific model of rice cooker is listed in Schedule A under both category (1), those items not currently produced by Pentalpha, and category (2), items that are produced by Pentalpha. There would be no point to listing a rice cooker model in both categories if the intent of the agreement was to cover all rice cookers rather than the specific models. But that was not the intent. The intent was to cover specified models and no others, as is plain from the four corners of the contract.

Even if this Court were to look beyond the four corners of the Agreement, evidence supports the proposition that only specific model numbers were covered. Eyal Lior, former President of Pentalpha, U.S., and one of Pentalpha's negotiators of the Product Supply Agreement, confirmed that the intent of the Agreement was to grant Pentalpha exclusive production rights only to the specific model numbers listed on Schedule A. In his deposition testimony, Lior succinctly stated that when he negotiated the contract it was his understanding that the four digit numbers included in Schedule A represented the specific models of each product that the Agreement covered. (Ex. 16, Lior Dep. at 21:22-22:19.) Lior testified that Pentalpha knew Sunbeam was buying irons, for example, from other suppliers and that

-12-

Pentalpha was only getting the three specific models of irons listed on Schedule A. (*See id.* at 22:15-19.) Although Pentalpha's counterclaim wishes otherwise, Sunbeam is allowed under the Agreement to buy the generic appliances listed in Schedule A from any source; Sunbeam is restricted only as to the models designated in Schedule A.

Attached as Exhibit 4 is a chart that lists each of the specific models listed in Schedule A to the Product Supply Agreement, tracking whether Sunbeam ever bought the model from a source other than Pentalpha, and, if so, whether Pentalpha ever submitted an acceptable bid and project plan on the model. It is apparent that Pentalpha cannot show any breach by Sunbeam and is entitled to summary judgment. Even as to the limited instances (rotisserie models 4780 and 4783)[7] in which Sunbeam did buy a listed model from another (but non-infringing) source – and in which Pentalpha had submitted acceptable bids and plans – Sunbeam is still entitled to summary judgment because those purchases came after Pentalpha had already materially breached the Agreement (as explained in Part II.A.2. below) and Sunbeam's performance was excused.[8]

---

[7] Sunbeam also purchased a Deep Fryer Model 3242 from other sources. Deep Fryer Model 3242 was one of the products accused of infringement by SEB; after settling with SEB, Sunbeam had the product redesigned to eliminate the infringing feature and purchased it from another source. Although the model number was left the same to avoid commercial confusion, the product was – indeed, had to be – different to avoid further infringement claims.

[8] Pentalpha has contended in prior filings that a report, by a non-party, Arthur Andersen, proves that Sunbeam breached the Agreement. (*See, e.g.,* Pentalpha Memorandum of Law in Response to Sunbeam's Motion for Summary Judgment on Pentalpha's Counterclaims, at 13.) But Arthur Andersen's opinion that *both* Sunbeam and Pentalpha did not perform is not evidence of whether or who breached the Agreement first.

**2.    Pentalpha Breached The Product Supply Agreement Thereby Excusing Sunbeam's Performance As A Matter Of Law.**

It is settled under Florida law that when a contract is breached by one of the parties, the other party is released from its obligation to perform the contract. *Miller v. Reinhart*, 548 So. 2d 1174, 1175 (Fla. Dist. Ct. App. 1989); *see also Marshall Construction, LTD v. Coastal Sheet Metal & Roofing*, 569 So. 2d 845, 848 (Fla. Dist. Ct. App. 1990) (holding that a material breach of contract by one party excuses the other party's obligation to perform).  In order to maintain an action for breach of contract, one must first establish performance on its part of the contractual obligations imposed in the contract.  *See Marshall Construction*, 569 So. 2d at 848.  Pentalpha's multiple material breaches of the Agreement – through failure to submit bids and plans and failure to indemnify Sunbeam – excused Sunbeam's performance.

The Agreement required that "[a]ll items not currently being manufactured by Pentalpha will be quoted by Pentalpha as soon as possible," and that "[i]f the quoted prices from Pentalpha are equal to or lower than Sunbeam's existing pricing, a project will be started to move tooling from the current supply source to Pentalpha."  (Exs. 2 and 3, at ¶ 3.B.)  Obviously, a manufacturer enters an exclusive supply agreement with the expectation of limiting its suppliers, expecting that it will save the resources needed to find and qualify multiple suppliers.  But that expectation is defeated if the "exclusive" supplier fails to supply.  The Agreement covers 59 specific products. (Ex. 4.)  But Pentalpha submitted acceptable bids on only 14 of these, less than 25% – and of these 14, only 2 – 3.4% – were accompanied with proper transition plans. (Ex. 4.)  Pentalpha's failure to substantially perform by failing in more than 95+% of its obligations excused Sunbeam from any obligation on the handful of products that Pentalpha did manage to bid and plan for.

Pentalpha contends that Sunbeam breached the Agreement by failing to provide Pentalpha with samples of various products, but this argument must fail for two reasons. First, Sunbeam did not purchase some of the models from *anyone.* (Ex. 4.) The Agreement clearly does not obligate Sunbeam to purchase every model listed on Schedule A even if Sunbeam decides against outsourcing the product. (Exs. 2 and 3, at ¶ 2.) Second, Sunbeam's alleged failure to provide Pentalpha with a product sample cannot constitute a breach of the Agreement since the Agreement does not require Sunbeam to do so. The Agreement is silent on this issue. On the other hand, the Agreement obligates *Pentalpha* to quote a bid to *Sunbeam.* (Exs. 2 and 3, at ¶ 3.B.) Moreover, the listed models were all available in the marketplace. Pentalpha argues that Sunbeam breached its UCC duty of good faith and fair dealing, but if Pentalpha needed a sample to submit a bid, it only had to plunk down a few dollars to do so. Its failure to do that simple mitigating step defeats any contract claim for damages.

Pentalpha also materially breached the Agreement by failing to indemnify Sunbeam for its costs resulting from the patent infringement litigation initiated here by SEB and elsewhere by Rival and Black & Decker (as explained more fully in Part I, above). Pentalpha's failure to provide indemnification amounts to a material breach of the Agreement. Therefore, even if Sunbeam did breach the contract as Pentalpha claims – which it did not – Pentalpha's initial failures under the Agreement excuse any further performance by Sunbeam.

**B.      Sunbeam Did Not Fraudulently Induce Pentalpha To Enter Into The Product Supply Agreement.**

Pentalpha also alleges that Sunbeam fraudulently induced the execution of the Product Supply Agreement (Count II) in two ways. (*See, e.g.,* Countercl. ¶¶ 35, 57, 61, 62.) First, Pentalpha claims that Sunbeam falsely represented its true financial condition. Second, Pentalpha asserts that Sunbeam falsely represented to Pentalpha that, contrary to the plain language of the Product Supply Agreement, it would purchase certain minimum quantities of

products.  Pentalpha claims that but for these alleged misrepresentations it would not have extended a $1 million rebate to Sunbeam and it would not have made certain improvement to its plant and equipment in China.  (*See id.* at ¶¶ 58, 60.)

The evidence conclusively demonstrates that this claim must fail.  Under Florida law, Pentalpha must prove *all four* of the following elements: (1) that the representor made a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representor induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation. *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985).  Sunbeam is entitled to summary judgment because:  *First*, Sunbeam did not make any false statements regarding material facts; *second*, Pentalpha was not justified in relying on any of Sunbeam's alleged false statements; and *third*, Sunbeam's alleged fraudulent misrepresentations did not cause Pentalpha any injury.

### 1.    None Of The Alleged False Statements Concerns Any Material Fact.

The first element of a fraudulent inducement claim is that the representor must have made a false statement concerning a material fact. *See Johnson*, 480 So. 2d at 627.  To be material "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (upholding summary judgment upon district court's finding that omitted fact was not material).  A promise of future action or occurrence cannot, standing alone, be a basis for fraud because it is not a material representation, there is no right to rely on it, and it is not false when made. *See Jankovich v. Bowen*, 844 F. Supp. 743, 747 (S.D. Fla. 1994) (Florida law); *see also Brod v. Jernigan*, 188 So. 2d 575, 579 (Fla. Dist. Ct. App. 1966) ("[a] promise to do something in the future, even if made as a representation to induce the other person to enter into a contract, does not amount to fraud

-16-

in the legal sense"). Moreover, a representation cannot be considered "material" to an agreement unless it is included in the actual contract. *See Saunders Leasing Sys., Inc. v. Gulf Cent. Distrib.*, 513 So. 2d 1303, 1306-07 (Fla. Dist. Ct. App. 1987) (rejecting fraud claims as "contrary to the obvious fact that if [alleged misrepresentations] were so material to [plaintiff's] bargain, [those terms] would or should have been included in the contract").

Thus, courts routinely reject fraud claims based on alleged misrepresentations that (a) concern future events or (b) are not addressed in the writing between the parties. For instance, in *Jankovich*, the counterclaimants asserted that a false representation about the registration of stock fraudulently induced them to enter into a stock share transfer agreement. *See Jankovich*, 844 F. Supp. at 747. But this Court found as a matter of law that the counterdefendant's assurances were merely promises of <u>future</u> action that were not actionable because the actual agreement, which contained a merger clause, was <u>silent</u> as to the claimed misrepresentations. *See id.* Likewise here, Pentalpha claims that it was fraudulently induced to enter the Product Supply Agreement based on alleged promises of future sales or upon supposed representations as to which the integrated contract is silent.[9] (*See* Countercl. ¶¶ 35-61, 66-69.)

As to the first prong on Pentalpha's fraud claim – general statements in press releases and public filings – there is nothing in the Product Supply Agreement that in any way relates to Sunbeam's general financial condition. As in *Jankovich*, the silence of the Agreement as to that issue, as well as the inclusion of the merger clause, prohibit any fraud claim.

As to the second prong – Sunbeam's projected sales greater than $70 million of products listed on Schedule A to the Agreement – these projections amount to nothing more than non-

------

[9] The Product Supply Agreement's merger clause states (Ex. 3 ¶ 8):

This Agreement embodies the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings between the parties with respect to the subject matter hereof . . . .

-17-

actionable, forward-looking statements as a matter of law. Indeed, Pentalpha's own officers acknowledged that they understood the projections to be just that. (Ex. 16 at 21:2-12, Eyal Lior stating that his impression of the documents was that they represented what Sunbeam had bought in the past; Ex. 13 at 68:8-10, John Sham referring to documents as "forecasts"; Ex. 17 at 94:5-97:19, George Timchal calling these documents "purchase projections" and "forecasts.") Moreover, not only were these documents not included in the final contract, but the Agreement never required Sunbeam to purchase a single unit from Pentalpha. (Exs. 2 and 3, at ¶ 2, stating "this Agreement is not a guarantee by Sunbeam to purchase any specific quantity of products at any time.") It is unreasonable to suggest that, absent being included in the written contract, Sunbeam's financial condition and accounting structure were "material" facts that provoked Pentalpha to sign the Agreement. *Jankovich* and other Florida cases instruct that Pentalpha cannot base a fraudulent inducement claim on mere promises of future sales. *See, e.g., Brod*, 188 So. 2d at 579 ("[a] promise to do something in the future, even if made as a representation to induce the other person to enter into a contract, does not amount to fraud in the legal sense"); *Sleight v. Sun & Surf Realty, Inc.*, 410 So. 2d 998, 999 (Fla. Dist. Ct. App. 1982) ("[a] false statement amounting to a promise to do something in the future is not actionable fraud"); *Maunsell v. American General Life & Accident Ins. Co.*, 707 So. 2d 916, 917 (Fla. Dist. Ct. App. 1998) (holding that because defendant's future promises were not actionable as fraud, there was no action for fraudulent inducement).

### 2.     Pentalpha's Reliance Was Neither Justified Nor Reasonable.

To commit a fraud, the representor must intend that the misrepresentation induce another to act on it. *See Johnson*, 480 So. 2d at 627. It is settled in Florida that the claimant's reliance must be "justifiable." *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1315 (11th Cir. 1998) (Florida law); *see also Jankovich*, 844 F. Supp. at 748 (rejecting

claimant's fraudulent inducement claim as a matter of law because reliance on representations not included in the written contract was not "reasonable"). Pentalpha claims that it suffered injury for relying on sales forecasts and public financial statements. (*See* Countercl. ¶¶ 35-61, 66-69.) Even if Pentalpha could establish that Sunbeam made a false statement concerning a material fact, Pentalpha's action for fraudulent inducement still must fail because Pentalpha lacks evidence to prove the reasonableness of its alleged reliance.

Florida law firmly asserts that "reliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement." *Eclipse Med., Inc. v. American Hydro-Surgical Instruments, Inc.*, 96-8532-CIV-RYSKAMP, 1999 U.S. Dist. LEXIS 22434, at *14 (S.D. Fla. Jan. 20, 1999) (Florida law). A claim for fraudulent inducement fails where the subsequent contract simply says nothing about the allegedly false promise. *See id.*; *see also Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996) (under Florida law, rejecting fraud claims "where the representations are not contained in the subsequent written agreement between the parties"); *Schubot v. McDonald's Corp.*, 757 F. Supp. 1351, 1356 (S.D. Fla. 1990) ("[a]ny reliance on the defendants' alleged misrepresentations is unreasonable because the statements were not contained in the subsequent written agreement"). Similarly, the Product Supply Agreement between Sunbeam and Pentalpha is silent regarding any of the alleged fraudulent representations, and Pentalpha was not justified in relying on them.

A case directly on point is *Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290 (11th Cir. 1998). Johnson Enterprises entered into a multi-year contract with FPL, a cable television firm, to install FPL's new cable lines. The contract provided that for the term of the contract, Johnson Enterprises would have the right of first refusal for all work assignments. As the parties were negotiating its contract, Johnson Enterprises asked FPL how much work it

could expect in the subsequent two years.  FPL pointed to its operating budget for the coming year, which called for the installation of 1255 miles of cable in 14 projects.  FPL stated, "how's that for a guarantee?" and said that the following year would be as good or better.  Johnson Enterprises alleged that it would not have entered into the contract but for those representations concerning expected cable mileage.  However, those representations never made their way into the fully integrated contract.  *Id.* at 1298-99.  When the arrangement went awry and Johnson Enterprises claimed fraud, the court found the absence of those provisions dispositive under Florida law.  In rejecting the fraud claim as a matter of law, the court noted that "it was unreasonable for [Johnson Enterprises] to rely on an alleged oral mileage guarantee that it chose not to reduce to writing."  *Id.* at 1315.  In light of that incontrovertible fact and in light of the integration clause, the court found the cable mileage misrepresentations insufficient as a matter of law to constitute fraud in the inducement.  *Id.*

Similarly, Pentalpha contends that it would not have entered into the Product Supply Agreement if not for Sunbeam's alleged fraudulent disclosures.  In light of *Johnson Enterprises*, however, Pentalpha's claim must fail as a matter of law because the subject of the purported fraud was not included in the contract.  It is neither reasonable nor justifiable for Pentalpha to rely on assertions that were not contained within the final writing.  Johnson Enterprises had a stronger case than does Pentalpha.  No "guarantee" was given to Pentalpha; indeed, Pentalpha expressly acknowledged that it was not getting any guarantees.  (Exs. 2 and 3, at ¶ 2.)  Johnson Enterprises had a stronger case, but it had no case – neither does Pentalpha.

Pentalpha's claimed reliance on Sunbeam's alleged misrepresentations also is unreasonable because PSA 1 was negotiated and executed some three months <u>prior</u> to the public

-20-

release of the financial data in question.[10]   Specifically, the initial Agreement binding Pentalpha and Sunbeam was dated June 27, 1997.  (Ex. 2.)   The facts prove that in June, 1997, former President of Pentalpha, U.S., Eyal Lior, acting with authority to bind Pentalpha into an exclusive supply contract with Sunbeam, initially negotiated and executed the Agreement and the $1 million rebate.  (Ex. 16, Lior Dep. at 13:9-20:3; Ex. 2.)   Further, a portion of the $1 million payment was paid to Sunbeam prior to the execution of PSA 2.  (Ex. 18, Nugent Dep. at 136:6-23.)   However, Sunbeam's press releases and public financial filings in issue were not received by Pentalpha until on or after October 22, 1997.  (Ex. 13, Sham Dep. at 174:12-176:17; 183:8-185:18.)   It is implausible to argue that statements made *after* the execution of PSA 1 could have induced Pentalpha into the relationship.

### 3.   Sunbeam's Alleged Misrepresentations Were Not The Proximate Or Direct Cause Of Pentalpha's Injury.

A fraud claimant must prove that misrepresentations caused it injury.  *See Johnson*, 480 So. 2d at 627.  To do that, the plaintiff must establish that the untruth is directly responsible for the loss; it is not enough to simply prove reliance on a material misrepresentation.  *See Anderson v. Transglobe Energy Corp.*, 35 F. Supp. 2d 1363, 1369 (M.D. Fla. 1999).  Pentalpha cannot point to evidence to satisfy that burden of proving causation.

In *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441, 1443 (11th Cir. 1997), the court reversed the trial court's finding that the plaintiffs offered sufficient proof of causation to satisfy their fraud claim against accountants.  Plaintiffs were able to show that the accountants misrepresented financial statements of their client, Koger Properties ("KPI"), and as a result KPI's stock price became artificially inflated.  *See id.* at 1444-45.  The plaintiff investors sued the

---

[10] On June 27, 1997, Sunbeam and Pentalpha entered into the Product Supply Agreement, PSA 1. (Ex. 2.) On or about October 23, 1997, the two parties entered into another version of the Product Supply Agreement, PSA 2, which is substantively identical except for the fact that the contracting Pentalpha entity is different. (Ex. 3.)

accountants claiming injury based upon these representation. *See id.* In rejecting their claim, the appellate court held that this showing was not enough to satisfy the causation requirement. *See id.* at 1448. The court found that there was no evidence that the inflated stock price ever caused plaintiffs a loss. *See id.*

Similarly, Pentalpha has not and cannot prove that any of Sunbeam's alleged misrepresentations caused its harm. Pentalpha claims that it was injured because Sunbeam did not order as many products as Pentalpha was led to believe it could expect. But Pentalpha has not, and cannot show that its reduced sales were caused by the alleged falsity of Sunbeam's financial statements, or alleged promises or accounting practices. Pentalpha lost sales because it breached the Agreement. But most important, while the financial frauds complained of by Pentalpha may have affected Sunbeam's stock price and may have played a role in Sunbeam's need to seek chapter 11 reorganization, *there is no showing – as there could not be – that Sunbeam failed to continue to order and sell products.* From 1998 through 2000, Sunbeam's total domestic household manufacturing purchases remain relatively steady. (Ex. 19.) The Product Supply Agreement was not an agreement for credit, financing, or any other arrangement where Sunbeam's financial health would have been a central issue; rather, it was a contract to buy goods. Eyal Lior even testified that Sunbeam's financial situation was not a concern to Pentalpha because the Agreement was not an agreement to give credit. (Ex. 16, Lior Dep. at 140:16-141:10.) Lior further states that Pentalpha's concern was solely to sell appliances. (*See id.*) If Pentalpha had not breached the Agreement, Sunbeam would have purchased goods from it. Pentalpha cannot argue that any of Sunbeam's alleged misrepresentations were the proximate and direct cause of any injury.

-22-

**C.      Pentalpha's Fraud In The Performance Claim Is Barred By The Economic Loss Doctrine.**

Pentalpha's final claim alleges that Sunbeam misrepresented its intentions under the Product Supply Agreement because Sunbeam knew it did not intend to abide by the terms of the Agreement (Count III). (*See, e.g.,* Countercl. ¶¶ 70-71, 74.) Even assuming this allegation were true, the facts surrounding it are too interwoven with the breach of contract claim to state a claim for fraud. Florida law firmly holds that the economic loss doctrine precludes fraud recovery if the claim relates to fraud in the performance of a contract. *Dantzler Lumber & Export Co. v. Bullington Lumber Co.,* 968 F. Supp. 1543, 1545 (M.D. Fla. 1997) (Florida law); *see also Allen v. The Stephan Co.,* 784 So. 2d 456, 457 (Fla. Dist. Ct. App. 2000) ("[w]here the fraud complained of related to the performance of the contract, the economic loss doctrine will limit the parties to their contractual remedies").

The economic loss doctrine precludes recovery in tort for economic losses incurred pursuant to the terms of a contract where there is no property damage or personal injury. *See Florida Power and Light Co. v. Westinghouse Electric Corp.,* 510 So. 2d 899, 900 (Fla. 1987). Florida courts apply the economic loss rule to prevent tort recovery "when damages flow from a breach of contract unless the tort is independent of the breach of contract." *Dantzler Lumber,* 968 F. Supp. at 1545. In other words, an independent tort claim, such as a fraud claim, will be barred if the facts surrounding the tort claim are "interwoven and indistinct" from those surrounding the breach of contract claim. *See Hotels of Key Largo, Inc. v. RHI Hotels, Inc.,* 694 So. 2d 74, 78 (Fla. Dist. Ct. App. 1997); *see also HTP, LTD. v. Lineas Aereas Costarricenses, S.A.,* 685 So. 2d 1238, 1239 (Fla. 1996) ("[a]n independent tort 'requires proof of facts separate and distinct from the breach of contract'"). Courts have generally found that fraudulent inducement is the <u>only</u> kind of fraud claim not barred by the economic loss doctrine. *See Dantzler Lumber,* 968 F. Supp. at 1546 (emphasis added).

-23-

Courts continually reject efforts to plead fraud where the misrepresentations are intertwined with, and not wholly independent of, allegations of performance or breach of a contract. In *Dantzler Lumber*, the plaintiff, a lumber distributor, brought both a fraud and a breach of contract claim against the defendant, a lumber mill, for shipping non-conforming lumber. *See id.* at 1544. The plaintiff alleged that the defendant shipped the lumber in "strawberry packs," a manner where non-conforming lumber is hidden so that only disassembly would reveal the non-conforming material. *See id.* Assuming that the allegations were true, the court still affirmed the preclusion of the fraud claim because it found that the intentional act of "strawberry packing" was "interwoven" with the facts surrounding the breach of contract claim. *See id.* at 1547.

Here, Pentalpha repeatedly asserts that Sunbeam committed fraud by falsely promising to perform under the Product Supply Agreement. For example, Pentalpha alleges that Sunbeam falsely represented that it would purchase all of its requirements for each product list exclusively from Pentalpha, and that Sunbeam gave Pentalpha "the false impression that Pentalpha remained the exclusive supplier to Sunbeam of those products." (*See* Countercl. ¶ 71.) Additionally, the counterclaim maintains that Sunbeam "fraudulently omitted to inform Pentalpha that Sunbeam was purchasing products listed in Schedule A of the Agreement from sources other than Pentalpha," and that "Sunbeam had actual knowledge that these omissions would be misleading to Pentalpha." (*See id.* ¶ 70.) However, these fraud allegations, among the others made within Count III, relate directly to Sunbeam's performance under the Product Supply Agreement. Even if true, similar to *Dantzler Lumber*, these contentions are not a separate and independent tort, but merely a breach of contract claim; all of the alleged misrepresentations relate to Sunbeam's supposed intentions and ability to fulfill its end of the Product Supply Agreement.

-24-

Despite these clear legal rules, Pentalpha contends it may proceed with its fraud in the performance claim not because of any independent tortious acts, but because Sunbeam had superior information. This position lacks merit. Here, where the alleged misrepresentations all relate to Sunbeam's supposed intentions and ability to fulfill its end of the Product Supply Agreement, Sunbeam's superior knowledge, which Pentalpha cannot expressly prove, is irrelevant. The claims fail because they are intertwined with the contractual arrangement.

Pentalpha also asserts no facts proving that the damages it incurred are separate and distinct from the damages caused by Sunbeam's supposed breach. Aside from the conclusory assertion that Pentalpha was damaged in respects distinct from its breach damages, Pentalpha argues only that the stock of its parent, Global-Tech, declined after Sunbeam was accused of accounting improprieties. (*See* Countercl. ¶ 75.) While Sunbeam maintains that Pentalpha and Global-Tech are alter-egos, Pentalpha had denied that allegation and certainly does not plead alter ego status itself. (*See* Countercl. ¶ 3.) Accordingly, it cannot take advantage of the drop in Global-Tech's stock price. Moreover, any other possible damages – i.e., that Pentalpha continued spending money retooling its China factory as a result of Sunbeam's repeated assurances of performance – are expressly pled as contract damages. (*See* Countercl. ¶¶ 15,30) (incorporating in contract count allegation that Pentalpha "spent substantial amounts of money to expand its manufacturing facilities to meet its anticipated obligations to Sunbeam under the Agreement.") Count III is barred by the economic loss doctrine.

## Conclusion

WHEREFORE, Third-Party Plaintiffs/Counterdefendants, Sunbeam Corporation and Sunbeam Products, Inc. respectfully request that this Court: (1) enter an Order pursuant to Federal Rule of Civil Procedure 56 in favor of Sunbeam and against Pentalpha on Sunbeam's indemnification claim in the amount of $3,746,728.00; and (2) enter an Order pursuant to Federal Rule of Civil Procedure 56 granting summary judgment in favor of Sunbeam and against Pentalpha on each of the claims in Pentalpha's Counterclaim.

Respectfully submitted,

Dated: July / 2002

SUNBEAM CORPORATION and
SUNBEAM PRODUCTS, INC.

By: _____
    Mark F. Bideau (Florida Bar No. 564044)
    GREENBERG TRAURIG, P.A.
    777 South Flagler Drive; Suite 300 East
    West Palm Beach, FL 33401
    (561) 650-7900

Robert L. Byman (admitted *pro hac vice*)
Clark C. Johnson (admitted *pro hac vice*)
Bradley I. Schecter (admitted *pro hac vice*)
JENNER & BLOCK, LLC
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
*Of Counsel*

Attorneys for SUNBEAM CORPORATION and
SUNBEAM PRODUCTS, INC.

-26-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been by U.S. Mail

to William Dunnegan, Esq., Perkins & Dunnegan, 720 Fifth Avenue, New York, NY 10019 and

David M. Kohane, Esq., Cole, Schotz, Meisel, Forman & Leonard, 25 Main Street, Hackensack,

NJ 07602-0800, this __/_ day of July, 2002.

Respectfully submitted,


JENNER & BLOCK, LLC
Robert L. Byman
Clark C. Johnson
Bradley I. Schecter
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350

GREENBERG TRAURIG, P.A.
777 South Flagler Drive - Suite 300E
West Palm Beach, FL 33401
Telephone: (561) 650-7900
Facsimile:  (561) 655-6222

By: _____
     Mark F. Bideau
     Florida Bar No. 564044
     Lorie M. Gleim
     Florida Bar No. 0069231

*Attorneys for SUNBEAM CORPORATION
and SUNBEAM PRODUCTS, INC.*