# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.02-80527-CIV (Judge Ryskamp)

|  |  |
|---|---|
| SEB S.A., | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SUNBEAM CORP.  SUNBEAM PRODUCTS, INC., WING SHING INT'L LTD.  (BVI), and PENTALPHA ENTERS., LTD., | ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| SUNBEAM CORP., SUNBEAM PRODUCTS, INC., | ) ) |
| | ) |
| Third-Party Plaintiffs/Counterdefendants, | ) ) |
| | ) |
| v. | ) |
| | ) |
| WING SHING INT'L, LTD.  (BVI), and GLOBAL-TECH APPLIANCES, INC., Third-Party Defendants, and | ) ) ) |
| | ) |
| PENTALPHA ENTERS., LTD., | ) |
| | ) |
| Third-Party Defendant/Counterclaimant. | ) |

## APPENDIX TO SUNBEAM'S CONSOLIDATED MOTION FOR SUMMARY JUDGMENT

1.   **EXHIBIT 1** attached hereto is a true and correct copy of the April 1998 Prospectus for Global-Tech Appliances, Inc., produced in this litigation.

2.   **EXHIBIT 2** attached hereto is a true and correct copy of the June 27, 1997 Product Supply Agreement ("PSA 1") between Sunbeam and Pentalpha, produced in this litigation.

3.   **EXHIBIT 3** attached hereto is a true and correct copy of the October 23, 1997 Product Supply Agreement ("PSA 2") between Sunbeam and Pentalpha, produced in this litigation.

4.   **EXHIBIT 4** attached hereto is a table listing all of the models included in Schedule A of the Product Supply Agreement. The table first details whether or not Sunbeam purchased the model from a supplier other than Pentalpha. It also explains if Pentalpha submitted a lower bid than other potential suppliers of the model and whether Pentalpha ever submitted to Sunbeam a suitable project plan. Finally, the table lists where authority for each statement made by the table is found in the record.

5.   **EXHIBIT 5** attached hereto is a true and correct copy of the relevant portions cited within the summary judgment memorandum and the statement of facts of the Deposition Transcript of Peter C.M. Howell.

6.   **EXHIBIT 6** attached hereto is a true and correct copy of Global-Tech's 1998 Annual Report produced in this litigation.

7.   **EXHIBIT 7** attached hereto is a true and correct copy of Global-Tech's 1999 Annual Report produced in this litigation.

8.   **EXHIBIT 8** attached hereto is a true and correct copy of Sunbeam's verified answers to Pentalpha's second set of interrogatories.

9.   **EXHIBIT 9** attached hereto is a true and correct copy of a food steamer agreement between Sunbeam and Wing Shing, a Global-Tech predecessor, produced in this litigation.

10.  **EXHIBIT 10** attached hereto is a group exhibit of sample Sunbeam purchase orders for the deep fryers at issue in this litigation. The front side of the purchase orders refers to terms and conditions on the reverse side; the reverse side of some orders is provided, but all such purchase order forms contain materially the same terms as are provided on the sample reverse sides. Sunbeam has not retained copies of all of its purchase orders with the reverse side of those purchase orders included.

11.  **EXHIBIT 11** attached hereto is a true and correct copy of Sunbeam's verified answers to Pentalpha's first set of interrogatories.

12.   **EXHIBIT 12** attached hereto is a true and correct copy of the affidavit of Steven P. Berreth.

13.   **EXHIBIT 13** attached hereto is a true and correct copy of the relevant portions cited within the summary judgment memorandum and the statement of facts of the Deposition Transcript of John Sham.

14.   **EXHIBIT 14** attached hereto is a true and correct copy of a complaint for patent infringement filed by The Rival Company against Sunbeam.

15.   **EXHIBIT 15** attached hereto is a true and correct copy of a complaint for patent infringement filed by Black & Decker, Inc. against Sunbeam.

16.   **EXHIBIT 16** attached hereto is a true and correct copy of the relevant portions cited within the summary judgment memorandum and the statement of facts of the Deposition Transcript of Eyal Lior.

17.   **EXHIBIT 17** attached hereto is a true and correct copy of the relevant portions cited within the summary judgment memorandum and the statement of facts of the Deposition Transcript of George Timchal.

18.   **EXHIBIT 18** attached hereto is a true and correct copy of the relevant portions cited within the summary judgment memorandum and the statement of facts of the Deposition Transcript of James Nugent.

19.   **EXHIBIT 19** attached hereto is a true and correct copy of the affidavit of Alan W. LeFevre.

20.   **EXHIBIT 20** attached hereto is a true and correct copy of the Order entered on May 23, 2002 by the United States District Court for the District of New Jersey in this litigation.

21.   **EXHIBIT 21** attached hereto is a true and correct copy of a docket sheet in the Black & Decker litigation referenced in Exhibit 15.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing has been by U.S. Mail

to William Dunnegan, Esq., Perkins & Dunnegan, 720 Fifth Avenue, New York, NY 10019 and

David M. Kohane, Esq., Cole, Schotz, Meisel, Forman & Leonard, 25 Main Street, Hackensack,

NJ 07602-0800, this _____ day of July, 2002.

Respectfully submitted,

JENNER & BLOCK, LLC
Robert L. Byman
Clark C. Johnson
Bradley I. Schecter
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350

GREENBERG TRAURIG, P.A.
777 South Flagler Drive - Suite 300E
West Palm Beach, FL 33401
Telephone:  (561) 650-7900
Facsimile:   (561) 655-6222

By: _____

Mark F. Bideau
Florida Bar No. 564044
Lorie M. Gleim
Florida Bar No. 0069231

*Attorneys for SUNBEAM CORPORATION
and SUNBEAM PRODUCTS, INC.*

**4,200,000 Shares**



## Common Shares

All the ordinary shares, par value $0.01 per share (the "Shares"), offered hereby are being issued and sold by Global-Tech Appliances Inc. (the "Company"). Prior to this offering, there has been no public market for the ordinary shares (the "Common Stock") of the Company. See "Underwriting" for a discussion of the factors considered in determining the initial public offering price. The Common Stock has been authorized for listing on The New York Stock Exchange under the symbol "GAI."

**See "Risk Factors" beginning on page 7 for a discussion of certain factors that should be considered by prospective purchasers of the Shares offered hereby.**

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PROSPECTUS. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

|  | Price to Public | Underwriting Discounts and Commissions(1) | Proceeds to Company(2) |
|---|---|---|---|
| Per Share | $19.00 | $1.33 | $17.67 |
| Total(3) | $79.800,000 | $5.586,000 | $74.214,000 |

(1) See "Underwriting" for information concerning indemnification of the Underwriters and other matters.

(2) Before deducting expenses of the offering payable by the Company, estimated at $1,900,000.

(3) The Company has granted the Underwriters a 30-day option to purchase up to 630,000 additional Shares solely to cover over-allotments, if any. If the Underwriters exercise this option in full, the total Price to Public, Underwriting Discounts and Commissions and Proceeds to Company will be $91,770,000, $6,423,900 and $85,346,100, respectively. See "Underwriting."

The Shares are offered by the Underwriters, subject to prior sale, when, as and if delivered to and accepted by them and subject to approval of certain legal matters by counsel for the Underwriters and certain other conditions. The Underwriters reserve the right to reject any order in whole or in part. It is expected that delivery of the Shares will be made against payment therefor at the offices of Furman Selz LLC in New York, New York, on or about April 14, 1998.

**Furman Selz**                                    **CIBC Oppenheimer**

The date of this Prospectus is April 8, 1998.

P 000517

# GLOBAL-TECH
## APPLIANCES INC.



CERTAIN PERSONS PARTICIPATING IN THE OFFERING MAY ENGAGE IN TRANSACTIONS THAT STABILIZE, MAINTAIN OR OTHERWISE AFFECT THE PRICE OF THE COMMON STOCK, INCLUDING PURCHASES OF THE COMMON STOCK TO STABILIZE ITS MARKET PRICE, PURCHASES OF THE COMMON STOCK TO COVER SOME OR ALL OF A SHORT POSITION IN THE COMMON STOCK MAINTAINED BY THE UNDERWRITERS AND THE IMPOSITION OF PENALTY BIDS. FOR A DESCRIPTION OF THESE ACTIVITIES, SEE "UNDERWRITING."

P000018

## PROSPECTUS SUMMARY

*This summary is qualified in its entirety by the more detailed information and consolidated financial statements and notes thereto appearing elsewhere in this Prospectus. Unless otherwise indicated, all information in this Prospectus (i) gives effect to the stock split of the Common Stock and stock dividend described in Note 1 of Notes to Consolidated Financial Statements, and (ii) assumes no exercise of the Underwriters' over-allotment option. References throughout this Prospectus to a fiscal year refer to the Company's fiscal year ended on March 31 of that calendar year, for example, "fiscal 1997" refers to the fiscal year ended March 31, 1997, and (iii) an interim period refer to the first nine months of the Company's fiscal year ended on December 31 of that fiscal year, for example, "1998 interim period" refers to the nine month period ended December 31, 1997.*

### The Company

Global-Tech Appliances Inc. is a designer and manufacturer of a wide range of small household appliances. The Company's products, all of which are manufactured in China, are sold under brand names such as Sunbeam, Oster, Mr. Coffee, Vidal Sassoon, Revlon, Hamilton Beach, Proctor-Silex, Moulinex, Krups and Welbilt. The Company manufactures over 160 different models, primarily in four product categories: (i) kitchen appliances such as breadmakers and coffeemakers; (ii) personal, beauty and health care products such as hair dryers and curling irons; (iii) travel products and accessories such as irons and hair setters; and (iv) garment care products such as steam and dry irons. The Company's net sales grew to $62.7 million in fiscal 1997, as compared to net sales of $31.5 million and $44.1 million in fiscal 1995 and 1996, respectively. Net sales for the nine months ended December 31, 1997 were $96.2 million.

The Company has achieved this growth by emphasizing original design manufacturing rather than contract manufacturing. As an original design manufacturer ("ODM"), the Company designs and develops proprietary new products which it manufactures for well-known household appliance companies for sale under their brand names. As a result of the Company's innovative product designs and high quality, low-cost manufacturing capabilities, in July 1997 the Company entered into a four-year agreement with Sunbeam Products, Inc., a subsidiary of Sunbeam Corporation ("Sunbeam"), to be its sole outside supplier of certain models of breadmakers, air cleaners, coffeemakers, irons, rotisseries, toaster ovens, food steamers, rice cookers, deep fryers and other products. Net sales of the Company's ODM products represented 39.5%, 58.1%, 73.6% and 80.0% of the Company's net sales during fiscal 1995, 1996, 1997 and the 1998 interim period, respectively. The balance of the Company's net sales are from contract manufacturing performed according to product specifications provided by customers.

During fiscal 1997, U.S. and European sales of the Company's products accounted for 75.1% and 23.2%, respectively, of the Company's net sales. Total retail sales of small household appliances in the U.S. during 1996 were approximately $5.3 billion. Small household appliances are sold through a variety of distribution channels including mass merchandisers, specialty retailers, warehouse clubs, drug store chains, direct marketing organizations and department stores. In the U.S., mass merchandisers, such as Wal-Mart, Kmart and Target, have become the dominant retailers of small household appliances. The Company believes a similar trend has emerged in Western Europe. Generally, mass merchandisers prefer to purchase from a limited number of well-known household appliance companies that provide a variety of high quality, innovative, brand-name products on a timely and cost-effective basis. Accordingly, household appliance companies are focusing on their primary strengths of marketing and distribution while increasingly outsourcing product development and manufacturing.

P000119

## Business Strategy

The Company's business strategy is to achieve growth, market share gains and increased profitability by helping its customers meet the stringent requirements of mass merchandisers and major retailers. The key elements of the Company's business strategy are:

*Innovative Product Development.* As an ODM, the Company regularly develops new products which may range from minor design changes in existing products to significant new functions or features. In creating new products, the Company concentrates on the development of concepts, functions and features which are not offered by existing products and which can be produced at a reasonable cost. The Company seeks to reinforce the proprietary nature of its new products by obtaining patent protection when possible and retaining ownership of the tooling required to manufacture its ODM products. The Company believes the flexibility of its design and manufacturing process allows it to introduce new products with shorter development cycles than its customers.

*Vertically Integrated, Low Cost Manufacturing.* The Company operates two vertically integrated manufacturing facilities in China. The Company has made a significant investment, and continues to invest, in sophisticated machinery for creating the tooling and components used in the manufacturing process. This machinery, along with the use of inexpensive labor, enables the Company to efficiently produce many of its components and to assemble these components to create finished products. By locating its manufacturing facilities in close proximity to Hong Kong, the Company is also able to leverage both the transportation resources and engineering and managerial expertise available in Hong Kong. The Company believes that its investment in manufacturing machinery combined with the strategic use of labor and management resources allows it to provide customers with high quality, low cost products in an efficient and timely manner.

*Commitment to Quality.* The Company is committed to manufacturing products of the highest quality and achieves this goal by engaging in quality control testing at each stage of the manufacturing process. The Company is able to assure the reliability and consistent performance of its products by testing components on both a stand-alone and assembled basis. After the assembly stage, the Company tests each finished product.

*Wide Variety of Products.* The Company believes its variety of product offerings enables its customers to offer mass merchandisers and other retailers a single source for a wide range of household appliances. The Company has continually increased the number of its product offerings and intends to continue to introduce at least twenty new products each year. During the current fiscal year, the Company has introduced new models of breadmakers, coffeemakers, food steamers, deep fryers, hair dryers, rice cookers, travel irons and toaster ovens. The Company expects to ship floor care products beginning in the first quarter of fiscal 1999 when it introduces its hand-held steam vacuum cleaner. Additional products in each of the four major product categories are currently under development.

· *Focus on Sales to Brand Name Customers.* The Company's ability and commitment to develop new and innovative, high quality products at low cost has allowed the Company to benefit from the increased outsourcing of product development and manufacturing by its customers. The Company intends to enter into exclusive supply agreements for certain household appliance products. Effective July 1, 1997, the Company entered into a four-year agreement with Sunbeam to be its sole outside supplier of certain products. See "Business—Supply Agreement with Sunbeam."

*Pursue Selected Acquisitions.* The Company believes that the continuing trend among retailers to consolidate their vendors, including suppliers of small household appliances, will provide the Company with acquisition opportunities. The Company intends to pursue selected acquisitions of complementary businesses. The Company does not have any current or pending arrangements, understandings, negotiations or agreements with respect to any potential acquisitions.

4

The Company's executive and administrative offices are located in the Kin Teck Industrial Building, 12 F, 26 Wong Chuk Hang Road, Aberdeen, Hong Kong. Its telephone number is (852) 2814-0601, and its e-mail address is "welcome@pentalpha.com.hk." The Company was organized on May 2, 1994 under the laws of the British Virgin Islands.

In this Prospectus, unless the context otherwise requires, all references to the "Company" are to Global-Tech Appliances Inc., a British Virgin Islands corporation, and its consolidated subsidiaries, Wing Shing Products (BVI) Company Limited and Wing Shing Overseas Limited, each a British Virgin Islands corporation, Pentalpha Enterprises Limited and Kwong Lee Shun Trading Company Limited, each a Hong Kong corporation, Dongguan Wing Shing Electrical Products Factory Company Limited, a corporation formed under the laws of the People's Republic of China, and Global-Tech U.S.A. Inc., a Delaware corporation. All references to "China" refer to the People's Republic of China and all references to "Hong Kong" refer to the Hong Kong Special Administrative Region of China.

The Company's financial statements are prepared in U.S. dollars (see Note 3(e) of Notes to Consolidated Financial Statements) and in accordance with generally accepted accounting principles in the United States ("U.S. GAAP"). All references to "dollars" or "$" in this Prospectus are to U.S. dollars and references to "HK$" are to Hong Kong dollars.

### The Offering

| | |
|---|---|
| Common Stock offered by the Company . . . . . . . . . . . . | 4,200,000 shares |
| Common Stock to be outstanding after the offering . . . . | 12,200,000 shares(1) |
| Use of proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . | To expand the Company's primary manufacturing facility, including the purchase of capital equipment, repay certain outstanding indebtedness, and for working capital and other corporate purposes, including acquisitions. See "Use of Proceeds." |
| New York Stock Exchange Symbol . . . . . . . . . . . . . . . . | "GAI" |

(1) Excludes 1,600,000 shares that have been reserved for issuance under the Company's 1997 Stock Option Plan, of which options have been granted to purchase (a) 322,000 shares with an exercise price of $14.50 per share and (b) 283,800 shares with an exercise price equal to the initial public offering price of the Shares offered hereby. See "Management—1997 Stock Option Plan."

### Risk Factors

An investment in the Common Stock is subject to certain risks, including those relating to substantially all of the Company's assets being located in China, risks of doing business in China, the Company's ability to manage growth, dependence on major customers, in particular Sunbeam, sales of breadmakers and the other risks set forth under the heading "Risk Factors."

---

*This Prospectus contains forward-looking statements. Reference is made in particular to the description of the Company's plans and objectives for future operations, assumptions underlying such plans and objectives and other forward-looking statements included in "Prospectus Summary," "Use of Proceeds," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business" in this Prospectus. Such statements are based on management's current expectations and are subject to a number of factors and uncertainties which could cause actual results to differ materially from those described in the forward-looking statements. Factors which could cause such results to differ materially from those described in the forward-looking statements include those set forth in "Risk Factors."*

P 000121

**Summary Consolidated Financial Data**

(in thousands, except per share data)

| | Fiscal Years Ended March 31, | | | | | Nine Months Ended December 31, | |
|---|---|---|---|---|---|---|---|
| | 1993(1) | 1994(1) | 1995 | 1996 | 1997 | 1996 | 1997 |
| | | | | | | (unaudited) | |
| **Statement of Income Data:** | | | | | | | |
| Net sales | $24,760 | $27,247 | $31,515 | $44,393 | $62,800 | $44,322 | $49,245 |
| Gross profit | 5,453 | 5,554 | 4,525 | 12,390 | 16,665 | 4,585 | 25,02 |
| Operating income (loss) | n/a | 874 | 2,307 | 5,035 | 6,280.2 | 2,882.2 | 4,502 |
| Interest expense and other income, net | 482 | 4,885 | (296) | (677) | ,773 | 437, | 884 |
| Income tax credit/expense | 377 | 187 | 52 | (186) | 406 | 307 | 1,254 |
| Net income | 5,948 | $3,824 | $2,049 | $4,592 | $(5,111.2) | $3,885.2 | $,472 |
| Net income per share | $0.24 | $0.48 | $0.26 | $0.57 | $0.64 | $0.48 | $,49 |
| Weighted average number of shares outstanding | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |

| | | At December 31, 1997 | |
|---|---|---|---|
| | | Actual | As Adjusted(3) |
| | | | (unaudited) |
| **Balance Sheet Data:** | | | |
| Working capital | | $2,889 | $75,833 |
| Total assets | | 80,432 | 126,746 |
| Total debt | | 14,757 | 2,757 |
| Shareholders' equity | | 28,789 | 100,503 |

(1) Results of operations in fiscal 1993 and 1994 were affected by floods that occurred during each of those fiscal years at the Company's facilities in Shenzhen, China. Interest expense and other income, net includes the damage losses from these floods, including repair costs, fixed assets and inventories, in the amounts of $453,000 and $2,367,000 in fiscal 1993 and 1994, respectively. Net income in fiscal 1993 and 1994 includes gains in the amounts of approximately $636,000 and $5,078,000, respectively, representing insurance proceeds received in compensation for damages and consequential losses in profit caused by these floods.

(2) Includes provisions of $782,000, $644,000 and $511,000 against advances to a former minority shareholder of a subsidiary of the Company and his affiliates in fiscal 1997, the 1997 interim period and the 1998 interim period, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—General" and Note 2 of Notes to Consolidated Financial Statements.

(3) Adjusted to reflect the sale of 4,200,000 Shares offered hereby and the initial application of the estimated net proceeds therefrom to repay certain debt obligations. See "Use of Proceeds."

P000122

# RISK FACTORS

*An investment in the securities offered hereby involves a high degree of risk. Prospective investors should carefully consider the following risk factors prior to making an investment decision.*

## Business Risks Relating to International Operations

*Foreign Sales, Operations and Assets.* Substantially all of the Company's products are currently manufactured in China and over 97% of net book value of the Company's total fixed assets are located in China. The Company is a party to agreements with instrumentalities of the government of China and is a party to agreements with and sells products to entities based principally in North America, Europe and Asia. International operations and sales may be subject to political and economic risks, including political instability, currency controls and exchange rate fluctuations and changes in import/export regulations, inflation, tariff and freight rates. In addition, various forms of protectionist trade legislation have been proposed in the U.S. and certain foreign countries. Changes in tariff structures or other trade policies could adversely affect the Company's customers or suppliers or decrease the cost of products for the Company's competitors. See "Certain Foreign Issuer Considerations."

*Government Regulation.* The Company's operations and assets in China are subject to significant political, economic, legal and other uncertainties. Changes in policies by the Chinese government resulting in changes in laws, regulations, or the interpretation thereof, confiscatory taxation, restrictions on currency conversion, imports and sources of supply, currency devaluations or the expropriation of private enterprise could have a material adverse effect on the Company's business, results of operations and financial condition. Under its current leadership, the Chinese government has been pursuing economic reform policies, including the encouragement of private economic activity and greater economic decentralization. There can be no assurance, however, that the Chinese government will continue to pursue such policies, that such policies will be successful if pursued or that such policies will not be significantly altered from time to time without notice. Economic development may be limited as well by the imposition of austerity measures intended to reduce inflation, the inadequate development of infrastructure and the unavailability of adequate power and water supplies, transportation and raw materials and parts. In the past, however, the Company has encountered no material shortages in power and water supplies, raw materials or parts or any material deficiency in transportation availability. See "Certain Foreign Issuer Considerations."

*Restrictions on Imports.* The Chinese government regulates the import into China of certain raw materials used by the Company in its manufacturing process and taxes the importation of certain capital equipment. The approval of imports by the government is based to some extent on the lack of qualified domestically-produced products and strategic plans for the development of local Chinese industry. There can be no assurance that the government's policies will continue to allow the raw materials required by the Company to be imported into China or will not impose import fees which raise the cost of raw materials or capital equipment. The imposition of such fees could have a material adverse effect on the Company's business, results of operations and financial condition, including plans for the expansion of the Dongguan factory. See "Limitations of Manufacturing Facilities."

*Loss of Most Favored Nation Trading Status.* At present, a significant portion of the economic activity in China is export-driven and, therefore, is affected by developments in the economies of China's principal trading partners. The U.S. Congress considers annually the renewal of China's current "Most Favored Nation" trading status and may attach conditions to the renewal of such status which China may decline or be unable to meet. In 1994, President Clinton announced delinkage of such status to China's achievement of overall significant progress in the area of human rights. Prior to this announcement, renewal of such status had been contingent on the achievement of such progress. There can be no assurance that renewal of such status in the future will not be linked to human rights issues or other requirements or that, notwithstanding continuing Presidential support for such status, Congress for any reason in the future will not deny such status and impose tariffs or trade restrictions. Revocation or conditional extension by the U.S. of China's "Most Favored Nation"

7

P000123

trading status, or the imposition of tariffs or trade restrictions, would have a material adverse effect on the Company's business, results of operations and financial condition. See "Certain Foreign Issuer Considerations—China."

*Increase in Effective Tax Rates.*   The location of the Company's business operations results in an overall effective tax rate that may be less than that of U.S. corporations. The Company is incorporated in the British Virgin Islands and has subsidiaries incorporated in the British Virgin Islands, Hong Kong, China and the U.S. The Company's executive and administrative offices are located in Hong Kong, the Company's manufacturing facilities are located in China and the Company sells its products to customers located primarily in the U.S. and Europe. Changes in tax laws could have a material adverse effect on the Company's results of operations. In addition, the exemption of the Company's subsidiary in China from income taxes in China will expire two years after the subsidiary records profits to the extent the profits are not offset by losses in a prior year, which event has not yet occurred. Losses from operations in China in any year can only be used to offset future income from operations in China for a period of five years. See "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Tax Considerations."

A significant portion of the Company's sales are made to U.S. customers. Any income of the Company held to be effectively connected with a trade or business in the U.S. would be subject to U.S. federal income and branch profits taxes at an aggregate rate of up to 55%. The Company does not believe that its current method of operations would subject it to material U.S. taxes because it should not be considered to have significant income effectively connected with a trade or business in the U.S. However, there can be no assurance that U.S. taxes will not be imposed on an additional portion of the Company's income. The imposition of U.S. income taxes could have a material adverse effect on the Company's results of operations.

*Recent Conditions in Asia.*   During the last few months economic conditions and markets have been unstable throughout Asia. Currencies in several countries have been devalued and there has been political instability in certain countries. To date, neither Hong Kong nor China has devalued its currency or experienced significant instability as a result of these developments. However, there can be no assurance that the economic downturn will not spread to Hong Kong or China. Economic or political instability in Hong Kong or China or a significant devaluation of the currency in either country could have a material adverse effect on the Company's business, results of operations and financial condition.

## Business Risks

*Rapid Expansion; Ability to Manage Growth.*   The Company has recently experienced rapid growth in sales and product offerings which has placed and will continue to place a significant strain on its manufacturing and operational resources. The Company's net sales grew to $96.2 million in the 1998 interim period as compared to $31.5 million in fiscal 1995, $44.1 million in fiscal 1996 and $62.7 million in fiscal 1997. The growth of the Company has been, and will continue to be, dependent upon a number of factors, including the ability of the Company to continue to increase manufacturing capacity to meet product demand and to introduce new products and design innovations on this rapid basis. Any future growth can be expected to place significant additional responsibilities on the Company's management, operations, employees and resources. There can be no assurance the Company will be able to maintain or accelerate its current growth, effectively manage its expanding operations or achieve planned growth on a timely basis. In addition, there can be no assurance that the Company will be able to increase its manufacturing capacity in amounts and at times which will enable the Company to continue to meet the demand of its customers, that it will continue to develop new product ideas or that new products and design innovations will be successfully introduced or received. To the extent the Company is unable to manage its growth efficiently and effectively, there could be a material adverse effect on the Company's business, results of operations and financial condition.

*Dependence on Major Customers.*   Net sales to the Company's five major customers, Sunbeam, Appliance Corporation of America, Helen of Troy Limited, Global Marketing Corp. and Hamilton Beach/Proctor-Silex, accounted for 45.4%, 56.1%, 52.7% and 57.9% of the Company's total net sales during fiscal 1995, 1996, 1997

8

P000124

and the 1998 interim period. respectively. During each of these periods, the following customers accounted for more than 10% of the Company's total net sales: during fiscal 1995: Helen of Troy Limited (20.5%) and Hamilton Beach/Proctor-Silex (20.9%); during fiscal 1996: Sunbeam (16.6%). Helen of Troy Limited (14.7%) and Hamilton Beach/Proctor-Silex (18.7%); during fiscal 1997: Sunbeam (13.3%), Appliance Corporation of America (12.1%) and Helen of Troy Limited (10.8%); and during the 1998 interim period: Sunbeam (39.7%). Although the relative percentage of net sales of each of the Company's major customers changes each year, the Company expects that in the foreseeable future it will be dependent on between four and six major customers during each fiscal year. While the Company may enter into contracts with general terms for the purchase of products with certain of its major customers, sales are generally made by purchase orders received by the Company from time to time. Therefore there can be no assurance of the level of sales by any of these major customers in the future. The loss of any one of its major customers could have a material adverse effect on the Company's business. results of operations and financial condition.

*Increasing Significance of Sunbeam.*   Effective July 1. 1997. the Company entered into a four-year agreement with Sunbeam to be its sole outside supplier of certain products. Prior to the effectiveness of the supply agreement, sales to Sunbeam represented 0%, 16.6% and 13.3% of the Company's net sales during fiscal 1995, 1996 and 1997. respectively. Sales to Sunbeam have increased significantly and represented 39.7% of the Company's net sales in the 1998 interim period. The supply agreement does not require Sunbeam to purchase any minimum quantities nor does it specify prices, which will be subject to negotiation between the Company and Sunbeam. Accordingly, there is no assurance as to the amount or price of products that may be purchased by Sunbeam. In addition, Sunbeam recently announced that it has agreed to purchase Signature Brands USA, Inc. ("Signature Brands") which sells coffeemakers and other products under the Mr. Coffee brand name. Signature Brands is also a customer of the Company and sales to Sunbeam and Signature Brands represented an aggregate of 45.1% of the Company's net sales in the 1998 interim period. The loss of Sunbeam as a customer or the failure of Sunbeam to purchase a significant amount of products under the supply agreement would have a material adverse effect on the Company's business. results of operations and financial condition.

*Consolidation in the Appliance Industry.*   The demand by mass merchants of small household appliances to purchase from suppliers that offer a diversity of products has resulted in a continued consolidation in this industry. Recently, Windmere-Durable Holdings, Inc. acquired 50% of Salton-Maxim Housewares. Inc., Sunbeam announced an agreement to acquire Signature Brands and The Black & Decker Corporation announced that it intends to sell its household products division. Consolidation in the small household appliance industry could reduce the number of customers for the Company's products, which in turn could result in reduced profitability.

*Dependence on Sales of Breadmakers.*   The Company's line of breadmakers, which it introduced in the fall of, 1996, accounted for $12.4 and $36.0 million of the Company's net sales in fiscal 1997 and the 1998 interim period, respectively. Although unit sales of breadmakers in the U.S. have increased steadily over the last few years, the average price per unit has been decreasing during this period. There can be no assurance that sales of breadmakers will continue to increase, that breadmakers will be sold at prices that will be profitable to the Company or that new products developed by competitors will not render the Company's breadmakers obsolete or will not have a material adverse effect on the Company's business. results of operations and financial condition.

*Increases in Cost of Raw Materials.*   The Company is dependent upon outside suppliers for all of its raw material needs, including plastic resins, and is subject to price increases in these raw materials. The plastic resins used by the Company are derived from natural gas liquids. Plastic resin prices may fluctuate as a result of natural gas and crude oil prices and capacity. supply and demand for resin and petrochemical intermediates from which they are produced. The Company has no long-term supply contracts for the purchase of plastic resin. although the Company generally maintains a 90-day supply. In the past, the Company has had limited ability to increase product pricing in response to plastic resin price increases. Any future increases in the price of plastic resins or

9

other raw materials could have a material adverse effect on the Company's business, results of operations and financial condition. There can be no assurance that the Company will be able to purchase necessary quantities of plastic resin and other raw materials at reasonable prices. See "Business—Suppliers."

*New Products and Rapid Technological Change.*   The technology incorporated in many of the Company's products, particularly kitchen appliances, is characterized by rapid change. In addition, the emergence of new technologies can rapidly render existing products obsolete or unmarketable. The Company's ability to anticipate changes in technology and industry standards and successfully develop and introduce new and enhanced products that gain market acceptance will be a critical factor in the Company's ability to grow and remain competitive. There can be no assurance that the Company will timely or successfully complete the development of new or enhanced products or successfully manage the transitions from one product release to the next, or that the Company's future products will achieve market acceptance. The failure to realize such goals could have a material adverse effect on the Company's business, results of operations and financial condition. See "Business —Product Design and Development."

*Proprietary Technology; Patent Protection.*   The Company holds a number of patents registered in various jurisdictions including the U.S., the United Kingdom, Germany and France and holds the exclusive rights with respect to certain technology included in its products. The Company relies primarily upon a combination of trademark, copyright, know-how, trade secrets and contractual restrictions to protect its intellectual property rights. The Company believes that such measures afford only limited protection and, accordingly, there can be no assurance that the steps taken by the Company to protect these proprietary rights will be adequate to prevent misappropriation of the technology or the independent development of similar technology by others. Despite the Company's efforts to protect its proprietary rights, unauthorized parties may attempt to copy aspects of the Company's products or obtain and use information that the Company regards as proprietary.

*Indemnification Liability for Patent Infringement.*   In contracts relating to its ODM products, the Company typically has agreed to indemnify customers for all liabilities, costs, expenses or damages payable by its customers based upon a claim of patent infringement by an ODM product manufactured by the Company, whether such amount is awarded by a court or agreed to in settlement negotiations. One of the Company's customers is currently defending two patent infringement claims pertaining to the Company's food steamers, a product line which represented 13.2% and 12.6% of the Company's net sales in fiscal 1997 and the 1998 interim period, respectively. The Company has provided an indemnity in connection with these legal proceedings and has reserved approximately $641,000 for its litigation costs as of December 31, 1997. The potential liability of the Company in the event of adverse decisions in these proceedings cannot be determined at this time. No assurance can be given that such claims will be resolved in favor of the Company's customer or that other parties will not assert infringement claims against the Company, although no other such claims have been asserted against the Company in the past. The cost of any such indemnity or of responding to any such assertion could be significant, regardless of whether the assertion is valid. An adverse decision against the Company with respect to any significant patent infringement case or indemnity liability could have a material adverse effect on the Company's business, results of operations and financial condition since the Company would not only be required to pay damages but it would also be restricted from pursuing further sales of the product. See "Business— Intellectual Property Rights" and "—Legal Proceedings."

*Product Liability.*   The Company may be subject to substantial products liability costs if claims arise out of problems associated with its products. The Company provides a warranty for limited manufacturing defects to certain of its customers; however, the Company does not provide warranties that extend to the ultimate consumers of the product. Nevertheless, there can be no assurance that the Company will not be subject to a suit by a consumer who uses one of its products should the product cause injury to any person or not perform properly. The Company maintains product liability insurance in an amount that the Company believes sufficient; however, there can be no assurance that the coverage limits of its insurance will be adequate or that all such claims will be covered by insurance. In addition, these policies must be renewed annually. To date, the Company

P 000126

has not been subject to any material product liability claim. While the Company has been able to obtain liability insurance in the past, such insurance varies in cost and may not be available in the future on terms acceptable to the Company, if at all. The failure to maintain insurance coverage or a successful claim against the Company not covered by or in excess of the insurance coverage could have a material adverse effect on the Company's business, results of operations and financial condition. In addition, claims, regardless of their merit or eventual outcome, may have a material adverse effect on the Company's reputation.

*Product Safety; Delays in Regulatory Approval.* The Company's products include several electric components which may cause fires if not properly handled. Although the Company's products have experienced no significant safety problems in the past and the Company believes that its products do not present safety risks, there can be no assurance that safety problems will not occur in the future. Prior to the commercial introduction of the Company's products into the general market, the Company obtains approval of its products by one or more of the organizations engaged in testing product safety, such as Underwriters' Laboratories in the U.S., TUV Rheinland and VDE in Germany, NF in France, BS in the United Kingdom and CSA in Canada. Such approvals require significant time and resources of the Company's technical staff and could delay the introduction of the Company's products. The Company's inability to obtain regulatory approval within the projected timeframe for commercial introduction of its products or other product introduction delays could have a material adverse effect on the Company's business, results of operations and financial condition.

*Risks of Manufacturing in China; Property Damage.* All of the Company's products are manufactured in two factories located in the Guangdong province of China. The Company's products are manufactured primarily at its factory complex located in the County of Dongguan and the remainder of manufacturing takes place at the Company's licensed facility in the County of Shenzhen. In addition to the political and economic risks of operations in China (see "Certain Foreign Issuer Considerations—Operations in China"), firefighting and disaster relief assistance in China is not as sophisticated as in Western countries. The Company currently maintains property damage insurance aggregating approximately $56.3 million covering its inventory, furniture, equipment, machinery and buildings and business interruption insurance in the aggregate of approximately $54.3 million for losses relating to its factory. Material damage to, or the loss of, the Company's facilities due to fire, severe weather, flood or other act of God or cause, even if insured against, would have a material adverse effect on the Company's business, results of operations and financial condition.

*Limitations of Manufacturing Facilities.* The seasonal nature of the Company's business requires that a large amount of products be manufactured during the months of September and October to meet demand for holiday sales. In addition, the Company must increase production from time to time as a result of new product introductions or significant customer orders. During these peak production periods, the Company's primary manufacturing facility in Dongguan operates near maximum capacity. As a result, any further significant growth of the Company's current manufacturing in Dongguan or elsewhere in China could require the Company to outsource production of components. The need to outsource will be directly related to the extent of the growth and the nature of the additional products being manufactured. The Company believes that there is sufficient capacity available from multiple sources to supply components needed for any such increase until completion of the expansion of the Dongguan facility. However, the Company has not entered into contracts with any of these sources. See "Business—Manufacturing." The Company has allocated a portion of the proceeds of this offering to complete the expansion of the Dongguan facility. The expansion is expected to be completed during fiscal 1999; however, there can be no assurance that such expansion will be completed on time or in accordance with the Company's estimate of its cost. In the event such expansion is not completed by the end of fiscal 1999, the Company estimates that its production expenses could increase by approximately 4% due to the costs of outsourcing plastic injection components, based on current costs of such components. In addition, the equipment that the Company plans to install in its Dongguan facility may be subject to import restrictions. See "Risk Factors—Business Risks Relating to International Operations—Restrictions on Imports."

*License of Shenzhen Factory.* On April 1, 1997, the Company entered into an agreement with the Buji Economic Development Company, a Chinese government agency, pursuant to which the Company has received a license for a factory facility encompassing approximately 22,000 square feet located in Shenzhen and

11


P000127

contracted for the services of approximately 250 factory employees. The agreement expires on March 31, 2007 and may be terminated by either party on 90 days' notice. No assurance can be given that the Buji Economic Development Company will not terminate the agreement prior to its expiration or that, if terminated, the Company would be able to arrange for alternative sources of manufacturing on a timely basis. The Company's loss of such agreement and its failure to arrange for alternative sources of manufacturing on a timely basis could have a material adverse effect on the Company's business, results of operations and financial condition.

*Risks Related to Environmental Regulations.* The Company is subject to Chinese laws which regulate environmental quality, the utilization of natural resources and the reduction of pollution. As a manufacturer, the Company is subject to annual inspections. Although compliance with environmental regulations has not had a material adverse effect on the Company, failure to comply with these laws or to pass such an inspection could have a material adverse effect on the Company's business, results of operations and financial condition.

*Dependence on Distributions from Operating Subsidiaries.* The Company has no direct business operations, other than its ownership of its subsidiaries. While the Company has no intention of paying dividends, should it decide to do so, as a holding company, the Company's ability to pay dividends and meet other obligations would depend upon the receipt of dividends or other payments from its operating subsidiaries and its other holdings and investments. In addition, the Company's operating subsidiaries from time to time may be subject to restrictions on their ability to make distributions to the Company, including as a result of restrictive covenants in loan agreements, restrictions on the conversion of local currency into U.S. dollars or other hard currency and other regulatory restrictions. As the Company does not engage in hedging or other similar transactions, extraordinary currency fluctuations could have a material adverse effect on the Company's business, results of operations and financial condition. However, in the past the Company has not been significantly affected by exchange rate fluctuations and therefore has not entered into hedging transactions. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources—Currency and Exchange Rates" and Note 3(e) of Notes to Consolidated Financial Statements.

*Competition.* The Company believes that the markets for its products are mature and highly competitive and that competition is based upon several factors, including price, product features and enhancements and new product introductions. The Company competes with established companies, a number of which have substantially greater technical, financial and marketing resources than the Company. Competition is based on unit price, product quality and availability and promptness of service as well as product variety, uniqueness of product features, combination of features offered and brand name identification. There can be no assurance that the Company will be able to compete successfully against current and future sources of competition or that the competitive pressures faced by the Company will not have a material adverse effect on the Company's business, results of operations and financial condition.

*Dependence on Key Personnel.* The Company depends to a large extent on the abilities and continued participation of Mr. Kwong Ho Sham, its Chairman of the Board, and Mr. John Sham, the Company's President and Chief Executive Officer, who directs the Company's day-to-day manufacturing and marketing operations from the Company's executive offices in Hong Kong, and on other management personnel. The Company has employment agreements with Mr. Kwong Ho Sham and Mr. John Sham. The Company maintains a key man life policy of $1 million for Mr. John Sham. There can be no assurance that proceeds of such insurance would be sufficient to compensate the Company for his loss. The loss of Mr. John Sham or others among the Company's key personnel would have a material adverse effect on the Company's business, results of operations and financial condition if a suitable replacement or replacements could not be promptly found. See "Management."

*Fluctuations in Quarterly Results; Seasonality.* The Company's business is seasonal, with a large portion of its sales and earnings generated in the second and third quarters of each fiscal year (June through December). These fluctuations are based on customers' increased stocking of the Company's products in anticipation of heavy demand during the Christmas holiday season. In addition, the Company's sales can vary from quarter to quarter based on the timing of the introduction of new products and may be affected in the future by the timing

12

P000128

of any acquisition completed by the Company. The Company believes that quarterly comparisons of the results of its operations during any fiscal year are not necessarily meaningful and that results for any one fiscal quarter should not be relied upon as an indication of future performance.

*Discretion in Application of Proceeds.*  The Company intends to utilize approximately $25.3 million representing approximately 35.0% of the estimated net proceeds of this offering, for general corporate purposes including working capital. The Company may also allocate funds for potential acquisitions. The Company does not have any current or pending arrangements, understandings, negotiations or agreements with respect to any potential acquisitions and there can be no assurance that any such transaction will be consummated. Accordingly, the Company will have broad discretion as to the application of such proceeds. See "Use of Proceeds."

*No Prior Public Market; Possible Volatility of Stock Price.*  Prior to this offering, there has been no public market for the shares of Common Stock. The initial public offering price was determined by negotiations between the Company and the representatives of the Underwriters. See "Underwriting" for a discussion of the factors to be considered in determining the initial public offering price. There can be no assurance that an active public market will develop or be sustained after this offering or that the market price of the Common Stock will not decline below the public offering price. The market price of the Common Stock could be subject to significant fluctuations in response to future announcements concerning the Company or its competitors, quarterly variations in operating results, announcements of technological innovations, the introduction of new products or changes in product pricing policies by the Company or its competitors, proprietary rights or other litigation, changes in analysts' earnings estimates, general market conditions in the industry, developments in the financial markets and other factors. In addition, the stock market has, from time to time, experienced extreme price and volume fluctuations that have particularly affected the market prices for companies having a significant presence in China and that have often been unrelated to the operating performance of the affected companies. Broad market fluctuations of this type may adversely affect the future market price of the Common Stock.

*Immediate and Substantial Dilution.*  At the initial public offering price of $19.00 per Share and assuming no exercise of the Underwriters' over-allotment option, the purchasers of the Shares offered hereby will experience an immediate and substantial dilution in the net tangible book value of their shares of approximately $10.76 per Share. See "Dilution."

*Concentration of Ownership.*  Wing Shing Holdings Company Limited, a British Virgin Islands company ("Wing Shing Holdings"), will beneficially own approximately 62.4% of the Company's outstanding Common Stock after this offering. The common share ownership of Wing Shing Holdings is owned 50% by Kwong Ho Sham, 20% by John Sham and 15% by each of Shun Chi Hui and Wai Chun Hui, each of whom are directors of the Company. Voting control of Wing Shing Holdings is held approximately 36% by Kwong Ho Sham, approximately 43% by John Sham and approximately 11% by each of Shun Chi Hui and Wai Chun Hui. As a result, Wing Shing Holdings and its shareholders will be in a position to control the Company's activities and policies, including possessing the voting power to elect the Board of Directors and approve all matters requiring shareholder approval and the ability to generally direct the Company's affairs. See "Principal Shareholders."

*Shares Eligible for Future Sale.*  Upon completion of this offering, the Company will have 12,200,000 shares of Common Stock outstanding (12,830,000 shares if the Underwriters' over-allotment option is exercised in full), not including 1,600,000 shares of Common Stock issuable upon exercise of options which may be granted under the 1997 Stock Option Plan (the "Plan"), of which options to purchase 605,800 shares have been granted. Of these 12,200,000 shares of Common Stock, the 4,200,000 Shares offered hereby will be freely tradeable without restriction or further registration under the Securities Act of 1933, as amended (the "Securities Act"). The 8,000,000 shares of Common Stock owned by the present shareholders of the Company are "restricted securities" within the meaning of Rule 144 under the Securities Act, and, together with any Shares which are purchased by affiliates of the Company, as the term is defined in Rule 144, may be sold only by the respective holders thereof pursuant to an effective registration statement under the Securities Act or in

13

accordance with one or more other exemptions under the Securities Act (including Rule 144). Rule 144, as amended, permits sales of restricted securities by any person, whether or not an affiliate, after a one year minimum time sales can be made subject to the Rule's existing volume and other limitations and by non-affiliates without adhering to Rule 144's existing volume or other limitations after two years. In addition, the present shareholders of the Company, and the directors and executive officers of the Company, including all other shareholders, have agreed that, for a period of 180 days from the date of this Prospectus, they will not, directly or indirectly, offer to sell, sell, contract to sell, pledge or grant or otherwise sell or dispose of any of their shares of Common Stock or options to purchase Common Stock without the prior written consent of Furman Selz LLC. The Company has also agreed not to sell any shares of Common Stock for a period of 180 days of the date of this Prospectus without the prior written consent of Furman Selz LLC, except that the Company may, without such consent, grant options and permit the exercise of outstanding options pursuant to the Plan. Furman Selz LLC may remove any of such restrictions in its discretion. Future sales of substantial amounts of shares of Common Stock in the public market, or the perception that such sales could occur, could adversely affect the price of the shares of Common Stock in any market that may develop for the trading of such shares. See "Shares Eligible for Future Sale."

### Foreign Issuer Risks

*Inflation.* During 1995, 1996 and 1997, the rate of inflation in Hong Kong has ranged from approximately 6% to 9% per year (approximately 6% during 1997) and the rate of inflation in China has ranged from approximately 4% to 17% per year (approximately 4% during 1997). Inflation in China would increase the Company's labor costs and could have a material adverse effect on the Company's business, results of operations and financial condition.

*Service and Enforcement of Legal Process.* The Company is incorporated in the British Virgin Islands, a majority of the Company's executive officers and directors are nonresidents of the U.S. and a substantial portion of the assets of such persons and the Company are located outside the U.S. Accordingly, there can be no assurance that U.S. courts would be able to enforce judgments of such courts obtained against the Company, certain of its directors and officers predicated upon the civil liability provisions of the federal securities laws of the U.S. In addition, the Company has been advised by counsel in the British Virgin Islands and in Hong Kong that there is doubt as to whether the courts of the British Virgin Islands or Hong Kong would enforce (i) judgments of U.S. courts obtained against the Company, certain of its directors and officers predicated upon the civil liability provisions of the federal securities laws of the U.S.; or (ii) in original actions brought in the British Virgin Islands or Hong Kong, liabilities against the Company or such persons predicated upon the federal securities laws of the U.S.

The Company has been advised by British Virgin Islands and Hong Kong counsel that no treaty exists between the British Virgin Islands or Hong Kong and the U.S. providing for the reciprocal enforcement of foreign judgments. However, the courts of Hong Kong and the British Virgin Islands are generally prepared to accept a foreign judgment as evidence of a debt due. An action may then be commenced in Hong Kong or the British Virgin Islands for recovery of this debt. A Hong Kong or British Virgin Islands court will only accept a foreign judgment as evidence of a debt due if: (i) the judgment is for a liquidated amount in a civil matter; (ii) the judgment is final and conclusive and has not been stayed or satisfied in full; (iii) the judgment is not directly or indirectly for the payment of foreign taxes, penalties, fines or charges of a like nature (in this regard, a Hong Kong or British Virgin Islands court is unlikely to accept a judgment for an amount obtained by doubling, trebling or otherwise multiplying a sum assessed as compensation for the loss or damage sustained by the person in whose favor the judgment was given); (iv) the judgment was not obtained by actual or constructive fraud or duress on the part of the person in whose favor judgment was given or on the part of the foreign court; (v) the foreign court has taken jurisdiction on grounds that are recognized by the common law rules as to conflict of laws in Hong Kong or the British Virgin Islands in particular where the judgment debtor either submitted to the jurisdiction of the foreign court or was resident and was carrying on business within such jurisdiction and was duly served with process; (vi) the proceedings in which the judgment was obtained were not contrary to natural justice; (vii) the proceedings in which the judgment was obtained, the judgment itself and the enforcement of the

14

...judgment is contrary to the public policy of Hong Kong or the British Virgin Islands ... (ii) the person against whom the judgment is given was subject ... the jurisdiction of the Hong Kong or the British Virgin Islands court, and (iii) the judgment given is a claim for contribution in respect of damages awarded by a judgment which does not satisfy the foregoing. Enforcement of a foreign judgment in Hong Kong or the British Virgin Islands may ... also be stayed ... or affected by applicable bankruptcy, insolvency, liquidation, arrangement moratorium or similar laws relating to or affecting creditors' rights generally and will be subject to a statutory limitation on the time within which proceedings may be brought.

*Director Actions Without Shareholder Approval; Limited Shareholder Rights under British Virgin Islands Law.* Pursuant to the Company's Memorandum and Articles of Association and pursuant to the laws of British Virgin Islands, the Company's Memorandum and Articles of Association may be amended by the Board of Directors without shareholder approval. This includes amendments increasing or reducing the authorized capital stock of the Company, authorizing the issuance of different classes of stock including Preferred Stock and increasing or reducing the par value of its shares. The Board of Directors may also increase the capital of the Company without shareholder approval by transferring a portion of the Company's surplus to capital or reduce the capital of the Company, subject to the requirements of the laws of the British Virgin Islands, by transferring a portion of the Company's capital to surplus. Furthermore, the Company's Memorandum and Articles of Association provide that differences which may arise between the Company and any of its shareholders, their executors, administrators or assigns relating to the Company's Memorandum and Articles of Association shall, unless the parties agree to a single arbitrator, be referred to two arbitrators to be chosen by each of the differing parties. The ability of the Company to amend its Memorandum and Articles of Association without shareholder approval could have the effect of delaying, deferring or preventing a change in control of the Company without any further action by the shareholders including but not limited to, a tender offer to purchase the Common Stock at a premium over then current market prices. In addition, issuance of Preferred Stock, without shareholder approval, on such terms as the Board of Directors may determine, could adversely affect the voting power of the holders of the Common Stock, including the loss of voting control to others. No amendment to the Memorandum and Articles of Association will be effective unless and until it is filed with the Companies Registry of the British Virgin Islands. See "Description of Securities."

Under U.S. law, majority and controlling shareholders generally have certain "fiduciary" responsibilities to the minority shareholders. Shareholder action must be taken in good faith and actions by controlling shareholders which are obviously unreasonable may be declared null and void. The British Virgin Islands law protecting the interests of the minority shareholders may not be as protective in all circumstances as the law protecting minority shareholders in U.S. jurisdictions. While British Virgin Islands law does permit a shareholder of a British Virgin Islands company to sue its directors derivatively, i.e. in the name of and for the benefit of the Company, and to sue the Company and its directors for his benefit and the benefit of others similarly situated, the circumstances in which any such action may be brought and the procedures and defenses that may be available in respect of any such action may result in the rights of shareholders of a British Virgin Islands company being more limited than those rights of shareholders in a U.S. company. See "Certain Foreign Issuer Considerations—Service and Enforcement of Legal Process."

*Exemptions under the Exchange Act as a Foreign Private Issuer.* The Company is a "foreign private issuer" within the meaning of rules promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). As such, it is exempt from certain provisions applicable to U.S. public companies including: the rules under the Exchange Act requiring the filing with the Securities and Exchange Commission (the "Commission") of quarterly reports on Form 10-Q or current reports on Form 8-K; the sections of the Exchange Act regulating the solicitation of proxies, consents or authorizations in respect of a security registered under the Exchange Act; and the sections of the Exchange Act requiring insiders to file public reports of their stock ownership and trading activities and establishing insider liability for profits realized from any "short-swing" trading transaction (i.e. a purchase and sale, or sale and purchase, of this issuer's equity securities within less than six months).

15

## USE OF PROCEEDS

The net proceeds to the Company from the sale of the 4,200,000 Shares offered hereby are estimated to be approximately $72.3 million (approximately $83.4 million if the Underwriters' over-allotment option is exercised in full), after deducting the underwriting discount and estimated offering expenses.

The Company intends to use approximately $30 million of the net proceeds of this offering to complete the expansion of its manufacturing facility in Dongguan, China. Of this amount, approximately $15 million will be used to increase the size of the factory from 850,000 square feet to 1,850,000 square feet and approximately $15 million will be used to purchase additional machinery and equipment for the factory. The Company intends to use approximately $12 million of the net proceeds to repay certain outstanding obligations payable to various banks under several revolving credit facilities and $5 million for expenditures relating to design and development of new products. The funds obtained by the Company under such bank obligations were used to finance the purchase of raw materials by the Company and the purchase of manufacturing equipment, as well as for general working capital purposes. The bank obligations were established on various dates since December 1995 and accrue interest at various rates based on the Hong Kong Dollar ("HKD") Prime Rate ranging from the HKD Prime Rate plus 0.375% to HKD Prime Rate plus 1% per year. For a more detailed discussion of the Company's indebtedness, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources." The balance of the net proceeds will be used for working capital to finance manufacturing and trade receivables and otherwise support the growth of the Company's business and for other general corporate purposes. The Company is undertaking this offering because it believes that it is important to raise working capital at this time to provide the Company with financial support and resources it needs for the anticipated increase in sales. To the extent the Underwriters' over-allotment option is exercised, the net proceeds will be used for working capital requirements.

The Company may also utilize a portion of the net proceeds for the acquisition of complementary businesses. There are no current or pending arrangements, understandings, negotiations or agreements for any such acquisition and there can be no assurance that any such transaction will occur.

Pending such uses, the net proceeds will be invested in U.S. Government securities and other short-term, investment grade, interest-bearing securities.

## DIVIDEND POLICY

The Company does not intend to pay or declare cash dividends in the foreseeable future. The Company's policy is to reinvest its earnings in the Company's business. The Company is currently subject to restrictions on the payment of dividends pursuant to the terms of certain of its bank facilities. In addition, as a holding company, the ability of the Company to pay dividends would depend upon the receipt of dividends or other payments from its subsidiaries. See "Risk Factors—Dependence on Distributions from Operating Subsidiaries." Future dividend policy will depend upon the Company's earnings and financial condition and its capital requirements as well as contractual restrictions and the impact of the distribution of dividends on the Company's financial condition and tax liabilities.

P 000132

## CAPITALIZATION

The following table sets forth the short-term debt and capitalization of the Company at December 31, 1997 and as adjusted to give effect to the sale of the 4,200,000 Shares being offered by the Company hereby after deducting the underwriting discount and estimated offering expenses and the initial application of the estimated net proceeds. See "Use of Proceeds." This table should be read in conjunction with the financial statements of the Company and the notes thereto included elsewhere in this Prospectus and "Management's Discussion and Analysis of Financial Condition and Results of Operations."

| | December 31, 1997 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| | (unaudited) | |
| | (in thousands, except share data) | |
| Short-term debt | $14,195 | $ 2,195 |
| Long-term debt | $ 562 | $ 562 |
| Shareholders' equity: | | |
| Preferred Stock, $0.01 par value per share: 1,000,000 shares authorized; no shares issued and outstanding | — | — |
| Common Stock, $0.01 par value per share: 50,000,000 shares authorized; 8,000,000 issued and outstanding; 12,200,000 shares issued and outstanding as adjusted(1) | 80 | 122 |
| Additional paid-in capital | — | 72,272 |
| Retained earnings | 28,109 | 28,109 |
| Total shareholders' equity | 28,189 | 100,503 |
| Total capitalization | $28,751 | $101,065 |

(1) Excludes 1,600,000 shares of Common Stock that have been reserved for issuance under the Company's 1997 Stock Option Plan, of which options have been granted to purchase (a) 322,000 shares with an exercise price of $14.50 per share and (b) 283,800 shares with an exercise price equal to the initial public offering price of the Shares offered hereby. See "Management—1997 Stock Option Plan."

17

P 000133

# DILUTION

Purchasers of the Shares offered hereby will experience an immediate and substantial dilution in the net tangible book value of the Shares from the initial public offering price. The net tangible book value of the Company as of December 31, 1997 was approximately $28.2 million, or approximately $3.52 per share of Common Stock. Net tangible book value per share represents the total amount of tangible assets of the Company less the total amount of liabilities of the Company, divided by the number of shares of Common Stock outstanding. After giving effect to the receipt of the estimated net proceeds from the Company's sale of 4,200,000 Shares offered hereby (after deducting the underwriting discounts and commissions and estimated offering expenses payable by the Company), the net tangible book value of the Company as of December 31, 1997 would have been approximately $100.5 million, or $8.24 per outstanding Share of Common Stock. This represents an immediate increase in net tangible book value of $4.72 per share of Common Stock to existing shareholders and an immediate and substantial dilution of $10.76 per share of Common Stock to new investors purchasing Shares in the offering. The following table illustrates this per share dilution:

| | | |
|---|---|---|
| Assumed initial public offering price | | $19.00 |
| Net tangible book value before the offering | $3.52 | |
| Increase in net tangible book value attributable to new investors | 4.72 | |
| Net tangible book value after the offering | | 8.24 |
| Dilution in net tangible book value to new investors | | $10.76 |

The following table summarizes the difference between existing shareholders and purchasers of Shares from the Company in this offering with respect to the number of shares of Common Stock purchased from the Company, the total consideration paid and the average price paid per share:

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | |
| Existing shareholders | 8,000,000 | 65.6% | $    20 | — | — |
| New investors | 4,200,000 | 34.4 | 79,800,000 | 100.0% | $19.00 |
| Total | 12,200,000 | 100.0% | $79,800,020 | 100.0% | |

18

P000134

## SELECTED CONSOLIDATED FINANCIAL DATA

The selected consolidated income statement data for the fiscal years ended March 31, 1995, 1996 and 1997 and the selected consolidated balance sheet data as of March 31, 1996 and March 31, 1997 set forth below have been prepared in accordance with U.S. generally accepted accounting principles and are derived from the Company's consolidated financial statements and notes thereto included elsewhere in this Prospectus, which have been audited by Arthur Andersen & Co., independent public accountants, whose report thereon is also included elsewhere in this Prospectus. The selected consolidated income statement data for the fiscal years ended March 31, 1993 and 1994 and the selected consolidated balance sheet data as of March 31, 1993, 1994 and 1995 have been prepared in accordance with U.S. GAAP and are derived from the audited financial statements and management accounts of individual companies of the Company not included elsewhere in this Prospectus. The selected consolidated income statement data for the nine months ended December 31, 1996 and 1997 and the selected consolidated balance sheet data as of December 31, 1997 set forth below are unaudited. In the opinion of management, such unaudited financial statements include all adjustments (consisting of only normal recurring adjustments) necessary for a fair presentation of the information set forth therein. The results of operations for the nine months ended December 31, 1997 are not necessarily indicative of the results that may be expected for the full fiscal year. The selected consolidated financial data set forth below should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations," the consolidated financial statements and the notes thereto and other financial information which appear elsewhere in this Prospectus.

| | Fiscal Years Ended March 31. | | | | | Nine Months Ended December 31. | |
| | 1993(1) | 1994(1) | 1995 | 1996 | 1997 | 1996 | 1997 |
| | | | | | | (unaudited) | |
| | (in thousands, except per share data) | | | | | | |
| **Statement of Income Data:** | | | | | | | |
| Net sales | $29,059 | $27,471 | $31,515 | $44,083 | $62,699 | $45,122 | $96,205 |
| Cost of goods sold | 23,576 | 24,067 | 21,989 | 31,893 | 46,031 | 33,136 | 70,284 |
| Gross profit | 5,483 | 3,384 | 9,526 | 12,190 | 16,668 | 11,986 | 25,921 |
| Selling, general and administrative expenses | 3,842 | 4,258 | 7,129 | 7,155 | 10,378(2) | 7,297(2) | 11,761(2) |
| Operating income (loss) | 1,641 | (874) | 2,397 | 5,035 | 6,290 | 4,689 | 14,160 |
| Interest expense | 289 | 218 | 405 | 696 | 867 | 635 | 1,116 |
| Other income, net | 771 | 5,103 | 109 | 85 | 94 | 118 | 132 |
| Income before income taxes | 2,123 | 4,011 | 2,101 | 4,424 | 5,517 | 4,172 | 13,176 |
| Income taxes (credit) expense | 177 | 187 | 52 | (168) | 406 | 307 | 1,259 |
| Net income | $1,946 | $3,824 | $2,049 | $4,592 | $5,111(2) | $3,865(2) | $11,917(2) |
| Net income per share | $0.24 | $0.48 | $0.26 | $0.57 | $0.64 | $0.48 | $1.49 |
| Weighted average number of shares outstanding | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |

19

P000135

| | At March 31, | | | | | At December 31, |
|---|---|---|---|---|---|---|
| | 1993 | 1994 | 1995 | 1996 | 1997 | 1997 |
| | | | | | | (unaudited) |
| Balance Sheet Data: | | | (in thousands) | | | |
| Working capital | $ ___ | $ ___ | $ ___ | $ ___ | $ ___ | $ ___ |
| Total assets | ___ | ___ | ___ | ___ | ___ | ___ |
| Total debt | ___ | ___ | ___ | ___ | ___ | ___ |
| Shareholders' equity | ___ | ___ | ___ | ___ | ___ | ___ |

(1) Results of operations in fiscal 1993 and 1994 were affected by floods that occurred during each of those fiscal years at the Company's facilities in Shenzhen, China. Interest expense and other income, net includes the damage losses from these floods, including repair costs, fixed assets and inventories, in the amount of $453,000 and $2,867,000 in fiscal 1993 and 1994, respectively. Other income, net in fiscal 1993 and 1994 includes gains in the amounts of approximately $636,000 and $5,078,000, respectively, representing insurance proceeds received in compensation for damages and consequential losses in profit caused by those floods.

(2) Includes provisions of $782,000, $644,000 and $511,000 against advances to a former minority shareholder of a subsidiary of the Company and his affiliates in fiscal 1997, the 1997 interim period and the 1998 interim period, respectively. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—General" and Note 2 of Notes to Consolidated Financial Statements

20

P000136

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

### General

The Company was founded in 1983 and, for most of its history, operated as a contract manufacturer of products developed by its customers. In recent years, however, the Company has emphasized original design manufacturing. As an ODM, the Company designs and develops proprietary new products which it manufactures for its customers. The Company made this shift by forming a product design and development team consisting of engineers who focus on the development of new products. Net sales of the Company's ODM products represented 39.5%, 58.1%, 73.6% and 80.0% of the Company's net sales during fiscal 1995, 1996, 1997 and the 1998 interim period, respectively, with the remaining sales generated by its contract manufacturing activities. This change in emphasis from contract manufacturing to original design manufacturing has caused the Company's growth to accelerate over the past three fiscal years.

Gross profit has increased significantly over the last three years while gross profit as a percentage of net sales ("gross margin") has declined. The decline in gross margin is a result of (i) an increase in the costs of raw materials in fiscal 1996; (ii) the Company's decision to shift its product mix toward higher priced kitchen products, in particular breadmakers, which have a higher profit per unit and a lower gross margin than the Company's other products; and (iii) a decline in gross margin in existing products over time due to price pressures from mass merchandisers.

During fiscal 1997, the Company formed a majority-owned subsidiary to assist with the marketing of products to certain United States customers. This assistance included customer introductions and facilitating communication with the Company. As of November 1, 1997, the Company purchased the interest of the subsidiary's minority shareholders, who were otherwise unaffiliated with the Company, for $360,000. The Company recorded as a charge to earnings provisions against advances of $782,000 and $511,000 made to the former minority shareholder and his affiliates for use in such marketing efforts in the Company's financial statements for fiscal 1997 and the 1998 interim period, respectively. The Company entered into a commission agreement with one of the former minority shareholders to compensate him for prior services and provide for the repayment of the $1,249,000 in advances (the "Debt"). No further services are to be provided by the minority shareholders under this agreement. The commission agreement provides that, for the period from January 1, 1998 through October 31, 2001, net sales of certain products previously marketed by the subsidiary will be subject to a 3% commission. The former minority shareholder will receive $50,000 per month from January 1998 through June 1999. Any commissions earned in excess of $50,000 per month will be applied to reduce the Debt. If commissions earned are less than $50,000 per month, such deficiency will be added to the Debt. Commissions will be applied equally each month from July 1999 through the end of the term of the commission agreement to reduce the Debt. Any portion of the Debt remaining outstanding at the end of the term of the commission agreement must be repaid by the former minority shareholder at that time.

The Company is not subject to taxation in the British Virgin Islands in accordance with British Virgin Island tax regulations. The Company is subject to income taxation in each jurisdiction in which its subsidiaries do business. Certain of the Company's profits accrue in Hong Kong, where the corporate tax rate is currently 16.5%, and areas of China where the effective tax rate is 27%. The proposed Hong Kong budget for 1998 includes a reduction in the Hong Kong corporate tax rate to 16%, effective April 1, 1998. There can be no assurance that this reduction will be enacted. In Hong Kong, estimated taxes for each fiscal year are paid during a fiscal year based on the Company's prior year's earnings derived from operations in Hong Kong. An adjustment in the form of additional taxes paid or refunds to the Company is then made in the following fiscal year based on actual earnings. Therefore in each fiscal year, the Company's statement of income reflects a provision for estimated taxes for the current fiscal year and adjustments for over or under provisions with respect to the prior fiscal year. Due to its activities in a special economic region of China, the Company's subsidiary in China is exempt from income taxation for the first two years in which it records profits to the extent the profits are not offset by losses in a prior year, which event has not yet occurred. The Company has a 50% tax reduction for the next three years

21

thereafter. Losses in any year can only be used to offset future income for a period of five years. To the extent that the Company has income effectively connected with the conduct of a U.S. trade or business in any fiscal year, it would be subject to U.S. federal taxes at an effective rate of up to 55%. The Company does not believe that its current method of operations would subject it to material U.S. taxes because it should not be considered to have significant income effectively connected with a trade or business in the U.S.

The Company is a holding company and has no business operations other than ownership of its subsidiaries. While the Company has no intention of paying cash dividends, should it decide to do so, as a holding company, the Company's ability to pay dividends and meet other obligations would depend upon the receipt of dividends or other payments from its operating subsidiaries and its other holdings and investments. In addition, the Company's operating subsidiaries from time to time may be subject to restrictions on their ability to make distributions to the Company, including as a result of restrictive covenants in loan agreements, restrictions on the conversion of local currency into U.S. dollars or other hard currency and other regulatory restrictions. Restrictions on currency conversion may be in effect from time to time but have not had a material effect on the Company in the past.

The Company has conducted an initial review regarding the effect the upcoming year 2000 will have on its computer applications. The Company has determined that there will be minimal impact on the Company and that the financial and human resources utilized to address this issue will not be material. However, there can be no assurance that unforeseen problems will not arise in connection with this issue.

Since most of the Company's purchases and sales are denominated in U.S. dollars, the Company's financial statements are presented in U.S. dollars, the functional currency of the Company. The Company's financial statements are prepared in accordance with U.S. generally accepted accounting principles.

References throughout this Prospectus to a fiscal year refer to the Company's fiscal year ended on March 31 of that year; for example "fiscal 1997" refers to the fiscal year ended March 31, 1997. References throughout this Prospectus to an interim period refer to the first nine months of the Company's fiscal year ended on December 31 of that fiscal year; for example, "1998 interim period" refers to the nine month period ended December 31, 1997.

## Results of Operations

The following table sets forth certain statement of income data as a percentage of net sales for the periods indicated:

| | Fiscal Years Ended March 31, | | | Nine Months Ended December 31, | |
| --- | --- | --- | --- | --- | --- |
| | 1995 | 1996 | 1997 | 1996 | 1997 |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 69.8 | 72.4 | 73.4 | 73.4 | 73.1 |
| Gross profit | 30.2 | 27.6 | 26.6 | 26.6 | 26.9 |
| Selling, general and administrative expenses | 22.6 | 16.2 | 16.6 | 16.2 | 12.2 |
| Operating income | 7.6 | 11.4 | 10.0 | 10.4 | 14.7 |
| Interest expense and other income, net | 0.9 | 1.4 | 1.2 | 1.1 | 1.0 |
| Income before income taxes | 6.7 | 10.0 | 8.8 | 9.3 | 13.7 |
| Income tax (credit) expense | 0.2 | (0.4) | 0.6 | 0.7 | 1.3 |
| Net income | 6.5% | 10.4% | 8.2% | 8.6% | 12.4% |

## Nine Months ended December 31, 1996 Compared with Nine Months ended December 31, 1997

*Net sales.* The Company's net sales consist of its gross invoiced sales less discounts and returns. Net sales for the 1998 interim period increased approximately 113.3% to $96.2 million from $45.1 million in the 1997 interim period. The increase in net sales was the result of increased net sales of ODM products which represented 80.0% of net sales in the 1998 interim period as compared to 68.2% of net sales in the 1997 interim period. The

22

increase in net sales of ODM products was primarily attributable to increased sales of breadmakers, coffeemakers and food steamers and the introduction of deep fryers.

Net sales are comprised primarily of sales in the Company's four major product categories: kitchen appliances, personal, beauty and health care products, travel products and garment care products. Sales in each such product category for the 1998 interim period as compared to the 1997 interim period were as follows: sales of kitchen appliances increased to $75.0 million, or 78.0% of net sales, from $27.2 million, or 60.3% of net sales; sales of personal, beauty and health care products increased to $11.1 million, or 11.6% of net sales, from $8.2 million, or 18.1% of net sales; sales of travel products decreased to $4.8 million, or 5.0% of net sales, from $6.3 million, or 14.0% of net sales; and sales of garment care products increased to $3.4 million, or 3.5% of net sales, as compared to $3.1 million, or 6.8% of net sales.

*Gross profit.* Gross profit consists of net sales less cost of goods sold, which includes the costs of raw materials, production materials, labor, transportation, depreciation and factory overhead. Gross profit in the 1998 interim period was $25.9 million, or 26.9% of net sales, as compared to $12.0 million, or 26.6% of net sales, in the 1997 interim period. Gross margins in the 1998 interim period increased due to greater in-house manufacturing of breadmaker motors and reduced depreciation as a percentage of net sales. Depreciation represented a higher percentage of net sales for the 1997 interim period due to the start-up of the breadmaker product line.

*Selling, general and administrative expenses.* The primary components of the Company's selling, general and administrative expenses ("SG&A") include advertising and promotion, product design and development, transportation of finished goods, salaries for the Company's marketing and administrative personnel, professional fees and utilities. SG&A in the 1998 interim period increased to $11.8 million, or 12.2% of net sales, from $7.3 million, or 16.2% of net sales, in the 1997 interim period. The increase in SG&A expenses reflects higher variable costs related to increased sales, including transportation costs, commissions paid, litigation costs and additional compensation commensurate with the growth of the business. SG&A as a percentage of net sales declined for the 1998 interim period due to the Company's spreading its fixed costs over a higher level of net sales. SG&A also includes provisions of $511,000 and $644,000 for the 1998 and 1997 interim periods, respectively, made against an advance to a former minority shareholder of a subsidiary formed during fiscal 1997 and his affiliates to assist with marketing of products to certain United States customers. These advances ceased as of November 1997.

The primary components of the Company's design and development expenses ("development expenses") include sample design, patent fees, testing charges, inspection fees and salaries for the Company's engineers and designers. Development expenses in the 1998 interim period were $1.0 million as compared to $778,000 in the 1997 interim period.

*Interest expense and other income, net.* Interest expense consists of interest on the Company's short and long term bank credit facilities. Interest expense was $1.1 million in the 1998 interim period as compared to $635,000 in the 1997 interim period. The higher interest expense is due to increased borrowings necessary to finance increased levels of sales and the acquisition of fixed assets. Other income, net includes tooling income, interest income and non-recurring income. Other income, net was $132,000 in the 1998 interim period as compared to $118,000 in the 1997 interim period.

*Income tax.* The Company had taxable income in Hong Kong in the 1997 and 1998 interim periods and the United States in the 1998 interim period. The financial statements include provisions for Hong Kong and United States income and withholding taxes of $819,000 and $440,000, respectively, in the 1998 interim period, and a provision for Hong Kong income taxes of $307,000 in the 1997 interim period. The Company does not believe that its current method of operations would subject it to material U.S. taxes because it should not be considered to have significant income effectively connected with a trade or business in the U.S. No income tax was payable by the Company in China during this period because the Company's subsidiary in China had accumulated tax losses during these periods.

23

**Fiscal Year ended March 31, 1996 Compared with Fiscal Year ended March 31, 1997**

*Net sales.* Net sales for fiscal 1997 increased approximately 42.2% to $62.7 million from $44.1 million in fiscal 1996. The increase in net sales was the result of increased net sales of ODM products, which represented 73.6% of net sales in fiscal 1997 as compared to 58.1% of net sales in fiscal 1996. The increase in net sales of ODM products was primarily due to sales of breadmakers, which were first introduced by the Company in fiscal 1997, and the increased sales of coffeemakers. Net sales to U.S. customers increased by 64.2% to $47.1 million in fiscal 1997 from $28.7 million in fiscal 1996, with a lower rate of increase in European sales.

Sales in each major product category for fiscal 1997 as compared to fiscal 1996 were as follows: sales of kitchen appliances increased to $41.5 million, or 66.1% of net sales, from $25.9 million, or 58.8% of net sales; sales of personal, beauty and health care products increased to $8.9 million, or 14.3% of net sales, from $7.0 million, or 15.8% of net sales; sales of travel products increased to $7.1 million, or 11.3% of net sales, from $6.3 million, or 14.3% of net sales, and sales of garment care products increased to $4.9 million, or 7.9% of net sales, from $4.3 million, or 9.8% of net sales.

*Gross profit.* Gross profit in fiscal 1997 was $16.7 million, or 26.6% of net sales, as compared to $12.2 million, or 27.6% of net sales, in fiscal 1996. Gross margins in fiscal 1997 declined because a higher percentage of the Company's sales were from products with lower gross margins, primarily breadmakers and coffeemakers.

*Selling, general and administrative expenses.* SG&A in fiscal 1997 increased to $10.4 million, or 16.6% of net sales, from $7.2 million, or 16.2% of net sales, in fiscal 1996. The overall increase in SG&A was primarily attributable to variable costs related to increased sales, additional compensation, including compensation resulting from hiring sales, marketing and administrative personnel commensurate with the growth in business and expansion of product lines, and a provision of $782,000 made against an advance to a former minority shareholder of a marketing subsidiary and his affiliates. Development expenses were $1.3 million in fiscal 1997 as compared to $915,000 in fiscal 1996. The increase in development expenses was primarily a result of the additional costs associated with the introduction of breadmakers in fiscal 1997.

*Interest expense and other income, net.* Interest expense was $867,000 in fiscal 1997 as compared to $696,000 in fiscal 1996. The increase was due to increased borrowing necessary to finance increased level of sales and the acquisition of fixed assets. Other income, net was $94,000 in fiscal 1997 as compared to $85,000 in fiscal 1996. The increase was primarily due to an increase in interest income in fiscal 1997.

*Income tax.* In fiscal 1996 and 1997, the Company had taxable income only in Hong Kong. The Company's estimated income tax liability in Hong Kong in fiscal 1997 was $406,000 as compared to an income tax credit of $168,000 in fiscal 1996. These amounts include a provision for Hong Kong income taxes of $406,000 in fiscal 1997 and $17,000 in fiscal 1996. No income tax was payable by the Company in China during this period because the Company's subsidiary in China had accumulated tax losses during these periods.

**Fiscal Year ended March 31, 1995 Compared with Fiscal Year ended March 31, 1996**

*Net sales.* Net sales in fiscal 1996 increased approximately 39.9% to $44.1 million from $31.5 million in fiscal 1995. The increase in net sales was primarily the result of increased net sales of ODM products, which represented 58.1% of net sales in fiscal 1996 as compared to 39.5% of net sales in fiscal 1995. The increase in net sales of ODM products was primarily due to sales of new products, in particular, sales of food steamers to Sunbeam and other customers.

Sales in each major product category for fiscal 1996 as compared to fiscal 1995 were as follows: sales of kitchen appliances increased to $25.9 million, or 58.8% of net sales, from $14.7 million, or 46.6% of net sales; sales of personal, beauty and health care products decreased to $7.0 million, or 15.8% of net sales, from $8.5 million, or 26.8% of net sales; sales of travel products increased $6.3 million, or 14.3% of net sales, from $5.3 million, or 16.7% of net sales; and sales of garment care products increased to $4.3 million, or 9.8% of net sales, from $3.0 million, or 9.5% of net sales.

24

*Gross profit.* Gross profit was $12.2 million, or 27.6% of net sales, in fiscal 1996 as compared to $9.5 million, or 30.2% of net sales, in fiscal 1995. The decline in gross margins was the result of increased cost of raw materials and increased depreciation costs due to the startup of the Dongguan production facility.

*Selling, general and administrative expenses.* SG&A was $7.2 million, or 16.2% of net sales, in fiscal 1996 as compared to $7.1 million, or 22.6% of net sales, in fiscal 1995. SG&A, as a percentage of net sales, decreased in fiscal 1996 as compared to fiscal 1995 because certain expenses remained relatively constant while sales increased. Development expenses in fiscal 1996 decreased to $915,000 from $933,000 in fiscal 1995.

*Interest expense and other income, net.* Interest expense was $696,000 in fiscal 1996 as compared to $405,000 in fiscal 1995. Other income, net was $85,000 in fiscal 1996 as compared to $109,000 in fiscal 1995. The decrease in other income, net is primarily attributable to the inclusion in other income, net for fiscal 1995 of the final settlement of insurance proceeds received in connection with a flood in the Company's Shenzhen factory.

*Income tax.* The Company had an income tax credit of $168,000 in fiscal 1996 as compared to an estimated income tax liability of $52,000 in fiscal 1995. These amounts include a provision for Hong Kong income taxes of $17,000 in fiscal 1996 and $52,000 in fiscal 1995. No income tax was payable by the Company in China during this period because the Company's subsidiary in China had accumulated tax losses during these periods.

## Quarterly Results and Seasonality

*Quarterly Results.* The following table sets forth the statement of operations data for each of the Company's last seven quarters and the percentage of revenues represented by the line items presented. The quarterly statement of operations data set forth below were derived from unaudited consolidated financial statements of the Company which, in the opinion of management of the Company, contain all adjustments (consisting only of normal recurring adjustments) necessary for the fair presentation of those statements.

| | Fiscal 1997 | | | | Fiscal 1998 | | |
|---|---|---|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter |
| | (in thousands) | | | | | | |
| **Statement of Operations Data:** | | | | | | | |
| Net sales | $12,865 | $15,270 | $16,987 | $17,577 | $25,987 | $38,933 | $31,285 |
| Gross profit | 3,574 | 3,660 | 4,752 | 4,682 | 7,105 | 10,502 | 8,314 |
| Income before income taxes | 1,512 | 628 | 2,033 | 1,345 | 3,471 | 5,747 | 3,958 |
| Net income | $ 1,400 | $ 581 | $ 1,884 | $ 1,245 | $ 3,068 | $ 5,081 | $ 3,768 |
| **Statement of Operations Data As a Percentage of Net Sales:** | | | | | | | |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Gross profit | 27.8 | 24.0 | 28.0 | 26.6 | 27.3 | 27.0 | 26.6 |
| Income before income taxes | 11.8 | 4.1 | 12.0 | 7.6 | 13.4 | 14.8 | 12.7 |
| Net income | 10.9 | 3.8 | 11.1 | 7.1 | 11.8 | 13.1 | 12.0 |

*Seasonality.* The Company's business is seasonal, with a large portion of its sales and earnings generated in the second and third quarters of each fiscal year (June through December). These fluctuations are based on customers' increased stocking of the Company's products in anticipation of heavy demand during the Christmas holiday season. In addition, the Company's sales can vary from quarter to quarter based on the timing of the introduction of new products and may be affected in the future by the timing of any acquisition completed by the Company. The Company believes that quarterly comparisons of the results of its operations during any fiscal year are not necessarily meaningful and that results for any one fiscal quarter should not be relied upon as an indication of future performance.

25

P000141

**Liquidity and Capital Resources**

The Company's primary sources of financing have been cash from operating activities and borrowings under credit agreements with various banks. During fiscal 1997 and the 1998 interim period, the Company generated approximately $901,000 and $8.4 million, respectively, in cash from operating activities.

At December 31, 1997 and March 31, 1997, accounts receivable were $3.9 million and $4.1 million, respectively, as compared to $3.6 million at December 31, 1996 and $2.4 million at March 31, 1996. Receivables at December 31, 1997 represented 11.1 days of sales as compared to 21.7 days of sales at December 31, 1996. At December 31, 1997, inventories were $25.7 million compared to $19.0 million at December 31, 1996. The Company's inventories consist primarily of raw materials needed to produce finished products. The increase in inventories is primarily attributable to the Company's maintaining increased stock of its raw materials as net sales increase.

The Company's aggregate capital expenditures during the 1998 interim period and fiscal 1997 were $9.7 million and $6.2 million, respectively, as compared with $5.6 million in the 1997 interim period and $2.3 million in fiscal 1996. This increase primarily reflects expenditures for the acquisition of property, plant and machinery and expansion of its factory facilities in Dongguan, China.

The Company's outstanding capital commitments of approximately $8.0 million as of December 31, 1997 included commitments for the expansion of the Dongguan facility and the purchase of machinery and equipment. The Company expects to incur an aggregate of approximately $12.2 million in capital expenses for expansion of the Dongguan facility in the fourth quarter of fiscal 1998 and fiscal 1999, of which approximately $1.3 million is committed. See "Business—Manufacturing." For the purchase of machinery and equipment, the Company anticipates spending approximately $15.0 million in fiscal 1998 and fiscal 1999, of which approximately $6.7 million was committed during the 1998 interim period. The Company may import approximately $4.3 million of capital equipment without being subject to Chinese import taxes; thereafter importation of such equipment will be taxed at various rates ranging from 15% to 25%.

The Company finances its operations and capital expenditures primarily by borrowings and cash flows from operations. As of December 31, 1997, the Company had bank credit facilities with an aggregate credit line of approximately $40.9 million, of which it had outstanding $562,000 in long-term debt (excluding the current portion), $14.2 million in short-term debt (including the current portion of long-term debt), and $2.9 million in outstanding letters of credit. The aggregate monthly payment on all such indebtedness was approximately $199,000 as of December 31, 1997.

The Company's long-term debt consists of thirteen term loans with an aggregate outstanding amount of $1.2 million as of December 31, 1997 (including the current portion of long-term debt), provided by various banks to finance the purchase of machinery, equipment and motor vehicles. These loans bear interest at rates per annum currently ranging from 7.26% to 13.00% and mature on various dates through the year 2000. All of such loans are payable in monthly installments which were approximately $80,000 as of December 31, 1997.

The Company's revolving credit facilities are with seven banks with an aggregate facilities limit of approximately $39.7 million and an aggregate amount outstanding of $13.6 million as of December 31, 1997. The credit facilities are with Standard Chartered Bank, HongkongBank, The Bank of Tokyo-Mitsubishi, Ltd., The Fuji Bank, Limited, Hang Seng Bank Limited, Dah Sing Bank, Ltd. and The Bank of East Asia Limited. These facilities bear interest at floating commercial bank lending rates in Hong Kong, which ranged from 9.0% to 10.5% per annum as of December 31, 1997. The amounts payable each month on these facilities varies depending upon the amounts drawn at the time and were approximately $119,000 in December 1997.

The Company's outstanding borrowings vary according to its seasonal working capital requirements. As of December 31, 1997, the amount utilized under its bank facilities was $17.6 million. The Company will use a portion of the net proceeds of this offering to reduce the amounts outstanding under these bank facilities. See "Use of Proceeds." The Company intends to seek to establish a new bank credit facility with an aggregate credit

26

line of approximately $50 million. No commitment has been obtained, and there can be no assurance that the Company will be able to obtain this line of credit.

The Company anticipates that the net proceeds received from this offering, together with cash from operating activities, should be adequate to satisfy its capital requirements for 18 to 24 months. In the event the Company should consummate an acquisition, its capital requirement could increase, however, there are no current or pending arrangements, understandings, negotiations or agreements with respect to any potential acquisitions.

*Inflation.*   During 1995, 1996 and 1997, the rate of inflation in Hong Kong has ranged from approximately 6% to 9% per year (approximately 6% during 1997) and the average rate of inflation in China has ranged from approximately 4% to 17% per year, (approximately 4% during 1997). As a general matter, the effect of this inflation on the Company is primarily limited to labor costs, which represent a small component of the Company's total expenses. As the Company purchases most of its raw materials outside China, inflation in China does not have a significant effect on its overall costs.

*Currency and Exchange Rates.*   The functional currency of the Company is the U.S. dollar. Nearly all of the Company's sales are denominated in U.S. dollars. The majority of the Company's expenses, including wages and other production and administrative costs are denominated in Hong Kong dollars and Chinese Renminbi. Certain raw materials and other expenses are purchased using a variety of currencies including the U.S. dollar, Chinese Renminbi, Japanese yen and German mark. The majority of raw materials are purchased using Hong Kong dollars. The Hong Kong dollar is pegged to the U.S. dollar. The Company has not been significantly affected by exchange rate fluctuations and therefore has not needed to hedge its positions. See Note 3(e) of Notes to Consolidated Financial Statements.

27

# BUSINESS

## Overview

The Company is a designer and manufacturer of a wide range of small household appliances. The Company's products, all of which are manufactured in China, are sold under brand names such as Sunbeam, Oster, Mr. Coffee, Vidal Sassoon, Revlon, Hamilton Beach, Proctor-Silex, Moulinex, Krups and Welbilt. The Company manufactures over 160 different models, primarily in four product categories: (i) kitchen appliances such as breadmakers and coffeemakers, (ii) personal, beauty and health care products such as hair dryers and curling irons, (iii) travel products and accessories such as irons and hair setters, and (iv) garment care products such as steam and dry irons. The Company's net sales grew to $62.7 million in fiscal 1997, as compared to net sales of $31.5 million and $44.1 million in fiscal 1995 and 1996, respectively. Net sales for the nine months ended December 31, 1997 were $96.2 million.

The Company has achieved this growth by emphasizing original design manufacturing rather than contract manufacturing. As an original design manufacturer ("ODM"), the Company designs and develops proprietary new products which it manufactures for well-known household appliance companies for sale under their brand names. As a result of the Company's innovative product designs and high quality, low-cost manufacturing capabilities, in July 1997 the Company entered into a four-year agreement with Sunbeam Products, Inc., a subsidiary of Sunbeam, to be its sole outside supplier of certain models of breadmakers, air cleaners, coffeemakers, irons, rotisseries, toaster ovens, food steamers, rice cookers, deep fryers and other products. Net sales of the Company's ODM products represented 39.5%, 58.1%, 73.6% and 80.0% of the Company's net sales during fiscal 1995, 1996, 1997 and the 1998 interim period, respectively. The balance of the Company's net sales are from contract manufacturing performed according to product specifications provided by customers.

During fiscal 1997, U.S. and European sales of the Company's products accounted for 75.1% and 23.2%, respectively, of the Company's net sales. Total retail sales of small household appliances in the U.S. during 1996 were approximately $5.3 billion. Small household appliances are sold through a variety of distribution channels including mass merchandisers, specialty retailers, warehouse clubs, drug store chains, direct marketing organizations and department stores. In the U.S., mass merchandisers, such as Wal-Mart, Kmart and Target, have become the dominant retailers of small household appliances. The Company believes a similar trend has emerged in Western Europe. Generally, mass merchandisers prefer to purchase from a limited number of well-known household appliance companies that provide a variety of high quality, innovative, brand-name products on a timely and cost-effective basis. Accordingly, household appliance companies are focusing on their primary strengths of marketing and distribution while increasingly outsourcing product development and manufacturing.

## Business Strategy

The Company's business strategy is to achieve growth, market share gains and increased profitability by helping its customers meet the stringent requirements of mass merchandisers and major retailers. The key elements of the Company's business strategy are:

*Innovative Product Development.*  As an ODM, the Company regularly develops new products which may range from minor design changes in existing products to significant new functions or features. In creating new products, the Company concentrates on the development of concepts, functions and features which are not offered by existing products and which can be produced at a reasonable cost. The Company seeks to reinforce the proprietary nature of its new products by obtaining patent protection when possible and retaining ownership of the tooling required to manufacture its ODM products. The Company believes the flexibility of its design and manufacturing process allows it to introduce new products with shorter development cycles than its customers.

*Vertically Integrated, Low Cost Manufacturing.*  The Company operates two vertically integrated manufacturing facilities in China. The Company has made a significant investment, and continues to invest, in sophisticated machinery for creating the tooling and components used in the manufacturing process. This machinery, along with the use of inexpensive labor, enables the Company to efficiently produce many of its

P 000144                28

components and to assemble these components to create finished products. By locating its manufacturing facilities in close proximity to Hong Kong, the Company is also able to leverage both the transportation resources and engineering and managerial expertise available in Hong Kong. The Company believes that its investment in manufacturing machinery combined with the strategic use of labor and management resources allows it to provide customers with high quality, low cost products in an efficient and timely manner.

*Commitment to Quality.* The Company is committed to manufacturing products of the highest quality and achieves this goal by engaging in quality control testing at each stage of the manufacturing process. The Company is able to assure the reliability and consistent performance of its products by testing components on both a stand-alone and assembled basis. After the assembly stage, the Company tests each finished product.

*Wide Variety of Products.* The Company believes its variety of product offerings enables its customers to offer mass merchandisers and other retailers a single source for a wide range of household appliances. The Company has continually increased the number of its product offerings and intends to continue to introduce at least twenty new products each year. During the current fiscal year, the Company has introduced new models of breadmakers, coffeemakers, food steamers, deep fryers, hair dryers, rice cookers, travel irons and toaster ovens. The Company expects to ship floor care products beginning in the first quarter of fiscal 1999 when it introduces its hand-held steam vacuum cleaner. Additional products in each of the four major product categories are currently under development.

*Focus on Sales to Brand Name Customers.* The Company's ability and commitment to develop new and innovative, high quality products at low cost has allowed the Company to benefit from the increased outsourcing of product development and manufacturing by its customers. The Company intends to enter into exclusive supply agreements for certain household appliance products. Effective July 1, 1997, the Company entered into a four-year agreement with Sunbeam to be its sole outside supplier of certain products. See "Business—Supply Agreement with Sunbeam."

*Pursue Selected Acquisitions.* The Company believes that the continuing trend among retailers to consolidate their vendors, including suppliers of small household appliances, will provide the Company with acquisition opportunities. The Company intends to pursue selected acquisitions of complementary businesses. The Company does not have any current or pending arrangements, understandings, negotiations or agreements with respect to any potential acquisitions.

## Products

The Company designs and manufactures a wide range of small household appliances. The Company emphasizes original design manufacturing, and in fiscal 1997 and the 1998 interim period ODM products accounted for 73.6% and 80.0%, respectively, of the Company's net sales. In fiscal 1997, the Company produced approximately 6 million products, of which 3 million were kitchen appliances (59 models), 1.7 million were personal care products (65 models), 730,000 were travel products and accessories (18 models), 500,000 were garment care products (10 models) and 50,000 were environmental care products (10 models). The term "models" refers to a product with identifiable features that distinguish it from the Company's other models of the same product. Each model may include various stock-keeping units ("SKU's"), which refers to variations of color or other less functional aspects of a product, which are tailored for each of the Company's customers, but do not represent a change in product features.

P000145

The following table sets forth the net sales of each of the Company's product categories in fiscal 1995, 1996, 1997 and the 1998 interim period:

| Product Category | Fiscal Years Ended March 31. | | | Nine Months Ended December 31. | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1996 | 1997 |
| | (in thousands) | | | | |
| Kitchen appliances | $14,673 | $25,929 | $41,251 | $27,206 | $75,000 |
| Personal, beauty and health care products | 8,450 | 6,961 | 8,946 | 8,172 | 11,421 |
| Travel products | 5,267 | 6,286 | 7,104 | 6,316 | 4,522 |
| Garment care products | 3,005 | 4,329 | 4,936 | 3,085 | 3,388 |
| Other(1) | 120 | 578 | 262 | 343 | 1,874 |
| Total | $31,515 | $44,083 | $62,699 | $45,122 | $96,205 |

(1) Includes environmental care products and accessories for each of the Company's product categories.

*Kitchen Appliances.* The Company began manufacturing kitchen appliances in 1992 and has focused its ODM design and development efforts in this area in recent years. The Company manufactures a broad line of kitchen appliances, including breadmakers, coffeemakers, food steamers, food choppers, food processors, blenders, electric knives, rice cookers, deep fryers and espresso machines. The Company believes that the higher price points generated by items such as breadmakers and deep fryers allow it to obtain per unit profits which are generally higher than the Company's other product categories.

A key element of the Company's strategy is the design and development of innovative, proprietary new products. Examples of new kitchen appliances introduced in the last fiscal year include: (i) breadmakers with interlocking paddles which remain in the machine when the loaf is taken out, (ii) food steamers with a heater system that has reduced the time to produce steam to less than thirty seconds from up to five minutes, and (iii) cycling deep fryers with a basket which can be raised and lowered automatically for more accurate cooking time, healthier, better tasting food and easier draining. During fiscal 1997 and the 1998 interim period, the Company introduced new models of deep fryers, ice cream makers, toaster ovens, food steamers, breadmakers, coffeemakers, rice cookers, espresso machines, food choppers and food processors. Products currently under development and scheduled for introduction in fiscal 1999 include indoor grills, steam ovens and steam rotisseries as well as new models of digital-control toaster ovens, lower priced breadmakers and cycling deep fryers. Kitchen appliances represented 46.6%, 58.8%, 66.1% and 78.0% of the Company's net sales in fiscal 1995, 1996, 1997 and the 1998 interim period, respectively.

Breadmakers have been sold in the U.S. since the mid-1980s. By 1996, retail sales of breadmakers in the U.S. had grown to approximately $576 million. Because of the significant growth of this market, and in response to the demands of its customers, the Company introduced its own line of breadmakers in the fall of 1996. Breadmakers accounted for $12.4 and $36.2 million of the Company's net sales in fiscal 1997 and the 1998 interim period, respectively. Pursuant to its agreement with Sunbeam, the Company is the exclusive supplier of certain models of breadmakers to Sunbeam.

*Personal, Beauty and Health Care Products.* The Company expanded into the area of personal, beauty and health care products in 1969, primarily as a contract manufacturer. The Company's personal, beauty and health care products include a variety of hair dryers, hair roller sets, make-up mirrors, curling irons, hot-air brushes, facial saunas, and body massagers. Innovative features introduced by the Company include a heat protection guard in curling irons to avoid burning the scalp or hair of the user and jumbo rollers in hair setters. During fiscal 1997 and the 1998 interim period, the Company introduced new models of hair dryers, curling irons and hair clippers. The Company plans to introduce new models of hair setters, hot air brushes, curling irons and hair dryers in fiscal 1999. Personal, beauty and health care products represented 26.8%, 15.8%, 14.3% and 11.6% of the Company's net sales in fiscal 1995, 1996, 1997 and the 1998 interim period, respectively.

30

P000146

*Travel Products.*  The Company expanded into the area of travel products in 1979. The Company's travel products include travel steam and dry irons, travel hair dryers, travel hair roller sets and voltage converters/adapters. Innovative features introduced by the Company include steam and temperature controls in one knob on travel steam irons and a quicker heating time for travel hair setters. During fiscal 1997 and the 1998 interim period, the Company introduced new models of travel irons. The Company plans to introduce new models of travel hair setters in fiscal 1999. Travel products represented 16.7%, 14.3%, 11.3% and 5.0% of the Company's net sales in fiscal 1995, 1996, 1997 and the 1998 interim period, respectively.

*Garment Care Products.*  The Company expanded into the area of garment care products in 1985. The Company's garment care products include a variety of steam and dry irons and clothes steam brushes. Innovative features introduced by the Company include an automatic on and off switch in steam irons and a "burst of steam" feature in steam brushes for better penetration into the garment to remove deep wrinkles. During fiscal 1997 and the 1998 interim period, the Company introduced several new models of steam irons. The Company plans to introduce new models of steam station irons and lower priced steam irons in fiscal 1999. Garment care products represented 9.5%, 9.8%, 7.9% and 3.5% of the Company's net sales in fiscal 1995, 1996, 1997 and the 1998 interim period, respectively.

*New Products.*  The Company continuously introduces new small household appliances. In addition to new products in its four major product categories, during fiscal 1997 the Company introduced an environment care product line, including a variety of humidifiers, air purifiers and water filters. Innovative features introduced by the Company include environment care products with a four-stage filtering process with a HEPA filter in the air cleaner and a four stage filtering process with a warm mist in the humidifier. The Company also plans to introduce in fiscal 1999 a new line of floor care products including a variety of steam vacuum cleaners, wet dry vacuum cleaners, stick steam vacuum cleaners and the first hand-held steam vacuum cleaners.

## Product Design and Development

As an ODM, the Company regularly develops new products which may range from minor design changes in features of existing products to significant new functions or features. In creating new products, the Company concentrates on the development of concepts, functions and features which are not offered by existing products and which can be produced at a reasonable cost. The Company seeks to reinforce the proprietary nature of its products by obtaining patents when possible and retaining ownership of the tooling required to manufacture its ODM products. The Company believes the flexibility of its design and manufacturing process allows it to introduce new products with shorter development cycles than its customers. The Company intends to introduce at least 20 new products each year. The Company is shifting its focus to the manufacture of higher priced products such as breadmakers and food steamers, which cost more to produce but which realize a higher per unit profit.

In 1988, the Company established its own design and development department, which is comprised of approximately 40 engineers and technical staff responsible for conducting feasibility analyses of new product ideas, testing of new products and overseeing the initial production runs for these products. This is done in close collaboration with the sales and marketing department. Together, both groups evaluate competitive products, monitor changes in consumer buying behavior and plan new products or the improvement of existing products. Since its inception, the product design and development team has contributed to the development of over 130 products.

The Company's design and development team guides products from conception through manufacturing. A typical cycle for a product to be manufactured and sold to an ODM customer is nine to twelve months from conception, through design, tooling and production, while the typical cycle for contract manufacturing is eight to ten months since the concept and design for the product is supplied by the customer. Contract manufacturing customers generally bear the cost of tooling produced by the Company, while the Company absorbs such costs in the ODM process. When tooling is completed and UL listing and TUV or other appropriate regulatory approval is obtained, production begins.

31

P000147

The Company employs industrial design, mechanical, electrical and electronic engineers to design, develop and test its products. Each group is primarily responsible for the design and testing of its products and utilizes sophisticated computer systems. The Company utilizes both employee and retailer feedback in identifying potential new products and product enhancements. Once targeted for possible production, product and enhancement concepts are conveyed to industrial, and then mechanical, designers. The Company utilizes computerized design and other leading design and engineering technologies. The Company currently uses CAD systems, an advanced 3-D solid modeling system and state-of-the-art stereo lithography equipment to design and engineer new products. The Company believes that these new technologies and equipment have improved the speed and efficiency of the design process and the quality of the finished products. The Company's expenditures for design and development of products were approximately $933,000, $914,000, $1.3 million and $1.0 million for fiscal 1995, 1996, 1997 and the 1998 interim period, respectively.

## Manufacturing

The Company operates two vertically integrated manufacturing facilities in China. Vertical integration enables the Company to manufacture high quality products at low cost, to emphasize quality control, and to provide the flexibility in the manufacturing process necessary to better service its customers' needs. The Company has made a significant investment, and continues to invest, in machinery for creating the tooling and components used in the manufacturing process. This machinery, along with the use of inexpensive labor, enables the Company to efficiently produce many of its components and assemble these components to create its finished products. It manufactures most of its motors and other components, including thermostats, plastic parts, switches, circuit boards and deep-draw breadmaker buckets and at its two factory facilities. The Company sub-contracts certain components when they can be bought from other suppliers at lower prices, if the Company does not have the specialized machinery to produce the component or when the Company can more efficiently allocate its production capacity to other components. Currently, the Company sub-contracts components such as diecast breadmaker buckets and steam iron sole plates as well as various small moldings to fifteen suppliers. The Company does not have any agreement with these suppliers and orders the components as needed using purchase orders. Although four of the component suppliers are currently the sole source of the components they supply, the Company does not consider any of these suppliers to be material to its business as there are numerous alternate suppliers of equivalent quality. The Company does not generally depend on other manufacturers to provide key parts or accessories.

Generally, the Company's production schedule is based on purchase orders and forecasts received from its customers upon completion of tooling, typically covering a period of three to six months. The first two months of orders to be shipped pursuant to the forecasts are generally firm. Later shipments often vary from initial forecasts, depending on the needs of the customer. The relation of actual shipments to forecasted orders is based on industry custom rather than on binding agreements and thus orders may be canceled at any time without penalty to the customer or recourse to the Company. The Company believes that its flexible manufacturing process enables it to meet customers' changing needs without significant disruption or additional capital expenditure. During the last three years, the Company has not suffered a material loss resulting from the cancellation of a forecasted order.

The seasonal nature of the Company's business requires that a large amount of products be manufactured during the months of September and October to meet demand for holiday sales. In addition, the Company must increase production from time to time as a result of new product introductions or significant customer orders. During these peak production periods, the Company's factories operate on a six-day work week with the assembly department operating for one 10-hour shift per day, the plastic injection department for two 10 or 11-hour shifts per day and the metal stamping department for two 10-hour shifts per day. The Company's two factory complexes operate near maximum capacity throughout these peak production periods. The Company intends to utilize a portion of the net proceeds of the offering to expand the manufacturing capacity at its Dongguan factory in order to increase its ability to produce a greater number and variety of products. These improvements will increase the number of production and assembly lines from 12 to 25 at this facility. The

P 000148

32

Company expects employment during peak production periods after completion of the expansion at the factory will increase to a high of approximately 9,500 employees compared to the high during the 1998 interim period of approximately 5,700 employees. The expansion is scheduled for completion during fiscal 1999.

The Company ships its products primarily from Hong Kong and China, with customers generally liable for any losses resulting from the transportation of finished products from Hong Kong to their final destination. Transportation of components and finished products between Dongguan, China and Hong Kong is by truck. Component parts purchased from other areas are generally shipped by sea.

## Quality Control

The Company is committed to manufacturing products of the highest quality and achieves this goal by engaging in quality control testing at each stage of the manufacturing process. All incoming raw materials and components are checked by the Company's quality control personnel. During the production stage, the Company's quality control personnel check all work-in-process at several points in the production process. The Company is able to assure the reliability and consistent performance of its products by testing components on both a stand-alone and assembled basis. After the assembly stage, the Company tests each finished product. The Company provides access to its China manufacturing facility for representatives of its major customers to permit them to monitor production and to provide them with direct access to the Company's manufacturing personnel.

The Company provides a warranty for limited manufacturing defects to certain of its customers; however, the Company does not provide warranties that extend to the ultimate consumers of the product. Consumer warranties are made by the marketer of the product. No warranty is given for defective products for up to 2% of the number of products sold to each customer. Over the 2% threshold, the Company warrants only manufacturing defects and, if there is such a defect, will replace the items or give the customer a credit for the purchase of future goods. To date, claims under the Company's warranty program have been minimal. The Company may, from time to time and under special circumstances, establish individual warranty policies with major customers. In addition, for its ODM products, the Company generally indemnifies its customers against any conflicts with patents owned by third parties. See "Business—Legal Proceedings."

## Suppliers

The Company obtains over 6,500 different component parts from more than 250 major suppliers and is not dependent upon any single supplier for any key component. Certain of the Company's major component parts, such as plastic, metal sheets and packaging, are purchased solely from outside suppliers, while others, such as motors and electronic parts are sometimes manufactured by the Company and, at other times sources from outside, depending on the complexity of the component and the capacity of the Company's facilities at that time. The Company believes it can obtain all these components from alternate sources if necessary. Raw materials, electronic components and other parts are either sourced in China or in other countries such as the U.S., Japan and Germany. Raw materials from outside China are generally shipped through Hong Kong, and then transported by truck to the Company's factories in China, where the finished products are manufactured and assembled. The Company's transactions with its suppliers are based on purchase orders issued by the Company from time to time and, except for these purchase orders, the Company has no written agreements with its suppliers. Orders for components are based on actual orders and forecasts that the Company receives from its customers, which reflect anticipated shipments during the production cycle for a particular model. See "—Product Design and Development." Many of the raw materials used in the Company's products, such as plastics, are purchased outside China and are subject to any applicable duties on international trade. See "Certain Foreign Issuer Considerations."

The Company is dependent upon outside suppliers for all of its raw material needs, including plastic resins, and is subject to price increases in these raw materials. The plastic resins used by the Company are derived from natural gas liquids. Plastic resin prices may fluctuate as a result of natural gas and crude oil prices and capacity, supply and demand for resin and petrochemical intermediates from which they are produced. The Company has

33

no long-term supply contracts for the purchase of plastic resin, although the Company generally maintains a 90-day supply. In the past, the Company has had limited ability to increase product pricing in response to plastic resin price increases.

The Company works closely with its customers and suppliers in order to minimize the amount of inventory on hand. The Company is currently in the process of automating its inventory maintenance and control system, which is expected to be completed during fiscal 1999. In order to expedite the production process and reduce the risk of delays caused by the non-delivery of supplies, it is the Company's policy generally to source each component from two or more suppliers. This multi-source approach is intended to ensure the delivery of the components necessary in the manufacturing process should one supplier be unable to deliver the required supplies. The Company has not experienced any difficulty in obtaining component parts.

## Major Customers

Sales to the Company's five major customers, Sunbeam (which also sells under the brand name Oster), Appliance Corporation of America (which sells under the brand name Welbilt), Helen of Troy Limited (which sells under the brand names Vidal Sassoon and Revlon), Global Marketing Corp. (which sells under the brand name Connoisseur) and Hamilton Beach/Proctor-Silex accounted for 45.4%, 56.1%, 52.7% and 57.9% of the Company's net sales during fiscal 1995, 1996, 1997 and the 1998 interim period, respectively. During each of these periods, the following customers accounted for more than 10% of the Company's total net sales: during fiscal 1995: Helen of Troy Limited (20.5%) and Hamilton Beach/Proctor-Silex (20.9%); during fiscal 1996: Sunbeam (16.6%), Helen of Troy Limited (14.7%) and Hamilton Beach/Proctor-Silex (18.7%); during fiscal 1997: Sunbeam (13.3%), Appliance Corporation of America (12.1%) and Helen of Troy Limited (10.8%); and during the 1998 interim period: Sunbeam (39.7%). Sunbeam recently announced that it has agreed to purchase Signature Brands. Signature Brands is also a customer of the Company and sales to Sunbeam and Signature Brands represented an aggregate of 45.1% of the Company's net sales in the 1998 interim period. Although the relative percentage of sales of each of the Company's major customers changes each year, the Company expects that in the foreseeable future it will be dependent on between four and six major customers during each fiscal year. While the Company may enter into contracts with general terms for the purchase of products with certain of its major customers, sales are generally made by purchase orders received by the Company from time to time without any firm commitment for sales levels over a long-term period. The Company believes its relations with its major customers are good.

*Supply Agreement with Sunbeam.* Effective July 1, 1997, the Company entered into a four-year agreement with Sunbeam Products, Inc., a subsidiary of Sunbeam, to be its sole outside supplier of certain models of breadmakers, air cleaners, coffeemakers, irons, rotisseries, toaster ovens, food steamers, deep fryers and other products. The agreement is not a guarantee by Sunbeam to purchase any specific quantity of the products covered under the agreement but provides that the Company will be Sunbeam's sole supplier of the specific models of such products so long as Sunbeam continues to market similar or like models of these products and does not manufacture such products itself. The agreement also provides that the number and pricing of products supplied to Sunbeam will be determined by the parties by mutual agreement. As consideration for the exclusivity granted, the Company paid Sunbeam a non-refundable incentive fee of $1 million. See Note 17(c) of Notes to Consolidated Financial Statements. Sunbeam may terminate the agreement upon ninety days' prior written notice to the Company if Sunbeam discontinues the marketing of such products or directly manufactures such products. Although the agreement does not contain any indemnification provisions, the Company generally provides certain indemnities in the individual product manufacturing and distribution agreements which will be entered into for each of the products which indemnify Sunbeam for all losses arising from death or injury resulting from products manufactured by the Company and from the infringement by the Company's products of any patents or other intellectual property of any third party.

## Marketing

The Company's extensive worldwide sales and marketing activities are managed by a team of executives based in Hong Kong who maintain frequent contact with the Company's customers. The Company maintains its

54

f 000150

relationships with its customers by employing senior marketing personnel who understand the culture of the customers' local market and share the same language with the employees of its customers who make purchasing decisions

The Company's marketing programs are designed to create an awareness of its comprehensive selection of innovative, high quality and cost-effective merchandise. Generally, the Company emphasizes personal contact with customers and potential customers. While the Company's customers rely on the Company for high quality products, the ultimate consumers of the products rely on the customers' brand name and generally do not know the identity of the manufacturer. The decision to offer to its ODM customers a new product is based on the Company's assessment of market conditions for that product along with the constant need to add innovations to products to generate more sales. New products are introduced to potential customers personally, through distribution of catalogues, at trade shows and through limited advertising in industry periodicals.

One of the most important parts of the marketing process is following through with the customer. The marketing maintains contact with the customer after the sale is made, serving as their liaison with the Company for the manufacturing and delivery process. These personal relationships have been cultivated over years and the Company believes that it has a stable relationship with its major customers. Many of its customers, including most of its largest customers, have purchased goods from the Company for more than ten years. The Company's long-standing relationships between its personnel and its customers and its reputation in the industry are the essential elements of marketing.

**Competition**

The Company believes that the markets for its products are mature and highly competitive and that competition is based upon several factors, including price, product features and enhancements, and new product introductions.

The Company competes with established companies, a number of which have substantially greater technical, financial and marketing resources than the Company. For ODM sales, competition is based on product variety, uniqueness of product features, combination of features offered and brand name identification as well as unit price, product quality and availability and promptness of service. Competition for contract manufacturing sales is based primarily on unit price, product quality and availability and promptness of service. The Company believes that it competes favorably with respect to each of these factors. The Company believes it possesses a competitive advantage in its ability to produce innovative products based on its product design and development capability, the quality and price of its products and its broad product line. In addition, while individual contract manufacturing customers may have preferences among their approved suppliers, management believes that no company dominates the market as contract manufacturing customers tend to order from several different suppliers in order to lessen dependence on any one entity.

**Employees**

At December 31, 1997, the Company employed 4,161 persons on a full-time basis, of which 99 were located in Hong Kong and 4,062 in China. Of the total workforce, 3,086 were engaged in manufacturing, 13 in sales and marketing, 316 in finance and administration, 52 in product design and development, 401 in production management, 133 in quality control, 91 in receiving and warehousing and 69 in production engineering. Since the Company's business is seasonal, the number of employees varies from time to time based on the Company's needs. During peak production periods, the Company employed a maximum of approximately 5,700 persons during the 1998 interim period. The Company's manufacturing personnel are paid a monthly salary, periodic incentive bonuses and are provided with housing, medical care and subsidized meals in the Company's dormitory complex adjacent to each factory. The Company has not experienced any significant labor stoppages and believes that relations with its employees are satisfactory.

The Company's relationships with its employees in China are subject to the Labor Law of the People's Republic of China (the "Labor Law") which went into effect on January 1, 1995. The Labor Law regulates, among other things, the number of hours employees may work on a daily and weekly basis, provides allowances for legal holidays, regulates working conditions such as safety and hygiene and provides for various social welfare and employment benefits. The Company believes that it is in material compliance with such regulations

P000151

## Intellectual Property Rights

The Company is the holder of a number of patents registered in various jurisdictions, including the U.S., the United Kingdom and France, and holds the exclusive rights with respect to certain technology included in its products. The Company relies primarily upon a combination of trademark, copyright, know-how, trade secrets and contractual restrictions to protect its intellectual property rights. The Company believes that such measures afford only limited protection and, accordingly, there can be no assurance that the steps taken by the Company to protect these proprietary rights will be adequate to prevent misappropriation of the technology or the independent development of similar technology by others. Despite the Company's efforts to protect its proprietary rights, unauthorized parties may attempt to copy aspects of the Company's products or obtain and use information that the Company regards as proprietary.

Significant and protracted litigation may be necessary to protect the Company's intellectual property rights, to determine the scope of the proprietary rights of others or to defend against claims of infringement. The Company believes that its systems do not infringe any existing third-party proprietary rights; however, there can be no assurance that third-party claims alleging infringement will not be asserted against the Company in the future. If infringement is alleged, the Company could be required to discontinue the use of certain software codes or processes, to cease the manufacture, use and sale of infringing products, to incur significant litigation damages, costs and expenses and to develop non-infringing technology or to obtain licenses to the alleged infringing technology. There can be no assurance that the Company would be able to develop any such alternative technologies or obtain any such licenses on terms commercially acceptable to the Company. Any infringement claim or other litigation against the Company could materially adversely affect the Company's business, operating results and financial condition.

The Company generally indemnifies its customers for patent infringement claims relating to the Company's ODM products. One of the Company's customers is currently defending two patent infringement claims pertaining to the Company's food steamers, a product line which represented 13.2% and 12.6% of the Company's net sales in fiscal 1997 and the 1998 interim period, respectively. The Company has provided an indemnity in connection with these two legal proceedings and, as of December 31, 1997, has reserved approximately $641,000 for its litigation costs. No assurance can be given that such claims will be resolved in favor of the Company's customers or that other parties will not assert infringement claims against the Company. The cost of any such indemnity or of responding to any such assertion could be significant, regardless of whether the assertion is valid. See "Risk Factors—Business Risks—Proprietary Technologies; Patent Protection and Infringement" and "Legal Proceedings."

The Company entered into a patent assignment agreement dated June 10, 1996 with Mr. John Sham for the assignment by Mr. Sham to the Company of patents for: (i) two portable steam vacuum cleaners; (ii) a photo-sensitive switching apparatus for electrical appliances; (iii) a steam cooking appliance; (iv) a food slicer; (v) a food chopper; (vi) a steam and dry iron; (vii) a leakage current circuit interrupter device; (viii) a coffeemaker; and (ix) a travel iron. The agreement provided for a payment of $1 million. The Company entered into a second patent assignment, dated May 21, 1997, with Mr. John Sham for the assignment of the patent to the Company for an automatic power interruption device which can be applied to a variety of heat-producing electrical appliances, a portable steam vacuum cleaner and a steam iron. The second agreement provided for the payment of $225,000. All payments required to be made under the patent assignment agreements have been made. See "Certain Transactions."

## Properties

### China

The Company's main manufacturing facility is located in Dongguan, China. The manufacturing complex includes 23 buildings of which 14 buildings are dormitories with accommodations for up to 3,700 employees, cafeterias and recreational areas. The Company owns all of the 23 buildings on the site and has freely transferable land use rights for a period of 50 years for the land upon which its buildings and facilities are located. The Company intends to use approximately $30 million of the net proceeds of this offering to expand its manufacturing capacity at its Dongguan factory.

The land use rights lease for the Dongguan facility between the Company and the People's Government of Qingxi Town, Dongguan City, Guangdong Province is a for a term of fifty years beginning August 7, 1993 and ending August 7, 2043 and requires the payment by the Company of $2,082,879 for the entire term of the lease. As of December 31, 1997, the Company owed approximately $207,000 of this amount and an additional $511,000 in transfer fees with respect to this transaction. The Company will not receive a formal grant of the lease rights until the final payment is made and the appropriate documents are processed by the government agencies in China. The Company expects to receive such grant during fiscal 1999. Upon expiration of the fifty-year lease term, the Company has the right to extend the lease for 20 years upon payment of a fee of $25.00 per square meter.

The Company has a manufacturing facility in Shenzhen which opened in 1984. Pursuant to an agreement with the Buji Economic Development Company ("BEDC"), a Chinese government agency, the Company has received a license to use a 22,000 square foot manufacturing facility located in Shenzhen. The agreement commenced on April 1, 1997, expires on March 31, 2007 and is terminable by either party upon 90 days' notice. The agreement with BEDC also provides that BEDC will make available to the Company the services of approximately 250 factory employees. In the Shenzhen facility, the Company manufactures hair setters, curling irons, hair clippers and other household appliances, some of which include components, such as plastic parts, which are manufactured in the Dongguan facility. Similarly, the Shenzhen factory manufactures certain components, such as breadmaker motors, which are then shipped to the Dongguan factory for assembly. The agreement with BEDC provides that the Company pay a license fee for the facility and the salary of each worker in the factory to BEDC, with a minimum annual payment of $168,000. The Company is currently paying the minimum amount.

The Company believes that its administrative office space will be adequate for the operation of its business for the foreseeable future. The Company believes that after completion of the expansion of the manufacturing facility in Dongguan, the Company will have sufficient manufacturing capabilities for the next several years. To the extent necessary, the Company intends to continue to utilize the Shenzhen facility after the expansion of its Dongguan factory is completed.

*Hong Kong*

On April 1, 1996, the Company entered into a three-year lease with Wing Shing Products Company Ltd., an affiliate of the Company (see "Certain Transactions"), for office space located in the Kin Teck Industrial Building in Aberdeen, Hong Kong, in which it currently operates its administrative offices and sales and marketing, purchasing, accounting and finance, product design and development and limited warehousing. Pursuant to the lease, the Company pays monthly rent of approximately $17,000 per month until March 31, 1998 and $18,000 per month thereafter. In addition, the Company owns one-half of one floor in the same building which is used for additional warehousing. The total offices and warehousing space in the building occupied by the Company includes an area of approximately 30,500 square feet, which houses 100 employees, 36 of whom are engaged in product design and development, 12 in accounting and finance, 13 in marketing and sales and the remaining in administration, purchasing, quality control and production management.

**Legal Proceedings**

Except as set forth below, the Company is not a party to any material litigation or arbitration and no material litigation or claim is known to the Company to be pending or threatened against the Company or with respect to any of its properties.

Certain of the Company's agreements with its ODM customers include an indemnification provision whereby the Company undertakes to hold harmless and indemnify the respective customer from all suits which may be brought against it for infringement of any patents or registered designs in connection with the sale of the products manufactured by the Company.

On November 20, 1995, Rival Company ("Rival") filed suit against Sunbeam in the U.S. District Court for the Western District of Missouri, Western Division alleging that certain features of food steamers which the Company manufactures for Sunbeam infringe a U.S. patent held by Rival. Rival claims damages estimated to be

P 000153

over $23 million and it also seeks injunctive relief. Sunbeam has denied that its product infringes the Rival patent and claims that Rival is barred as a matter of law from seeking numerous elements of its damage claims and has moved to limit the evidence regarding certain of those claims. On December 5, 1997, Sunbeam's motion for summary judgment was granted and Rival's was denied. Rival filed a notice of appeal of this judgment on January 5, 1998 and is not required to file a brief detailing the basis of its appeal until April 1998.

On December 21, 1995, Black & Decker Inc. ("Black & Decker") filed suit against Sunbeam for patent infringement in the U.S. District Court for the Northern District of Illinois. Black & Decker alleges that Sunbeam infringes a patent assigned to Black & Decker which covers certain features of food steamers and seeks unspecified money damages and injunctive relief. Sunbeam has denied the allegations and has asserted that the patents are not infringed and invalid. The lawsuit was stayed by order of court pending reexamination of Black & Decker's patent by the U.S. Patent and Trademark Office. The U.S. Patent and Trademark Officer confirmed the patent earlier this year, and the District Court vacated the stay of the case. Promptly after the stay was dissolved, Black & Decker moved for summary judgment of infringement. That motion was argued on October 14, 1997. Discovery in the case has been held in abeyance pending resolution of this motion.

Although the Company is not a party to these actions, pursuant to an agreement between the Company and Sunbeam, the Company is obligated to hold harmless, defend and indemnify Sunbeam for any losses and legal fees it may sustain as a result of these lawsuits. An adverse decision against the Company could have a material adverse effect on the Company's business, results of operations and financial condition. However, after considering all facts known to the Company, the Company does not believe that these actions will have such a material adverse effect.

38

P000154

## CERTAIN FOREIGN ISSUER CONSIDERATIONS

Because the Company is a foreign issuer incorporated in the British Virgin Islands and conducts its operations and owns assets primarily in China and Hong Kong, the Company's operations and assets are subject to significant political, economic, legal and other uncertainties in Hong Kong, China and, in some instances, the British Virgin Islands, including the following:

### China

China is a socialist state which, since 1949, has been controlled by the Communist Party of China. Changes in the top political leadership of the Chinese government may have a significant impact on policy and the political and economic environment in China. Moreover, economic reforms and growth in China have been more successful in certain provinces than in others and the continuation or increase of such disparities could affect political or social stability.

China is considered to be a high risk nation for business and investment in the Asian region. Although recently China has permitted greater provincial and local economic autonomy and private economic activities, the government of China has exercised and continues to exercise substantial control over virtually every section of the Chinese economy through regulation and state ownership. Accordingly, government actions in the future, including any decision not to continue to support the economic reform program that commenced in the late 1970's and possibly to return to the more centrally-planned economy that existed prior thereto, could have a significant effect on economic conditions in China and on the operations of the Company. China's economic reform plan was designed to bring in foreign investment capital and technological skills. The result has been a move towards a more mixed economy away from the previous centrally planned economy. The process of devolving responsibility for all aspects of enterprise to local management and authorities continues, even though the system of socialism with Chinese characteristics involves considerable influence by the central government on production and marketing.

Substantially all of the Company's products are currently manufactured in China and over 97% of the net book value of the Company's total fixed assets are located in China. The Company is a party to agreements with instrumentalities of the government of China and sells products to entities based principally in the U.S. and Europe. International operations and sales may be subject to political and economic risks, including political instability, currency controls and exchange rate fluctuations and changes in import/export regulations, tariff and freight rates. In addition, various forms of protectionist trade legislation have been proposed in the U.S. and certain foreign countries. Changes in tariff structures or other trade policies could adversely affect the Company.

China offers the Company low overhead and competitive labor rates. The location of its principal factory, in Dongguan, China, provides the Company with the ability to manage factory operations from Hong Kong and facilitates transportation of the Company's products to markets outside China. Political developments in China could have a material adverse effect on the business and assets of the Company. The legal system of China relating to foreign investments is both new and continually evolving and there can be no certainty as to the application of its laws and regulations in particular instances.

*International Trade.* At present, a significant portion of the economic activity in China is export-driven and, therefore, is affected by developments in the economies of China's principal trading partners. The U.S. Congress considers annually the renewal of China's current "Most Favored Nation" trading status and may attach conditions to the renewal of such status which China may decline, or be unable, to meet. In 1994, President Clinton announced delinkage of such status to China's achievement of overall significant progress in the area of human rights. Prior to this announcement, renewal of such status had been contingent on the achievement of such progress. There can be no assurance that renewal of such status in the future will not be linked to human rights issues or other requirements or that, notwithstanding continuing Presidential support for such status, Congress for any reason in the future will not deny such status and impose tariffs or trade restrictions. Revocation or conditional extension by the U.S. of China's "Most Favored Nation" trading status, or the imposition of

P000155

tariffs or trade restrictions, would have a material adverse effect on the Company's business, results of operations and financial condition.

**Government Regulation.** The Company's operations and assets in China are subject to significant political, economic, legal and other uncertainties. Changes in policies by the Chinese government resulting in changes in laws, regulations, or the interpretation thereof, confiscatory taxation, restrictions on currency conversion, imports and sources of supply, currency devaluations or the expropriation of private enterprise could have a material adverse effect on the Company's business, results of operations and financial condition. Under its current leadership, the Chinese government has been pursuing economic reform policies, including the encouragement of private economic activity and greater economic decentralization. There can be no assurance, however, that the Chinese government will continue to pursue such policies, that such policies will be successful if pursued or that such policies will not be significantly altered from time to time without notice. Economic development may be limited as well by the imposition of austerity measures intended to reduce inflation, the inadequate development of infrastructure and the unavailability of adequate power and water supplies, transportation and raw materials and parts.

The Chinese government regulates the import into China of certain raw materials used by the Company in its manufacturing process and taxes the importation of certain capital equipment. The approval of imports by the government is based to some extent on the lack of qualified domestically-produced products and strategic plans for the development of local Chinese industry. There can be no assurance that the government's policies will continue to allow the raw materials required by the Company to be imported into China or will not impose import fees which raise the cost of raw materials or capital equipment. The imposition of such fees could have a material adverse effect on the Company's business, results of operations and financial condition, including plans for the expansion of the Dongguan factory.

**Economic Conditions.** China has operated a centrally planned economy since 1949. Since 1978, China has implemented a series of economic reform programs in an effort to revitalize its economy and improve living standards. The Chinese government also has implemented policies designed to attract foreign investment and technology. Over the last few years, China's economy has registered a high growth rate and there have been recent indications that rates of inflation have increased. In response, the Chinese government recently has taken measures to curb the excessive expansion of the economy. These measures have included devaluations of the Chinese currency, the Renminbi, restrictions on the availability of domestic credit and limited re-centralization of the approval process for purchases of some foreign products. There can be no assurance that these austerity measures alone will succeed in slowing down the economy's excessive expansion or control inflation, nor that they will not result in severe dislocations in the Chinese economy in general. To further combat inflation, the Chinese government may adopt additional measures, including the establishment of freezes or restraints on certain projects or markets, which may have an adverse effect on the Company's operations.

**Recent Conditions in Asia.** During the last few months economic conditions and markets have been unstable throughout Asia. Currencies in several countries have been devalued and there has been political instability in certain countries. To date, neither Hong Kong nor China has devalued its currency or experienced significant instability as a result of these developments. However, there can be no assurance that the economic downturn will not spread to Hong Kong or China. Economic or political instability in Hong Kong or China or a significant devaluation of the currency in either country could have a material adverse effect on the Company's business, results of operations and financial condition.

**Legal System.** China's legal system is a civil law system which is based on written statutes and in which decided legal cases have little precedential value. China does not have a well-developed, consolidated body of laws governing foreign investment enterprises. As a result, the administration of laws and regulations by government agencies may be subject to considerable discretion. As legal systems in China develop, foreign business entities may be adversely affected by new laws, changes to existing laws (or interpretations thereof) and preemption of provincial or local laws by national laws. In circumstances where adequate laws exist, it may not be possible to obtain swift and equitable enforcement thereof.

40

P000156

*Environmental Law.* Environmental protection in China is regulated in accordance with the Environmental Protection Law of the People's Republic of China, which was effective December 26, 1989. The law sets national standards for environmental quality and monitoring as well as the utilization of natural resources and the reduction of pollution. As a manufacturer, the Company is subject to annual inspections. The Company has passed its most recent inspection and believes that it is in material compliance with all applicable environmental laws.

## Hong Kong

Hong Kong, the jurisdiction of incorporation of two of the Company's subsidiaries and the location of the Company's headquarters, was restored to China on July 1, 1997. The Company conducts sales, marketing, product design and development, administration and other activities in Hong Kong. Accordingly, the Company may be materially adversely affected by factors affecting Hong Kong's political situation and its economy or its international political and economic relations.

As of July 1, 1997, Hong Kong became a Special Administrative Region ("SAR") of China, with certain autonomy from the Chinese government, including (i) being a separate customs territory from China with separate tariff rates and export control procedures, and (ii) maintaining a separate intellectual property registration system. All land leases in effect at the time of the transfer of sovereignty were extended for a period of 50 years, except for those leases without a renewal option expiring after June 30, 1997 and before June 30, 2047. Hong Kong continues to be a member of the World Trade Organization and the Hong Kong dollar continues to be legal tender freely convertible into Renminbi and not subject to foreign exchange controls. The Hong Kong SAR government, as set up by China, has sole responsibility for tax policies. Notwithstanding the provisions of these international agreements, there can be no assurance as to the continued stability of political, economic or commercial conditions in Hong Kong.

No treaty exists between Hong Kong and the U.S. providing for the reciprocal enforcement of foreign judgments. Accordingly, Hong Kong courts might not enforce judgments predicated on the federal securities laws of the U.S., whether arising from actions brought in the U.S. or, if permitted, in Hong Kong.

41

P 000157

## MANAGEMENT

### Executive Officers, Directors and Key Personnel

The executive officers, directors and key personnel of the Company are as follows:

| Name | Age | Position |
|------|-----|----------|
| Kwong Ho Sham | 65 | Chairman of the Board of Directors |
| John C.K. Sham | 35 | President, Chief Executive Officer and Director |
| Brian Yuen | 42 | Chief Executive Officer, Global-Tech USA, Inc. and Director |
| Peter C. McC. Howell | 48 | Director* |
| Pui Lam Fan | 62 | Director of Engineering |
| Wing-On Lo | 41 | Director of Manufacturing Operations |
| Neil L. Bailey | 53 | Director of Sales, Marketing and Special Projects |
| Wu Yuen Tai | 32 | Director of International Sales and Marketing |
| Ray Freeman Huen | 51 | Director of Sales and Marketing—Asia |
| Shun Chi Hui | 57 | Director |
| Wai Chun Hui | 52 | Director |
| Mark S. Hirsch | 43 | Director* |

* Following the closing of this offering.

**Kwong Ho Sham** is the founder of the Company and has been its Chairman of the Board of Directors since its inception in 1963. Mr. Sham has expertise in the area of production engineering and manufacturing. He serves as the Chairman of the Hong Kong-Shantou Chamber of Commerce. Vice Chairman of the Hong Kong Chiu Chou Plastics Business Association. Chairman of the Overseas Chinese Association of Chiu Chou and was Honorary Chairman and Treasurer of the Hong Kong-Guangdong Committee for the Celebration of the Reunification.

**John C.K. Sham** has served as President and Chief Executive Officer of the Company since June 1992. Mr. Sham joined the Company in 1984 as managing director of Kwong Lee Shun Trading Company Limited, a wholly-owned subsidiary of the Company. From 1982 to 1984, Mr. Sham served as President of West Corp., a New York corporation which specialized in the marketing and distribution of household goods. Mr. Sham is also president of Wing Shing Property Development Ltd. and Jiulongshan Real Estate Development Co.

**Brian Yuen** joined the Company in January 1997, was elected to the Board of Directors in August 1997 and became the Chief Executive Officer of the Company's subsidiary Global-Tech USA, Inc. in October 1997. Mr. Yuen serves as the Chairman of the Finance Committee of the Company's Board of Directors and was a consultant to the Company from March 1994 to December 1996. Prior to joining the Company, Mr. Yuen served as purchasing manager of Magla Products, Inc., a manufacturer, importer and distributor of household products, from December 1992 to December 1996.

**Peter C. McC. Howell** will be elected to the Board of Directors of the Company following the closing of this offering. Mr. Howell was Chairman and Chief Executive Officer of Signature Brands USA, Inc., a publicly-traded manufacturing company of consumer and professional products, from August 1994 to August 1997. From October 1988 to August 1994, Mr. Howell was affiliated with Mr. Coffee, Inc., a publicly-traded manufacturing company, where he served as Chief Financial Officer from October 1988 to April 1989 and as President and Chief Executive Officer from April 1989 to August 1994, when it was acquired by Signature Brands, Inc. Mr. Howell has been a director of Libbey, Inc., a glass manufacturing company listed on the New York Stock Exchange, since 1993. Mr. Howell holds a Master of Arts degree from Cambridge University.

42

P000158

*Pui Lam Fan*, the Company's Director of Engineering, has been associated with the Company for more than ten years. Mr. Fan first joined the Company in October 1983 as a product design engineer and is currently the Director of Engineering responsible for the supervision of technical personnel in the product design and development department. Prior to joining the Company, Mr. Fan was a lecturer in engineering at the Guangdong Polytechnic University for 20 years. Mr. Fan holds a bachelors degree in Mechanical Engineering from the Guangdong Polytechnic University in China.

*Wing-On Lo* has been the Director of Manufacturing Operations with overall responsibility for the Dongguan manufacturing complex since September 1994. From 1990 to 1994, Mr. Lo served as Director of Operations for Eastern Mall Ltd., a manufacturing company of cameras and electronic products. Mr. Lo holds a Bachelor of Science degree in Engineering from the University of Hong Kong and a Master of Business Administration from the University of Florida.

*Neil L. Bailey*, the Company's Director of Sales, Marketing and Special Projects, joined the Company in October 1996. Prior to joining the Company, Mr. Bailey was the managing director of N. Bailey & Associates from August 1991. During 1989 to August 1991, Mr. Bailey served as Chief Operating Officer and Buying Director of Hamleys Limited, a U.K. based retailer of toys. Mr. Bailey holds a Bachelor of Arts degree in English from California State University—San Jose.

*Wa Yuen Tai*, the Company's Director of International Sales and Marketing, joined the Company in March 1997. From 1993 to 1997, Mr. Tai was the general manager of Applied International Holding Ltd., a consumer electronics manufacturer. From 1992 to 1993, he served as a senior merchandiser for Worldlist Ltd., a German company engaged in the export of clocks and watches. Mr. Tai is currently pursuing a masters degree in Business Administration from the Open Learning Institute of Hong Kong.

*Ray Freeman Huen*, Director of Sales and Marketing—Asia, joined the Company in October 1995. Prior to joining the Company, Mr. Huen was the general manager of Global Industries International Inc. USA, an import/export company dealing mainly in the import/export of toys and sundry products, from June 1991 to June 1995. From September 1986 to May 1991, Mr. Huen served as general manager of Leroy Industries Ltd., Hong Kong, a manufacturer of toys and plastic products. Mr. Huen holds a bachelors degree in Business Administration from the Chinese University in Hong Kong.

*Shun Chi Hui*, director, has been a director of the Company since November 1982. Ms. Hui is active in a variety of charitable activities in Hong Kong and China.

*Wai Chun Hui*, director, has been a director of the Company since December 1971. Ms. Hui participates in certain administrative oversight of the Company and also is active in a variety of charitable activities in Hong Kong and China.

*Mark S. Hirsch* will be elected to the Board of Directors of the Company following the closing of this offering. Mr. Hirsch has been a partner in the law firm of Parker Chapin Flattau & Klimpl, LLP since 1987 and has been an attorney with that firm since 1978. Mr. Hirsch holds a J.D. degree from The George Washington University.

Except for (i) Mr. Kwong Ho Sham and Mr. John Sham who are father and son, (ii) Ms. Shun Chi Hui and Mr. John Sham who are mother and son and (iii) Mr. Kwong Ho Sham and Ms. Wai Chun Hui who are husband and wife, no family relationship exists among any of the named directors, executive officers and key employees.

No arrangement or understanding exists between any director or officer and any other persons pursuant to which any director or executive officer was elected as director or executive officer of the Company. The Company's Articles of Association provide for a Board of Directors of not less than one nor more than seven members. Each director is elected to serve until the next annual general meeting of shareholders and until his successor has been elected unless a different term is specified. Officers serve at the discretion of the Board of Directors.

P 000159

**Compensation of Directors and Officers**

The aggregate direct remuneration paid to all directors and officers as a group of persons who served in the capacity of director or executive officer during the 1997 fiscal year was approximately $841,000. This includes amounts set aside or accrued to provide pension, retirement or similar benefits but does not include amounts expended by the Company (including business travel, professional and business association dues and expenses) reimbursed to officers and other fringe benefits commonly reimbursed or paid by companies in Hong Kong.

Each Director who is not an employee of the Company is paid for service on the Board of Directors a rate of $1,000 per annum and an additional $500 for each meeting of the Board of Directors attended. The Company also reimburses each Director for reasonable expenses in attending meetings of the Board of Directors. Directors who are also employees of the Company are not separately compensated for their services as Directors.

The Company has employment agreements with Mr. Kwong Ho Sham and Mr. John Sham each of which provides for an annual compensation of $300,000 effective as of July 1, 1997. In addition to the base compensation, the agreements provide for a bonus in an amount equal to the total base salary multiplied by the percentage increase in the Company's net profits in the current fiscal year over the net profits in the prior fiscal year. The employment agreements may be terminated by consent of both parties or by the Company for cause (as defined in the agreements).

The employment contracts with Mr. Kwong Ho Sham and Mr. John Sham are renewed on a monthly basis for a new ten-year term and grant to each of them the right to elect a cash payment of the remainder of his contract in the event of a merger, consolidation or transfer of all or substantially all of the Company's assets to any unaffiliated company or other person.

The Company has obtained a key-man life policy of $1 million for Mr. John Sham. The Company is the sole beneficiary under the policy. There can be no assurance that proceeds of such insurance will be sufficient to compensate the Company for his loss.

The Company also has employment agreements with Mr. Fan, Mr. Lo, Mr. Bailey and Mr. Huen which provide for an annual base salary and other benefits such as vacation and sick leave and contain confidentiality covenants. The employment agreements may be terminated by the Company for cause (as defined in the agreements) or by either party upon one month's notice.

**1997 Stock Option Plan**

In September 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (as amended, the "Plan"). The Plan provides for the grant of (i) options that are intended to qualify as incentive stock options ("Incentive Stock Options") within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), to employees and (ii) options not intended to qualify as Incentive Stock Options to employees and consultants. The total number of shares of Common Stock for which options may be granted under the Plan is 1,600,000 shares. The Company has granted options to purchase (a) 322,000 shares of Common Stock to employees and a consultant with an exercise price of $14.50 per share and (b) 283,800 shares to employees and consultants with an exercise price equal to the initial public offering price of the shares offered hereby. The options vest over varying periods of up to five years and are all exercisable for a period of ten years from the date of grant.

The Plan is administered by the Board of Directors or a committee of outside directors appointed by the Board of Directors, which will determine the terms of options, including the exercise price, the number of shares subject to the option and the terms and conditions of exercise. No option granted under the Plan is transferable by the optionee other than by will or the laws of descent and distribution and each option is exercisable during the lifetime of the optionee only by such optionee. The exercise price of all Incentive Stock Options granted under the Plan must be at least equal to the fair market value of such shares on the date of grant. With respect to

44

any participant who owns (or is deemed to own) stock possessing more than 10% of the voting rights of the Company's outstanding capital stock, the exercise price of any Incentive Stock Option must be not less than 110% of the fair market value on the date of grant. The term of each option granted pursuant to the Plan may be established by the Board of Directors, or a committee of the Board of Directors, in its sole discretion, provided, however, that the maximum term of each Incentive Stock Option granted pursuant to the Plan is 10 years. With respect to any Incentive Stock Option granted to a participant who owns (or is deemed to own) stock possessing more than 10% of the total combined voting power of all classes of the Company's outstanding capital stock, the maximum term is five years.

**Independent Directors; Audit Committee**

Upon completion of this offering, or shortly thereafter, the Company intends to appoint an additional independent director who, together with Mr. Hirsch, will serve on, and constitute a majority of, an audit committee of the Board of Directors.

P000161

# CERTAIN TRANSACTIONS

## Agreement with Mr. John Sham

The Company entered into a patent assignment agreement dated June 10, 1996 with Mr. John Sham for the assignment by Mr. Sham of patents for (i) two portable steam vacuum cleaners, (ii) a photo-sensitive switching apparatus for electrical appliances, (iii) a steam cooking appliance, (iv) a food slicer, (v) a food chopper, (vi) a steam and dry iron, (vii) a leakage current circuit interrupter device, (viii) a coffee maker, and (ix) a travel iron. The agreement provided for aggregate payments of $1 million. The Company entered into a second patent assignment dated May 21, 1997 with Mr. John Sham for the assignment of patent to the Company for an automatic power interruption device which can be applied to a variety of heat-producing electrical appliances, a portable steam vacuum cleaner and a steam iron. The second agreement provided for aggregate payments of $225,000. All payments required to be made under the patent assignment agreements have been made.

## Lease Agreement with Wing Shing Products Company

The Company leases approximately 26,500 square feet of space for its executive offices from Wing Shing Products Company Limited ("WSPL"), a company owned by the Sham family. Pursuant to the lease, the Company pays monthly rent of approximately $17,000 per month until March 31, 1998 and $18,000 thereafter. The lease expires on March 31, 1999 and is terminable by WSPL, upon not less than six months' notice to the Company, in the event that WSPL enters into contract for the sale, redevelopment, or demolition or rebuilding of the premises. The Company believes the lease was on terms no less favorable than could have been received from disinterested third parties.

As of March 31, 1996, the Company had a 100% equity interest in WSPL. On July 11, 1996, WSPL converted all of its outstanding ordinary shares, all of which were owned by the Company, into 100 non-voting deferred shares. WSPL then issued 100 new ordinary shares to members of the Sham family. As a result of the above share restructuring, the Company no longer holds any significant interest in WSPL. The net assets of WSPL, which amounted to $2,679,877 at July 11, 1996, were effectively transferred to members of the Sham family. The transfer of such amount was charged to retained earnings.

During fiscal 1995 and 1996 the Company paid annual management and accounting fees of approximately $282,000 to WSPL. Commencing in fiscal 1997, such functions were transferred to the Company.

During fiscal 1995, WSPL leased certain machinery to the Company with a rental expense of approximately $227,000. Such machinery was transferred to the Company in fiscal 1995 at its book value.

## Guarantees of Company Indebtedness by Certain Shareholders

Various members of the Sham family have guaranteed each of the Company's bank credit facilities. The Company expects that shortly after the consummation of the offering, the various banks will permit all of these guarantees to be released.

Mr. Kwong Ho Sham, Mr. John Sham, Ms. Wai Chun Hui and Ms. Shun Chi Hui, all directors of the Company, have personally guaranteed the Company's (i) line of credit agreement dated August 22, 1997 between the Company and Fuji Bank Limited in the maximum amount of approximately $2.5 million; (ii) line of credit agreement dated December 30, 1997 between the Company and Standard Chartered Bank in the maximum amount of approximately $25.2 million; and (iii) line of credit agreement dated January 17, 1997 between the Company and Bank of East Asia, Ltd. in the maximum amount of $904,000.

Mr. Kwong Ho Sham and Ms. Wai Chun Hui, directors of the Company, have personally guaranteed the Company's (i) line of credit agreement dated July 19, 1996 between the Company and Tokyo-Mitsubishi Ltd. in the maximum amount of approximately $3.0 million and (ii) line of credit agreement dated September 30, 1996 between the Company and Hang Seng Bank Ltd. in the maximum amount of $775,000.

46

Mr. Kwong Ho Sham, a director of the Company, has personally guaranteed the Company's line of credit agreement dated May 26, 1997 between the Company and The Hongkong and Shanghai Banking Corporation Limited in the maximum amount of approximately $6.5 million and is secured by a lien on property owned by Wing Shing Products Company. Mr. Kwong Ho Sham and Mr. John C.K. Sham, directors of the Company, have personally guaranteed the Company's obligations under its line of credit agreement dated January 5, 1997 with Dah Sing Bank, Ltd. in the maximum amount of approximately $1.3 million.

### Loans to Officers and Directors

The Company has made periodic loans without interest to Mr. Kwong Ho Sham and Mr. John C.K. Sham, officers and directors of the Company, from time to time during the past three fiscal years. The largest amount outstanding to each such individual during the three fiscal years ended March 31, 1997 was $692,000 and $188,000, respectively. The outstanding amounts due from each of such individual as of December 31, 1997 were $91,838 and $95,145, respectively. All the outstanding amounts were paid in full during March 1998.

### Sales in to Related Parties in Thailand

During fiscal 1996, fiscal 1997 and the 1998 interim period, the Company sold products in the amounts of $588,000, $150,000 and $98,000, respectively, to U.N.I. Products Co. Ltd. ("UNI") and $0, $34,000 and $410,000, respectively, to Universal Appliances Ltd. ("Universal"), both of which are Thailand corporations which, among other things, trade in housewares and small household appliances. Mr. Kwong Ho Sham, Mr. John C.K. Sham and other members of the Sham family are the beneficial owners of approximately 47.1% of the equity of UNI and 69.9% of the equity of Universal. The Company believes that sales to UNI and Universal were on terms no less favorable than those offered to disinterested third parties. Due to the aging of the receivables, there is uncertainty about UNI and Universal's ability to pay amounts they owe to the Company and, accordingly, the Company has reserved $100,000 in its financial statements for the 1998 interim period. The Company continues to sell products to UNI and Universal.

### Company's Policy Concerning Certain Transactions

Certain related party transactions were not negotiated on an arm's length basis. In the future, all transactions between the Company and its executive officers and directors will be approved by a majority of the Company's directors who are neither officers nor employees of the Company.

47

P000163

## PRINCIPAL SHAREHOLDERS

The following table sets forth information regarding the beneficial ownership of the Common Stock immediately prior to this offering, and as adjusted to reflect the sale of the Shares offered hereby. Except as indicated in the footnotes to this table, the persons named in this table, based on information provided by such persons, have sole voting and investment power with respect to all Common Stock shown as beneficially owned by them.

| Name of Owner(1) | Number of Shares | Percentage Prior to Offering | Percentage After Offering |
|---|---|---|---|
| Wing Shing Holdings Company Limited(2) | 7,615,189 | 95.2% | 62.4% |
| Kwong Ho Sham(3) | 151,899 | 1.9 | 1.2 |
| John C.K. Sham(3) | 76,962 | * | * |
| Brian Yuen(4) | 240,506 | 2.9 | 1.9 |
| Peter C. McC. Howell(5) | 60,000 | * | * |
| Shun Chi Hui(3) | 57,722 | * | * |
| Wai Chun Hui(3) | 57,722 | * | * |
| Mark S. Hirsch(6) | 5,000 | * | * |
| All officers and directors as a group (12 persons)(7) | 8,267,000 | 100.0 | 66.3 |

\* Less than 1%

(1) Unless otherwise indicated, the persons named in the table above have sole voting and dispositive power with respect to all shares beneficially owned by them.

(2) Wing Shing Holdings owns 7,615,189 of the issued and outstanding shares of Common Stock. The common share ownership of Wing Shing Holdings is owned 50% by Kwong Ho Sham, 20% by John Sham and 15% by each of Shun Chi Hui and Wai Chun Hui. Voting control of Wing Shing Holdings is held approximately 36% by Kwong Ho Sham, approximately 43% by John Sham and approximately 11% by each of Shun Chi Hui and Wai Chun Hui.

(3) Does not include shares of Common Stock owned by Wing Shing Holdings. See Note 2 above.

(4) Includes 200,000 shares of Common Stock issuable to Brian Yuen upon exercise of options granted under the Plan.

(5) Includes 60,000 shares of Common Stock issuable to Peter C. McC. Howell upon exercise of options granted under the Plan. Does not include 40,000 shares of Common Stock issuable upon exercise of options granted under the Plan which are exercisable in more than 60 days.

(6) Consists of 5,000 shares of Common Stock issuable to Mark S. Hirsch upon exercise of options granted under the Plan.

(7) Includes 7,615,189 shares of Common Stock owned by Wing Shing Holdings Company and 267,000 shares of Common Stock issuable to various officers and directors upon exercise of options granted under the Plan.

48

P000164

## SHARES ELIGIBLE FOR FUTURE SALE

Upon completion of this offering, the Company will have 12,200,000 shares of Common Stock outstanding (12,830,000 shares if the Underwriters' over-allotment option is exercised in full), not including 1,600,000 shares of Common Stock issuable upon exercise of share options which may be granted under the 1997 Stock Option Plans of which options to purchase 605,800 shares have been granted. Of the 12,200,000 shares of Common Stock, the 4,200,000 Shares offered hereby will be freely tradable without restriction or further registration under the Securities Act. The 8,000,000 shares of Common Stock owned by the present shareholders of the Company are "restricted securities" within the meaning of Rule 144 under the Securities Act; and, together with any Shares which are purchased by affiliates of the Company, as the term is defined in Rule 144, may be sold only by the respective holders thereof pursuant to an effective registration statement under the Securities Act or in accordance with one or more other exemptions under the Securities Act (including Rule 144).

In general, under Rule 144 as currently in effect, a person (or persons whose shares are aggregated) who has beneficially owned "restricted securities" for at least one year and persons who are deemed "affiliates" of the Company, are entitled to sell within any three-month period a number of shares that does not exceed the greater of 1% of the then-outstanding shares of Common Stock (122,000 shares of Common Stock immediately after this offering) or the average weekly trading volume in the Company's Common Stock during the four calendar weeks preceding such sale. Sales under Rule 144 are also subject to certain manner-of-sale provisions, notice requirements and the availability of current public information about the Company. However, a person who is not deemed to have been an "affiliate" of the Company at any time during the three months preceding a sale and who has beneficially owned restricted securities for at least two years, would be entitled to sell his shares under Rule 144 without regard to the volume limitations, manner-of-sale provisions, notice or current public information requirements. All of the 8,000,000 shares of Common Stock outstanding prior to this offering are currently held by affiliates of the Company.

No predictions can be made of the effect, if any, that market sales of restricted shares of Common Stock or their eligibility for sale under Rule 144 will have on the market price prevailing from time to time. Nevertheless, sales of substantial amounts of the restricted Common Stock on the public market could adversely affect such market price and could impair the Company's future ability to raise capital through the sale of equity securities.

Wing Shing Holdings, which immediately following this offering will beneficially own 7,615,189 shares of Common Stock of the Company, and the directors and executive officers of the Company, including all other shareholders, have agreed that, for a period of 180 days from the date of this Prospectus, they will not, directly or indirectly, offer to sell, sell, contract to sell, pledge or grant or otherwise sell or dispose of any of their shares of Common Stock or options to purchase Common Stock without the prior written consent of Furman Selz LLC. The Company has also agreed not to sell any shares of Common Stock for a period of 180 days from the date of this Prospectus without the prior written consent of the Furman Selz LLC, except that the Company may, without such consent, grant options and permit the exercise of outstanding options pursuant to the Plan. Furman Selz LLC may remove any of such restrictions in its discretion.

49

P000165

## DESCRIPTION OF SECURITIES

The authorized capital of the Company consists of 50,000,000 shares of Common Stock, of which 5,000,000 shares are currently outstanding and 12,200,000 shares of Common Stock will be outstanding at the conclusion of this offering (12,830,000 shares if the Underwriters' over-allotment option is exercised in full), and 1,000,000 shares of Preferred Stock, none of which will be outstanding at the conclusion of this offering.

**Common Stock**

All issued and outstanding shares of Common Stock of the Company are, and the Shares offered hereby when issued and paid for will be, validly issued, fully paid and non-assessable. The shares of Common Stock do not have preemptive rights. Neither the Memorandum of Association nor Articles of Association of the Company nor the laws of the British Virgin Islands restrict in any way the ownership or voting of shares of Common Stock by non-residents of the British Virgin Islands.

Pursuant to the Company's Memorandum and Articles of Association and pursuant to the laws of British Virgin Islands, the Company's Memorandum and Articles of Association may be amended by the Board of Directors without shareholder approval. This includes amendments increasing or reducing the authorized capital stock of the Company, authorizing the issuance of different classes of stock including Preferred Stock and increasing or reducing the par value of its shares. The Board of Directors may also increase the capital of the Company without shareholder approval by transferring a portion of the Company's surplus to capital or reduce the capital of the Company, subject to the requirements of the laws of the British Virgin Islands, by transferring a portion of the Company's capital to surplus. Furthermore, the Company's Memorandum and Articles of Association provide that differences which may arise between the Company and any of its shareholders, their executors, administrators or assigns relating to the Memorandum and Articles of Association shall, unless the parties agree to a single arbitrator, be referred to two arbitrators to be chosen by each of the differing parties. The ability of the Company to amend its Memorandum and Articles of Association without shareholder approval could have the effect of delaying, deterring or preventing a change in control of the Company without any further action by the shareholders including but not limited to, a tender offer to purchase the Common Stock at a premium over then current market prices. In addition, issuance of Preferred Stock, without shareholder approval, on such terms as the Board of Directors may determine, could adversely affect the voting power of the holders of the Common Stock, including the loss of voting control to others. No amendment to the Memorandum and Articles of Association will be effective unless and until it is filed with the Companies Registry of the British Virgin Islands.

Notwithstanding the powers granted to the Board of Directors under the Company's Memorandum and Articles of Association and British Virgin Islands law, as a New York Stock Exchange listed company, the Company must comply with certain policies and requirements of the New York Stock Exchange including the policy requiring shareholder approval, by a majority of votes cast on a proposal in a proxy bearing on such action, of (i) the establishment of a stock option or purchase plan or other arrangement whereby officers or directors may acquire shares of the Company; (ii) the acquisition of assets from an officer, director or security holder of the Company; (iii) the issuance of common stock or securities convertible into or exercisable for common stock if the common stock has or will have upon issuance voting power equal to or in excess of 20% of the voting power outstanding before the issuance of such stock or if securities convertible into or exercisable for common stock, or the number of shares of common stock to be issued is or will be equal to or in excess of 20% of the number of shares of common stock outstanding before the issuance of the stock; and (iv) the issuance of securities resulting in the change of control of the Company. Shareholder approval with respect to any proposal is effective only when the total vote cast represents over 50% in interest of all securities entitled to vote on such proposal.

Under U.S. law, majority and controlling shareholders generally have certain fiduciary responsibilities to the minority shareholders. Shareholder action must be taken in good faith and actions by controlling shareholders which are obviously unreasonable may be declared null and void. The British Virgin Islands law protecting the interests of the minority shareholders may not be as protective in all circumstances as the law protecting minority

P000166

shareholders in U.S. jurisdictions. While British Virgin Islands law does permit a shareholder of a British Virgin Islands company to sue its directors derivatively, i.e. in the name of and for the benefit of the Company, and to sue the Company and its directors for his benefit and the benefit of others similarly situated, the circumstances in which any such action may be brought and the procedures and defenses that may be available in respect of any such action may result in the rights of shareholders of a British Virgin Islands company being more limited than those rights of shareholders in a U.S. company. See "Risk Factors—Foreign Issuer Risks—Service and Enforcement of Legal Process."

### Preferred Stock

The Company is authorized to issue up to 1,000,000 shares of Preferred Stock, par value $0.01 per share. The Preferred Stock may be issued by the Board of Directors, without further action by stockholders, and may include voting rights (including the right to vote as a series on particular matters), preferences as to dividends and liquidation, conversion and redemption rights and sinking fund provisions.

No shares of Preferred Stock will be outstanding as of the closing of this offering, and the Company has no present plans for the issuance thereof. The issuance of any such Preferred Stock could adversely affect the rights of the holders of Common Stock and, therefore, reduce the value of the Common Stock. The ability of the Board of Directors to issue Preferred Stock could discourage, delay, or prevent a takeover of the Company.

### Dividend and Liquidation Rights

The Shares offered by this Prospectus, when issued, shall be entitled to the full amount of any cash or share dividend if declared from the date of this Prospectus.

Subject to the rights of the holders of stock with preferential or other special rights which may be authorized in the future, holders of Common Stock are entitled to receive dividends *pro rata* out of assets legally available therefor and, in the event of the winding up of the Company, to share ratably in all assets remaining after payment of liabilities. The Board of Directors may declare interim dividends and recommend a final annual dividend from retained earnings available for cash dividends as determined for statutory purposes at such times and in such amounts as they may determine. Dividends may only be declared and paid out of surplus. See "Dividend Policy."

### Voting, Shareholders' Meetings and Resolutions

Holders of Common Stock have one vote for each share held on all matters submitted to a vote of shareholders. The quorum required for any meeting of shareholders consists of the shareholders, present in person or by proxy, and holding, or representing, at least 50% of the voting rights of the issued share capital of the Company. A meeting of shareholders may be called upon seven days' notice. However, a meeting of shareholders may be called on short notice if the shareholders holding not less than 90% of the total number of shares entitled to vote on all matters to be considered at the meeting or 90% of the votes of each class or series of shares where shareholders entitled to vote thereon as a class or series together with not less than 90% majority of their remaining votes have agreed to short notice of the meeting or if all shareholders holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting. For this purpose, presence at such meeting shall be deemed to constitute a waiver. Alternatively, the shareholders may pass a consent resolution in writing signed by all of the shareholders or an absolute majority of the votes of each class or series of shares entitled to vote thereon. However, if any resolution of the shareholders is adopted in a manner other than by the unanimous written consent of all of the shareholders, a copy of such resolution must be sent to all of the shareholders not consenting to such resolution.

### Transfer of Common Stock; Transfer Agent and Registrar

Fully paid shares of Common Stock are issued in bearer or registered form and may be transferred freely. Each shareholder of record is entitled to receive at least seven days' prior notice of shareholders' meetings. The Transfer Agent and Registrar in the U.S. for the Company's Common Stock is American Stock Transfer & Trust Company.

51

P000167

**Modification of Class Rights**

The rights attached to any class or series (unless otherwise provided by the terms of issue of such class or series), such as voting, rights to dividends and the like, may be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class or series and of the holders of not less than three-fourths of the issued shares of any other class or series of shares which may be affected by such variation.

**Election of Directors**

The Shares do not have cumulative voting rights in the election of Directors. Thus, in any meeting where a quorum is present for the election of directors, the holders of the Common Stock conferring more than 50% of the voting power have the ability to elect all the Directors, provided that all of the shareholders have received or waived notice of such meeting. See "Principal Shareholders."

52

P000168

# TAX CONSIDERATIONS

## British Virgin Islands Tax Considerations

The following summary of the current tax laws of the British Virgin Islands as they relate to the Company and its shareholders is based on the advice of Harney Westwood & Riegels, counsel to the Company for matters relating to the law of the British Virgin Islands. This discussion is not intended, and should not be construed, as legal or professional tax advice and does not cover all possible tax considerations.

The Company is incorporated pursuant to the International Business Companies Act, Cap. 291, as currently in effect (the "Act"), and is not subject to taxes in the British Virgin Islands. Therefore (i) payment of principal and interest in respect of any transaction entered into by the Company will not be subject to taxation in the British Virgin Islands; (ii) no withholding tax will be required to be deducted by the Company on payments to be made thereunder; and (iii) no transaction document entered into by the Company will be subject to stamp duty in the British Virgin Islands. The Company is not subject to exchange control regulations in the British Virgin Islands as there are no such regulations in that jurisdiction. Shareholders who are not otherwise liable to income tax by virtue of being resident in the British Virgin Islands, will not be subject to British Virgin Islands tax. The British Virgin Islands does not impose a withholding tax on dividends paid by a company incorporated under the Act and currently has no capital gains tax, estate duty, inheritance tax or gift tax. Share transfers are not liable to transfer taxes, stamp duty or similar charges in the British Virgin Islands.

## China and Hong Kong Income Tax Considerations

The Company is subject to income taxation in each jurisdiction in which its respective subsidiaries do business. Certain of the Company's profits accrue in Hong Kong, where the corporate tax rate on assessable profits is currently 16.5% and areas of China where the reduced tax rate is 27%. The proposed Hong Kong budget for 1998 includes a reduction in the Hong Kong corporate tax rate to 16%, effective April 1, 1998. There can be no assurance that this reduction will be enacted. No income tax was payable by the Company in China during this period because the Company's subsidiary in China had accumulated tax losses during these periods. Losses in any year can only be used to offset future income for a period of five years. Fiscal 1997 was the first year in which the Company's subsidiary has profits. Assuming continued profitability for fiscal 1998, in the event profits are not completely offset by loss carry forwards, the Company would pay no taxes in China for the fiscal years ending March 31, 1998 and 1999 and would pay taxes at a fifty percent reduced rate for the fiscal years ending March 31, 2000, 2001 and 2002. For additional information concerning the Company's income taxes, see Note 12 of Notes to Consolidated Financial Statements.

## Certain United States Federal Income Tax Considerations

The following is a summary of material U.S. federal income tax consequences to a U.S. citizen or resident individual, a corporation or partnership organized under the laws of the U.S. or a state of the U.S., a trust in which one or more U.S. persons have the authority to control all substantial decisions of the trust and a U.S. court is able to exercise primary supervision over the administration of the trust, or an estate subject to U.S. federal income tax on all of its income regardless of source (each, a "U.S. Holder"), who purchases Shares in this offering and who holds such Shares as a capital asset within the meaning of Section 1221 of the Code. This summary is provided for general information only and does not purport to address all the U.S. federal income tax consequences that may be relevant to a U.S. Holder, including without limitation, the treatment of certain types of U.S. Holders (including, for example, persons who own, directly or constructively, at least 10% of the voting power or value of the Company's outstanding stock, qualified plans, persons holding the Shares as part of a hedge, hedging transaction or straddle, broker-dealers, financial institutions, insurance companies, tax-exempt organizations and other persons subject to special treatment under U.S. federal income tax laws) and persons other than U.S. Holders, all of whom may be subject to tax rules that differ significantly from those summarized below. It does not discuss all the U.S. federal income tax consequences that may be relevant to a U.S. Holder based on his particular tax circumstances. In addition, it does not discuss any state, local, foreign or minimum income or other U.S. federal tax considerations. The discussion is based upon the provisions of the U.S. federal income tax law as of the date hereof, which is subject to change retroactively as well as prospectively.

53

P000169

THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES IS NOT TAX ADVICE. EACH PERSON CONSIDERING THE PURCHASE OF SHARES SHOULD CONSULT HIS OR HER OWN TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES TO HIM OR HER OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE SHARES, INCLUDING THE APPLICABILITY AND EFFECT OF U.S. FEDERAL, STATE, LOCAL AND FOREIGN INCOME OR OTHER TAX LAWS, AS WELL AS POSSIBLE CHANGES IN THE TAX LAWS.

*Distributions*

The gross amount of any distribution actually or constructively received by a U.S. Holder with respect to Shares will be treated as ordinary income to the extent such distribution is paid from current or accumulated earnings and profits of the Company, as determined under U.S. federal income tax principles. Such distribution will be treated as foreign source dividend income and will not be eligible for the dividends received deduction allowed to U.S. corporations. Dividends paid in foreign currency to a U.S. Holder will be taken into account in the equivalent U.S. dollar amount based on the exchange rate in effect at the time of their receipt. Distributions in excess of the Company's current and accumulated earnings and profits will be treated as a non-taxable return of basis to the extent thereof, and then as a gain from the sale of Shares.

*Dispositions*

A U.S. Holder will recognize gain or loss upon the sale or other taxable disposition of Shares in an amount equal to the difference between the amount realized and the U.S. Holder's tax basis in the Shares. Such gain or loss will be long-term capital gain or loss if the Shares have been held for more than one year at the time of the sale or other disposition. Net long-term capital gains of non-corporate taxpayers are generally subject to more favorable tax rates. Net long-term capital gains from a sale of Shares by a non-corporate U.S. Holder is subject to a 20% maximum U.S. federal income tax rate if the Shares were held for more than 18 months and a 28% maximum rate if they were held for more than 12 months but not more than 18 months. A U.S. Holder's tax basis in his Shares generally will be the purchase price paid by him for such Shares less any return of basis distributions, and his holding period for such Shares will commence on the day following his purchase of Shares and will include the day on which the Shares are sold.

*Passive Foreign Investment Company Rules*

The Company will be treated as a passive foreign investment company ("PFIC") for U.S. federal income tax purposes for any tax year if, in such year or any prior tax year, either (i) 75% or more of the gross income of the Company is passive income, or (ii) on average, at least 50% of the assets of the Company (by value, so long as the Shares are publicly traded (within the meaning of Section 1297(e)(3) of the Code) during the tax year) produce or are held for the production of passive income. Based on the nature of its income and assets, the Company does not believe it (or any of its foreign corporate subsidiaries) will satisfy either of the above tests. However, since the determination is made annually based on facts and circumstances at that time, some of which may be beyond the control of the Company, there can be no assurance that the Company (and/or any subsidiary) will not become a PFIC at some time in the future.

If the Company were to be treated as a PFIC, notwithstanding the foregoing, upon a U.S. Holder's receipt of certain distributions from the Company or a disposition of his Shares, the U.S. Holder would be liable for U.S. federal income tax computed at the highest applicable rate as if such distribution or gain had been recognized ratably over the period the U.S. Holder held such Shares, plus interest on the tax allocable to prior years in which the U.S. Holder owned such Shares. Such tax and interest would be payable regardless of whether losses, credits or other tax benefits would have been available to the U.S. Holder to offset such income if it had actually been realized in such prior tax years. Under certain circumstances, distributions and dispositions in respect of shares in a direct or indirect foreign corporate subsidiary of the Company may be attributed in whole or in part to a U.S. Holder, and such U.S. Holder may be taxed under the PFIC rules with respect to such distributions or dispositions.

54

P000170

Alternatively, a U.S. Holder could elect to treat his Shares as an investment in a qualified electing fund ("QEF"). In such case, the PFIC rules described above would not apply to income earned in the year the election is made or any subsequent year and the U.S. Holder instead would be required to include in his income currently his *pro rata* share of the Company's ordinary earnings (as ordinary income) and his *pro rata* share of the Company's net capital gains (as long-term capital gains) for such period, whether or not distributions with respect to such earnings or gains are actually made to the U.S. Holder. Although the net capital gains of a U.S. Holder may be subject to different tax rates under different circumstances (e.g., holding periods), for this purpose, under new temporary regulations, the Company may calculate and report the amount of each category of capital gain recognized by the Company in the taxable year, report net capital gains as ordinary income or separately report only a single amount as net capital gain subject to the highest capital gain tax rate. In addition, a U.S. Holder may separately calculate his own *pro rata* share of the PFIC's ordinary earnings and net capital gains from the books and records of the Company.

A U.S. Holder may (so long as the Shares are publicly-traded), in lieu of making a QEF election, also avoid the PFIC rules described above by electing to "mark-to-market" the Shares as of the close of each taxable year. Under this election, the U.S. Holder must include as ordinary income each year, an amount equal to the excess, if any, of the fair market value of the Shares at the close of his taxable year over his adjusted basis in such Shares. If the Shares decline in value during any taxable year, the U.S. Holder may deduct any excess of his adjusted basis in such Shares over the fair market value of the Shares at the close of such year, but only to the extent of the net mark-to-market gains previously included in income. Any gain or loss on the sale of the Shares will be ordinary income or loss (but only to the extent of the previously included net mark-to-market gains). A U.S. Holder's adjusted basis in his Shares is increased by the income recognized under the mark-to-market election and decreased by the deductions allowed under the election. A mark-to-market election applies to the taxable year for which made and all subsequent taxable years and cannot be revoked without the consent of the U.S. Internal Revenue Service.

The Company intends to notify U.S. Holders in the event it concludes that it (or any foreign corporate subsidiary) will be treated as a PFIC for any tax year in order to enable the U.S. Holders to consider whether to make the QEF or mark-to-market election, although the Company is under no obligation to do so. Prospective investors should consult with their own tax advisors regarding the possible treatment of the Company as a PFIC, its effect on them, the eligibility, manner and advisability of making a QEF or mark-to-market election in such case.

*Backup Withholding and Other Rules*

To prevent U.S. federal "backup withholding" equal to 31% of any payment of dividends on the Shares and proceeds from the sale of the Shares, the U.S. Holder must either (i) qualify as a payee exempt from backup withholding (e.g., a corporation) and demonstrate this fact when required, or (ii) provide a taxpayer identification number to the payor (or certify that he has applied for a taxpayer identification number), certify as to no loss of exemption from backup withholding and otherwise comply with applicable requirements of the backup withholding rules. Any amounts paid as backup withholding with respect to the Shares will be credited to the income tax liability of the U.S. Holder receiving the payment from which such amount was withheld. U.S. Holders should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for obtaining such an exemption. A U.S. Holder that is otherwise required to, but does not, provide the Company with a correct taxpayer identification number may be subject to penalties imposed by the Code.

P 000171

## UNDERWRITING

Each of the Underwriters named below, for which Furman Selz LLC and CIBC Oppenheimer Corp. are acting as representatives (the "Representatives"), have severally agreed, subject to the terms and conditions contained in the underwriting agreement by and among the Company and the Underwriters (the "Underwriting Agreement") to purchase from the Company, and the Company has agreed to sell to each of the Underwriters the number Shares indicated below opposite their respective names:

| Underwriter | Number of Shares |
|---|---|
| Furman Selz LLC | 1,695,000 |
| CIBC Oppenheimer Corp. | 1,695,000 |
| Bear, Stearns & Co. Inc. | 60,000 |
| Donaldson, Lufkin & Jenrette Securities Corporation | 60,000 |
| Lehman Brothers Inc. | 60,000 |
| Morgan Stanley & Co. Incorporated | 60,000 |
| NationsBanc Montgomery Securities LLC | 60,000 |
| PaineWebber Incorporated | 60,000 |
| Prudential Securities Incorporated | 60,000 |
| SBC Warburg Dillon Read Inc. | 60,000 |
| Schroder & Co. Inc. | 60,000 |
| Barrington Capital Group, L.P. | 30,000 |
| Dominick & Dominick, Incorporated | 30,000 |
| C.L. King & Associates, Inc. | 30,000 |
| Ladenburg Thalmann & Co. Inc. | 30,000 |
| Legg Mason Wood Walker, Incorporated | 30,000 |
| McDonald & Company Securities, Inc. | 30,000 |
| Ragen Mackenzie Incorporated | 30,000 |
| Sands Brothers & Co., Ltd. | 30,000 |
| Van Kasper & Company | 30,000 |
| Total | 4,200,000 |

The Underwriting Agreement provides that the obligations of the Underwriters to purchase the Shares listed above are subject to certain conditions precedent, including the approval of certain legal matters by counsel. The Underwriting Agreement also provides that the Underwriters are committed to purchase all of the Shares offered hereby.

The Representatives have advised the Company that the Underwriters propose to offer the Shares to the public initially at the public offering price set forth on the cover page of this Prospectus, and to certain dealers at such price less a concession not in excess of $0.80 per Share. The Underwriters may allow, and such dealers may reallow, a concession not in excess of $0.10 per Share to certain other dealers. After the initial public offering of the Shares, the public offering price and other selling terms may be changed by the Representatives.

The Company has granted the Underwriters an option, exercisable during the 30-day period after the date of this Prospectus, to purchase up to 630,000 additional Shares at the initial public offering price set forth on the cover page of this Prospectus, less underwriting discounts and commissions. To the extent that the Underwriters exercise this option, each of the Underwriters will have a firm commitment, subject to certain conditions, to purchase a number of additional Shares as is appropriate to such Underwriter's initial commitment to purchase Shares from the Company. The Underwriters may exercise such option solely to cover over-allotments, if any, incurred in connection with the sale of the Shares offered hereby.

P000172                56

The Company has agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act, and to contribute to payments the Underwriters may be required to make in respect thereof.

Wing Shing Holdings, which immediately following this offering will beneficially own 7,615,189 shares of Common Stock of the Company, and the directors and executive officers of the Company, including all other shareholders, have agreed that, for a period of 180 days from the date of this Prospectus, they will not, directly or indirectly, offer, offer to sell, sell, contract to sell, pledge or grant or otherwise sell or dispose of any of their shares of Common Stock or options to purchase Common Stock without the prior written consent of Furman Selz LLC. The Company has also agreed not to sell any shares of Common Stock for a period of 180 days from the date of this Prospectus without the prior written consent of the Furman Selz LLC, except that the Company may, without such consent, grant options and permit the exercise of outstanding options pursuant to the Plan. Furman Selz LLC may remove any of such restrictions in its discretion.

The Representatives have informed the Company that the Underwriters do not intend to confirm sales to accounts over which they exercise discretionary authority.

In connection with this offering, certain Underwriters and their respective affiliates may engage in transactions that stabilize, maintain or otherwise affect the market price of the Common Stock. Such transactions may include stabilization transactions effected in accordance with Rule 104 of Regulation M under the Exchange Act, pursuant to which such persons may bid for or purchase Common Stock for the purpose of stabilizing its market price. The Underwriters may also create a short position for the account of the Underwriters by selling more Common Stock in connection with the offering than they are committed to purchase from the Company and, in such case, may purchase Common Stock in the open market following completion of the offering to cover all or a portion of such short position. The Underwriters may also cover all or a portion of such short position, up to 630,000 shares of Common Stock, by exercising the Underwriters' over-allotment option referred to above. In addition, the Representatives, on behalf of the Underwriters, may impose "penalty bids" under contractual arrangements with the Underwriters whereby it may reclaim from an Underwriter (or dealer participating in the offering) for the account of the Underwriters, the selling concession with respect to Common Stock that is distributed in the offering but subsequently purchased for the account of the Underwriters in the open market. Any of the transactions described in this paragraph may result in the maintenance of the price of the Common Stock at a level above that which might otherwise prevail in the open market. None of the transactions described in this paragraph is required, and, if undertaken, by may be discontinued at any time.

Prior to this offering, there has been no public market for the Common Stock of the Company. There can be no assurance that an active trading market will develop for the Shares or as to the price at which the Shares may trade in the public market from time to time subsequent to the offering. The price to the public of the Shares offered hereby has been determined by negotiations among the Representatives and the Company and was based, among other matters, the following factors: the financial and operating history and condition of the Company; the Company's business and financial prospects; the prospects for the industries in which the Company operates; prevailing market conditions; the present stage of the Company's development; the Representatives' assessment of the Company's management team; and the recent market prices of securities of companies in businesses similar to that of the Company.

P000173

## ADDITIONAL INFORMATION

The Company has filed with the Commission a Registration Statement on Form F-1 (the "Registration Statement") under the Securities Act with respect to the Shares offered hereby. This Prospectus, which constitutes a part of the Registration Statement, does not contain all of the information set forth in the Registration Statement, certain items of which are contained in the exhibits and schedules thereto as permitted by the rules and regulations of the Commission. Statements made in this Prospectus as to the contents of any contract, agreement or other document referred to herein are not necessarily complete. With respect to each such contract, agreement or other document filed as an exhibit to the Registration Statement, reference is made to the exhibit for a more complete description of the matter involved and each such statement shall be deemed qualified in its entirety by such reference. The Registration Statement, including the exhibits and schedules thereto, may be inspected without charge at the principal office of the Commission, 450 Fifth Street, N.W., Washington, D.C. 20549 or at the Regional Offices of the Commission: Northwestern Atrium Center, 500 West Madison Street, Suite 1400, Chicago, Illinois 60604 and Seven World Trade Center, New York, New York 10048. Copies of such material may be obtained by mail from the Public Reference Section of the Commission at 450 Fifth Street, N.W., Washington, D.C. 20549 at prescribed rates. The Commission also makes electronic filings publicly available on the Internet within 24 hours of acceptance. The Commission's Internet address is www.sec.gov. The Commission's web site also contains reports, proxy and information statements and other information regarding registrants that file electronically with the Commission. As a foreign private issuer, the Company is not required to and does not file electronically with the Commission.

Upon the effectiveness of the Registration Statement, the Company will be subject to the informational requirements of the Exchange Act and, in accordance therewith, will file periodic reports and other information with the Commission. The Company, as a "foreign private issuer," will be exempt from the rules under the Exchange Act prescribing certain disclosure and procedural requirements for proxy solicitations and the Company's officers, directors and principal shareholders will be exempt from the reporting and "short-swing" profit recovery provisions contained in Section 16 of the Exchange Act and the rules thereunder, with respect to their purchases and sales of Shares. In addition, the Company will not be required under the Exchange Act to file periodic reports and financial statements with the Commission as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act. The Company intends to furnish its shareholders with annual reports containing financial statements which will be examined and reported on, with an opinion expressed, by an independent public accounting firm, prepared in accordance with accounting principles generally accepted in the U.S.

This Prospectus contains translations of certain Hong Kong dollar amounts into U.S. dollars at specified rates. Unless otherwise indicated, translations of Hong Kong dollars into U.S. dollars in this Prospectus have been made at the noon buying rate in New York City on December 31, 1997 for cable transfers in Hong Kong dollars as certified for customs purposes by the Federal Reserve Bank of New York, which was US$1.00 = HK$7.746. The noon buying rate in New York City on March 11, 1998 for cable transfers in Hong Kong dollars as certified for customs purposes by the Federal Reserve Bank of New York, was US$1.00 = HK$7.745.

P000174

## LEGAL MATTERS

The validity of the Shares being offered hereby and certain legal matters in connection with this offering with respect to the law of the British Virgin Islands will be passed upon for the Company by Harney Westwood & Riegels, British Virgin Islands counsel to the Company. Certain legal matters in connection with this offering with respect to Hong Kong law will be passed upon for the Company by Galiant Y.T. Ho & Co., Hong Kong counsel to the Company and with respect to the laws of the Peoples' Republic of China will be passed upon for the Company by Guangzhou Foreign Economic Law Office. Peoples' Republic of China counsel to the Company. Certain legal matters in connection with this offering with respect to U.S. law will be passed upon for the Company by Parker Chapin Flattau & Klimpl, LLP. as U.S. counsel to the Company. Mark S. Hirsch, a partner in Parker Chapin Flattau & Klimpl, LLP. will be elected as a member of the Board of Directors of the Company following the closing of this offering. Certain partners of Parker Chapin Flattau & Klimpl. LLP. including Mark S. Hirsch. hold options to acquire 10,000 shares of Common Stock. Certain legal matters in connection with this offering will be passed upon for the Underwriters by Fulbright & Jaworski L.L.P. with respect to matters of U.S. law.

## EXPERTS

The Consolidated Financial Statements of the Company for the fiscal years ended March 31, 1995, 1996 and 1997 and the six months ended September 30, 1997 included in this Prospectus have been audited by Arthur Andersen & Co., Hong Kong (a member of the Andersen Worldwide Organization), independent public accountants, as indicated in their reports with respect thereto, and are included herein in reliance upon the authority of said firm as expert in giving said reports.

59

P000175

[This Page Intentionally Left Blank]

P000176

## GLOBAL-TECH APPLIANCES INC.

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Report of Independent Public Accountants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-2

Consolidated Statements of Income for the fiscal years ended March 31, 1995, 1996 and 1997 and for
the nine months ended December 31, 1996 and 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-3

Consolidated Balance Sheets as of March 31, 1996, March 31, 1997 and December 31, 1997 . . . . . . F-4

Consolidated Statements of Changes in Shareholders' Equity for the fiscal years ended March 31, 1995,
1996 and 1997 and for the nine months ended December 31, 1997 . . . . . . . . . . . . . . . . . F-5

Consolidated Statements of Cash Flows for the fiscal years ended March 31, 1995, 1996 and 1997 and
for the nine months ended December 31, 1996 and 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-6

Notes to the Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-7


Report of Independent Public Accountants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-20

Consolidated Statements of Income for the six months ended September 30, 1996 and 1997 . . . . . . . F-21

Consolidated Balance Sheet as of September 30, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-22

Consolidated Statement of Changes in Shareholders' Equity for the six months ended September 30,
1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-23

Consolidated Statements of Cash Flows for the six months ended September 30, 1996 and 1997 . . . . F-24

Notes to the Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . F-25

P000177

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders and Board of Directors of Global-Tech Appliances Inc.
(formerly known as Wing Shing International Limited)

We have audited the accompanying consolidated balance sheets of Global-Tech Appliances Inc. (incorporated in the British Virgin Islands ("Global-Tech") and Subsidiaries (the "Company") as of March 31, 1996 and 1997, and the related consolidated statements of income, changes in shareholders' equity and cash flows for the years ended March 31, 1995, 1996 and 1997. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Global-Tech Appliances Inc. and Subsidiaries as of March 31, 1996 and 1997, and the results of their operations and their cash flows for the years ended March 31, 1995, 1996 and 1997, in conformity with generally accepted accounting principles in the United States of America.

ARTHUR ANDERSEN & CO.
Certified Public Accountants

Hong Kong
December 8, 1997 (except for the stock dividend of
100,000 shares described in the second paragraph
of Note 1, as to which the date is March 9, 1998)

## GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF INCOME
### (Amounts expressed in United States dollars)

| | Years Ended March 31. | | | Nine Months Ended December 31. | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1996 | 1997 |
| | | | | (unaudited) | |
| Net sales | $31.515.659 | 544.082.617 | 562.698.846 | 545.121.911 | 596.205.477 |
| Cost of goods sold | 21.989.307 | 31.892.595 | 46.030.834 | 33.136.062 | 70.284.465 |
| Gross profit | 9.526.352 | 12.190.022 | 16.668.012 | 11.985.849 | 25.921.012 |
| Selling, general and administrative expenses | 7.129.556 | 7.154.811 | 10.378.272 | 7.297.349 | 11.760.507 |
| Operating income | 2.396.796 | 5.035.211 | 6.289.740 | 4.688.500 | 14.160.505 |
| Interest expense | 405.441 | 695.932 | 867.492 | 634.694 | 1.116.012 |
| Other income, net | (108.919) | (85.110) | (94.570) | (118.440) | (131.658) |
| Income before income taxes | 2.100.274 | 4.424.389 | 5.516.818 | 4.172.246 | 13.176.151 |
| Income tax (credit) expense (Note 12) | 51.639 | (168.413) | 406.418 | 307.012 | 1.258.883 |
| Net income | $ 2.048.635 | $ 4.592.802 | $ 5.110.400 | $ 3.865.234 | $11.917.268 |
| Net income per share | $     0.26 | $     0.57 | $     0.64 | $     0.48 | $     1.49 |
| Weighted average number of shares outstanding | 8.000.000 | 8.000.000 | 8.000.000 | 8.000.000 | 8.000.000 |

The accompanying notes are an integral part of these financial statements

P000179

## GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

## CONSOLIDATED BALANCE SHEETS

### (Amounts expressed in United States dollars)

| | March 31, | | December 31, |
|---|---|---|---|
| | 1996 | 1997 | 1997 |
| | | | (unaudited) |
| **ASSETS** | | | |
| Current assets | | | |
| Cash and bank balances (Note 21) | $ 136,413 | $ 464,467 | $ 1,605,532 |
| Restricted cash (Notes 4 & 21) | 516,396 | 516,396 | 825,689 |
| Accounts receivable, net (Notes 5 & 21) | 2,382,754 | 4,077,517 | 3,894,766 |
| Due from related companies (Note 6) | 698,077 | — | — |
| Due from directors (Note 6) | 320,199 | 12,309 | 186,983 |
| Deposits, prepayments and other assets | 547,496 | 1,015,816 | 2,341,053 |
| Tax recoverable | 2,723 | — | — |
| Inventories (Note 7) | 10,512,856 | 20,022,284 | 25,675,271 |
| Total current assets | 15,116,914 | 26,108,789 | 34,529,294 |
| Investment in subsidiary subsequently sold (Note 2) | 2,692,787 | — | — |
| Property, plant and equipment (Note 8) | 13,850,709 | 18,274,392 | 23,101,849 |
| Construction-in-progress | 104,278 | 2,040 | 2,783,430 |
| Patents (Note 9) | — | 14,459 | 17,364 |
| Total assets | $31,764,688 | $44,399,680 | $60,431,937 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | |
| Current liabilities | | | |
| Short-term bank borrowings (Notes 6, 10 & 21) | $ 5,502,111 | $11,453,724 | $13,599,154 |
| Current portion of long-term bank loans (Notes 10, 11 & 21) | 680,098 | 591,635 | 595,419 |
| Accounts payable | 5,972,723 | 10,220,426 | 11,927,805 |
| Fees payable for land use rights # | 1,316,809 | 1,248,117 | 718,482 |
| Salaries and allowances payable | 306,894 | 604,768 | 517,432 |
| Advance payments from customers | — | 929,414 | 470,028 |
| Accrued expenses | 709,794 | 1,182,147 | 2,221,654 |
| Due to related companies (Note 6) | 113,467 | — | — |
| Due to a director (Note 6) | 1,527,163 | 958,029 | — |
| Income tax payable | — | 362,144 | 1,610,405 |
| Total current liabilities | 16,129,059 | 27,550,404 | 31,660,379 |
| Long-term bank loans (Notes 10, 11 & 21) | 569,724 | 335,756 | 561,973 |
| Deferred income taxes (Note 12) | 20,656 | 20,656 | 20,656 |
| Total liabilities | 16,719,439 | 27,906,816 | 32,243,008 |
| Shareholders' equity | | | |
| Preferred stock, par value $0.01, 1,000,000 shares authorized, no shares issued (Note 1) | — | — | — |
| Common stock, par value $0.01, 50,000,000 shares authorized, 8,000,000 shares issued (Note 1) | 80,000 | 80,000 | 80,000 |
| Retained earnings | 14,965,249 | 16,412,864 | 28,108,929 |
| Total shareholders' equity | 15,045,249 | 16,492,864 | 28,188,929 |
| Total liabilities and shareholders' equity | $31,764,688 | $44,399,680 | $60,431,937 |

The accompanying notes are an integral part of these financial statements

P000180

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

(Amounts expressed in United States dollars)

| | Common Stock | | Retained Earnings |
|---|---|---|---|
| | Number of Shares | Amount | |
| Balance as of April 1, 1994 | 8,000,000 | $ 80,000 | $ 8,323,812 |
| Net income | — | — | 2,048,635 |
| Balance as of March 31, 1995 | 8,000,000 | 80,000 | 10,372,447 |
| Net income | — | — | 4,592,802 |
| Balance as of March 31, 1996 | 8,000,000 | 80,000 | 14,965,249 |
| Effect of the spin-off of a subsidiary (Note 2) | — | — | (2,679,877) |
| Excess of purchase price of patents over the historical cost to a shareholder (Note 9) | — | — | (982,908) |
| Net income | — | — | 5,110,400 |
| Balance as of March 31, 1997 | 8,000,000 | 80,000 | 16,412,864 |
| Excess of purchase price of patents over the historical cost to a shareholder (Note 9) (unaudited) | — | — | (221,203) |
| Net income (unaudited) | — | — | 11,917,268 |
| Balance as of December 31, 1997 (unaudited) | 8,000,000 | $ 80,000 | $28,108,929 |

The accompanying notes are an integral part of these financial statements

F-5

P000181

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS

(Amounts expressed in United States dollars)

| | Years Ended March 31, | | | Nine Months Ended December 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1996 | 1997 |
| | | | | (unaudited) | |
| Cash flows from operating activities | | | | | |
| Net income | $ 2,069,635 | $ 4,592,802 | $ 5,703,404 | $ 3,684,232 | $ 5,172,268 |
| Adjustments to reconcile net income to net cash provided by operating activities | | | | | |
| Depreciation and amortization | 662,453 | 1,241,103 | 1,853,268 | 1,208,484 | 2,048,080 |
| Loss on disposals of property, plant and equipment | 214,365 | — | 28,165 | — | — |
| Increase in restricted cash | 258,198 | 258,198 | — | — | 506,293 |
| Net loss attributable to the spin-off of a subsidiary (Note 2) | 172,707 | 216,735 | — | — | — |
| Increase (decrease) in accounts receivable, net | (273,294) | (1,241,773) | (1,694,763) | (1,201,340) | (252,751) |
| Increase (decrease) in due from related companies | (792,430) | 489,533 | 645,077 | 645,077 | — |
| Decrease (increase) in due from directors | 281,281 | (184,712) | 307,890 | 320,100 | 76,671 |
| Decrease (increase) in deposits, prepayments and other assets | 4,773,728 | 88,011 | 485,410 | 514,427 | (2,325,237) |
| Decrease in tax recoverable | — | 36,729 | 2,723 | 2,723 | — |
| Increase in inventories | (6,105,579) | (1,556,730) | (9,504,428) | (8,526,151) | (5,652,987) |
| Increase (decrease) in accounts payable | 3,044,401 | (406,805) | 4,247,703 | 4,743,735 | 1,707,279 |
| Increase (decrease) in fees payable for land use rights | 32,102 | (127,784) | (68,692) | (255,902) | (529,635) |
| Increase (decrease) in salaries and allowances payable | (91,240) | 28,405 | 297,874 | 42,507 | (67,136) |
| Increase (decrease) in advance payments from customers | — | — | 929,414 | 1,075,843 | 454,156 |
| Increase (decrease) in accrued expenses | 1,677,666 | (1,088,077) | 472,353 | 954,824 | (1,034,507) |
| Decrease (increase) in due to related companies | (401,925) | 4,454 | (1,5,367) | (1,15,407) | — |
| Increase (decrease) in due to a director | 112,976 | (1,023,932) | (1,567,533) | (2,017,636) | (1,183,205) |
| (Decrease) increase in income tax payable | (127,070) | 44,370 | 362,144 | 297,550 | (1,244,265) |
| Increase in deferred income taxes | — | 20,656 | — | — | — |
| Net cash provided by operating activities | 5,253,458 | 843,447 | 900,723 | 5,499,673 | 4,423,482 |
| Cash flows from investing activities | | | | | |
| Purchases of property, plant and equipment | (3,660,578) | (2,179,719) | (6,257,904) | (5,573,759) | (6,873,256) |
| Proceeds from disposals of property, plant and equipment | — | — | 58,095 | — | — |
| Additions to construction-in-progress | (3,646,920) | (104,278) | (2,040) | — | (2,751,369) |
| Net cash used in investing activities | (7,307,498) | (2,283,996) | (6,201,849) | (5,573,759) | (9,652,548) |
| Cash flows from financing activities | | | | | |
| Increase in short-term bank borrowings | 2,411,666 | 951,158 | 5,951,613 | 438,443 | 2,149,214 |
| Increase in long-term bank loans | 516,396 | 1,249,375 | 428,283 | 357,607 | 226,217 |
| Repayment of long-term bank loans | (958,356) | (483,727) | (750,714) | (636,690) | — |
| Net cash provided by financing activities | 1,969,706 | 1,716,806 | 5,629,182 | 159,451 | 2,375,431 |
| Net increase (decrease) in cash and bank balances | (84,334) | (74,257) | (329,054) | 85,365 | (1,14,065) |
| Cash and bank balances at beginning of year/period | 46,490 | 62,156 | 136,413 | 136,413 | 484,467 |
| Cash and bank balances at end of year/period | $ 42,156 | $ 136,413 | $ 484,467 | $ 50,778 | $ 605,532 |

The accompanying notes are an integral part of these financial statements.

F-6

P000182

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 1—ORGANIZATION AND PRINCIPAL ACTIVITIES

Global-Tech Appliances Inc. ("Global-Tech"), formerly known as Wing Shing International Limited, is incorporated in the British Virgin Islands and is a holding company. Global-Tech and its subsidiaries are collectively referred to as the "Company." The Company is a designer and manufacturer of a wide range of small household appliances. The Company's manufacturing operations are located in Dongguan and Shenzhen, the People's Republic of China ("China"). The Company's products are sold to customers primarily in the United States and Europe.

On October 14, 1997, Global-Tech effected a 395,000 for 1 stock split (the "Share Split") and as a result, 7,900,000 shares of common stock, par value $0.01, were outstanding. The authorized capital was also adjusted to 50,000,000 shares of common stock and 1,000,000 shares of preferred stock, all par value $0.01 per share. On March 9, 1998, the Company declared a stock dividend of 100,000 shares (the "Issuance") pro rata to all shareholders and as a result, 8,000,000 shares of common stock, par value $0.01, were outstanding. The Share Split and the Issuance have been reflected retroactively in the accompanying balance sheets and in all per share computations.

NOTE 2—SUBSIDIARIES

Details of Global-Tech's principal subsidiaries as of December 31, 1997 were as follows:

| Name of Subsidiary | Place of Incorporation | Percentage of Equity Interest Held |
|---|---|---|
| Pentalpha Enterprises Limited ("PEL") .............. | Hong Kong | 100.0% |
| Kwong Lee Shun Trading Company Limited ("KLS") .. | Hong Kong | 100.0% |
| Dongguan Wing Shing Electrical Products Factory Company Limited ("DWS") ...................... | China | 100.0% |
| Wing Shing Products (BVI) Company Limited ("WSPBVI") ...................................... | British Virgin Islands | 100.0% |
| Wing Shing Overseas Limited ("WSO") ............. | British Virgin Islands | 100.0% |
| Wing Shing Marketing Limited ("WSML") .......... | British Virgin Islands | 100.0% |

As of March 31, 1996, Global-Tech had a 100% equity interest in Wing Shing Products Company Limited ("WSPL"), a company incorporated in Hong Kong, which owns the Company's Hong Kong office facilities. On July 11, 1996, WSPL converted all of its outstanding ordinary shares, all of which were owned by Global-Tech, into 100 non-voting deferred shares with an aggregate value of $12,910. WSPL then issued 100 new ordinary shares to members of the family who control Global-Tech's principal stockholder. As a result of the above share restructuring, Global-Tech no longer holds any significant interest in WSPL. The net assets of WSPL, which amounted to $2,679,877 at July 11, 1996, were effectively transferred to members of such family. The transfer of such amount was charged to retained earnings. The operating results of WSPL were not material to the consolidated results of operations.

During the year ended March 31, 1997, the Company formed a majority-owned marketing subsidiary to assist with marketing of products to certain United States customers. Global-Tech owned 51.5% of the outstanding shares and the remaining shares were owned by two minority shareholders. During fiscal 1997, the subsidiary incurred a loss. The Company recorded the entire loss, including the portion applicable to the minority interest, in the accompanying financial statements. On November 1, 1997, the Company purchased the interest of the subsidiary's minority shareholders for $360,000. The Company recorded as a charge to earnings provisions

F-7

P000183

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 2—SUBSIDIARIES (Continued)

of $752,000, $644,000 and $511,000 against advances made to a former minority shareholder and his affiliates in the Company's financial statements for the year ended March 31, 1997, the nine months ended December 31, 1996 and the nine months ended December 31, 1997, respectively.

NOTE 3—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

a. Basis of Consolidation

The consolidated financial statements include the financial statements of Global-Tech and its subsidiaries. All significant intercompany balances and transactions have been eliminated on consolidation.

b. Subsidiaries

A company is a subsidiary if more than 50% of the issued voting capital is held long-term directly or indirectly.

c. Sales

Sales represent the gross invoiced sales, net of discounts and returns, and are recognized when goods are shipped and title has passed.

d. Advertising Costs

Advertising costs represent costs relating to promotional activities intended to stimulate, directly or indirectly, a customer's purchase of goods, and are charged to expenses as incurred.

e. Foreign Currencies

The Company considers the U.S. dollar as its functional currency, as most of the Company's business activities are denominated in U.S. dollars. (Note: The Hong Kong dollar is pegged to the U.S. dollar at the exchange rate of $1 to HK$7.8).

Individual companies within the Company maintain their books and records in their respective currencies. In the financial statements of the individual companies, transactions in other currencies during the year/period are translated into the respective currencies at exchange rates in effect at the time of the transactions. Monetary assets and liabilities denominated in other currencies at any balance sheet date are remeasured into the functional currency at the rates of exchange in effect at such balance sheet date. Non-monetary assets and liabilities, income and expenses denominated in other currencies are remeasured into the functional currency at the rates of exchange in effect at the time of the transactions. Aggregate gains and losses from the remeasurement into the functional currency, which were insignificant, were included in the results of operations.

f. Income Taxes

The Company accounts for income tax under the provisions of Statement of Financial Accounting Standards No. 109, which requires recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns. Deferred income taxes are provided using the liability method. Under the liability method, deferred income taxes are recognized for all significant temporary differences between the tax and financial statement bases of assets and liabilities.

P000184

F-3

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 3—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

*g. Inventories*

Inventories are stated at the lower of cost and net realizable value. Cost, calculated on the first-in first-out basis, comprises materials and, where applicable, direct labor and an appropriate proportion of production overhead expenditure. Net realizable value is determined on the basis of estimated selling prices, less further costs expected to be incurred to completion and direct selling and distribution expenses. Provision is made for obsolete, slow-moving or defective items where considered appropriate by management.

*h. Property, Plant and Equipment*

Property, plant and equipment, other than freehold land, are stated at cost less accumulated depreciation. Gains or losses on disposals are reflected in current operations. Depreciation is calculated on the straight-line or reducing balance basis at annual rates estimated to write off the cost of each asset over its expected useful life. The annual rates are as follows:

| | Annual Rate | Method |
|---|---|---|
| Land use rights | Over the business license period | Straight-line |
| Leasehold improvements and buildings | Over the remaining lease term | Straight-line |
| Plant and machinery | 15%-30% | Reducing balance |
| Molds | 20% | Straight-line |
| Motor vehicles | 15%-20% | Straight-line |
| Furniture, fixtures and equipment | 15% | Straight-line |

The Company recognizes an impairment loss on a fixed asset when evidence, such as the sum of expected future cash flows (undiscounted and without interest charges), indicates that future operations will not produce sufficient revenue to cover the related future costs, including depreciation, and when the carrying amount of the asset cannot be realized through sale. Measurement of the impairment loss is based on the fair value of the assets.

The Company's manufacturing plants are located in China. The Company has acquired from the relevant local authorities in China certain land use rights for an amount of $2,987,351. As of March 31, 1996, March 31, 1997 and December 31, 1997, the balance of the land use rights payable to the local authorities amounted to $1,316,809, $1,248,117 and $718,482, respectively. Such amounts do not bear interest. The cost of the land use rights is amortized on a straight-line basis over the period of the business license of DWS, which is 30 years from 1993.

Maintenance and repairs are charged to expense as incurred; improvements are capitalized.

*i. Patents*

Patents are stated at the historical cost incurred by a shareholder, who transferred the patents to the Company, and are amortized on a straight-line basis over the expected future economic lives ranging from 11 to 20 years. See Notes 6(d) and 9.

*j. Operating Leases*

Leases where substantially all the rewards and risks of ownership remain with the lessor are accounted for as operating leases. Rental payments under operating leases are charged to the statements of income on a straight-line basis over the period of the relevant leases.

F-9

P000185

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 3—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period Actual results could differ from those estimates.

*Net Income Per Share*

The computation of net income per share is based on the weighted average number of shares of common stock outstanding, on the basis that the Share Split and the Issuance (see Note 1) had been consummated prior to the years/periods presented, in accordance with SFAS No. 128. Diluted net income per share is not presented because the effect of the assumed exercise of stock options is not material. The Company will continue to follow the provisions of APB Opinion No. 25 to account for stock options but will provide the pro forma disclosures required by SFAS No. 123.

## NOTE 4—RESTRICTED CASH

As of March 31, 1996, March 31, 1997 and December 31, 1997, cash deposits of approximately $516,000, $516,000 and $826,000, respectively, were pledged to a bank to secure certain banking facilities of the Company.

## NOTE 5—ACCOUNTS RECEIVABLE, NET

|  | March 31, | | December 31, |
| --- | --- | --- | --- |
|  | 1996 | 1997 | 1997 |
|  | | | (unaudited) |
| Trade receivables | $2,388,866 | $4,083,629 | $4,150,878 |
| Less Allowance for doubtful accounts | 6,112 | 6,112 | 256,112 |
| Accounts receivable, net | $2,382,754 | $4,077,517 | $3,894,766 |

## NOTE 6—RELATED PARTY TRANSACTIONS

A related party is essentially any party that controls or can significantly influence the management or operating policies of the Company to the extent that the Company may be prevented from fully pursuing its own interests. Such parties would include affiliates, investors accounted for by the equity method, trusts for the benefit of employees, principal shareholders, management, and immediate family members of shareholders or management.

The Company had the following transactions and balances with related parties:

a. The balances with directors and related companies are unsecured, interest free and have no fixed repayment terms, except as disclosed below in paragraph d.

b. Certain directors, a shareholder and a related company have pledged their personal assets to banks to secure banking facilities of the Company.

c. Certain directors also provided guarantees to banks to secure banking facilities of the Company.

d. During the year ended March 31, 1997 and the nine months ended December 31, 1997, the Company purchased patents on various household products for total consideration in the amounts of $693,300 and $225,076, respectively, from a shareholder who is also a director of the Company. As of

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 6—RELATED PARTY TRANSACTIONS (Continued)

December 31, 1997, such amounts were paid in full. The excess of the purchase price over the historical cost was charged to retained earnings. The amounts due to the shareholder were unsecured and interest free.

e. During the years ended March 31, 1995, 1996 and 1997, the Company paid annual real estate rental expenses of approximately $184,000 to a related company; and during the nine months ended December 31, 1996 and 1997, the Company paid real estate rental expenses of approximately $138,000 and $152,000, respectively, to the related company.

f. During the years ended March 31, 1995 and 1996, the Company paid annual management and accounting fees of approximately $282,000 to a related company. Thereafter, such management and accounting functions have been performed by the Company.

g. During the year ended March 31, 1995, the Company paid annual machinery rental expenses of approximately $227,000 to a related company. Such machinery was transferred to the Company during the year ended March 31, 1995 at its book value.

h. During the years ended March 31, 1996 and 1997 and the nine months ended December 31, 1996 and 1997, sales to related companies amounted to approximately $588,000, $184,000, $118,000 and $508,000, respectively.

## NOTE 7—INVENTORIES

| | March 31, | | December 31, |
|---|---|---|---|
| | 1996 | 1997 | 1997 |
| | | | (unaudited) |
| Raw materials | $ 6,989,225 | $12,788,684 | $16,500,921 |
| Work-in-progress | 1,994,276 | 3,776,184 | 5,349,178 |
| Finished goods | 1,529,355 | 3,457,416 | 3,825,172 |
| | $10,512,856 | $20,022,284 | $25,675,271 |

## NOTE 8—PROPERTY, PLANT AND EQUIPMENT

| | March 31, | | December 31, |
|---|---|---|---|
| | 1996 | 1997 | 1997 |
| | | | (unaudited) |
| Leasehold improvements and buildings | $ 7,224,548 | $ 7,930,573 | $ 8,481,636 |
| Land use rights | 2,082,879 | 2,987,351 | 3,006,285 |
| Plant and machinery | 3,850,625 | 6,069,888 | 10,135,118 |
| Molds | 1,753,283 | 3,541,709 | 5,223,270 |
| Motor vehicles | 214,099 | 243,371 | 243,371 |
| Furniture, fixtures and equipment | 793,425 | 1,593,156 | 2,149,524 |
| | 15,918,859 | 22,366,048 | 29,239,204 |
| Less: Accumulated depreciation | 2,068,150 | 4,091,656 | 6,137,355 |
| | $13,850,709 | $18,274,392 | $23,101,849 |

P000187

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 9—PATENTS

| | March 31, | | December 31, |
|---|---|---|---|
| | 1996 | 1997 | 1997 |
| | | | (unaudited) |
| Cost | — | $ 998,399 | $1,223,475 |
| Less: Excess of purchase price over the historical cost to a shareholder charged to retained earnings | — | 982,908 | 1,204,111 |
| | — | 15,491 | 19,364 |
| Less: Accumulated amortization | — | 1,032 | 2,000 |
| | — | $ 14,459 | $ 17,364 |

NOTE 10—SHORT-TERM BANK BORROWINGS

| | March 31, | | December 31, |
|---|---|---|---|
| | 1998 | 1997 | 1997 |
| | | | (unaudited) |
| Bank overdrafts | $ 2,039,522 | $ 703,899 | $ 725,783 |
| Short-term bank loans | 3,462,589 | 10,749,825 | 12,873,371 |
| | $ 5,502,111 | $11,453,724 | $13,599,154 |

As of March 31, 1996, March 31, 1997 and December 31, 1997, the Company had banking facilities of approximately $24,371,000, $30,878,000 and $40,871,000, respectively, for bank loans, overdrafts, guarantees and forward exchange contracts, of which approximately $7,777,000, $14,987,000 and $17,631,000, respectively, had been utilized. The banking facilities were secured by several properties owned by the Company, a director, a shareholder and a related company, personal guarantees from the directors, pledged deposits offered by a subsidiary and a director, and corporate guarantees from the Company and a subsidiary.

Short-term bank borrowings are denominated in Hong Kong dollars and bear interest at the floating commercial bank lending rates in Hong Kong, which ranged from 8.75% to 9.5% per annum as of March 31, 1997 and from 9.0% to 10.5% per annum as of December 31, 1997. They are drawn for working capital purposes and are renewable annually with the consent of the relevant banks.

In October 1997, the Company entered into an agreement with a principal bank lender in which the Company agreed to maintain its consolidated shareholders' equity at not less than $25.8 million as of March 31, 1998 and not to distribute dividends in excess of 50% of the Company's consolidated net income commencing in fiscal 1997.

NOTE 11—LONG-TERM BANK LOANS

| | March 31, | | December 31, |
|---|---|---|---|
| | 1996 | 1997 | 1997 |
| | | | (unaudited) |
| Secured bank loans | $1,249,822 | $ 927,391 | $1,157,392 |
| Less: Amounts due within one year included under current liabilities | 680,098 | 591,635 | 595,419 |
| | $ 569,724 | $ 335,756 | $ 561,973 |
| Weighted average interest rate as of the end of the year/period | 10.22% | 10.11% | 11.32% |

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 11—LONG-TERM BANK LOANS (Continued)

Aggregate maturities of long-term bank loans are as follows:

**Payable during the following period:**

|  | March 31, 1997 | December 31, 1997 |
|---|---|---|
|  |  | (unaudited) |
| Within one year .............................................. | $ 591,635 | $ 595,419 |
| Over one year but not exceeding two years ...................... | 324,009 | 387,581 |
| Over two years but not exceeding three years ................... | 11,747 | 174,392 |
|  | $ 927,391 | $1,157,392 |

NOTE 12—INCOME TAXES

Global-Tech and its subsidiaries are subject to income taxes on an entity basis on income arising in or derived from the tax jurisdiction in which they are domiciled or deemed to operate.

Entities subject to Hong Kong profits tax are taxed at a rate of 16.5% on their assessable income. Entities subject to United States federal income tax are taxed at a rate of up to 35% of their assessable income. In addition, after tax U.S. effectively-connected earnings would be subject to a U.S. federal withholding equivalent tax (branch profits tax) at a rate of 30%. The combined impact of these taxes creates a U.S. federal effective tax rate of up to 55% on income effectively connected with the conduct of a U.S. trade or business.

The subsidiary established in China (DWS) is subject to a China income tax at a rate of 27% (24% reduced tax rate and 3% local income tax rate, in the open coastal areas of China). Current income tax is computed based on the taxable income as reported in the statutory financial statements prepared under China accounting regulations. DWS is exempted from income tax for two years starting from the first profitable year (after utilizing any accumulated tax loss carry forwards) followed by a 50% exemption for the next three years. For tax purposes, DWS has not recognized its first profitable year.

Income tax (credit) expense comprised:

|  | Years Ended March 31. | | | Nine Months Ended December 31. | |
|---|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1996 | 1997 |
|  |  |  |  | (unaudited) | |
| Reversal of income taxes payable ..................... | — | $ (205,723) | — | — | — |
| Provision of income taxes— current..................... | $ 51,639 | 16,654 | $ 406,418 | $ 307,012 | $1,258,883 |
| Provision of income taxes— deferred................... | — | 20,656 | — | — | — |
|  | $ 51,639 | $ (168,413) | $ 406,418 | $ 307,012 | $1,258,883 |

F-13

𝒫000189

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 12—INCOME TAXES (Continued)

The reconciliation of the Hong Kong income tax rate to the effective income tax rate based on income before income taxes stated in the consolidated statements of income is as follows:

| | Years Ended March 31, | | | Nine Months Ended December 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1996 | 1997 |
| | | | | (unaudited) | |
| Hong Kong income tax rate | 16.5% | 16.5% | 16.5% | 16.5% | 16.5% |
| Income subject to United States tax | — | — | — | — | 3.3 |
| Non-taxable income arising from activities which qualified as offshore | (14.2) | (15.3) | (9.1) | (9.1) | (10.2) |
| Overprovision in prior years | — | (4.8) | — | — | — |
| Effective income tax rate | 2.3% | (3.6)% | 7.4% | 7.4% | 9.6% |

Deferred income taxes as of March 31, 1996, March 31, 1997 and December 31, 1997 comprised the following timing differences:

| | March 31, | | December 31, |
|---|---|---|---|
| | 1996 | 1997 | 1997 |
| | | | (unaudited) |
| Timing differences relating to fixed assets | $ 383,480 | $ 395,209 | $ 434,174 |
| Operating loss carry forwards | 475,601 | 1,040,370 | — |
| Less: valuation allowances | (838,425) | (1,414,923) | (413,518) |
| | $ 20,656 | $ 20,656 | $ 20,656 |

Valuation allowances have been established for substantially all deferred tax assets due to the uncertain realization of such assets.

## NOTE 13—DESIGN AND DEVELOPMENT COSTS

Included in selling, general and administrative expenses were design and development costs of approximately $933,000, $914,000 and $1,310,000 for the years ended March 31, 1995, 1996 and 1997, respectively, and $778,000 and $1,003,000 for the nine months ended December 31, 1996 and 1997, respectively.

## NOTE 14—COMMITMENTS

*a. Capital Commitments*

As of December 31, 1997, the Company had capital commitments amounting to approximately $8.0 million in respect of construction of factories and staff quarters and acquisition of manufacturing machinery in China.

*b. Operating Lease Commitments*

The Company has various operating lease agreements for parking lots, motor vehicles, equipment and real estate, which extend through May 2002. Rental expenses for the years ended March 31, 1995, 1996 and 1997 and the nine months ended December 31, 1996 and 1997 were approximately $40,000, $59,000, $245,000, $158,000 and $174,000, respectively. Future minimum rental payments are as follows:

F-14

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 14—COMMITMENTS (Continued)

Payable during the following period:

|  | March 31, 1997 | December 31, 1997 |
|---|---|---|
|  |  | (unaudited) |
| Within one year | $211,000 | $225,000 |
| Over one year but not exceeding two years | 230,000 | 61,000 |
| Over two years but not exceeding three years | 5,000 | 4,000 |
| Over three years but not exceeding four years | 4,000 | 1,000 |
| Over four years but not exceeding five years | 1,000 | — |
|  | $451,000 | $291,000 |

*c. Commission Agreement*

The Company entered into a commission agreement with one of the former minority shareholders of a subsidiary to compensate him for his prior services and provide for the repayment of the $1,249,000 in advances (the "Debt"). The commission agreement provides that, for the period from January 1, 1998 through October 31, 2001, net sales of certain products previously marketed by the subsidiary will be subject to a 3% commission. The former minority shareholder will receive $50,000 per month from January 1998 through June 1999. Any commissions earned in excess of $50,000 per month will be applied to reduce the Debt. If commissions earned are less than $50,000 per month, such deficiency will be added to the Debt. Commissions will be applied equally each month from July 1999 through the end of the term of the commission agreement in October 2001 to reduce the Debt. Any portion of the Debt remaining outstanding at the end of the term of the commission agreement is required to be repaid by the former minority shareholder at that time.

**NOTE 15—CONTINGENT LIABILITIES**

As of March 31, 1996, March 31, 1997 and December 31, 1997, the Company had contingent liabilities with respect to discounted bills with recourse amounting to approximately $1,210,000, $1,574,000 and $3,614,000, respectively.

As of March 31, 1996, March 31, 1997 and December 31, 1997, the Company had outstanding letters of credit amounting to approximately $1,025,000, $2,606,000 and $2,874,000, respectively.

On November 20, 1995, Rival Company ("Rival") filed suit against Sunbeam Products Inc. (formerly known as Sunbeam-Oster Household, "Sunbeam") in the U.S. District Court for the Western District of Missouri, Western Division, alleging that certain features of food steamers which the Company manufactures for Sunbeam infringe a U.S. patent held by Rival. On December 8, 1997, the court granted a judgment in favor of Sunbeam.

On December 21, 1995, Black & Decker Inc. ("B&D") filed suit against Sunbeam in the U.S. District Court for the Northern District of Illinois for patent infringement. B&D alleges that Sunbeam infringes a patent assigned to B&D which covers certain features of food steamers manufactured by the Company and seeks unspecified money damages and injunctive relief.

Although the Company is not a party to these actions, pursuant to agreements between the Company and Sunbeam, the Company is obligated to hold harmless, defend and indemnify Sunbeam for any losses and legal fees it may sustain as a result of these actions.

F-15

P 000191

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 15—CONTINGENT LIABILITIES (Continued)

After considering all facts known to the Company and advice from its attorneys, the Company believes that these actions will not have a material adverse effect on its business, financial condition or results of operations.

NOTE 16—EMPLOYEE BENEFITS

a. Retirement Fund

The Company has arranged a defined contribution retirement plan for all eligible employees of the Company under which the Company and the employees each contribute 5% of the employees' basic salary. The plan is administered and funded by an independent trustee. Salaried employees are eligible to participate on the first day of the month coincident with or immediately following the date on which they have completed continuous service of the probationary period, provided they are employed on a full-time basis. Part-time employees are not eligible for the plan. The costs of this plan recognized during the years ended March 31, 1995, 1996 and 1997 and the nine months ended December 31, 1996 and 1997 were $51,234, $57,397, $62,427, $38,693 and $61,125, respectively. The Company has no other post-retirement or post-employment benefit plans.

b. Other Benefits

The Company provides housing, medical care and subsidized meals to all factory employees. The aggregate amounts incurred by the Company for such benefits were approximately $60,000, $145,000 and $229,000 during the years ended March 31, 1995, 1996 and 1997, respectively, and $149,000 and $380,000 during the nine months ended December 31, 1996 and 1997, respectively.

NOTE 17—SEGMENT INFORMATION

a. The Company belongs to a single industry, namely, manufacturing and trading of small household appliances.

b. Analysis of sales

| | Years Ended March 31, | | | Nine Months Ended December 31, | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1996 | 1997 |
| | | | | (unaudited) | |
| Export sales | | | | | |
| Australia | $ 209,357 | $ 153,907 | $ 338,625 | $ 410,451 | $ 2,003,975 |
| Europe | 8,418,408 | 13,927,510 | 14,544,052 | 10,761,079 | 20,777,081 |
| North America | 21,192,129 | 28,669,539 | 47,076,426 | 33,689,867 | 71,517,830 |
| Total export sales | 29,819,894 | 42,750,956 | 61,959,103 | 44,861,397 | 94,298,886 |
| Total domestic sales | 1,695,765 | 1,331,661 | 739,743 | 260,514 | 1,906,591 |
| | $31,515,659 | $44,082,617 | $62,698,846 | $45,121,911 | $96,205,477 |

P000192

F-16

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 17—SEGMENT INFORMATION (Continued)

c. Customers representing 10% or more of total revenues are as follows:

| | Years Ended March 31. | | | Nine Months Ended December 31. | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1996 | 1997 |
| | | | | (unaudited) | |
| | % | % | % | % | % |
| Sunbeam Products Inc. (formerly known as Sunbeam-Oster Household) | — | 17 | 13 | 16 | 40 |
| Appliance Corporation of America (Welbilt) | — | — | 12 | 11 | 1 |
| Helen of Troy Limited | 21 | 15 | 11 | 13 | 7 |
| Hamilton Beach/Proctor-Silex, Inc. | 21 | 19 | 8 | 9 | 4 |

Pursuant to a product supply agreement dated July 1, 1997 between the Company and one of the major customers listed above, the Company is the sole supplier of certain products to such customer for the period from July 1, 1997 to June 30, 2001. As consideration for entering into this exclusive supply agreement, the Company paid an incentive fee of $1,000,000 to the customer during the nine months ended December 31, 1997. Such fee is included in "Deposits, prepayments and other assets" and is being charged to income on a straight-line basis over two years.

NOTE 18—SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION

Cash paid for interest and income taxes comprised:

| | Years Ended March 31. | | | Nine Months Ended December 31. | |
|---|---|---|---|---|---|
| | 1995 | 1996 | 1997 | 1996 | 1997 |
| | | | | (unaudited) | |
| Interest paid | $ 405,441 | $ 695,932 | $ 867,492 | $ 634,694 | $1,116,012 |
| Income taxes paid | 178,710 | 56,441 | 43,229 | 6,459 | 10,623 |
| Income taxes refunded | — | (183,869) | — | — | — |

F-17

P000193

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—Continued

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 19—PROPOSED INITIAL PUBLIC OFFERING AND SUPPLEMENTARY NET INCOME PER SHARE

The Company is contemplating an initial public offering of 4,200,000 shares at a price of $19.00 per share with net proceeds of approximately $17.22 per share after deduction of fees and expenses. The Company intends to utilize $12,000,000 of the net proceeds of the offering to retire short-term debt outstanding. Presented below is the pro forma effect on net income per share for the year ended March 31, 1997 and the nine months ended December 31, 1997 of issuing a sufficient number of shares at the net proceeds of $17.22 per share to retire such debt.

| | Year Ended March 31, 1997 | Nine Months Ended December 31, 1997 |
| --- | --- | --- |
| | | (unaudited) |
| Net income as reported | $ 5,110,400 | $11,917,268 |
| Adjusted for interest expenses net of tax effect | 742,715 | 914,886 |
| Pro forma net income | 5,853,115 | 12,832,154 |
| Weighted average number of shares reported | 8,000,000 | 8,000,000 |
| Pro forma increase in shares | 696,864 | 696,864 |
| Pro forma weighted average number of shares | 8,696,864 | 8,696,864 |
| Net income per share as reported | $ 0.64 | $ 1.49 |
| Pro forma adjusted net income per share | $ 0.67 | $ 1.48 |

## NOTE 20—RISK CONSIDERATIONS

The Company's operations are conducted in Hong Kong and China. As a result, the Company's business, financial condition and results of operations may be influenced by the political, economic and legal environments in Hong Kong and China, and by the general state of the Hong Kong and China economies.

On July 1, 1997, sovereignty over Hong Kong was transferred from the United Kingdom to China, and Hong Kong became a Special Administrative Region of China ("SAR"). As provided in the Sino-British Joint Declaration relating to Hong Kong and the Basic Law of the Hong Kong SAR of the People's Republic of China, Hong Kong will have full economic autonomy and its own legislative, legal and judicial systems for fifty years from 1997. The Company's management does not believe that the transfer of sovereignty over Hong Kong will have an adverse impact on the Company's financial and operating environment. There can be no assurance, however, that changes in political or other conditions will not result in such an adverse impact.

As substantially all of the Company's manufacturing operations are conducted in China, the Company is subject to different considerations and other risks not typically associated with companies in North America and Western Europe. These include risks associated with, among others, the political, economic and legal environments and foreign currency exchange. The Company's results may be adversely affected by changes in the political and social conditions in China, and by changes in governmental policies with respect to laws and regulations, anti-inflationary measures, currency conversions and remittances abroad, and rates and methods of taxation, among other things.

## NOTE 21—FINANCIAL INSTRUMENTS

The carrying amounts of the Company's cash and accounts receivable approximate their fair values because of the short maturity of those instruments. The carrying amounts of the bank loans approximate their fair values based on borrowing rates currently available for bank loans with similar terms and maturities.

F-18

P000194

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 22—STOCK OPTION PLAN

In September 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (as amended, the "Plan"). The Plan provides for the grant of (i) options that are intended to qualify as incentive stock options ("Incentive Stock Options") within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") to employees and (ii) options not intended to qualify as Incentive Stock Options to employees and consultants. The total number of shares of Common Stock for which options may be granted under the Plan is 1,600,000 shares. The Company has granted options to purchase (i) 322,000 shares of Common Stock to employees and a consultant in accordance with the terms of the Plan, with an exercise price of $14.50 per share and (ii) 283,800 shares to employees and consultants with an exercise price equal to the initial public offering price of the Company's shares. The options vest over varying periods of up to five years and are all exercisable for a period of ten years from the date of grant.

The Plan is administered by the Board of Directors or a committee of outside directors appointed by the Board of Directors, which will determine the terms of options, including the exercise price, the number of shares subject to the option and the terms and conditions of exercise. No option granted under the Plan is transferable by the optionee other than by will or the laws of descent and distribution and each option is exercisable during the lifetime of the optionee only by such optionee. The exercise price of all Incentive Stock Options granted under the Plan must be at least equal to the fair market value of such shares on the date of grant. With respect to any participant who owns (or is deemed to own) stock possessing more than 10% of the voting rights of the Company's outstanding capital stock, the exercise price of any Incentive Stock Option must be not less than 110% of the fair market value on the date of grant. The term of each option granted pursuant to the Plan may be established by the Board of Directors, or a committee of the Board of Directors, in its sole discretion; provided, however, that the maximum term of each Incentive Stock Option granted pursuant to the Plan is 10 years. With respect to any Incentive Stock Option granted to a participant who owns (or is deemed to own) stock possessing more than 10% of the total combined voting power of all classes of the Company's outstanding capital stock, the maximum term is five years.

## NOTE 23—NEWLY ISSUED ACCOUNTING STANDARD

In 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards SFAS No. 130, "Comprehensive Income." This statement will be adopted by the Company in connection with its consolidated financial statements for the year ending March 31, 1999. The adoption of this standard will not have a material effect on the Company's consolidated financial statements.

P 000195

## REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders and Board of Directors of Global-Tech Appliances Inc
(formerly known as Wing Shing International Limited)

We have audited the accompanying consolidated balance sheet of Global-Tech Appliances Inc. incorporated in the British Virgin Islands, ("Global-Tech") and Subsidiaries (the "Company") as of September 30, 1997, and the related consolidated statements of income, changes in shareholders' equity and cash flows for the six months ended September 30, 1997. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Global-Tech Appliances Inc. and Subsidiaries as of September 30, 1997, and the results of their operations and their cash flows for the six months ended September 30, 1997, in conformity with generally accepted accounting principles in the United States of America.


ARTHUR ANDERSEN & CO.
Certified Public Accountants

Hong Kong
December 3, 1997 (except for the stock dividend of
   100,000 shares described in the second paragraph
   of Note 1, as to which the date is March 9, 1998)

F-20

(000196

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF INCOME

(Amounts expressed in United States dollars)

| | Six Months Ended September 30. | |
|---|---|---|
| | 1996 | 1997 |
| | (unaudited) | |
| Net sales | $28.135.229 | $64.920.425 |
| Cost of goods sold | 20.901.096 | 47.311.439 |
| Gross profit | 7.234.133 | 17.608.986 |
| Selling. general and administrative expenses | 4.838.766 | 7.644.939 |
| Operating income | 2.395.367 | 9.964.047 |
| Interest expense | 386.443 | 789.727 |
| Other income. net | (65.628) | (43.417) |
| Income before income taxes | 2.074.552 | 9.217.737 |
| Income tax expense (Note 12) | 158.275 | 1.068.883 |
| Net income | $ 1.916.277 | $ 8.148.854 |
| Net income per share | $ 0.24 | $ 1.02 |
| Weighted average number of shares outstanding | 8.000.000 | 8.000.000 |

The accompanying notes are an integral part of these financial statements.

F-21

P 000197

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

CONSOLIDATED BALANCE SHEET

(Amounts expressed in United States dollars)

September 30,
1997

## ASSETS

| | |
|---|---:|
| Current assets | |
| Cash and bank balances (Note 21) | $   902,398 |
| Restricted cash (Notes 4 & 21) | 822,094 |
| Accounts receivable, net (Notes 5 & 21) | 6,913,937 |
| Deposits, prepayments and other assets | 2,368,478 |
| Inventories (Note 7) | 26,266,782 |
| Total current assets | 37,363,687 |
| Property, plant and equipment (Note 8) | 22,101,466 |
| Construction-in-progress | 2,072,618 |
| Patents (Note 9) | 17,687 |
| Total assets | $61,555,458 |

## LIABILITIES AND SHAREHOLDERS' EQUITY

| | |
|---|---:|
| Current liabilities: | |
| Short-term bank borrowings (Notes 6, 10 & 21) | $13,572,836 |
| Current portion of long-term bank loans (Notes 10, 11 & 21) | 701,025 |
| Accounts payable | 15,722,462 |
| Fees payable for land use rights | 989,864 |
| Salaries and allowances payable | 627,585 |
| Advance payments from customers | 902,503 |
| Accrued expenses | 2,093,626 |
| Due to a director (Note 6) | 457,339 |
| Income tax payable | 1,420,404 |
| Total current liabilities | 36,487,644 |
| Long-term bank loans (Notes 10, 11 & 21) | 626,643 |
| Deferred income taxes (Note 12) | 20,656 |
| Total liabilities | 37,134,943 |
| Shareholders' equity: | |
| Preferred stock, par value $0.01: 1,000,000 shares authorized: no shares issued (Note 1) | — |
| Common stock, par value $0.01: 50,000,000 shares authorized: 8,000,000 shares issued (Note 1) | 80,000 |
| Retained earnings | 24,340,515 |
| Total shareholders' equity | 24,420,515 |
| Total liabilities and shareholders' equity | $61,555,458 |

The accompanying notes are an integral part of these financial statements.

F-22

P000198

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENT OF CHANGES IN SHAREHOLDERS' EQUITY

(Amounts expressed in United States dollars)

| | Common Stock | | Retained Earnings |
|---|---|---|---|
| | Number of Shares | Amount | |
| Balance as of March 31, 1997 | 8,000,000 | $80,000 | $16,412,504 |
| Excess of purchase price of patents over the historical cost to a shareholder (Note 9) | — | — | 221,203 |
| Net income | — | — | 8,148,854 |
| Balance as of September 30, 1997 | 8,000,000 | $80,000 | $24,340,515 |

The accompanying notes are an integral part of these financial statements

F-23

f²000199

## GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF CASH FLOWS

### (Amounts expressed in United States dollars)

| | Six Months Ended September 30, | |
|---|---|---|
| | 1996 | 1997 |
| | (unaudited) | |
| Cash flows from operating activities | | |
| Net income | $ 1,916,277 | $ 8,148,854 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Depreciation and amortization | 765,780 | 1,274,553 |
| Increase in restricted cash | — | (305,698) |
| Net loss attributable to the spin-off of a subsidiary (Note 2) | 64,769 | — |
| Increase in accounts receivable, net | (1,269,649) | (2,836,420) |
| Decrease in due from related companies | 698,077 | — |
| Decrease in due from directors | 320,199 | 12,309 |
| Increase in deposits, prepayments and other assets | (670,780) | (1,352,662) |
| Increase in tax recoverable | (6,459) | — |
| Increase in inventories | (3,887,381) | (6,244,498) |
| Increase in accounts payable | 1,939,717 | 5,502,036 |
| Decrease in fees payable for land use rights | — | (258,253) |
| Increase in salaries and allowances payable | 54,876 | 22,817 |
| Increase (decrease) in advance payments from customers | 112,929 | (26,911) |
| Increase in accrued expenses | 4,129,172 | 911,479 |
| Increase in due to related companies | 252,313 | — |
| Decrease in due to a director | (2,525,044) | (725,766) |
| Increase in income tax payable | 158,275 | 1,058,260 |
| Net cash provided by operating activities | 2,053,071 | 5,177,100 |
| Cash flows from investing activities: | | |
| Purchases of property, plant and equipment | (4,170,998) | (5,095,942) |
| Additions to construction-in-progress | (36,073) | (2,072,618) |
| Net cash used in investing activities | (4,207,071) | (7,168,560) |
| Cash flows from financing activities: | | |
| Increase in short-term bank borrowings | 2,778,295 | 2,119,112 |
| Increase in long-term bank loans | 135,210 | 585,389 |
| Repayment of long-term bank loans | (594,496) | (185,112) |
| Net cash provided by financing activities | 2,319,009 | 2,519,389 |
| Net increase in cash and bank balances | 165,009 | 527,929 |
| Cash and bank balances at beginning of period | 136,413 | 464,467 |
| Cash and bank balances at end of period | $ 301,422 | $ 992,396 |

The accompanying notes are an integral part of these financial statements

F-24

P 000200

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 1—ORGANIZATION AND PRINCIPAL ACTIVITIES

Global-Tech Appliances Inc. ("Global-Tech"), formerly known as Wing Shing International Limited, is incorporated in the British Virgin Islands and is a holding company. Global-Tech and its subsidiaries are collectively referred to as the "Company". The Company is a designer and manufacturer of a wide range of small household appliances. The Company's manufacturing operations are located in Dongguan and Shenzhen, the People's Republic of China ("China"). The Company's products are sold to customers primarily in the United States and Europe.

On October 14, 1997, Global-Tech effected a 395,000 for 1 stock split (the "Share Split") and as a result, 7,900,000 shares of common stock, par value $0.01, were outstanding. The authorized capital was also adjusted to 50,000,000 shares of common stock and 1,000,000 shares of preferred stock, all par value $0.01 per share. On March 9, 1998, the Company declared a stock dividend of 100,000 shares (the "Issuance") pro rata to all shareholders and as a result, 8,000,000 shares of common stock, par value $0.01, were outstanding. The Share Split and the Issuance have been reflected retroactively in the accompanying balance sheets and in all per share computations.

## NOTE 2—SUBSIDIARIES

Details of Global-Tech's principal subsidiaries as of September 30, 1997 were as follows:

| Name of Subsidiary | Place of Incorporation | Percentage of Equity Interest Held |
|---|---|---|
| Pentalpha Enterprises Limited ("PEL") | Hong Kong | 100.0% |
| Kwong Lee Shun Trading Company Limited ("KLS") | Hong Kong | 100.0% |
| Dongguan Wing Shing Electrical Products Factory Company Limited ("DWS") | China | 100.0% |
| Wing Shing Products (BVI) Company Limited ("WSPBVI") | British Virgin Islands | 100.0% |
| Wing Shing Overseas Limited ("WSO") | British Virgin Islands | 100.0% |
| Wing Shing Marketing Limited ("WSML") | British Virgin Islands | 51.5% |

During the year ended March 31, 1997, the Company formed a majority-owned marketing subsidiary to assist with marketing of products to certain United States customers. Global-Tech owned 51.5% of the outstanding shares and the remaining shares were owned by two minority shareholders. During fiscal 1997, the subsidiary incurred a loss. The Company recorded the entire loss, including the portion applicable to the minority interest, in the accompanying financial statements. In the six months ended September 30, 1997, the subsidiary recorded a profit but the amount was less than the accumulated loss brought forward as of April 1, 1997. Accordingly, the Company recorded the entire profit, including the portion applicable to the minority interests, in the accompanying financial statements. On November 1, 1997, the Company purchased the interest of the subsidiary's minority shareholders for $360,000. The Company recorded as a charge to earnings provisions against advances of $472,000 and $467,000 made to a minority shareholder and his affiliates in the Company's financial statements for the six months ended September 30, 1996 and 1997, respectively.

## NOTE 3—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*a. Basis of Consolidation*

The consolidated financial statements include the financial statements of Global-Tech and its subsidiaries. All significant intercompany balances and transactions have been eliminated on consolidation.

F-25

P 000201

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 3—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

A company or its subsidiary if no less than 50% of the issued voting capital is held, long-term unless indirectly.

(c) Sales

Sales represent the gross invoiced sales, net of discounts and returns, and are recognized when goods are shipped and title has passed.

(d) Advertising Costs

Advertising costs represent costs relating to promotional activities intended to stimulate, directly or indirectly, a customer's purchase of goods, and are charged to expenses as incurred.

(e) Foreign Currencies

The Company considers the U.S. Dollar as its functional currency, as most of the Company's business activities are denominated in U.S. dollars. (Note: The Hong Kong dollar is pegged to the U.S. dollar at the exchange rate of $1 to HK$7.8.)

Individual companies within the Company maintain their books and records in their respective currencies. In the financial statements of the individual companies, transactions in other currencies during the period are translated into the respective currencies at exchange rates in effect at the time of the transactions. Monetary assets and liabilities denominated in other currencies at any balance sheet date are remeasured into the functional currency at the rates of exchange in effect at such balance sheet date. Non-monetary assets and liabilities, income and expenses denominated in other currencies are remeasured into the functional currency at the rates of exchange in effect at the time of the transactions. Aggregate gains and losses from the remeasurement into the functional currency, which were insignificant, were included in the results of operations.

(f) Income Taxes

The Company accounts for income tax under the provisions of Statement of Financial Accounting Standards No. 109, which requires recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns. Deferred income taxes are provided using the liability method. Under the liability method, deferred income taxes are recognized for all significant temporary differences between the tax and financial statement bases of assets and liabilities.

(g) Inventories

Inventories are stated at the lower of cost and net realizable value. Cost, calculated on the first-in first-out basis, comprises materials and, where applicable, direct labor and an appropriate proportion of production overheads expenditure. Net realizable value is determined on the basis of estimated selling prices, less further costs expected to be incurred to completion and direct selling and distribution expenses. Provision is made for obsolete, slow-moving or defective items where considered appropriate by management.

(h) Property, Plant and Equipment

Property, plant and equipment, other than freehold land, are stated at cost less accumulated depreciation. Gains or losses on disposals are reflected in current operations. Depreciation is calculated on the straight-line

F-26

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 3—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

on reducing balance basis at annual rates estimated to write off the cost of each asset over its expected useful life. The annual rates are as follows:

| | Annual Rate | Method |
|---|---|---|
| Land use rights | Over the business license period | Straight-line |
| Leasehold improvements and buildings | Over the remaining lease term | Straight-line |
| Plant and machinery | 15%-30% | Reducing balance |
| Molds | 20% | Straight-line |
| Motor vehicles | 15%-20% | Straight-line |
| Furniture, fixtures and equipment | 15% | Straight-line |

The Company recognizes an impairment loss on a fixed asset when evidence, such as the sum of expected future cash flows (undiscounted and without interest charges), indicates that future operations will not produce sufficient revenue to cover the related future costs, including depreciation, and when the carrying amount of the asset cannot be realized through sale. Measurement of the impairment loss is based on the fair value of the assets.

The Company's manufacturing plants are located in China. The Company has acquired from the relevant local authorities in China certain land use rights for an amount of $2,987,351. As of September 30, 1997, the balance of the land use rights payable to the local authorities amounted to $989,864. Such amount does not bear interest. The cost of the land use rights is amortized on a straight-line basis over the period of the business license of DWS, which is 30 years from 1993.

Maintenance and repairs are charged to expense as incurred; improvements are capitalized.

### i. Patents

Patents are stated at the historical cost incurred by a shareholder, who transferred the patents to the Company, and are amortized on a straight-line basis over the expected future economic lives ranging from 11 to 20 years. See Notes 6(d) and 9.

### j. Operating Leases

Leases where substantially all the rewards and risks of ownership remain with the lessor are accounted for as operating leases. Rental payments under operating leases are charged to the statements of income on a straight-line basis over the period of the relevant leases.

### k. Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Actual results could differ from those estimates.

### l. Net Income Per Share

The computation of net income per share is based on the weighted average number of shares of common stock outstanding, on the basis that the Share Split and the Issuance (see Note 1) had been consummated prior to the periods presented, in accordance with SFAS No. 128. Diluted net income per share is not presented because the effect of the assumed exercise of stock options is not material. The Company will continue to follow the


P 000203

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

### NOTE 3—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

... ... ... SFAS (No. ... No. 25 ... ... ... account for stock options but will provide the pro forma disclosures ... ... by SFAS No. 123.

### NOTE 4—RESTRICTED CASH

As of September 30, 1997, cash deposits of approximately $822,000, were pledged to a bank to secure certain banking facilities of the Company.

### NOTE 5—ACCOUNTS RECEIVABLE, NET

| | |
|---|---:|
| Trade receivables | $7,170,049 |
| Less: Allowance for doubtful accounts | 256,112 |
| Accounts receivable, net | $6,913,937 |

### NOTE 6—RELATED PARTY TRANSACTIONS

A related party is essentially any party that controls or can significantly influence the management or operating policies of the Company to the extent that the Company may be prevented from fully pursuing its own interests. Such parties would include affiliates, investors accounted for by the equity method, trusts for the benefit of employees, principal shareholders, management, and immediate family members of shareholders or management.

The Company had the following transactions and balances with related parties:

a. The balances with directors are unsecured, interest free and have no fixed repayment terms, except as disclosed below in paragraph d.

b. Certain directors, a shareholder and a related company have pledged their personal assets to banks to secure banking facilities of the Company.

c. Certain directors also provided guarantees to banks to secure banking facilities of the Company.

d. During the six months ended September 30, 1997, the Company purchased patents on various household products for total consideration in the amount of $225,076 from a shareholder who is also a director of the Company. The excess of the purchase price over the historical cost was charged to retained earnings. The amount due to the shareholder is unsecured and interest free and is payable in installments of $45,015 on each of August 1, 1997, October 1, 1997 and December 1, 1997, with the remainder payable on February 1, 1998.

e. During the six months ended September 30, 1996 and 1997, the Company paid real estate rental expenses of approximately $92,000 and $101,000, respectively, to the related company.

f. During the six months ended September 30, 1996 and 1997, sales to related companies amounted to approximately $12,000 and $455,000 respectively.

### NOTE 7—INVENTORIES

| | |
|---|---:|
| Raw materials | $17,789,788 |
| Work-in-progress | 4,215,709 |
| Finished goods | 4,261,285 |
| | $26,266,782 |

F-25

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 8—PROPERTY, PLANT AND EQUIPMENT

| | |
|---|---|
| Leasehold improvements and buildings | $ 8,212,997 |
| Land use rights | 2,947,351 |
| Plant and machinery | 9,522,315 |
| Molds | 4,493,120 |
| Motor vehicles | 243,371 |
| Furniture, fixtures and equipment | 2,004,876 |
| | 27,464,030 |
| Less: Accumulated depreciation | 5,362,564 |
| | $22,101,466 |

## NOTE 9—PATENTS

| | |
|---|---|
| Cost | $1,223,475 |
| Less: Excess of purchase price over the historical cost to a shareholder charged to retained earnings | 1,204,111 |
| | 19,364 |
| Less: Accumulated amortization | 1,677 |
| | $ 17,687 |

## NOTE 10—SHORT-TERM BANK BORROWINGS

| | |
|---|---|
| Bank overdrafts | $ 522,391 |
| Short-term bank loans | 13,050,445 |
| | $13,572,836 |

As of September 30, 1997, the Company had banking facilities of approximately $34,585,000, for bank loans, overdrafts, guarantees and forward exchange contracts, of which approximately $19,396,000 had been utilized. The banking facilities were secured by several properties owned by the Company, a director, a shareholder and a related company, personal guarantees from the directors, pledged deposits offered by a subsidiary and a director, and corporate guarantees from the Company and a subsidiary.

Short-term bank borrowings are denominated in Hong Kong dollars and bear interest at the floating commercial bank lending rates in Hong Kong, which ranged from 9.0% to 9.75% per annum as of September 30, 1997. They are drawn for working capital purposes and are renewable annually with the consent of the relevant banks.

In October 1997, the Company entered into an agreement with a principal bank lender in which the Company agreed to maintain its consolidated shareholders' equity at not less than $25.8 million as of March 31, 1998 and not to distribute dividends in excess of 50% of the Company's consolidated net income commencing in fiscal 1997.

P000205

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 11—LONG-TERM BANK LOANS

| | |
|---|---:|
| Secured bank loans | $1,327,668 |
| Less: Amounts due within one year included under current liabilities | 701,025 |
| | $ 626,643 |
| Weighted average interest rate as of the end of the period | 10.56% |

Aggregate maturities of long-term bank loans are as follows:

### Payable during the following period:

| | |
|---|---:|
| Within one year | $ 701,025 |
| Over one year but not exceeding two years | 399,817 |
| Over two years but not exceeding three years | 226,826 |
| | $1,327,668 |

## NOTE 12—INCOME TAXES

Global-Tech and its subsidiaries are subject to income taxes on an entity basis on income arising in or derived from the tax jurisdiction in which they are domiciled or deemed to operate.

Entities subject to Hong Kong profits tax are taxed at a rate of 16.5% on their assessable income. Entities subject to United States federal income tax are taxed at a rate of up to 35% of their assessable income. In addition, after tax U.S. effectively-connected earnings would be subject to a U.S. federal withholding equivalent tax (branch profits tax) at a rate of 30%. The combined impact of these taxes creates a U.S. federal effective tax rate of up to 55% on income effectively connected with the conduct of a U.S. trade or business.

The subsidiary established in China (DWS) is subject to a China income tax at a rate of 27% (24% reduced tax rate and 3% local income tax rate, in the open coastal areas of China). Current income tax is computed based on the taxable income as reported in the statutory financial statements prepared under China accounting regulations. DWS is exempted from income tax for two years starting from the first profitable year (after utilizing any accumulated tax loss carry forwards) followed by a 50% exemption for the next three years. For tax purposes, DWS has not recognized its first profitable year.

Income tax expense comprised:

| | Six Months Ended September 30, | |
|---|---:|---:|
| | 1996 | 1997 |
| | (unaudited) | |
| Reversal of income taxes payable | $ — | $ — |
| Provision of income taxes—current | 158,275 | 1,068,883 |
| Provision of income taxes—deferred | — | — |
| | $ 158,275 | $1,068,883 |

F-30

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 12—INCOME TAXES (Continued)

The reconciliation of the Hong Kong income tax rate to the effective income tax rate based on income before income taxes stated in the consolidated statements of income is as follows

| | Six Months Ended September 30, | |
|---|---|---|
| | 1996 | 1997 |
| | (unaudited) | |
| Hong Kong income tax rate | 16.5% | 16.5% |
| Income subject to United States tax | — | 3.6% |
| Non-taxable income arising from activities which qualified as offshore | (9.1%) | (8.5%) |
| Effective income tax rate | 7.4% | 11.6% |

Deferred income taxes as of September 30, 1997 comprised the following timing differences:

| | |
|---|---|
| Timing differences relating to fixed assets | $ 586,214 |
| Less: valuation allowances | (565,558) |
| | $  20,656 |

Valuation allowances have been established for substantially all deferred tax assets due to the uncertain realization of such assets.

NOTE 13—DESIGN AND DEVELOPMENT COSTS

Included in selling, general and administrative expenses were design and development costs of approximately $580,000 and $608,000 for the six months ended September 30, 1996 and 1997, respectively.

NOTE 14—COMMITMENTS

a. Capital Commitments

As of September 30, 1997, the Company had capital commitments amounting to approximately $2.3 million in respect of construction of factories and staff quarters in China. In October 1997, the Company further agreed to acquire manufacturing machinery in the amount of approximately $6.6 million.

b Operating Lease Commitments

The Company has various operating lease agreements for parking lots, motor vehicles, equipment and real estate, which extend through May 2002. Rental expenses for the six months ended September 30, 1996 and 1997 were approximately $98,000 and $127,000, respectively. Future minimum rental payments are as follows:

**Payable during the following period:**

| | |
|---|---|
| Within one year | $220,000 |
| Over one year but not exceeding two years | 118,000 |
| Over two years but not exceeding three years | 5,000 |
| Over three years but not exceeding four years | 3,000 |
| | $346,000 |

F-31

P 000207

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 14—COMMITMENTS (Continued)

*c. Commission Agreement*

The Company entered into a commission agreement with one of the former minority shareholders of a subsidiary, to compensate him for his prior services and provide for the repayment of the $1,249,000 in advances (the "Debt"). The commission agreement provides that, for the period from January 1, 1998 through October 31, 2001, net sales of certain products previously marketed by the subsidiary will be subject to a 3% commission. The former minority shareholder will receive $50,000 per month from January 1998 through June 1999. Any commissions earned in excess of $50,000 per month will be applied to reduce the Debt. If commissions earned are less than $50,000 per month, such deficiency will be added to the Debt. Commissions will be applied equally each month from July 1999 through the end of the term of the commission agreement in October 2001 to reduce the Debt. Any portion of the Debt remaining outstanding at the end of the term of the commission agreement is required to be repaid by the former minority shareholder at that time.

NOTE 15—CONTINGENT LIABILITIES

As of September 30, 1997, the Company had contingent liabilities with respect to discounted bills with recourse amounting to approximately $3,259,000.

As of September 30, 1997, the Company had outstanding letters of credit amounting to approximately $4,495,000.

On November 20, 1995, Rival Company ("Rival") filed suit against Sunbeam Products Inc. (formerly known as Sunbeam-Oster Household, "Sunbeam") in the U.S. District Court for the Western District of Missouri, Western Division, alleging that certain features of food steamers which the Company manufactures for Sunbeam infringe a U.S. patent held by Rival. On December 8, 1997, the court granted a judgment in favor of Sunbeam.

On December 21, 1995, Black & Decker Inc. ("B&D") filed suit against Sunbeam in the U.S. District Court for the Northern District of Illinois for patent infringement. B&D alleges that Sunbeam infringes a patent assigned to B&D which covers certain features of food steamers manufactured by the Company and seeks unspecified money damages and injunctive relief.

Although the Company is not a party to these actions, pursuant to agreements between the Company and Sunbeam, the Company is obligated to hold harmless, defend and indemnify Sunbeam for any losses and legal fees it may sustain as a result of these actions.

After considering all facts known to the Company and advice from its attorneys, the Company believes that these actions will not have a material adverse effect on its business, financial condition or results of operations.

NOTE 16—EMPLOYEE BENEFITS

*a. Retirement Fund*

The Company has arranged a defined contribution retirement plan for all eligible employees of the Company under which the Company and the employees each contribute 5% of the employees' basic salary. The plan is administered and funded by an independent trustee. Salaried employees are eligible to participate on the first day of the month coincident with or immediately following the date on which they have completed continuous service of the probationary period, provided they are employed on a full-time basis. Part-time employees are

F-32

P000208

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 16—EMPLOYEE BENEFITS (Continued)

not eligible for the plan. The costs of this plan recognized during the six months ended September 30, 1996 and 1997 were $24,359 and $36,774, respectively. The Company has no other post-retirement or post-employment benefit plans.

*b  Other Benefits*

The Company provides housing, medical care and subsidized meals to all factory employees. The aggregate amounts incurred by the Company for such benefits were approximately $86,000 and $236,000 during the six months ended September 30, 1996 and 1997, respectively.

## NOTE 17—SEGMENT INFORMATION

a. The Company belongs to a single industry, namely, manufacturing and trading of small household appliances

b  Analysis of sales

| | Six Months Ended September 30, | |
| | 1996 | 1997 |
| | (unaudited) | |
| Export sales | | |
| Australia | $    140,493 | $  1,045,261 |
| Europe | 6,842,132 | 13,013,675 |
| North America | 21,006,899 | 49,100,444 |
| Total export sales | 27,989,524 | 63,159,380 |
| Total domestic sales | 145,705 | 1,761,045 |
| | $28,135,229 | $64,920,425 |

c  Customers representing 10% or more of total revenues are as follows:

| | Six Months Ended September 30, | |
| | 1996 | 1997 |
| | (unaudited) | |
| | % | % |
| Sunbeam Products Inc. (formerly known as Sunbeam-Oster Household) | 23 | 39 |
| Helen of Troy Limited | 15 | 6 |
| Hamilton Beach/Proctor-Silex, Inc. | 11 | 5 |

Pursuant to a product supply agreement dated July 1, 1997 between the Company and one of the major customers listed above, the Company is the sole supplier of certain products to such customer for the period from July 1, 1997 to June 30, 2001. As consideration for entering into this exclusive supply agreement, the Company paid an incentive fee of $1,000,000 to the customer during the six months ended September 30, 1997. Such fee is included in "Deposits, prepayments and other assets" and is being charged to income on a straight-line basis over two years

F-33

P000209

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

NOTE 18—SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION

Cash paid for interest and income taxes comprised:

| | Six Months Ended September 30 | |
|---|---|---|
| | 1996 | 1997 |
| | (unaudited) | |
| Interest paid | $386,443 | $759,727 |
| Income taxes paid | 6,459 | 10,623 |

## NOTE 19—PROPOSED INITIAL PUBLIC OFFERING AND SUPPLEMENTARY NET INCOME PER SHARE

The Company is contemplating an initial public offering of 4,200,000 shares at a price of $19.00 per share with net proceeds of approximately $17.22 per share after deduction of fees and expenses. The Company intends to utilize $12,000,000 of the net proceeds of the offering to retire short-term debt outstanding. Presented below is the pro forma effect on net income per share for the six months ended September 30, 1997 of issuing a sufficient number of shares at the net proceeds of $17.22 per share to retire such debt.

| | Six Months Ended September 30, 1997 |
|---|---|
| Net income as reported | $8,148,854 |
| Adjusted for interest expenses net of tax effect | 533,388 |
| Pro forma net income | $8,682,242 |
| Weighted average number of shares reported | 8,000,000 |
| Pro forma increase in shares | 696,864 |
| Pro forma weighted average number of shares | 8,696,864 |
| Net income per share as reported | $ 1.02 |
| Pro forma adjusted net income per share | $ 1.00 |

## NOTE 20—RISK CONSIDERATIONS

The Company's operations are conducted in Hong Kong and China. As a result, the Company's business, financial condition and results of operations may be influenced by the political, economic and legal environments in Hong Kong and China, and by the general state of the Hong Kong and China economies.

On July 1, 1997, sovereignty over Hong Kong was transferred from the United Kingdom to China, and Hong Kong became a Special Administrative Region of China ("SAR"). As provided in the Sino-British Joint Declaration relating to Hong Kong and the Basic Law of the Hong Kong SAR of the People's Republic of China, Hong Kong will have full economic autonomy and its own legislative, legal and judicial systems for fifty years from 1997. The Company's management does not believe that the transfer of sovereignty over Hong Kong will have an adverse impact on the Company's financial and operating environment. There can be no assurance, however, that changes in political or other conditions will not result in such an adverse impact.

As substantially all of the Company's manufacturing operations are conducted in China, the Company is subject to different considerations and other risks not typically associated with companies in North America and Western Europe. These include risks associated with, among others, the political, economic and legal

P000210

F-34

GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

(Amounts expressed in United States dollars unless otherwise stated)

## NOTE 20—RISK CONSIDERATIONS (Continued)

environments and foreign currency exchange. The Company's results may be adversely affected by changes in the political and social conditions in China, and by changes in governmental policies with respect to laws and regulations, anti-inflationary measures, currency conversion and remittance abroad, and rates and methods of taxation, among other things.

## NOTE 21—FINANCIAL INSTRUMENTS

The carrying amounts of the Company's cash and accounts receivable approximate their fair values because of the short maturity of those instruments. The carrying amounts of the bank loans approximate their fair values based on borrowing rates currently available for bank loans with similar terms and maturities.

## NOTE 22—STOCK OPTION PLAN

In September 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (as amended, the "Plan"). The Plan provides for the grant of (i) options that are intended to qualify as incentive stock options ("Incentive Stock Options") within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") to employees and (ii) options not intended to qualify as Incentive Stock Options to employees and consultants. The total number of shares of Common Stock for which options may be granted under the Plan is 1,600,000 shares. The Company has granted options to purchase (i) 322,000 shares of Common Stock to employees and a consultant in accordance with the terms of the Plan, with an exercise price of $14.50 per share and (ii) 283,800 shares to employees and consultants with an exercise price equal to the initial public offering price of the Company's shares. The options vest over varying periods of up to five years and are all exercisable for a period of ten years from the date of grant.

The Plan is administered by the Board of Directors or a committee of outside directors appointed by the Board of Directors, which will determine the terms of options, including the exercise price, the number of shares subject to the option and the terms and conditions of exercise. No option granted under the Plan is transferable by the optionee other than by will or the laws of descent and distribution and each option is exercisable during the lifetime of the optionee only by such optionee. The exercise price of all Incentive Stock Options granted under the Plan must be at least equal to the fair market value of such shares on the date of grant. With respect to any participant who owns (or is deemed to own) stock possessing more than 10% of the voting rights of the Company's outstanding capital stock, the exercise price of any Incentive Stock Option must be not less than 110% of the fair market value on the date of grant. The term of each option granted pursuant to the Plan may be established by the Board of Directors, or a committee of the Board of Directors, in its sole discretion; provided, however, that the maximum term of each Incentive Stock Option granted pursuant to the Plan is 10 years. With respect to any Incentive Stock Option granted to a participant who owns (or is deemed to own) stock possessing more than 10% of the total combined voting power of all classes of the Company's outstanding capital stock, the maximum term is five years.

## NOTE 23—NEWLY ISSUED ACCOUNTING STANDARD

In 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards SFAS No. 130, "Comprehensive Income". This statement will be adopted by the Company in connection with its consolidated financial statements for the year ending March 31, 1999. The adoption of this standard will not have a material effect on the Company's consolidated financial statements.

P 000211

[This Page Intentionally Left Blank]

P000212

[This Page Intentionally Left Blank]

P000213

[This Page Intentionally Left Blank]

P000214



 

 

 

P 000215

No dealer, salesman or any other person has been authorized to give any information or to make any representation not contained in this Prospectus, and, if given or made, such information or representation must not be relied upon as having been authorized by the Company, or by any of the Underwriters. This Prospectus does not constitute an offer to sell or a solicitation of an offer to buy any security other than Shares referred by this Prospectus, nor does it constitute an offer to sell or a solicitation to such person in any jurisdiction to any person to whom such offer or solicitation may not lawfully be made. Neither the delivery of this Prospectus nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Company since the date hereof.

## TABLE OF CONTENTS

| | Page |
| --- | --- |
| Prospectus Summary | 3 |
| Summary Consolidated Financial Data | 6 |
| Risk Factors | 7 |
| Use of Proceeds | 16 |
| Dividend Policy | 16 |
| Capitalization | 17 |
| Dilution | 18 |
| Selected Consolidated Financial Data | 19 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 21 |
| Business | 28 |
| Certain Foreign Issuer Considerations | 39 |
| Management | 42 |
| Certain Transactions | 46 |
| Principal Shareholders | 48 |
| Shares Eligible for Future Sale | 49 |
| Description of Securities | 50 |
| Tax Considerations | 53 |
| Underwriting | 56 |
| Additional Information | 58 |
| Legal Matters | 59 |
| Experts | 59 |
| Index to Consolidated Financial Statements | F-1 |

Until May 3, 1998 (25 days after the date of this Prospectus), all dealers effecting transactions in the Common Stock, whether or not participating in this distribution, may be required to deliver a Prospectus. This is in addition to the obligation of dealers to deliver a Prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

P000216

# 4,200,000 Shares


GLOBAL-TECH APPLIANCES INC.

## Common Stock

## PROSPECTUS

## Furman Selz

## CIBC Oppenheimer

April 8, 1998

TEL: 2014612650     JUN 27 1997     P 2
06/27/97  FRI 14:07 FAX 201 461 2097     ☎002

# PRODUCT SUPPLY AGREEMENT

## SUMMARY

SUPPLIER:   Name:        Pentalpha Enterprises, Inc.
                         Wing Shing Marketing (BVI Limited)
                         Pentalpha Enterprises US
            Address:     2125 Center Avenue
                         Suite 406
                         Fort Lee, NJ 07024
            Contact:     Al Lior
            Phone:       201-461-2600
            Fax:         201-461-2650

DATE OF THIS AGREEMENT:     June 27 , 1997

This agreement is between Sunbeam Products, Inc., a Delaware corporation ("Sunbeam"), and jointly and severally, Pentalpha Enterprises, Ltd., Wing Shing Marketing Ltd.(BVI) and Pentalpha Enterprises US Ltd. (collectively "Pentalpha").

1. Term. The term of this agreement ("Term") will be July 1, 1997 to June 30, 2001.

2. Supply. During the Term, Pentalpha will be the sole supplier to Sunbeam of product listed in schedule A. Pentalpha's supply rights and Sunbeam's purchase requirements obligation are subject to all terms and conditions set forth herein, including without limitation, Pentalpha's continued delivery of product in accordance with all terms and conditions of Sunbeam's purchase orders for product and product specific manufacturing and distribution agreements. Notwithstanding the foregoing, this agreement is not a guarantee by Sunbeam to purchase any specific quantity of product at any time, but that Pentalpha shall remain the exclusive supplier of each said product in accordance withthe terms hereof so long as Sunbeam continues to market similar or like products of the type listed in Schedule A during the Term of this agreement. Pentalpha hereby acknowledges that Sunbeam is entitled at any time during the Term to make changes in its product line, or otherwise modify its business operations, in such a way as to completely eliminate Sunbeam's need to purchase product pursuant to the terms of this agreement by giving Pentalpha ninety (90) days notice of such changes or modifications.

3. Pricing.   A. The price for the products will be defined in the individual product manufacturing and distribution agreements. Notwithstanding any provisions of such agreements, pricing for the respective products shall be adjusted, upon the mutual agreement of Sunbeam and Pentalpha as follows: (i) The portion of the price attributable to materials will be adjusted based upon verifiable changes in Pentalpha's standard material costs for the proceeding year versus the material costs as of July 1 of the new year, and (ii) The pricing of the products will be reduced by two percent (2%) of the net

CONFIDENTIAL

SB 000352

of material cost (which is defined as the pricing after the material cost and freight) on July 1 of each year.

       B. All items not currently being manufactured by Pentalpha will be quoted by Pentalpha as soon as possible. If the quoted prices from Pentalpha are equal to or lower than Sunbeam's existing pricing, a project will be started to move tooling from the current supply source to Pentalpha no later than by April 1, 1998. Sunbeam and Pentalpha agree that time is of the essence and will strive to move as much tooling as possible before the Chinese New Year holiday. If Sunbeam does not own the tooling, Pentalpha will begin new tooling construction when pricing is agreed upon.

    **4. Modification and Assignment.** No modification, amendment, extension, waiver or assignment of this agreement or any provision hereof shall be binding unless in writing and signed by the president or a vice president of each of the parties. This agreement is binding on and shall inure to the benefit of the parties to this agreement and their successors, and shall not be assigned by any party without prior written consent.

    **5. Governing Law.** This agreement shall be interpreted, enforced and construed under the laws of the State of Florida as applied to contracts entered into between residents of Florida to be performed wholly in Florida and without giving effect to conflict of law principles, and each party hereby agrees to exclusive jurisdiction and venue in the State of Florida for all purposes and proceedings.

    **6. Notice.** All notices given by either party hereunder to the other party shall be addressed as follows:

        To Sunbeam:  Sunbeam Products, Inc.
                      Suite 200, 1615 South Congress Ave.
                      Delray Beach, FL 33445
                      Attn: Director of Procurement

        To Pentalpha:  Pentalpha Enterprises US
                      Suite 406, 2125 Center Ave.
                      Fort Lee, NJ 07024
                      Attn: Al Lior



CONFIDENTIAL

SB 000353

IN WITNESS WHEREOF, each of the parties has caused this agreement to be duly executed by an authorized representative as of the day and year first written above.

ATTEST

.................................

SUNBEAM PRODUCTS, INC.

_C. D. TIMEGAL_
(print name)

_V P PROCUREMENT_
(Title)

ATTEST

PENTALPHA ENTERPRISES, INC.

_AL LIOR_
(print name)

_PRESIDENT_
(Title)

ATTEST

PENTALPHA ENTERPRISES US

_PRESIDENT AL LIOR_
(print name)

_PRESIDENT_
(Title)

ATTEST

WING SHING MARKETING (BVI LIMITED) INC.

_AL LIOR_
(print name)

_PRESIDENT_
(Title)

CONFIDENTIAL

SB 000354

## SCHEDULE A

### Product Covered Under Supply Agreement

Product not currently produced by Pentalpha

| | | | | | | |
|---|---|---|---|---|---|---|
| Air cleaners | 2586 | 2587 | 2588 | 2590 | | |
| Air filter replacements | 6588 | 6612 | 6613 | 6615 | 6617 | 6618 |
| Ultrasonic humidifiers | 696 | 1281 | | | | |
| Hand mixers | 4450 | 2603 | | | | |
| Coffeemakers | 5653 | 5654 | 5655 | 3262 | 3263 | 3264 3265 |
| | 3270 | 3271 | 3272 | 3273 | 3274 | 3275 |
| Garment steamers | 4026 | 4036 | | | | |
| Irons | 4014 | 4015 | | | | |
| Rice cookers | RS-05 | RS-06 | RS-07 | RS-15 | RS-25 | RS-26 RS-27 |
| Rotisseries | 4780 | 4785 | | | | |
| Toaster ovens | 4831 | 4857 | 4877 | 4878 | | |

Product currently produced by Pentalpha

| | | | | |
|---|---|---|---|---|
| Breadmakers | 5814 | 5815 | 5839 | 5840 |
| Food steamers | 4710 | 4711 | 4713 | 5710 |
| Travel irons | 3938 | | | |
| Rice cookers | 4706 | 4708 | | |
| Deep fryers | 3240 | 3241 | 3242 | 3243 |



**CONFIDENTIAL**

SB 000355

Rider to Pentalpha / Sunbeam Product Supply Agreement

1. This rider shall supplement the Product Supply Agreement dated June 17, 1997 by and between Sunbeam Products, Inc. and Pentalpha Enterprises US, Ltd.

2. In consideration of the exclusive supply commitments contained in the Product Supply Agreement, and so long as Sunbeam is in full compliance with said Agreement, Pentalpha shall pay to Sunbeam a rebate in the amount of one million dollars ($1,000,000) for purchases made during the period July 1, 1996 and June 30, 1997. This sum shall be paid in two (2) equal installments, the first on August 15, 1997 and the second on September 30, 1997.

Pentalpha shall give notice to Sunbeam five (5) days in advance of each of these two payments of the form of payment to be made (check or deduction/debit memo).

PENTALPHA ENTERPRISES US, LTD.

Al Lioz, President

CONFIDENTIAL

SB 000356

PRODUCT SUPPLY AGREEMENT

SUPPLIER:   Name:              Pentalpha Enterprises Limited

              Address:    Kin Teck Industrial Building
                          12/F, 26 Wong Chuk Hang Road
                          Aberdeen, Hong Kong

This Agreement, dated as of July 1, 1997, is between Sunbeam Products, Inc., a Delaware corporation ("Sunbeam") and Pentalpha Enterprises Limited, a Hong Kong limited liability company ("Pentalpha").

1.    **Term.** The term of this Agreement ("Term") will be July 1, 1997 to June 31, 2001.

2.    **Supply.** During the Term, Pentalpha will be the sole supplier to Sunbeam of the Products listed in Schedule A. Pentalpha's supply rights and Sunbeams purchase requirement obligations are subject to all terms and conditions set forth herein, including without limitation, Pentalpha's continued delivery of products in accordance with all terms and conditions of Sunbeam's purchase orders for products and product specific manufacturing and distribution agreements. Notwithstanding the foregoing, this Agreement is not a guarantee by Sunbeam to purchase any specific quantity of Products at any time, but that Pentalpha shall remain the exclusive supplier of each of said Products in accordance with the terms hereof so long as Sunbeam continues to market similar or like products of the type listed in Schedule A during the Term of this Agreement. Pentalpha hereby acknowledges that Sunbeam is entitled at any time during the Term to discontinue its marketing of similar or like products of the type listed on Schedule A, or to engage in the direct manufacture of its complete supply of such products, and thereby eliminate Sunbeam's need to purchase Products pursuant to the terms of this Agreement for the duration of such discontinuance or direct manufacture, by giving Pentalpha ninety (90) days prior written notice.

3.    **Pricing.**

      A.    The price for the Products will be defined in the individual product manufacturing and distribution agreements. Notwithstanding any provision of such agreements, pricing for the respective Products shall be adjusted, upon the mutual agreement of Sunbeam and Pentalpha, as follows: (i) The portion of the price attributable to materials will be adjusted based upon material costs as of July 1 of the new year, and (ii) the pricing of the Products will be reduced by two percent (2%) for the net of material costs (which is defined as the pricing after the material cost and freight) on July 1 of each year.

      B.    All items not currently being manufactured by Pentalpha will be quoted by Pentalpha as soon as possible. If the quoted prices from Pentalpha are equal to or lower than Sunbeam's existing pricing, a project will be started to move tooling from the current supply source to Pentalpha no later than by April 1, 1998. Sunbeam and Pentalpha agree that time is of the essence and will strive to move as much tooling as possible before the Chinese New Year

Exhibit A

H000820

holiday. Documents does not waive the cooling. Pentalpha will begin accumulating construction when pricing is agreed upon.

4.    **Product Rebates.**    In consideration of the exclusive supply commitments contained herein and so long as Sunbeam is in full compliance with this Agreement, Pentalpha shall pay to Sunbeam a rebate in the amount of one million dollars ($1,000,000) for purchases made during the period July 1, 1996 and June 30, 1997. This sum shall be paid in two (2) equal installments, the first on August 15, 1997 and the second on September 30, 1997. Pentalpha shall give notice to Sunbeam five (5) days in advance of each of these two payments of the form of payment to be made (check or deduction/debit memo).

5.    **Modification and Assignment.** No modification, amendment, extension, waiver or assignment of this Agreement or any provisions hereof shall be binding unless in writing and signed by the president or a vice president of each of the parties. This Agreement is binding on and shall inure to the benefit of the parties to this Agreement and their successors, and shall not be assigned by any party without prior written consent.

6.    **Governing Law.** This Agreement shall be interpreted, enforced and construed under the laws of the Sate of Florida as applied to contracts entered into between residents of Florida to be performed wholly in Florida and without giving effect to conflict of law principles, and each party hereby agrees to exclusive jurisdiction and venue in the State of Florida for all purposes and proceedings.

7.    **Notice.**    All notices given by either party hereunder to the other party shall be addressed as follows:

> To Sunbeam: Sunbeam Products, Inc.
> Suite 200, 1615 South Congress Avenue
> Delray Beach, Florida 33445
> Attn: Director of Procurement

> To Pentalpha: Pentalpha Enterprises Limited
> Kin Teck Industrial Building
> 12/F, 26 Wong Chuk Hang Road
> Aberdeen, Hong Kong
> Attn: John Sham

8.    **Entire Agreement; and Counterparts.** This Agreement embodies the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings between the parties with respect to the subject matter hereof. This Agreement may be executed in counterpart copies in the United States and Hong Kong, each of which may be executed by one or more of the parties hereto, but all of which, when taken together, shall constitute a single agreement binding upon all of the parties hereto.

H 000033

IN WITNESS WHEREOF, each of the parties has caused this agreement to be duly executed by an authorized representative as of the day and year first above written.

ATTEST

ATTEST

SUNBEAM PRODUCTS, INC.

By: _____
Name: George Timshal
Title:  Vice President, Purchasing

PENTALPHA ENTERPRISES LIMITED

By: _____
Name: John Khua
Title: President

H-00028

## SCHEDULE A

Products Covered Under Supply Agreement

### PRODUCTS NOT CURRENTLY PRODUCED BY PENTALPHA

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Air Cleaners | 2585 | 2587 | 2588 | 2590 | | | |
| Air Filter Replacements | 6588 | 6612 | 6613 | 6615 | 6617 | 6618 | |
| Ultrasonic Humidifiers | 696 | 1281 | | | | | |
| Hand Mixers | 4450 | 2603 | | | | | |
| Coffeemakers | 5653 | 5654 | 5655 | 3262 | 3263 | 3264 | 3265 |
| | 3270 | 3271 | 3272 | 3273 | 3274 | 3275 | |
| Garment Steamers | 4026 | 4036 | | | | | |
| Irons | 4014 | 4015 | | | | | |
| Rice Cookers | RS-05 | RS-06 | RS-07 | RS-15 | RS-25 | RS-26 | RS-27 |
| Rotisseries | 4780 | 4783 | | | | | |
| Toaster Ovens | 4831 | 4857 | 4877 | 4878 | | | |

### PRODUCTS CURRENTLY PRODUCED BY PENTALPHA

| | | | | |
|---|---|---|---|---|
| Breadmakers | 5814 | 5815 | 5839 | 5840 |
| Food Steamers | 4710 | 4711 | 4713 | 5710 |
| Travel Irons | 3939 | | | |
| Rice Cookers | 4706 | 4708 | | |
| Deep Fryers | 3240 | 3241 | 3242 | 3243 |

g:\shared\kc.pub-ophant\jgr\agreed\supply_prodpentalta.req

M000023

**Exhibit 4**

| Product Supply Agreement Schedule A | | Purchased from Other Suppliers | Low Bid Submitted | Project Plan Submitted | Source |
|---|---|---|---|---|---|
| Appliance | Model | | | | |
| Air Cleaners | 2585 | No | No | No | Deposition Transcript of James Nugent [1] ("Nugent Dep.") at 14:4-9; Sunbeam's Responses to Pentalpha's First Set of Interrogatories at Exhibit A (hereinafter, "Exhibit 11"). |
| Air Cleaners | 2587 | Yes | No | No | Nugent Dep. at 14:4-9; Exhibit 11 |
| Air Cleaners | 2588 | No | No | No | Nugent Dep. at 14:4-9; Exhibit 11 |
| Air Cleaners | 2590 | Yes | No | No | Nugent Dep. at 14:4-9; Exhibit 11 |
| Air Filter Replacements | 6588 | No | No | No | Nugent Dep. at 14:10-13; Ex. 11 |
| Air Filter Replacements | 6612 | Yes | No | No | Nugent Dep. at 14:10-13; Ex. 11 |
| Air Filter Replacements | 6613 | Yes | No | No | Nugent Dep. at 14:10-13; Ex. 11 |
| Air Filter Replacements | 6615 | No | No | No | Nugent Dep. at 14:10-13; Ex. 11 |
| Air Filter Replacements | 6617 | No | No | No | Nugent Dep. at 14:10-13; Exhibit 11 |

| Product Supply Agreement Schedule A | | Purchased from Other Suppliers | Low Bid Submitted | Project Plan Submitted | Source |
|---|---|---|---|---|---|
| Appliance | Model | | | | |
| Air Filter Replacements | 6618 | No | No | No | Nugent Dep. at 14:10-13; Exhibit 11 |
| Ultrasonic Humidifiers | 696 | Yes | No | No | Nugent Dep. at 14:14-16; Exhibit 11 |
| Ultrasonic Humidifiers | 1281 | No | No | No | Nugent Dep. at 14:14-16; Exhibit 11 |
| Hand Mixers | 4450 | No | No | No | Nugent Dep. at 14:17-19; Exhibit 11 |
| Hand Mixers | 2603 | No | No | No | Nugent Dep. at 14:17-19; Exhibit 11 |
| Coffeemakers | 5653 | No | No | No | Nugent Dep. at 14:20-25; Exhibit 11 |
| Coffeemakers | 5654 | No | No | No | Nugent Dep. at 14:20-25; Exhibit 11 |
| Coffeemakers | 5655 | No | No | No | Nugent Dep. at 14:20-25; Exhibit 11 |
| Coffeemakers | 3262 | No | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Coffeemakers | 3263 | No | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Coffeemakers | 3264 | No | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |

-2-

| Product Supply Agreement Schedule A | | Purchased from Other Suppliers | Low Bid Submitted | Project Plan Submitted | Source |
|---|---|---|---|---|---|
| Appliance | Model | | | | |
| Coffeemakers | 3265 | Yes | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Coffeemakers | 3270 | No | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Coffeemakers | 3271 | No | Yes | No . | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Coffeemakers | 3272 | No | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Coffeemakers | 3273 | No | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Coffeemakers | 3274 | No | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Coffeemakers | 3275 | No | Yes | No | Nugent Dep. at 14:22-17:6; Exhibit 11 |
| Garment Steamers | 4026 | Yes | Yes | No | Nugent Dep. at 17:7-19:9; Exhibit 11 |
| Garment Steamers | 4036 | Yes | Yes | No | Nugent Dep. at 17:7-19:9; Exhibit 11 |
| Irons | 4014 | No | No | No | Nugent Dep. at 19:20-22; Exhibit 11 |
| Irons | 4015 | No | No | No | Nugent Dep. at 19:20-22; Exhibit 11 |

-3-

| Product Supply Agreement Schedule A | | Purchased from Other Suppliers | Low Bid Submitted | Project Plan Submitted | Source |
|---|---|---|---|---|---|
| Appliance | Model | | | | |
| Rice Cookers | RS-05 | No | No | – | Nugent Dep. at 19:23-20:10; Exhibit 11 |
| Rice Cookers | RS-06 | No | No | – | Nugent Dep. at 19:23-20:10; Exhibit 11 |
| Rice Cookers | RS-07 | No | No | – | Nugent Dep. at 19:23-20:10; Exhibit 11 |
| Rice Cookers | RS-15 | No | No | – | Nugent Dep. at 19:23-20:10; Exhibit 11 |
| Rice Cookers | RS-25 | No | No | – | Nugent Dep. at 19:23-20:10; Exhibit 11 |
| Rice Cookers | RS-26 | No | No | – | Nugent Dep. at 19:23-20:10; Exhibit 11 |
| Rice Cookers | RS-27 | No | No | – | Nugent Dep. at 19:23-20:10; Exhibit 11 |
| Rotisseries[2] | 4780 | Yes | Yes | – | Nugent Dep. at 20:15-23:8; Exhibit 11 |
| Rotisseries[2] | 4783 | Yes | Yes | – | Nugent Dep. at 20:15-23:8; Exhibit 11 |
| Toaster Ovens | 4831 | Yes | No | No | Nugent Dep. at 20:11-14; Exhibit 11 |
| Toaster Ovens | 4857 | No | No | No | Nugent Dep. at 20:11-14; Exhibit 11 |

| Product Supply Agreement Schedule A | | Purchased from Other Suppliers | Low Bid Submitted | Project Plan Submitted | Source |
|---|---|---|---|---|---|
| Appliance | Model | | | | |
| Toaster Ovens | 4877 | Yes | No | No | Nugent Dep. at 20:11-14; Exhibit 11 |
| Toaster Ovens | 4878 | No | No | No | Nugent Dep. at 20:11-14; Exhibit 11 |
| Breadmakers | 5814 | No | – | – | Nugent Dep. at 10:1-5; Ex. 11 |
| Breadmakers | 5815 | No | – | – | Nugent Dep. at 10:1-5; Ex. 11 |
| Breadmakers | 5839 | No | – | – | Nugent Dep. at 10:1-5; Ex. 11 |
| Breadmakers | 5840 | No | – | – | Nugent Dep. at 10:1-5; Ex. 11 |
| Food Steamers | 4710 | No | – | – | Nugent Dep. at 10:6-10; 12:1-4; Exhibit 11 |
| Food Steamers | 4711 | No | – | – | Nugent Dep. at 12:1-4; Ex. 11 |
| Food Steamers | 4713 | No | – | – | Nugent Dep. at 12:1-4; Ex. 11 |
| Food Steamers | 5710 | No | – | – | Nugent Dep. at 10:6-10; 12:1-4; Exhibit 11 |
| Travel Irons | 3939 | No | – | – | Nugent Dep. at 10:11-15; Exhibit 11 |
| Rice Cookers | 4706 | No | – | – | Nugent Dep. at 10:16-20; Exhibit 11 |
| Rice Cookers | 4708 | No | – | – | Nugent Dep. at 10:16-20; Exhibit 11 |

| Product Supply Agreement Schedule A | | Purchased from Other Suppliers | Low Bid Submitted | Project Plan Submitted | Source |
|---|---|---|---|---|---|
| Appliance | Model | | | | |
| Deep Fryers | 3240 | No | – | – | Nugent Dep. at 10:21-25; Exhibit 11 |
| Deep Fryers | 3241 | No | – | – | Nugent Dep. at 10:21-25; Exhibit 11 |
| Deep Fryers[3] | 3242 | Yes | – | –. | Nugent Dep. at 10:21-25; Exhibit 11 |
| Deep Fryers | 3243 | No | – | – | Nugent Dep. at 10:21-25; Exhibit 11 |

[1] The relevant pages of James Nugent's deposition is attached as Exhibit 18.

[2] Sunbeam purchased Rotisseries models 4780 and 4783 from Chiaphua Industries Limited (in July 1997, October 1998, and April 1999) despite Pentalpha bidding on the models. Regarding the 1998 and 1999 purchases, Pentalpha had already materially breached the Agreement. *See* Exhibit 18, Nugent Dep. at 20:15-23:8; Exhibit 11. Specifically, Pentalpha owed money to Sunbeam for the patent infringement litigation with SEB, there were disputes between the two companies regarding air freight costs, and Pentalpha had failed to bid on many of the models covered in the Agreement. *See id.* Regarding the July 1997 purchases, even if the Product Supply Agreement was in place (PSA 2, which Pentalpha states controls, was not signed until late October 1997), the purchases by Sunbeam were too close in time to the effective date of PSA 1 to constitute a breach of the Agreement; it is impossible for the two parties to have agreed on a price, prepared project plans, and move all tooling for efficient production in less than one month.

[3] Deep Fryer Model 3242 was one of the products accused of infringement by SEB; after settling with SEB, Sunbeam had the product redesigned to eliminate the infringing feature and purchased it from another source. Thus, Sunbeam's purchase of Deep Fryer model 3242 occurred after Pentalpha had materially breached the Agreement by both selling Sunbeam patent infringing deep fryers and later failing to indemnify Sunbeam for its costs associated with resulting lawsuits. *See* Exhibit 10; Exhibit 12, Affidavit of Steven P. Berreth. Although the model number was left the same to avoid commercial confusion, the product was – indeed, had to be – different to avoid further infringement claims.

1
2          UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
3
    SEB S.A.,                        )
4                                    )
              Plaintiff,             )
5                                    ) Civil No.
              Vs.                    ) 98-1050 (WGB)
6                                    )
    SUNBEAM CORPORATION, SUNBEAM )
7   PRODUCTS, INC., WING SHING       )
    INTERNATIONAL LTD. (BVI) and )
8   PENTALPHA ENTERPRISES, LTD., )    .
9              Defendants.           )
    ---------------------------)
10  SUNBEAM CORPORATION, SUNBEAM )
    PRODUCTS, INC.,                  )
11                                   )
         Third-Party Plaintiffs )
12           Counterclaimants, )
13              vs.                  )
                                     )
14  WING SHING INTERNATIONAL         )
    LTD. (BVI) and GLOBAL-TECH       )
15  APPLIANCES INC.,                 )
                                     )
16       Third-Party Defendants, )
                                     )
17              -and-                )
                                     )
18  PENTALPHA ENTERPRISES, LTD., )
                                     )
19       Third-Party Defendant )
             Counterclaimant. )
20  ---------------------------)
21        DEPOSITION OF PETER C.M. HOWELL
              New York, New York
22         Tuesday, August 29, 2000
23
24  Reported by:
    ERICA L. RUGGIERI, RPR
25  JOB NO. 112701A



ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1

2

3

4                    August 29, 2000

5                    9:15 a.m.

6

7          Deposition of PETER C.M. HOWELL, held

8     at the offices of Skadden Arps Slate Meagher

9     & Flom, Four Times Square, New York, New

10    York, pursuant to Agreement, before Erica L.

11    Ruggieri, Registered Professional Reporter

12    and Notary Public of the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1
 2   A P P E A R A N C E S:
 3
 4        JENNER & BLOCK
 5        Attorneys for Defendants and Third-Party
 6             Plaintiffs Counterclaimants Sunbeam
 7             Corporation, Sunbeam Products, Inc.
 8             One IBM Plaza
 9             Chicago, Illinois 60611-7602
10        BY:  ROBERT L. BYMAN, ESQ.
11                  -and-
12             CLARK C. JOHNSON, ESQ.
13
14
15        PERKINS & DUNNEGAN
16        Attorneys for Defendants Global-Tech
17             Appliances, Inc. f/k/a Wing Shing
18             International Ltd. (BVI) and
19             Pentalpha Enterprises Ltd.
20             720 Fifth Avenue
21             New York, New York 10019
22        BY:  WILLIAM DUNNEGAN, ESQ.
23
24
25
```



1

2          IT IS HEREBY STIPULATED AND AGREED by

3     and between the attorneys for the respective

4     parties herein, that filing and sealing be

5     and the same are hereby waived.

6          IT IS FURTHER STIPULATED AND AGREED

7     that all objections, except as to the form

8     of the question, shall be reserved to the

9     time of the trial.

10          IT IS FURTHER STIPULATED AND AGREED

11     that the within deposition may be sworn to

12     and signed before any officer authorized to

13     administer an oath, with the same force and

14     effect as if signed and sworn to before the

15     Court.

16

17                    - oOo -

18

19

20

21

22

23

24

25



ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

5

```
 1
 2      P E T E R     H O W E L L,   called as a witness,
 3          having been duly sworn by a Notary Public,
 4          was examined and testified as follows:
 5    EXAMINATION BY
 6    MR. BYMAN:
 7              MR. BYMAN:  The record should reflect
 8          that this the deposition of Peter C. Howell
 9          is taken pursuant to agreement to time and
10          place.
11          Q.    Would you state your full name for the
12    record?
13          A.    My full name is Peter Cartwright
14    McCallum Howell.
15          Q.    Where do you reside, Mr. Howell?
16          A.    In Chagrin Falls, Ohio.
17          Q.    How old are you, sir?
18          A.    Fifty.
19          Q.    By whom are you employed?
20          A.    I'm not employed.
21          Q.    Could you tell me what your
22    educational background is?
23          A.    I have a Master of Arts from Cambridge
24    University in England and I'm a fellow of the
25    Institute of Chartered Accountants in England and
```



6

```
 1                    HOWELL
 2   Wales.
 3        Q.    Is that the equivalent of a CPA in the
 4   U.S.?
 5        A.    Yes.
 6        Q.    In what year did you receive your
 7   degree from Cambridge?
 8        A.    1971.
 9        Q.    Would you tell me briefly how you have
10   been employed since 1991?
11        A.    I joined Arthur Young McClelland
12   Moores in London.  And in 1975, they transferred
13   me to the Arthur Young in New York.
14             In 1980, I became the chief financial
15   officer of Chemfab Corporation in Bennington,
16   Vermont.
17             In 1985, I transferred to a joint
18   venture between Chemfab and Owens Corning
19   Fiberglass called OC Birdair.
20             I left them in 1988 and joined
21   Mr. Coffee as chief financial officer.  In April
22   of 1989, I took over as CEO of Mr. Coffee.
23             In 1994, I believe Mr. Coffee was sold
24   and merged with a company called Health-O-Meter,
25   and I became CEO of the combined entity.  And it
```

ESQUIRE
DEPOSITION SERVICES
A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

```
 1                          HOWELL
 2   changed its name to Signature Brands and I left
 3   the company in September of 1997.
 4              Since then I have basically been doing
 5   some consulting work as well as acting as
 6   director of two public companies.
 7       Q.    One of those public companies is
 8   Global-Tech Appliances?
 9       A.    Yes.
10       Q.    What is the other?
11       A.    Libbey, Inc.
12       Q.    L-I-B-B-E-Y?
13       A.    Yes.
14       Q.    Is that the food and can company?
15       A.    Glassware, in Toledo.
16       Q.    When did you first establish any
17   relationship with either Global-Tech or
18   Pentalpha?
19       A.    Mr. Coffee bought their first product
20   from Pentalpha in 1993.
21       Q.    What product was that?
22       A.    It was a coffee maker.
23       Q.    During the entire time you were with
24   Mr. Coffee and then Signature Brand in 1993 until
25   you left in 1997, was Pentalpha a supplier to
```



```
                         HOWELL
Mr. Coffee and then Signature Brands?

     A.    Yes.

     Q.    Did it have other suppliers of coffee
makers besides Pentalpha?

     A.    Yes.

     Q.    What percentage, if you can
approximate, of Signature Brands/Mr. Coffee's
coffee maker needs were purchased from Pentalpha?

     A.    I can't give you a precise answer on
that.

     Q.    More than half?  Less then half?

     A.    Less than half.

     Q.    Apart from serving on the board of
Global-Tech Appliances, Inc. -- may I just take
that for Global-Tech?

     A.    Yes.

     Q.    Do you have any other current
relationship with Pentalpha or Global-Tech?

     A.    I do some consulting work for them.

     Q.    What is the nature of the consulting
work?

     A.    Primarily reviewing merger and
acquisition opportunities and the public
financing issues.
```



ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago. 312.782.8087 • 800.708.8087 • Fax 312.704.4950

9

```
 1                       HOWELL
 2       Q.      When did you first form a consulting
 3  relationship to either Pentalpha or Global-Tech?
 4       A.      I believe in October of 1997.
 5       Q.      Was that prior to Global-Tech's
 6  initial public offering?
 7       A.      It was prior to Global-Tech's, yes.
 8       Q.      What was the nature of your consulting
 9  engagement in 1997?
10       A.      Global-Tech was seeking to be one of
11  the bidders or buyers of Signature Brands.
12       Q.      You were engaged to help in that
13  bidding process?
14       A.      Correct.  Yes.
15       Q.      Can you estimate how much effort you
16  expended in that regard in terms of hours?
17       A.      I don't know precisely but maybe 50
18  hours.
19       Q.      Global-Tech's efforts were not
20  successful in that regard; is that right?
21       A.      Yes.
22       Q.      Mr. Howell, let me back up one
23  moment.  What is your understanding of the
24  relationship between Pentalpha and Global-Tech?
25       A.      What do you mean by relationship?
```



HOWELL

1

2    Q.    Well, are Pentalpha and Global-Tech

3    separate entities or are they the same entity?

4    A.    My understanding is they are separate

5    legal entities.

6    Q.    What is your understanding of the

7    relationship between those separate entities, if

8    any?

9    A.    One is a subsidiary of the other.

10   Q.    Which is which?

11   A.    Pentalpha is a subsidiary of

12   Global-Tech.

13   Q.    Have you ever done consulting work for

14   Pentalpha as opposed to Global-Tech?

15   A.    No.

16   Q.    Have you ever received any

17   compensation from Pentalpha?

18   A.    Not to my knowledge.

19   Q.    So whatever financial arrangements

20   you've had with these entities has been entirely

21   with Global-Tech?

22   A.    Yes.

23   Q.    Can you estimate since October of 1997

24   how much revenue you have received in consulting

25   work from Global-Tech?

ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago· 312.782.8087 • 800.708.8087 • Fax 312.704.4950

HOWELL

A.    About $500,000.

Q.    That's just for consulting work, not for director's fees?

A.    I don't get any director's fees.

Q.    That was going to be my next question.  Do you receive any compensation at all for being a director?

A.    Other than my consulting, no.

Q.    The $500,000 or so that you've received from Global-Tech since October of 1997, has that been on a relatively constant basis or any concentration here or there?

A.    It varies.

Q.    It's strictly on a per diem, in other words, on an hourly rate?

A.    It's on an hourly rate.

Q.    What is your hourly rate?

A.    $200.

Q.    Before we began this deposition, Mr. Howell, Mr. Dunnegan gave me a letter of today's date that identified documents with a Bates range P 10656 through P 10700, and told me off the record that they were from your files.

Are you familiar with this little



12

```
                        HOWELL
 1

 2   stack of documents that you see in front of us?

 3        A.    Can I look?

 4        Q.    Sure.  Unfortunately, I have taken

 5   them apart.  I have taken some of the set.  I

 6   have made copies of certain of the documents here

 7   that are out of that stack, so this will be

 8   multiple sets of individual documents.

 9             (Witness reviews documents.)

10        A.    Yes.

11        Q.    Do these documents constitute all of

12   the documents in your possession that, so far as

13   you know, relate to the lawsuit between Sunbeam

14   and Pentalpha and Global-Tech?

15        A.    Yes.

16        Q.    Did you ever have any other documents

17   in your possession that relate to that dispute

18   that for one reason or another you do not any

19   longer have?

20        A.    Not to my knowledge.

21        Q.    Let me show you what we have marked as

22   Exhibit 6 for identification.

23             (Plaintiff's Exhibit 6, set of

24        responses by Pentalpha Enterprises, Limited,

25        to Sunbeam's first set of interrogatories,
```



ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago· 312.782.8087 • 800.708.8087 • Fax 312.704.4950

1                          HOWELL

2          marked for identification, as of this date.)

3          Q.     This is a set of responses by

4     Pentalpha Enterprises, Limited, to Sunbeam's

5     first set of interrogatories.  And I assume you

6     may not have seen this before, sir, but have you?

7          A.     I have not seen this.

8          Q.     Let me represent to you, sir, on page

9     two we asked a question that Pentalpha identify

10    every person knowledgeable concerning Pentalpha

11    negotiations for an entry into the product supply

12    agreement between Pentalpha and Sunbeam and

13    describe the substance of each person's

14    knowledge.

15               And you were one of the persons

16    identified by Pentalpha in response to that

17    question.

18               MR. DUNNEGAN:  Excuse me, Bob, which

19         interrogatory did you just say?

20               MR. BYMAN:  Interrogatory one.

21               MR. DUNNEGAN:  Thank you.

22         Q.     What knowledge do you have, sir,

23    concerning Pentalpha's negotiations for an entry

24    into the product supply agreement?

25         A.     Could you repeat the question, please.



ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

14

```
                        HOWELL
1
2       Q.     Let me start in smaller steps.  You
3   are aware there is a product service agreement
4   between Pentalpha and Sunbeam; is that correct?
5       A.     Yes.
6       Q.     When did you first become aware of the
7   existence of that agreement?
8       A.     October or November 1997.
9       Q.     And at that time did you become aware
10  that there were different versions of the
11  agreement?
12      A.     I was not aware there were different
13  versions.
14      Q.     I'm going to mark, as Exhibit 7, a
15  document that has a production number beginning
16  with P 00112; and, as Exhibit 8, a document that
17  has a production number beginning with H 000026.
18            (Plaintiff's Exhibit 7, product supply
19       agreement, marked for identification, as of
20       this date.)
21            (Plaintiff's Exhibit 8, product supply
22       agreement, marked for identification, as of
23       this date.)
24      Q.     I'll represent to you, sir, these are
25  two different versions of the product supply
```



ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

                              HOWELL

1     agreement.  And I'll ask you which, if either of

2     those, is the agreement that you are familiar

3     with?

4                MR. DUNNEGAN:  Object to the form.

5          Look at all the pages.

6                (Witness reviews document.)

7          A.    I can't say for certain which one I'm

8     familiar with.

9          Q.    Do you recall whether the agreement

10    that you first saw in October or November of 1997

11    included a provision for a million dollar rebate

12    from Pentalpha to Sunbeam?

13         A.    I recall that, yes.

14         Q.    Do you recall if that provision was in

15    the body of the agreement or in a separate rider?

16         A.    I don't recall.

17         Q.    Is it fair to say, sir, since you

18    first became aware of the agreement in October or

19    November of 1997, that you had nothing to do with

20    the actual negotiation of the agreement?

21         A.    That is correct.

22         Q.    In what context did you become

23    familiar with the agreement?

24         A.    In a drafting session.

HOWELL

Q.     Drafting of what?

A.     A registration statement.

Q.     How did the agreement come up in the course of that drafting session?

A.     It was a major part of the drafting session.

Q.     Who was involved in the drafting session other than yourself?

A.     The drafting session was at the offices of Parker Chapin.

Q.     That was counsel to Pentalpha and Global-Tech?

A.     Counsel to Global-Tech.

Q.     Who were the individuals in the session?

A.     I know that Mark Hirsch was there, I know that Jordan Horvath was there and I don't recall precisely who else was there.

Q.     Is Mr. Horvath an attorney with Parker Chapin?

A.     To my knowledge, yes.

Q.     Was anyone else present representing the interests of Global-Tech?

A.     I don't know.



                           HOWELL

1

2        Q.    Why was the product service agreement

3   a major part of the drafting session?

4        A.    The business with Sunbeam was critical

5   to Global-Tech.

6        Q.    In what way?

7        A.    It was a very important part of their

8   business and their future business.

9        Q.    If Pentalpha was a separate entity, in

10  what way did Global-Tech benefit from the

11  agreement?

12       A.    Global-Tech consolidated the results

13  of its subsidiaries.

14       Q.    What subsidiaries did it have other

15  than Pentalpha?

16       A.    I don't know all of them but one of

17  them was Wing Shing Products.

18       Q.    So you know Pentalpha and you know

19  Wing Shing.  Do you know that there were others

20  and you just can't recall their names or you do

21  not think there were others?

22       A.    I know there were others but I can't

23  recall their names.

24       Q.    Do you know how many others?

25       A.    No.



ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE
Chicago 312.782.8087 • 800.708.8087 • Fax 312.704.4950

18

```
 1                        HOWELL

 2        Q.    I'm sorry?

 3        A.    No.

 4        Q.    What portion of Global-Tech's

 5   consolidated business was represented by

 6   Pentalpha?

 7        A.    I don't know.

 8        Q.    Was it more than half?

 9        A.    I can't even say that.

10        Q.    What was the business of Wing Shing

11   Products?

12        A.    Wing Shing Products was a marketer of

13   product.

14        Q.    Of the product made by Pentalpha?

15        A.    Yes.

16        Q.    So Wing Shing had no separate

17   manufacturing arm of its own?

18        A.    I don't know that.

19        Q.    Do you know what the business was of

20   the other subsidiaries whose names you can't

21   recall?

22        A.    One of the subsidiaries is the

23   manufacturing organization itself.

24        Q.    That makes the products sold by

25   Pentalpha and Wing Shing?
```



ESQUIRE
DEPOSITION SERVICES

A RECORD OF EXCELLENCE

Chicago: 312.782.8087 • 800.708.8087 • Fax 312.704.4950

**EXHIBIT 6**



# GLOBAL-TECH
## APPLIANCES INC.

### 1998 Annual Report

BG 0660

# TABLE OF CONTENTS

|  | Page |
|---|---|
| LETTER TO OUR SHAREHOLDERS | 1 |
| CORPORATE PROFILE | 2 |
| BUSINESS HIGHLIGHTS | 3 |
| FINANCIAL HIGHLIGHTS | 4 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS | 5 |
| REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS | 16 |
| CONSOLIDATED STATEMENTS OF INCOME | 17 |
| CONSOLIDATED BALANCE SHEETS | 18 |
| CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY | 19 |
| CONSOLIDATED STATEMENTS OF CASH FLOWS | 20 |
| NOTES TO CONSOLIDATED FINANCIAL STATEMENTS | 21 |
| SHAREHOLDER INFORMATION | 35 |

BG 0661

# LETTER TO OUR SHAREHOLDERS:

This is our first Annual Report as a publicly traded company. I am pleased to welcome all of the new shareholders of Global-Tech Appliances Inc.

In the past seven years, Global-Tech has transformed itself into the thriving company we see today. Our remarkable growth over the last few years originated from the strategic decision in 1988 to shift our focus from serving as a contract manufacturer of products developed by our customers to an original design manufacturer ("ODM") of proprietary new products.

We are now in the position to take advantage of the major trends in the industry we serve: the constant demand for new products with innovative features and the growing need for outsourcing to manufacturers such as Global-Tech.

Global-Tech's growth is reflected in our exceptional financial performance for the year ended March 31, 1998. Sales increased 89% to $118.3 million as compared to the prior year and net income increased 168% to $13.7 million, or $1.71 per share. These dramatic increases resulted primarily from our ODM strategy and our emphasis on kitchen appliance products. Cash flow from operations for the year was $13.7 million, which enabled us to expand our manufacturing capacity from internally generated funds.

Global-Tech's goal is to continue to grow through the continued development of our ODM capabilities. As an ODM, we own the patented designs and tooling necessary to provide a variety of innovative products to our customers. Our design and development team consists of over 40 engineers who are dedicated to creating new products for the small appliance industry. We are very proud to have registered more than 20 patents over the last five years, with additional applications pending.

All of Global-Tech's products are built in our vertically integrated manufacturing facility in Dongguan, China, which provides us with flexible production lines at low cost. We have earned a reputation for building high quality products and believe we consistently match any of our competitors in China, Mexico, America or Europe in our quality performance.

We continue to support our major brand name customers in their efforts to market high quality, better value products to consumers. We believe that consumers prefer brand name products and that innovative product features are most effectively marketed through the promotional and advertising activities of our customers.

As consumers and retailers continuously seek better value through lower pricing, brand name companies have been forced to seek lower costs in manufacturing. Having invested in automation in American and European factories and built vertically integrated factories in Mexico, most companies have determined that Chinese manufacturers continue to have competitive costs. If outsourcing increases, as many business leaders in the U.S. and Europe have predicted, and demand for new products continues, we believe that Global-Tech's market share should increase.

In April we completed our initial public offering of stock and sold 4,830,000 shares (including over-allotment shares purchased by the underwriters of the offering), with net proceeds of approximately $81 million. This has enabled us to reduce our debt while continuing to expand our Dongguan factory. We plan to use approximately $30 million of the proceeds to expand and equip the Dongguan facility. We expect to complete the expansion of the physical space to 1,850,000 square feet by the end of the current fiscal year. Currently, half of the physical plant has been completed and is being equipped with the requisite machinery. However, we do not expect to complete the entire infrastructure or purchase all the equipment initially anticipated until our order flow warrants the additional capacity.

The employees of Global-Tech are motivated to improve shareholder value and are committed to the growth and superior performance of our company. We look forward to sharing this with you.

John C.K. Sham
President and Chief Executive Officer
December 31, 1998

BG 0662

# CORPORATE PROFILE

Global-Tech Appliances Inc. is a designer and manufacturer of a wide range of small household appliances. Global-Tech's products, all of which are manufactured in China, are sold under various brand names such as Hamilton Beach, Krups, Moulinex, Mr. Coffee, Oster, Proctor-Silex, Revlon, Sunbeam, Vidal Sassoon and Welbilt.

Global-Tech's business strategy is to achieve growth, market share gains and increased profitability by helping its customers meet the stringent requirements of mass merchandisers and major retailers. The key elements of Global-Tech's business strategy include the design and development of innovative products, the production of high quality, low cost products in an efficient and timely manner and the focus on sales to brand name customers.

Global-Tech is well positioned to take advantage of the accelerating trend of offshore purchasing and continuing customer consolidation and possesses a competitive advantage in its ability to manufacture innovative products based on its design and development capability, the quality and price of its products and its broad product line.

BG 0663

# BUSINESS HIGHLIGHTS

Global-Tech is a leading designer of over 160 different models of small household appliances. The small household appliance industry consists of five principal categories:

- Kitchen appliances, such as toasters, coffeemakers and food processors;
- Personal, beauty, and health care products, such as hair dryers and curling irons;
- Environmental care products, such as fans and air purifiers;
- Garment care products, primarily irons; and
- Floor care products, primarily vacuum cleaners.

Global-Tech's initial business was the sale of personal care products but its emphasis shifted to kitchen appliances five years ago. Additionally, its garment care business has grown recently and is expected to be more significant in the future. Global-Tech will enter the floor care category in fiscal 1999 and has developed some environmental care products.

Key products developed by Global-Tech since 1996 include food steamers, breadmakers, curling irons, deep fryers, rice cookers and ice cream makers. During fiscal 1999 Global-Tech plans to begin selling indoor grills, a hand-held steam vacuum cleaner and a steam iron station. Global-Tech believes that indoor grills will be a key product at retail in the U.S. this Christmas and any weakness in the U.S. breadmaker business will be offset by an increase in breadmaker sales in Europe.

Net sales of kitchen appliances represented 78.2% of Global-Tech's net sales compared to 66.1% in the prior year. Personal, beauty and health care product sales increased 36.2% over the prior year but declined as a percentage of total net sales to 10.3%.

Net sales to North America and Europe represented 70.8% and 24.1%, respectively, of total net sales in fiscal 1998 as compared to 75.1% and 23.2%, respectively, in the prior year. ODM products represented 85.5% of sales in fiscal 1998 as compared to 73.6% in the prior year. In fiscal 1998, Global-Tech produced approximately 6.2 million units.

The following table sets forth the net sales of each of Global-Tech's product categories in fiscal 1996, 1997 and 1998:

| Fiscal Years Ended March 31, Product Category: | 1996 | 1997 | 1998 |
|---|---|---|---|
| | | (in thousands) | |
| Kitchen appliances | $ 25,929 | $ 41,451 | $ 92,578 |
| Personal, beauty and health care products | 6,961 | 8,946 | 12,182 |
| Travel products | 6,286 | 7,104 | 6,671 |
| Garment care products | 4,329 | 4,936 | 4,607 |
| Other(1) | 578 | 262 | 2,298 |
| Total | $ 44,083 | $ 62,699 | $118,336 |

(1)   Includes environmental care products and accessories for each of Global-Tech's product categories.

BG 0664

# FINANCIAL HIGHLIGHTS

The selected consolidated income statement data for the fiscal years ended March 31, 1996, 1997 and 1998 and the selected consolidated balance sheet data as of March 31, 1997 and March 31, 1998 set forth below have been prepared in accordance with U.S. generally accepted accounting principles and are derived from Global-Tech's consolidated financial statements and notes thereto included elsewhere in this Annual Report, which have been audited by Arthur Andersen & Co., independent public accountants, whose report thereon is also included elsewhere in this Annual Report. The selected consolidated income statement data for the fiscal year ended March 31, 1994 and the selected consolidated balance sheet data as of March 31, 1994 and 1995 have been prepared in accordance with U.S. GAAP and are derived from the audited financial statements and management accounts of individual companies of Global-Tech not included elsewhere in this Annual Report. The selected consolidated financial data set forth below should be read in conjunction with Management's Discussion and Analysis, the consolidated financial statements and the notes thereto and other financial information which appear elsewhere in this Annual Report.

| Fiscal Years Endd March 31, | 1994(1) | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|
| | | (in thousands, except per share data) | | | |
| **Statement of Income Data:** | | | | | |
| Net sales | $  27,471 | $  31,515 | $  44,083 | $  62,699 | $ 118,336 |
| Cost of goods sold | 24,087 | 21,989 | 31,893 | 46,031 | 86,521 |
| Gross profit | 3,384 | 9,526 | 12,190 | 16,668 | 31,815 |
| Selling, general & administrative expenses | 4,258 | 7,129 | 7,155 | 10,378(2) | 15,476 |
| Operating income (loss) | (874) | 2,397 | 5,035 | 6,290 | 16,339 |
| Interest expense | 218 | 405 | 696 | 867 | 1,398 |
| Other income, net | 5,103 | 109 | 85 | 94 | 220 |
| Income before income taxes | 4,011 | 2,101 | 4,424 | 5,517 | 15,161 |
| Income taxes (credit) expense | 187 | 52 | (168) | 406 | 1,453 |
| Net income | $   3,824 | $   2,049 | $   4,592 | $   5,111(2) | $  13,708 |
| Net income per share | $0.48 | $0.26 | $0.57 | $0.64 | $1.71 |
| Weighted average number of shares outstanding | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| | | | | | |
| At March 31, | 1994 | 1995 | 1996 | 1997 | 1998 |
| **Balance Sheet Data:** | | (in thousands) | | | |
| Working capital | $      357 | $  (3,754) | $   (1,012) | $  (1,442) | $     (984) |
| Total assets | 18,350 | 29,721 | 31,765 | 44,400 | 60,268 |
| Total debt | 4,460 | 5,035 | 6,752 | 12,381 | 14,494 |
| Shareholders' equity | 8,404 | 10,453 | 15,045 | 16,493 | 29,980 |

(1)   Results of operations in fiscal 1994 were affected by floods that occurred during such fiscal year at Global-Tech's facilities in Shenzhen, China. Interest expense and other income, net includes the damage losses from these floods, including repair costs, fixed assets and inventories, in the amount of $2,867,000 in fiscal 1994. Other income, net in fiscal 1994 includes gains in the amount of approximately $5,078,000, representing insurance proceeds received in compensation for damages and consequential losses in profit caused by those floods.

(2)   Includes provisions of $782,000 and $511,000 against advances to a former minority shareholder of a subsidiary of Global-Tech and his affiliates in fiscal 1997 and fiscal 1998, respectively. See Management's Discussion and Analysis and Note 2 of Notes to Consolidated Financial Statements.

# MANAGEMENT'S DISCUSSION AND ANALYSIS

## General

Global-Tech was founded in 1963 and, for most of its history, operated as a contract manufacturer of products developed by its customers. In recent years, however, Global-Tech has emphasized original design manufacturing. As an ODM, Global-Tech designs and develops proprietary new products which it manufactures for its customers. Global-Tech made this shift by forming a product design and development team consisting of engineers who focus on the development of new products. Net sales of Global-Tech's ODM products represented 58.1%, 73.6% and 85.5% of Global-Tech's net sales during fiscal 1996, 1997 and 1998, respectively, with the remaining sales generated by its contract manufacturing activities. This change in emphasis from contract manufacturing to original design manufacturing has caused Global-Tech's growth to accelerate over the past three fiscal years.

Gross profit has increased significantly over the last three years while gross profit as a percentage of net sales ("gross margin") has declined. The decline in gross margin is a result of (i) an increase in the costs of raw materials in fiscal 1996; (ii) Global-Tech's decision to shift its product mix toward higher priced kitchen products, in particular breadmakers, which have a higher profit per unit and a lower gross margin than Global-Tech's other products; and (iii) a decline in gross margin in existing products over time due to price pressures from mass merchandisers.

During fiscal 1997, Global-Tech formed a majority-owned subsidiary to assist with the marketing of products to certain United States customers. This assistance included customer introductions and facilitating communication with Global-Tech. As of November 1, 1997, Global-Tech purchased the interest of the subsidiary's minority shareholders, who were otherwise unaffiliated with Global-Tech, for $360,000. Global-Tech recorded as a charge to earnings provisions against advances of $782,000 and $511,000 made to the former minority shareholder and his affiliates for use in such marketing efforts in Global-Tech's financial statements for fiscal 1997 and 1998, respectively. Global-Tech entered into a commission agreement with one of the former minority shareholders to compensate him for his prior services and provide for the repayment of the $1,249,000 in advances (the "Debt"). No further services are to be provided by the minority shareholders under this agreement. The commission agreement provides that, for the period from January 1, 1998 through October 31, 2001, net sales of certain products previously marketed by the subsidiary will be subject to a 3% commission. The former minority shareholder will receive $50,000 per month from January 1998 through June 1999. Any commissions earned in excess of $50,000 per month will be applied to reduce the Debt. If commissions earned are less than $50,000 per month, such deficiency will be added to the Debt. Commissions will be applied equally each month from July 1999 through the end of the term of the commission agreement to reduce the Debt. Any portion of the Debt remaining outstanding at the end of the term of the commission agreement must be repaid by the former minority shareholder at that time.

Global-Tech is not subject to taxation in the British Virgin Islands in accordance with British Virgin Island tax regulations. Global-Tech is subject to income taxation in each jurisdiction in which its subsidiaries do business. Certain of Global-Tech's profits accrue in areas of China where the effective tax rate is 27%, and in Hong Kong, where the corporate tax rate was 16.5% through March 31, 1998 and is 16%, effective April 1, 1998. In Hong Kong, estimated taxes for each fiscal year are paid during the fiscal year based on Global-Tech's prior year's earnings derived from operations in Hong Kong. An adjustment in the form of additional taxes paid or refunds to Global-Tech is then made in the following fiscal year based on actual earnings. Therefore in each fiscal year, Global-Tech's statement of income reflects a provision for estimated taxes for the current fiscal year and adjustments for over or under provisions with respect to the prior fiscal year. Due to its activities in a special economic region of China, Global-Tech's subsidiary in China is exempt from income taxation for the first two years in which it records profits to the extent the profits are not offset by losses in a prior year, which event has not yet occurred. Global-Tech has a 50% tax reduction for the next three years thereafter. Losses in any year can only be used to offset future income for a period of five years. To the extent that Global-Tech has income effectively connected with the conduct of a U.S. trade or business in any fiscal year, it would be subject to U.S. federal taxes at an effective rate of up to 55%. Global-Tech does not believe that its current method of operations would subject it to material U.S. taxes because it should not be considered to have significant income effectively connected with a trade or business in the U.S.

BG 0666

Global-Tech is a holding company and has no business operations other than ownership of its subsidiaries. While Global-Tech has no intention of paying cash dividends, should it decide to do so, as a holding company, Global-Tech's ability to pay dividends and meet other obligations would depend upon the receipt of dividends or other payments from its operating subsidiaries and its other holdings and investments. In addition, Global-Tech's operating subsidiaries from time to time may be subject to restrictions on their ability to make distributions to Global-Tech, including as a result of restrictive covenants in loan agreements, restrictions on the conversion of local currency into U.S. dollars or other hard currency and other regulatory restrictions. Restrictions on currency conversion may be in effect from time to time but have not had a material effect on Global-Tech in the past.

Global-Tech has conducted an initial review regarding the effect the upcoming year 2000 will have on its computer applications. Global-Tech has determined that there will be minimal impact on Global-Tech and that the financial and human resources utilized to address this issue will not be material. However, there can be no assurance that unforeseen problems will not arise in connection with this issue.

Since most of Global-Tech's purchases and sales are denominated in U.S. dollars, Global-Tech's financial statements are presented in U.S. dollars, the functional currency of Global-Tech. Global-Tech's financial statements are prepared in accordance with U.S. GAAP.

## Results of Operations

The following table sets forth certain statement of income data as a percentage of net sales for the periods indicated:

| Fiscal Years Ended March 31, | 1996 | 1997 | 1998 |
|---|---|---|---|
| Net sales | 100.0 | 100.0 | 100.0 |
| | % | % | % |
| Cost of goods sold | 72.4 | 73.4 | 73.1 |
| Gross profit | 27.6 | 26.6 | 26.9 |
| Selling, general and administrative expenses | 16.2 | 16.6 | 13.1 |
| Operating income | 11.4 | 10.0 | 13.8 |
| Interest expense and other income, net | 1.4 | 1.2 | 1.0 |
| Income before income taxes | 10.0 | 8.8 | 12.8 |
| Income tax (credit) expense | (0.4) | 0.6 | 1.2 |
| Net income | 10.4% | 8.2% | 11.6% |

BG 0667

**Fiscal Year Ended March 31, 1997 Compared with Fiscal Year ended March 31, 1998**

*Net sales.* Global-Tech's net sales consist of its gross invoiced sales less discounts and returns. Net sales in fiscal 1998 increased approximately 88.7% to $118.3 million from $62.7 million in fiscal 1997. The increase in net sales was the result of increased net sales of ODM products which represented 85.5% of net sales in fiscal 1998 as compared to 73.6% of net sales in fiscal 1997. The increase in net sales of ODM products was primarily attributable to increased sales of breadmakers, coffeemakers and food steamers and the introduction of deep fryers.

Net sales are comprised primarily of sales in Global-Tech's four major product categories: kitchen appliances, personal, beauty and health care products, travel products and garment care products. Sales in each such product category for fiscal 1998 as compared to fiscal 1997 were as follows: sales of kitchen appliances increased to $92.6 million, or 78.2% of net sales, from $41.5 million, or 66.1% of net sales; sales of personal, beauty and health care products increased to $12.2 million, or 10.3% of net sales, from $8.9 million, or 14.3 % of net sales; sales of travel products decreased to $6.7 million, or 5.6% of net sales, from $7.1 million, or 11.3% of net sales; and sales of garment care products decreased to $4.6 million, or 3.9% of net sales, as compared to $4.9 million, or 7.9% of net sales.

*Gross profit.* Gross profit consists of net sales less cost of goods sold, which includes the costs of raw materials, production materials, labor, transportation, depreciation and factory overhead. Gross profit in fiscal 1998 was $31.8 million, or 26.9% of net sales, as compared to $16.7 million, or 26.6% of net sales, in fiscal 1997. Gross margins in fiscal 1998 increased due to greater in-house manufacturing of breadmaker motors and reduced depreciation as a percentage of net sales. Depreciation represented a higher percentage of net sales for fiscal 1997 due to the start-up of the breadmaker product line.

*Selling, general and administrative expenses.* The primary components of Global-Tech's selling, general and administrative expenses ("SG&A") include advertising and promotion, product design and development, transportation of finished goods, salaries for Global-Tech's marketing and administrative personnel, professional fees and utilities. SG&A in fiscal 1998 increased to $15.4 million, or 13.1% of net sales, from $10.4 million, or 16.6% of net sales, in fiscal 1997. The increase in SG&A expenses reflects higher variable costs related to increased sales, including transportation costs, commissions paid, litigation costs and additional compensation commensurate with the growth of the business. SG&A as a percentage of net sales declined for fiscal 1998 due to Global-Tech's spreading its fixed costs over a higher level of net sales. SG&A also includes provisions of $511,000 and $782,000 for fiscal 1998 and 1997, respectively, made against an advance to a former minority shareholder of a subsidiary formed during fiscal 1997 and his affiliates to assist with marketing of products to certain United States customers. These advances ceased as of November 1997.

The primary components of Global-Tech's design and development expenses ("development expenses") include sample design, patent fees, testing charges, inspection fees and salaries for Global-Tech's engineers and designers. Development expenses in fiscal 1998 were $1.6 million as compared to $1.3 million in fiscal 1997.

*Interest expense and other income, net.* Interest expense consists of interest on Global-Tech's bank credit facilities. Interest expense was $1.4 million in fiscal 1998 as compared to $867,000 in fiscal 1997. The higher interest expense is due to increased borrowings necessary to finance increased levels of sales and the acquisition of fixed assets. Other income, net includes tooling income, interest income and non-recurring income. Other income, net was $220,000 in fiscal 1998 as compared to $95,000 in fiscal 1997.

*Income tax.* Global-Tech had taxable income in Hong Kong in fiscal 1997 and 1998 and the United States in fiscal 1998. The financial statements include provisions for Hong Kong and United States income and withholding taxes of $1.0 million and $440,000 in fiscal 1997 and 1998, respectively, and a provision for Hong Kong income taxes of $406,000 in fiscal 1997. Global-Tech does not believe that its current method of operations would subject it to material U.S. taxes because it should not be considered to have significant income effectively connected with a trade or business in the U.S. No income tax was payable by Global-Tech in China during this period because Global-Tech's subsidiary in China had accumulated tax losses during these periods.

BG 0668

**Fiscal Year ended March 31, 1996 Compared with Fiscal Year ended March 31, 1997**

*Net sales.* Net sales for fiscal 1997 increased approximately 42.2% to $62.7 million from $44.1 million in fiscal 1996. The increase in net sales was the result of increased net sales of ODM products, which represented 73.6% of net sales in fiscal 1997 as compared to 58.1% of net sales in fiscal 1996. The increase in net sales of ODM products was primarily due to sales of breadmakers, which were first introduced by Global-Tech in fiscal 1997, and the increased sales of coffeemakers. Net sales to U.S. customers increased by 64.2% to $47.1 million in fiscal 1997 from $28.7 million in fiscal 1996, with a lower rate of increase in European sales.

Sales in each major product category for fiscal 1997 as compared to fiscal 1996 were as follows: sales of kitchen appliances increased to $41.5 million, or 66.1% of net sales, from $25.9 million, or 58.8% of net sales; sales of personal, beauty and health care products increased to $8.9 million, or 14.3% of net sales, from $7.0 million, or 15.8% of net sales; sales of travel products increased to $7.1 million, or 11.3% of net sales, from $6.3 million, or 14.3% of net sales; and sales of garment care products increased to $4.9 million, or 7.9% of net sales, from $4.3 million, or 9.8% of net sales.

*Gross profit.* Gross profit in fiscal 1997 was $16.7 million, or 26.6% of net sales, as compared to $12.2 million, or 27.6% of net sales, in fiscal 1996. Gross margins in fiscal 1997 declined because a higher percentage of Global-Tech's sales were from products with lower gross margins, primarily breadmakers and coffeemakers.

*Selling, general and administrative expenses.* SG&A in fiscal 1997 increased to $10.4 million, or 16.6% of net sales, from $7.2 million, or 16.2% of net sales, in fiscal 1996. The overall increase in SG&A was primarily attributable to variable costs related to increased sales, additional compensation, including compensation resulting from hiring sales, marketing and administrative personnel commensurate with the growth in business and expansion of product lines, and a provision of $782,000 made against an advance to a former minority shareholder of a marketing subsidiary and his affiliates. Development expenses were $1.3 million in fiscal 1997 as compared to $915,000 in fiscal 1996. The increase in development expenses was primarily a result of the additional costs associated with the introduction of breadmakers in fiscal 1997.

*Interest expense and other income, net.* Interest expense was $867,000 in fiscal 1997 as compared to $696,000 in fiscal 1996. The increase was due to increased borrowing necessary to finance increased level of sales and the acquisition of fixed assets. Other income, net was $94,000 in fiscal 1997 as compared to $85,000 in fiscal 1996. The increase was primarily due to an increase in interest income in fiscal 1997.

*Income tax.* In fiscal 1996 and 1997, Global-Tech had taxable income only in Hong Kong. Global-Tech's estimated income tax liability in Hong Kong in fiscal 1997 was $406,000 as compared to an income tax credit of $168,000 in fiscal 1996. These amounts include a provision for Hong Kong income taxes of $406,000 in fiscal 1997 and $17,000 in fiscal 1996. No income tax was payable by Global-Tech in China during this period because Global-Tech's subsidiary in China had accumulated tax losses during these periods.

BG 0669

## Quarterly Results and Seasonality

Quarterly Results. The following table sets forth the statement of operations data for each of Global-Tech's last eight quarters and the percentage of revenues represented by the line items presented. The quarterly statement of operations data set forth below were derived from unaudited consolidated financial statements of Global-Tech which, in the opinion of management of Global-Tech, contain all adjustments (consisting only of normal recurring adjustments) necessary for the fair presentation of those statements.

| | Fiscal 1997 | | | | Fiscal 1998 | | | |
|---|---|---|---|---|---|---|---|---|
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| | | | | (in thousands) | | | | |
| **Statement of Operations Data:** | | | | | | | | |
| Net sales | $12,865 | $15,270 | $16,987 | $17,577 | $25,987 | $38,933 | $31,285 | $22,131 |
| Gross profit | 3,574 | 3,660 | 4,752 | 4,682 | 7,105 | 10,502 | 8,314 | 5,894 |
| Income before income taxes | 1,512 | 628 | 2,033 | 1,345 | 3,471 | 5,747 | 3,958 | 1,985 |
| Net income | $ 1,400 | $ 581 | $ 1,884 | $ 1,245 | $ 3,068 | $ 5,081 | $ 3,768 | $ 1,791 |
| **Statement of Operations Data As a Percentage of Net Sales:** | | | | | | | | |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Gross profit | 27.8 | 24.0 | 28.0 | 26.6 | 27.3 | 27.0 | 26.6 | 26.6 |
| Income before income taxes | 11.8 | 4.1 | 12.0 | 7.6 | 13.4 | 14.8 | 12.7 | 9.0 |
| Net income | 10.9 | 3.8 | 11.1 | 7.1 | 11.8 | 13.1 | 12.0 | 8.1 |

*Seasonality.* Global-Tech's business is seasonal, with a large portion of its sales and earnings generated in the second and third quarters of each fiscal year (June through December). These fluctuations are based on customers' increased stocking of Global-Tech's products in anticipation of heavy demand during the Christmas holiday season. In addition, Global-Tech's sales can vary from quarter to quarter based on the timing of the introduction of new products and may be affected in the future by the timing of any acquisition completed by Global-Tech. Global-Tech believes that quarterly comparisons of the results of its operations during any fiscal year are not necessarily meaningful and that results for any one fiscal quarter should not be relied upon as an indication of future performance.

BG 0670

## Liquidity and Capital Resources

Global-Tech's primary sources of financing have been cash from operating activities and borrowings under credit agreements with various banks. During fiscal 1997 and 1998, Global-Tech generated approximately $901,000 and $13.7 million, respectively, in cash from operating activities.

At March 31, 1998, accounts receivable were $3.8 million, as compared to $4.0 million at March 31, 1997. Receivables at March 31, 1998 represented 11.9 days of sales as compared to 23.7 days of sales at March 31, 1997. At March 31, 1998, inventories were $21.8 million compared to $20.0 million at March 31, 1997. Global-Tech's inventories consist primarily of raw materials needed to produce finished products. The increase in inventories is primarily attributable to Global-Tech's maintaining increased stock of its raw materials as net sales increase.

Global-Tech's aggregate capital expenditures during fiscal 1998 and 1997 were $15.9 million and $6.2 million, respectively. This increase primarily reflects expenditures for the acquisition of property, plant and machinery and expansion of its factory facilities in Dongguan, China.

Global-Tech's outstanding capital commitments of approximately $10.8 million as of March 31, 1998 included commitments for the expansion of the Dongguan facility and the purchase of machinery and equipment. Global-Tech expects to incur an aggregate of approximately $6.0 million in capital expenses for expansion of the Dongguan facility in fiscal 1999, of which approximately $3.1 million is committed. For the purchase of machinery and equipment, Global-Tech anticipates spending approximately $15.0 million in fiscal 1999, of which approximately $6.3 million was committed during fiscal 1998. Global-Tech may import from other countries in Asia approximately $4.3 million of capital equipment without being subject to Chinese import taxes; thereafter importation of such equipment will be taxed at various rates ranging from 15% to 25%.

Global-Tech finances its operations and capital expenditures primarily by proceeds from its initial public offering, cash flows from operations and borrowings. As of March 31, 1998, Global-Tech had bank credit facilities with an aggregate credit line of approximately $39.9 million, of which it had outstanding $454,000 in long-term debt (excluding the current portion) and $14.0 million in short-term debt (including the current portion of long-term debt). The aggregate monthly payment on all such indebtedness was approximately $103,000 as of March 31, 1998.

Global-Tech's long-term debt consists of thirteen term loans with an aggregate outstanding amount of $998,000 as of March 31, 1998 (including the current portion of long-term debt), provided by various banks to finance the purchase of machinery, equipment and motor vehicles. These loans bear interest at rates per annum currently ranging from 7.26% to 13.75% and mature on various dates through the year 2000. All of such loans are payable in monthly installments which were approximately $53,000 as of March 31, 1998.

BG 0671

Global-Tech's revolving credit facilities are with six banks with an aggregate facilities limit of approximately $39.9 million as of March 31, 1998. The credit facilities are with Standard Chartered Bank, HongkongBank, The Bank of Tokyo-Mitsubishi, Ltd., The Fuji Bank, Limited, Dah Sing Bank, Ltd. and The Bank of East Asia Limited. These facilities bear interest at floating commercial bank lending rates in Hong Kong, which ranged from 9.0% to 11.3% per annum as of March 31, 1998. The amounts payable each month on these facilities varies depending upon the amounts drawn at the time and were approximately $50,000 in March 1998. Global-Tech's outstanding borrowings vary according to its seasonal working capital requirements. As of March 31, 1998, the amount utilized under its bank facilities was $16.5 million.

Global-Tech anticipates that the net proceeds received from its initial public offering of Shares, together with cash from operating activities, should be adequate to satisfy its capital requirements for 18 to 24 months. In the event Global-Tech should consummate an acquisition, its capital requirement could increase; however, there are no current or pending arrangements, understandings, negotiations or agreements with respect to any potential acquisitions.

*Inflation.* During 1995, 1996 and 1997, the rate of inflation in Hong Kong has ranged from approximately 6% to 9% per year (approximately 6% during 1997) and the average rate of inflation in China has ranged from approximately 4% to 17% per year, (approximately 4% during 1997). As a general matter, the effect of this inflation on Global-Tech is primarily limited to labor costs, which represent a small component of Global-Tech's total expenses. As Global-Tech purchases most of its raw materials outside China, inflation in China does not have a significant effect on its overall costs.

*Currency and Exchange Rates.* The functional currency of Global-Tech is the U.S. dollar. Nearly all of Global-Tech's sales are denominated in U.S. dollars. The majority of Global-Tech's expenses, including wages and other production and administrative costs are denominated in Hong Kong dollars and Chinese Renminbi. Certain raw materials and other expenses are purchased using a variety of currencies including the U.S. dollar, Chinese Renminbi, Japanese yen and German mark. The majority of raw materials are purchased using Hong Kong dollars. The Hong Kong dollar is pegged to the U.S. dollar. Global-Tech has not been significantly affected by exchange rate fluctuations and therefore has not needed to hedge its positions. See Note 3(e) of Notes to Consolidated Financial Statements.

BG 0672

*II*

## FOREIGN ISSUER CONSIDERATIONS

Because Global-Tech is a foreign issuer incorporated in the British Virgin Islands and conducts its operations and owns assets primarily in the People's Republic of China ("China") and Hong Kong, Global-Tech's operations and assets are subject to significant political, economic, legal and other uncertainties in Hong Kong, China and, in some instances, the British Virgin Islands, including the following:

*Conditions in China.* China is a socialist state which, since 1949, has been controlled by the Communist Party of China. Changes in the top political leadership of the Chinese government may have a significant impact on policy and the political and economic environment in China. Moreover, economic reforms and growth in China have been more successful in certain provinces than in others and the continuation or increase of such disparities could affect political or social stability.

China is considered to be a high risk nation for business and investment in the Asian region. Although recently China has permitted greater provincial and local economic autonomy and private economic activities, the government of China has exercised and continues to exercise substantial control over virtually every section of the Chinese economy through regulation and state ownership. Accordingly, government actions in the future, including any decision not to continue to support the economic reform program that commenced in the late 1970's and possibly to return to the more centrally-planned economy that existed prior thereto, could have a significant effect on economic conditions in China and on the operations of Global-Tech. China's economic reform plan was designed to bring in foreign investment capital and technological skills. The result has been a move towards a more mixed economy away from the previous centrally planned economy. The process of devolving responsibility for all aspects of enterprise to local management and authorities continues, even though the system of socialism with Chinese characteristics involves considerable influence by the central government on production and marketing.

Substantially all of Global-Tech's products are currently manufactured in China and over 97% of the net book value of Global-Tech's total fixed assets are located in China. Global-Tech is a party to agreements with instrumentalities of the government of China and sells products to entities based principally in the U.S. and Europe. International operations and sales may be subject to political and economic risks, including political instability, currency controls and exchange rate fluctuations and changes in import/export regulations, tariff and freight rates. In addition, various forms of protectionist trade legislation have been proposed in the U.S. and certain foreign countries. Changes in tariff structures or other trade policies could adversely affect Global-Tech.

China offers Global-Tech low overhead and competitive labor rates. The location of its principal factory, in Dongguan, China, provides Global-Tech with the ability to manage factory operations from Hong Kong and facilitates transportation of Global-Tech's products to markets outside China. Political developments in China could have a material adverse effect on the business and assets of Global-Tech. The legal system of China relating to foreign investments is both new and continually evolving and there can be no certainty as to the application of its laws and regulations in particular instances.

BG 0673

***China-Legal System.*** China's legal system is a civil law system which is based on written statutes and in which decided legal cases have little precedential value. China does not have a well-developed, consolidated body of laws governing foreign investment enterprises. As a result, the administration of laws and regulations by government agencies may be subject to considerable discretion. As legal systems in China develop, foreign business entities may be adversely affected by new laws, changes to existing laws (or interpretations thereof) and preemption of provincial or local laws by national laws. In circumstances where adequate laws exist, it may not be possible to obtain swift and equitable enforcement thereof.

***China-Environmental Law.*** Environmental protection in China is regulated in accordance with the Environmental Protection Law of the People's Republic of China, which was effective December 26, 1989. The law sets national standards for environmental quality and monitoring as well as the utilization of natural resources and the reduction of pollution. As a manufacturer, Global-Tech is subject to annual inspections. Global-Tech has passed its most recent inspection and believes that it is in material compliance with all applicable environmental laws.

***Conditions in Hong Kong.*** Hong Kong, the jurisdiction of incorporation of two of Global-Tech's subsidiaries and the location of Global-Tech's headquarters, was restored to China on July 1, 1997. Global-Tech conducts sales, marketing, product design and development, administration and other activities in Hong Kong. Accordingly, Global-Tech may be materially adversely affected by factors affecting Hong Kong's political situation and its economy or its international political and economic relations.

As of July 1, 1997, Hong Kong became a Special Administrative Region ("SAR") of China, with certain autonomy from the Chinese government, including (i) being a separate customs territory from China with separate tariff rates and export control procedures; and (ii) maintaining a separate intellectual property registration system. All land leases in effect at the time of the transfer of sovereignty were extended for a period of 50 years, except for those leases without a renewal option expiring after June 30, 1997 and before June 30, 2047. Hong Kong continues to be a member of the World Trade Organization and the Hong Kong dollar continues to be legal tender freely convertible into Renminbi and not subject to foreign exchange controls. The Hong Kong SAR government, as set up by China, has sole responsibility for tax policies. Notwithstanding the provisions of these international agreements, there can be no assurance as to the continued stability of political, economic or commercial conditions in Hong Kong.

No treaty exists between Hong Kong and the U.S. providing for the reciprocal enforcement of foreign judgments. Accordingly, Hong Kong courts might not enforce judgments predicated on the federal securities laws of the U.S., whether arising from actions brought in the U.S. or, if permitted, in Hong Kong.

***Recent Conditions in Asia.*** During the last few months economic conditions and markets have been unstable throughout Asia. Currencies in several countries have been devalued and there has been political instability in certain countries. To date, neither Hong Kong nor China has devalued its currency or experienced significant instability as a result of these developments. However, there can be no assurance that the economic downturn will not spread to Hong Kong or China. Economic or political instability in Hong Kong or China or a significant devaluation of the currency in either country could have a material adverse effect on Global-Tech's business, results of operations and financial condition.

BG 0674

# REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

## To the Shareholders and Board of Directors of Global-Tech Appliances Inc.:

We have audited the accompanying consolidated balance sheets of Global-Tech Appliances Inc. (incorporated in the British Virgin Islands; "Global-Tech") and Subsidiaries ("the Company") as of March 31, 1997 and 1998, and the related consolidated statements of income, changes in shareholders' equity and cash flows for the years ended March 31, 1996, 1997 and 1998. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Global-Tech Appliances Inc. and Subsidiaries as of March 31, 1997 and 1998, and the results of their operations and their cash flows for the years ended March 31, 1996, 1997 and 1998, in conformity with generally accepted accounting principles in the United States of America.

Arthur Andersen & Co.
Certified Public Accountants
Hong Kong
May 23, 1998

BG 0675

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
# CONSOLIDATED BALANCE SHEETS

**AS OF MARCH 31, 1997 AND 1998**
(Amounts expressed in United States dollars)

| ASSETS | | 1997 | | 1998 |
|---|---|---|---|---|
| Current assets: | | | | |
| Cash and bank balances (Note 20) | $ | 464,467 | $ | 308,995 |
| Restricted cash (Notes 4 & 20) | | 516,396 | | 880,451 |
| Accounts receivable, net (Notes 5 & 20) | | 4,077,517 | | 3,847,264 |
| Due from directors (Note 6) | | 12,309 | | - |
| Deposits, prepayments and other assets (Note 17(c)) | | 1,015,816 | | 1,992,831 |
| Inventories (Note 7) | | 20,022,284 | | 21,800,017 |
| Total current assets | | 26,108,789 | | 28,829,558 |
| Property, plant and equipment (Note 8) | | 18,274,392 | | 22,983,299 |
| Construction-in-progress | | 2,040 | | 4,895,639 |
| Patents (Note 9) | | 14,459 | | 17,041 |
| Deferred stock issuance costs | | - | | 3,542,422 |
| Total assets | $ | 44,399,680 | $ | 60,267,959 |
| | | | | |
| LIABILITIES AND SHAREHOLDERS' EQUITY | | | | |
| Current liabilities: | | | | |
| Short-term bank borrowings (Notes 6, 10 & 20) | $ | 11,453,724 | $ | 13,495,696 |
| Current portion of long-term bank loans (Notes 10, 11 & 20) | | 591,635 | | 544,260 |
| Accounts payable | | 10,220,426 | | 8,370,839 |
| Fees payable for land use rights | | 1,248,117 | | 719,416 |
| Salaries and allowances payable | | 604,768 | | 524,027 |
| Advance payments from customers | | 929,414 | | 97,185 |
| Accrued expenses (Note 15) | | 1,182,147 | | 4,222,043 |
| Due to a director (Note 6) | | 958,029 | | - |
| Income tax provision | | 362,144 | | 1,839,828 |
| Total current liabilities | | 27,550,404 | | 29,813,294 |
| | | | | |
| Long-term bank loans (Notes 10, 11 & 20) | | 335,756 | | 453,785 |
| Deferred income taxes (Note 12) | | 20,656 | | 20,656 |
| Total liabilities | | 27,906,816 | | 30,287,735 |
| Shareholders' equity: | | | | |
| Preferred stock, par value $0.01: 1,000,000 shares authorized: | | | | |
| no shares issued (Note 1) | | - | | - |
| Common stock, par value $0.01: 50,000,000 shares authorized: | | | | |
| 8,000,000 issued (Note 1) | | 80,000 | | 80,000 |
| Retained earnings | | 16,412,864 | | 29,900,224 |
| Total shareholders' equity | | 16,492,864 | | 29,980,224 |
| Total liabilities and shareholders' equity | $ | 44,399,680 | $ | 60,267,959 |

The accompanying notes are an integral part of these financial statements.

BG 0676

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
# CONSOLIDATED STATEMENTS OF CHANGES IN
# SHAREHOLDERS' EQUITY

**FOR THE YEARS ENDED MARCH 31, 1996, 1997 AND 1998**
(Amounts expressed in United States dollars)

| Common stock | Number of shares | Amount | Retained earnings |
|---|---|---|---|
| Balance as of April 1, 1995 | 8,000,000 | 8,000,000 | $ 10,372,447 |
| Net income | - | - | 4,592,802 |
| Balance as of March 31, 1996 | 8,000,000 | 8,000,000 | 14,965,249 |
| Effect of the spin-off of a subsidiary (Note 2) | - | - | (2,679,877) |
| Excess of purchase price of patents over the historical cost to a shareholder (Note 9) | - | - | (982,908) |
| Net income | - | - | 5,110,400 |
| Balance as of March 31, 1997 | 8,000,000 | 8,000,000 | 16,412,864 |
| Excess of purchase price of patents over the historical cost to a shareholder (Note 9) | - | - | (221,203) |
| Net income | - | - | 13,708,563 |
| Balance as of March 31, 1998 | 8,000,000 | 8,000,000 | $ 29,900,224 |

The accompanying notes are an integral part of these financial statements.

BG 0677

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
# CONSOLIDATED STATEMENTS OF CASH FLOWS

**FOR THE YEARS ENDED MARCH 31, 1996, 1997 AND 1998**
(Amounts expressed in United States dollars)

| | 1996 | 1997 | 1998 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income | $ 4,592,802 | $ 5,110,400 | $ 13,708,563 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 1,241,103 | 1,853,268 | 2,801,807 |
| Loss on disposals of property, plant and equipment | - | 28,168 | - |
| Increase in restricted cash | (258,198) | - | (364,055) |
| Net cash attributable to the spin-off of a subsidiary (Note 2) | 216,735 | - | - |
| (Increase) decrease in accounts receivable, net | (1,241,773) | (1,694,763) | 230,253 |
| Decrease in due from related companies | 489,533 | 698,077 | - |
| (Increase) decrease in due from directors | (184,712) | 307,890 | 12,309 |
| Decrease (increase) in deposits, prepayments and other assets | 88,011 | (455,410) | (977,015) |
| Decrease in tax recoverable | 36,729 | 2,723 | - |
| Increase in inventories | (1,556,730) | (9,509,428) | (1,777,733) |
| (Decrease) increase in accounts payable | (496,805) | 4,247,703 | (1,849,587) |
| Decrease in fees payable for land use rights | (127,784) | (68,692) | (528,701) |
| Increase (decrease) in salaries and allowances payable | 28,405 | 297,874 | (80,744) |
| Increase (decrease) in advance payments from customers | - | 929,414 | (832,229) |
| (Decrease) increase in accrued expenses | (1,088,677) | 472,353 | 3,039,896 |
| Increase (decrease) in due to related companies | 4,454 | (113,467) | - |
| Decrease in due to a director | (1,023,932) | (1,567,533) | (1,183,105) |
| (Decrease) increase in income tax provision | (98,370) | 362,144 | 1,477,684 |
| Increase in deferred income taxes | 20,656 | - | - |
| Net cash provided by operating activities | 641,447 | 900,721 | 13,677,346 |
| **Cash flows from investing activities:** | | | |
| Purchases of property, plant and equipment | (2,179,718) | (6,257,904) | (7,507,383) |
| Proceeds from disposals of property, plant and equipment | - | 58,095 | - |
| Additions to construction-in-progress | (104,278) | (2,040) | (4,895,639) |
| Stock issuance costs | - | - | (3,542,422) |
| Net cash used in investing activities | (2,283,996) | (62,201,849) | (15,945,444) |
| **Cash flows from financing activities:** | | | |
| Increase in short-term bank borrowings | 951,158 | 5,951,613 | 2,041,972 |
| Increase in long-term bank loans | 1,249,375 | 428,283 | 230,003 |
| Repayment of long-term bank loans | (483,727) | (750,714) | (159,349) |
| Net cash provided by financing activities | 1,716,806 | 5,629,182 | 2,112,626 |
| Net increase (decrease) in cash and bank balances | 74,257 | 328,054 | (155,472) |
| Cash and bank balances at beginning of year | 62,156 | 136,413 | 464,467 |
| Cash and bank balances at end of year | $ 136,413 | $ 464,467 | $ 308,995 |

The accompanying notes are an integral part of these financial statements.

BG 0678

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
# NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(Amounts expressed in United States dollars unless otherwise stated)

## 1.   ORGANIZATION AND PRINCIPAL ACTIVITIES

Global-Tech Appliances Inc. ("Global-Tech"), is incorporated in the British Virgin Islands and is a holding company. Global-Tech and its subsidiaries are collectively referred to as the "Company". The Company is a designer and manufacturer of a wide range of small household appliances. The Company's manufacturing operations are located in Dongguan and Shenzhen, the People's Republic of China ("China"). The Company's products are sold to customers primarily in the United States and Europe.

On October 14, 1997, Global-Tech effected a 395,000 for 1 stock split (the "Share Split") and as a result, 7,900,000 shares of common stock, par value $0.01, were outstanding. The authorized capital was also adjusted to 50,000,000 shares of common stock and 1,000,000 shares of preferred stock, all par value $0.01 per share. On March 9, 1998, the Company declared a stock dividend of 100,000 shares (the "Issuance") pro rata to all shareholders and as a result, 8,000,000 shares of common stock, par value $0.01, were outstanding. The Share Split and the Issuance have been reflected retroactively in the accompanying balance sheets and in all per share computations.

BG 0679

## 2.   SUBSIDIARIES

Details of Global-Tech's principal subsidiaries as of March 31, 1998 were as follows:

| Name of subsidiary | Place of incorporation | Percentage of equity interest held |
|---|---|---|
| Pentalpha Enterprises Limited ("PEL") | Hong Kong | 100% |
| Kwong Lee Shun Trading Company Limited ("KLS") | Hong Kong | 100% |
| Dongguan Wing Shing Electrical Products Factory Company Limited ("DWS") | China | 100% |
| Wing Shing Products (BVI) Company Limited ("WSPBVI") | British Virgin Islands | 100% |
| Wing Shing Overseas Limited ("WSO") | British Virgin Islands | 100% |
| Wing Shing Marketing Limited ("WSML") | British Virgin Islands | 100% |

As of March 31, 1996, Global-Tech had a 100% equity interest in Wing Shing Products Company Limited ("WSPL"), a company incorporated in Hong Kong, which owns the Company's Hong Kong office facilities. On July 11, 1996, WSPL converted all of its outstanding ordinary shares, all of which were owned by Global-Tech, into 100 non-voting deferred shares with an aggregate value of $12,910. WSPL then issued 100 new ordinary shares to members of the family who control Global-Tech's principal stockholder. As a result of the above share restructuring, Global-Tech no longer holds any significant interest in WSPL. The net assets of WSPL, which amounted to $2,679,877 at July 11, 1996, were effectively transferred to members of such family. The transfer of such amount was charged to retained earnings. The operating results of WSPL were not material to the consolidated results of operations.

During the year ended March 31, 1997, the Company formed a majority-owned marketing subsidiary to assist with marketing of products to certain United States customers. Global-Tech owned 51.5% of the outstanding shares and the remaining shares were owned by two minority shareholders. During fiscal 1997, the subsidiary incurred a loss. The Company recorded the entire loss, including the portion applicable to the minority interest, in the accompanying financial statements. On November 1, 1997, the Company purchased the interest of the subsidiary's minority shareholders for $360,000. The Company recorded as a charge to earnings provisions of $782,000 and $511,000 against advances made to a former minority shareholder and his affiliates, in the Company's financial statements for the years ended March 31, 1997 and 1998, respectively.

BG 0680

3.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

a.    **Basis of consolidation**

   The consolidated financial statements include the financial statements of Global-Tech and its subsidiaries.  All significant intercompany balances and transactions have been eliminated on consolidation.

b.    **Subsidiaries**

   A company is a subsidiary if more than 50% of the issued voting capital is held long-term directly or indirectly.

c.    **Sales**

   Sales represent the gross invoiced sales, net of discounts and returns, and are recognized when goods are shipped and title has passed.

d.    **Advertising costs**

   Advertising costs represent costs relating to promotional activities intended to stimulate, directly or indirectly, a customer's purchase of goods, and are charged to expenses as incurred.

e.    **Foreign currencies**

   The Company considers the U.S. dollar as its functional currency, as most of the Company's business activities are denominated in U.S. dollars.  (Note: The Hong Kong dollar is pegged to the United States dollar at the exchange rate of $1 to HK$7.8).

   Individual companies within the Company maintain their books and records in their respective currencies.  In the financial statements of the individual companies, transactions in other currencies during the year are translated into the respective currencies at exchange rates in effect at the time of the transactions.  Monetary assets and liabilities denominated in other currencies at any balance sheet date are remeasured into the functional currency at the rates of exchange in effect at such balance sheet date.  Non-monetary assets and liabilities, income and expenses denominated in other currencies are remeasured into the functional currency at the rates of exchange in effect at the time of the transactions.  Aggregate gains and losses from the remeasurement into the functional currency, which were insignificant, were included in the results of operations.

f.    **Income taxes**

   The Company accounts for income tax under the provisions of Statement of Financial Accounting Standards No. 109, which requires recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns.  Deferred income taxes are provided using the liability method.  Under the liability method, deferred income taxes are recognized for all significant temporary differences between the tax and financial statement bases of assets and liabilities.

g.    **Inventories**

   Inventories are stated at the lower of cost and net realizable value.  Cost, calculated on the first-in first-out basis, comprises materials and, where applicable, direct labor and an appropriate proportion of production overhead expenditure.  Net realizable value is determined on the basis of estimated selling prices, less further costs expected to be incurred to completion and direct selling and distribution expenses.  Provision is made for obsolete, slow-moving or defective items where considered appropriate by management.

BG 0681

23

**3.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES  (Cont'd)**

**h.   Property, plant and equipment**

Property, plant and equipment, other than freehold land, are stated at cost less accumulated depreciation.  Gains or losses on disposals are reflected in current operations.  Depreciation is calculated on the straight-line or reducing balance basis at annual rates estimated to write off the cost of each asset over its expected useful life.  The annual rates are as follows:

|  | Annual rate | Method |
|---|---|---|
| Land use rights | Over the business licence period | Straight-line |
| Leasehold improvements and buildings | Over the remaining lease term | Straight-line |
| Plant and machinery | 15%-30% | Reducing balance |
| Molds | 20% | Straight-line |
| Motor vehicles | 15%-20% | Straight-line |
| Furniture, fixtures and equipment | 15% | Straight-line |

The Company recognizes an impairment loss on a fixed asset when evidence, such as the sum of expected future cash flows (undiscounted and without interest charges), indicates that future operations will not produce sufficient revenue to cover the related future costs, including depreciation, and when the carrying amount of the asset cannot be realized through sale.  Measurement of the impairment loss is based on the fair value of the assets.

The Company's manufacturing plants are located in China.  The Company has acquired from the relevant local authorities in China certain land use rights for an amount of $2,987,351.  As of March 31, 1997 and 1998, the balance of the land use rights payable to the local authorities amounted to $1,248,117 and $719,416, respectively.  Such amounts do not bear interest.  The cost of the land use rights is amortized on a straight-line basis over the period of the business license of DWS, which is 30 years from 1993.

Maintenance and repairs are charged to expense as incurred; improvements are capitalized.

**i.   Patents**

Patents are stated at the historical cost incurred by a shareholder, who transferred the patents to the Company, and are amortized on a straight-line basis over the expected future economic lives ranging from 11 to 20 years.  See Notes 6 (d) and 9.

**j.   Operating leases**

Leases where substantially all the rewards and risks of ownership remain with the lessor are accounted for as operating leases.  Rental payments under operating leases are charged to the statements of income on a straight-line basis over the period of the relevant leases.

**k.   Use of estimates**

The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions.  These estimates and assumptions affect the reported amounts of assets and liabilities, the disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period.  Actual results could differ from those estimates.

BG 0682

24

3.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES  (Cont'd)

l.   **Net income per share**

The computation of net income per share is based on the weighted average number of shares of common stock outstanding, on the basis that the Share Split and the Issuance (see Note 1) had been consummated prior to the years presented, in accordance with SFAS No. 128.  Diluted net income per share is not presented because the effect of the assumed exercise of stock options is not material.  The Company will continue to follow the provisions of APB Opinion No. 25 to account for stock options but will provide the pro forma disclosures required by SFAS No. 123.

4.   **RESTRICTED CASH**

As of March 31, 1997 and 1998, cash deposits of approximately $516,000 and $880,000, respectively, were pledged to banks to secure certain banking facilities of the Company.

5.   **ACCOUNTS RECEIVABLE, NET**

|  | 1997 | 1998 |
|---|---|---|
| Trade receivables | $4,083,629 | $4,056,256 |
| Less: Allowance for doubtful accounts | 6,112 | 208,992 |
| Accounts receivable, net | $4,077,517 | $3,847,264 |

BG 0683

## 6.   RELATED PARTY TRANSACTIONS

A related party is essentially any party that controls or can significantly influence the management or operating policies of the Company to the extent that the Company may be prevented from fully pursuing its own interests. Such parties would include affiliates, investors accounted for by the equity method, trusts for the benefit of employees, principal shareholders, management, and immediate family members of shareholders or management.

The Company had the following transactions and balances with related parties:

a.   The balances with directors and related companies are unsecured, interest free and have no fixed repayment terms, except as disclosed below in paragraph d.

b.   Certain directors, a shareholder and a related company have pledged their personal assets to banks to secure banking facilities of the Company.

c.   Certain directors also provided guarantees to banks to secure banking facilities of the Company.

d.   During the years ended March 31, 1997 and 1998, the Company purchased patents on various household products for total consideration of $998,399 and $225,076, respectively, from a shareholder who is also a director of the Company. As of March 31, 1998, such amounts were paid in full. The excess of the purchase price over the historical cost was charged to retained earnings.

e.   During the years ended March 31, 1996, 1997 and 1998, the Company paid annual real estate rental expenses of approximately $184,000, $184,000 and $203,000, respectively, to a related company.

f.   During the year ended March 31, 1996, the Company paid annual management and accounting fees of approximately $282,000 to a related company. Thereafter, such management and accounting functions have been performed by the Company.

g.   During the years ended March 31, 1996, 1997 and 1998, sales to related companies amounted to approximately $588,000, $184,000 and $508,000, respectively.

BG 0684

## 7.   INVENTORIES

|  | 1997 | 1998 |
|---|---|---|
| Raw materials | $  12,788,684 | $  15,189,887 |
| Work-in-progress | 3,776,184 | 3,411,334 |
| Finished goods | 3,457,416 | 3,198,796 |
|  | $  20,022,284 | $  21,800,017 |

## 8.   PROPERTY, PLANT AND EQUIPMENT

|  | 1997 | 1998 |
|---|---|---|
| Leasehold improvements and buildings | $  7,930,573 | $  8,621,359 |
| Land use rights | 2,987,351 | 2,987,351 |
| Plant and machinery | 6,069,888 | 10,085,064 |
| Molds | 3,541,709 | 5,641,431 |
| Motor vehicles | 243,371 | 243,371 |
| Furniture, fixtures and equipment | 1,593,156 | 2,296,895 |
|  | 22,366,048 | 29,875,471 |
| Less: Accumulated depreciation | 4,091,656 | 6,892,172 |
|  | $  18,274,392 | $  22,983,299 |

## 9.   PATENTS

|  | 1997 | 1998 |
|---|---|---|
| Cost | $  998,399 | $  1,223,475 |
| Less: Excess of purchase price over the historical cost to a shareholder charged to retained earnings | 982,908 | 1,204,111 |
|  | 15,491 | 19,364 |
| Less: Accumulated amortization | 1,032 | 2,323 |
|  | $  14,459 | $  17,041 |

BG 0685

## 10.   SHORT-TERM BANK BORROWINGS

|  | 1997 | 1998 |
|---|---|---|
| Bank overdrafts | $     703,899 | $     1,450,101 |
| Short-term bank loans | 10,749,825 | 12,045,595 |
|  | $   11,453,724 | $   13,495,696 |

As of March 31, 1997 and 1998, the Company had banking facilities of approximately $30,878,000 and $39,937,000, respectively, for bank loans, overdrafts, guarantees and forward exchange contracts, of which approximately $14,987,000 and $16,527,000, respectively, had been utilized.  The banking facilities were secured by several properties owned by the Company, a director, a shareholder and a related company, personal guarantees from the directors, pledged deposits offered by a subsidiary and a director, and corporate guarantees from the Company and a subsidiary.

Short-term bank borrowings are denominated in Hong Kong dollars and bear interest at the floating commercial bank lending rates in Hong Kong, which ranged from 8.75% to 9.5% per annum as of March 31, 1997 and from 9.0% to 11.25% per annum as of March 31, 1998.  They are drawn for working capital purposes and are renewable annually with the consent of the relevant banks.

In October 1997, the Company entered into an agreement with a principal bank lender in which the Company agreed to maintain its consolidated shareholders' equity at not less than $25.8 million as of March 31, 1998 and not to distribute dividends in excess of 50% of the Company's consolidated net income commencing in fiscal 1997.

## 11.   LONG-TERM BANK LOANS

|  | 1997 | 1998 |
|---|---|---|
| Secured bank loans | $     927,391 | $     998,045 |
| Less: Amount due within one year included under current liabilities | 591,635 | 544,260 |
|  | $     335,756 | $     453,785 |
| Weighted average interest rate as of the end of the year | 10.11% | 12.02% |

Aggregate maturities of long-term bank loans are as follows:

|  | 1998 |
|---|---|
| Payable during the following period: |  |
| Within one year | $     544,260 |
| Over one year but not exceeding two years | 349,028 |
| Over two years but not exceeding three years | 104,757 |
|  | $     998,045 |

BG 0686

## 12.  INCOME TAXES

Global-Tech and its subsidiaries are subject to income taxes on an entity basis on income arising in or derived from the tax jurisdiction in which they are domiciled or deemed to operate.

Entities subject to Hong Kong profits tax are taxed at a rate of 16.5% on their assessable income.  Entities subject to United States federal income tax are taxed at a rate of up to 35% of their assessable income.  In addition, after tax U.S. effectively-connected earnings would be subject to a U.S. federal withholding equivalent tax (branch profits tax) at a rate of 30%.  The combined impact of these taxes creates a U.S. federal effective tax rate of up to 55% on income effectively connected with the conduct of a U.S. trade or business.

The subsidiary established in China (DWS) is subject to China income tax at a rate of 27% (24% reduced tax rate and 3% local income tax rate, in the open coastal areas of China).  Current income tax is computed based on the taxable income as reported in the statutory financial statements prepared under China accounting regulations.  DWS is exempted from income tax for two years starting from the first profitable year (after utilizing any accumulated tax loss carry forwards) followed by a 50% exemption for the next three years.  For tax purposes, DWS has not recognized its first profitable year.

| Income tax (credit) expense comprised: | 1996 | 1997 | 1998 |
|---|---|---|---|
| Reversal of income taxes payable | $ (205.723) | $ - | $ - |
| Provision of income taxes- current | 16.654 | 406.418 | 1.452.532 |
| Provision of income taxes- deferred | 20.656 | - | ! - |
| | $ (168.413) | $ 406.418 | $ 1.452.532 |

The reconciliation of the Hong Kong income tax rate to the effective income tax rate based on income before income taxes stated in the consolidated statements of income is as follows:

| | 1996 | 1997 | 1998 |
|---|---|---|---|
| Hong Kong income tax rate | 16.5% | 16.5% | 16.5% |
| Income subject to United States tax | - | - | 2.4% |
| Non-taxable income arising from activities which qualified as off-shore | (15.3%) | (9.1%) | (8.3%) |
| Overprovision in prior years | (4.8%) | - | - |
| Effective income tax rate | (3.6%) | 7.4% | 10.6% |

Deferred income taxes as of March 31, 1997 and 1998 comprised the following timing differences:

| | 1997 | 1998 |
|---|---|---|
| Timing differences related to fixed assets | $ 395.209 | $ 401.140 |
| Operating loss carry forwards | 1.040.370 | - |
| Less: valuation allowances | (1.414.923) | (380.484) |
| | $ 20.656 | $ 20.656 |

Valuation allowances have been established for substantially all deferred tax assets due to the uncertain realization of such assets.

BG 0687

## 13.   DESIGN AND DEVELOPMENT COSTS

Included in selling, general and administrative expenses were design and development costs of approximately $914,000, $1,310,000 and $1,601,000 for the years ended March 31, 1996, 1997 and 1998, respectively.

## 14.   COMMITMENTS

### a.   Capital Commitments

As of March 31, 1998, the Company had capital commitments amounting to approximately $10.8 million in respect of construction of factories and staff quarters and acquisition of manufacturing machinery in China.

### b.   Operating Lease Commitments

The Company has various operating lease agreements for parking lots, motor vehicles, equipment and real estate which extend through May 2002.  Rental expenses for the years ended March 31, 1996, 1997 and 1998 were approximately $59,000, $245,000 and $331,000, respectively.  Future minimum rental payments as of March 31, 1998 are as follows:

|  | 1998 |
|---|---|
| Payable during the following period: |  |
| Within one year | $    230,000 |
| Over one year but not exceeding two years | 5,000 |
| Over two years but not exceeding three years | 4,000 |
| Over three years but not exceeding four years | 1,000 |
|  | $    240,000 |

### c.   Commission Agreement

The Company entered into a commission agreement with one of the former minority shareholders of a subsidiary to compensate him for his prior services and provide for the repayment of the $1,249,000 in advances (the "Debt").  The commission agreement provides that, for the period from January 1, 1998 through October 31, 2001, net sales of certain products previously marketed by the subsidiary will be subject to a 3% commission.  The former minority shareholder will receive $50,000 per month from January 1998 through June 1999.  Any commissions earned in excess of $50,000 per month will be applied to reduce the Debt.  If commissions earned are less than $50,000 per month, such deficiency will be added to the Debt.  Commissions will be applied equally each month from July 1999 through the end of the term of the commission agreement in October 2001 to reduce the Debt.  Any portion of the Debt remaining outstanding at the end of the term of the commission agreement is required to be repaid by the former minority shareholder at that time.

BG 0688

## 15.   CONTINGENT LIABILITIES

As of March 31, 1997 and 1998, the Company had contingent liabilities with respect to discounted bills with recourse amounting to approximately $1,574,000 and $3,878,000, respectively.

As of March 31, 1997 and 1998, the Company had outstanding letters of credit amounting to approximately $2,606,000 and $2,033,000, respectively.

On November 20, 1995, Rival Company ("Rival") filed suit against Sunbeam Products Inc. (formerly known as Sunbeam-Oster Household, "Sunbeam") in the U.S. District Court for the Western District of Missouri. Western Division, alleging that certain features of food steamers which the Company manufactures for Sunbeam infringe a U.S. patent held by Rival. On December 8, 1997, the court granted a judgement in favor of Sunbeam. The judgement was thereafter appealed by Rival to the Federal Circuit Court of Appeals. The case has been briefed by the parties and is now pending before the Court.

On December 21, 1995, Black & Decker Inc. ("B&D") filed suit against Sunbeam in the U.S. District Court for the Northern District of Illinois for patent infringement. B&D alleges that Sunbeam infringed a patent assigned to B&D which covers certain features of food steamers manufactured by the Company and seeks unspecified money damages and injunctive relief.

Although the Company is not a party to these actions, pursuant to agreements between the Company and Sunbeam, the Company is obligated to hold harmless, defend and indemnify Sunbeam for any losses and legal fees it may sustain as a result of these actions.

After considering all facts known to the Company and advice from its attorneys, the Company believes that these actions will not have a material adverse effect on its business, financial condition or results of operations.

Included in "Accrued expenses" as of March 31, 1998, was a provision of legal fees of approximately $672,000 in relation to the above two cases.


## 16.   EMPLOYEE BENEFITS

### a.   Retirement Fund

The Company has arranged a defined contribution retirement plan for all eligible employees of the Company under which the Company and the employees each contribute 5% of the employees' basic salary. The plan is administered and funded by an independent trustee. Salaried employees are eligible to participate on the first day of the month coincident with or immediately following the date on which they have completed the probationary period, provided they are employed on a full-time basis. Part-time employees are not eligible for the plan. The costs of this plan recognized during the years ended March 31, 1996, 1997 and 1998 were $57,397, $62,427 and $87,299, respectively. The Company has no other post-retirement or post-employment benefit plans.

### b.   Other Benefits

The Company provides housing, medical care and subsidized meals to all factory employees. The aggregate amounts incurred by the Company for such benefits were approximately $145,000, $229,000 and $553,000 during the years ended March 31, 1996, 1997 and 1998, respectively.

BG 0689

17. **SEGMENT INFORMATION**

a. **The Company belongs to a single industry, namely, manufacturing and trading of small household appliances.**

b. **Analysis of sales**

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Export sales |  |  |  |
| Australia | $ 153,907 | $ 338,625 | $ 2,100,375 |
| Europe | 13,927,510 | 14,544,052 | 28,470,871 |
| North America | 28,669,539 | 47,076,426 | 83,752,910 |
| Total export sales | 42,750,956 | 61,959,103 | 114,324,156 |
| Total domestic sales | 1,331,661 | 739,743 | 4,011,799 |
|  | $ 44,082,617 | $ 62,698,846 | $ 118,335,955 |

c. Customers representing 10% or more of total revenues are as follows:

|  | 1996 % | 1997 % | 1998 % |
|---|---|---|---|
| Sunbeam Products Inc. (formerly known as Sunbeam-Oster Household) | 17 | 13 | 39 |
| Appliance Corporation of America (Welbilt) | - | 12 | 4 |
| Helen of Troy Limited | 15 | 11 | 6 |
| Hamilton Beach/Proctor-Silex, Inc. | 19 | 8 | 5 |

Pursuant to a product supply agreement dated July 1, 1997 between the Company and one of the major customers listed above, the Company is the sole supplier of certain products to such customer for the period from July 1, 1997 to June 30, 2001. As consideration for entering into this exclusive supply agreement, the Company paid an incentive fee of $1,000,000 to the customer during the year ended March 31, 1998. Such fee is included in "Deposits, prepayments and other assets" and is being charged to income on a straight-line basis over two years. As of March 31, 1998, the unamortized amount of $624,766 was included under "Deposits, prepayments and other assets".

18. **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION**

Cash paid for interest and income taxes comprised:

|  | 1996 | 1997 | 1998 |
|---|---|---|---|
| Interest paid | $ 695,932 | $ 367,492 | $ 1,397,583 |
| Income taxes paid | 56,441 | 43,229 | 10,623 |
| Income taxes refunded | (183,869) |  |  |

BG 0690

## 19.   RISK CONSIDERATIONS

The Company's operations are conducted in Hong Kong and China. As a result, the Company's business, financial condition and results of operations may be influenced by the political, economic and legal environments in Hong Kong and China, and by the general state of the Hong Kong and China economies.

On July 1, 1997, the sovereignty over Hong Kong was transferred from the United Kingdom to China, and Hong Kong became a Special Administrative Region of China ("SAR"). As provided in the Sino-British Joint Declaration relating to Hong Kong and the Basic Law of the Hong Kong SAR of the People's Republic of China. Hong Kong will have full economic autonomy and its own legislative, legal and judicial systems for fifty years from 1997. The Company's management does not believe that the transfer of sovereignty over Hong Kong will have an adverse impact on the Company's financial and operating environment. There can be no assurance, however, that changes in political or other conditions will not result in such an adverse impact.

As substantially all of the Company's manufacturing operations are conducted in China, the Company is subject to different considerations and other risks not typically associated with companies in North America and Western Europe. These include risks associated with, among others, the political, economic and legal environments and foreign currency exchange. The Company's results may be adversely affected by changes in the political and social conditions in China, and by changes in governmental policies with respect to laws and regulations, anti-inflationary measures, currency conversion and remittance abroad, and rates and methods of taxation, among other things.

## 20.   FINANCIAL INSTRUMENTS

The carrying amounts of the Company's cash and accounts receivable approximate their fair values because of the short maturity of those instruments. The carrying amounts of the bank loans approximate their fair values based on borrowing rates currently available for bank loans with similar terms and maturities.

## 21.   STOCK OPTION PLAN

In September 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (as amended, the "Plan"). The Plan provides for the grant of (i) options that are intended to qualify as incentive stock options ("Incentive Stock Options") within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") to employees and (ii) options not intended to qualify as Incentive Stock Options to employees and consultants. The total number of shares of Common Stock for which options may be granted under the Plan is 1,600,000 shares. The Company granted options to purchase (i) 322,000 shares of Common Stock to employees and a consultant in accordance with the terms of the Plan, with an exercise price of $14.50 per share in September 1997 and (ii) 279,500 shares to employees and consultants with an exercise price equal to the initial public offering price of the Company's shares in March 1998. The options vest over varying periods of up to five years and are all exercisable for a period of ten years from the date of grant.

The Plan is administered by the Board of Directors or a committee of outside directors appointed by the Board of Directors, which will determine the terms of options, including the exercise price, the number of shares subject to the option and the terms and conditions of exercise. No option granted under the Plan is transferable by the optionee other than by will or the laws of descent and distribution and each option is exercisable during the lifetime of the optionee only by such optionee. The exercise price of all Incentive Stock Options granted under the Plan must be at least equal to the fair market value of such shares on the date of grant. With respect to any participant who owns (or is deemed to own) stock possessing more than 10% of the voting rights of the Company's outstanding capital stock, the exercise price of any Incentive Stock Option must be not less than 110% of the fair market value on the date of grant. The term of each option granted pursuant to the Plan may be established by the Board of Directors, or a committee of the Board of Directors, in its sole discretion; provided, however, that the maximum term of each Incentive Stock Option granted pursuant to the Plan is 10 years. With respect to any Incentive Stock Option granted to a participant who owns (or is deemed to own) stock possessing more than 10% of the total combined voting power of all classes of the Company's outstanding capital stock, the maximum term is five years.

BG 0691

## 22.   NEWLY ISSUED ACCOUNTING STANDARD

In 1997, the Financial Accounting Standards Board issued Statement of Financial Accounting Standards SFAS No. 130, "Comprehensive Income." This statement will be adopted by the Company in connection with its consolidated financial statements for the year ending March 31, 1999. The adoption of this standard will not have a material effect on the Company's consolidated financial statements.

## 23.   SUBSEQUENT EVENTS

Subsequent to March 31, 1998, the following major events occurred:

a.   In April 1998, the Company issued 4,200,000 shares of common stock, par value $0.01 each, for cash consideration of $19 per share or total gross proceeds of $79,800,000 through a public offering, and raised net proceeds of approximately $70,672,000 after deducting underwriting discount and stock issuance costs.

b.   In May 1998, following the initial public offering of the Company's common stock, the Company repaid $5,280,000 of its borrowings under a revolving credit facility using proceeds from the offering.

c.   In May 1998, the Company further issued 630,000 shares of common stock, par value $0.01 each, for cash consideration of $19 per share pursuant to an over-allotment option granted to the underwriters, and raised net proceeds of approximately $11,132,000 after deducting underwriting discount.

d.   In May 1998, the Company entered into a two-year agreement with the Sharper Image Corporation for the exclusive introduction, marketing, and distribution of a hand-held steam vacuum cleaner developed and patented by the Company.

## 24.   PRO FORMA ADJUSTED NET INCOME PER SHARE

Based on the net offering proceeds of $16.83 per share, the pro forma adjusted net income per share for the year ended March 31, 1998 is $1.70. This is computed on the basis of issuing 313,725 shares to retire short-term bank borrowings of $5,280,000 as discussed in note 23 above.

BG 0692

# SHAREHOLDER INFORMATION:

**BOARD OF DIRECTORS**

Kwong Ho Sham
Chairman of the Board

John C.K. Sham
President, Chief Executive Officer and
Chief Financial Officer

Brian Yuen
Chairman of the Finance Committee
Chief Executive Officer, Global-Tech USA, Inc.

Mark S. Hirsch
Director
Partner, Parker Chapin Flattau & Klimpl, LLP

Peter C. McC. Howell
Director
Former Chairman and Chief Executive Officer,
Signature Brands USA, Inc.

Shun Chi Hui
Director

Wai Chun Hui
Director

**OFFICERS**

Kwong Ho Sham
Chairman of the Board

John C.K. Sham
President, Chief Executive Officer and
Chief Financial Officer

Brian Yuen
Chairman of the Finance Committee
Chief Executive Officer, Global-Tech USA, Inc.

Pui Lam Fan
Director of Engineering

Wing-On Lo
Director of Manufacturing Operations

Neil L. Bailey
Director of Sales, Marketing and Special Projects

Wa Yuen Tai
Director of International Sales and Marketing

Ray Freeman Huen
Director of Sales and Marketing—Asia

BG 0693

REGISTRAR AND TRANSFER AGENT

American Stock Transfer & Trust Company
40 Wall Street
New York. New York 10006
212-936-5100

INDEPENDENT ACCOUNTANTS

Arthur Andersen & Co.
Certified Public Accountants
Hong Kong

LEGAL COUNSEL

Parker Chapin Flattau & Klimpl. LLP
New York. New York

1998 ANNUAL MEETING OF SHAREHOLDERS

March 11. 1999 at 10:30 A.M.
Aberdeen Marina Club
8 Shum Wan Road.
Aberdeen. Hong Kong

STOCK WATCH

Global-Tech's ordinary shares are traded on the New York Stock Exchange ("NYSE") under the symbol GAI. The usual stock table abbreviation is GlbTApp.

From the commencement of trading on April 8. 1998 through May 31. 1998, the high and low last reported sale prices for the Company's ordinary shares listed on NYSE were $21 and $17¼, respectively.

AVAILABILITY OF ADDITIONAL INFORMATION

This publication is a summary annual report. A copy of the Company's annual report on Form 20-F and quarterly reports will be furnished without charge upon request to any shareholder. Please send requests to:

Brian Yuen
Global-Tech USA. Inc.
244 Fifth Avenue
Suite 2342
New York. New York 10001

For further information on the Company. products and markets, call 212-683-3320.

BG 0694

36





# GLOBAL-TECH
## APPLIANCES INC.

**1999 ANNUAL REPORT**

BG 0588

BG 0589



# GLOBAL-TECH APPLIANCES INC.
# AND SUBSIDIARIES

# AUDITED FINANCIAL STATEMENTS

### AS OF MARCH 31, 1998 AND 1999
### AND FOR THE YEARS ENDED MARCH 31, 1997,
### 1998 AND 1999

BG 0590

# GLOBAL-TECH
## APPLIANCES INC.

# LETTER TO OUR SHAREHOLDERS

Fiscal 1999 was a challenge. For the fiscal year ended March 31, 1999, net sales declined to $84.1 million from $118.3 million in fiscal 1998. Net income for fiscal 1999 declined to $7.9 million ($0.65 per share) from $13.7 million in fiscal 1998.

As we started the year with a successful initial public offering, a factory expansion well under way and a substantial forecast from our largest customer, we had every reason to believe that our growth would continue. Unfortunately, that customer had a change in management and subsequently a change in strategic direction. This not only lead to a significant shortfall in sales, but also a delay for one year in the introduction of many of our new products that had been reserved for them. Despite the pressure and disappointment, the business was managed professionally and performed well under the circumstances. A new business plan was developed, costs and investments were managed, and the end result was that the Company continued to be profitable and nearly all of the cash it raised was preserved for future growth.

One of the key components of our new business plan was the re-evaluation of our original design manufacturing emphasis. While patented products can be developed independently of a committed customer, inputs from customers close to the market can greatly increase a product's marketability during the development stage. Cooperative efforts with key customers enhance product designs and increase the likelihood that new products will gain market acceptance. The Company has initiated this cooperative development process with a number of key customers to date and the outlook is promising.

Another change that impacted our business and that we needed to address is the continuing consolidation of our customer base, particularly in the U.S. To the extent that the acquiring company owns its own manufacturing facility (particularly in China) or has a different procurement philosophy with respect to quality and innovation, our potential customer base will be affected. This occurred in the Black & Decker, Toastmaster and Rival acquisitions last year. With a broader product line, our customer base is still expanding, but the Company plans to establish joint ventures or further solidify partnerships with a number of its key customers to ensure more consistent growth in the future.

BG 0591

# TABLE OF CONTENTS

LETTER TO OUR SHAREHOLDERS .......................................... 1-2
CORPORATE PROFILE ....................................................... 3
BUSINESS HIGHLIGHTS .................................................... 4-5
FINANCIAL HIGHLIGHTS ................................................... 6-7
MANAGEMENT'S DISCUSSION AND ANALYSIS ............................. 8-9
RESULTS OF OPERATIONS ................................................. 10
FISCAL YEAR ENDED MARCH 31, 1998 COMPARED WITH
     FISCAL YEAR ENDED MARCH 31, 1999 ............................... 11-12
FISCAL YEAR ENDED MARCH 31, 1997 COMPARED WITH
     FISCAL YEAR ENDED MARCH 31, 1998 ............................... 13-14
QUARTERLY RESULTS AND SEASONALITY ................................. 15
LIQUIDITY AND CAPITAL RESOURCES ..................................... 16-18
FOREIGN ISSUE CONSIDERATIONS ........................................ 19-21
REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS ....................... 22
CONSOLIDATED STATEMENTS OF INCOME .............................. 23
CONSOLIDATED BALANCE SHEETS ....................................... 24
CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY ... 25-26
CONSOLIDATED STATEMENTS OF CASH FLOWS ........................... 27-28
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS ..................... 29-45
SHAREHOLDER INFORMATION ............................................ 46





BG 0592

# GLOBAL-TECH
## APPLIANCES INC.

The Company has some very significant assets to build on as it charts its future. With over $60 million in net cash on hand, it has the resources to invest in equipment, product development, new technologies or acquisitions. Our state-of-the-art U.S.-style manufacturing facility in Dongguan, China is structurally completed and has over 1.8 million square feet of manufacturing space. With additional equipment, the facility can support and accommodate tripling our current business. The Company is now ISO9002 certified to produce products of the highest quality standards in the industry and has an approved Underwriters Lab in its facility. The Company has also registered twenty-eight patents and nine are pending. This is a testament to our innovative capabilities.

At the end of the day, new products that become "hits" make the difference. The Company has developed a number of key products, each of which could be a major success if promoted effectively by the Company or its customers. Most of these products will not impact fiscal 2000 significantly, but should generate additional revenues in the following years.

We continue to believe that the Company has many growth opportunities and are committed and determined to maximize our return on assets and build long-term value for all of our shareholders. We plan to put the Company's cash resources to work by continuing to explore opportunities with long-term shareholder benefits.

We appreciate the support and patience of our shareholders and the continuing efforts of all of our employees in their dedication to achieving our short- and long-term goals and objectives.


## JOHN C.K. SHAM
President and Chief Executive Officer

December 31, 1999

Kin Teck Industrial Building
12/F, 26 Wong Chuk Hang Road
Aberdeen, Hong Kong
Tel. (852) 2814-0601
Fax. (852) 2873-0591

2

BG 0593

# CORPORATE PROFILE

Global-Tech Appliances Inc. is a designer and manufacturer of a wide range of small household appliances. Our products, all of which are manufactured in China, are sold under brand names such as Black & Decker®, Hamilton Beach®, Krups®, Morphy Richards®, Moulinex®, Mr. Coffee®, Proctor-Silex®, Regal®, Remington®, Sunbeam® and Vidal Sassoon®.

Our business strategy is to achieve growth, market share gains and increased profitability by helping our customers meet the stringent requirements of mass merchandisers and major retailers. The key elements of our business strategy include the design and development of innovative products, the production of high quality, low cost products in an efficient and timely manner and the focus on sales to brand name customers.

We are well positioned to take advantage of the accelerating trend of offshore purchasing and continuing customer consolidation and possesses a competitive advantage in our ability to manufacture innovative products based on our design and development capability, the quality and price of our products and our broad product line.

*3*

BG 0594

# BUSINESS HIGHLIGHTS

Global-Tech is a leading designer of over 160 different models of small household appliances, primarily in six categories:

- · Kitchen appliances such as coffeemakers, breadmakers and food processors;
- · Personal, beauty and health care products such as hair dryers and hair setters;
- · Garment care products such as steam and dry irons;
- · Travel products and accessories such as travel irons and garment steam brushes;
- · Floor care products such as hand-held steam vacuum cleaners; and
- · Environmental care products such as humidifiers and air cleaners.

Our initial business was the sale of personal care products but our emphasis shifted to kitchen appliances six years ago. Additionally, our garment care and floor care businesses have grown recently and are expected to be more significant in the future. We continue to develop our environmental care products.

Key products that we have developed since 1996 include food steamers, breadmakers, curling irons, deep fryers, rice cookers and ice cream makers. During the current fiscal year, we have introduced new models of breadmakers, coffee makers, hair setters, hand-held vacuum cleaners, ice cream makers, indoor grills, steam station irons and toaster ovens. Additional products in each of the six product categories are currently under development.

Net sales of kitchen appliances represented 75.5% of our net sales compared to 78.2% in the prior year. Personal, beauty and health care product sales were 7.1% of our net sales compared to 10.3% in the prior year. Garment care products increased to 8.8% of our net sales from 3.9% in the prior year. Travel products and accessories represented 4.7% of our net sales as compared to 5.6% in the prior year. Floor care products, which were not material prior to 1998, constituted 2.2% of our net sales.

BG 0595

Net sales to North America and Europe represented 60.0% and 33.7%, respectively, of total sales in fiscal 1999 as compared to 70.8% and 24.1%, respectively, in the prior year. ODM products represented 86.0% of sales in fiscal 1999 as compared to 85.5% in the prior year. In fiscal 1999, Global-Tech produced approximately 6.1 million units.

The following table sets forth the net sales of each of Global-Tech's product categories in fiscal 1997, 1998 and 1999:

| | | | Fiscal Years Ended March 31, | | | |
|---|---|---|---|---|---|---|
| **Product Category:** | | 1997 | | 1998 | | 1999 |
| | | | | (in thousands) | | |
| Kitchen appliances | $ | 41,451 | $ | 92,578 | $ | 63,468 |
| Personal, beauty and health care products | | 8,946 | | 12,182 | | 5,962 |
| Garment care products | | 4,936 | | 4,607 | | 7,366 |
| Travel products and accessories | | 7,104 | | 6,671 | | 3,981 |
| Floor care products | | - | | - | | 1,834 |
| Other(1) | | 262 | | 2298 | | 1,459 |
| Total | $ | 62,699 | $ | 118,336 | $ | 84,070 |

(1)      Includes environmental care products and accessories for each of our product categories.

# FINANCIAL HIGHLIGHTS

The selected consolidated income statement data for the fiscal years ended March 31, 1997, 1998 and 1999 and the selected consolidated balance sheet data as of March 31, 1998 and March 31, 1999 set forth below have been prepared in accordance with U.S. generally accepted accounting principles and are derived from our consolidated financial statements and notes thereto included elsewhere in this Annual Report, which have been audited by Arthur Andersen & Co., independent public accountants, whose report thereon is also included elsewhere in this Annual Report. The selected consolidated income statement data for the fiscal year ended March 31, 1995 and 1996 and the selected consolidated balance sheet data as of March 31, 1995, 1996 and 1997 have been prepared in accordance with U.S. GAAP and are derived from the audited financial statements and management accounts of individual companies of Global-Tech not included elsewhere in this Annual Report. The selected consolidated financial data set forth below should be read in conjunction with Management's Discussion and Analysis, the consolidated financial statements and the notes thereto and other financial information which appear elsewhere in this Annual Report.

| Statement of Income Data: | Fiscal Years Ended March 31, | | | | |
|---|---|---|---|---|---|
|  | 1995 | 1996 | 1997 | 1998 | 1999 |
|  | (in thousands, except per share data) | | | | |
| Net sales | $ 31,515 | $ 44,083 | $  62,699 | $ 118,336 | $  84,070 |
| Cost of goods sold | 21,989 | 31,893 | 46,031 | 86,521 | 63,033 |
| Gross profit | 9,526 | 12,190 | 16,668 | 31,815 | 21,037 |
| Selling, general and administrative expenses | 7,129 | 7,155 | 10,378 (1) | 15,476 | 15,650 |
| Operating income | 2,397 | 5,035 | 6,290 | 16,339 | 5,387 |
| Interest expense | 405 | 696 | 867 | 1,398 | 805 |
| Other income, net | 109 | 85 | 94 | 220 | 3,735 |
| Income before income taxes | 2,101 | 4,424 | 5,517 | 15,161 | 8,317 |
| Income taxes (credit) expense | 52 | (168) | 406 | 1,453 | 420 |
| Net income | $ 2,049 | $ 4,592 | $   5,111 (1) | $  13,708 | $   7,897 |
| Net income per share | $ 0.26 | $ 0.57 | $     0.64 | $      1.71 | $     0.65 |
| Weighted average number of shares outstanding | 8,000 | 8,000 | 8,000 | 8,000 | 12,235 |

BG 0597

|                        |   | At March 31, |   |      |   |       |   |       |   |         |
|------------------------|---|--------------|---|------|---|-------|---|-------|---|---------|
|                        |   | 1995         |   | 1996 |   | 1997  |   | 1998  |   | 1999    |
| **Balance Sheet Data:** |   |              |   |      |   |       |   |       |   |         |
|                        |   | (in thousands) |  |    |   |       |   |       |   |         |
| Working capital        | S | (3,754)      | S | (1,012) | S | (1,442) | S | (984) | S | 80,554 |
| Total assets           |   | 29,721       |   | 31,765 |   | 44,400 |   | 60,268 |   | 132,371 |
| Total debt             |   | 5,035        |   | 6,752  |   | 12,381 |   | 14,494 |   | 3,658   |
| Shareholders' equity   |   | 10,453       |   | 15,045 |   | 16,493 |   | 29,980 |   | 113,963 |

(1)    Includes provisions of $782,000 and $511,000 against advances to a former minority
sharholder of a subsidiary of Global-Tech and his affiliates in fiscal 1997 and fiscal 1998,
respectively. See Management's Discussion and Analysis.

BG 0598

# MANAGEMENT'S DISCUSSION AND ANALYSIS

## General

Global-Tech was founded in 1963 and, for most of its history, operated as a contract manufacturer of products developed by its customers. In recent years, however, we have emphasized original design manufacturing. As an ODM, we design and develop proprietary new products which we manufacture for our customers. We made this shift by forming a product design and development team consisting of engineers who focus on the development of new products. Net sales of our ODM products represented 73.6%, 85.5% and 86.0% of our net sales during fiscal 1997, 1998 and 1999, respectively, with the remaining sales generated by our contract manufacturing activities. This change in emphasis from contract manufacturing to original design manufacturing has caused our growth to accelerate over the past three fiscal years.

Gross profit declined in fiscal 1999 as a result of a decrease in net sales. Gross profit as a percentage of net sales ("gross margin") has declined as a result of: (i) a decrease in sales of breadmakers, which have a higher profit per unit and a lower gross margin than our other products; and (ii) a decline in gross margin in existing products over time due to price pressures from mass merchandisers.

During fiscal 1997, Global-Tech formed a majority-owned subsidiary to assist with the marketing of products to certain United States customers. This assistance included customer introductions and facilitating communication with us. As of November 1, 1997, we purchased the interest of the subsidiary's minority shareholders, who were otherwise unaffiliated with us, for $360,000. We recorded as a charge to earnings provisions against advances of $782,000, $511,000 and $0 made to the former minority shareholder and his affiliates for use in such marketing efforts in our financial statements for fiscal 1997, 1998 and 1999, respectively. We entered into a commission agreement with one of the former minority shareholders to compensate him for his prior services and provide for the repayment of the $1,249,000 in advances (the "Debt"). No further services are to be provided by the minority shareholders under this agreement. The commission agreement provides that, for the period from January 1, 1998 through October 31, 2001, net sales of certain products previously marketed by the subsidiary will be subject to a 3% commission. The former minority shareholder will receive $50,000 per month from January 1998 through June 1999. Any commissions earned in excess of $50,000 per month will be applied to reduce the Debt. If commissions earned are less than $50,000 per month, such deficiency will be added to the Debt. Commissions will be applied equally each month from July 1999 through the end of the term of the commission agreement to reduce the Debt. Any portion of the Debt remaining outstanding at the end of the term of the commission agreement must be repaid by the former minority shareholder at that time.

We are not subject to taxation in the British Virgin Islands in accordance with British Virgin Island tax regulations. We are subject to income taxation in each jurisdiction in which our subsidiaries do business. Certain of our profits accrue in areas of China where the effective tax rate is 27%, and in Hong Kong, where the corporate tax rate is 16%, effective April 1, 1998.

BG 0599

8

In Hong Kong, estimated taxes for each fiscal year are paid during the fiscal year based on the our prior year's earnings derived from operations in Hong Kong. An adjustment in the form of additional taxes paid or refunds to us is then made in the following fiscal year based on actual earnings. Therefore in each fiscal year, our statement of income reflects a provision for estimated taxes for the current fiscal year and adjustments for over or under provisions with respect to the prior fiscal year. To the extent that we have income effectively connected with the conduct of a U.S. trade or business in any fiscal year, we would be subject to U.S. federal taxes at an effective rate of up to 55%. We do not believe that our current method of operations would subject us to material U.S. taxes because we should not be considered to have significant income effectively connected with a trade or business in the U.S.

Global-Tech is a holding company and has no business operations other than ownership of its subsidiaries. While we have no intention of paying cash dividends, should we decide to do so, as a holding company, our ability to pay dividends and meet other obligations would depend upon the receipt of dividends or other payments from our operating subsidiaries and our other holdings and investments. In addition, our operating subsidiaries from time to time may be subject to restrictions on their ability to make distributions to us, including as a result of restrictive covenants in loan agreements, restrictions on the conversion of local currency into U.S. dollars or other hard currency and other regulatory restrictions. Restrictions on currency conversion may be in effect from time to time but have not had a material effect on us in the past.

Since most of our purchases and sales are denominated in U.S. dollars, our financial statements are presented in U.S. dollars, our functional currency. Our financial statements are prepared in accordance with U.S. GAAP.

BG 0600

# RESULTS OF OPERATIONS

The following table sets forth certain statement of income data as a percentage of net sales for the periods indicated:

|  | Fiscal Years Ended March 31. | | |
|---|---|---|---|
|  | 1997 | 1998 | 1999 |
| Net sales | 100.0% | 100.0% | 100.0% |
| Cost of goods sold | 73.4 | 73.1 | 75.0 |
| Gross profit | 26.6 | 26.9 | 25.0 |
| Selling, general and administrative expenses | 16.6 | 13.1 | 18.6 |
| Operating income | 10.0 | 13.8 | 6.4 |
| Interest expense and other income, net | 1.2 | 1.0 | 3.5 |
| Income before income taxes | 8.8 | 12.8 | 9.9 |
| Income tax expense | 0.6 | 1.2 | 0.5 |
| Net income | 8.2% | 11.6% | 9.4% |

BG 0601

# FISCAL YEAR ENDED MARCH 31, 1998 COMPARED
# WITH FISCAL YEAR ENDED MARCH 31, 1999

## Net sales.

Global-Tech's net sales consist of its gross invoiced sales less discounts and returns. Net sales in fiscal 1999 decreased approximately 29.0% to $84.1 million from $118.3 million in fiscal 1998. The decrease in net sales was primarily attributable to decreased sales to certain customers, including Sunbeam, due to continued consolidation in the small household appliance industry. Net sales are comprised primarily of sales in Global-Tech's five major product categories: kitchen appliances, personal, beauty and health care products, garment care products, travel products and accessories and floor care products. Sales in each such product category for fiscal 1999 as compared to fiscal 1998 were as follows: sales of kitchen appliances decreased to $63.5 million, or 75.5% of net sales, from $92.6 million, or 78.2% of net sales; sales of personal, beauty and health care products decreased to $6.0 million, or 7.1% of net sales, from $12.2 million, or 10.3% of net sales; sales of garment care products increased to $7.4 million, or 8.8% of net sales, as compared to $4.6 million, or 3.9% of net sales; sales of travel products decreased to $4.0 million, or 4.7% of net sales from $6.7 million, or 5.6% of net sales; and sales of floor care products were $1.8 million, or 2.2% of net sales.

## Gross profit.

Gross profit consists of net sales less cost of goods sold, which includes the costs of raw materials, production materials, labor, transportation, depreciation and factory overhead. Gross profit in fiscal 1999 was $21.0 million, or 25.0% of net sales, as compared to $31.8 million, or 26.9% of net sales, in fiscal 1998. Gross margins in fiscal 1999 decreased due to lower net sales without corresponding decreases in certain fixed expenses.

BG 0602

Selling, general and administrative expenses.

The primary components of Global-Tech's selling. general and administrative expenses ("SG&A") include advertising and promotion. product design and development. transportation of finished goods. salaries for Global-Tech's marketing and administrative personnel. professional fees and utilities. SG&A in fiscal 1999 increased to $15.6 million, or 18.6% of net sales, from $15.4 million, or 13.1% of net sales in fiscal 1998. The increase in SG&A is due to increased salaries and employee housing allowances. marketing expenses. product safety testing fees. agent commissions and management fees, which were offset in part by lower expenses for transportation and certain administrative expenses. SG&A as a percentage of net sales increased for fiscal 1999 due to Global-Tech's spreading its fixed costs over a lower level of net sales. SG&A for fiscal 1998 also includes a provision of $511,000 made against an advance to a former minority shareholder of a subsidiary formed during fiscal 1997 and his affiliates to assist with marketing of products to·certain United States customers. These advances ceased as of November 1997.

The primary components of Global-Tech's design and development expenses ("development expenses") include sample design, patent fees, testing charges, inspection fees and salaries for Global-Tech's engineers and designers. Development expenses in fiscal 1999 were $2.0 million as compared to $1.6 million in fiscal 1998. The increase in development expenses is due to increased sample design fees and product safety testing charges.

## Interest expense and other income (expense), net.

Interest expense consists of interest on Global-Tech's short and long term bank credit facilities. Interest expense was $805,000 in fiscal 1999 as compared to $1.4 million in fiscal 1998. The lower interest expense is due to decreased borrowing requirements. Other income (expense), net includes tooling income. interest income and non-recurring income. Other income (expense), net was $3.7 million in fiscal 1999 as compared to $220,000 in fiscal 1998.

The increase in other income (expense), net is primarily attributable to an increase in interest income in fiscal 1999 as Global-Tech invested the proceeds received from its initial public offering.

## Income tax.

Global-Tech had taxable income in Hong Kong in fiscal 1998 and 1999 and in the United States in fiscal 1998.The financial statements include provisions for Hong Kong profits tax of approximately $420,000 in fiscal 1999. In fiscal 1998 the financial statements included provisions for Hong Kong and United States income and withholding taxes of approximately $440,000. Global-Tech does not believe that its current method of operations would subject it to material U.S. taxes because it should not be considered to have significant income effectively connected with a trade or business in the U.S. No income tax was payable by Global-Tech in China during this period because Global-Tech's subsidiary in China had accumulated tax losses during these periods.

BG 0603

# FISCAL YEAR ENDED MARCH 31, 1997 COMPARED
# WITH FISCAL YEAR ENDED MARCH 31, 1998

### Net sales.

Net sales in fiscal 1998 increased approximately 88.7% to $118.3 million from $62.7 million in fiscal 1997. The increase in net sales was the result of increased net sales of ODM products which represented 85.5% of net sales in fiscal 1998 as compared to 73.6% of net sales in fiscal 1997. The increase in net sales of ODM products was primarily attributable to increased sales of breadmakers, coffeemakers and food steamers and the introduction of deep fryers.

Sales in each major product category for fiscal 1998 as compared to fiscal 1997 were as follows: sales of kitchen appliances increased to $92.6 million, or 78.2% of net sales, from $41.5 million, or 66.1% of net sales; sales of personal, beauty and health care products increased to $12.2 million, or 10.3% of net sales, from $8.9 million, or 14.3 % of net sales; sales of garment care products decreased to $4.6 million, or 3.9% of net sales, as compared to $4.9 million, or 7.9% of net sales; and sales of travel products decreased to $6.7 million, or 5.6% of net sales, from $7.1 million, or 11.3% of net sales.

### Gross profit.

Gross profit in fiscal 1998 was $31.8 million, or 26.9% of net sales, as compared to $16.7 million, or 26.6% of net sales, in fiscal 1997. Gross margins in fiscal 1998 increased due to greater in-house manufacturing of breadmaker motors and reduced depreciation as a percentage of net sales. Depreciation represented a higher percentage of net sales for fiscal 1997 due to the start-up of the breadmaker product line.

### Selling, general and administrative expenses.

SG&A in fiscal 1998 increased to $15.4 million, or 13.1% of net sales, from $10.4 million, or 16.6% of net sales, in fiscal 1997. The increase in SG&A expenses reflects higher variable costs related to increased sales, including transportation costs, commissions paid, litigation costs and additional compensation commensurate with the growth of the business. SG&A as a percentage of net sales declined for fiscal 1998 due to Global-Tech's spreading its fixed costs over a higher level of net sales. SG&A also includes provisions of $511,000 and $782,000 for fiscal 1998 and 1997, respectively, made against an advance to a former minority shareholder of a subsidiary formed during fiscal 1997 and his affiliates to assist with marketing of products to certain United States customers.

These advances ceased as of November 1997. Development expenses in fiscal 1998 were $1.6 million as compared to $1.3 million in fiscal 1997.

BG 0604

## Interest expense and other income, net.

Interest expense was $1.4 million in fiscal 1998 as compared to $867,000 in fiscal 1997. The higher interest expense is due to increased borrowings necessary to finance increased levels of sales and the acquisition of fixed assets. Other income, net was $220,000 in fiscal 1998 as compared to $95,000 in fiscal 1997.

## Income tax.

Global-Tech had taxable income in Hong Kong in fiscal 1997 and 1998 and the United States in fiscal 1998. The financial statements include provisions for Hong Kong and United States income and withholding taxes of $1.0 million and $440,000 in fiscal 1997 and 1998, respectively, and a provision for Hong Kong income taxes of $406,000 in fiscal 1997. No income tax was payable by Global-Tech in China during this period because Global-Tech's subsidiary in China had accumulated tax losses during these periods.

BG 0605

# QUARTERLY RESULTS AND SEASONALITY

## Quarterly Results.

The following table sets forth the statement of operations data for each of Global-Tech's last eight quarters and the percentage of revenues represented by the line items presented. The quarterly statement of operations data set forth below were derived from unaudited consolidated financial statements of Global-Tech which, in the opinion of management of Global-Tech, contain all adjustments (consisting only of normal recurring adjustments) necessary for the fair presentation of those statements.

|  | Fiscal 1998 | | | | Fiscal 1999 | | | |
|---|---|---|---|---|---|---|---|---|
|  | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| **Statement of Operations Data:** | | | | | | | | |
| Net sales | $25.987 | $38.933 | $31.285 | $22.131 | $23.624 | $22.913 | $20.673 | $16.860 |
| Gross profit | 7.105 | 10.502 | 8.314 | 5.894 | 6.175 | 6.078 | 5.145 | 3.639 |
| Income before income taxes | 3.471 | 5.747 | 3.958 | 1.985 | 3.538 | 2.852 | 1.825 | 102 |
| Net income | $ 3.068 | $ 5.081 | $ 3.768 | $ 1.791 | $ 3.256 | $ 2.623 | $ 1.679 | $ 339 |
| **Statement of Operations Data as a Percentage of Net Sales:** | | | | | | | | |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Gross profit | 27.3 | 27.0 | 26.6 | 26.6 | 26.1 | 26.5 | 24.9 | 21.6 |
| Income before income taxes | 13.4 | 14.8 | 12.7 | 9.0 | 15.0 | 12.4 | 8.8 | 0.6 |
| Net income | 11.8 | 13.1 | 12.0 | 8.1 | 13.8 | 11.4 | 8.1 | 2.0 |

## Seasonality.

Global-Tech's business is seasonal, with a large portion of its sales and earnings generated in the second and third quarters of each fiscal year (June through December). These fluctuations are based on customers' increased stocking of Global-Tech's products in anticipation of heavy demand during the Christmas holiday season. In addition, Global-Tech's sales can vary from quarter to quarter based on the timing of the introduction of new products and may be affected in the future by the timing of any acquisition completed by Global-Tech. Global-Tech believes that quarterly comparisons of the results of its operations during any fiscal year are not necessarily meaningful and that results for any one fiscal quarter should not be relied upon as an indication of future performance.

BG 0606

# LIQUIDITY AND CAPITAL RESOURCES

Global-Tech's primary sources of financing have been cash from operating activities and borrowings under credit agreements with various banks. During fiscal 1998 and 1999, Global-Tech generated approximately $13.7 million and $7.9 million, respectively, in cash from operating activities.

At March 31, 1999, accounts receivable were $8.1 million compared to $3.8 million at March 31, 1998. Receivables at March 31, 1999 represented 35.1 days of sales compared to 11.9 days of sales at March 31, 1998.  This increase is primarily due to Global-Tech's granting of longer payment terms to certain customers. At March 31, 1999, inventories were $20.1 million compared to $21.8 million at March 31, 1998. Global-Tech's inventories consist primarily of raw materials needed to produce finished products. The decrease in inventories is primarily attributable to the reduced stock of raw materials as order flow decreases.

On October 27, 1998, Global-Tech made a loan to a start-up U.S. corporation in the original principal amount of $1.0 million, bearing interest at a fixed annual rate of 7.0% and payable in quarterly installments of approximately $81,000 commencing October 28, 2003, with any remaining balance due in full on October 28, 2008. As of March 31, 1999, accrued interest on the loan was approximately $29,000. As this company is in a development stage, there can be no assurance that the loan will be repaid on a timely basis, if at all.

Global-Tech's aggregate capital expenditures during fiscal 1998 and 1999 were $12.4 million and $9.9 million, respectively. This increase primarily reflects expenditures for the acquisition of property, plant and machinery and expansion of its factory facilities in Dongguan, China.

Global-Tech's outstanding capital commitments of approximately $1.2 million as of March 31, 1999 included commitments for the expansion of the Dongguan facility and the purchase of machinery and equipment. Global-Tech intends to use an aggregate of approximately $30.0 million of the funds raised in its initial public offering to expand and equip its Dongguan factory, of which it used approximately $3.9 million in fiscal 1999. Global-Tech has nearly completed the expansion of the physical space to 1,850,000 square feet. However, Global-Tech does not expect to complete the entire infrastructure or purchase all the equipment initially anticipated until its order flow warrants the additional capacity.

Global-Tech expects to incur an aggregate of approximately $2.5 million in capital expenses for expansion of the Dongguan facility in fiscal 2000, of which approximately $1.1 million was committed as of March 31, 1999. See "Item 1—Business Description—Manufacturing." For the purchase of machinery, tooling and equipment, Global-Tech anticipates spending approximately $3.5 million in fiscal 2000, of which approximately $119,000 was committed during fiscal 1999. Global-Tech may import from other countries in Asia approximately $275,000 of capital equipment without being subject to Chinese import taxes; thereafter importation of such equipment will be taxed at various rates ranging from 15% to 25%.

BG 0607

Global-Tech finances its operations and capital expenditures primarily from the proceeds of its initial public offering of Shares, cash flows from operations and borrowings. As of March 31, 1999, Global-Tech had bank credit facilities with an aggregate credit line of approximately $31.5 million, of which it had outstanding $1.1 million in long-term debt (excluding the current portion) and $2.6 million in short-term debt (including the current portion of long-term debt). The aggregate monthly payment on all such indebtedness was approximately $1.0 million as of March 31, 1999.

Global-Tech's long-term debt consists of fourteen term loans with an aggregate outstanding amount of $1.9 million as of March 31, 1999 (including the current portion of long-term debt), provided by various banks to finance the purchase of machinery, equipment and motor vehicles. These loans bear interest at rates per annum currently ranging from 7.26% to 12.25% and mature on various dates through the year 2001. All of such loans are payable in monthly installments which were approximately $37,000 as of March 31, 1999.

Global-Tech's revolving credit facilities were with three banks with an aggregate facilities limit of approximately $31.5 million as of March 31, 1999, bearing interest at floating commercial bank lending rates in Hong Kong, which ranged from 9.75% to 11.00% per annum as of March 31, 1999. The amounts payable each month on the revolving credit facilities varies depending upon the amounts drawn at the time and were approximately $1.0 million in March 1999. Global-Tech continues to maintain credit facilities with Standard Chartered Bank and HongkongBank but terminated its facility with The Bank of East Asia, Limited in April 1999. Global-Tech's outstanding borrowings vary according to its seasonal working capital requirements. As of March 31, 1999, the amount utilized under its bank facilities was $5.0 million.

Global-Tech anticipates that the net proceeds received from its initial public offering of Shares, together with cash from operating activities, should be adequate to satisfy its capital requirements for 18 to 24 months. Global-Tech has over the past several months considered potential acquisitions of companies marketing small household appliances with brand name recognition. Although Global-Tech has not reached an agreement for such an acquisition, it will continue to pursue selected acquisitions of complementary businesses.

## Inflation.
During 1996, 1997 and 1998, the rate of inflation in Hong Kong has ranged from approximately -1.6% to 9% per year (approximately 2.8% during 1998) and the average rate of inflation in China has ranged from approximately -2.1% to 17% per year, (approximately -0.8% during 1998). As a general matter, the effect of this inflation on Global-Tech is primarily limited to labor costs, which represent a small component of Global-Tech's total expenses. As Global-Tech purchases most of its raw materials outside China, inflation in China does not have a significant effect on its overall costs.

BG 0608

## Currency and Exchange Rates.

The functional currency of Global-Tech is the U.S. dollar. Nearly all of Global-Tech's sales are denominated in U.S. dollars. The majority of Global-Tech's expenses, including wages and other production and administrative costs are denominated in Hong Kong dollars and Chinese Renminbi. Certain raw materials and other expenses are purchased using a variety of currencies including the U.S. dollar, Chinese Renminbi, Japanese yen and German mark. The majority of raw materials are purchased using Hong Kong dollars. The Hong Kong dollar is pegged to the U.S. dollar. Global-Tech has not been significantly affected by exchange rate fluctuations and therefore has not needed to hedge its positions. See Note 3(e) of Notes to Consolidated Financial Statements.

## Year 2000.

The year 2000 problem is the result of computer software and hardware being written in two-digit (rather than four-digit) formats to define the applicable year, which could cause miscalculations or system failures due to the recognition of a year defined as "00" as 1900 rather than 2000. Global-Tech has identified the year 2000 ("Y2K") problem as one of its principal information technology objectives and has organized a committee to address any related issues. The committee has been evaluating and resolving the potential impact of the upcoming Y2K on its information technology ("IT"), non-information technology ("non-IT") and business processes.

Global-Tech's systems have been fully tested for Y2K compliance. Global-Tech's primary IT systems consist of computer applications relating to accounts payable, accounts receivable, general ledger, inventory management, payroll and sales. Global-Tech's non-IT systems include central HVAC systems, manufacturing machinery and equipment, safety equipment and telephone systems. Based on its assessment of the Y2K problem, Global-Tech believes that its primary systems are Y2K compliant. Global-Tech is also in the process of ensuring that its suppliers and subcontractors have addressed the Y2K problem, or are undertaking appropriate actions to ensure that the Y2K problem will not have a significant impact on the delivery of raw materials and components to Global-Tech.

Global-Tech estimates that it has spent approximately $90,000, as of March 31, 1999, in addressing the Y2K problem, and anticipates spending an additional $110,000 in the remainder of 1999. Because Global-Tech's administrative and manufacturing processes generally do not rely on IT, particularly in China, Global-Tech believes that the Y2K problem will have a minimal impact on Global-Tech. However, there can be no assurance that Global-Tech's systems are free of unanticipated errors related to the Y2K problem or that the systems of Global-Tech's suppliers, subcontractors, vendors, shippers and customers will be fully Y2K compliant before December 31, 1999.

Contingency plans are being developed by each department within Global-Tech to address the possibility that errors in Global-Tech's systems or the failure by third parties to achieve Y2K compliance could result in delays in the receipt of raw materials and components, the manufacture of products, the shipment of products to customers, the receipt of payments from customers, and the processing of payments to suppliers. Such delays would have a material adverse effect on Global-Tech's business, results of operations and financial condition.

BG 0609

# FOREIGN ISSUER CONSIDERATIONS

*Because our operations are international, we are subject to significant worldwide political, economic, legal and other uncertainties.*

We are a company incorporated in the British Virgin Islands and have subsidiaries incorporated in the British Virgin Islands, Hong Kong, China and the U.S. Our executive and administrative offices are located in Hong Kong. We manufacture substantially all of our products in China. Over 97% of the net book value of our total fixed assets are located in China. We are party to agreements with government agencies in China and business entities based principally in the U.S. and Europe. The majority of our customers are located in the U.S. and Europe. These international operations may be subject to significant political and economic risks and legal uncertainties, including:

- political instability,
- currency controls,
- exchange rate fluctuations,
- changes in import/export regulations,
- inflation,
- changes in tariff and freight rates, and
- enactment of protectionist trade legislation.

Specifically, because the majority of our operations and assets are located in China, our business is subject to the risks associated with China's socialist political structure and unpredictable economic environment. Those risks, which could result in higher costs of raw materials, lower profits and even the cessation of operations, include the following:

- China's economic reform policies, which are favorable to companies with foreign investors such as Global-Tech, may not succeed or may be altered without notice;

- China could implement restrictions on the importation of, or impose import fees on, raw materials and capital equipment necessary to our business and operations;

- the U.S. may revoke China's Most Favored Nation trading status;

- government agencies in China may interpret or apply laws inconsistently;

- due to China's poor infrastructure, we may encounter difficulty obtaining sufficient power and water supplies, protecting our properties in the event of a fire or other casualty and transporting raw materials and finished products; and

- China may implement policies or enact legislation in Hong Kong which would adversely affect Hong Kong's political situation and economy.

BG 0610

*19*

*Because we are a British Virgin Islands company and are governed by British Virgin Islands law, many laws applicable to our corporate operations and shareholders are different from those of a company incorporated in a U.S. jurisdiction.*

Our corporate affairs are governed by our Memorandum and Articles of Association and by the International Business Companies Act of the British Virgin Islands. The laws relating to matters like the validity of corporate procedures, the fiduciary duties of our management, directors and controlling shareholders and the rights of our shareholders differ from those laws that would apply if we were incorporated in a jurisdiction within the U.S. Therefore, our shareholders would be less likely to be familiar with their shareholder rights and the corporate rules by which our business is run. Furthermore, the rights of shareholders under British Virgin Islands law are not as clearly established as the rights of shareholders in most U.S. jurisdictions. This means that our shareholders may have more difficulty in protecting their interests when confronted by actions by our management, directors or controlling shareholders than they might have as shareholders of a company incorporated in a U.S. jurisdiction.

*U.S. courts may not be able to enforce their judgments against us and our non-U.S. officers and directors and the courts of the British Virgin Islands and Hong Kong may not enforce U.S. securities judgments against us.*

We have appointed Parker Chapin Flattau & Klimpl, LLP as our agent upon whom process may be served in any action brought against us under the securities laws of the United States. However, outside the United States, it may be difficult for investors to enforce judgments against us obtained in the United States in any such actions, including actions predicated upon civil liability provisions of securities laws. A majority of our executive officers and directors are nonresidents of the U.S. and a substantial portion of our assets and those of our officers and directors are located outside the U.S. Accordingly, U.S. courts may not be able to enforce their judgments against us and our non-U.S. officers and directors predicated upon the civil liability provisions of the federal securities laws of the U.S.

No treaty exists between the British Virgin Islands or Hong Kong and the U.S. providing for the reciprocal enforcement of foreign judgments. Accordingly, Hong Kong courts might not enforce judgments predicated on the federal securities laws of the U.S., whether arising from actions brought in the U.S. or, if permitted, in the British Virgin Islands or Hong Kong.

BG 0611

*British Virgin Islands law may not protect our minority shareholders as well as U.S. law would.*

Because we are a British Virgin Islands company, our controlling shareholders may take less care and be less reasonable in taking shareholder action than controlling shareholders of a company incorporated in a U.S. jurisdiction would. In most U.S. jurisdictions, shareholder action by controlling shareholders must be taken in good faith and if obviously unreasonable may be declared null and void. However, British Virgin Islands law may not be as protective of minority shareholders as the laws of most U.S. jurisdictions may be, as British Virgin Islands law may allow controlling shareholders to use less care and be less reasonable when taking shareholder actions.

*Under British Virgin Islands law, our directors may take important actions without receiving shareholder approval.*

Subject to the requirements of British Virgin Islands law, our directors may effect many actions without shareholder approval if they determine that the actions are in our best interests or the best interests of our creditors or shareholders, including:

- increase or reduce our authorized capital stock, authorize the issuance of different classes of stock, including preferred stock, and increase or reduce the par value of our shares;

- increase our capital by transferring a portion of our surplus to capital or reduce our capital by transferring a portion of our capital to surplus;

- implement a reorganization;

- enter into some types of mergers or consolidations;

- sell, transfer exchange or dispose of any of our assets, properties, business, or securities; or

- wind-up or dissolve our business.

BG 0612

# REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

To the Shareholders and Board of Directors of Global-Tech Appliances Inc.:

We have audited the accompanying consolidated balance sheets of Global-Tech Appliances Inc. (a company incorporated in the British Virgin Islands; "Global-Tech") and Subsidiaries ("the Company") as of March 31, 1998 and 1999, and the related consolidated statements of income, changes in shareholders' equity and cash flows for the years ended March 31, 1997, 1998 and 1999. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with generally accepted auditing standards in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Global-Tech Appliances Inc. and Subsidiaries as of March 31, 1998 and 1999, and the results of their operations and their cash flows for the years ended March 31, 1997, 1998 and 1999, in conformity with generally accepted accounting principles in the United States of America.

**ARTHUR ANDERSEN & CO.**
Certified Public Accountants

Hong Kong
May 21, 1999

BG 0613

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
# CONSOLIDATED STATEMENTS OF INCOME

## FOR THE YEARS ENDED MARCH 31, 1997, 1998 AND 1999
### (Amounts expressed in United States dollars)

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| Net sales | $ 62,698,846 | $ 118,335,955 | $ 84,069,738 |
| Cost of goods sold | (46,030,834) | (86,520,914) | (63,032,595) |
| Gross profit | 16,668,012 | 31,815,041 | 21,037,143 |
| Selling, general and administrative expenses | (10,378,272) | (15,476,145) | (15,649,840) |
| Operating income | 6,289,740 | 16,338,896 | 5,387,303 |
| Interest expense | (867,492) | (1,397,583) | (804,843) |
| Interest income | 29,580 | 55,481 | 3,391,922 |
| Other income, net | 64,990 | 164,301 | 342,888 |
| Income before income taxes | 5,516,818 | 15,161,095 | 8,317,270 |
| Provision for income tax (Note 14) | (406,418) | (1,452,532) | (419,758) |
| Net income (Note 16) | $ 5,110,400 | $ 13,708,563 | $ 7,897,512 |
|  |  |  |  |
| Net income per common share | $ 0.64 | $ 1.71 | $ 0.65 |
| Weighted average number of shares outstanding | 8,000,000 | 8,000,000 | 12,235,045 |

The accompanying notes are an integral part of these financial statements.

BG 0614

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
# CONSOLIDATED BALANCE SHEETS

## AS OF MARCH 31, 1998 AND 1999
### (Amounts expressed in United States dollars)

|  | 1998 | 1999 |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents (Notes 4 & 24) | $ 308,995 | $ 56,514,223 |
| Restricted cash (Notes 5 & 24) | 880,451 | |
| Short-term investments (Note 6) | - | 10,541,663 |
| Accounts receivable, net (Notes 7 & 24) | 3,847,264 | 8,082,835 |
| Deposits, prepayments and other assets (Note 8) | 1,992,831 | 2,636,930 |
| Inventories (Note 9) | 21,800,017 | 20,072,172 |
| Total current assets | 28,829,558 | 97,847,823 |
| Property, plant and equipment (Note 10) | 22,983,299 | 24,982,441 |
| Construction-in-progress | 4,895,639 | 9,524,573 |
| Patents (Note 11) | 17,041 | 15,750 |
| Deferred stock issuance costs | 3,542,422 | |
| Total assets | $ 60,267,959 | $ 132,370,587 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Current liabilities: | | |
| Short-term bank borrowings (Notes 12 & 24) | $ 13,495,696 | $ 1,716,513 |
| Current portion of long-term bank loans (Notes 12, 13 & 24) | 544,260 | 848,393 |
| Accounts payable | 8,370,839 | 8,961,402 |
| Fees payable for land use rights | 719,416 | 512,858 |
| Salaries and allowances payable | 524,027 | 774,055 |
| Advance payments from customers | 97,185 | 122,416 |
| Accrued expenses (Note 19) | 4,222,043 | 2,098,974 |
| Income tax provision | 1,839,828 | 2,259,586 |
| Total current liabilities | 29,813,294 | 17,294,197 |
| Long-term bank loans (Notes 12, 13 & 24) | 453,785 | 1,093,071 |
| Deferred income taxes (Note 14) | 20,656 | 20,656 |
| Total liabilities | 30,287,735 | 18,407,924 |
| Shareholders' equity: | | |
| Preferred stock, par value $0.01; 1,000,000 shares authorized; no shares issued (Note 17) | - | - |
| Common stock, par value $0.01; 50,000,000 shares authorized; 8,000,000 issued as of March 31, 1998 and 12,830,000 as of March 31, 1999 (Note 17) | 80,000 | 128,300 |
| Additional paid-in capital (Note 17) | - | 81,661,840 |
| Retained earnings | 29,900,224 | 37,797,736 |
| Accumulated other comprehensive deficit | - | (399,409) |
| Less: Treasury stock, at cost, 739,900 shares (Note 17) | - | (5,225,804) |
| Total shareholders' equity | 29,980,224 | 113,962,663 |
| Total liabilities and shareholders' equity | $ 60,267,959 | $ 132,370,587 |

The accompanying notes are an integral part of these financial statements.

BG 0615

24

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY

### FOR THE YEARS ENDED MARCH 31, 1997, 1998 AND 1999
(Amounts expressed in United States dollars)

| | Number of shares | |
| --- | --- | --- |
| | Common Stock | Treasury Stock |
| Balance as of March 31, 1996 | $ 8,000,000 | $ - |
| Effect of the spin-off of a subsidiary | - | - |
| Excess of purchase price of patents over the historical cost to a shareholder | - | - |
| Net income | - | - |
| Balance as of March 31, 1997 | 8,000,000 | - |
| Excess of purchase price of patents over the historical cost to a shareholder | - | - |
| Net income | - | - |
| Balance as of March 31, 1998 | 8,000,000 | - |
| Issuance of common stock | 4,830,000 | - |
| Common stock issuance expenditure | - | - |
| Purchase of treasury stock | - | (739,900) |
| Other comperhensive income - unrealized loss on marketable securities, net of tax | - | - |
| Net income | - | - |
| Balance as of March 31, 1999 | $ 12,830,000 | $ (739,900) |

(To be continued)

BG 0616

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY
## FOR THE YEARS ENDED MARCH 31, 1997, 1998 AND 1999 (CONT'D)
### (Amounts expressed in United States dollars)

| | Common Stock | Additional Paid-in Capital | Retained Earnings | Treasury Stock | Accumulated Other Comprehensive Deficit | Total Shareholders' Equity |
|---|---|---|---|---|---|---|
| | $ 80,000 | $ - | $ 14,965,249 | $ - | $ - | $ 15,045,249 |
| | - | - | (2,679,877) | - | - | (2,679,877) |
| | - | - | (982,908) | - | - | (982,908) |
| | - | - | 5,110,400 | - | - | 5,110,400 |
| | 80,000 | - | 16,412,864 | - | - | 16,492,864 |
| | - | - | (221,203) | - | - | (221,203) |
| | - | - | 13,708,563 | - | - | 13,708,563 |
| | 80,000 | - | 29,900,224 | - | - | 29,980,224 |
| | 48,300 | 91,721,700 | - | - | - | 91,770,000 |
| | - | (10,059,860) | - | - | - | (10,059,860) |
| | - | - | - | (5,225,804) | - | (5,225,804) |
| | - | - | - | - | (399,409) | (399,409) |
| | - | - | 7,897,512 | - | - | 7,897,512 |
| | $ 128,300 | $ 81,661,840 | $ 37,797,736 | $ (5,225,804) | $ (399,409) | $ 113,962,663 |

The accompanying notes are an integral part of these financial statements.

BG 0617

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
# CONSOLIDATED STATEMENTS OF CASH FLOWS

## FOR THE YEARS ENDED MARCH 31, 1997, 1998 AND 1999
### (Amounts expressed in United States dollars)

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| **Cash flows from operating activities:** | | | |
| Net income | $ 5,110,400 | $ 13,708,563 | $ 7,897,512 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 1,853,268 | 2,801,807 | 3,318,672 |
| Loss on disposals of property, plant and equipment | 28,168 | - | - |
| (Increase) decrease in restricted cash | - | (364,055) | 880,451 |
| (Increase) decrease in accounts receivable, net | (1,694,763) | 230,253 | (4,235,571) |
| Decrease in due from related companies | 698,077 | - | - |
| Decrease in due from directors | 307,890 | 12,309 | - |
| Increase in deposits, prepayments and other assets | (455,410) | (977,015) | (644,099) |
| Decrease in tax recoverable | 2,723 | - | - |
| (Increase) decrease in inventories | (9,509,428) | (1,777,733) | 1,727,845 |
| Increase (decrease) in accounts payable | 4,247,703 | (1,849,587) | 590,563 |
| Decrease in fees payable for land use rights | (68,692) | (528,701) | (206,558) |
| Increase (decrease) in salaries and allowances payable | 297,874 | (80,741) | 250,028 |
| Increase (decrease) in advance payments from customers | 929,414 | (832,229) | 25,231 |
| Increase (decrease) in accrued expenses | 472,353 | 3,039,896 | (2,123,069) |
| Decrease in due to related companies | (113,467) | - | - |
| Decrease in due to a director | (1,567,533) | (1,183,105) | - |
| Increase in income tax provision | 362,144 | 1,477,684 | 419,758 |
| Net cash provided by operating activities | 900,721 | 13,677,346 | 7,900,763 |

(To be continued)

BG 0618

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
# CONSOLIDATED STATEMENTS OF CASH FLOWS

## FOR THE YEARS ENDED MARCH 31, 1997, 1998 AND 1999
## (CONT'D)
### (Amounts expressed in United States dollars)

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| **Cash flows from investing activities:** |  |  |  |
| Purchase of short-term investments | - | - | (10,941,072) |
| Purchases of property, plant and equipment | (6,257,904) | (7,507,383) | (5,316,523) |
| Proceeds from disposals of property, plant and equipment | 58,095 | - | - |
| Additions to construction-in-progress | (2,040) | (4,895,639) | (4,628,934) |
| Net cash used in investing activities | (6,201,849) | (12,403,022) | (20,886,529) |
| **Cash flows from financing activities:** |  |  |  |
| Proceeds from issuance of common stock | - | - | 91,770,000 |
| Stock issuance costs | - | (3,542,422) | (6,517,438) |
| Purchase of treasury stock | - | - | (5,225,804) |
| Increase in short-term bank borrowings | 5,951,613 | 2,041,972 | - |
| Repayment of short-term bank borrowings | - | - | (11,779,183) |
| Increase in long-term bank loans | 428,283 | 230,003 | 1,523,367 |
| Repayment of long-term bank loans | (750,714) | (159,349) | (579,948) |
| Net cash provided by (used in) financing activities | 5,629,182 | (1,429,796) | 69,190,994 |
| Net increase (decrease) in cash and cash equivalents | 328,054 | (155,472) | 56,205,228 |
| Cash and cash equivalents at beginning of year | 136,413 | 464,467 | 308,995 |
| Cash and cash equivalents at end of year | $ 464,467 | $ 308,995 | $ 56,514,223 |

The accompanying notes are an integral part of these financial statements.

BG 0619

# GLOBAL-TECH APPLIANCES INC. AND SUBSIDIARIES
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

(Amounts expressed in United States dollars unless otherwise stated)

## 1.   ORGANIZATION AND PRINCIPAL ACTIVITIES

Global-Tech Appliances Inc. ("Global-Tech"), is incorporated in the British Virgin Islands and is a holding company.  Global-Tech and its subsidiaries are collectively referred to as the "Company".  The Company is a designer and manufacturer of a wide range of small household appliances.  The Company's manufacturing operations are located in Dongguan and Shenzhen, the People's Republic of China ("China").  The Company's products are sold to customers primarily in the United States of America and Europe.

The common stock of the Company is listed on the New York Stock Exchange.

## 2.   SUBSIDIARIES

Details of Global-Tech's principal subsidiaries as of March 31, 1999 were as follows:

| Name of Subsidiary | Place of Incorporation | Percentage of equity interest held |
|---|---|---|
| Pentalpha Enterprises Limited ("PEL") | Hong Kong | 100% |
| Kwong Lee Shun Trading Company Limited ("KLS") | Hong Kong | 100% |
| Dongguan Wing Shing Electrical Products Factory Company Limited ("DWS") | China | 100% |
| Wing Shing Products (BVI) Company Limited ("WSPBVI") | British Virgin Islands | 100% |
| Wing Shing Overseas Limited ("WSO") | British Virgin Islands | 100% |
| Global-Tech USA, Inc. ("GTU") | United States of America | 100% |
| Wing Shing Marketing Limited ("WSML") | British Virgin Islands | 100% |

On March 25, 1999, the Company has resolved to wind up and dissolve Wing Shing Marketing Limited voluntarily.

BG 0620

3.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

a.    Basis of consolidation
      The consolidated financial statements include the financial statements of Global-Tech and
      its subsidiaries. All significant intercompany balances and transactions have been eliminated
      on consolidation.

b.    Subsidiaries
      A company is a subsidiary if more than 50% of the issued voting capital is held long-term
      directly or indirectly.

c.    Sales
      Sales represent the gross invoiced sales, net of discounts and returns, and are recognized
      when goods are shipped and title has passed.

d.    Advertising costs
      Advertising costs represent costs relating to promotional activities intended to stimulate,
      directly or indirectly, a customer's purchase of goods, and are charged to expenses as incurred.

e.    Foreign currencies
      The Company considers the U.S. dollar as its functional currency, as most of the Company's
      business activities are denominated in U.S. dollars. (Note: The Hong Kong dollar is pegged
      to the United States dollar at the exchange rate of approximately $1 to HK$7.8).

      Individual subsidiaries maintain their books and records in their respective currencies. In
      the financial statements of the individual companies, transactions in other currencies during
      the year are translated into the respective currencies at exchange rates in effect at the time
      of the transactions. Monetary assets and liabilities denominated in other currencies at any
      balance sheet date are remeasured into the functional currency at the rates of exchange in
      effect at such balance sheet date. Non-monetary assets and liabilities, income and expenses
      denominated in other currencies are remeasured into the functional currency at the rates of
      exchange in effect at the time of the transactions. Aggregate gains and losses from the
      remeasurement into the functional currency, which were insignificant, were included in the
      results of operations.

f.    Operating leases
      Leases where substantially all the rewards and risks of ownership remain with the lessor
      are accounted for as operating leases. Rental payments under operating leases are charged
      to the statements of income on a straight-line basis over the period of the relevant leases.

BG 0621

3.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
      (Cont'd)

g.    Income taxes
      The Company accounts for income tax under the provisions of SFAS No. 109, which requires recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements or tax returns. Deferred income taxes are provided using the liability method. Under the liability method, deferred income taxes are recognized for all temporary differences between the tax and financial statement bases of assets and liabilities.

h.    Net income per common share
      The computation of net income per common share is based on the weighted average number of shares of common stock outstanding, on the basis that the Share Split and the Issuance (see Note 17) had been consummated prior to the years presented, in accordance with SFAS No. 128. Diluted net income per common share is not presented because the effect of the assumed exercise of stock options is not material. The Company will continue to follow the provisions of APB Opinion No. 25 to account for stock options but will provide the pro forma disclosures required by SFAS No. 123.

i.    Investments
      Highly liquid investments with insignificant interest rate risk and with original maturity of three months or less are classified as cash and cash equivalents.

      Investments with maturities greater than three months and less than one year are classified as short-term investments. Investments with maturities greater than one year are classified as long-term investments.

      The Company accounts for investments in accordance with SFAS No. 115, "Accounting for Certain Investments in Debt and Equity Securities." The Company's policy is to protect the value of its investment portfolio and to minimize principal risk by earning returns based on current interest rates. All of the Company's marketable equity investments are classified as available-for-sale as of the balance sheet date and are reported at fair value, with unrealized gains and losses, net of tax, recorded in shareholders' equity. The cost of securities sold is based on the specific identification method. Realized gains or losses and declines in value, if any, judged to be other than temporary, on available-for-sale securities are reported in other income or expense.

BG 0622

3.    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
      (Cont'd)

j.    Inventories
      Inventories are stated at the lower of cost and net realizable value. Cost, calculated on the first-in first-out basis, comprises materials and, where applicable, direct labor and an appropriate proportion of production overhead expenditure. Net realizable value is determined on the basis of estimated selling prices, less further costs expected to be incurred to completion and direct selling and distribution expenses. Provision is made for obsolete, slow-moving or defective items where considered appropriate by management.

k.    Property, plant and equipment
      Property, plant and equipment, other than freehold land, are stated at cost less accumulated depreciation. Gains or losses on disposals are reflected in current operations. Depreciation is calculated on the straight-line or reducing balance basis at annual rates estimated to write off the cost of each asset over its expected useful life. The annual rates are as follows:

|  | Annual rate | Method |
|---|---|---|
| Land use rights | Over the business license period | Straight-line |
| Leasehold improvements and buildings | Over the remaining lease term | Straight-line |
| Plant and machinery | 15%-30% | Reducing balance |
| Molds | 20% | Straight-line |
| Motor vehicles | 15%-20% | Straight-line |
| Furniture, fixtures and equipment | 15% | Straight-line |

      The Company recognizes an impairment loss on property, plant and equipment when evidence, such as the sum of expected future cash flows (undiscounted and without interest charges), indicates that future operations will not produce sufficient revenue to cover the related future costs, including depreciation, and when the carrying amount of the asset cannot be realized through sale. Measurement of the impairment loss is based on the fair value of the assets.

      The Company's manufacturing plants are located in China. The cost of the land use rights is amortized on a straight-line basis over the period of the business license of DWS, which is 30 years from 1993.

      Maintenance and repairs are charged to expense as incurred; improvements are capitalized.

BG 0623

32

## 3.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Cont'd)

l.   Patents

Patents are stated at the historical cost incurred by a shareholder, who transferred the patents to the Company, and are amortized on a straight-line basis over the expected future economic lives ranging from 11 to 20 years.

m.   Comprehensive income

The Company had adopted SFAS No. 130 which establishes guidance for the reporting and display of comprehensive income and its components. The purpose of reporting comprehensive income is to report a measure of all changes in equity that resulted from recognized transactions and other economic events of the period other than transactions with shareholders. Adoption of the standard had no economic impact on the Company's consolidated financial position, results of operations or cash flows, although the presentation of certain items has changed. The accumulated other comprehensive income included in the consolidated balance sheets consists of unrealized loss on marketable securities as of the end of each year.

n.   Use of estimates

The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, the disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the period. Actual results could differ from those estimates.

## 4.   CASH AND CASH EQUIVALENTS

|  | 1998 | 1999 |
|---|---|---|
| Cash on hand and in bank | $       308,995 | $     31,303,843 |
| Money market fund | - | 25,210,380 |
| | $       308,995 | $     56,514,223 |

BG 0624

## 5.    RESTRICTED CASH

As of March 31, 1998, cash deposits of approximately $880,000 were pledged to banks to secure certain banking facilities of the Company. Such facilities were terminated by the Company in the year ended March 31, 1999. As a result, such restricted cash was released by the banks.

## 6.    SHORT-TERM INVESTMENTS

|  | 1998 | 1999 |
|---|---|---|
| Treasury bills | $           - | $      9,790,733 |
| Listed shares |  - | 1,150,339 |
|  | $           - | $   10,941,072 |

Short-term investments comprise investment in short-term U.S. treasury bills and listed shares of a U.S. consumer products company. The unrealized loss of $399,409 as of March 31, 1999 from the above short-term investments is reported under other comprehensive deficit as part of the shareholders' equity.

## 7.    ACCOUNTS RECEIVABLE, NET

|  | 1998 | 1999 |
|---|---|---|
| Trade receivables | $      4,056,256 | $      8,171,030 |
| Less: Allowance for doubtful accounts | (208,992) | (88,195) |
|  | $      3,847,264 | $      8,082,835 |

During the year ended March 31, 1999, $121,636 of trade receivables were written off against the allowance for doubtful accounts.

BG 0625

## 8.    RELATED PARTY TRANSACTIONS

A related party is essentially any party that controls or can significantly influence the management or operating policies of the Company to the extent that the Company may be prevented from fully pursuing its own interests.  Such parties would include affiliates, investors accounted for by the equity method, trusts for the benefit of employees, principal shareholders, management, and immediate family members of shareholders or management.

The Company had the following transactions and balances with related parties:

a.      The balances with directors and related companies are unsecured, interest free and have no fixed repayment terms, except as disclosed below in paragraph b.

b.      During the years ended March 31, 1997, 1998 and 1999, the Company paid annual real estate rental expenses of approximately $184,000, $203,000 and $223,000, respectively, to a related company.

c.      During the years ended March 31, 1997, 1998 and 1999, sales to related companies amounted to approximately $184,000, $508,000 and $173,000, respectively.

d.      In October 1998, the Company extended a loan of $1,000,000 to a U.S. corporation wholly owned by the spouse of a director of the Company.  The loan was granted to finance its start up costs and working capital.  The loan bears interest at a fixed annual rate of 7.0% and is payable in quarterly installments of approximately $81,000 commencing October 28, 2003, with any remaining balance due in full on October 28, 2008.  As of March 31, 1999, the loan was included in deposits, prepayments and other assets on the accompanying consolidated balance sheet.

## 9.    INVENTORIES

|  | | 1998 | | 1999 |
|---|---|---|---|---|
| Raw materials | $ | 15,189,887 | $ | 14,583,263 |
| Work-in-progress | | 3,411,334 | | 3,266,668 |
| Finished goods | | 3,198,796 | | 2,222,241 |
| | $ | 21,800,017 | $ | 20,072,172 |

BG 0626

## 10.   PROPERTY, PLANT AND EQUIPMENT

|  | 1998 | 1999 |
|---|---|---|
| Leasehold improvements and buildings | $    8.621.359 | $    8.764.343 |
| Land use rights | 2.987.351 | 2.987.351 |
| Plant and machinery | 10.085.064 | 13.794.393 |
| Molds | 5.641.431 | 7.320.564 |
| Motor vehicles | 243.371 | 540.081 |
| Furniture, fixtures and equipment | 2.296.895 | 1.785.262 |
|  | 29,875,471 | 35.191,994 |
| Less: Accumulated depreciation | (6.892,172) | (10.209.553) |
|  | $    22.983,299 | $    24.982,441 |

## 11.   PATENTS

|  | 1998 | 1999 |
|---|---|---|
| Cost | $    1,223,475 | $    1,223,475 |
| Less: Excess of purchase price over the historical cost to a shareholder charged to retained earnings | (1.204,111) | (1.204,111) |
|  | 19.364 | 19.364 |
| Less: Accumulated amortization | (2.323) | (3.614) |
|  | $    17,041 | $    15,750 |

## 12.   SHORT-TERM BANK BORROWINGS

|  | 1998 | 1999 |
|---|---|---|
| Bank overdrafts | $    1,450,101 | $    6,026 |
| Short-term bank loans | 12,045,595 | 1,710,487 |
|  | $    13,495,696 | $    1,716,513 |

BG 0627

## 12.   SHORT-TERM BANK BORROWINGS (Cont'd)

As of March 31, 1998 and 1999, certain subsidiaries had banking facilities of approximately $39,937,000 and $31,505,000, respectively, for overdrafts, bank loans, guarantees and letters of credit, of which approximately $16,527,000 and $4,987,000, respectively, had been utilized.  The banking facilities were secured by corporate guarantees from the Company.

Short-term bank borrowings are denominated in Hong Kong dollars and bear interest at the floating commercial bank lending rates in Hong Kong, which ranged from 9.0% to 11.25% per annum as of March 31, 1998 and from 9.75% to 11.0% per annum as of March 31, 1999.  They are drawn for working capital purposes and are renewable annually with the consent of the relevant banks.

Since October 1997, the Company entered into an agreement with a principal bank lender in which the Company agreed to maintain its consolidated shareholders' equity at not less than $25.8 million as of each fiscal year and not to distribute dividends in excess of 50% of the Company's consolidated net income commencing in fiscal 1997.

## 13.   LONG-TERM BANK LOANS

|  | 1998 | 1999 |
|---|---|---|
| Secured bank loans | $        998,045 | $      1,941,464 |
| Less: Amount due within one year included under current liabilities | (544,260) | (848,393) |
|  | $        453,785 | $      1,093,071 |
| Weighted average interest rate at the end of year | 12.02% | 9.85% |

Aggregate maturities of long-term bank loans are as follows:

Payable during the following period:

|  | 1999 |
|---|---|
| Within one year | $        848,393 |
| Over one year but not exceeding two years | 603,930 |
| Over two years but not exceeding three years" | 489,141 |
|  | $      1,941,464 |

BG 0628

## 14.   INCOME TAXES

Global-Tech and its subsidiaries are subject to income taxes on an entity basis on income arising in or derived from the tax jurisdiction in which they are domiciled or deemed to operate.

Entities subject to Hong Kong profits tax are taxed at a rate of 16% on their assessable income. Entities subject to U.S. federal income tax are taxed at a rate of up to 35% of their assessable income. In addition, any after tax U.S. effectively-connected earnings would be subject to a U.S. federal withholding equivalent tax (branch profits tax) at a rate of 30%. The combined impact of these taxes creates a U.S. federal effective tax rate of up to 55% on income effectively-connected with the conduct of a U.S. trade or business.

The subsidiary established in China (DWS) is subject to income tax at a rate of 27% (24% reduced tax rate and 3% local income tax rate, in the open coastal areas of China). Current income tax is computed based on the taxable income as reported in the statutory financial statements prepared under China accounting regulations. DWS is exempted from income tax for two years starting from the first profitable year (after utilizing any accumulated tax loss carry forwards) followed by a 50% exemption for the next three years. For tax purposes, DWS has not recognized its first profitable year.

The reconciliation of the Hong Kong income tax rate to the effective income tax rate based on income before income taxes stated in the consolidated statements of income is as follows:

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| Hong Kong income tax rate | 16.5% | 16.5% | 16.0% |
| Income subject to United States tax | - | 2.4% | - |
| Non-taxable income arising from activities which qualified as offshore | (9.1%) | (8.3%) | (11.1%) |
| Effective income tax rate | 7.4% | 10.6% | 4.9% |

Deferred income taxes as of March 31, 1998 and 1999 comprised the following timing differences:

|  | 1998 | 1999 |
|---|---|---|
| Net timing differences related to fixed assets | $ (20,656) | $ (20,656) |
| Operating loss carry forwards | 380,484 | 432,656 |
| Less: valuation allowances | (380,484) | (432,656) |
|  | $ (20,656) | $ (20,656) |

Valuation allowances have been established for substantially all deferred tax assets due to the uncertain realization of such assets.

BG 0629

## 15.  DESIGN AND DEVELOPMENT COSTS

Included in selling, general and administrative expenses were design and development costs of approximately $1,310,000, $1,601,000 and $2,002,000 for the years ended March 31, 1997, 1998 and 1999, respectively.

## 16.  COMPREHENSIVE INCOME

Comprehensive income and its components, net of tax, comprised:

|  | 1997 | 1998 | 1999 |
|---|---|---|---|
| Net income | $ 5,110,400 | $ 13,708,563 | $ 7,897,512 |
| Other comprehensive income - Unrealized loss on marketable securities, net of tax | - | - | (399,409) |
| Total comprehensive income | $ 5,110,400 | $ 13,708,563 | $ 7,498,103 |

## 17.  SHARE CAPITAL

On October 14, 1997, Global-Tech effected a 395,000 for 1 stock split (the "Share Split") and as a result, 7,900,000 shares of common stock, par value $0.01, were outstanding. The authorized capital was also adjusted to 50,000,000 shares of common stock and 1,000,000 shares of preferred stock, all par value $0.01 per share. On March 9, 1998, the Company declared a stock dividend of 100,000 shares (the "Issuance") pro rata to all shareholders and as a result, 8,000,000 shares of common stock, par value $0.01, were outstanding. The Share Split and the Issuance have been reflected retroactively in the accompanying balance sheets and in all per share computations.

On April 14, 1998, the Company issued 4,200,000 shares of common stock, par value $0.01 each, for cash consideration of $19 per share or total gross proceeds of $79,800,000 through an initial public offering, and raised net proceeds of approximately $70,672,000 after deducting underwriting discount and stock issuance costs.

On May 7, 1998, the Company further issued 630,000 shares of common stock, par value $0.01 each, for cash consideration of $19 per share pursuant to an over-allotment option granted to the underwriters, and raised net proceeds of approximately $11,132,000 after deducting underwriting discount and stock issuance costs.

On June 17, 1998, the Board of Directors authorized the Company to repurchase up to approximately $5 million of its shares of common stock. The timing of stock purchases were made at the discretion of management. As of March 31, 1999, the Company had repurchased a total of 739,900 of its own shares as treasury stock at an aggregate cost of $5,225,804.

BG 0630

## 18.   COMMITMENTS

a.  Capital Commitments

As of March 31, 1998 and 1999, the Company had capital commitments of approximately $10.8 million and $1.2 million, respectively, in respect of construction of factories and staff quarters and acquisition of manufacturing machinery in China.

b.  Operating Lease Commitments

The Company has various operating lease agreements for parking lots, motor vehicles, equipment and real estate which extend through 2007. Rental expenses for the years ended March 31, 1997, 1998 and 1999 were approximately $245,000, $331,000 and $619,000, respectively. Future minimum rental payments as of March 31, 1999 are as follows:

| Payable during the following period: | 1999 |
|---|---|
| Within one year | $ 435,000 |
| Over one year but not exceeding two years | 433,000 |
| Over two years but not exceeding three years | 208,000 |
| Over three years but not exceeding four years | 207,000 |
| Over four years but not exceeding five years | 207,000 |
| Thereafter | 619,000 |
| | $ 2,109,000 |

c.  Commission Agreement

The Company has entered into a commission agreement with one of the former minority shareholders of a subsidiary. The commission agreement provides that, for the period from January 1, 1998 through October 31, 2001, net sales of certain products previously marketed by the subsidiary will be subject to a 3% commission. During the years ended March 31, 1998 and 1999, the Company advanced total commissions of $1,249,000 and $600,000, respectively, to this former minority shareholder. These advances have been offset against the commissions payable for the respective years. As of March 31, 1998 and 1999, the amounts receivable from this former minority shareholder after netting of the commissions payable were $16,000 and $440,000, respectively. Any portion remaining outstanding at the end of the term of the commission agreement is required to be repaid by the former minority shareholder at that time.

BG 0631

40

## 19.    CONTINGENT LIABILITIES

As of March 31, 1998 and 1999, the Company had outstanding letters of credit amounting to approximately $2,033,000 and $1,329,000, respectively.

On December 21, 1995, Black & Decker Inc. ("B&D") filed suit against Sunbeam in the U.S. District Court for the Northern District of Illinois for patent infringement.  B&D alleges that Sunbeam infringed a patent assigned to B&D which covers certain features of food steamers manufactured by the Company and seeks unspecified money damages and injunctive relief.  On May 17, 1999, the U.S. District Court for the Northern District of Illinois denied plaintiff's motion for summary judgment.

Although the Company is not a party to the above actions, pursuant to agreements between the Company and Sunbeam, the Company is obligated to hold harmless, defend and indemnify Sunbeam for any losses and legal fees it may sustain as a result of these actions.

On October 13, 1998, Kenwood Painted Metals, Inc. ("Kenwood") filed a claim against Pentalpha Enterprises Limited ("Pentalpha"), a subsidiary of the Company, in the High Court of the Hong Kong Special Administrative Region, alleging that Pentalpha has not settled the outstanding balance of approximately $509,000 relating to certain goods purchased from Kenwood.  The Company believes that the amount payable is approximately $153,000 which is included in accounts payable as of March 31, 1999.

On June 9, 1998, SEB, S.A. ("SEB") filed suit against Sunbeam, the Company and Pentalpha Enterprises Limited, a Hong Kong subsidiary of the Company ("Pentalpha") in the U.S. District Court of New Jersey for patent infringement.  SEB alleges that Sunbeam infringes a patent issued to SEB which covers certain features of deep fryers manufactured by the Company and Pentalpha. SEB seeks to recover unspecified money damages.  The Company and Pentalpha have moved to dismiss the compliant for lack of personal jurisdiction.  In addition, Sunbeam has asserted a third-party claim and a cross-claim against the Company and Pentalpha for breach of their alleged obligation to indemnify Sunbeam against SEB's patent infringement claims.  The Company has moved to dismiss these claims for lack of personal jurisdiction and Pentalpha has additional time to respond. The Company has also asked the court to construe the patent infringement claims to expedite the disposition of this lawsuit.

After considering all facts known to the Company and advice from its attorneys, the Company believes that these actions will not have a material adverse effect on its business, financial condition or results of operations.

Included in "Accrued expenses" as of March 31, 1998 and 1999, were provisions for legal fees of approximately $672,000 and $418,000 in relation to the above cases.

BG 0632

## 20.   EMPLOYEE BENEFITS

a.   Retirement Fund
The Company has arranged a defined contribution retirement plan for all eligible employees of the Company under which the Company and the employees each contribute 5% of the employees' basic salary. The plan is administered and funded by an independent trustee. Salaried employees are eligible to participate on the first day of the month coincident with or immediately following the date on which they have completed the probationary period, provided they are employed on a full-time basis. Part-time employees are not eligible for the plan. The costs of this plan recognized during the years ended March 31, 1997, 1998 and 1999 were $62,427, $87,299 and $144,590, respectively. The Company has no other post-retirement or post-employment benefit plans.

b.   Other Benefits
The Company provides housing, medical care and subsidized meals to all factory employees. The aggregate amounts incurred by the Company for such benefits were approximately $229,000, $553,000 and $396,000 during the years ended March 31, 1997, 1998 and 1999, respectively.

## 21.   SEGMENT INFORMATION

The Company is principally engaged in one reportable segment of manufacturing and trading of small household appliances.

a.   Net sales

| | 1997 | 1998 | 1999 |
|---|---|---|---|
| Export sales | | | |
| Australia | $ 338,625 | $ 2,100,375 | $ 3,583,444 |
| Europe | 14,544,052 | 28,470,871 | 28,313,678 |
| North America | 47,076,426 | 83,752,910 | 50,430,486 |
| Asia | 739,743 | 4,011,799 | 1,564,016 |
| Other Region | - | - | 178,114 |
| | $ 62,698,846 | $ 118,335,955 | 84,069,738 |

b.   Major customers
Customers accounting for 10% or more of the Company's sales are as follows:

| | 1997 | 1998 | 1999 |
|---|---|---|---|
| | % | % | % |
| Sunbeam Products Inc. | 13 | 39 | 15 |
| Appliance Corporation of America (Welbilt) | 12 | - | 8 |
| Helen of Troy Limited | 11 | 6 | 6 |
| Krups (Far East) Limited | 7 | 6 | 13 |

42

BG 0633

## 22. SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION

Cash paid for interest and income taxes comprised:

|                   | 1997 | 1998 | 1999 |
|-------------------|------|------|------|
| Interest paid     | $ 867,492 | $ 1,397,583 | $ 804,843 |
| Income taxes paid | 43,229 | 10,623 | - |

## 23. RISK CONSIDERATION

The Company's operations are conducted in Hong Kong and China. As a result, the Company's business, financial condition and results of operations may be influenced by the political, economic and legal environments in Hong Kong and China, and by the general state of the Hong Kong and China economies.

As substantially all of the Company's manufacturing operations are conducted in China, the Company is subject to different considerations and other risks not typically associated with companies in North America and Western Europe. These include risks associated with, among others, the political, economic and legal environments and foreign currency exchange. The Company's results may be adversely affected by changes in the political and social conditions in China, and by changes in governmental policies with respect to laws and regulations, anti-inflationary measures, currency conversion and remittance abroad, and rates and methods of taxation, among other things.

## 24. FINANCIAL INSTRUMENTS

The carrying amounts of the Company's cash and cash equivalents and accounts receivable approximate their fair values because of the short maturity of those instruments. The carrying amounts of the bank loans approximate their fair values based on borrowing rates currently available for bank loans with similar terms and maturities.

BG 0634

## 25.   STOCK OPTION PLAN

In September 1997, the Board of Directors adopted the Company's 1997 Stock Option Plan (as amended, the "Plan"). The Plan provides for the grant of (i) options that are intended to qualify as incentive stock options ("Incentive Stock Options") within the meaning of Section 422 of the U.S. Internal Revenue Code of 1986, as amended (the "Code") to employees and (ii) options not intended to qualify as Incentive Stock Options to employees and consultants. The total number of shares of Common Stock for which options may be granted under the Plan is 1,600,000 shares. The Company granted options to purchase (i) 322,000 shares of Common Stock to employees and a consultant in accordance with the terms of the Plan, with an exercise price of $14.50 per share in September 1997; (ii) 279,500 shares to employees and consultants with an exercise price equal to the initial public offering price of $19.00 of the Company's shares in March 1998 and (iii) 4,300 shares to a former employee. The options vest over varying periods of up to five years and are all exercisable for a period of ten years from the date of grant.

The Company further granted options to purchase (i) 250,000 shares of common stock to two directors with an exercise price of $8.31 per share in August 1998 and (ii) 18,000 shares to two officers with an exercise price of $19.00 in July 1998 and December 1998.

The Plan is administered by the Board of Directors or a committee of outside directors appointed by the Board of Directors, which will determine the terms of options, including the exercise price, the number of shares subject to the option and the terms and conditions of exercise. No option granted under the Plan is transferable by the optionee other than by will or the laws of descent and distribution and each option is exercisable during the lifetime of the optionee only by such optionee. With respect to any participant who owns (or is deemed to own) stock possessing more than 10% of the voting rights of the Company's outstanding capital stock, the exercise price of any Incentive Stock Option must be not less than 110% of the fair market value on the date of grant. The term of each option granted pursuant to the Plan may be established by the Board of Directors, or a committee of the Board of Directors, in its sole discretion; provided, however, that the maximum term of each Incentive Stock Option granted pursuant to the Plan is 10 years. With respect to any Incentive Stock Option granted to a participant who owns (or is deemed to own) stock possessing more than 10% of the total combined voting power of all classes of the Company's outstanding capital stock, the maximum term is five years.

BG 0635

## 25.   STOCK OPTIONS  (Cont'd)

Changes in outstanding options under the plan during the year ended March 31. 1999 are as follows:

|  | 1999 | |
|---|---|---|
|  | Options | Exercise price range |
| Outstanding. beginning of year | - | $           - |
| Granted at market price | 873,800 | 8.31 - 19.00 |
| Exercised | - | - |
| Forfeited | - | - |
| Outstanding, end of year | 873,800 | 14.28 |
| Exercisable. end of year | 377,140 | 14.28 |

The Company accounts for stock-based compensation using the intrinsic value method prescribed by Accounting Principles Board ("APB") Opinion No. 25. under which no compensation cost for stock options is recognized for stock option awards granted at or above fair market value.  No compensation cost is recognized in accordance with APB Opinion No. 25.  Had compensation expense for the Company's stock-based compensation plan been determined based upon fair values at the grant dates in accordance with SFAS No. 123, the Company's pro forma net income for the year ended March 31, 1999 would be approximately $5,583,000.  The Company's pro forma net income per common share would be approximately $0.46 for the year ended March 31, 1999.

The weighted average fair value of options granted during the year ended March 31, 1999 is estimated on the date of grant using the Black-Scholes option-pricing model to be $2.65.  The fair value of the 1999 options granted is estimated on the date of grant using the following assumptions:

|  | 1999 |
|---|---|
| Risk-free interest rate | 5.90% |
| Expected dividend yield | 0% |
| Expected option life | 9.04 years |
| Expected stock price volatility | 58.8% |

BG 0636

# SHAREHOLDER INFORMATION

**BOARD OF DIRECTORS**

Kwong Ho Sham
Chairman of the Board

John C.K. Sham
President and Chief Executive Officer

Brian Yuen
Chairman of the Finance Committee
Chief Executive Officer, Global-Tech USA, Inc.

Peter C. McC. Howell
Director
Former Chairman and Chief Executive Officer,
Signature Brands USA, Inc.

Shun Chi Hui
Director

Wai Chun Hui
Director

**OFFICERS**

Kwong Ho Sham
Chairman of the Board

John C.K. Sham
President and Chief Executive Officer

Brian Yuen
Chairman of the Finance Committee
Chief Executive Officer, Global-Tech USA, Inc.

Pui Lam Fan
Director of Engineering

Wing-On Lo
Director of Manufacturing Operations

Cheok Yuen Lee
Director of Human Resources

**REGISTRAR AND TRANSFER AGENT**

American Stock Transfer & Trust Company
40 Wall Street
New York, New York 10006
212-936-5100

**INDEPENDENT ACCOUNTANTS**

Arthur Andersen & Co.
Certified Public Accountants
Hong Kong

**LEGAL COUNSEL**

Parker Chapin Flattau & Klimpl, LLP
New York, New York

**1999 ANNUAL SHAREHOLDER MEETING**

March 15, 2000 at 10:30 A.M.
Aberdeen Marina Club
8 Shum Wan Road
Aberdeen, Hong Kong

**STOCK WATCH**

Global-Tech's ordinary shares are traded on The New York Stock Exchange ("NYSE") under the symbol GAI. The usual stock table abbreviation is GlbTApp.

From April 8, 1998 through March 31, 1999, the high and low last reported sale prices for Global-Tech's ordinary shares listed on NYSE were $20.50 and $4.00, respectively.

As of December 28, 1999, approximately 67% of the outstanding ordinary shares of Global-Tech were held in the United States by 12 holders registered on the books of Global-Tech's transfer agent.

**AVAILABILITY OF ADDITIONAL INFORMATION**

This publication is a summary annual report. A copy of Global-Tech's annual report on Form 20-F and quarterly reports will be furnished without charge upon request to any shareholder. Please send requests to:

Jeff Ng
Financial Controller
Global-Tech Appliances Inc.
Kin Teck Industrial Building
12/F., 26 Wong Chuk Hang Road
Aberdeen, Hong Kong

For further information on Global-Tech, products and markets, please call (852) 2814-0601 or fax (852) 2873-0591.

BG 0637

BG 0638

BG 0639

`

Confidential and Restricted
Pursuant to Protective Order

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SEB S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 98-1050 (WGB) |
| SUNBEAM CORP., SUNBEAM | ) | |
| PRODUCTS, INC., WING SHING INT'L | ) | |
| LTD. (BVI), and PENTALPHA ENTERS., | ) | |
| LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| SUNBEAM CORP., SUNBEAM | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Third-Party Plaintiffs/Counterdefendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WING SHING INT'L, LTD. (BVI) and | ) | |
| GLOBAL-TECH APPLIANCES, INC., | ) | |
| | ) | |
| Third-Party Defendants, and | ) | |
| | ) | |
| PENTALPHA ENTERS., LTD., | ) | |
| | ) | |
| Third-Party Defendant/Counterclaimant. | ) | |

## SUNBEAM'S RESPONSES TO PENTALPHA'S
## SECOND SET OF INTERROGATORIES

Pursuant to Rules 26, 33 and 37 of the Federal Rules of Civil Procedure, third-party plaintiffs and counterdefendants Sunbeam Corporation and Sunbeam Products, Inc. (collectively "Sunbeam") respectfully submit the following objections and responses to third-

Confidential and Restricted
Pursuant to Protective Order

party defendant and counterclaimant Pentalpha Enterprises Ltd.'s ("Pentalpha") Second Set of

Interrogatories.

## GENERAL OBJECTIONS

Sunbeam will respond to the Interrogatories subject to the general objections set

forth below.  These limitations and objections, which form a part of the response to each and

every interrogatory, are set forth here to avoid the duplication and retention of restating them for

every response.  These general objections may be specifically referred to in response to certain

interrogatories for the purpose of clarity.  However, the failure to specifically incorporate a

general objection shall not be construed as a waiver of that objection.

1.     Sunbeam objects to the Interrogatories (including the Definitions and

Instructions referenced and contained therein) to the extent that they purport to impose

requirements, obligations and duties beyond, or different from, those imposed by the Federal

Rules of Civil Procedure, the Local Rules of the Federal District Court for the District of New

Jersey, and the Revised Scheduling Order dated May 25, 2000.

2.     Sunbeam objects to the Interrogatories to the extent that they seek

information that is neither relevant to the issues raised in this lawsuit nor reasonably calculated to

lead to the discovery of admissible evidence.  Nothing herein shall be construed as an admission

by Sunbeam respecting the admissibility or relevance of any fact or document.

3.     Sunbeam objects to the Interrogatories to the extent that they call for

disclosure of information protected by the attorney-client privilege, the attorney work product

privilege or any other applicable privilege or immunity.  Sunbeam will not disclose such

-2-

Confidential and Restricted
Pursuant to Protective Order

privileged and protected information.  Inadvertent disclosure of privileged or otherwise objectionable information shall not be deemed a waiver of any such privilege and/or immunity.

   4.  Sunbeam objects to the Interrogatories to the extent that they seek confidential commercial, business, financial, proprietary or competitively sensitive information. Such information shall only be disclosed pursuant to the protective order and where directly pertinent to the instant litigation.

   5.  Sunbeam objects to the Interrogatories to the extent that they seek publicly available information to which Pentalpha and Sunbeam have equal access.

   6.  Sunbeam objects to the Interrogatories to the extent that they seek information not in Sunbeam's possession, custody or control.  In particular, Sunbeam objects to the Interrogatories that request information not within Sunbeam's knowledge and, instead, request information within the knowledge of former employees of Sunbeam who are no longer affiliated with Sunbeam.  Any responses to the individual interrogatories are based solely on information in Sunbeam's current possession.

   7.  Sunbeam objects to the Interrogatories to the extent that they are unduly broad and/or to the extent that responding to them would be unduly burdensome, impose extreme hardship or would result in the expenditure of unnecessary time and resources, as the Interrogatories seek information that has already been provided to Pentalpha, or is in Pentalpha's possession, custody or control.

   8.  Sunbeam objects to the Interrogatories to the extent that they seek the disclosure of private and confidential information relating to third parties not subject to this suit

Confidential and Restricted
Pursuant to Protective Order

or make inquiries about matters the disclosure of which is prohibited by statute, regulation or other applicable law.

9.   Sunbeam objects to the Interrogatories to the extent certain interrogatories either assume the existence of facts that Sunbeam disputes or constitute an inaccurate characterization of the facts.  Any response, objection or production is without prejudice to Sunbeam's continuing objection to such characterizations.

10.   Sunbeam objects to the Interrogatories to the extent that the terms or phrases used therein are vague and ambiguous.

11.   Sunbeam objects to the Interrogatories to the extent the answers thereto may be derived or ascertained from documents produced or to be produced in this action or from an examination, audit or inspection of such documents and the burden of deriving or ascertaining the answer is substantially the same for Pentalpha as for Sunbeam.  In such case, Sunbeam will produce documents from which the answer to the interrogatory may be derived or ascertained in accordance with the schedule for the production of documents set forth in the May 25, 2000 Revised Scheduling Order in this case.

12.   In making these objections and responses, Sunbeam does not in any way waive or intend to waive, but rather intends to preserve and is preserving:

(a)  all objections as to competency, relevancy, materiality and admissibility of any information that may be provided in response to the Interrogatories, or the subject matter thereof;

Confidential and Restricted
Pursuant to Protective Order

(b)  all rights to object on any ground to the use of any of the information that may be provided in response to the Interrogatories, or the subject matter thereof, in any subsequent proceedings, including the trial of this or any other action; and

(c) all rights to object on any ground to any request for further responses to this or any other discovery requests.

13.    Any reference to a document contained in the responses to the Interrogatories shall not be deemed to be an admission that any particular copy of the document is authentic or genuine, nor shall it be deemed an admission of the relevance or admissibility of the document.  Sunbeam reserves its right to object to the authenticity, relevance, and admissibility of all such documents referred to in the responses to the Interrogatories.

14.    The responses and objections herein are based on Sunbeam's present knowledge, information and belief.  Sunbeam reserves the right to amend, revise, correct, and to clarify any of the responses or objections therein.

15.    Sunbeam objects to the disclosure of information falling within any of the foregoing general objections or the specific objections set forth below, and in the event any information falling within one or more of these objections is disclosed in these responses, the disclosure is inadvertent and shall not constitute a waiver of the objections.

Confidential and Restricted
Pursuant to Protective Order

## – SPECIFIC OBJECTIONS AND RESPONSES

Interrogatory No. 1. State in detail the amounts that you claim that Pentalpha owed Sunbeam for indemnification with respect to each of the following cases:

Rival v. Sunbeam;

Black & Decker v. Sunbeam; and

SEB v. Sunbeam.

### Response to Interrogatory No. 1:

Subject to the above-stated General Objections, Sunbeam states it is still incurring expenses for which it will seek indemnification from Pentalpha, and as such Sunbeam reserves the right to supplement its response to this interrogatory at the appropriate time. Based on information reasonably available, Sunbeam intends to seek indemnification from Pentalpha of the following amounts for the following cases.

| | |
|---|---|
| Rival / Black & Decker v. Sunbeam: | $1,351,392.00 |
| SEB v. Sunbeam: | $2,395,336.00 |

Interrogatory No. 2. Identify all documents that constitute, relate or refer to your response to the preceding interrogatory.

### Response to Interrogatory No. 2:

Subject to the above-stated General Objections, Sunbeam objects to Interrogatory No. 2 to the extent that the interrogatory does nothing more than seek to compel Sunbeam to perform a substantive review and coding for Pentalpha of the documents Sunbeam is producing or has produced. The burden of reviewing those produced documents is equal upon Pentalpha as

-6-

Confidential and Restricted
Pursuant to Protective Order

it is upon Sunbeam.  Without waiving these objections, Sunbeam states that it has produced and

is producing documents responsive to this interrogatory.

Interrogatory No. 3.  State in detail all amounts that you admit Pentalpha paid or credited to Sunbeam with respect to each of the following cases:

Rival v. Sunbeam;

Black & Decker v. Sunbeam; and

SEB v. Sunbeam.

**Response to Interrogatory No. 3**:

In addition to the above-stated General Objections, Sunbeam states that the

burden of proving any credits against the amounts sought by Sunbeam for indemnification is

Pentalpha's burden, not Sunbeam's.  As such, Sunbeam objects to Interrogatory No. 3 to the

extent that the interrogatory does nothing more than seek to compel Sunbeam to perform a

substantive review and coding for Pentalpha of the documents Sunbeam is producing or already

has produced.  The burden of reviewing those produced documents is equal upon Pentalpha and

Sunbeam.

Interrogatory No. 4.  Identify all documents that constitute, relate or refer to your response to the preceding interrogatory.

**Response to Interrogatory No. 4**:

Subject to the above-stated General Objections, Sunbeam states that the burden of

proving any credits against the amounts sought by Sunbeam for indemnification is Pentalpha's

burden, not Sunbeam's.  As such, Sunbeam objects to Interrogatory No. 4 to the extent that the

interrogatory does nothing more than seek to compel Sunbeam to perform a substantive review

and coding for Pentalpha of the documents Sunbeam is producing or already has produced.  The

-7-

Confidential and Restricted
Pursuant to Protective Order

burden of reviewing those produced documents is equal upon Pentalpha and Sunbeam.  Without

waiving this objection, Sunbeam has produced and is producing documents in response to this

interrogatory.

Interrogatory No. 5.  Other than for indemnification with respect to the cases referred to in interrogatories 1 and 2, state whether you claim that Pentalpha owes any other money to Sunbeam and if so:

(a)   describe in detail the nature of the claim;

(b)   identify each document that constitutes, relates or refers to that claim; and

(c)   state the amount of money that you claim is owed pursuant to that claim.

Confidential and Restricted
Pursuant to Protective Order

**Response to Interrogatory No. 5:**

Subject to the above-stated General Objections, Sunbeam objects to this interrogatory on the ground that it seeks information not likely to lead to the discovery of admissible evidence and because it seeks information regarding claims not asserted in this action. Sunbeam will supplement its response to this interrogatory if Sunbeam seeks to assert additional claims against Pentalpha.

Dated:   October 17, 2000

Respectfully submitted,

SUNBEAM CORPORATION and
SUNBEAM PRODUCTS, INC.

By: _____

Robert L. Byman                     Claire C. Cecchi (CC1340)
Terrence J. Truax                    CARPENTER, BENNETT & MORRISSEY
Clark C. Johnson                     Three Gateway Center
JENNER & BLOCK                       100 Mulberry Street
One IBM Plaza                        Newark, NJ 07102-4079
Chicago, Illinois 60611              (973) 622-7711
(312) 222-9350

Attorneys for SUNBEAM CORPORATION
and SUNBEAM PRODUCTS, INC.

Document Number : 476212

-9-

Confidential and Restricted Pursuant To The Protective Order

## VERIFICATION

State of Florida          )
                          )
County of Palm Beach)

        Steven Berreth, being duly sworn, states:

        That he verifies the foregoing Answers to Interrogatories for and on behalf of The Sunbeam Company and is duly authorized to do so; that certain of the matters stated in the foregoing answers are not within his personal knowledge; that the facts stated in said answers have been assembled by employees and/or legal counsel, and that he is informed by said employees and/or legal counsel that the facts stated herein are true and correct.

Subscribed and sworn to before me
this _9th_ day of _October_ , 2000.

Notary Public

Diane Kay Vickery
Commission # CC 831908
Expires May 2, 2003
Bonded Thru
Atlantic Bonding Co., Inc.

## CERTIFICATE OF SERVICE

I, Timothy A. Hudson, an attorney, certify that on October 17, 2000, I caused a copy of Sunbeam's Responses to Pentalpha's Second Set of Interrogatories to be served via Federal Express upon the following counsel for Pentalpha:

William Dunnegan, Esq.
Perkins & Dunnegan
720 Fifth Avenue
New York, NY 10019
(212) 397-7020

Timothy A. Hudson

# AGREEMENT

**THIS AGREEMENT**, made and entered into as of the 10 day of February, by and between SUNBEAM-OSTER HOUSEHOLD PRODUCTS, having a place of business at 1501 Woodfield Road, Schaumburg, Illinois 60173, U.S.A. (hereinafter referred to as "Sunbeam"), and Wing Shing Products (BVI) Company Ltd., having a place of business at P.O. Box 71 Craigmuir Chambers, Road Town Tortola, British Virgin Islands  and c/o Wing Shing Products Co. Ltd. 9-10/F, 12-13F, Kin Teck Ind. Bldg.,26 Wong Chuk hang Road, Aberdeen, Hong Kong.

**WHEREAS,** Sunbeam desires to purchase on an exclusive basis a Food Steamer; and

**WHEREAS,** Supplier desires to manufacture on an  exclusive basis for Sunbeam one model of the Food Steamer in oval shape and one or two Steaming Bowls models 4710, and 4711. (These model numbers and names may be changed by Sunbeam at a later date) and to sell same to Sunbeam.

**NOW, THEREFORE**, the parties hereto agree as follows:

## Variable Terms and Conditions
## PART I

1. The following Variable Terms and Conditions supplement and modify the General Terms and Conditions that follow in Part II herof.  Capitalized words shall have the meaning ascribed to them in the General Terms and Conditions.

2. The Units shall meet the following Board Standards (see Paragraph 2  (a) of Part II:  Underwriter's Laboratories (U.L.) and all Food and Drug Administration (F.D.A.) regulations for units to be sold in the U.S.A.; Canadian Specification and Quality Assurance Standard will be provided and will be incorporated  in Attachment "A".

3. The number of Samples to be delivered by Supplier (see Paragraph 2(b) of Part II) shall be 30.

CONFIDENTIAL

1

SB 000215

4. The number of Units contained in each master shipping carton (see Paragraph 3 (a) of Part II) shall be 4.

5. The expense of fabricating the printing plates and dies necessary for printing the graphics for the packaging and enclosures of the Units (see Paragraph 3 (b) of Part II shall be borne by Sunbeam.

6. Supplier shall bear all costs and expenses associated with listing the Units with the Boards set forth above.

7. The quantity of Units to be purchased by Sunbeam (see Paragraph 6(a) of Part II) shall be 100,000.

8. The F.O.B. point to which Supplier will deliver Units (see Paragraph 7(a) of Part II shall be Hong Kong.

9. The price for Units and Additional Units (see Paragraph 8 of Part II) shall be $12.60 USD, For model 4710 and $14.10 USD for Model 4711. ~~Such~~ ~~Unit price~~ shall remain firm through 1995. *Such price has been revised to $18.00 and $14.60 respectively for shipment starting August 1.95.*

Payment shall be make via Letter of Credit payable upon presentation of sight draft and other listed documents. Letter of Credit ot be issued 30 days days before ship date. Letter of credit will only be used on the first 50,000 units. Additional units will be paid by D/P.

10. The following party shall bear the expense of purchasing of fabrication the Tooling (see Paragraph 9(a) of Part II) :  Supplier.

11. Supplier shall bear the cost of service, repair or replacement of Units on the following basis:  Supplier to provide 2% free goods in the first container shipment and supplier to replace in one basis for any defective goods as found to be manufacturing defects.  Sunbeam responsible for all other warranty expenses except that of an epidemic failure.

12. Any failure rate in excess of the following shall be deemed to be an epidemic (see Paragraph 12 (b) if Part II) : 5%.

13. Supplier agrees to make available replacement assemblies and /or parts

CONFIDENTIA

2

SB 000216

to Sunbeam for a period of one (1) year, after shipment received in the United States. (See Subsection 12(c) of Part II).

14. Additional terms (if any): ~~Sunbeam has the exclusive right to sell the Food Steamer in North America~~. "SUNBEAM has the exclusive right to Sell the Oval food Steamer in North America ~~with an exception~~ and will be exclusive to Sunbeam in Canada. A different model mutually acceptable to Sunbeam and Supplier will be exclusive to Sunbeam in Canada.

ROW
Aug 16, 1995

15. All notices given by either party hereunder to the other shall be addressed follows:

Sunbeam-Oster Household Products
P.O. Box 247
Laurel, Mississippi 39441
Attn: Robert O. Ward

Wing Shing Products Co. Ltd.
9-10 /F, 12-13 F Kin Teck Ind. Bld.
26 Wong Chuk Hang Road,
Aberdeen, Hong Kong
Attn: Peter Yu

**CONFIDENTIAL**

3    *ROW*

**General Terms and Conditions**
**PART II**

1.  **THE UNDERTAKING:**

    Supplier agrees to manufacture and Sunbeam agrees to purchase the Units.

2.  **SPECIFICATIONS:**

    (a)   The Units will strictly conform with Attachment "A" and will be manufactured so as to meet the Board Standards and other requirements referenced above in Part I.

    (b)   Supplier will provide samples of each model Unit and its packaging ("Samples") in the quantities set forth in Part I. Samples shall be produced from Tooling (as hereinafter defined) and must satisfy the Board Standards and in all respects conform to the specifications for Units. The Samples will be inspected by Sunbeam and Supplier will be advised of changes which need to be made before production and/or packaging of Units may be commenced. The final approved Samples shall supplement the specifications to which the Units shall strictly conform.

3.  **PACKAGING, ENCLOSURES AND MARKING SPECIFICATIONS:**

    (a)   The Units will be individually packaged. The number of individually packaged Units placed in each master carton shall be as specified in Part I. Supplier shall package master cartons of Units so that they withstand the mode of transportation selected by Sunbeam for each shipment without damage. The packaging must satisfy packaging requirements specified in Attachment "A".

    (b)   The party designated in Part I will bear the expense of the purchase of the printing plates and dies required to print and fabricate the packaging.

4.  **INSPECTION:**

    (a)   Based upon its inspection and testing at its ultimate destination, Sunbeam may reject any shipment or part thereof which does not meet its specifications for Units. Sunbeam shall <u>not</u> be deemed to have accepted any shipment of Units and Sunbeam

**CONFIDENTIAL**

4  *[signature]*

SB 000218

shall be entitled to a refund of the purchase price (including the cost of transporting the Units from the F.O.B. points specified in Paragraph 8 of Part I hereof to the point of Sunbeam's final inspection) paid for any shipments of Units which shall fail to meet said specifications.

5.    **BOARD STANDARDS:**

Supplier will, at no cost to Sunbeam, offer all assistance, provide samples and make any changes to Tooling so the Units will meet the various Board Standards listed herein. Sunbeam will not be required to pay for any Units until and unless they conform and continue to conform to the Board Standards.

6.    **QUANTITY TO BE PURCHASED:**

(a)    Sunbeam may order Units in addition to the number specified in Part I (hereinafter referred to as "Additional Units").

(b)    Units and Additional Units shall be ordered via Sunbeam's standard form of purchase order bearing a notation which refers to this Agreement. Such purchase order shall specify the number of Units ordered, the delivery schedule and the ultimate shipping destination. Sunbeam will provide Supplier with a minimum of two (2) months lead time for delivery of Additional Units to the ultimate destination designated by Sunbeam.

7.    **SHIPMENT, DELIVERY AND TITLE:**

(a)    The Units are to be delivered F.O.B. the point specified in Part I. Sunbeam retains the right to modify any delivery schedule previously designated in any purchase order delivered to Supplier.

(b)    If all or any portion of an order is not delivered on the delivery date(s) specified in the relevant purchase order, Sunbeam may (without limiting or waiving its right to assert any other remedies available at law) exercise one or more of the following options:

(i)         cancel the undelivered portion of any order;

(ii)        require Supplier to ship the order via premium means (such as air freight at Supplier's expense); or

**CONFIDENTIAL**

-5-

*Now*

SB 000219

(iii)        require Supplier to discount the pricing on the undelivered portion of the order.

8.    <u>PRICING</u>:

The price for Units and/or Additional Units (see Section 9 of Part I) shall remain firm throughout the life of this Agreement unless otherwise specified in Part I.

9.    <u>SUNBEAM TOOLING</u>:

(a)    The tools, dies, molds or fixtures ("Tools" or "Tooling") required by Supplier to manufacture the Units shall be purchased or fabricated by Supplier at the expense of the party designated in Part I. The minimum useful life of such Tooling shall allow manufacture of the total number of Units to be purchased hereunder. Supplier shall provide Sunbeam with a list of the Tooling as well as a drawing of each such Tool.

(b)    If Tooling is to be paid for by Sunbeam, Supplier will not charge Sunbeam more than Suppliers' actual Tooling costs and will bear the expense of Tooling in excess of the amount specified in Part I. Sunbeam will pay for such Tooling costs in the manner set forth in Section 10 and Section 11 of Part I.

(c)    Tools paid for by Sunbeam (whether wholly or in part) shall be the property of Sunbeam. Supplier shall maintain and repair Sunbeam's Tooling at no cost to Sunbeam. Upon written demand, the Tools shall, at Sunbeam's option, be either promptly destroyed or shipped in accordance with Sunbeam's instructions. Sunbeam shall reimburse Supplier for its reasonable costs of destruction (less any scrap value realized by Supplier) or shipping.

(d)    If Sunbeam rejects the first shipment of production Units because of a problem attributable to defects in the Tooling and Supplier is unable to correct such defects within a reasonable time not to exceed sixty (60) days, Supplier shall be required to purchase the Tooling from Sunbeam at a price equal to all payments made by Sunbeam in respect of such Tooling.

(e)    Supplier shall not use any Tools paid for or to be paid for by Sunbeam for any purpose other than the manufacture of Units to be sold to Sunbeam hereunder.

CONFIDENTIAL

-6-

SB 000220

10.   **RESTRICTIONS OF TRADEMARK AND DESIGN**:

    (a)    Supplier acknowledges that Sunbeam is the owner of all rights in any and all trade names and trademarks, including SUNBEAM, and the brand names which may be applied to the Units or which Sunbeam may notify Supplier of in the future (hereinafter referred to as "Trademarks") and that Sunbeam has the exclusive right to use the Trademarks or any confusingly similar trade names or trademarks. Supplier will not use the Trademarks or any confusingly similar trade name or trademark in any manner except as specified herein and will not use the Trademarks or any confusingly similar trade name or trademark on or in connection with any goods other than those specifically covered by this Agreement. Supplier will supply only to Sunbeam goods bearing the Trademarks or any confusingly similar trade name or trademark. Upon termination of this Agreement for any cause, Supplier will immediately cease any and all use of the Trademarks or any confusingly similar trade name or trademark, and thereafter will not manufacture and sell itself or enter into any agreement with any third party to manufacture or supply goods under the Trademarks or any confusingly similar trade name or trademark.

    (b)    Sunbeam shall have the exclusive right to the visual design of the Units covered by the Agreement. Supplier agrees that it will not manufacture or sell any goods which are the same or similar to the visual design of the Units except under the terms of this Agreement. Supplier agrees not to use the Tooling or to allow same to be utilized in the manufacture of any goods which embody the same or similar visual design as the Units except as expressly approved in writing by Sunbeam.

    (c)    If the Unit's mechanical, visual and electrical designs were created by Sunbeam, Supplier agrees not to use the Tooling or to allow same to be utilized in the manufacture of any goods which are the same as or similar to the Units except as sold to Sunbeam pursuant to this Agreement or otherwise expressly approved in writing by Sunbeam.

11.   **PRODUCT WARRANTY**:

    Supplier hereby warrants that the Units will be of good and merchantable quality, be free from defects in material and workmanship, strictly conform to the Specifications and pass quality control inspection and testing in accordance with the Quality Assurance Standard attached hereto as Attachment "A".

12.   **SERVICE AND REPLACEMENT PARTS**:

CONFIDENTIAL

-7-

SB 000221

(a)     Except with respect to an epidemic as defined in Paragraph 12(b), service, repair or replacement of defective Units purchased pursuant to the Agreement shall be performed by Sunbeam or its authorized service facilities. The cost of any such service, repair or replacement (or any specified portion of such cost) shall be borne by the party specified in Part I.

(b)     If the Units or any particular model line of the Units become subject to an epidemic or broad series of product failures, as evidenced by a failure rate(s) in excess of that specified in Part I, Supplier shall at its own cost and expense, including necessary shipping charges, provide Sunbeam, Sunbeam's customers or consumers with a new and unused and properly functioning Unit for each Unit (all units, not simply defective Units) manufactured during the period of time which is relevant to the defect. Supplier shall indemnify, defend and hold Sunbeam its subsidiaries and its customers harmless from any and all costs and expenses, including claims, suits or other manner of governmental or private actions relating to or arising from an epidemic.

For the purpose of this Paragraph 12, the terms "fail" or "failure" refer to any Unit or mechanical part thereof which is not of good and merchantable quality and free from defects in material and workmanship and the term "failure rate" refers to the ratio of the number of Units which failed compared to the total number of Units which at any time during the life of the Agreement have been sold at the retail level. An epidemic shall also be deemed to exist if any significant number of Units shall contain one or more defects which create a substantial product hazard within the meaning of the Consumer Product Safety Act of the United States or any comparable law of any country in which Units are used.

(c)     After the final shipment of Units and Additional Units hereunder, Supplier shall, for the period of time specified in Part I, supply replacement assemblies and/or parts to Sunbeam upon request and shall not discontinue the manufacture thereof without Sunbeam's prior approval. The price for such replacement assemblies or parts shall be negotiated in good faith by the parties hereto, but shall in any event generally conform to the pricing applicable prior to the final shipment of Units or Additional Units hereunder.

13.   <u>**INDEMNITY**</u>:

(a)     Supplier agrees to hold harmless, defend and indemnify, Sunbeam and its customers from and against all liability, cost and expense arising out of the death of or injury

CONFIDENTIAL

-8-



SB 000222

to any person, or damage to property, resulting or claimed to have resulted from any purchase, sale, or use of the Units furnished hereunder. Sunbeam shall promptly notify Supplier of any such claim or lawsuit.

(b)     Supplier shall hold harmless, defend and indemnify Sunbeam and its customers from all suits which may be brought on account of United States patents or patents or registered designs of any other country charged to have been infringed by such Units or the purchase and resale thereof; provided, however, that Supplier is given notice of such suit for infringement and is given the right to defend the same.

(c)     Supplier shall, at its own cost and expense, during the term of the Agreement and for a period of three (3) years from the date of Supplier's last shipment of Units or Additional Units hereunder, buy and maintain product liability insurance, written by an insurer acceptable to Sunbeam which is licensed to conduct business in the United States with product liability and contract liability endorsements with a combined personal injury and property damage limit of not less than One Million Dollars (U.S.)($1,000,000.00) per occurrence. *LIABILITY INSURANCE IS TO BE RENEWED EVERY YEAR BEFORE THE EXPIRY DATE* All such policies shall include Sunbeam as an additional insured and shall provide that coverage thereunder shall not be terminated or changed without at least ten (10) days prior notice in writing to Sunbeam. Evidence of such insurance shall be submitted to Sunbeam prior to the delivery of any Units to Sunbeam as herein elsewhere provided.

*ROW Aug 16, 1995*

*ROW Aug 16, 1995*

.14.     <u>ODC LABELING</u>:

Supplier represents and warrants that it does not use ozone depleting chemicals (ODCs) in its manufacturing processes for the Units and that the Units will not need to be labelled pursuant to the provisions of Section 611 of the Clean Air Act Amendments of 1990 ("Section 611") of the United States of America. Supplier represents that it is familiar with the requirements of Section 611 and understands that Sunbeam would not enter into any agreement to purchase the Units from Supplier if the Units were manufactured with ODCs or with manufacturing processes that make use of ODCs.

15.     <u>ASSIGNMENTS</u>:

This Agreement shall not be assignable by either party without the written consent of the other; provided, however, that this Agreement shall be assignable by Sunbeam to any successor of its entire business and goodwill without the consent of Supplier.

CONFIDENTIAL

-9-

*ROW*

SB 000223

16.    **TERMINATION:**

Deliver of all the Units required hereunder shall not in any manner affect or terminate the rights and obligations of the parties hereto which have accrued hereunder prior or subsequent to such delivery, and specifically, without limitation, the rights and obligations of the parties relative to payment, warranties, parts and indemnities.

17.    **SEVERABILITY CLAUSE:**

Any provision of this Agreement which is prohibited by the laws of any country or state shall as to that jurisdiction be ineffective only to the extent of such prohibition without invalidating the remaining provisions of this Agreement.

18.    **WAIVER:**

The failure of any party to insist in any one instance or more, upon the performance of any of the covenants or conditions of this Agreement, or to exercise any right or privilege therein conferred, shall not be construed as thereafter waiving any such covenants, conditions, right or privileges but the same shall continue and remain in full force and effect.

19.    **NOTICE:**

Any notice required to be given hereunder shall be in writing by registered mail, addressed to the other party as set forth in the Agreement.

20.    **PRIOR AGREEMENTS OR UNDERSTANDINGS AND MODIFICATIONS:**

The Agreement supersedes all other Agreements and shall constitute the entire contract between the parties hereto, and no party shall be bound by any Agreement not specifically stated herein.

-10-

**CONFIDENTIAL**

SB 000224

21. **MISCELLANEOUS:**

The Agreement shall not be construed as constituting the parties a partnership, joint venture or any other form of association which would impose on any party liability for the act or failure to act of the other party.

**IN WITNESS WHEREOF**, the parties, by their duly authorized representatives, do execute this Agreement.

ATTEST:

_____         _____

                               David Q. McCoy
                              (Printed Name)
                              V.P. Human Resource Info Systems
                              (Title)

ATTEST:

_____         _____

                               SHAM CHUN KUEN, JOHN
                              (Printed Name)
                              PRESIDENT
                              (Title)

CONFIDENTIAL

-11-

SB 000225

# *Sunbeam*, CORPORATION

1615 Sunbread Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| | | SHIP VIA | FOB | | CODE | TERMS See Text | CODE | BUYER CODE 2212 | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE 03/05/98 | REQUESTED BY | | AMCD | | VALUE 00011727 | | | AR. NO. 00011727 | | ACCOUNT NO |
| | | | PURCHASING | | | | | REMIT | | |

```
T      Pentalpha Enterprises Ltd
O      Kin Teck Ind. BLdg. 9-10, 12-13/F
       Wong Chuk Hang Road
       Aberdeen
       Hong Kong
```

SUNBEAM PRODUCTS, INC.
98 MC RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | UM | SHIP SCHEDULE QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| | | Ship Date 6/25/98 | | | | |
| 21060.000 | PC | 21060.000 | 07/25/98 | 003246-000-000 | DEEP FRYER,OSTER 110.12250.430 | 26.5800 |
| | | Ship Date 7/20/98 | | | | |
| ✳ 9828.000 | PC | 9828.000 | 08/20/98 | 003246-000-000 | DEEP FRYER,OSTER 110.12250.430 | 26.5800 |
| | | Ship Date 8/20/98 | | | | |
| 21060.000 | PC | 21060.000 | 09/20/98 | 003246-000-000 | DEEP FRYER,OSTER 110.12250.430 | 26.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model 84714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:

✳ Revised P.O. Qty Change -
Do Not Duplicate.

Ship To: Address stated above
Bill To: SUNBEAM, INC., P.O. BOX 537925, LIVONIA, MI 48153-8925

**ALL PALLETS USED ON THIS PURCHASE ORDER MUST BE GOOD QUALITY 40" X 48" 4-WAY PALLETS.**

1. Correspondence - Must show our purchase order number and our part number including invoices, packing slips.
2. Packing List - Must be itemized with our part number and purchase order number.
3. All Shipping Containers - Must show our purchase order number, our part number, quantity per box, and the weight per box.
4. If shipment is made to Laurel, Miss. instead of ship to, vendor will be charged back □ $50.00 extra handling plus reconsignment charge.
5. The articles purchased are to be incorporated into tangible personal property to be consumed directly in manufacturing, unless otherwise stated.
6. All cash discounts allowed are taken with dating starting as of receipt or invoice or of merchandise, whichever is later.
7. Invoices dated after the 25th of the month will be considered as of the first of the following month.
8. If shipment is to be made or invoiced by some other company, advise at once. Do not ship C.O.D.
9. No charge for boxing, crating, etc. will be allowed unless stated on order.
10. Mail invoice and bill of lading immediately on day of shipment.
11. Hold overrun or underrun to $100.00 maximum on total purchase order value.
12. All goods are to be of American manufacture unless otherwise stated.
13. All conditions of this order, which appear on reverse side, must be complied with.
14. A 5% Handling Fee will be charged to Reject Materials.

BY _Felice Rosenstein_

ORIGINAL          9018522 8730591

ACTIVITY TRANSMISSION REPORT

```
TIME      : MAY 12 '98  14:10
TEL NUMBER : 5612432017
NAME      : SUNBEAM CORPORATION
```

| NBR | FILE | DATE | TIME | DURATION | PGS | TO | DEPT NBR | MODE | STATUS |
|-----|------|------|------|----------|-----|-----|----------|------|--------|
| 471 | 09 | MAY.12 | 14:08 | 02/24 | 4 | + 852 2814 0769 | | EC | M | OK |

Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO.
0P00F   98039970
Page    1

| | SHIP VIA | FOB | | CODE | TERMS See Text | | CODE BUYER CODE 2212 | CONFIRMATION WITH | | F.O. TYP |
|---|----------|-----|---|------|----------------|---|------|-------------------|---|----|

| DATE 05/05/98 | REQUESTED BY | | | | VALUE | AR NO. | | ACCOUNT NO. | |
|---------------|--------------|---|---|---|-------|--------|---|-------------|---|
| | ANCB | | | | 00011727 | 00011727 | | | |

PURCHASING — REMIT

| T O | Pentalpha Enterprises Ltd<br>Kin Teck Ind. Bldg. 9-10, 12-13/F<br>Wong Chuk Hang Road<br>Aberdeen<br>Hong Kong<br>Hong Kong | S H I P T O | SUNBEAM PRODUCTS, INC.<br>*** *** ***<br>*** *** |

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | UM | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|----------------|-----|----------|------|--------------|-------------|-------|
| | | *Ship Date 6/25/98* | | | | |
| 21060.000 | PC | 21060.000 | 07/25/98 | 003246-000-000 | DEEP FRYER,OSTER<br>110.12250.430 | 26.580 |
| | | *Ship Date 7/20/98* | | | | |
| *#* 9828.000 | PC | 9828.000 | 08/20/98 | 003246-000-000 | DEEP FRYER,OSTER<br>110.12250.430 | 26.580 |
| | | *Ship Date 8/20/98* | | | | |
| 21060.000 | PC | 21060.000 | 09/20/98 | 003246-000-000 | DEEP FRYER,OSTER<br>110.12250.430 | 26.580 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:

*\* Revised P.O. Qty Change —*
*Do Not Duplicate*

Ship To: Address stated above      ALL PALLETS USED ON THIS PURCHASE ORDER MUST BE GOOD QUALITY 40" X 48" 4-WAY PALLETS.
Bill To: SUNBEAM, INC., P.O. BOX 537925, LIVONIA, MI 48153-8925
1 Correspondence - Must show our purchase order number and our part number including invoices, packing slips.
2 Packing List - Must be itemized with our part number and purchase order number.

# TERMS AND CONDITIONS

This purchase order may be construed as an offer, an acceptance of an offer or a confirmation of a contract.

If this purchase order is construed as an offer, the seller expressly limits acceptance of any part of the offer to these the terms and conditions of the offer and constitues notice of objection to any and all additional or different terms in the acceptance so as to preclude the inclusion of any such different or additional terms in any resulting contract.

If this purchase order is construed as an acceptance, the acceptance of any part of the offer is expressly conditioned on the Seller's assent to any additional or different terms contained herein.

If this purchase order is construed as a written confirmation of an existing contract, any such confirmation in whole or in part is expressly conditioned on the Seller's assent to any additional or different terms contained herein.

All sections of the applicable Uniform Commercial Code which expressly or impliedly protect the Buyer are hereby incorporated by reference in this form whether it be construed as an offer, acceptance or confirmation.

1. Sunbeam Corporation (Buyer) reserves, and shall at all times have, the right to recoin excess shipments at Seller's expense.

2. If the same or similar goods, commodities, products and items have previously been purchased by the Buyer from the Seller, the Seller shall not charge higher prices therefor than on such previous purchases, irrespective of the price noted and shown on this order. If higher prices are to be charged, the Seller shall notify the Buyer thereof, and actually receive Buyer's written acceptance of such higher prices before accepting or filling this order.

3. If this order specifies the requirements of the Buyer for any period at prices herein stated, the Buyer reserves the right (1) in the event of a decline in the market price of the goods, commodities, products and items herein ordered, or (2) if the Buyer is offered similar goods, commodities, products and items of similar good quality at a price less than the price herein stated, to cancel any unfilled or undelivered part or portion of this order, unless the Seller meets such lower prices.

4. If the Buyer shall cease to use the goods, commodities, products and items herein specified, it may at its option, cancel this order at any time, but if said goods, commodities, products and items herein specified are not stock goods, commodities, products and items, but are special designs and sizes manufactured or obtained by Seller to fill this order for the Buyer, the Buyer shall on such cancellation of this order, only take delivery of such special sizes and designs of such goods, commodities, products and items which shall have then been made up and completed for the Buyer especially for this order, at the time of such cancellation.

5. Seller warrants all goods sold pursuant hereto as to workmanship, materials and design, and, where applicable as to conformance with drawings, specification samples or other descriptions. Such Warranty shall be for a period of two years from date of shipment or in the event of latent defects, two years from the date Buyer or its customers first became or should have become aware of same. If in the judgement of the Buyer goods delivered pursuant to this Purchase Order are defective, in whole or in part, then Buyer may elect to treat this as either a partial or total breach of contract, and may avail itself of any and all remedies available to it therefor, including, but not limited to cancellation of the Order, in whole or in part, rejection and return to Seller, at Seller's expense, of all or any portion of goods previously shipped, whether defective or not and whether previously accepted or not, replacement from other sources of goods covered by this Order and retention of defective goods and repair thereof at Seller's expense in any event. Seller shall be liable to Buyer for the full amount of such damages as flow from its breach of contract and Seller shall not be entitled, in diminution of same, to show that such procedures as Buyer chose to follow upon such breach resulted in greater damages than might or would have ensued had Buyer selected other available alternatives.

6. Time is of the essence as to Seller's performance hereunder, and if any goods are not delivered to Buyer by the time specified on the front of this Purchase Order, Buyer may at its option refuse acceptance of such goods, cancel any remaining unshipped portions of the Order, and avail itself of any other remedies available to it at law or equity for breach of contract, provided however that Seller shall not be liable for any special or consequential damages for late delivery owing only to reasons beyond its reasonable control and not resulting from its own negligence, including, but not limited to: Acts of God, war, civil disorders, strikes and the like. The Seller, however, shall promptly notify Buyer of any delays, or any impending or threatened delays.

7. Upon notice from Buyer of any contingency beyond Buyer's reasonable control, such as strikes, disputes or differences with workmen, accidents at Buyer's plant or the like, Seller shall defer or postpone any further shipments of goods pursuant to this Purchase Order and in such an event, no invoice shall be payable until completion of such contingency and acceptance by Buyer of shipment covered thereby.

8. If goods ordered pursuant hereto are to be made to any inventions, innovations, designs, plans, specifications, drawings or the like supplied by or on behalf of Buyer, then same shall remain property of the Buyer, and Seller shall have no rights, property or interest in same and hereby irrevocably assigns all such rights, at law or equity, if any to Buyer. Seller will treat same in confidence. Seller shall not furnish to anyone else the same goods, commodities, products and items or parts thereof without the Buyer's written permission, and at anytime upon demand by Buyer shall return the same to Buyer or make such other disposition as Buyer shall direct.

9. If any molds, dies, tools, special fixtures, jigs, patterns, models or the like, or any photographic negatives or printing plates or positives or the like, should be purchased or supplied by or on behalf of Buyer in connection with this Purchase Order, then same shall remain property of the Buyer, and Seller shall have no rights, property or interest in same; Seller shall be responsible for maintaining same in proper working order subject only to normal wear and tear where applicable. Seller shall treat same in confidence; Seller shall not furnish to anyone else the same goods, commodities, products and items or parts thereof without the Buyer's written permission, and at any time upon demand by Buyer, Seller shall return same to Buyer or make such other disposition as Buyer shall direct.

10. Prices shown on this Purchase Order are inclusive of any and all taxes whatsoever, whether sales, use, excise or other, or fees, duties or other governmental impositions, whether or not same are set forth separately on invoice to Buyer. If Buyer shall subsequently be reduced to pay any taxes or other fees relating to the production, sale or transportation of goods ordered pursuant hereto, Seller will reimburse Buyer therefor, if any tax is included in said prices with respect to which a refund is hereafter made to Seller, then Seller shall immediately pay the Buyer the amount of such refund.

17. Seller agrees to indemnify and hold harmless the Buyer and its customers from any and all claims, demands, damages or other injuries to persons or property in any way arising out of or resulting from the purchase or use of goods covered by this order.

12. Seller represents and warrants that it is the rightful and true exclusive owner of the goods covering this Purchase Order. Seller will defend, protect and save harmless the Buyer and its customers from all damages, claims and demands for actual or alleged infringement of any United States or foreign patent, or any trademark or copyright, or other intellectual property rights or for actual or alleged appropriation of any confidential information or trade secrets, and will defend, protect and save harmless the Buyer or any of its customer's against any suit or action which may be brought against the Buyer or any of its customers by reason of any such actual or alleged infringement resulting from the purchase, sale or use of said goods sold pursuant to this Purchase Order.

13. Seller will comply with any and all applicable laws state and federal pertaining to wages, hours, working conditions, employee's liability, social security, workmen's compensation and the like; and will, at Buyer's request, furnish Buyer with satisfactory evidence of insurance covering its liability to pay any compensation to employees engaged in work involving this Purchase Order because of any employee's liability or workmen's compensation act.

14. If at any time Buyer shall reasonably determine that Seller is, or is about to become, insolvent or bankrupt, then Buyer may forthwith cancel this order.

15. Seller shall not assign this order, any interest therein, any right or obligation created thereby or any payment due or to become due thereunder without Purchaser's written consent. Any attempt by Seller to make such assignment shall be null and void and any such assignment by operation of the law shall give Purchaser the option to terminate the order without further liability.

Buyer shall have the right, at all times to set off any amount owing from Seller to any component of Purchaser or any of its affiliated companies against any amount payable at any time by Purchaser in connection with this order or Purchaser's Material schedule.

15. Seller has, or will obtain at Buyer's request, but at its own expense product liability insurance with broad form vendor's and blanket contractual liability coverage in minimum amounts of $100,000 per person, $300,000 per occurrence and $100.00 aggregate property damage, insuring Seller's obligations pursuant to this Purchase Order. Such insurance must be written by an insurer acceptable to Buyer. At Buyer's request, Seller will submit satisfactory evidence of such coverage to Buyer.

16. Sunbeam Corporation Buyer hereby orders from you as buyer the goods, commodities, products and items hereinabove specified. This purchase order contains the entirety of the terms and conditions of Buyer's offer, and acceptance hereof is expressly limited and made conditional upon the exclusivity of said terms and conditions. Neither Buyer nor Seller shall be bound by any oral or written agreements not expressly included in this purchase order. When accepted by Seller, this purchase order shall constitute the entire agreement and understanding of the parties. If this purchase order is deemed to be an acceptance, the it is expressly made conditional upon Seller's assent to any terms and conditions herein which differ from, or are in addition to, those in Seller's offer. No action, or failure to act, by Buyer shall constitute a waiver of any provision hereof. This purchase order may be amended or altered only in writing signed by authorized representatives of both Seller and Buyer expressly purporting to constitute an amendment to this purchase order.

17. Seller represents that all items herein described which may be subject to the "Occupational Safety and Health Act of 1970" will conform to the Standards promulgated under said Act. Compliance with laws - Seller agrees to comply with the applicable provisions of any federal, state, or local law or ordinance and all orders, rules and regulations issued thereunder; and any provisions, representations or agreements, required thereby to be included in the contract, resulting from acceptance of this order, including the clause dealing with Equal Opportunities (Executive Order 11246 as amended by Executive Order 11375) set forth in 41 CFR Chapter 60-250 employment of the handicapped (Executive Order 11758) set forth in 41 CFR Chapter 60-741, and utilization of minority business enterprises (Executive Order 11825) set forth in 41 CFR Chapter 1-1-1310, and such requirements are incorporated herein by reference. Further Seller warrants that each chemical substance constituting or contained in goods sold or otherwise transferred to Purchaser hereunder which is required or permitted to be reported for the inventory of chemical substances published by EPA pursuant to the Toxic Substance Control Act (15 USC Sec. 2601 et. seq.) is as of the time of sale or transfer on the list of such substances published by the Administrator of EPA.

18. The Seller shall provide and maintain a Quality Control System to assure conformance to the provisions of the purchase agreement. The Buyer reserves the right to assure compliance through vendor surveillance, appropriate "flow-down" inspection, monitoring, verification by the production process, or finished product validation. The Seller may request copies of the Buyer's inspection instructions which include degree of inspection and the criteria for acceptance or rejection to be used for reference only. It remains the Seller's responsibility to take adequate measures to assure conformance to specifications.

19. Seller guarantees that all goods, commodities, products and items sold pursuant to this order will be manufactured, produced, packaged, marked, labeled and shipped in accordance and in all respects conform to all applicable laws, statutes, rules or regulations of the United States Federal Government. Seller shall indemnify defend and hold harmless the Buyer from any and all claims, demands, suits and expenses in any way arising out of or resulting from or related to such guarantees, including but not limited to expenses for recall, replacement, repair or refunds.

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| | SHIP VIA | FOB | CODE | TERMS See Text | CODE | VEN/VL/CODE 2212 | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|---|
| 07/08/98 | REQUESTED BY | | | | | | | |
| | AMCD | | | VALUE 00011727 | | AR. NO. 00011727 | ACCOUNT NO | |
| | PURCHASING | | | | | REMIT | | |

TO:
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong Kong PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | | PRICE |
|---|---|---|---|---|---|

Ship Date 7/10/98

| 7020.000 | PC | 7020.000 | 08/10/98 | 003240-000-000 | DEEP FRYER,SBM | 24.5800 |
|---|---|---|---|---|---|---|

110.12250.430

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

*  Revised P.O. Qty

Do Not Duplicate

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, INC.

95 W.I. Runnels Industrial Drive
Hattiesburg, MS 39401
Phone: (601) 296-5000
Fax:    (601) 296-5498

97020179

| | PURCHASING | | REMIT | 00011737 |
|---|---|---|---|---|

PENTALPHA ENTERPRISES LIMITED
KIN TECK IND. BLDG, 9-10, 12-13/F
WONG CHUK HANG ROAD
ABERDEEN
HONG KONG

SUNBEAM PRODUCTS, INC.
95 WI RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

| TOTAL QUANTITY | U/M | SHIP SCHEDULE QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| | | | | | Please confirm | |
| 1500.000 | PC | 1500.000 | 07/20/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |
| 100.000 | PC | 100.000 | 07/27/97 | 003240-000-000 | DEEP FRYER,SBM | 23.00 |
| 1660.000 | PC | 1660.000 | 08/01/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |
| 700.000 | PC | 700.000 | 08/01/97 | 003243-000-000 | DEEP FRY,GST,W/CYL & OIL SYS | 32.00 |
| 23000.000 | PC | 23000.000 | 08/01/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |
| 12000.000 | PC | 12000.000 | 08/08/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |

011-852-2-814 9390
011-852-2-873-0591
011-852-2956-0736

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | DUE | INVOICE # | DATE REC'D | R/T NO | QUAN REC'D |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

PURCHASING

P.5

# Sunbeam, INC.

95 W.L. Runnels Industrial Drive
Hattiesburg, MS 39401
Phone. (601) 296-5000
Fax:   (601) 296-5498

| PURCHASE ORDER NO. |
|---|
| Order 91000011 |
| Page |

| SHIP VIA | FOB | TERMS | FREIGHT ALLOWANCE |
|---|---|---|---|
| | | See Text | 2212 |

| REQUESTED BY | | | | A/P NO. | VENDOR NO. |
|---|---|---|---|---|---|
| /19/97 | | | | | |

| | PURCHASING | 00011707 | REMIT | 0011707 |
|---|---|---|---|---|

PENTALPHA ENTERPRISES LIMITED
KIN TECK IND. BLDG, 9-10, 12-13/F
WONG CHUK HANG ROAD
ABERDEEN
HONG KONG

SUNBEAM PRODUCTS, INC.
95 WL RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

### PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

| TOTAL QUANTITY | UNIT | SHIP SCHEDULE QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| 1100.000 | PC | 1100.000 | 08/15/97 | 003240-000-000 | DEEP FRYER,SBM | 23.00 |
| 100.000 | PC | 100.000 | 08/15/97 | 003241-000-000 | DEEP FRYER,W/TIMER.SBM | 25.00 |
| 200.000 | PC | 200.000 | 08/15/97 | 003243-000-000 | DEEP FRY,DST,W/CYL & OIL SYS | 31.00 |
| 1250.000 | PC | 1250.000 | 08/22/97 | 003240-000-000 | DEEP FRYER.SBM | 23.00 |
| 500.000 | PC | 500.000 | 08/22/97 | 003241-000-000 | DEEP FRYER,W/TIMER.SBM | 25.00 |
| 2000.000 | PC | 2000.000 | 08/22/97 | 003243-000-000 | DEEP FRY,DST,W/CYL & OIL SYS | 31.00 |

| INVOICE # | DATE REC'D | R/T NO. | QUAN REC'D | BAL DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

P.6

MON 01:54 PM   SUNBEAM PURCHASING        FAX NO. 601 428 4599        P.03

# Sunbeam, INC.

95 W.L. Runnels Industrial Drive
Harriesburg, MS 39401
Phone: (601) 296-5000
Fax:   (601) 296-5498

| PURCHASE ORDERING | |
|---|---|
| Order | |
| Page | |

| SHIP VIA | FOB | CUL4 TERMS | MODE | SHIPPING | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|
| | | | STE Tax | 2242 | | |

| REQUESTED BY | | | | AR NO | ACCOUNT NO |
|---|---|---|---|---|---|

| AMPD | PURCHASING | 00011737 | REMIT | 00011737 |
|---|---|---|---|---|

PENTALPHA ENTERPRISES LIMITED
KIN TECK IND. BLDG, 9-19, 12-13/F
WONG CHUK HANG ROAD
ABERDEEN
HONG KONG

SUNBEAM PRODUCTS, INC.
95 WL RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

## PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

| AL QUANTITY | UM | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| 14000.000 | PC | 14000.000 | 08/29/97 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST | 30.00 |
| 4000.000 | PC | 4000.000 | 08/29/97 | 003243-000-000 | DEEP FRY,OST,W/CYL & OIL SYS | 31.00 |
| 3165.000 | PC | 3165.000 | 09/06/97 | 003240-000-000 | DEEP FRYER,SBM | 25.000 |
| 4740.000 | PC | 4740.000 | 09/06/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.000 |
| 600.000 | PC | 600.000 | 09/06/97 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST | 30.000 |
| 2600.000 | PC | 2600.000 | 09/06/97 | 003243-000-000 | DEEP FRY,OST,W/CYL & OIL SYS | 31.00 |

| INVOICE # | DATE REC'D | R/T NO | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

PURCHASING

P.7

# Sunbeam, INC.

95 W.L. Runnels Industrial Drive
Hattiesburg, MS 39401
Phone: (601) 296-5000
Fax: (601) 296-5498

| TOTAL QUANTITY | U/M | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| 3000.000 | PC | 3000.000 | 09/13/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SSM | 25.000 |
| 1100.000 | PC | 1100.000 | 09/13/97 | 003242-000-000 | DEEP FRYER,W/CYCLING,DST | 30.000 |
| 400.000 | PC | 400.000 | 09/13/97 | 003243-000-000 | DEEP FRY,DST,W/CYL & OIL SYS | 31.000 |

PENTALPHA ENTERPRISES LIMITED
KIN TECK IND. BLDG. 9-10, 12-13/F
JONS CHUK HANG ROAD
ABERDEEN
HONG KONG

SUNBEAM PRODUCTS, INC.
95 WL RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

PAYMENT TERMS: D/P AT SIGHT.  BANK INFORMATION BELOW
*** FOB POINT:  HONG KONG       *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

P.8

# *Sunbeam*, CORPORATION

1835 South Congress Ave
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| SHIP VIA | | FOB | | CODE | TERMS<br>See Text | CODE | BUYER CODE<br>2212 | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|---|---|

| DATE<br>02/16/98 | REQUESTED BY | | | | VALUE | | AR NO. | | ACCOUNT NO |
|---|---|---|---|---|---|---|---|---|---|

HATT      PURCHASING        00011727        REMIT    00011727

| | |
|---|---|
| T<br>O | Pentalpha Enterprises Ltd<br>Kin Teck Ind. BLdg. 9-10, 12-13/F<br>Wong Chuk Hang Road<br>Aberdeen<br>Hong Kong |

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| TOTAL QUANTITY | U/M | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| 68.000 | PC | 68.000 | 10/01/98 | 005840-000-000 | BREADMAKER,OST DES,2 LB<br>110.12250.110 | .0000 |
| 208.000 | PC | 208.000 | 10/01/98 | 003241-035-000 | DEEP FRYER,W/TIMER,SBM,QVC<br>110.12250.110 | .0000 |

PAYMENT TERMS: D/P AT SIGHT.(Model W4714/W5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
BELINDA BOYER  NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# *Sunbeam*, CORPORATION

163 South Congress Ave.
Delray Beach. FL 33445
Phone: (601) 296-5000
Fax:     (601) 296-5498

PURCHASE ORDER NO
99036507
Page      2

| SHIP VIA | FOB | | CODE | TERMS See Text | CODE | BUYER CODE 2212 | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|

| DATE 02/16/98 | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO. |
|---|---|---|---|---|---|---|

HATT     PURCHASING     00011727     REMIT     00011727

```
T     Pentalpha Enterprises Ltd
O     Kin Teck Ind. BLdg. 9-10, 12-13/F
      Wong Chuk Hang Road
      Aberdeen
      Hong Kong
```

SUNBEAM PRODUCTS, INC.
93 W. RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANT. | LINE NO. | UNIT | REQ'D | SIZE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|---|

```
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,
LTD., P.O. BOX 66698, CHICAGO, IL 60666

NO LATER THAN 4 DAYS AFTER SHIPMENT
***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
***
ADVISING BANK:   FIRST CHICAGO INTERNATIONAL
                 153 W. 51ST STREET
                 NEW YORK, NY 10019
                 ATTN:  QAISRA MALIK

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.
```

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam, CORPORATION

695 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
036507

Page  3

| SHIP VIA | | FOB | | CODE | TERMS See Text | CODE | BUYER CODE 2212 | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|---|
| DATE 02/16/98 | REQUESTED BY | | | | | VALUE | | AR. NO. | ACCOUNT NO | |

HATT      PURCHASING      00011727        REMIT    00011727

T O

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

SUNBEAM PRODUCTS, INC.
95 W. RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| | | | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF
SCHEDULED SHIP DATE.


INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.
####
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILED AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
        SUNBEAM PRODUCTS, INC.
        95 W. RUNNELS INDUSTRIAL DRIVE
        HATTIESBURG, MS 39401
        ATTN: JUDY CUNNINGHAM
COPY SENT TO
        SUNBEAM PRODUCTS, INC.

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORPORATION

1615 South Congress Ave
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| | SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | See Text | | 2212 | | | |
| DATE | REQUESTED BY | | | VALUE | | AR. NO. | | ACCOUNT NO. | |
| 02/16/98 | | | | | | | | | |

HATT   PURCHASING   00011727   REMIT   00011727

```
T   Pentalpha Enterprises Ltd
O   Kin Teck Ind. Bldg. 9-10, 12-13/F
    Wong Chuk Hang Road
    Aberdeen
    Hong Kong
```

SUNBEAM PRODUCTS, INC.
95 WL RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | CODE | QUANTITY | SHIP SCHEDULE DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| | | | | | | |

```
            95 WL RUNNELS INDUSTRIAL DRIVE
            HATTIESBURG, MS 39401
            ATTN:  49 NORTH
     **
     OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

     FAX SHIPPING DOCUMENTS, ATTN:  DAVID PITTS 601-296-5492
                        ATTN: DELRAY OFFICE 561-243-2218
                             SEE RETURN COMM INV. #PEN0007
                             2/16/98


                             ALL CARTONS & PAPERWORK MUST BE
                             MARKED WITH BLUEPRINT NUMBER,
                             DATE AND REVISION CURRENTLY
                             BEING USED
```

Total:                .00

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, INC.

Hattiesburg, MS 39401
Phone: (601) 296-5000
Fax:   (601) 296-5498

| | | | | | PURCHASE ORDER NO. |
|---|---|---|---|---|---|
| | | | | | Order 98036831 |
| | | | | | Page |

*98036831*

| | SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. |
|---|---|---|---|---|---|---|---|---|
| | | | | See Text | | 2212 | | |

| DATE | REQUESTED BY | | | VALUE | | AR. NO. | ACCOUNT NO. |
|---|---|---|---|---|---|---|---|
| 02/19/98 | | | | | | | |

AMCD   PURCHASING   00011727      REMIT   00011727

| T O | Pentalpha Enterprises Ltd<br>Kin Teck Ind. BLdg. 9-10, 12-13/F<br>Wong Chuk Hang Road<br>.Aberdeen<br>Hong Kong | | SUNBEAM PRODUCTS, INC.<br>25 W. RUNNELS INDUSTRIAL DR.<br>HATTIESBURG MS 39401 |
|---|---|---|---|

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | UNIT | SHIP SCHEDULE QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|

*Note: Shipment of this p.o. (model #3242) Pending on Approval from Engineering Dept's acceptance of Life Cycle Testing Results.*

```
****************  SUPPLIERS PLEASE NOTE  ****************

DATE REFERENCED BESIDE THE QUANTITY AND MODEL # ON THE P.O.
IS THE "ACTUAL REQUESTED ARRIVAL DATE TO OUR FACILITY".

SUPPLIERS MUST SHIP 30 DAYS PRIOR TO THE DATE REQUESTED ON
THE P.O.

**********************************************************
```

Ship Date 6/1/98

| 2272.000 | PC | 2272.000 | 07/01/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,DST<br>110.12250.430 | 30.000 |
|---|---|---|---|---|---|---|

Ship Date 7/1/98

| 1136.000 | PC | 1136.000 | 08/01/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,DST<br>110.12250.430 | 30.000 |
|---|---|---|---|---|---|---|

*Please confirm ship date a.s.a.p.*

*See Note*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

*Brady*

PURCHASING



Sunbeam Corporation
Sunbeam Corporate Center
1615 South Congress Ave.
Suite 200
Delray Beach, FL 33445
561 243 2100  Fax 561 243 2210

## FAX COMMUNICATION COVER LETTER

**TO:** JENA BRADY

**FAX:** 1-601-296-5766

**FROM:** KEN ROACH
PROCUREMENT MANAGER-SOURCED PRODUCTS
PHONE: 561-243-2144
FAX:   561-243-2107

**CC:** JILL NUGENT

**DATE:** FEB 20, 1996

**#PAGES**
(including cover sheet): 1

**COMMENTS:**  P.O. FOR CYCLING DEEP FRYERS
NEED TO STATE VERY CLEARLY%
SHIPMENT OF THESE
PURCHASE ORDER FOR THE
3242 & 3243 CYCLING DEEP
FRYERS PENDING ON
APPROVAL FROM ENGINEERING
DEPARTMENT'S ACCEPTANCE
OF LIFE CYCLE TESTING
RESULTS.

Fax to
Pentalpha

PAGE 1

# *Sunbeam*, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax: (601) 296-5498

| SHIP VIA | FOB | | CODE | TERMS See Text | CODE | LANG. CODE 7071 | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|
| DATE 08/03/98 | REQUESTED BY   AMCD | | | | VALUE 00011727 | | AR. NO.   00011727 | | ACCOUNT NO. |
| | PURCHASING | | | | | REMIT | | | |

TO

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong Kong PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| | | | | | | PRICE |
|---|---|---|---|---|---|---|
| | *ship Date 8/15/98* | | | | | |
| 2272.000 | PC | 2272.000 | 09/15/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |
| | *ship Date 9/1/98* | | | | | |
| 13632.000 | PC | 13632.000 | 10/01/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

*011-852-2-873-0591*

PURCHASING

```
                                    TIME      : JUN 03 '98  14:40
                                    TEL NUMBER : 9547672027
                                    NAME       : CORPORATE ACCT
```

| NBR | FILE | DATE | TIME | DURATION | PGS | TO | DEPT NBR | MODE | STATUS |
|-----|------|------|------|----------|-----|-----|----------|------|--------|
| 233 | 28 | JUN.03 | 14:38 | 02/31 | 4 | + 852 2814 0769 | | EC   M | OK |

Sunbeam, CORPORATION

.1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax: (601) 296-5498

| PURCHASE ORDER NO. | |
|---|---|
| Order | 98041171 |
| Page | 1 |

| | SHIP VIA | FOB | | CODE | TERMS See Text | CODE P071 | BUYER CONF. CONFIRMATION WITH | | P.O. TYP |
|---|---|---|---|---|---|---|---|---|---|
| DATE 06/03/98 | REQUESTED BY | | | | VALUE | | AR NO | ACCOUNT NO | |
| | | AMCB PURCHASING | | | 00011727 | REMIT | 00011727 | | |

```
T   Pentalpha Enterprises Ltd              S  SUNBEAM PRODUCTS, INC.
O   Kin Teck Ind. Bldg. 9-10, 12-13/F      H  79 VL RUSSELS INDUSTRIAL DR.
    Wong Chuk Hang Road                     I  HATTIESBURG MS 39401
    Aberdeen                                P
    Hong Kong
```

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

| TOTAL QUANTITY | U/G | SHIP SCHEDULE QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| | | *Ship Date 8/15/98* | | | | |
| 2272.000 | PC | 2272.000 | 09/15/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |
| | | *Ship Date 9/1/98* | | | | |
| 13632.000 | PC | 13632.000 | 10/01/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |

```
PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
```

Ship To: Address stated above          ALL PALLETS USED ON THIS PURCHASE ORDER MUST BE GOOD QUALITY 40" X 48" 4-WAY PALLETS.
Bill To: SUNBEAM, INC., P.O. BOX 537925, LIVONIA, MI 48153-8925
    1. Correspondence - Must show our purchase order number and our part number including invoices, packing slips
    2. Packing List - Must be itemized with our part number and purchase order number

# Sunbeam, CORPORATION

611 South Congress Ave.
Delray Beach, FL 33445
Phone:   (601) 296-5000
Fax:     (601) 296-5498

PURCHASE ORDER NO.

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | CARRIER CODE 1212 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|

| 02/19/98 | REQUESTED BY AMCD | | | VALUE 00011727 | | AR. NO. 00011727 | ACCOUNT NO. |
|---|---|---|---|---|---|---|---|

PURCHASING                                   REMIT

```
T
O
```
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong



Hong Kong **PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| TOTAL QUANTITY | UNIT | | | | | PRICE |
|---|---|---|---|---|---|---|
| 2808.000 | PC | 2808.000 | 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |
| 1404.000 | PC | 1404.000 | 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |

*(handwritten: Ship Date 6/25/98)*
*(handwritten: Ship Date 6/25/98)*

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

*(handwritten: * Revised P.O. Qty Do Not Duplicate)*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

PURCHASE ORDER NO
Page 1

Delray Beach, FL 33445
Phone:   (601) 296-5000
Fax:      (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS See Text | CODE UNTR CODE 7071 | CONFIRMATION WITH | P.O. |
|---|---|---|---|---|---|---|

| DATE 06/03/98 | REQUESTED BY AMCD | VALUE 00011727 | AR. NO. 00011727 | ACCOUNT NO |
|---|---|---|---|---|

PURCHASING                    REMIT

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong Kong  PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | ONE PART NO | | PRICE |
|---|---|---|---|---|---|---|
| 2808.000 | PC | 2808.000 | 09/15/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |
| 12636.000 | PC | 12636.000 | 10/01/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |

*ship Date 8/15/98*
*ship Date 9/1/98*

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

*Revised P.O. Qty*
*Do Not Duplicate*

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam , CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO.

| | SHIP VIA | FOB | CODE | TERMS | CODE | CODE | CONFIRMATION WITH | | TYPE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | See Text | | 2212 | | | |

| 04/08/98 | REQUESTED BY | | VALUE | A/R. NO. | ACCOUNT NO. |
|---|---|---|---|---|---|
| | AMCD | | 00011727 | 00011727 | |

PURCHASING                                    REMIT

| T O | Pentalpha Enterprises Ltd<br>Kin Teck Ind. BLdg. 9-10, 12-13/F<br>Wong Chuk Hang Road<br>Aberdeen<br>Hong Kong |
|---|---|

Hong Kong PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | OUR PART NO. | PRICE |
|---|---|---|---|---|---|

Ship Date 6/25/98

| 1404.000 | PC | 1404.000 | 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST | 35.5000 |

110.12250.430
PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

*   Revised P.O. Qty
    Do Not Duplicate

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORPORATION

**PURCHASE ORDER NO.**

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | 2212 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|

| 03/13/98 | REQUESTED BY AMCD | VALUE 00011727 | AR. NO. 00011727 | ACCOUNT NO |
|---|---|---|---|---|

**PURCHASING**    **REMIT**

```
T     Pentalpha Enterprises Ltd
O     Kin Teck Ind. BLdg. 9-10, 12-13/F
      Wong Chuk Hang Road
      Aberdeen
      Hong Kong
```

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| | | | | | **PRICE** |
|---|---|---|---|---|---|
| 7020.000 | PC | 7020.000 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |
| 7020.000 | PC | 7020.000 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |
| 1404.000 | PC | 1404.000 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |

*Ship Date 6/25/98* (handwritten, ×3)

PAYMENT TERMS: D/P AT SIGHT.(Model W4714/W5843 at T/T-by fax
copies) FOB POINT HONK KONG  ### FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:

*# Revised P.O. Qty*
*Do Not Duplicate* (handwritten)

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam, CORPORATION

1615 South Congress Ave
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO.
27731   78055852
Page    1

| | SHIP VIA | FOB | CODE | TERMS See Text | CODE | UNIT/FR.CODE 2212 | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|
| 02/19/98 | REQUESTED BY AMCD | | | VALUE 00011727 | | AR. NO. 00011727 | | ACCOUNT NO. | |

PURCHASING                                  REMIT

**TO**
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong Kong PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| | | | | | PRICE |
|---|---|---|---|---|---|
| | | *ship Date 6/25/98* | | | |
| 2808.000 | PC | 2808.000 07/25/98 | 003243-000-000 | DEEP FRY,DST,W/CYL & OIL SYS 110.12250.430 | 36.0000 |
| | | *Ship Date 6/25/98* | | | |
| 2808.000 | PC | 2808.000 07/25/98 | 003243-000-000 | DEEP FRY,DST,W/CYL & OIL SYS 110.12250.430 | 36.0000 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG   *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

*Revised P.O. Qty*

*Do Not Duplicate*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORPO \TION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.

Page 1

| SHIP VIA | FOB | CODE | TERMS See Text | CODE VENDOR CODE 2212 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|

| 04/06/98 | REQUESTED BY AMCD | | VALUE 00011727 | AR. NO. 00011727 | ACCOUNT NO. |
|---|---|---|---|---|---|

PURCHASING                          REMIT

```
T   Pentalpha Enterprises Ltd
O   Kin Teck Ind. BLdg. 9-10, 12-13/F
    Wong Chuk Hang Road
    Aberdeen
    Hong Kong

Hong K  PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.
```

*Ship Date 7/15/98*

| 2808.000 | PC | 2808.000 | 08/15/98 | 003242-000-000 | DEEP FRY,OST,W/2 KNIVES 110.12250.430 | 35.5000 |

*Ship Date 8/1/98*

| 2808.000 | PC | 2808.000 | 09/01/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |

```
PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
```

*Revised P.O. Qty*
*Do Not Duplicate*

| INVOICE # | DATE REC'D | F/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | F/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

**Sunbeam, CORPORATION**

13 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | VENDOR CODE 2212 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|

| DATE 03/13/98 | REQUESTED BY AMCD | VALUE 00011727 | AR. NO. 00011727 | ACCOUNT NO. |
|---|---|---|---|---|

PURCHASING          REMIT

**T O**
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong K PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

*Ship Date 6/25/98*

| 4212.000 | PC | 4212.000 | 07/25/98 | 003242-000-000 | DEEP FRY,OST,W/CYL & OIL SYS 110.12250.430 | 35.5000 |
|---|---|---|---|---|---|---|

*Ship Date 7/1/98*

| 1404.000 | PC | 1404.000 | 08/01/98 | 003243-000-000 | DEEP FRY,OST,W/CYL & OIL SYS 110.12250.430 | 36.0000 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

*Revised PO Qty
Do Not Duplicate*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam, CORPORATION

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| | PURCHASE ORDER NO. |
|---|---|
| | 044003 |
| | Page    1 |

| | SHIP VIA | FOB | | CODE | TERMS | | CODE | BUYER CODE | CONFIRMATION WITH | | F.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | See Text | | | 9071 | | | |

| DATE | REQUESTED BY | | | | VALUE | | AR. NO. | | ACCOUNT NO. | |
|---|---|---|---|---|---|---|---|---|---|---|
| 08/26/98 | | | | | | | | | | |

MORG   PURCHASING   00011727   REMIT   00011727

```
T  Pentalpha Enterprises Ltd
O  Kin Teck Ind. Bldg. 9-10, 12-13/F
   26 Wong Chuk Hang Road
   Aberdeen
   Hong Kong
```

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

Ship Date 8/30/98

| | | | | | | PRICE |
|---|---|---|---|---|---|---|
| 3408.000 | PC | 3408.000 | 09/25/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 26.5800 |
| | | | | | 110.12250.191 | |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
BELINDA BOYER  NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO
6044003
Page        2

| | SHIP VIA | FOB | | CODE | TERMS | | CODE | BUYER CODE | CONFIRMATION WITH | | P.O TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | See Text | | | 9071 | | | |
| DATE | REQUESTED BY | | | | | VALUE | | | AR. NO. | ACCOUNT NO | |
| 08/26/98 | | | | | | | | | | | |
| | MORG | PURCHASING | | | | 00011727 | | REMIT | 00011727 | | |

**T O**
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | OUR PART NO. | | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

LTD., P.O. BOX 66698, CHICAGO, IL 60466

NO LATER THAN 4 DAYS AFTER SHIPMENT
***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
***
ADVISING BANK:   FIRST CHICAGO INTERNATIONAL
                 153 W. 51ST STREET
                 NEW YORK, NY 10019
                 ATTN: QAISRA MALIK

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam, CORPORATION

169 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
044003

Page    3

| | SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | F.O. TYP |
|---|---|---|---|---|---|---|---|---|
| | | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO. |
|---|---|---|---|---|---|---|
| 08/26/98 | | | | | | |

MURG   PURCHASING        00011727        REMIT    00011727

T
O
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | OUR PART NO. | PRICE |
|---|---|---|

SCHEDULED SHIP DATE.

INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.
****
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILES AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
        SUNBEAM PRODUCTS, INC.
        95 WL RUNNELS INDUSTRIAL DRIVE
        HATTIESBURG, MS 39401
        ATTN:  JUDY CUNNINGHAM
COPY SENT TO:
        SUNBEAM PRODUCTS, INC.
        95 WL RUNNELS INDUSTRIAL DRIVE
        HATTIESBURG, MS 39401
        ATTN:  49 NORTH

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | F.O. TYPE |
|----------|-----|------|-------|------|-----------|-------------------|-----------|
|  |  |  | See Text |  | 9071 |  |  |

| DATE | REQUESTED BY | VALUE | AR. NO. | ACCOUNT NO |
|------|--------------|-------|---------|------------|
| 08/26/98 |  |  |  |  |

MORG    PURCHASING    00011727    REMIT    00011727

```
T    Pentalpha Enterprises Ltd
O    Kin Teck Ind. BLdg. 9-10, 12-13/F
     26 Wong Chuk Hang Road
     Aberdeen
     Hong Kong
```

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| TOTAL QUANTITY | OUR PART NO. | PRICE |
|----------------|--------------|-------|

```
**
OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

FAX SHIPPING DOCUMENTS, ATTN:  DAVID PITTS 601-296-5492
                  ATTN: DELRAY OFFICE 561-243-2218


              ALL CARTONS & PAPERWORK MUST BE
              MARKED WITH BLUEPRINT NUMBER,
              DATE AND REVISION CURRENTLY
              BEING USED


                                          Total:    90,584.6
```

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|-----------|-----------|---------|-------------|----------|-----------|-----------|---------|--------------|----------|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

**PURCHASING**

```
***********************
***   TX REPORT   ***
***********************


TRANSMISSION OK

TX/RX NO              2338
CONNECTION TEL              901185228730591
SUBADDRESS
CONNECTION ID
ST. TIME              08/26 16:08
USAGE T               05'59
PGS.                     5
RESULT                OK
```

# Sunbeam.

| | |
|---|---|
| **Date**      8/26/98 | |
| **Number of pages including       5 cover sheet** | |

| | | | |
|---|---|---|---|
| **TO:**     Fred Wong | | **FROM:**        Paul Taddonio | |
|             Pentalpha | |                  Sunbeam Corp. | |
| **Phone** | | **Phone**       561-243-2173 | |
| **Fax Phone**  011-852-2-873-0591 | | **Fax Phone**  561-912-4157 | |

**CC:**

**REMARKS:**   ☒ Urgent      ☐ For your review      ☒ Reply ASAP      ☐ Please Comment

Fred,
 NEW P.O. # 98044003. PLEASE CONFIRM SHIP DATE
Thanks..

Any questions please fax or call.

Best regards,    Paul Taddonio

# *Sunbeam.*

| | |
|---|---|
| **Date** | *8/26/98* |

| | |
|---|---|
| *Number of pages including cover sheet* | 5 |

| **TO:** | Fred Wong | **FROM:** | Paul Taddonio |
|---|---|---|---|
| | | | Sunbeam Corp. |
| | Pentalpha | | |

| **Phone** | | **Phone** | 561-243-2173 |
|---|---|---|---|
| **Fax Phone** | 011-852-2-873-0591 | **Fax Phone** | 561-912-4157 |

**CC:**

**REMARKS:** ☒ *Urgent*   ☐ *For your review*   ☒ *Reply ASAP*   ☐ *Please Comment*

Fred,
 NEW P.O. # 98044003. PLEASE CONFIRM SHIP DATE.
Thanks..

Any questions please fax or call.

Best regards,   Paul Taddonio

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO
Order   98044004
Page    1

| SHIP VIA | | FOB | | CODE | TERMS See Text | | CODE | BUYER CODE 9071 | CONFIRMATION WITH | | F.O TYP |
|---|---|---|---|---|---|---|---|---|---|---|---|

| DATE 08/26/98 | REQUESTED BY | | | | | VALUE | | AR. NO. | | ACCOUNT NO. | |
|---|---|---|---|---|---|---|---|---|---|---|---|

HATT    PURCHASING    00011727    REMIT    00011727

**T O**
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | | | PRICE |
|---|---|---|---|---|---|---|
| | | *ship date 9/15/98* | | | | |
| 4212.000 | PC | 4212.000 | 10/15/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |
| | | *ship date 9/20/98* | | | | |
| 5616.000 | PC | 5616.000 | 10/20/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |
| | | *ship date 10/15/98* | | | | |
| 1404.000 | PC | 1404.000 | 11/15/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG ### FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORPORATION

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax: (601) 296-5498

| SHIP VIA | | FOB | | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | P.O. TYPE |
|----------|---|-----|---|------|-------|------|-----------|-------------------|---|---|
| | | | | | See Text | | 9071 | | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | | ACCOUNT NO. |
|------|--------------|---|-------|---|---------|---|-------------|
| 08/26/98 | | | | | | | |

HATT  PURCHASING  00011727  REMIT  00011727

| T O | Pentalpha Enterprises Ltd<br>Kin Teck Ind. BLdg. 9-10, 12-13/F<br>26 Wong Chuk Hang Road<br>Aberdeen<br>Hong Kong | Walit... Manufacturing |
|-----|---|---|

### PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | DUE DATE | | DESCRIPTION | PRICE |
|----------------|---|---|---|----------|---|-------------|-------|
| 4544.000 | PC | 4544.000 | 09/25/98 | 003241-000-000 | | DEEP FRYER,W/TIMER,SBM<br>110.12250.110 | 26.5800 |
| 5680.000 | PC | 5680.000 | 10/15/98 | 003241-000-000 | | DEEP FRYER,W/TIMER,SBM<br>110.12250.110 | 26.5800 |
| 1136.000 | PC | 1136.000 | 11/15/98 | 003241-000-000 | | DEEP FRYER,W/TIMER,SBM<br>110.12250.110 | 26.5800 |

*Ship Date 8/30/98*

*Ship Date 9/15/98*

*Ship Date 10/15/98*

PAYMENT TERMS: D/P AT SIGHT. (Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG $$$ FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF

*updated per Note from Pentalpha*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|-----------|-----------|---------|-------------|----------|-----------|-----------|---------|--------------|----------|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| | PURCHASE ORDER NO |
|---|---|
| Order | 98045748 |
| Page | 1 |

| | SHIP VIA | FOB | | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | See Text | | 9071 | | | | |

| DATE | REQUESTED BY | | | VALUE | | | | A/R. NO. | | ACCOUNT NO | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10/15/98 | | | | | | | | | | | |
| | HATT   PURCHASING | | | 00011727 | | | REMIT | 00011727 | | | |

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HE___ ___DE.

| TOTAL QU... | | | | | | | ... | |
|---|---|---|---|---|---|---|---|---|
| | | | ship Date 11/10/98 | | | | | |
| 8424.000 | PC | 8424.000 | 12/10/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.110 | | | 24.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model #A714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
BELINDA BOYER  NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.

ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
UNIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

\* Revised P.O.
Do Not Duplicate
10/16/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| | PURCHASE ORDER NO |
|---|---|
| Order | 98045748 |
| Page | 2 |

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | | VALUE | AR. NO. | ACCOUNT NO. |
|---|---|---|---|---|---|
| 10/15/98 | | | | | |

MATT    PURCHASING    00011727         REMIT    00011727

T
O
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED H... ...VERSE SIDE.

LTD., P.O. BOX 66698, CHICAGO, IL 60666

NO LATER THAN 4 DAYS AFTER SHIPMENT
***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
***
ADVISING BANK:   FIRST CHICAGO INTERNATIONAL
                 153 W. 51ST STREET
                 NEW YORK, NY 10019
                 ATTN:  QAISRA MALIK

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF

*  Revised P.O.
Do Not Duplicate
10/16/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| | PURCHASE ORDER NO |
|---|---|
| Order | 9B045748 |
| Page | 3 |

| | SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|
| | | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO. |
|---|---|---|---|---|---|---|
| 10/15/98 | | | | | | |

| | WATT  PURCHASING | 00011727 | REMIT | 00011727 |
|---|---|---|---|---|

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HE[illegible]

SCHEDULED SHIP DATE.


INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.
****
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILES AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
        SUNBEAM PRODUCTS, INC.
        95 WL RUNNELS INDUSTRIAL DRIVE
        HATTIESBURG, MS 39401
        ATTN:  JUDY CUNNINGHAM
COPY SENT TO
        SUNBEAM PRODUCTS, INC.
        95 WL RUNNELS INDUSTRIAL DRIVE
        HATTIESBURG, MS 39401
        ATTN:  49 NORTH


\* *Revised P.O.*
*Do Not Duplicate*
*10/16/98*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| | PURCHASE ORDER NO. |
|---|---|
| Order | 9B045748 |
| Page | 6 |

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | | ACCOUNT NO | |
|---|---|---|---|---|---|---|---|---|
| 10/15/98 | | | | | | | | |
| | HATI | PURCHASING | 00011727 | | REMIT | 00011727 | | |

```
T   Pentalpha Enterprises Ltd
O   Kin Teck Ind. BLdg. 9-10, 12-13/F
    26 Wong Chuk Hang Road
    Aberdeen
    Hong Kong
```

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED H                          E.

```
**
OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

FAX SHIPPING DOCUMENTS, ATTN:  DAVID PITTS 601-296-5492
                         ATTN: DELRAY OFFICE 561-912-4304


                            ALL CARTONS & PAPERWORK MUST BE
                            MARKED WITH BLUEPRINT NUMBER,
                            DATE AND REVISION CURRENTLY
                            BEING USED
```

Total:      207,061.92

\* *Revised P.O.*
*Do Not Duplicate*
*10/16/98*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

```
                              *** TX REPORT ***
                              ********************


          TRANSMISSION OK

          TX/RX NO              0253
          CONNECTION TEL             901185228730591
          SUBADDRESS
          CONNECTION ID
          ST. TIME              10/16 10:46
          USAGE T               06'41
          PGS. SENT             5
          RESULT                OK
```

# Sunbeam

| | |
|---|---|
| **Date** | *10/15/98* |
| *Number of pages including cover sheet* | 5 |

**TO:**   *Fred Wong*

*Vicky Tai*

*Pentalpha*

**FROM:**   *Paul Taddonio*

*Sunbeam Corp.*

**Phone**

**Fax Phone**   *011-852-2-873-0591*

**Phone**   *561-243-2173*

**Fax Phone**   *561-912-4304*

**CC:**

**REMARKS:**   ☒ *Urgent*   ☐ *For your review*   ☒ *Reply ASAP*   ☐ *Please Comment*

Fred and Vicky,

Thanks for your reply, Subject new orders.

Revised purchase order #98045748. Please inform of ship date. Can you ship order 98045125 before 11/01/98?

# Sunbeam.

| | |
|---|---|
| **Date** | *10/15/98* |

*Number of pages including cover sheet*          5

| | | | |
|---|---|---|---|
| **TO:** | Fred Wong | **FROM:** | Paul Taddonio |
| | Vicky Tai | | Sunbeam Corp. |
| | Pentalpha | | |

| | | | |
|---|---|---|---|
| **Phone** | | **Phone** | 561-243-2173 |
| **Fax Phone** | 011-852-2-873-0591 | **Fax Phone** | 561-912-4304 |

**CC:**

**REMARKS:**   ☒ Urgent      ☐ For your review      ☒ Reply ASAP      ☐ Please Comment

Fred and Vicky,

Thanks for your reply, Subject new orders.

Revised purchase order #98045748. Please inform of ship date. Can you ship order 98045125 before 11/01/98?

Thanks..Paul

Any questions please fax or call.

Best regards,    Paul Taddonio

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
Order    98046146
Page         1

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | VALUE | A/R. NO. | ACCOUNT NO. |
|---|---|---|---|---|
| 10/26/98 | | | | |

| HATT    PURCHASING | 00011727 | REMIT | 00011727 |
|---|---|---|---|

**T O**
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| TOTAL QUANTITY | | | | | | PRICE |
|---|---|---|---|---|---|---|

ShiP ASAP

2808.000  PC    2808.000  11/10/98    003240-000-000    DEEP FRYER,SBM    24.5800
110.12250.110

PAYMENT TERMS: D/P AT SIGHT.(Model #8714/85943 at L/T-by fax
copies) FOR POINT HONK KONG  *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS,
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 64805, ATTN:
BELINDA BOYER, NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# *Sunbeam* CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO.
Order    98046146
Page     2

| SHIP VIA | FOB | | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | See Text | | 9071 | | | |

| DATE | REQUESTED BY | | | VALUE | | AR. NO. | | ACCOUNT NO. |
|---|---|---|---|---|---|---|---|---|
| 10/26/98 | | | | | | | | |

| | HATT | PURCHASING | 00011727 | REMIT | 00011727 |
|---|---|---|---|---|---|

```
T     Pentalpha Enterprises Ltd
O     Kin Teck Ind. BLdg. 9-10, 12-13/F
      26 Wong Chuk Hang Road
      Aberdeen
      Hong Kong
```

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| TOTAL QUANTITY | | | | PRICE |
|---|---|---|---|---|

LTD., P.O. BOX 66698, CHICAGO, IL 60666

NO LATER THAN 4 DAYS AFTER SHIPMENT
***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
***
ADVISING BANK: FIRST CHICAGO INTERNATIONAL
153 W. 51ST STREET
NEW YORK, NY 10019
ATTN: DAISRA MALIK

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT

INSURANCE TO BE PAID AT SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO.
Order    98046146
Page      3

| | SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | See Text | | 9071 | | | |
| DATE | REQUESTED BY | | | | VALUE | | AR. NO. | ACCOUNT NO. | |
| 10/26/98 | | | | | | | | | |

| | | HATT    PURCHASING | 00011727 | REMIT | 00011727 |
|---|---|---|---|---|---|

```
T O
```
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | | | | | | PRICE |
|---|---|---|---|---|---|---|---|---|---|

SCHEDULED SHIP DATE.

INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.
****
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILES AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
SUNBEAM PRODUCTS, INC.
95 NL RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: JUDY CUNNINGHAM
COPY SENT TO:
SUNBEAM PRODUCTS, INC.
95 NL RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: 49 NORTH

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
8046146
Order
Page        4

| | SHIP VIA | FOB | | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | See Text | | 9071 | | | |

| DATE | REQUESTED BY | | | VALUE | | | AR. NO. | | ACCOUNT NO. | |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/26/98 | | | | | | | | | | |
| | HATT   PURCHASING | | | 00011727 | | REMIT | 00011727 | | | |

```
T   Pentalpha Enterprises Ltd
O   Kin Teck Ind. BLdg. 9-10, 12-13/F
    26 Wong Chuk Hang Road
    Aberdeen
    Hong Kong
```

## PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

**

OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

FAX SHIPPING DOCUMENTS, ATTN:  DAVID PITTS 601-296-5492
                        ATTN: DELRAY OFFICE 561-912-4304

ALL CARTONS & PAPERWORK MUST BE
MARKED WITH BLUEPRINT NUMBER,
DATE AND REVISION CURRENTLY
BEING USED.

Total: 69,020.4

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# *Sunbeam.*

| | |
|---|---|
| **Date** | *10/26/98* |
| **Number of pages including cover sheet** | 5 |

| **TO:** | Fred Wong | **FROM:** | Paul Taddonio |
|---|---|---|---|
| | Vicky Tai | | Sunbeam Corp. |
| | Pentalpha | | |

| **Phone** | | **Phone** | 561-243-2173 |
|---|---|---|---|
| **Fax Phone** | 011-852-2-873-0591 | **Fax Phone** | 561-912-4304 |

**CC:**

**REMARKS:**  ☒ Urgent   ☐ For your review   ☒ Reply ASAP   ☐ Please Comment

Fred and Vicky,

* New purchase order #98046146. Need this order to ship 11/10 or before. Can you ship 3240's before 11/10?

* Your last fax I do not understand. Are you changing ship schedule for replacement breadmakers? or Are these the new orders?

* Please inform me of ship date and provide paper work for 3 lots of 5841.

* Your ship dates dates keep moving out. I need all orders to ship on time or before. Please respond.


Thanks..Paul


Any questions please fax or call.


Best regards,    Paul Taddonio

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO           0328
CONNECTION TEL          901185228730591
SUBADDRESS
CONNECTION ID
ST. TIME           10/26 14:14
USAGE T            06'11
PGS. SENT          5
RESULT             OK
```

# Sunbeam.

| | |
|---|---|
| **Date** | *10/26/98* |
| **Number of pages including cover sheet** | *5* |

| | |
|---|---|
| **TO:** Fred Wong | **FROM:** Paul Taddonio |
| Vicky Tai | Sunbeam Corp. |
| Pentalpha | |

| | |
|---|---|
| **Phone** | **Phone** *561-243-2173* |
| **Fax Phone** *011-852-2-873-0591* | **Fax Phone** *561-912-4304* |

**CC:**

**REMARKS:** ☒ *Urgent*   ☐ *For your review*   ☒ *Reply ASAP*   ☐ *Please Comment*

Fred and Vicky,

* New purchase order #98046146. Need this order to ship 11/10 or before. Can you ship 3240's before 11/10?

* Your last fax I do not understand. Are you changing ship schedule for replacement breadmakers? or Are these the new orders?

* Please inform me of ship date and provide paper work for 3 lots of 5841.

* Your ship dates dates keep moving out. I need all orders to ship as

# Sunbeam. CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| | | | | | | | PURCHASE ORDER NO. |
|---|---|---|---|---|---|---|---|
| | | | | | | | Order  Y8046359 |
| | | | | | | | Page     1 |

| SHIP VIA | FOB | CODE | TERMS | CODE | SHIPS CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | |

| DATE 10/29/98 | REQUESTED BY  HATT | VALUE  00011727 | A/R. NO.  00011727 | ACCOUNT NO |
|---|---|---|---|---|

PURCHASING                              REMIT

TO
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED

| TOTAL QUANTITY | | | | | |
|---|---|---|---|---|---|

shy date 12/5/98 ok

| 1404.000 | PO 1404.000 01/05/99  003241-000-000  DEEP FRYER W/TIMER,SBM | 26.5800 |

110.12250.110

PAYMENT TERMS: D/P AT SIGHT.(Model #4721A/#5843 at 1/3 by fax
copies) FOB POINT HONK KONG  *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20 OR 40 CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO PRIZE COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
BELINDA BOYER  NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.

ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

# * REVISED P.O.
# DO NOT DUPLICATE

11/2/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam* CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO.
Order   98046359
Page    2

98046359

| SHIP VIA | | FOB | | CODE | TERMS See Text | | CODE | DATE CODE 9501 | | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| DATE 10/29/98 | REQUESTED BY HATT | | | VALUE 00011727 | AR. NO. | 00011727 | ACCOUNT NO |
|---|---|---|---|---|---|---|---|

|               |                |
|---------------|----------------|
| PURCHASING    | REMIT          |

TO

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED ...

LTD., P.O. BOX 66678, CHICAGO, IL 60666 ...

NO LATER THAN 4 DAYS AFTER SHIPMENT. ...
***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER.
***
ADVISING BANK: FIRST CHICAGO INTERNATIONAL
             153 W. 51ST STREET
             NEW YORK, NY 10019
             ATTN: DAISRA MALIK

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF

# * REVISED P.O.
# DO NOT DUPLICATE

11/2/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

Case 9:02-cv-80527-KLR   Document ... filed on FLSD Docket 07/22/2002   Page 302 of 473

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:     (601) 296-5498

Order  98048359
Page      3

| SHIP VIA | FOB | CODE | TERMS | CODE | SHIP CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | n | 907 | | |

| DATE 10/29/98 | REQUESTED BY | VALUE | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|
| | HATT | 00011727 | 00011727 | |

PURCHASING                    REMIT

**TO**

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED

SCHEDULED SHIP DATE

INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS
****
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILED AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
   SUNBEAM PRODUCTS INC.
   95 ML RUNNELS INDUSTRIAL
   HATTIESBURG, MS 39401
   ATTN:  JUDY CUNNINGHAM
COPY SENT TO
   SUNBEAM PRODUCTS, INC.
   95 ML RUNNELS INDUSTRIAL DRIVE
   HATTIESBURG, MS 39401
   ATTN:  49 NORTH

# * REVISED P.O.
# DO NOT DUPLICATE

11/2/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

Case 9:02-cv-80527-KLR    Document filed entered on et 02/2002    Page 303 of 473

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| | PURCHASE ORDER NO. |
|---|---|
| Order | 98046339 |
| Page | 4 |

| | SHIP VIA | FOB | CODE | TERMS See Text | CODE | BUYER CODE 9071 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|

| DATE 10/29/98 | REQUESTED BY HATT | | VALUE 00011727 | AR. NO. 00011727 | ACCOUNT NO |
|---|---|---|---|---|---|
| | PURCHASING | | | REMIT | |

T O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED

**##**
**OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.**

**FAX SHIPPING DOCUMENTS, ATTN: DAVID PITTS 601-296-5492**
**ATTN: DELRAY OFFICE 561-912-4304**

**ALL CARTONS & PAPERWORK MUST BE**
**MARKED WITH BLUEPRINT NUMBER,**
**DATE AND REVISION CURRENTLY**
**BEING USED**

Total:    37,318.32

# * REVISED P.O.
# DO NOT DUPLICATE

11/2/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

```
                    ***********************
                    ***   TX REPORT   ***
                    ***********************


      TRANSMISSION OK

      TX/RX NO              0424
      CONNECTION TEL              901185228730591
      SUBADDRESS
      CONNECTION ID
      ST. TIME             11/02 10:43
      USAGE T              07'35
      PGS. SENT               5
      RESULT               OK
```

# Sunbeam.

| | |
|---|---|
| **Date** | *11/02/98* |
| *Number of pages including cover sheet* | 5 |

**TO:**  Fred Wong
Vicky Tai
Pentalpha

**FROM:**  Paul Taddonio
Sunbeam Corp.

**Phone**

**Fax Phone**  011-852-2-873-0591

**Phone**  561-243-2173

**Fax Phone**  561-912-4304

**CC:**

**REMARKS:**   ☒ Urgent   ☐ For your review   ☒ Reply ASAP   ☐ Please Comment

Fred and Vicky,

Revised purchase order, 98046359.
Thanks..Paul

Any questions please fax or call.

# *Sunbeam.*

| | |
|---|---|
| **Date** | 11/02/98 |

| |
|---|
| Number of pages including    5<br>cover sheet |

| **TO:** | Fred Wong | **FROM:** | Paul Taddonio |
|---|---|---|---|
| | Vicky Tai | | Sunbeam Corp. |
| | Pentalpha | | |

| **Phone** | | **Phone** | 561-243-2173 |
|---|---|---|---|
| **Fax Phone** | 011-852-2-873-0591 | **Fax Phone** | 561-912-4304 |

**CC:**

**REMARKS:**   ☒ Urgent      ☐ For your review      ☒ Reply ASAP      ☐ Please Comment

Fred and Vicky,

Revised purchase order, 98046359.

Thanks..Paul

Any questions please fax or call.

Best regards,    Paul Taddonio

Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 306 of 473

# Sunbeam, CORPORATION

619 South Congress Ave.
Delray Beach, FL 33445
Phone:   (601) 296-5000
Fax:      (601) 296-5498

| | SHIP VIA | FOB | CODE | TERMS See Text | CODE | BUYER CODE 9071 | CONFIRMATION WITH | | |
|---|---|---|---|---|---|---|---|---|---|
| DATE 10/30/98 | REQUESTED BY | | | | | | | | |
| | HATT | | VALUE 00011727 | | | AR. NO. 00011727 | | ACCOUNT NO. | |
| | PURCHASING | | | | REMIT | | | | |

**T O**

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

Ship Date 12/20/98

| 7020.000 | PC | 7020.000 | 01/20/99 | 003240-000-000 | DEEP FRYER,SBM 110.12250.110 | 24.580 |
|---|---|---|---|---|---|---|

Ship Date 2/5/99

| 5616.000 | PC | 5616.000 | 03/05/99 | 003240-000-000 | DEEP FRYER,SBM 110.12250.110 | 24.580 |
|---|---|---|---|---|---|---|

PAYMENT TERMS: D/P AT SIGHT. (Model 98714/96843 available by fax
copies) FOR POINT HONG KONG *** PREPAYS COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES
THESE SHIPMENTS. EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 2/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL PINDALE, SUITE 2032 SPRINGFIELD, MO 65803 ATTN:
BELINDA BUYER NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE

| INVOICE # | DATE REC'D | P/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | P/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam, CORPORATION



1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
78046431

Page        2

| | | SHIP VIA | | FOB | | | CODE | TERMS See Text | | CODE | BUYER CODE 9071 | | CONFIRMATION WITH | | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DATE 10/30/98 | REQUESTED BY HATT | | | | | | | VALUE 00011727 | | | | AR. NO. 00011727 | | | ACCOUNT NO. | |
| | | | | PURCHASING | | | | | | | REMIT | | | | | |

**TO**

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,
LTD., P.O. BOX 66698, CHICAGO, IL 60666

NO LATER THAN 4 DAYS AFTER SHIPMENT
***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
***
ADVISING BANK: FIRST CHICAGO INTERNATIONAL

NEW YORK, NY 10019

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

ORDER NO. V8046431
Page    3

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | BUYER CODE 9071 | CONFIRMATION WITH | P.C. TYPE |
|----------|-----|------|----------------|------|-----------------|-------------------|------|

| DATE 10/30/98 | REQUESTED BY HATT | VALUE 00011727 | AR. NO. 00011727 | ACCOUNT NO. |
|---------------|--------------------|----------------|------------------|-------------|

PURCHASING                        REMIT

T O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF
SCHEDULED SHIP DATE.

INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS

ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILED AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:

SUNBEAM PRODUCTS, INC.
W. RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: JUDY CUNNINGHAM

COPY SENT TO:

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|-----------|-----------|---------|-------------|----------|-----------|-----------|---------|-------------|----------|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.

Page        4

| SHIP VIA | FOB | | CODE | TERMS See Text | CODE | BUYER CODE 9071 | CONFIRMATION WITH | | F.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|

| DATE 10/30/98 | REQUESTED BY | | VALUE | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|---|
| | HATT | 00011727 | 00011727 | | |

PURCHASING                                    REMIT

**T O**
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong  PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

SUNBEAM PRODUCTS, INC.
95 ML RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: 49 NORTH

OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.
FAX SHIPPING DOCUMENTS ATTN: DAVID PITTS 601-29 5477
ATTN: DELRAY OFFICE 561-912-4304

ALL CARTONS & PAPERWORK MUST BE
MARKED WITH BLUEPRINT NUMBER,
DATE AND REVISION CURRENTLY

**Total** 310,592.8

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO            0413
CONNECTION TEL        901185228730591
SUBADDRESS
CONNECTION ID
ST. TIME           10/30 18:18
USAGE T            07'47
PGS. SENT          5
RESULT             OK
```

# Sunbeam.

| | |
|---|---|
| **Date** | 10/30/98 |

**Number of pages including**    5
**cover sheet**

| **TO:** | | **FROM:** | |
|---|---|---|---|
| | Fred Wong | | Paul Taddonio |
| | Vicky Tai | | Sunbeam Corp. |
| | Pentalpha | | |

**Phone** | | **Phone** 561-243-2173
**Fax Phone** 011-852-2-873-0591 | | **Fax Phone** 561-912-4304

**CC:**

**REMARKS:** ☒ Urgent    ☐ For your review    ☒ Reply ASAP    ☐ Please Comment

Fred and Vicky,

New purchase order, 98046431. please confirm ship date.
Thanks..Paul

Any questions please fax or call.

# *Sunbeam.*

| | |
|---|---|
| **Date** | *10/30/98* |

*Number of pages including cover sheet*    5

**TO:**    ~Fred Wong
Vicky Tai
Pentalpha

**FROM:**    Paul Taddonio
Sunbeam Corp.

**Phone**

**Fax Phone**  *011-852-2-873-0591*

**Phone**    *561-243-2173*

**Fax Phone**  *561-912-4304*

**CC:**

**REMARKS:**    ☒ Urgent    ☐ *For your review*    ☒ Reply ASAP    ☐ Please Comment

Fred and Vicky,

New purchase order, 98046431. please confirm ship date.
Thanks..Paul

Any questions please fax or call.

Best regards,    Paul Taddonio

Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 1 of 1

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | LAYER CODE 2212 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|

| DATE 03/05/98 | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|---|---|
| | ANCD | | 00011727 | | 00011727 | |
| | PURCHASING | | | REMIT | | |

TO:
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

SUNBEAM PRODUCTS, INC.
[illegible] RUNNELS INDUSTRIAL DR.
[illegible] MS 39401

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | UNIT | SHIP SCHEDULE QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| | | Ship Date 6/25/98 | | | | |
| 21060.000 | PC | 21060.000 | 07/25/98 | 003246-000-000 | DEEP FRYER, OSTER 110.12250.430 | 26.5800 |
| | | Ship Date 7/20/98 | | | | |
| # 9828.000 | PC | 9828.000 | 08/20/98 | 003246-000-000 | DEEP FRYER, OSTER 110.12250.430 | 26.5800 |
| | | Ship Date 8/20/98 | | | | |
| 21060.000 | PC | 21060.000 | 09/20/98 | 003246-000-000 | DEEP FRYER, OSTER 110.12250.430 | 26.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model 84714/85843 at T/T-by fax
copies) FOB POINT HONE. HONE  SIZE FREIGHT:  COLLECT-
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA NANYIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINALE, SUITE 200, SPRINGFIELD, MO  65807, ATTN:

**★ Revised PO. Qty Change −**
**Do Not Duplicate.**

ALL PALLETS USED ON THIS PURCHASE ORDER MUST BE GOOD QUALITY 40" X 48" 4-WAY PALLETS.

Ship To: Address stated above
Bill To: SUNBEAM, INC., P.O. BOX 537925, LIVONIA, MI 48153-8925

1. Correspondence - Must show our purchase order number and our part number including invoices, packing slips.
2. Packing List - Must be itemized with our part number and purchase order number.
3. All Shipping Containers - Must show our purchase order number, our part number, quantity per box, and the weight per box.
4. If shipment is made to Laurel, Miss. instead of ship to, vendor will be charged back □ $50.00 extra handling plus reconsignment charge.
5. The articles purchased are to be incorporated into tangible personal property to be consumed directly in manufacturing, unless otherwise stated.
6. All cash discounts allowed are taken with dating starting as of receipt or invoice or of merchandise, whichever is later.
7. Invoices dated after the 25th of the month will be considered as of the first of the following month.
8. If shipment is to be made or invoiced by some other company, advise at once. Do not ship C.O.D.
9. No charge for boxing, crating, etc. will be allowed unless stated on order.
10. Mail invoice and bill of lading immediately on day of shipment.
11. Hold overrun or underrun to $100.00 maximum on total purchase order value.
12. All goods are to be of American manufacture unless otherwise stated.
13. All conditions of this order, which appear on reverse side, must be complied with.
14. A 5% Handling Fee will be charged to Reject Materials.

BY _Felice Rosenstein_

ORIGINAL    9018522873059/

70039778

MEMORY TRANSMISSION REPORT

```
                              TIME   : MAY 12 '98 14:10
                              TEL NUMBER : 5612432017
                              NAME   : SUNBEAM CORPORATION
```

| NBR | FILE | DATE | TIME | DURATION | PGS | TO | | DEPT NBR | MODE | STATUS |
|-----|------|------|------|----------|-----|-----|---|----------|------|--------|
| 471 | 09 | MAY.12 | 14:08 | 02/24 | 4 | + 852 2814 0769 | | | EC | M OK |

Sunbeam, Corporation

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax: (601) 296-5498

PURCHASE ORDER NO.
BF00P  VB03VV78
Page     1

| SHIP VIA | FOB | CODE | TERMS See Text | CODE LEVEL ADJ 2212 | CONFIRMATION WITH | 72 78 |
|---|---|---|---|---|---|---|

| 03/03/98 | REQUESTED BY AMCB | | VALUE 00011727 | AR NO. 00011727 | ACCOUNT NO. |
|---|---|---|---|---|---|

PURCHASING                                    REMIT

| T O | Pentalpha Enterprises Ltd<br>Kin Teck Ind. Bldg. 9-10, 12-13/F<br>Wong Chuk Hang Road<br>Aberdeen<br>Hong Kong | S H I P | SUNBEAM PRODUCTS, INC.<br>78 N. CROOLS INDUSTRIAL DR.<br>HATTIESBURG MS 39401 |
|---|---|---|---|

Hong Kong PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | UM | ITEM QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| | | Ship Date 6/25/98 | | | | |
| 21060.000 | PC | 21060.000 | 07/25/98 | 003246-000-000 | DEEP FRYER, OSTER<br>110.12250.430 | 26.580 |
| | | Ship Date 7/20/98 | | | | |
| * 9828.000 | PC | 9828.000 | 08/20/98 | 003246-000-000 | DEEP FRYER, OSTER<br>110.12250.430 | 26.580 |
| | | Ship Date 8/20/98 | | | | |
| 21060.000 | PC | 21060.000 | 09/20/98 | 003246-000-000 | DEEP FRYER, OSTER<br>110.12250.430 | 26.580 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5043 at T/T-by fax
copies) FOB POINT HONK KONG  ### FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:

**\* Revised P.O. Qty Change —**
**Do Not Duplicate**

Ship To: Address stated above          ALL PALLETS USED ON THIS PURCHASE ORDER MUST BE GOOD QUALITY 40" X 48" 4-WAY PALLETS.
Bill To: SUNBEAM, INC., P.O. BOX 537925, LIVONIA, MI 48153-8925

1 Correspondence - Must show our purchase order number and our part number including invoices, packing slips.
2 Packing List - Must be itemized with our part number and purchase order number.

# TERMS AND CONDITIONS

# *Sunbeam*, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

Page    1

| SHIP VIA | FOB | CODE   594 Text | CODE   2212 | CONFIRMATION WITH | |
|---|---|---|---|---|---|
| 04/08/98 | REQUESTED BY        AMCD | VALUE   00011727 | AR. NO. | ACCOUNT NO.   00011727 | |
| | PURCHASING | | REMIT | | |

```
T    Pentalpha Enterprises Ltd
O    Kin Teck Ind. BLdg. 9-10, 12-13/F
     Wong Chuk Hang Road
     Aberdeen
     Hong Kong
```

Hong Kong PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

Ship Date 7/10/98

| | | | | | PRICE |
|---|---|---|---|---|---|
| 7020.000 | PC | 7020.000 08/10/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES, 1721 EL FINALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN: LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS, INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

\* Revised P.O. Qty
Do Not Duplicate

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**



# Sunbeam, INC.

95 W.L. Runnels Industrial Drive
Hattiesburg, MS 39401
Phone: (601) 296-5000
Fax: (601) 296-5408

97020179

PURCHASING

| PENTALPHA ENTERPRISES LIMITED | SUNBEAM PRODUCTS, INC. |
|---|---|
| KIN TECK IND. BLDG. 9-10, 13-13/F | 95 WL RUNNELS INDUSTRIAL DR. |
| WONG CHUK HANG ROAD | HATTIESBURG MS 39401 |
| ABERDEEN | |
| HONG KONG | |

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

Please confirm

| TOTAL QUANTITY | U/M | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| 1500.000 | PC | 1500.000 | 07/20/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |
| 100.000 | PC | 100.000 | 07/27/97 | 003240-000-000 | DEEP FRYER,SBM | 23.00 |
| 1660.000 | PC | 1660.000 | 08/01/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |
| 700.000 | PC | 700.000 | 08/01/97 | 003243-000-000 | DEEP FRY.CST.W/CYL & OIL SYS | 31.00 |
| 23000.000 | PC | 23000.000 | 08/01/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |
| 12000.000 | PC | 12000.000 | 08/08/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |

011-852-2-8149390
011-852-2-873-0591
011-852-2956-0736

| INVOICE # | DATE REC'D | R.T NO. | QUAN. REC'D | AMT. DUE | INVOICE # | DATE REC'D | R.T NO. | QUAN. REC'D |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

PURCHASING

P.5

97 MON 01:53 PM   SUNBEAM PURCHASING              FAX NO. 601 428 4599          P 02

# *Sunbeam*, INC.

95 W.L. Runnels Industrial Drive
Hattiesburg, MS 39401
Phone: (601) 296-5000
Fax:   (601) 296-5498

<table>
<tr><td></td><td colspan="3">Order</td></tr>
<tr><td></td><td colspan="3">Page</td></tr>
</table>

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| 4/16/97 | | | See Text | 2213 | |

| | PURCHASING | | | REMIT | |

PENTALPHA ENTERPRISES LIMITED
KIN TECK IND. BLDG, 9-10, 12-13/F
WONG CHUK HANG ROAD
ABERDEEN
HONG KONG

SUNBEAM PRODUCTS, INC.
95 WL RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

### PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

| TOTAL QUANTITY | U/M | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| 1100.000 | PC | 1100.000 | 08/15/97 | 003240-000-000 | DEEP FRYER,SBM | 23.00 |
| 100.000 | PC | 100.000 | 08/15/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |
| 200.000 | PC | 200.000 | 08/15/97 | 003243-000-000 | DEEP FRY,GST,W/CYL & OIL SYS | 31.00 |
| 1250.000 | PC | 1250.000 | 08/22/97 | 003240-000-000 | DEEP FRYER,SBM | 23.00 |
| 500.000 | PC | 500.000 | 08/22/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.00 |
| 2000.000 | PC | 2000.000 | 08/22/97 | 003243-000-000 | DEEP FRY,GST,W/CYL & OIL SYS | 31.00 |

| INVOICE # | DATE REC'D | R/T NO. | QUAN REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

P.6

Case 9:02-cv-80527-KLR Document 40 Entered on FLSD Docket 07/24/2002 Page 319 of 473

MON 01:54 PM  SUNBEAM PURCHASING          FAX NO. 601 428 4599          P. 08

# Sunbeam, INC.

95 W.L. Runnels Industrial Drive
Hattiesburg, MS 39401
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASING          20011727          REMIT          20011727

PENTALPHA ENTERPRISES LIMITED
KIN TECH IND. BLDG, 9-19, 12-13/F
WONG CHUK HANG ROAD
ABERDEEN

SUNBEAM PRODUCTS, INC.
95 WL RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

## PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

| QUANTITY | U/M | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| 14000.000 | PC | 14000.000 | 08/29/97 | 003242-000-000 | DEEP FRYER,W/CYCLING,DST | 30.300 |
| 4000.000 | PC | 4000.000 | 08/29/97 | 003243-000-000 | DEEP FRY,DST,W/CYL & OIL SYS | 31.000 |
| 3165.000 | PC | 3165.000 | 09/06/97 | 003240-000-000 | DEEP FRYER,SBM | 25.000 |
| 4740.000 | PC | 4740.000 | 09/06/97 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM | 25.000 |
| 600.000 | PC | 600.000 | 09/06/97 | 003242-000-000 | DEEP FRYER,W/CYCLING,DST | 30.000 |
| 2600.000 | PC | 2600.000 | 09/06/97 | 003243-000-000 | DEEP FRY,DST,W/CYL & OIL SYS | 31.000 |

| INVOICE # | DATE REC'D | R/T NO | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN REC'D |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

PURCHASING

P.7

FRI MON 01:55 PM SUNBEAM PURCHASING          FAX NO. 601 428 4599          P. 01

# *Sunbeam*, INC.

95 W L. Runnels Industrial Drive
Hattiesburg, MS 39401
Phone: (601) 296-5000
Fax: (601) 296-5498

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Order 172591.00 |
| | | | | | | Page |

| SHIP VIA | FOB | DATE / TERMS | CODE | PURCH. CONFIRMATION NO. | |
|---|---|---|---|---|---|
| | | Sea Trns | 1212 | | |

| ACKNOWLEDGE TO | | | | SHIP WT | WEIGHT NO. |
|---|---|---|---|---|---|
| 1-8-97 | | | | | |

| | | ATTN PURCHASING | 001-777 | REMIT 000-777 |
|---|---|---|---|---|

PENTALPHA ENTERPRISES LIMITED
KIN TECK IND. BLDG. 9-10, 12-13/F
2035 CHUK HANG ROAD
ABERDEEN
HONG KONG

SUNBEAM PRODUCTS, INC.
95 WL RUNNELS INDUSTRIAL DR.
HATTIESBURG MS 39401

## PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

| TOTAL QUANTITY | LINE | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| 3000.000 PC | | 3000.000 | 09/13/97 | 003241-000-000 | DEEP FRYER,W/TIMER.S3M | 25.00 |
| 1100.000 PC | | 1100.000 | 09/13/97 | 003242-000-000 | DEEP FRYER,W/CYCLING.DST | 30.00 |
| 400.000 PC | | 400.000 | 09/13/97 | 003243-000-000 | DEEP FRY,DST,W/CYL & OIL SYS | 31.00 |

PAYMENT TERMS: D/P AT SIGHT. BANK INFORMATION BELOW
*** FOB POINT: HONG KONG   *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES.
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
LINDA DEEDS NO LATER THAN 5 DAYS AFTER SHIPMENT IS MADE.

| INVOICE # | DATE REC'D | R.T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R.T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

P.8

Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 321 of 473

# *Sunbeam*, CORFATION

1613 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
Order  98036507
Page

| SHIP VIA | FOB | | CODE | TERMS | | CODE | BUYER CODE | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | See Text | | | 2212 | | |

| DATE | REQUESTED BY | | | VALUE | | | A/R. NO. | | ACCOUNT NO |
|---|---|---|---|---|---|---|---|---|---|
| 02/16/98 | | | | | | | | | |

HATT     PURCHASING     00011727     REMIT     00011727

| T O | Pentalpha Enterprises Ltd<br>Kin Teck Ind. BLdg. 9-10, 12-13/F<br>Wong Chuk Hang Road<br>Aberdeen<br>Hong Kong | |
|---|---|---|

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | | | | | PRICE |
|---|---|---|---|---|---|---|---|---|
| 68.000 | PC | 68.000 | 10/01/98 | 005840-000-000 | BREADMAKER,OST DES,2 LB<br>110.12250.110 | | | .0000 |
| 208.000 | PC | 208.000 | 10/01/98 | 003241-035-000 | DEEP FRYER,W/TIMER,SBM,QVC<br>110.12250.110 | | | .0000 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  === FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
BELINDA BOYER  NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
:
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 322 of 473

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

Order   09036507
Page

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 2212 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | | ACCOUNT NO |
|---|---|---|---|---|---|---|---|
| 02/16/98 | | | | | | | |

HATT    PURCHASING    00011727    REMIT    00011727

T O
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

SUNBEAM PRODUCTS, INC.

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTALS | | | OUR PART NO. | | | DESCRIPTION | | PRICE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,
LTD., P.O. BOX 66696, CHICAGO, IL 60466

NO LATER THAN 4 DAYS AFTER SHIPMENT
###
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
###
ADVISING BANK:  FIRST CHICAGO INTERNATIONAL
                153 W. 51ST STREET
                NEW YORK, NY 10019
                ATTN:  GAISRA MALIK

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORPORATION

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 2212 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO | |
|---|---|---|---|---|---|---|---|
| 02/16/98 | | | | | | | |

HATY   PURCHASING   00011727       REMIT   00011727

**T O**  Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

SUNBEAM PRODUCTS, INC.
95 NE RUNNELS INDUSTRIAL DR.
HATTIESBURG, MS 39401

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| | | OUR PART | DESCRIPTION | PRICE |
|---|---|---|---|---|

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF
SCHEDULED SHIP DATE.


INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.
****
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILED AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
         SUNBEAM PRODUCTS, INC.
         95 NE RUNNELS INDUSTRIAL DRIVE
         HATTIESBURG, MS 39401
         ATTN:  JUDY CUNNINGHAM
COPY SENT TO
         SUNBEAM PRODUCTS, INC.

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# *Sunbeam*, CORPORATION

615 East Crafton Road
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS | CODE | SUPER CODE | CONFIRMATION WITH | T.O. |
|---|---|---|---|---|---|---|---|
|  |  |  | See Text | 2212 |  |  |  |

| DATE | REQUESTED BY | VALUE | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|
| 02/16/98 | HATT   PURCHASING   00011727 | REMIT   00011727 |  |  |

T
O
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| TOTAL QUANTITY | | | OUR PART NO. | | | | PRICE |
|---|---|---|---|---|---|---|---|

```
            95 WL RUNNELS INDUSTRIAL DRIVE
            HATTIESBURG, MS 39401
            ATTN: 49 NORTH
    **
    OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

    FAX SHIPPING DOCUMENTS, ATTN:  DAVID PITTS 601-296-5492
                           ATTN: DELRAY OFFICE 561-243-2218
                                 SEE RETURN COMM INV. #PEN0007
                                 2/16/98

                                 ALL CARTONS & PAPERWORK MUST BE
                                 MARKED WITH BLUEPRINT NUMBER,
                                 DATE AND REVISION CURRENTLY
                                 BEING USED

                                                 -------------
                                        Totals          .00
```

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

**PURCHASING**

# Sunbeam, INC.

95 W.L. Runnels Industrial Drive
Harrisburg, MS 39401
Phone: (601) 296-5000
Fax:   (601) 296-5498

*9803683l*

| SHIP VIA | FOB | CODE | TERMS | | CODE | BUYER CODE | CONFIRMATION WITH | | F.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|
| | | | See Text | | | 2212 | | | |

| DATE | REQUESTED BY | | | VALUE | | | AR. NO. | | ACCOUNT NO. |
|---|---|---|---|---|---|---|---|---|---|
| 03/18/98 | | | | | | | | | |

ABCD   PURCHASING   00011727       REMIT   00011727

**TO**
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

**SUNBEAM PRODUCTS, INC.**
95 W. RUNNELS INDUSTRIAL DR.
HATTIESBURG, MS 39401

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| TOTAL QUANTITY | UM | QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|

*Note: Shipment of this p.o. (Model #3242) Pending on Approval from Engineering Dept's. acceptance of Life Cycle Testing Results.*

```
************* SUPPLIERS PLEASE NOTE **************

DATE REFERENCED BESIDE THE QUANTITY AND MODEL # ON THE P.O.
IS THE "ACTUAL REQUESTED ARRIVAL DATE TO OUR FACILITY".

SUPPLIERS MUST SHIP 30 DAYS PRIOR TO THE DATE REQUESTED ON
THE P.O.

*******************************************************
```

*Ship Date 6/1/98*

| 2272.000 | PC | 2272.000 | 07/01/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST | 30.000 |
| | | | | | 110.12250.430 | |

*Ship Date 7/1/98*

| 1136.000 | PC | 1136.000 | 08/01/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST | 30.000 |
| | | | | | 110.12250.430 | |

*Please confirm ship date a.s.a.p.*

*See Note*

| INVOICE # | DATE REC'D | R/T REC'D | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

02/20/96   FRI 10:43   561 243 3107   EPA INC

# Sunbeam

Sunbeam Corporation
Sunbeam Corporate Center
1615 South Congress Ave.
Suite 200
Delray Beach, FL 33445
561 243 2100  Fax 561 243 2210

## FAX COMMUNICATION COVER LETTER

TO: JENA BRADY

FAX: 1-601-296-5766

FROM: KEN ROACH
PROCUREMENT MANAGER-SOURCED PRODUCTS
PHONE: 561-243-2144
FAX: 561-243-3107

CC: JILL NUGENT

DATE: FEB 20, 1996

#PAGES
(including cover sheet): 1

COMMENTS:

P.O. FOR CYCLING DEEP FRYERS
NEED TO STATE VERY CLEARLY%
SHIPMENT OF THESE
PURCHASE ORDER FOR THE
3242 & 3243 CYCLING DEEP
FRYERS PENDING ON
APPROVAL FROM ENGINEERING
DEPARTMENT'S ACCEPTANCE
OF LIFE CYCLE TESTING
RESULTS.

PAGE 1

Fax to
Pentalpha

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

Page   1

| | SHIP VIA | FOB | CODE | TERMS | CODE | CONFIRMATION WITH | P.O. |
|---|---|---|---|---|---|---|---|
| | | | | See Text | 7071 | | |

| 04/03/98 | REQUESTED BY | | VALUE | | AR. NO. | | ACCOUNT NO. |
|---|---|---|---|---|---|---|---|
| | AMCD | | 00011727 | | 00011727 | | |

PURCHASING                          REMIT

**T O**
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong K**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

| | | | | | | PRICE |
|---|---|---|---|---|---|---|
| | | Ship Date 8/15/98 | | | | |
| 2272.000 | PC | 2272.000 | 09/15/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |
| | | ship Date 9/1/98 | | | | |
| 13632.000 | PC | 13632.000 | 10/01/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

011-852-2-873-0591          PURCHASING

```
                              TIME     : JUN 03 '98 14:48
                              TEL NUMBER : 9547672027
                              NAME     : CORPORATE ACCT
```

| NBR | FILE | DATE | TIME | DURATION | PGS | TO | DEPT NBR | MODE | STATUS |
|-----|------|------|------|----------|-----|----|----------|------|--------|
| 233 | 28 | JUN.03 | 14:38 | 02/31 | 4 | + 852 2814 0769 | | EC | M OK |

Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5494

PURCHASE ORDER NO.
Order  98041171
Page       1

| DATE | SHIP VIA | FOB | CODE / TERMS | CODE / BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|------|----------|-----|--------------|------------------|-------------------|-----------|
| | | | See Text | 9071 | | |

| DATE 06/03/98 | REQUESTED BY | VALUE | AR NO. | ACCOUNT NO. |
|---------------|--------------|-------|--------|-------------|
| | AMCB | 00011727 | 00011727 | |
| | PURCHASING | | REMIT | |

T O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

S SUNBEAM PRODUCTS, INC.
H 79 WL RODGELS INDUSTRIAL DR.
P HATTIESBURG MS 39401

None   PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE

| TOTAL QUANTITY | U/M | SHIP/RELEASE QUANTITY | DATE | OUR PART NO. | DESCRIPTION | PRICE |
|----------------|-----|----------------------|------|--------------|-------------|-------|
| | | Ship Date | 8/15/98 | | | |
| 2272.000 | PC | 2272.000 | 09/15/98 | 003240-000-000 | DEEP FRYER,SBM  110.12250.430 | 24.5000 |
| | | Ship Date | 9/1/98 | | | |
| 13632.000 | PC | 13632.000 | 10/01/98 | 003240-000-000 | DEEP FRYER,SBM  110.12250.430 | 24.500C |

PAYMENT TERMS: D/P AT SIGHT.(Model 84714/85843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*

Ship To: Address stated above
Bill To: SUNBEAM, INC., P.O. BOX 537925, LIVONIA, MI 48153-8925

ALL PALLETS USED ON THIS PURCHASE ORDER MUST BE GOOD QUALITY 40" X 48" 4-WAY PALLETS.

1. Correspondence - MUST show our purchase order number and our part number including invoices, packing slips
2. Packing List - Must be itemized with our part number and purchase order number

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO.

Page 1

| SHIP VIA | FOB | CODE | TERMS | CODE | CONFIRMATION WITH | P.O. |
|---|---|---|---|---|---|---|
| | | | 500 Test | 2212 | | |

| DATE 02/19/98 | REQUESTED BY AMCD | VALUE 00011727 | AR NO. 00011727 | ACCOUNT NO. |
|---|---|---|---|---|

PURCHASING          REMIT

TO
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| QUANTITY | | PRICE |
|---|---|---|

Ship Date 6/25/98

| .2808.000 | PC | 2808.000 | 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |

Ship Date 6/25/98

| 1404.000 | PC | 1404.000 | 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  $$$ FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
$
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

*Revised PO Qty
Do Not Duplicate*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam CORPORATION

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| SHIP VIA | FOB | CODE See Text | CODE 071 | CONFIRMATION WITH | T.O. TYPE |
|---|---|---|---|---|---|

| DATE 08/03/98 | REQUESTED BY AMCD | VALUE 00011727 | AR. NO. 00011727 | ACCOUNT NO |
|---|---|---|---|---|
| PURCHASING | | | REMIT | |

T O
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | | | | | PRICE |
|---|---|---|---|---|---|
| 2808.000 | PC | *Ship Date 8/15/98* 2808.000 09/15/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |
| 12636.000 | PC | *Ship Date 9/1/98* 12636.000 10/01/98 | 003240-000-000 | DEEP FRYER,SBM 110.12250.430 | 24.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  ### FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

*Revised P.O. Qty*

*Do Not Duplicate*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

*Sunbeam*, CORPORATION

PURCHASE ORDER NO.
Page 1

1615 Stanislaw Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| SHIP VIA | FOB | CODE | | Text | CODE | | CONFIRMATION WITH | | |
|---|---|---|---|---|---|---|---|---|---|
| 94/08/98 | | 530 | | | 2212 | | | | |
| REQUESTED BY | | | VALUE | | AR. NO. | | ACCOUNT NO |
| | ABCD | | 00011727 | | 00011727 | | |

PURCHASING                    REMIT

**T O**

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

Ship Date 6/25/98

| | | | | | PRICE |
|---|---|---|---|---|---|
| 1404.000 | PC | 1404.000 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | 35.5000 |

PAYMENT TERMS: D/P AT SIGHT.(Model N4714/N5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

\* *Revised P.O Qty*
*Do Not Duplicate*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORPORATION

PURCHASE ORDER NO.
Page 1

183 South Court Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:  (601) 296-5498

| SHIP VIA | | FOB | | CODE | TYPE | 300 Text | | CODE | ORDER DATE 2212 | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| 03/13/98 | REQUESTED BY | | AMCD | | | VALUE 00011727 | | AR. NO. 00011727 | | ACCOUNT NO. | |
|---|---|---|---|---|---|---|---|---|---|---|---|

PURCHASING                                      REMIT

T
O
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong  KONG  PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| | | | | | | | PRICE |
|---|---|---|---|---|---|---|---|
| | | *Ship Date  6/25/98* | | | | | |
| 7020.000 | PC | 7020.000 | 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | | 35.5000 |
| | | *Ship Date  6/25/98* | | | | | |
| 7020.000 | PC | 7020.000 | 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | | 35.5000 |
| | | *Ship Date  6/25/98* | | | | | |
| 1404.000 | PC | 1404.000 | 07/25/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST 110.12250.430 | | 35.5000 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/85843 at T/T-by fax
copies) FOB POINT HONK KONG  ### FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:

*# Revised PO Qty*

*Do Not Duplicate*

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORP ...ATION

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.

Page 1

| SHIP VIA | FOB | CODE | See Text | CODE | 2212 | CONFIRMATION WITH | P.O. |
|---|---|---|---|---|---|---|---|

| 02/19/98 | REQUESTED BY | AMCD | VALUE | 00011727 | AR. NO. | 00011727 | ACCOUNT NO. |
|---|---|---|---|---|---|---|---|

PURCHASING                                REMIT

```
T    Pentalpha Enterprises Ltd
O    Kin Teck Ind. Bldg. 9-10, 12-13/F
     Wong Chuk Hang Road
     Aberdeen
     Hong Kong
```

Hong Kong PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

*ship Date 6/25/98*

| 2808.000 | PC | 2808.000 | 07/25/98 | 003243-000-000 | DEEP FRY,OST,W/CYL & OIL SYS 110.12250.430 | 36.0000 |
|---|---|---|---|---|---|---|

*Ship Date 6/25/98*

| 2808.000 | PC | 2808.000 | 07/25/98 | 003243-000-000 | DEEP FRY,OST,W/CYL & OIL SYS 110.12250.430 | 36.000C |
|---|---|---|---|---|---|---|

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65007, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

*\* Revised P.O. Qty*

*Do Not Duplicate*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

Page 1

| SHIP VIA | FOB | CODE | 599 Text | CODE | UNIT/COST | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|

| 07/06/98 | REQUESTED BY | | VALUE | | AR. NO. | | ACCOUNT NO. |
|---|---|---|---|---|---|---|---|
| | AMCD | | 00011727 | | 00011727 | | |

PURCHASING                    REMIT

T O

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong Kong  PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

PRICE

*Ship Date 7/15/98*

| 2808.000 | PC | 2808.000 | 08/15/98 | 003242-000-000 | DEEP FRY,DST,W/2 KNIVES | 35.5000 |
|---|---|---|---|---|---|---|
| | | | | | 110.12250.430 | |

*Ship Date 8/1/98*

| 2808.000 | PC | 2808.000 | 09/01/98 | 003242-000-000 | DEEP FRYER,W/CYCLING,OST | 35.5000 |
|---|---|---|---|---|---|---|
| | | | | | 110.12250.430 | |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA

* *Revised P.O. Qty*
*Do Not Duplicate*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
Page

| SHIP VIA | FOB | CODE | 500 Text | CODE | 2212 | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|

| 03/13/98 | REQUESTED BY | | VALUE | | AR. NO. | | ACCOUNT NO. |
|---|---|---|---|---|---|---|---|
| | AHCD | | 00011727 | | 00011727 | | |

PURCHASING      REMIT

```
T   Pentalpha Enterprises Ltd
O   Kin Teck Ind. BLdg. 9-10, 12-13/F
    Wong Chuk Hang Road
    Aberdeen
    Hong Kong
```

Hong Kong **PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

*ship Date 6/25/98*

| 4212.000 | PC | 4212.000 | 07/25/98 | 003242-000-000 | DEEP FRY,OST,W/CYL & OIL SYS 110.12250.430 | 35.5000 |
|---|---|---|---|---|---|---|

*ship Date 7/1/98*

| 1404.000 | PC | 1404.000 | 08/01/98 | 003243-000-000 | DEEP FRY,OST,W/CYL & OIL SYS 110.12250.430 | 36.0000 |
|---|---|---|---|---|---|---|

```
PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING A 1/3 BILL OF LADING TO FRITZ COMPANIES,
1721 EL FINALE, SUITE 203, SPRINGFIELD, MO 65807, ATTN:
LINNEA DEEDS NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
*
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
```

**✳ Revised PO Qty
Do Not Duplicate.**

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO. 48044003

Page    1

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | F.O. |
|---|---|---|---|---|---|---|---|
|  |  |  | See Text | | 7071 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|---|---|
| 08/26/98 | | | | | | |

MORG    PURCHASING    00011727        REMIT    00011727

```
T   Pentalpha Enterprises Ltd
O   Kin Teck Ind. Bldg. 9-10, 12-13/F
    26 Wong Chuk Hang Road
    Aberdeen
    Hong Kong
```

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

*ship Date 8/30/8*

| | | | | | PRICE |
|---|---|---|---|---|---|
| 3408.000 | PC | 3408.000 09/25/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.191 | 26.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T by fax
copies) FOB POINT HONK KONG ### FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 65807, ATTN:
BELINDA BOYER  NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.
$
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# *Sunbeam*, CORP ATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
Order   88044003
Page       2

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | F.O. |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 7071 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO. |
|---|---|---|---|---|---|---|
| 08/26/98 | | | | | | |

MDRG    PURCHASING      00011727        REMIT    00011727

**T O**   Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

LTD., P.O. BOX 66698, CHICAGO, IL 60666

NO LATER THAN 4 DAYS AFTER SHIPMENT
***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
***
ADVISING BANK:   FIRST CHICAGO INTERNATIONAL
153 W. 51ST STREET
NEW YORK, NY 10019
ATTN:  GAISRA MALIK

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D. | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 3 of 4

# *Sunbeam*, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | | | VALUE | | AR. NO. | | ACCOUNT NO |
|---|---|---|---|---|---|---|---|---|
| 08/26/98 | | | | | | | | |
| | HORG | PURCHASING | | 00011727 | | REMIT | 00011727 | |

```
T    Pentalpha Enterprises Ltd
O    Kin Teck Ind. BLdg. 9-10, 12-13/F
     26 Wong Chuk Hang Road
     Aberdeen
     Hong Kong
```

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

```
SCHEDULED SHIP DATE.


INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.
****
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILED AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
     SUNBEAM PRODUCTS, INC.
     95 EL RUNNELS INDUSTRIAL DRIVE
     HATTIESBURG, MS 39401
     ATTN:  JUDY CUNNINGHAM
COPY SENT TO:
     SUNBEAM PRODUCTS, INC.
     95 EL RUNNELS INDUSTRIAL DRIVE
     HATTIESBURG, MS 39401
     ATTN:  49 NORTH
```

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

Order   98044003
Page   4

| SHIP VIA | FOB | CODE TERMS | CODE | BUYER CODE | CONFIRMATION WITH |
|---|---|---|---|---|---|
| | | See Text | 7071 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO. |
|---|---|---|---|---|---|---|
| 08/26/98 | | | | | | |

| | MORG | PURCHASING | 00011727 | | REMIT | 00011727 |

T O
Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL QUANTITY | ONE PART NO. | PRICE |
|---|---|---|
| | | |

**

OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

FAX SHIPPING DOCUMENTS, ATTN:  DAVID PITTS 601-296-5492
                        ATTN: DELRAY OFFICE 561-243-2218

ALL CARTONS & PAPERWORK MUST BE
MARKED WITH BLUEPRINT NUMBER,
DATE AND REVISION CURRENTLY
BEING USED

Totals:     90,584.6

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

```
*************************
***   TX REPORT   ***
*************************

TRANSMISSION OK

TX/RX NO               2338
CONNECTION TEL            801185228730591
SUBADDRESS
CONNECTION ID
ST. TIME               08/26 18:08
USAGE T                06'59
PGS.                      5
RESULT                 OK
```

# Sunbeam.

| | |
|---|---|
| **Date** | 8/26/98 |

**Number of pages including**      **5**
**cover sheet**

| | | | |
|---|---|---|---|
| **TO:** | Fred Wong | **FROM:** | Paul Taddonio |
| | Pentalpha | | Sunbeam Corp. |

| | | | |
|---|---|---|---|
| **Phone** | | **Phone** | 561-243-2173 |
| **Fax Phone** | 011-852-2-873-0591 | **Fax Phone** | 561-912-4157 |

**CC:**

**REMARKS:**  ☒ Urgent  ☐ For your review  ☒ Reply ASAP  ☐ Please Comment

Fred,
  NEW P.O. # 98044003. PLEASE CONFIRM SHIP DATE.
Thanks..

Any questions please fax or call.

Best regards,   Paul Taddonio

# *Sunbeam.*

| | |
|---|---|
| **Date** | 8/26/98 |
| **Number of pages including cover sheet** | 5 |

| | | | | |
|---|---|---|---|---|
| **TO:** | Fred Wong | **FROM:** | Paul Taddonio | |
| | | | Sunbeam Corp. | |
| | Pentalpha | | | |
| **Phone** | | **Phone** | 561-243-2173 | |
| **Fax Phone** | 011-852-2-873-0591 | **Fax Phone** | 561-912-4157 | |

**CC:**

**REMARKS:**  ☒ Urgent   ☐ For your review   ☒ Reply ASAP   ☐ Please Comment

Fred,
 NEW P.O. # 98044003. PLEASE CONFIRM SHIP DATE.
Thanks..

Any questions please fax or call.

Best regards,    Paul Taddonio

# *Sunbeam*, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
Order   98044004
Page    1

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | | P071 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|---|---|
| 08/26/98 | | | | | | |

HATT    PURCHASING    00011727    REMIT    00011727

T  Pentalpha Enterprises Ltd
O  Kin Teck Ind. Bldg. 9-10, 12-13/F
   26 Wong Chuk Hang Road
   Aberdeen
   Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| | | | | | | PRICE |
|---|---|---|---|---|---|---|
| 4212.000 | PC | 4212.000 | 10/15/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |
| 5616.000 | PC | 5616.000 | 10/20/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |
| 1404.000 | PC | 1404.000 | 11/15/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |

ship date 9/15/98

ship date 9/20/98

ship date 10/15/98

PAYMENT TERMS: D/P AT SIGHT.(Model 84714/85843 at T/T-by fax
copies) FOB POINT HONK KONG  *** FREIGHT: COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

615 East Congress St.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
0004004
Page

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 7071 | | |

| DATE | REQUESTED BY | | VALUE | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|---|
| 08/26/98 | | | | | |

HATT    PURCHASING    00011727        REMIT    00011727

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

| TOTAL ORDER | | | | | DESCRIPTION | PRICE |
|---|---|---|---|---|---|---|
| | | | Ship Date 8/30/98 | | | |
| 4544.000 | PC | 4544.000 | 08/25/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |
| | | | Ship Date 9/15/98 | | | |
| 5680.000 | PC | 5680.000 | 10/15/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |
| | | | Ship Date 10/15/98 | | | |
| 1136.000 | PC | 1136.000 | 11/15/98 | 003241-000-000 | DEEP FRYER,W/TIMER,SBM 110.12250.110 | 26.5800 |

PAYMENT TERMS: D/P AT SIGHT.(Model 84714/85843 at T/T-by fax
copies) FOB POINT HONK KONG *** FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

**Sunbeam CORPORATION**

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| | PURCHASE ORDER NO |
|---|---|
| | Order   98045748 |
| | Page      1 |

| | SHIP VIA | | FOB | | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | P.C. TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | See Text | 9071 | | | | |

| DATE | REQUESTED BY | | VALUE | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|---|
| 10/15/98 | | | | | |

|  | HATT   PURCHASING | 00011727 | REMIT | 00011727 |
|---|---|---|---|---|

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HE...

ship Date  11/10/98

| 8424.000 | PC | 8424.000 | 12/10/98 | 003240-000-000 | DEEP FRYER,SBM | 24.5800 |
|---|---|---|---|---|---|---|
| | | | | | 110.12250.110 | |

PAYMENT TERMS: D/P AT SIGHT.(Model #4714/#5843 at T/T-by fax
copies) FOB POINT HONK KONG  ### FREIGHT:  COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20' OR 40' CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO  65807, ATTN:
BELINDA BOYER  NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.

ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

\* Revised P.o.
Do Not Duplicate
10/16/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

**Sunbeam CORPORATION**

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:     (601) 296-5498

| | PURCHASE ORDER NO. |
|---|---|
| Order | 98045748 |
| Page | 2 |

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | | VALUE | A/R NO. | ACCOUNT NO |
|---|---|---|---|---|---|
| 10/15/98 | | | | | |

MATT    PURCHASING              00011727          REMIT          00011727

T
O
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HE...      ...VERSE SIDE.

LTD., P.O. BOX 66678, CHICAGO, IL 60666

NO LATER THAN 4 DAYS AFTER SHIPMENT
***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
***
ADVISING BANK:    FIRST CHICAGO INTERNATIONAL
                  153 W. 51ST STREET
                  NEW YORK, NY 10019
                  ATTN:  QAISRA MALIK

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF

*  *Revised P.O.*
*Do Not Duplicate*
10/16/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

**Sunbeam CORPORATION**

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| | PURCHASE ORDER NO |
|---|---|
| Order | 9804574B |
| Page | 3 |

| | SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|
| | | | | See Text | 9071 | | | |

| DATE | REQUESTED BY | | | | VALUE | | AR. NO. | | ACCOUNT NO |
|---|---|---|---|---|---|---|---|---|---|
| 10/15/98 | | | | | | | | | |

MATT   PURCHASING      00011727      REMIT   00011727

```
T    Pentalpha Enterprises Ltd
O    Kin Teck Ind. Bldg. 9-10, 12-13/F
     26 Wong Chuk Hang Road
     Aberdeen
     Hong Kong
```

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED H... ...SE SIDE.

```
SCHEDULED SHIP DATE.


INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.
####
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILES AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
          SUNBEAM PRODUCTS, INC.
          95 ML RUNNELS INDUSTRIAL DRIVE
          HATTIESBURG, MS 39401
          ATTN:  JUDY CUNNINGHAM
COPY SENT TO
          SUNBEAM PRODUCTS, INC.
          95 ML RUNNELS INDUSTRIAL DRIVE
          HATTIESBURG, MS 39401
          ATTN:  49 NORTH
```

*# Revised P.O.*
*Do Not Duplicate*
*10/16/98*

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| | | | PURCHASE ORDER NO. | |
|---|---|---|---|---|
| | | Order | 9B04574B |
| | | Page | 6 |



| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | | |

| DATE | REQUESTED BY | | | VALUE | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|---|---|
| 10/15/98 | | | | 00011727 | | 00011727 |
| | MATT    PURCHASING | | | | REMIT | |

T
O        Pentalpha Enterprises Ltd
         Kin Teck Ind. Bldg. 9-10, 12-13/F
         26 Wong Chuk Hang Road
         Aberdeen
         Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED H...

```
**
OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

FAX SHIPPING DOCUMENTS, ATTN:  DAVID PITTS 601-296-5492
                         ATTN: DELRAY OFFICE 561-912-4304

                                        ALL CARTONS & PAPERWORK MUST BE
                                        MARKED WITH BLUEPRINT NUMBER,
                                        DATE AND REVISION CURRENTLY
                                        BEING USED
```

Total:     207,061.92

*Revised P.O.*
*Do Not Duplicate*
10/16/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D. | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO              0253
CONNECTION TEL           901185228730591
SUBADDRESS
CONNECTION ID
ST. TIME              10/16 10:46
USAGE T               06'41
PGS. SENT             5
RESULT                OK
```

# Sunbeam.

| | |
|---|---|
| **Date** | 10/15/98 |

**Number of pages including cover sheet**  5

**TO:** Fred Wong

Vicky Tai

Pentalpha

**FROM:** Paul Taddonio

Sunbeam Corp.

**Phone**

**Fax Phone** 011-852-2-873-0591

**Phone** 561-243-2173

**Fax Phone** 561-912-4304

**CC:**

**REMARKS:** ☒ Urgent   ☐ For your review   ☒ Reply ASAP   ☐ Please Comment

Fred and Vicky,

Thanks for your reply, Subject new orders.

Revised purchase order #98045748. Please inform of ship date. Can you ship order 98045125 before 11/01/98?

# *Sunbeam.*

| | |
|---|---|
| **Date** | *10/15/98* |

**Number of pages including**     5
**cover sheet**

| | | | |
|---|---|---|---|
| **TO:** | *Fred Wong* | **FROM:** | *Paul Taddonio* |
| | *Vicky Tai* | | *Sunbeam Corp.* |
| | *Pentalpha* | | |

| | | | |
|---|---|---|---|
| **Phone** | | **Phone** | *561-243-2173* |
| **Fax Phone** | *011-852-2-873-0591* | **Fax Phone** | *561-912-4304* |

**CC:**

**REMARKS:**  ☒ *Urgent*  ☐ *For your review*  ☒ *Reply ASAP*  ☐ *Please Comment*

```
Fred and Vicky,

Thanks for your reply, Subject new orders.


Revised purchase order #98045748. Please inform of ship date. Can you
ship order 98045125 before 11/01/98?


Thanks..Paul

Any questions please fax or call.


Best regards,    Paul Taddonio
```

Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 350 of 473

# *Sunbeam*, CORPORATION

161 ... Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | | VALUE | | AR. NO. | | ACCOUNT NO |
|---|---|---|---|---|---|---|---|
| 10/26/98 | | | | | | | |

| | HATT   PURCHASING | 00011727 | REMIT | 00011727 |
|---|---|---|---|---|

T
O
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

Ship ASAP

| 2808.000 | PC | 2808.000 | 11/10/98 | 003240-000-000 | DEEP FRYER, SBM | 24.580 |
|---|---|---|---|---|---|---|
| | | | | | 110:12250:110 | |

PAYMENT TERMS: D/P AT SIGHT. (Model #85314/85843 at E/I-13 Yrs
copies) FOR POINT HONK KONG   ... FRIGHT COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN FCL OR CL CONTAINED
TO BE MADE VIA MANDIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO FRITZ COMPANIES
1721 W. PINDALE, SUITE 205, SPRINGFIELD ... ATTN: ...
BELINDA ROYER. NO LATER THAN 4 DAYS BILLS DOCUMENT DATE.
ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED

| INVOICE # | DATE REC'D | RT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 351 of 473

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

Order  98046144
Page   2

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | F.O.B TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | 9071 | | | |

| DATE | REQUESTED BY | | VALUE | AR. NO. | ACCOUNT NO |
|---|---|---|---|---|---|
| 10/26/98 | | | | | |

| | HATT | PURCHASING | 00011727 | REMIT | 00011727 |
|---|---|---|---|---|---|

T O
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

**PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.**

LTD., P.O. BOX 66678, CHICAGO, IL 60666

NO LATER THAN 4 DAYS AFTER SHIPMENT ***
DELIVERY SCHEDULE PER THIS PURCHASE ORDER
***
ADVISING BANK: FIRST CHICAGO INTERNATIONAL
153 W 51ST STREET
NEW YORK, NY 10019
AYUMA DAISRA KALIN

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
Order  98046146
Page  3

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|
| | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | VALUE | AR. NO. | ACCOUNT NO. |
|---|---|---|---|---|
| 10/26/98 | | | | |

HATT   PURCHASING   00011727   REMIT   00011727

**TO**

Pentalpha Enterprises Ltd
Kin Teck Ind. BLdg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

SCHEDULED SHIP DATE.

INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.
ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILES AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
SUNBEAM PRODUCTS, INC.
95 W. RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: JUDY CUNNINGHAM

COPY SENT TO:
SUNBEAM PRODUCTS, INC.
95 W. RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: JW NORTH

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

PURCHASING

Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 353 of 473

# Sunbeam, CORPORATION

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS | CODE | BUYER CODE | CONFIRMATION WITH | |
|----------|-----|------|-------|------|------------|-------------------|--|
| | | | See Text | | 9071 | | |

| DATE | REQUESTED BY | | | VALUE | | AR. NO. | | ACCOUNT NO. |
|------|--------------|--|--|-------|--|---------|--|-------------|
| 10/26/98 | | | | | | | | |

| | HATT   PURCHASING | 00011727 | REMIT | 00011727 |
|--|--------------------|----------|-------|----------|

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

## PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

**
OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

FAX SHIPPING DOCUMENTS, ATTN:  DAVID PITTS 601-296-3492
              ATTN: DELRAY OFFICE 561-912-4304

ALL CARTONS & PAPERWORK MUST BE
MARKED WITH BLUEPRINT NUMBER,
DATE AND REVISION CURRENTLY
BEING USED.

Total:      69,020.4

| INVOICE # | DATE REC'D | RT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RT NO. | QUAN. REC'D. | BAL. DUE |
|-----------|-----------|--------|-------------|----------|-----------|-----------|--------|--------------|----------|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

# *Sunbeam.*

| | |
|---|---|
| **Date** | *10/26/98* |

**Number of pages including**      5
**cover sheet**

| | | | |
|---|---|---|---|
| **TO:** | Fred Wong | **FROM:** | Paul Taddonio |
| | Vicky Tai | | Sunbeam Corp. |
| | Pentalpha | | |

| | | | |
|---|---|---|---|
| **Phone** | | **Phone** | 561-243-2173 |
| **Fax Phone** | 011-852-2-873-0591 | **Fax Phone** | 561-912-4304 |

**CC:**

**REMARKS:**    ☒ Urgent    ☐ For your review    ☒ Reply ASAP    ☐ Please Comment

Fred and Vicky,

* New purchase order #98046146. Need this order to ship 11/10 or before. Can you ship 3240's before 11/10?

* Your last fax I do not understand. Are you changing ship schedule for replacement breadmakers? or Are these the new orders?

* Please inform me of ship date and provide paper work for 3 lots of 5841.

* Your ship dates dates keep moving out. I need all orders to ship on time or before. Please respond.


Thanks..Paul


Any questions please fax or call.


Best regards,     Paul Taddonio

```
                          **********************
                          ***   TX REPORT   ***
                          **********************

        TRANSMISSION OK

        TX/RX NO              0328
        CONNECTION TEL             901185228730591
        SUBADDRESS
        CONNECTION ID
        ST. TIME             10/26 14:14
        USAGE T              06'11
        PGS. SENT               5
        RESULT               OK
```

# Sunbeam.

| | |
|---|---|
| **Date** 10/26/98 | |
| **Number of pages including** | **5** |
| **cover sheet** | |

| **TO:** | Fred Wong | **FROM:** | Paul Taddonio |
|---|---|---|---|
| | Vicky Tai | | Sunbeam Corp. |
| | Pentalpha | | |

| **Phone** | | **Phone** | 561-243-2173 |
|---|---|---|---|
| **Fax Phone** | 011-852-2-873-0591 | **Fax Phone** | 561-912-4304 |

**CC:**

**REMARKS:**   ☒ Urgent    ☐ For your review    ☒ Reply ASAP    ☐ Please Comment

Fred and Vicky,

* New purchase order #98046146. Need this order to ship 11/10 or before. Can you ship 3240's before 11/10?

* Your last fax I do not understand. Are you changing ship schedule for replacement breadmakers? or Are these the new orders?

* Please inform me of ship date and provide paper work for 3 lots of 5841.

* Your ship dates dates keep moving out. I need all orders to ship --

Case 9:02-cv-80527-KLR   Document 15   Entered on FLSD Docket 07/22/2002   Page 356 of 473

# *Sunbeam* CORPORATION

1615 South Congress Ave.
Delray Beach, EL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | CODE | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|

| DATE 10/29/98 | REQUESTED BY | | VALUE | AR NO. | ACCOUNT NO |
|---|---|---|---|---|---|
| | HATT | | 00011727 | 00011727 | |

PURCHASING — REMIT

TO

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED

| 1404.000 | PC | 1404.000 | 01/05/99 | 003241-000-000 | DEEP FRYER W/TIMER SBN-110.12250.110 | 26.5800 |
|---|---|---|---|---|---|---|

ship date 12/5/98 ok

PAYMENT TERMS: D/P AT SIGHT.(Model 8871A/85843 at 1/3 by fax
copies) FOB POINT HONK KONG   $$$ FREIGHT COLLECT
ROUTING: FULL CONTAINER SHIPMENTS IN 20 OR 40 CONTAINERS
TO BE MADE VIA HANJIN OR YANG MING AND ROUTED TO NEW ORLEANS
LA THROUGH THE PORT OF LONG BEACH OR LOS ANGELES, CA. ON ALL
THESE SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF
DOCUMENTS INCLUDING 1/3 BILL OF LADING TO PRICE COMPANIES
1721 EL FINDALE, SUITE 205, SPRINGFIELD, MO 45007, ATTN:
BELINDA BOYER   NO LATER THAN 4 DAYS AFTER SHIPMENT IS MADE.

ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,

# * REVISED P.O.
# DO NOT DUPLICATE

11/2/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

PURCHASE ORDER NO.
ORDER      9804635?
Page        2

9804635?

| SHIP VIA | FOB | CODE | TERMS See Text | CODE 4500 DSB 9071 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|

| DATE 10/29/98 | REQUESTED BY HATT | | VALUE 00011727 | AR. NO. 00011727 | ACCOUNT NO. |
|---|---|---|---|---|---|
| | PURCHASING | | | REMIT | |

**TO**
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED

LTD., P.O. BOX 66678, CHICAGO, IL 60666

NO LATER THAN 8 DAYS AFTER SHIPMENT

DELIVERY SCHEDULE PER THIS PURCHASE ORDER.

ADVISING BANK - FIRST CHICAGO INTERNATIONAL
                153 WEST 51ST STREET
                NEW YORK, NY 10019
                ATTN: LETTER OF CREDIT

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF

# * REVISED P.O.
# DO NOT DUPLICATE

11/2/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

Case 9:02-cv-80527-KLR    Document 19    Entered on FLSD Docket 07/22/2002    Page 358 of 473

**Sunbeam CORPORATION**

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

Order 78048359
Page 3

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | 9071 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|

| DATE 10/29/98 | REQUESTED BY HATT | VALUE 00011727 | AR NO. 00011727 | ACCOUNT NO. |
|---|---|---|---|---|
| | PURCHASING | | REMIT | |

T O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong  PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED

SCHEDULED SHIP DATE

INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS

ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILED AT
THE SAME TIME AS SHIPMENT TO THE FOLLOWING ADDRESS:
SUNBEAM PRODUCTS, INC.
95 NL RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: JUDY CUNNINGHAM

COPY SENT TO
SUNBEAM PRODUCTS, INC.
95 NL RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: 49 NORTH

# * REVISED P.O.
# DO NOT DUPLICATE

11/2/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**PURCHASING**

*Sunbeam* CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:    (601) 296-5498

PURCHASE ORDER NO.
UP587   V8048557
Page        4

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | BUYER CODE 9071 | CONFIRMATION WITH | | P.O. TYPE |
|---|---|---|---|---|---|---|---|---|

| DATE 10/29/98 | REQUESTED BY MATT | PURCHASING | VALUE 00011727 | A/R. NO. 00011727 | ACCOUNT NO | REMIT |
|---|---|---|---|---|---|---|

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

Hong   PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED ...

OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

FAX SHIPPING DOCUMENTS, ATTN: DAVID PITTS 601-296-5492
                        ATTN: DELRAY OFFICE 561-212-6304

ALL CARTONS & PAPERWORK MUST BE
MARKED WITH BLUEPRINT NUMBER,
DATE AND REVISION CURRENTLY
BEING USED

Total:    37,318.32

# * REVISED P.O.
# DO NOT DUPLICATE

11/2/98

| INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | R/T NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

```
                    ********************
                    ***   TX REPORT   ***
                    ********************

      TRANSMISSION OK

      TX/RX NO              0424
      CONNECTION TEL            901185228730591
      SUBADDRESS
      CONNECTION ID
      ST. TIME              11/02 10:43
      USAGE T               07'35
      PGS. SENT             5
      RESULT                OK
```

# *Sunbeam.*

| | |
|---|---|
| **Date** | 11/02/98 |
| **Number of pages including cover sheet** | 5 |

| | | | | |
|---|---|---|---|---|
| **TO:** | Fred Wong | | **FROM:** | Paul Taddonio |
| | Vicky Tai | | | Sunbeam Corp. |
| | Pentalpha | | | |
| **Phone** | | | **Phone** | 561-243-2173 |
| **Fax Phone** | 011-852-2-873-0591 | | **Fax Phone** | 561-912-4304 |

**CC:**

**REMARKS:**  ☒ Urgent   ☐ For your review   ☒ Reply ASAP   ☐ Please Comment

Fred and Vicky,

Revised purchase order, 98046359.

Thanks..Paul

Any questions please fax or call.

# *Sunbeam*

| | |
|---|---|
| **Date** | *11/02/98* |
| **Number of pages including cover sheet** | *5* |

**TO:**   *Fred Wong*
          *Vicky Tai*
          *Pentalpha*

**FROM:**  *Paul Taddonio*
           *Sunbeam Corp.*

**Phone**
**Fax Phone**  *011-852-2-873-0591*

**Phone**     *561-243-2173*
**Fax Phone**  *561-912-4304*

**CC:**

**REMARKS:**  ☒ *Urgent*   ☐ *For your review*   ☒ *Reply ASAP*   ☐ *Please Comment*

Fred and Vicky,

Revised purchase order, 98046359.
Thanks..Paul

Any questions please fax or call.

Best regards,   Paul Taddonio

Case 9:02-cv-80527-KLR   Document 1961 Entered on FLSD Docket 07/22/2002   Page 362 of 473

# _Sunbeam_, CORPORATION

615 ...
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | SHIP DATE 9071 | CONFIRMATION WITH | P.O. TYPE |
|---|---|---|---|---|---|---|---|

| DATE 10/30/98 | REQUESTED BY HATT | VALUE 00011727 | AR. NO. | ACCOUNT NO. 00011727 |
|---|---|---|---|---|
| | PURCHASING | | REMIT | |

```
T   Pentalpha Enterprises Ltd
O   Kin Teck Ind. BLdg. 9-10, 12-13/F
    26 Wong Chuk Hang Road
    Aberdeen
    Hong Kong
```

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

_ship Date  12/20/98 ok_

| 7020.000 | PC | 7020.000 | 01/20/99 | 003240-000-000 | DEEP FRYER, SDH 110.12250.110 | 24.580 |
|---|---|---|---|---|---|---|

_ship Date  2/5/99 ok_

| 5616.000 | PC | 5616.000 | 03/05/99 | 003240-000-000 | DEEP FRYER, SDH 110.12250.110 | 24.580 |
|---|---|---|---|---|---|---|

PAYMENT TERMS: S/D AT SIGHT. (Node: 05514/86843 at 2.1C by fax ...

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | 1 | |
| | | | | | | | | | |

PURCHASING

# Sunbeam, CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax: (601) 296-5498

Page 2

| SHIP VIA | FOB | CODE | TERMS | CODE | | CONFIRMATION WITH |
|---|---|---|---|---|---|---|
| | | | See Text | 9071 | | |

| DATE | REQUESTED BY | | VALUE | AR. NO. | | ACCOUNT NO |
|---|---|---|---|---|---|---|
| 10/30/98 | WATT | | 00011727 | | 00011727 | |

PURCHASING                                  REMIT

**TO**
Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

ROUTING: ALL LESS THAN CONTAINER SHIPMENTS TO BE MADE VIA
WIDER CONSOLIDATED, INC. AND ROUTED TO CHICAGO, IL. ON ALL
SHIPMENTS, EXPRESS COURIER A DUPLICATE SET OF DOCUMENTS,
INCLUDING A 1/3 BILL OF LADING TO UNITRANS CONSOLIDATED,
LTD., P.O. BOX 66678, CHICAGO, IL 60666

NO LATER THAN 4 DAYS AFTER SHIPMENT

DELIVERY SCHEDULE PER THIS PURCHASE ORDER

ADVISING BANK: FREE CHICAGO INTERNATIONAL

ALL BANK CHARGES OUTSIDE OF THE UNITED STATES ARE FOR THE
BENEFICIARY'S ACCOUNT

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

# Sunbeam CORPORATION

1615 South Congress Ave.
Delray Beach, FL 33445
Phone: (601) 296-5000
Fax: (601) 296-5498

| SHIP VIA | FOB | CODE | TERMS See Text | CODE | DATE CODE | CONFIRMATION WITH | F.O. |
|---|---|---|---|---|---|---|---|
| | | | | | 9071 | | |

| DATE 10/30/98 | REQUESTED BY HATT | | VALUE 00011727 | AR. NO. 00011727 | | ACCOUNT NO. |
|---|---|---|---|---|---|---|
| | PURCHASING | | | REMIT | | |

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong



PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

INSURANCE TO BE PAID BY SUNBEAM PRODUCTS, INC.

SUNBEAM PRODUCTS, INC. HAS THE OPTION TO CANCEL THIS
PURCHASE ORDER IF SHIPMENTS ARE NOT MADE WITHIN 14 DAYS OF
SCHEDULED SHIP DATE.

INSPECTION CERTIFICATE FROM PENTALPHA REQUIRED CERTIFYING
THAT THE UNITS MEET OUR QUALITY ASSURANCE SPECIFICATIONS.

ORIGINAL COPY OF SHIPPING DOCUMENTS TO BE AIR MAILED AT
THE SAME TIME AS SHIPPED TO THE FOLLOWING ADDRESS:

                    SUNBEAM PRODUCTS INC.
                    U. S. HWY 49 NORTH INDUSTRIAL DRIVE
                    HATTIESBURG, MS 39401
                    ATTN: JUDY CUNNINGHAM

COPY SENT TO:

| INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RVT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING

Case 9:02-cv-80527-KLR   Document 1615 Entered on FLSD Docket 07/22/2002   Page 365 of 473

# *Sunbeam*, CORPORATION

Delray Beach, FL 33445
Phone: (601) 296-5000
Fax:   (601) 296-5498

| | SHIP VIA | FOB | CODE | TERMS See Text | CODE #091 | CONFIRMATION WITH | |
|---|---|---|---|---|---|---|---|
| DATE 10/30/98 | REQUESTED BY WATT | | PURCHASING | VALUE 00011727 | AR NO. 00011727 | REMIT | ACCOUNT NO |

T
O

Pentalpha Enterprises Ltd
Kin Teck Ind. Bldg. 9-10, 12-13/F
26 Wong Chuk Hang Road
Aberdeen
Hong Kong

PLEASE SHIP THE FOLLOWING SUBJECT TO THE CONDITIONS STATED HEREON AND ON THE REVERSE SIDE.

SUNBEAM PRODUCTS, INC.
95 W. RUNNELS INDUSTRIAL DRIVE
HATTIESBURG, MS 39401
ATTN: 49 NORTH

OCEAN CARRIER SEAL NUMBER TO BE RECORDED ON BILL OF LADING.

FAX SHIPPING DOCUMENTS: ATTN: DAVID PITTS 601-271-5472
ATTN: DELRAY OFFICE 561-912-4304

**Total** 310,592.8

| INVOICE # | DATE REC'D | RT NO. | QUAN. REC'D | BAL. DUE | INVOICE # | DATE REC'D | RT NO. | QUAN. REC'D | BAL. DUE |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

PURCHASING



```
************************
***  TX REPORT  ***
************************

TRANSMISSION OK

TX/RX NO            0413
CONNECTION TEL          901185228730591
SUBADDRESS
CONNECTION ID
ST. TIME            10/30 18:18
USAGE T             07'47
PGS. SENT           8
RESULT              OK
```

# Sunbeam.

| | |
|---|---|
| **Date** 10/30/98 | |
| **Number of pages including cover sheet** | **5** |

**TO:** Fred Wong
Vicky Tai
Pentalpha

**FROM:** Paul Taddonio
Sunbeam Corp.

**Phone**
**Fax Phone** 011-852-2-873-0591

**Phone** 561-243-2173
**Fax Phone** 561-912-4304

**CC:**

**REMARKS:**  ☒ Urgent   ☐ For your review   ☒ Reply ASAP   ☐ Please Comment

Fred and Vicky,

New purchase order, 98046431. please confirm ship date.
Thanks..Paul

Any questions please fax or call.

# *Sunbeam.*

| | |
|---|---|
| **Date** | 10/30/98 |

**Number of pages including    5
cover sheet**

| | | | |
|---|---|---|---|
| **TO:** | Fred Wong | **FROM:** | Paul Taddonio |
| | Vicky Tai | | Sunbeam Corp. |
| | Pentalpha | | |

**Phone**

**Fax Phone**   011-852-2-873-0591

**Phone**        561-243-2173

**Fax Phone**    561-912-4304

**CC:**

**REMARKS:**   ☒ *Urgent*     ☐ *For your review*     ☒ *Reply ASAP*     ☐ *Please Comment*

Fred and Vicky,

New purchase order, 98046431. please confirm ship date.
Thanks..Paul

Any questions please fax or call.

Best regards,    Paul Taddonio

Confidential and Restricted
Pursuant to Protective Order

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| SEB S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 98-1050 (WGB) |
| SUNBEAM CORP., SUNBEAM | ) | |
| PRODUCTS, INC., WING SHING INT'L | ) | |
| LTD. (BVI), and PENTALPHA ENTERS., | ) | |
| LTD., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| SUNBEAM CORP., SUNBEAM | ) | |
| PRODUCTS, INC., | ) | |
| | ) | |
| Third-Party Plaintiffs/Counterdefendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WING SHING INT'L, LTD. (BVI) and | ) | |
| GLOBAL-TECH APPLIANCES, INC., | ) | |
| | ) | |
| Third-Party Defendants, and | ) | |
| | ) | |
| PENTALPHA ENTERS., LTD., | ) | |
| | ) | |
| Third-Party Defendant/Counterclaimant. | ) | |

## SUNBEAM'S RESPONSES TO PENTALPHA'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26, 33 and 37 of the Federal Rules of Civil Procedure, third-party plaintiffs and counterdefendants Sunbeam Corporation and Sunbeam Products, Inc. (collectively "Sunbeam") respectfully submit the following objections and responses to third-

Confidential and Restricted
Pursuant to Protective Order

party defendant and counterclaimant Pentalpha Enterprises Ltd.'s ("Pentalpha") First Set of

Interrogatories.

## GENERAL OBJECTIONS

Sunbeam will respond to the Interrogatories subject to the general objections set

forth below.  These limitations and objections, which form a part of the response to each and

every interrogatory, are set forth here to avoid the duplication and retention of restating them for

every response.  These general objections may be specifically referred to in response to certain

interrogatories for the purpose of clarity.  However, the failure to specifically incorporate a

general objection shall not be construed as a waiver of that objection.

1.      Sunbeam objects to the Interrogatories (including the Definitions and

Instructions referenced and contained therein) to the extent that they purport to impose

requirements, obligations and duties beyond, or different from, those imposed by the Federal

Rules of Civil Procedure, the Local Rules of the Federal District Court for the District of New

Jersey, and the Revised Scheduling Order dated May 25, 2000.

2.      Sunbeam objects to the Interrogatories to the extent that they seek

information that is neither relevant to the issues raised in this lawsuit nor reasonably calculated to

lead to the discovery of admissible evidence.  Nothing herein shall be construed as an admission

by Sunbeam respecting the admissibility or relevance of any fact or document.

3.      Sunbeam objects to the Interrogatories to the extent that they seek the

disclosure of the opinions, mental impressions, conclusions or legal theories of Sunbeam,

Sunbeam's counsel or other representatives.

Confidential and Restricted
Pursuant to Protective Order

4.      Sunbeam objects to the Interrogatories to the extent that they call for disclosure of information protected by the attorney-client privilege, the attorney work product privilege or any other applicable privilege or immunity. Sunbeam will not disclose such privileged and protected information. Inadvertent disclosure of privileged or otherwise objectionable information shall not be deemed a waiver of any such privilege and/or immunity.

5.      Sunbeam objects to the Interrogatories to the extent that they seek confidential commercial, business, financial, proprietary or competitively sensitive information. Such information shall only be disclosed pursuant to the protective order and where directly pertinent to the instant litigation.

6.      Sunbeam objects to the Interrogatories to the extent that they seek publicly available information to which Pentalpha and Sunbeam have equal access.

7.      Sunbeam objects to the Interrogatories to the extent that they seek information not in Sunbeam's possession, custody or control. In particular, Sunbeam objects to the Interrogatories that request information not within Sunbeam's knowledge and, instead, request information within the knowledge of former employees of Sunbeam who are no longer affiliated with Sunbeam. Any responses to the individual interrogatories are based solely on information in Sunbeam's current possession.

8.      Sunbeam objects to the Interrogatories to the extent that they are unduly broad and/or to the extent that responding to them would be unduly burdensome, impose extreme hardship or would result in the expenditure of unnecessary time and resources, as the

-3-

Confidential and Restricted
Pursuant to Protective Order

Interrogatories seek information that has already been provided to Pentalpha, or is in Pentalpha's possession, custody or control.

9.      To the extent the Interrogatories seek the name or identity of witnesses, Sunbeam objects on the basis that they seek information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection.  Without waiving any objections or privileges, Sunbeam, when requested to identify individuals with knowledge of specific subject matter, has attempted to identify those persons believed to be most likely to have substantial knowledge or information directly relevant to the specific subject matter described by each interrogatory.  By identifying an individual as a person with knowledge of a specified subject matter, Sunbeam makes no representation as to the nature of such person's knowledge.

10.      Sunbeam objects to the Interrogatories to the extent that they seek the disclosure of private and confidential information relating to third parties not subject to this suit or make inquiries about matters the disclosure of which is prohibited by statute, regulation or other applicable law.

11.      Sunbeam objects to the Interrogatories to the extent certain interrogatories either assume the existence of facts that Sunbeam disputes or constitute an inaccurate characterization of the facts.  Any response, objection or production is without prejudice to Sunbeam's continuing objection to such characterizations.

12.      Sunbeam objects to the Interrogatories to the extent that the terms or phrases used therein are vague and ambiguous.

-4-

Confidential and Restricted
Pursuant to Protective Order

13.    Sunbeam objects to the Interrogatories to the extent the answers thereto may be derived or ascertained from documents produced or to be produced in this action or from an examination, audit or inspection of such documents and the burden of deriving or ascertaining the answer is substantially the same for Pentalpha as for Sunbeam.  In such case, Sunbeam will produce documents from which the answer to the interrogatory may be derived or ascertained in accordance with the schedule for the production of documents set forth in the May 25, 2000 Revised Scheduling Order in this case.

14.    In making these objections and responses, Sunbeam does not in any way waive or intend to waive, but rather intends to preserve and is preserving:

(a)  all objections as to competency, relevancy, materiality and admissibility of any information that may be provided in response to the Interrogatories, or the subject matter thereof;

(b)  all rights to object on any ground to the use of any of the information that may be provided in response to the Interrogatories, or the subject matter thereof, in any subsequent proceedings, including the trial of this or any other action; and

(c)  all rights to object on any ground to any request for further responses to this or any other discovery requests.

15.    Any reference to a document contained in the responses to the Interrogatories shall not be deemed to be an admission that any particular copy of the document is authentic or genuine, nor shall it be deemed an admission of the relevance or admissibility of

-5-

Confidential and Restricted
Pursuant to Protective Order

the document. Sunbeam reserves its right to object to the authenticity, relevance, and

admissibility of all such documents referred to in the responses to the Interrogatories.

16.     The responses and objections herein are based on Sunbeam's present

knowledge, information and belief. Sunbeam reserves the right to amend, revise, correct, and to

clarify any of the responses or objections therein.

17.     Sunbeam objects to the disclosure of information falling within any of the

foregoing general objections or the specific objections set forth below, and in the event any

information falling within one or more of these objections is disclosed in these responses, the.

disclosure is inadvertent and shall not constitute a waiver of the objections.

## SPECIFIC OBJECTIONS AND RESPONSES

Interrogatory No. 1.  Identify each person who has, claims to have or whom you
believe may have knowledge or information pertaining to any fact alleged in any pleading, as
defined in Fed.R.Civ.P. 7(a), filed in this case, or of any fact underlying the subject matter of this
case, including but not limited to, for example, every person knowledgeable about the
negotiation and execution by Sunbeam of the Agreement; every person knowledgeable about any
Bill and Hold or Early Buy Program engaged in by Sunbeam; every person involved in drafting
or otherwise knowledgeable about the Form 8-K, Form 10-K/A and any other filings made by
Sunbeam with the Securities and Exchange Commission from July 1996 to the present; and
every person knowledgeable about the purchase by Sunbeam of any Schedule A Product from
any source other than Pentalpha.

Response to Interrogatory No. 1:

In addition to the above-stated General Objections, Sunbeam objects to

Interrogatory No. 1 on the grounds that this interrogatory is vague and overbroad and it would be

unduly burdensome to identify all individuals with any knowledge regarding any aspect of, *inter*

*alia*, Sunbeam's SEC filings from July 1996 to the present. Sunbeam further objects to

Confidential and Restricted
Pursuant to Protective Order

identifying Pentalpha employees knowledgeable concerning the negotiations for and entry into the Product Supply Agreement ("Agreement") on the ground that it is unduly burdensome because their identities are known to Pentalpha. Subject to the foregoing General and Specific Objections and without waiving any applicable privilege, Sunbeam identifies the following persons as knowledgeable concerning certain of the matters listed in the Interrogatories.

(1)   Albert J. Dunlap, former President, Chief Executive Officer and Chairman of the Board of Directors, c/o Donald Zakarin, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, New York. (SEC filings; special purchasing programs)

(2)   Russell A. Kersh, former Executive Vice President, Chief Financial Officer and Vice Chairman of the Board of Directors, c/o Donald Zakarin, Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, New York. (SEC filings; special purchasing programs)

(3)   David C. Fannin, former Executive Vice President, Chief Legal Officer, c/o Howard Coates, Jr., Proskauer Rose LLP, One Boca Place, Suite 340 West, 2255 Glades Road, Boca Raton, Florida. (SEC filings; special purchasing programs)

(4)   Robert Gluck, former Vice President, Corporate Controller, c/o J. Cameron Story, III, McGuire Woods Battle & Boothe LLP, 3300 Barnett Center, 50 North Laura Street, Jacksonville, Florida. (SEC filings; special purchasing programs)

**Confidential and Restricted**
**Pursuant to Protective Order**

(5)    Janet G. Kelley, former Senior Vice President, General Counsel, c/o
Dennis E. Glazer, Davis, Polk & Wardwell, 450 Lexington Avenue, New
York, New York.  (SEC filings; special purchasing programs)

(6)    Karen Clark, former Senior Vice President, Finance, c/o Robert E. Zimet,
Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York,
New York.  (SEC filings)

(7)    Various representatives of Arthur Anderson LLP, including Philip Harlow,
Lawrence Bornstein, Dennis Pastrana and Vance Kessler, c/o Eliot Lauer,
Curtis Mallet-Provost, Colt & Mosle, 101 Park Avenue, New York, New
York.  (SEC filings; special purchasing programs)

(8)    Donald Uzzi, former Executive Vice President, Consumer Products
Worldwide, c/o Brian Rosner, 3 New York Plaza, 14th Floor, New York,
New York.  (special purchasing programs)

(9)    Lee Griffith, former President, Household Products, c/o Keith Olin,
Morgan, Lewis & Bockius LLP, 5300 First Union Financial Center, 200
South Biscayne Boulevard, Miami, Florida.  (special purchasing
programs)

(10)   Phillip Bogner, Vice President of Sales & Trade Development, Outdoor
Cooking.  (special purchasing programs)

(11)   Alan LeFevre, Senior Vice President & CFO, Household Products.
(special purchasing programs)

Confidential and Restricted
Pursuant to Protective Order

(12)   Warren Myers, Senior Vice President, Sales Operations.  (special purchasing programs)

(13)   Kyle Kaiser, director, Trade Marketing.  (special purchasing programs)

(14)   The following present and former directors of Sunbeam: William Rutter, Charles Elson, Howard Kristol, Faith Whittlesey, Peter Langerman, all c/o Robert Zimet, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, New York.  (special purchasing programs)

(15)   Thomas Hartshorne  (special purchasing programs)

(16)   Deidre Den Danto (special purchasing programs)

(17)   George Timchal, c/o David P. Ackerman, Ackerman, Link & Sartory, P.A., 222 Lakeview Avenue, Suite 1250, West Palm Beach, Florida (Product Supply Agreement)

(18)   James Nugent, former Vice President, Asian Sourcing. (Product Supply Agreement; product purchasing)

(19)   Brian Wood, Director of Procurement (Product Supply Agreement)

(20)   Steven Berreth, Attorney, Sunbeam General Counsel's Office (Product Supply Agreement)

(21)   Charles James, Director of Procurement (Product Supply Agreement)


Interrogatory No. 2.  State the substance of the knowledge that you believe each person identified in your response to Interrogatory No. 1 has or may have.

Confidential and Restricted
Pursuant to Protective Order

**Response to Interrogatory No. 2:**

In addition to the above-stated General Objections, Sunbeam objects to

Interrogatory No. 2 on the ground that the directive "state the substance of the knowledge" is

unreasonably burdensome and vague, especially with respect to those persons not currently

employed by Sunbeam.  Sunbeam has identified the subject areas of the knowledge of those

persons and will consider supplemental responses with respect to specific persons.

Interrogatory No. 3.  Identify each document pertaining to any fact alleged in any
pleadings, as defined in Fed.R.Civ.P. 7(a), filed in this case.

**Response to Interrogatory No. 3:**

In addition to the above-stated General Objections, Sunbeam objects to

Interrogatory No. 3 to the extent that the interrogatory does nothing more than seek to compel

Sunbeam to perform a substantive review and coding, for Pentalpha, of the documents Sunbeam

is producing.  The burden of reviewing those produced documents is equal.  Sunbeam has

produced documents covered by this interrogatory in response to the Document Requests of

Pentalpha to Sunbeam.

Interrogatory No. 4.  Identify each person whom you may use as an expert witness
at trial and state in detail the substance of his or her opinions that you expect to be offered at
trial.

**Response to Interrogatory No. 4:**

In addition to the above-stated General Objections, Sunbeam objects to

Interrogatory No. 4 on the grounds that, under the May 25, 2000 Revised Scheduling Order,

-10-

Confidential and Restricted
Pursuant to Protective Order

Sunbeam need not disclose the identity of expert witnesses until October 15, 2000. Sunbeam has

not yet retained any expert to testify at the trial of this action.

 

     Interrogatory No. 5. With respect to each Schedule A Product that Sunbeam did not purchase from Pentalpha

        (a)    State the reason that Sunbeam did not purchase the Schedule A Product from Pentalpha;

        (b)    Identify each person who has knowledge concerning the reasons that Sunbeam did not purchase each such Schedule A product from Pentalpha; and

        (c)    Identify each document that constitutes, or refers or relates to, the reason that Sunbeam did not purchase the Schedule A product from Pentalpha.

**Response to Interrogatory No. 5:**

        (a)    Subject to the above-stated General Objections, Sunbeam objects that this

information is equally available to Pentalpha in the form of the March 21, 2000, Deposition of

James Nugent. Specifically, Mr. Nugent discusses the reasons why Sunbeam did not purchase

certain Schedule A products from Pentalpha on pages 9-23 of the deposition.

        (b)    In addition to the above-stated General and Specific Objections and

without waiving any applicable privilege, Sunbeam identifies:

        (1)    James Nugent, former Vice President, Asian Sourcing

        (2)    George Timchal, c/o David P. Ackerman, Ackerman, Link & Sartory, P.A., 222 Lakeview Avenue, Suite 1250, West Palm Beach, Florida

-11-

Confidential and Restricted
Pursuant to Protective Order

  (3)  Janet G. Kelley, former Senior Vice President, General Counsel, c/o

    Dennis E. Glazer, Davis, Polk & Wardwell, 450 Lexington Avenue, New

    York, New York.

  (4)  Russell A. Kersh, former Executive Vice President, Chief Financial

    Officer and Vice Chairman of the Board of Directors, c/o Donald Zakarin,

    Pryor, Cashman, Sherman & Flynn, 410 Park Avenue, New York, New

    York.

  (5)  Brian Wood, Director of Procurement

  (6)  Charles James, Director of Procurement

  (7)  George Garcia, Director of Reliability, Hattiesburg, Mississippi

  (8)  Scott Myerly, former Vice President, Engineering

  (9)  Chad Richard, former Product Manager

  (10)  Steven Berreth, Attorney, Sunbeam General Counsel's Office

  (c)  In addition to the above-stated General Objections, Sunbeam objects to

Interrogatory No. 5(c) to the extent that the interrogatory does nothing more than seek to compel

Sunbeam to perform a substantive review and coding, for Pentalpha, of the documents Sunbeam

is producing. The burden of reviewing those produced documents is equal. Sunbeam has

produced documents covered by this interrogatory in response to the Document Requests of

Pentalpha to Sunbeam.

Confidential and Restricted
Pursuant to Protective Order

**Interrogatory No. 6.** For each Schedule A Product that Sunbeam purchased from a source other than Pentalpha during the time period from July 1, 1997, to June 30, 2001,

    (a)    State the number of products Sunbeam purchased;

    (b)    State the amount(s) that Sunbeam paid for each product that it purchased; and

    (c)    Identify each document that constitutes, or refers or relates to, the purchase of such products.

**Response to Interrogatory No. 6:**

    (a)    In addition to the above-stated General Objections, see Exhibit A.

    (b)    In addition to the above-stated General Objections, see Exhibit A.

    (c)    In addition to the above-stated General Objections, Sunbeam objects to Interrogatory No. 6(c) to the extent that the interrogatory does nothing more than seek to compel Sunbeam to perform a substantive review and coding, for Pentalpha, of the documents Sunbeam is producing. The burden of reviewing those produced documents is equal. Sunbeam has produced documents covered by this interrogatory in response to the Document Requests of Pentalpha to Sunbeam.

**Interrogatory No. 7:** For each Schedule A Model that Sunbeam purchased from a source other than Pentalpha during the time period from July 1, 1997, to June 30, 2001,

    (a)    State the number of products Sunbeam purchases;

    (b)    State the amount(s) that Sunbeam paid for each product that it purchased; and

    (c)    Identify each document that constitutes, or refers or relates to, the purchase of such products.

Confidential and Restricted
Pursuant to Protective Order

<u>Response to Interrogatory No. 7</u>:

(a)     In addition to the above-stated General Objections, see Exhibit A.

(b)     In addition to the above-stated General Objections, see Exhibit A.

(c)     In addition to the above-stated General Objections, Sunbeam objects to Interrogatory No. 7(c) to the extent that the interrogatory does nothing more than seek to compel Sunbeam to perform a substantive review and coding, for Defendants, of the documents Sunbeam is producing.  The burden of reviewing those produced documents is equal.  Sunbeam has produced documents covered by this interrogatory in response to the Document Requests of Pentalpha to Sunbeam.

<u>Interrogatory No. 8</u>: With respect to George Timchal state:

(a)     His current residence address(s);

(b)     His current business address(s);

(c)     His most recent prior residence address(es);

(d)     His most recent prior business address(es);

(e)     The location at which the last voted in any federal, state or local governmental election;

(f)     The state in which he is currently registered to vote; and

(g)     The state, if any, from which he holds a drivers license.

-14-

Confidential and Restricted
Pursuant to Protective Order

**Response to Interrogatory No. 8:**

In addition to the above-stated General Objections, Sunbeam objects to

Interrogatory No. 8 on the grounds that George Timchal is represented by counsel and all

inquiries should be directed to Mr. Timchal's attorney.

David P. Ackerman

Ackerman, Link & Sartory, P.A.

222 Lakeview Ave., Suite 1250

West Palm Beach, FL 33401

Telephone:    (561) 838-4100

Fax:          (561) 838-5305

Dated: June 9, 2000                    Respectfully submitted,

                                       SUNBEAM CORPORATION and
                                       SUNBEAM PRODUCTS, INC.

                                       By: _____

Robert L. Byman                        Claire C. Cecchi (CC1340)
Terrence J. Truax                      CARPENTER, BENNETT & MORRISSEY
Clark C. Johnson                       Three Gateway Center
Timothy A. Hudson                      100 Mulberry Street
JENNER & BLOCK                         Newark, NJ 07102-4079
One IBM Plaza                          (973) 622-7711
Chicago, Illinois 60611
(312) 222-9350

Attorneys for SUNBEAM CORPORATION
and SUNBEAM PRODUCTS, INC.

PC DOCS No. 476212

-15-

EXHIBIT A

## CERTIFICATE OF SERVICE

I, Timothy A. Hudson, an attorney, certify that on June 9, 2000, I caused a copy of

Sunbeam's Responses to Pentalpha's First Set of Interrogatories to be served via Federal Express

to the address below upon counsel for Pentalpha:

William Dunnegan, Esq.
Perkins & Dunnegan
720 Fifth Avenue
New York, NY 10019
(212) 397-7020

Timothy A. Hudson

Confidential and Restricted Pursuant To The Protective Order

## VERIFICATION

State of Florida      )
                      Palm Beach )
County of ~~Broward~~  )

        Steven Berreth, being duly sworn, states:

        That he verifies the foregoing Answers to Interrogatories for and on behalf of The Sunbeam Company and is duly authorized to do so; that certain of the matters stated in the foregoing answers are not within his personal knowledge; that the facts stated in said answers have been assembled by employees and/or legal counsel, and that he is informed by said employees and/or legal counsel that the facts stated herein are true and correct.

Subscribed and sworn to before me
this 14th day of June , 2000.

Notary Public

Diane Kay Vickery
Commission # CC 881938
Expires May 2, 2000
Bonded Thru
Atlantic Bonding Co., Inc.

OCT 1 7 2000

STATE OF FLORIDA       )
                              )
COUNTY OF PALM BEACH   )

### <u>AFFIDAVIT OF STEVEN P. BERRETH</u>

I, Steven P. Berreth, on oath state:

1.     I am Senior Vice President and Intellectual Property Counsel for Sunbeam Corporation. I am admitted to practice law in the State of Washington and am registered with the United States Patent and Trademark Office.

2.     As explained below, I have personal knowledge of the matters set forth in this affidavit and would testify to these same facts in a court of law if called upon to do so.

3.     In the course of my duties as Intellectual Property Counsel, I reviewed the patent infringement case SEB filed against Sunbeam and Pentalpha relating to deep fryers that Pentalpha had supplied to Sunbeam. I also retained outside counsel to assist in investigating SEB's allegations.

4.     After counsel and I completed our investigations, we determined that SEB's claim had some merit and decided, in good faith, to settle the claim. In connection with that settlement, Sunbeam paid $2.0 million to SEB.

Further affiant sayeth not.

_____
Steven P. Berreth

Subscribed and sworn to before me
this 15th day of October, 2000.

_____
Notary Public

Diane Kay Vickery
Commission # CC 831908
Expires May 2, 2003
Bonded Thru
Atlantic Bonding Co., Inc.

ORIGINAL

```
 1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY
 2
   ─────────────────────────────────
 3   SEB S.A.,                       )
                                     )
     Plaintiff                       )
 4                                   )
                                     )
 5             v.                    )
                                     )            Civil Action No.
 6   SUNBEAM CORP., SUNBEAM PRODUCTS,)            98-1050 (WGB)
     INC., WING SHING INT'L LTD. (BVI),)
     and PENTALPHA ENTERS., LTD.     )
 7                                   )            STIPULATED
     Defendants                      )            PROTECTIVE ORDER
 8   ─────────────────────────────────
                                     )
 9   SUNBEAM CORP., SUNBEAM PRODUCTS, INC.)
                                     )
10   Third-Party Plaintiffs/Counterdefendants)
                                     )
11             v.                    )
                                     )
12   WING SHING INT'L, LTD. (BVI), and)
     GLOBAL-TECH APPLIANCES, INC.    )
13                                   )
     Third-Party Defendants, and     )
14                                   )
     PENTALPHA ENTERS., LTD.         )
15                                   )
     Third-Party Defendant/Counterclaimant )
16   ─────────────────────────────────

17              DEPOSITION OF JOHN SHAM

18              Vol. I (Pages 5 - 169)

19           Wednesday, September 13th, 2000

20              AT:  10.00 am

21                Taken at:

22   Room 1901, Mandarin Oriental Hotel, Hong Kong

23
                REPORTED BY:    JENNY BUCK,
24      SMITH BERNAL INTERNATIONAL (ASIA) LIMITED

25
```

ORIGINAL

1               IN THE UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW JERSEY
2

3   SEB S.A.,                         )

    Plaintiff                  )
4

          v.                     )
5

6   SUNBEAM CORP., SUNBEAM PRODUCTS,   )   Civil Action No.
    INC., WING SHING INT'L LTD. (BVI),   )   98-1050 (WGB)
    and PENTALPHA ENTERS., LTD.        )
7                              )   **STIPULATED**

    Defendants               )   **PROTECTIVE ORDER**
8

9   SUNBEAM CORP., SUNBEAM PRODUCTS, INC.   )

10   Third-Party Plaintiffs/Counterdefendants)

11          v.                     )

12   WING SHING INT'L, LTD. (BVI), and     )
    GLOBAL-TECH APPLIANCES, INC.        )
13                              )

    Third-Party Defendants, and       )
14

    PENTALPHA ENTERS., LTD.           )
15

    Third-Party Defendant/Counterclaimant   )
16

17               DEPOSITION OF JOHN SHAM

18           Vol. II (Pages 173 - 293)

19        Thursday, September 14th, 2000

20             AT: 10.00 am

21             Taken at:

22   Room 1901, Mandarin Oriental Hotel, Hong Kong

23

          REPORTED BY:    JENNY BUCK,
24    SMITH BERNAL INTERNATIONAL (ASIA) LIMITED

25

Page 1



1                    A P P E A R A N C E S

2

3          ROBERT L BYMAN
           Jenner & Block
4          One IBM Plaza
           Chicago
5          Illinois 60611-7602

6

7          WILLIAM DUNNEGAN
           Perkins & Dunnegan
8          720 Fifth Avenue
           New York
9          New York 10019

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 2

1   erected the 500,000 square feet of building.

2           A. You want me to guess the area, right?

3           Q. Give me your best estimate.

4           A. What is the scale -- I would say --

5           MR DUNNEGAN:   If you think out loud, she is

6   going to write down.  So you may think you are thinking to

7   yourself but she is writing it down, so be aware at that.

8           A. I have to really look at the scale just to

9   tell you about that.  Right now, it is too rough.

10          MR BYMAN:   Maybe I can do something to help

11  you.  Let's mark as exhibit 24 a document with production

12  numbers P010731 to 740.

13          **(Exhibit 24 marked for identification)**

14          Do you recognize that document, Sir, as

15  a construction project contract dated in September 1997

16  between Wing Shing and Guangdong Construction Company?

17          A. Yes.

18          Q. Is that your signature on page P010739?

19          A. No.

20          Q. Is that your father's signature?

21          A. It is my father's signature.

22          Q. There is a page at the end, P010740.

23          A. Yes.

24          Q. Is that a plat, layout of the entire amount of

25  land in the 1.6 million square feet you were talking about?

Page 18

1              A. Yes.

2              Q. There are a number of areas that have numbers

3     on them which I understand to be blocks; is that correct?

4              A. That is right.

5              Q. Which blocks were part of the 1993 original

6     construction?

7              A. One, two, three, four, five, six, seven,

8     eight, nine -- these nine blocks in front of -- in the

9     left-hand corner was the factory building, and some of the

10    dormitories here -- not all, but some; I can't tell you at

11    that time all of this, but I remember some of them.

12             Q. When you say "dormitories", those are the

13    somewhat smaller figures with numbers 1 through 8 which are

14    immediately to the right of blocks 1 through 9?

15             A. Right.

16             Q. Exhibit 24 is primarily, if not entirely, in

17    Chinese, and I apologize, Sir, that my Chinese is

18    non-existent, but does this indicate that it's phase II?

19             A. In 1993 --

20             MR DUNNEGAN:   Was there a particular character

21    you can perhaps point him to?

22             MR BYMAN:   Just the first page.

23             MR DUNNEGAN:   Look at the first page.  Does it

24    say phase II somewhere?

25             A. The Chinese name you can say is phase II.

**Page 19**

1          MR BYMAN:    Immediately under phase II, there are

2      a number of blocks shown.   In printing it is 12, 13, 15, 16

3      and 17, but someone has stricken the 12 and 13 and written

4      in 13 and 14; do you see that, Sir?

5          A. Yes.

6          Q. Do you recognize that handwriting?

7          A. No.

8          Q. To your knowledge, was this contract for

9      blocks 12, 13, 15, 16 and 17 or was it for 13, 14, 15, 16

10     or 17, or some other group of blocks?

11         A. At this moment I cannot give you the answer.

12         Q. Was there a contract under which blocks 11 and

13     12 were developed?

14         MR DUNNEGAN:    Mine is the same as yours.  If you

15     don't know, say you don't know.

16         A. I don't know right now.  The 12 and 13, right

17     now, based on what I know right now, is already done.

18         MR BYMAN:    Is 11 done?

19         A. 11 is done.

20         Q. And 10 seems to be a much smaller block, right

21     to the left of block 14.  Is that one of the buildings

22     that's part of the factory?

23         A. 10, yes.  10 is also a block of buildings.

24         Q. It seems to be considerably smaller than the

25     other buildings.  Can you tell me what it houses?

1          A. Just it is very small, but it is still
2     a facility inside the layout.
3          Q. As of today, are each of the blocks that are
4     shown on P010740 constructed?
5          A. Everything is done.
6          Q. As of the middle part of 1997, July of 1997,
7     how many of these blocks were constructed?
8          MR DUNNEGAN:   You mean the buildings on the
9     blocks?
10          A. I can't really remember how many were already
11     done, or started; I don't know.
12          MR BYMAN:   1 through 9 were already done, those
13     were done by the time you moved in in 1994; is that right?
14          A. 1 through 9, yes.
15          Q. Was any construction done on 10 through 17
16     prior to July of 1997?
17          A. This contract is September 1997, it is just
18     signed, then how can it be done?  No way.
19          Q. But this contract is either for 12 through 17
20     or 13 through 17, so my question is, when were 9, 10 and 11
21     constructed?
22          A. I can't recall.
23          Q. Do you have any records or documents from
24     which you can determine that, Sir?
25          A. I can go back and check.  If you need this

Page 21

1    answer later on, I can give you an answer later on.

2              Q. On the second page of the document P010732, in

3    about the middle of the page --

4              A. Which one are you talking about?

5              MR DUNNEGAN:    732 at the bottom.

6              MR BYMAN:    There is a reference with numbers

7    that shows 60,000 square metres; do you see that, Sir?

8              A. Yes.

9              Q. Was that the total amount of construction that

10   was covered by this contract?

11             A. Yes, from the wording it seems like this,

12   approximately it says.

13             Q. Take a look at page P010737, if you would,

14   Sir.

15             A. 37?

16             Q. Yes.   In about the center of the page, there

17   is again a number 415.   Does that indicate that the cost

18   for this construction is 415 renminbi per square metre?

19             A. Based on this contract, yes, it is

20   approximately in this amount, per square metre.

21             Q. Is it approximate or is it the contractual

22   amount, Sir?

23             A. Because the actual amount would be later on,

24   based on the completion and how they calculate it, the

25   actual area that they built.

Page 22

1          Q. Is it correct, Sir, that 415 renminbi would be

2     approximately US$6?

3          A. US$6, no.

4          Q. How much in US dollars?

5          A. 415 divided by 7.8 --

6          MR DUNNEGAN:   Object to the form.

7          MR BYMAN:   Divided by 7.8, Sir.

8          A. That is Hong Kong, so divide it by 8.3 for

9     renminbi or 8.2.

10         Q. I am going to try to do that.  Then it would

11    be roughly $50 per square metre?

12         A. It would be around 50, not $5.

13         Q. Pages P010739 and 40 seem to be an attachment

14    to the original contract; is that correct, Sir?

15         A. Yes, in addition.

16         Q. My confusion is, if I understand the dates,

17    the contract itself is dated September 23, 1997, and the

18    attachment is September 19, 1997.  Are those dates correct,

19    Sir?

20         MR DUNNEGAN:   You mean are you reading them

21    correctly --

22         MR BYMAN:   Are those the dates on the document?

23         A. This is the contract, but the date would be

24    based on the time we signed the contract.

25         Q. Let me just ask it more directly.  On

1   page P010738, which is the contract itself, what is the

2   date?

3             A. Well, the 738, it is based on this typed

4   document, it was dated September 23rd.

5             Q. And the attachment which is P010739, what is

6   the date?

7             A. It is September 19th.

8             Q. And that is also your father's signature?

9             A. Yes.

10            Q. Let me go back to some of the people that are

11  involved and get a better sense of who they are and what

12  they do.  Who is Mr Fred Wong?

13            A. Fred Wong is the assistant marketing and sales

14  manager.

15            Q. Who does he report to?

16            A. He used to report to the director of marketing

17  and sales.

18            Q. Who was that?

19            A. That was Vicky Tai.

20            Q. Has Mr Tai been replaced -- is there someone

21  who is now director of marketing and sales?

22            A. Now still working.

23            MR DUNNEGAN:   Still working on filling the

24  vacancy, I believe.

25            MR BYMAN:   In other words, Mr Wong has the title

1   as Sunbeam exhibit 1.  Do you recognize that, Sir?

2              A. Yes.

3              Q. That's a copy of a product supply agreement

4   between Pentalpha and Sunbeam dated as of July 1, 1997?

5              A. Right.

6              Q. And you signed that on behalf of Pentalpha; is

7   that correct, Sir?

8              A. Right.

9              Q. It was actually signed in October of 1997; is

10  that correct?

11             A. Right.

12             MR DUNNEGAN:   Objection to the form.

13             MR BYMAN:   Do you recall when in October it was

14  signed?

15             A. I think it was October 23rd.

16             Q. And how are you able to place that date, Sir?

17             A. How I recall those dates?

18             Q. Yes.

19             A. Because I think this negotiation took place on

20  the 22nd, the whole day.

21             Q. That was a negotiation that occurred in

22  Florida, Sir?

23             A. That's correct.

24             Q. And you signed the agreement then in Florida?

25             A. I signed my signature in Florida, and later on

**Page 29**

1    Sunbeam also sent another set of copies to Hong Kong for me

2    to sign again too.

3              Q. Let me show you what's been previously marked

4    as exhibit L in this case.  Have you ever seen this before,

5    Sir?

6              A. Yes.

7              Q. Is this a copy of the copy that you re-signed

8    in Hong Kong?

9              A. Yes.

10             Q. Was there a reason why you signed it in

11   Florida on October 23rd and then re-signed it in Hong Kong?

12             A. Yes.

13             Q. What was the reason?

14             A. First of all, George Timshal wanted me to sign

15   in Florida.  I told him that due to the tax structure

16   I want to sign outside of the United States the contract.

17   So we settled out that I signed the contract, one copy to

18   him, and he sent the copy with his signature to me for my

19   execution.

20             Q. The two copies were identical; is that

21   correct, Sir?

22             A. Yes.

23             Q. Let me show you what's been previously marked

24   as exhibit 7.

25             MR DUNNEGAN:   If it saves you time, I have

Page 30

1  and a very good experience for us, and we heard about how

2  analysts are giving -- saying good things about Sunbeam.

3  I remember they say "Al is doing a good job, great, you

4  have good results".

5      Then afterwards, of course after the conference

6  call, George said that, you know, you heard it, the company

7  is going to be growing so fast in this industry, and it

8  will be a good deal for us to grow with them.  Then of

9  course Jim Nugent handed us over the forecast on the

10  products that are exhibited on the attachment A.  So we

11  were some more excited about that business.  Plus there is

12  of course more negotiations, talking about how those

13  businesses will be given to us and we will be the exclusive

14  supplier.  We talked about everything that Sunbeam will be

15  outsourcing out of the United States, we will be the

16  exclusive supplier for that.

17      So we think that, well, if we grow with Sunbeam

18  with the turning around story on Wall Street, it will be

19  a good way to go with that business, even though paying

20  $1 million is really never my practice, I never signed such

21  a contract in my life yet at that time, to pay the money

22  for that.  At the end of the day, we sought an agreement on

23  this supplier contract.

24      Q. Mr Sham, I am going to mark as exhibit 26

25  a document with production numbers P00219 through 223.

1    benefits did Pentalpha get from the agreement that you

2    signed?

3           A. I would say, of course, the business that we

4    are going to have with them, the exclusivity, that we are

5    going to be exclusive supplier for them -- these I think

6    are the key, major things.

7           Q. Was it your understanding that you were

8    guaranteed any minimum amount of business?

9           A. I understand there is no guarantee but also we

10   were concerned about that as long as they manufacture

11   themselves or they discontinue the item, or marketing the

12   product, then it is okay, I mean then we can have no other

13   benefit, but if they are not doing that too, we will be

14   making products for them, and the quantity, of course, we

15   think that with Sunbeam, the big name and the company will

16   be able to sell a lot of products.

17          Q. At any time prior to signing the agreement,

18   did you attempt to negotiate with Sunbeam for a commitment

19   for a minimum guaranteed amount?

20          A. Did we try to negotiate with a minimum

21   quantity?

22          Q. Yes, Sir.

23          A. For certain products prior to the agreement,

24   like food steamer, we did negotiate a minimum quantity,

25   because that's our product; we spent a lot of money for

Page 73

1    patent and special features that nobody would be able to
2    match.  So we require Sunbeam to put a minimum quantity,
3    otherwise we are not going to offer them exclusivity.
4              Q. You are talking about earlier agreements for
5    special products?
6              A. Right.
7              Q. I am talking about this particular product
8    supply agreement which you signed on October 23, 1997.  Did
9    you attempt to negotiate into that any provision for
10   guaranteed minimum quantities?
11             A. No.
12             Q. You understood, Sir, that in order for
13   Pentalpha to get any product under the product supply
14   agreement, it had to quote a price for that product, if it
15   was a product not already being manufactured by Sunbeam for
16   Pentalpha?
17             A. Yes.
18             Q. And you understood that Sunbeam was not
19   obligated under the product supply agreement to accept
20   a quote if it was not at least as good as its existing
21   source of supply?
22             A. Yes, for that time being.
23             Q. What do you mean, for that time being?
24             A. The time we signed the contract, for that
25   period.

Page 74

1    trading Mr Fan and Mr Chan for two other people that you

2    will try to depose next week, the week after, etcetera.

3              MR BYMAN:   There is no such intention.

4              MR DUNNEGAN:   Okay, that's fine.  We will

5    proceed with Mr Wong tomorrow and thereafter Mr Wing Lo,

6    and I would plan to go back on Saturday.  Thank you.

7              MR BYMAN:   Mr Sham, you understand that you are

8    still giving testimony pursuant to our agreement that your

9    testimony is subject to penalties of perjury and that it's

10   given as if under oath?

11             A. Yes.

12             Q. I just want to recap a little bit by way of

13   preface and then move on to some other areas, but still

14   talking about the allegations that Pentalpha and

15   Global-Tech make of fraud.

16             Is it correct, Sir, that the claims of fraud

7    consist of claims that Pentalpha would be the exclusive

18   supplier of certain products, that Sunbeam was doing well

19   and beating analysts' expectations, and that certain

20   forecasts given to you on October 22nd, 1997, which have

21   been marked as exhibit B in this case, were false and

22   incorrect?

23             A. Right.

24             Q. Is there any other element of fraud that

25   Pentalpha claims was committed on it?

1    A. The other thing I want to cover is the
2    statement you mentioned yesterday, about did Sunbeam
3    continue to make fraud after October 22nd.
4    Q. What do you want to add in that respect?
5    A. My answer is yes.
6    Q. What did Sunbeam do prior to October 22nd that
7    you contend was fraudulent?
8    MR DUNNEGAN:   Don't you mean after?
9    MR BYMAN:   Sorry, I misunderstood what you said
10   then.  What did it do after October 22nd that you contend
11   is fraudulent?
12   A. That Sunbeam announced in the last quarter of
13   1997 earnings, as well as the first quarter of 1998.
14   Q. Is there anything else?
15   A. That's the thing I am aware of right now.
16   Q. Just to make sure that we have a timeframe for
17   each of these items, the first three items which
18   I recounted for you a moment ago -- the exclusive supplier,
19   doing well, the forecasts -- let me take the second and
20   third, the doing well and beating expectations and the
21   forecasts.  Both of those alleged frauds were delivered to
22   Pentalpha on October 22nd, 1997; is that correct?
23   MR DUNNEGAN:   Object to the form.
24   A. You said the forecast and the press release?
25   MR BYMAN:   Yes, Sir.

Page 5 175

1          A. The press release was delivered on me on

2    October 22nd of 1997.

3          Q. And when were the forecasts delivered to you?

4          A. The forecast was one earlier that was sent by

5    Bill Archer to me, and the second one, with more detail,

6    was on October 22nd.

7          Q. I think I have already shown you exhibit A,

8    which means I no longer have it in my stack.  (**Handed**).  Is

9    exhibit A the earlier forecast to which you just referred?

10         A. Yes.

11         Q. Do you have exhibit B here handy?

12         MR DUNNEGAN:   Yes.  Shall I show it to him?

13         MR BYMAN:   Yes.  Is exhibit B the forecast you

14    received on or about October 22nd?

15         A. As I mentioned earlier, there was also, in

16    addition to these pages, another couple of pages that

17    I received on October 22nd.

18         Q. I am sorry, you probably did mention that

19    yesterday, but if you have it slipped my mind.  Can you

20    describe those other pages?

21         A. I recall the pages in addition to these

22    talking about bread makers and food steamers and rice

23    cooker projections.

24         Q. Going to exhibit A for a moment, do you have

25    any information to suggest that the annual volume shown for

Page 7176

1      Q. I am sure you will let me know; it is just

2  a question of when I get to know it.  As you sit here

3  today, you are not aware of anything that's out there

4  lurking and you just can't put your finger on it; is that

5  right, Sir?

6      A. I can't think right now of anything else.

7  That's my answer.

8      Q. Yesterday we talked about exhibit 24, which

9  was the construction contract, and that agreement was

10  entered into in September of 1997; correct?

11      A. Yes.

12      Q. So none of the items that you listed as

13  occurring on October 22nd induced Global-Tech or Pentalpha

14  into entering into that agreement; is that correct, Sir?

15      A. What's your question?

16      Q. Since you signed or your father signed

17  exhibit 24 in September, is it fair to say, Sir, that

18  things that happened in October were not the reason that

19  you signed that agreement in September?

20      A. No.

21      Q. That's not fair to say or it is?

22      A. No.

23      Q. Why is it not fair to say?

24      A. Because before the signing of this

25  agreement -- the reason we signed this agreement with the

1   other factory is that we know the contract with Sunbeam,

2   supply agreement contract, was done, so we relied upon that

3   agreement to expand the factory.

4            Q. Yes, Sir, I understand that.  I am not trying

5   to exclude everything.  I understand that you knew that

6   there was a product supply agreement in place as of June --

7   you didn't know about the rider but you knew about the

8   product supply agreement.

9            A. Right.

10            Q. I understand that you had exhibit A, which you

11   characterize as a forecast.  I am just trying to see if you

12   will concede that the things that you didn't yet know

13   about, the forecast that was given to you on October 22nd

14   and the press release that was given to you on October

15   22nd -- is it fair to say, Sir, that you couldn't have

16   relied on those future events when this contract was signed

17   in September?

18            A. This contract was signed relying on the

19   Sunbeam new business, otherwise we wouldn't expand the

20   factory.

21            Q. Yes, Sir.  Now could you answer my question,

22   because I'm going to keep asking it until you answer.

23            A. So your question was saying nothing to do with

24   that supply agreement?

25            Q. No, it had nothing to do with the things that

1    you were told on October 22nd.

2           MR DUNNEGAN:    Object to the form.

3           A. As I mentioned earlier, I got this one much

4    earlier than October 22nd.

5           MR BYMAN:    You are looking at exhibit A;

6    I understand that, I thought I made that clear to you.

7    Looking at exhibit B again, Sir, did you rely on exhibit B

8    in any way in entering into exhibit 24?

9           A. Exhibit 24?

10          Q. The contract.

11          A. Can you say the question a little bit more

12   clear?

13          Q. Sure.  It's a matter of simple logic, Sir, and

14   maybe I don't need to get you to admit something that

15   everybody on the jury will be able to understand, but is it

16   fair to say that you couldn't rely on something that hadn't

17   happened yet when you signed that contract in September?

18          A. Fair.

19          Q. Thank you.  Let me show you what I'm going to

20   mark as exhibit 33, with production numbers P010768 through

21   772.

22          (Exhibit 33 marked for identification)

23          Do you recognize this document, Sir?

24          A. Yes.

25          Q. And is this a contract for some of the work

1          Q. Has Sunbeam ever claimed any proprietary
2     rights in the design of the deep fryer, to your knowledge?
3               MR DUNNEGAN:   Object to the form.
4          A. What do you mean by Sunbeam ever claimed
5     design proprietary?
6               MR BYMAN:   Did they ever say, "We have a right
7     to this design"?
8          A. They never mentioned that to us.
9          Q. What elements of the design did Sunbeam take
10    control of?
11         A. Sunbeam gave us specifications.
12         Q. Did Sunbeam specify how the pan was to be
13    attached to the housing the deep fryer?
14         A. No.
15         Q. Who designed that feature of the deep fryer?
16         A. Our company.
17         Q. Pentalpha, or Global-Tech, offers a deep fryer
18    product which is sold by Wards; is that correct?
19         A. Yes.
20         Q. And I understand that there are at least two
21    different versions of it, one version that had a continuous
22    ring and another version that was made after the injunction
23    proceeding that Mr Dunnegan described yesterday on the
24    record; is that right, Sir?
25         A. Yes.

Page 92 230

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| THE RIVAL COMPANY,<br><br>          Plaintiff,<br><br>    v.<br><br>SUNBEAM CORPORATION,<br><br>SUNBEAM-OSTER HOUSEHOLD<br>PRODUCTS,<br><br>      and<br><br>SUNBEAM PRODUCTS, INC.<br><br>          Defendants. | 95-1179-CV-W-5<br><br>Civil Action No. _____<br><br>Judge: _____<br><br>JURY DEMANDED |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, THE RIVAL COMPANY, for its Complaint against Defendants, SUNBEAM CORPORATION, SUNBEAM-OSTER HOUSEHOLD PRODUCTS and SUNBEAM PRODUCTS, INC., alleges as follows:

### I.  THE PARTIES

1.  Plaintiff, The Rival Company (hereinafter "Rival"), is a corporation organized and existing under the laws of the State of Delaware, and has a principal place of business at 800 East 101 Terrace, Kansas City, Missouri  64131.  Rival develops, manufactures and sells a variety of small electrical appliances.

2.  Defendant Sunbeam-Oster Household Products is an assumed name of defendant Sunbeam Corporation.  Sunbeam Corporation is a corporation of the State of Delaware and has a

ORIGINAL
P.02

Document #

S D M

JUN-05-2000   12:42

place of business at 200 E. Las Olas Blvd., #2100, Fort
Lauderdale, Florida  33301-2100.

3.    On information and belief, defendant Sunbeam
Products, Inc. is a corporation organized and existing under the
laws of the State of Delaware.  Sunbeam Products, Inc. sells a
variety of consumer home products including an electric food
steaming appliance.  (Hereinafter, all defendants are
collectively referred to as "Sunbeam").

4.    Sunbeam sells its products, including the accused
devices, within this judicial district.  Sunbeam sells the
accused devices under the name "Sunbeam-Oster Household
Products."

## II. JURISDICTION AND VENUE

5.    This is an action for patent infringement arising
under the patent laws of the United States, including 35 U.S.C.
§§ 271 and 281.  Jurisdiction of this Court is based upon 28
U.S.C. § 1338(a).

6.    Venue is predicated upon 28 U.S.C. §§ 1391(b),
1391(c) and 1400(b).

## III. PATENT INFRINGEMENT

7.    On April 9, 1985, United States Patent No.
4,509,412 ("the '412 patent"), entitled "Food Steaming Device,"
duly and legally issued to Rival's predecessor in interest, Rival
Manufacturing Company.  A copy of the '412 patent is attached

-2-

hereto at Tab A.  Rival is the owner of all right, title and interest in and to the '412 patent.

8.   On March 23, 1993, reexamination proceedings were initiated on the '412 patent by an outside requestor.  On January 11, 1994, the United States Patent and Trademark Office issued Reexamination Certificate No. B1 4,509,412.  The Certificate confirmed the patentability of all original claims in the '412 patent.  A copy of the Certificate is attached hereto at Tab B.

9.   Rival has provided notice of the '412 patent to Sunbeam and others at least by placing statutory notice, pursuant to 35 U.S.C. § 287, on products manufactured and sold by Rival incorporating the invention of the '412 patent.

10.  In or about the summer of 1995, Sunbeam introduced its Sunbeam Model 4710 food steamer.  Sunbeam continues to sell the Model 4710 food steamer throughout the United States.

11.  On information and belief, in or about the summer of 1995, Sunbeam introduced its Oster Model 4711 food steamer. Sunbeam continues to sell the Model 4711 food steamer throughout the United States.

12.  On information and belief, defendants' Model 4710 and Model 4711 food steamers are manufactured in Hong Kong by John C. K. Sham and/or Pentalpha Enterprises, Ltd. (hereinafter "Pentalpha") and/or Wing Shing International, Ltd. (hereinafter "Wing Shing"), all believed to be related.  On information and belief, Sham, Pentalpha and/or Wing Shing have been and continue

-3-

to be the primary manufacturer of the Model 4710 and Model 4711 food steamers to Sunbeam.

13. Defendants' Model 4710 and Model 4711 food steamers infringe Rival's '412 patent.

14. Defendants' infringement of the '412 patent has been with full knowledge of Rival's '412 patent, and has been and continues to be willful and wanton.

15. Defendants' infringing activities have damaged and will continue to damage Rival's business in an amount not presently known, and such damage will continue unless such activities are enjoined by this Court.

16. The infringing acts complained of in paragraphs 10 through 11 and 13 through 14 of this Complaint occurred within the jurisdiction of this Court, and elsewhere within the United States, and will continue unless enjoined by this Court.

WHEREFORE, Plaintiff, The Rival Company, prays for judgment against Sunbeam and in favor of Rival, and requests that this Court:

A. Declare that Sunbeam infringes United States Patent No. 4,509,412, and that said infringement is willful and wanton.

B. Issue a permanent injunction against further infringement of United States Patent No. 4,509,412 by Sunbeam, its officers, agents, servants, employees and those persons in active concert or participation with Sunbeam.

-4-

C.   Order Sunbeam to account for and pay to Rival damages adequate to compensate Rival for the infringement of the '412 patent.

D.   Increase the damages for infringement of the '412 patent to three times the amount found or assessed, and award such amount to Rival together with interest pursuant to 35 U.S.C. § 284, due to Sunbeam's willful and wanton infringement.

E.   Declare that this case is exceptional under the patent laws and award Rival its costs, expenses and attorneys' fees for this suit.

F.   Award Rival such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial of all issues so triable.

Respectfully submitted,

Dated: November 24, 1995

Thomas F. Fisher    #19898
John S. Conner      #30014
Ellen S. Martin     #38317
SHUGHART THOMSON
    & KILROY, P.C.
120 W. 12th Street, 17th Floor
Kansas City, Missouri 64105
Telephone:  (816) 421-3355
Facsimile: (816) 421-0509

and

William H. Frankel
Clyde F. Willian
Michael P. Chu
WILLIAN BRINKS HOFER
GILSON & LIONE
NBC Tower, Suite 3600
455 N. Cityfront Plaza Drive
Chicago, Illinois  60611-5599
Telephone: (312) 321-4200
Facsimile: (312) 321-4299

Attorneys for the Plaintiff
THE RIVAL COMPANY

Of Counsel:

Ann Thompson   #35561
THE RIVAL COMPANY
800 East 101 Terrace
Kansas City, Missouri  64131
Telephone:  (816) 943-4100
Facsimile:  (816) 943-4123

-6-

# United States Patent [19]

**Whittenburg et al.**

[11] Patent Number: 4,509,412
[45] Date of Patent: Apr. 9, 1985

[54] FOOD STEAMING DEVICE

[75] Inventors: Stephen L. Whittenburg, Overland Park, Kans.; David D. McCormick; William J. Tweed, both of Kansas City, Mo.; A. Aykut Ozgunay, Clinton, Mo.; James T. Williams, Sacramento, Calif.

[73] Assignee: Rival Manufacturing Company, Kansas City, Mo.

[21] Appl. No.: 472,193

[22] Filed: Mar. 4, 1983

[51] Int. Cl.³ ........................ A47J 27/04
[52] U.S. Cl. ................ 99/331; 99/413; 99/446; 126/20; 126/369; 219/401; 219/441; 426/510
[58] Field of Search ........... 99/331, 410, 413, 446, 99/447, 347, 126/369, 369, 381; 122/492; 137/200, 201; 219/401, 441, 442; 426/510, 511

[56] References Cited

U.S. PATENT DOCUMENTS

(reference list omitted)

FOREIGN PATENT DOCUMENTS

(list omitted)

Primary Examiner—Billy J. Wilhite
Attorney, Agent or Firm—Willian Brinks Olds Hofer Gilson & Lione Ltd.

[57]                  ABSTRACT

A steam cooking utensil is disclosed which includes a base, a boiling water reservoir and a condensate trough defined by the base, and a heater disposed centrally in the boiling water reservoir, mounted in the base, and coupled to a thermostat also mounted in the base. The condensate trough is disposed in annular relationship to the boiling water reservoir. A food tray defining a imperforate central surface and an array of peripheral apertures is supported such that the imperforate surface is vertically aligned with the boiling water reservoir and the array of peripheral apertures is vertically aligned with the condensate trough. A cover having a bottom opening defined by a rim is positioned over the food tray, condensate trough and boiling water reservoir, such that the rim cooperates with an outer peripheral lip of the condensate trough to form a seal. The disclosed steam cooking utensil operates to cook food quickly, cleanly and efficiently. The boiling water reservoir remains free from condensate residue even after boiling dry, and the food product remains free from excess moisture.

32 Claims, 7 Drawing Figures



Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 428 of 473



FIG.1

FIG.2

## FIG.3



## FIG.4



Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 430 of 473



FIG. 7

FIG. 5

FIG. 6

4,509,412

1

# FOOD STEAMING DEVICE

## BACKGROUND OF THE INVENTION

This invention relates to a steam cooking utensil which is heat efficient, easy to use and easy to clean. It may be left to boil dry without burning or emitting foul odors and it operates to limit food contact with condensate.

In the past, many commonly used steam cooking utensils permitted steam to condense and circulate back to the boiling water reservoir after contacting the food. If the system boiled dry, food matter carried by the condensate would bake on to the reservoir surface. Foul odors were emitted and cleaning was difficult.

Further, conventional steamers often permitted condensate to accumulate on the food. The food soaked in this liquid during the entire steaming process. It became soggy and unpalatable. Attempts to resolve the problem by limiting live steam entry into the cooking chamber were not without drawbacks: condensate which accumulated while the food was cold remained there to soak into the food.

Finally, older models tended towards a lesser degree of heat efficiency because a large volume of water required heating before initial steam formation could occur. Conventional steam cooking utensils have traditionally failed to provide the homemaker with a quick, clean and efficient way to steam vegetables and other foods without soaking them in condensate.

Thus, there presently exists a need for a steam cooking utensil which may be left to boil dry without the emission of foul odors, which will yield a food product free from sogginess, and which will operate to cook food quickly and efficiently.

## SUMMARY OF THE INVENTION

An important object of the present invention is to provide an improved steam cooking utensil which keeps condensate separate from the original steam source after contact with the food. According to this aspect of the invention, a condensate trough, separate from a boiling water reservoir, is provided for the collection of condensate. Condensate does not drain from the food back to the boiling water reservoir, and the boiling water reservoir can therefore boil dry without leaving a residue of food matter. This prevents odors caused by burning food matter and facilitates cleaning.

A further object of this invention is to limit contact between the condensate and cooking food. According to this aspect of the invention, a food tray is provided which comprises two regions: an imperforate surface and a drainage surface through which condensate will flow. The food tray may be of any shape, and may be formed with or without sides, so long as the food tray permits flow of condensate into the condensate trough and prevents return of condensate to the boiling water reservoir. The imperforate portion of the tray is positioned over the boiling water reservoir, while the drainage surface is aligned with the condensate trough such that condensate drains into it rather than soaking the food. This arrangement has been found effective to prevent a soggy and unpalatable food product.

Yet another object of this invention is to facilitate efficient heat transfer and shortened steaming time. According to this aspect of the invention, a central baffle extending below the imperforate surface of the food tray operates to contain heated water in a vertical

2

relationship with the heater, resulting in steam formation before peripheral water is fully heated. A lower flange defined by the food tray cooperates with a peripheral lip defined by the condensate trough to create a labyrinthian seal operative to impede the loss of heated water from the boiling water reservoir.

The preferred embodiment of this invention described below provides a number of important advantages. The annular positioning of the condensate trough with respect to the boiling water reservoir is compact and aesthetically pleasing. The oval shape is convenient for elongated vegetables, such as corn on the cob and squash. Heat is generated from the center of the boiling water reservoir and such that thermal insulation around the periphery is efficient: simply the result of radial heat loss and heat insulating material. In addition, the high domed cover permits steaming of a generous quantity of vegetables or other food.

The steam cooking utensil of this invention has been found to facilitate clean, quick and efficient steam cooking.

The invention itself, together with further objects and attendant advantages, will best be understood by reference to the following detailed description taken in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of a presently preferred embodiment of the steam cooking utensil of this invention.

FIG. 2 is an exploded elevational view in partial cutaway of the steam cooking utensil of FIG. 1.

FIG. 3 is a horizontal sectional view taken along line 3—3 of FIG. 2.

FIG. 4 is a vertical sectional view taken along line 4—4 of FIG. 3.

FIG. 5 is a horizontal sectional view taken along line 5—5 of FIG. 2 showing a top view of the food tray of the steam cooking utensil of FIG. 1.

FIG. 6 is a horizontal sectional view taken along line 6—6 of FIG. 2 showing a bottom view of the food tray of the steam cooking utensil of FIG. 1.

FIG. 7 is an enlarged, fragmentary sectional view showing the protrusions in FIG. 2 supporting the food tray of FIG. 8 and illustrating the path of steam flow.

## DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EMBODIMENTS

Turning now to the drawings, FIGS. 1 through 7 show various views of the presently preferred embodiment of the steam cooking utensil 10 of this invention. As shown in FIGS. 1 and 2, this cooking utensil 10 includes a rigid base 20. The base 20 defines a condensate trough 30 disposed in annular relationship to a boiling water reservoir 40. The preferred spatial relationship between the condensate trough 30 and the boiling water reservoir 40 is best illustrated in FIGS. 3 and 4: they are disposed on opposite sides of an inner peripheral wall 35 which defines an inner peripheral lip 34 and a plurality of vertical protrusions 37. The inner peripheral wall 35 is preferably composed of a heat insulating material such as a polypropylene, for example, which may be obtained from Northern Petrochemical Co. as material number 8001LK. The inner peripheral wall 35 is preferably ellipsoidal in shape. The condensate trough 30 is also bounded by an outer peripheral wall 31 of this embodiment which defines an outer

4,509,412

3

peripheral lip 32. The outer peripheral wall 31 of this embodiment is also ellipsoidal in shape. The ratio of the volume of water contained in the boiling water reservoir to that contained in the condensate trough is preferably 1:1.

A steel plate 27, preferably annular in shape, is disposed centrally to the boiling water reservoir 40 and is secured to the base 20. The steel plate 27 serves to mount an electric heater 22 at its inner perimeter, and acts to insulate the base 20 from this heater 22.

The heater 22, disposed centrally to the steel plate 27, is mounted in the base 20. It defines a heater well 24 which comprises a concave surface 26. The heater 22 also defines a central recess 25 directly beneath the heater well 24, such that the concave surface of the heater well 26 is in very close proximity to the recess 25.

A thermostat 21 is seated in the recess 25 such that it is placed as closely as is feasible to the concave surface 26 of the heater well 24 (0.078" in the preferred embodiment). It is firmly secured in place by a spring bracket 28. The thermostat 21 is coupled to the heater 22 and an indicator light 23. The thermostat 21 switches to open circuit at a switching temperature of 274° F., and is circuited such that the power is then removed from both the heater 22 and the light 23.

By way of example, the following can be used for the steel plate 27, the electric heater 22, the thermostat 21 and the spring bracket 28. The steel plate 27 of this embodiment is constructed from corrison resistant 304 stainless steel, 0.035" thick. The heater 22 is preferably constructed of a die cast material, such as type 380 aluminum, and operates at 600 watts at 120 volts. Suitable heaters can be obtained from Encon, Inc., Dallas, Pa. 18612. The thermostat can be of the type distributed by Elmwood Sensors of Cranston, R.I., as part number 2450HR. The spring bracket of this embodiment is 0.025" thick, constructed of 1050 annealed spring steel, heat treated to Rockwell hardness 82/87 on the 15-N scale.

FIGS. 5 and 6 show the presently preferred embodiment of a food tray 50, which is included in the utensil 10. This food tray 50 comprises an imperforate surface 51 and an array of peripheral apertures 52. The food tray 50 is preferably ellipsoidal in shape. The food tray 50 is supported, as illustrated in FIGS. 2 and 7, by the vertical protrusions 37 situated above the inner peripheral lip 36 defined by the inner peripheral wall 35. The imperforate surface 51 is vertically aligned with the boiling water reservoir 40, and the array of peripheral apertures 52 is vertically aligned with the condensate trough 30. In the preferred embodiment, the imperforate surface 51 is slightly convex, in order to facilitate drainage of condensate through the peripheral apertures 52 into the condensate trough 30. The shape also acts to prevent the condensate from travelling along the food tray and returning to the boiling water reservoir by means of capillary action. The top view shown in FIG. 5 shows a multiplicity of raised hemispheres 53. As seen in FIG. 4, the raised hemispheres 53 support food 99 above the imperforate surface 51 to facilitate radial drainage.

The bottom view shown in FIG. 6 discloses a central baffle 54 and a lower flange 55. The central baffle 54 is vertically aligned with the heater 22. The lower flange 55 cooperates with the inner peripheral lip 36 to form a labrynthian seal 56. This is best understood from FIG. 7. As used herein, the term "labrynthian seal" is used to denote the slight overlap between the inner peripheral

4

lip 36 and the lower flange 55 such that water or steam must travel a circuitous path to escape from the boiling water reservoir.

Finally, FIG. 3 illustrates a high domed cover 60 having a bottom opening defined by a rim 61, which is positioned such that the rim 61 cooperates with the outer peripheral lip 32 of the condensate trough 30 to form an outer seal 62. The cover defines an upper chamber 63. The cover 60 is constructed of a polypropylene, such as the polypropylene obtainable from Northern Petrochemical Co. as material number 8001LX. As seen in FIG. 4, the cover 60 defines a steam vent 94 such that the pressure in the upper chamber 63 is maintained substantially at atmospheric pressure.

Having described the structure of this preferred embodiment, its operation can now be described in detail. The boiling water reservoir 40 is first filled with a measured amount of water. Then, food is placed upon the imperforate surface 51 of the food tray 50, and the food tray 50 is positioned upon the vertical protrusions 37 of the inner peripheral lip 36. The cover 60 is positioned such that its rim 61 cooperates with the outer peripheral lip 32 of the condensate trough 30 to form the outer seal 62. The steam cooking utensil is plugged then into a wall socket. The heater 22 heats water in the heater well 24, and steam quickly forms and travels along a path through the labrynthian seal 56 and into the upper chamber 63. The steam condenses upon food on the imperforate surface 51 of the food tray 50, thereby heating the food. Condensate then drains from the food, through the array of peripheral apertures 52 in the food tray 50, and collects in the condensate trough 30. When the water boils dry in the boiling water reservoir 40, the temperature of the heater 22 increases. This activates the thermostat 21 which turns off the indicator light 23 and the heater 22, thereby completing the cooking operation.

One of the important advantages of this invention is that no condensate travels from the food to the boiling water reservoir 40, hence food matter does not cake on the heater 22 when the system boils dry. Furthermore, the condensate in the trough 30 never boils dry because it is thermally insulated from the heater 22. In addition, the baffle 54 promotes local heating of water in the boiling water reservoir adjacent the heater 22 and quicker steaming time; the labrynthian seal 56 promotes conservation of water in the boiling water reservoir; and the domed food tray 50 permits good drainage of water away from the food. In summary, this invention provides a quick and efficient device for steaming food that can boil dry without leaving condensate residues.

It should be understood that the present invention is not limited to the precise structure described above. Rather, a wide range of modifications can be made to this steam cooking utensil without departing from the spirit of the invention. For example, the condensate trough need not be disposed in annular relationship to the boiling water reservoir, and need not be oval in shape. Rather, a wide variety of shapes and arrangements can be adapted for use with this invention. As an example of some of the minor variations that can be made to the preferred embodiments shown and described, the boiling water reservoir can be situated to one side of the condensate trough, or on a different horizontal plane from the condensate trough. Alternately, the boiling water reservoir can, for example, define a cube-shaped volume central to a condensate trough of an irregular shape. These and the following

4,509,412

7

16. The invention of claim 7 wherein the drainage surface comprises a perforated surface vertically aligned with the condensate trough.

15. The invention of claim 7 wherein the means for supporting the food tray comprises a plurality of protrusions which extend upwardly from the base, such that the imperforate surface of the food tray is supported vertically over the boiling water reservoir by the protrusions.

16. A steam cooking utensil comprising:

a base;

a boiling water reservoir defined by the base and adapted to contain a quantity of boiling water;

means for heating water contained in the boiling water reservoir to form steam;

a condensate trough defined by the base such that the base, the boiling water reservoir and the condensate trough are integrally molded in one piece and the condensate trough is thermally-insulated from the heating means;

a food tray comprising an imperforate surface adapted to support a food product, and a drainage surface adapted to drain fluid from the imperforate surface;

means for supporting said food tray in a relationship to the boiling water reservoir and the condensate trough such that the imperforate surface is aligned with the boiling water reservoir, the drainage surface is aligned with the condensate trough, and condensed steam flows from the imperforate surface to the drainage surface and into the condensate trough, thereby substantially preventing the flow of condensate from the imperforate surface to the boiling water reservoir and limiting the rate of evaporation of condensate from the trough.

17. The invention of claim 16 wherein the drainage surface comprises a perforated surface vertically aligned with the condensate trough.

18. The invention of claim 16 further comprising means for defining a labyrinthian seal, operative to impede the loss of water from the boiling water reservoir during the steaming process.

19. The invention of claim 16 wherein the means for supporting the food tray comprises a plurality of protrusions which extend upwardly from the base, such that the imperforate surface of the food tray is supported vertically over the boiling water reservoir by the protrusions.

20. The invention of claim 16, further comprising: means for covering the food tray, the condensate trough and the boiling water reservoir, such that steam generated by the heating means is localized within the steam cooking utensil and does not freely diffuse away from the reservoir; and means for venting pressure from the steam cooking utensil.

21. The invention of claim 16 wherein the condensate trough is disposed in annular relationship to the boiling water reservoir.

22. A steam cooking utensil comprising:

a base;

a boiling water reservoir defined by and integral with the base and adapted to contain a volume of water;

means for heating water contained in the boiling water reservoir;

a condensate trough, defined by and integral with the base, disposed in peripheral relationship to the

8

boiling water reservoir, and defining an outer peripheral lip;

thermostat means, mounted in the base and coupled to the heating means, for arresting the operation of the heating means when all the water in the boiling water reservoir has evaporated therefrom;

a food tray comprising an imperforate surface and an array of peripheral apertures, said imperforate surface disposed centrally to the array of peripheral apertures;

means for supporting said food tray in a vertical relationship to the boiling water reservoir and the condensate trough, said food tray shaped and positioned such that the imperforate surface is vertically aligned with the boiling water reservoir, and the array of peripheral apertures is vertically aligned with the condensate trough;

a cover, which defines a rim shaped to cooperate with the outer peripheral lip of the condensate trough to form a seal such that a steaming chamber is defined around the food tray; and

means, included in the cover, for venting steam from the cover to maintain the steaming chamber at substantially atmospheric pressure;

said boiling water reservoir, heating means, condensate trough, food tray, and supporting means cooperating to cause steam condensate formed over the imperforate surface to flow through the array of peripheral apertures and into the condensate trough, thereby isolating said condensate from the heating means.

23. The invention of claim 22, further comprising means for defining a labyrinthian seal, operative to impede the loss of water from the boiling water reservoir during the steaming process.

24. A steam cooking utensil comprising:

a base;

a boiling water reservoir defined by the base, said reservoir comprising an inner peripheral wall which defines an inner peripheral lip and a plurality of protrusions;

a heater, mounted in the base, disposed centrally within the reservoir;

a heater well, disposed adjacent the heater;

a condensate trough, defined by the base, disposed in annular relationship to the boiling water reservoir and thermally insulated from the heater, said trough defined by the inner peripheral wall, an outer peripheral wall, and an outer peripheral lip, said outer peripheral lip disposed adjacent to the outer peripheral wall such that the base, the boiling water reservoir, the condensate trough, the inner peripheral wall, the outer peripheral wall, the inner peripheral lip, the outer peripheral lip and the protrusions are integrally molded and formed in one piece;

thermostat means, mounted in the base and coupled to the heater, for switching off the heater when the condensate trough attains a preselected temperature;

a food tray comprising an imperforate central surface, and an array of peripheral apertures, said food tray supported by the protrusions, such that said imperforate central surface is vertically aligned with the boiling water reservoir and said peripheral apertures are vertically aligned with the condensate trough and said food tray further comprising a central baffle vertically aligned with the heater

4,509,412

**9**

well, said baffle operative to direct heated water in a vertical relationship to the heater well such that steam formation is accelerated between the heater well and the heater;

a cover which defines a rim shaped to cooperate with the outer peripheral lip of the condensate trough to form a seal;

an upper chamber, defined by the cover; and

means, included in the cover, for maintaining the upper chamber at substantially atmospheric pressure.

25. The invention of claim 24 wherein the imperforate central surface is shaped to facilitate radial drainage through the peripheral apertures into the condensate trough.

26. The invention in claim 24 wherein the imperforate central surface defines a multiplicity of raised surfaces effective to facilitate radial drainage through the peripheral apertures into the condensate trough.

27. A steam cooking utensil comprising:

a base;

a boiling water reservoir defined by the base, said reservoir comprising an inner peripheral wall with which defines an inner peripheral lip and a plurality of protrusions;

a heater, mounted in the base, disposed centrally within the reservoir;

a condensate trough, defined by the base, disposed in annular relationship to the boiling water reservoir and thermally insulated from the heater, said trough defined by the inner peripheral wall, an outer peripheral wall, and an outer peripheral lip, said outer peripheral lip disposed adjacent to the outer peripheral wall;

a food tray comprising an imperforate central surface and an array of peripheral apertures, said food tray supported by the protrusions, such that said imperforate central surface is vertically aligned with the boiling water reservoir and said peripheral apertures are vertically aligned with the condensate trough;

a cover which defines a rim shaped to cooperate with the outer peripheral lip of the condensate trough to form a seal;

an upper chamber, defined by the cover; and

means, included in the cover, for maintaining the upper chamber at substantially atmospheric pressure;

wherein the food tray defines a lower flange disposed in overlapping relationship to the inner peripheral lip, said lower flange cooperating with said inner peripheral lip to create a labrynthian seal operative

**10**

to impede water flow from the boiling water reservoir to the condensate trough.

28. The invention of claim 27 wherein the food tray defines a central baffle vertically aligned with the heater, said baffle operative to direct heated water back to the vicinity of the heater in order to accelerate steam formation by the heater.

29. The invention of claim 27 wherein the imperforate central surface is shaped to facilitate radial drainage through the peripheral apertures into the condensate trough.

30. The invention in claim 27 wherein the imperforate central surface defines a multiplicity of raised surfaces effective to facilitate radial drainage through the peripheral apertures into the condensate trough.

31. A steam cooking utensil comprising:

means for defining a boiling water reservoir;

a heater mounted adjacent a central portion of the reservoir to heat water contained in the reservoir;

means for supporting food to be steamed above the reservoir, said supporting means defining an imperforate surface above the heater; and

a baffle which extends downwardly from the supporting surface over the heater, said baffle shaped to define a partially enclosed region of the supporting surface in alignment with the heater;

said baffle effective to impede the outward flow of water, heated by the heater and splashed by the heater against the partially enclosed region, radially away from the partially enclosed region.

32. A steam cooking utensil comprising:

means for defining a boiling water reservoir;

a heater mounted adjacent a central portion of the reservoir to heat water contained in the reservoir;

means for supporting food to be steamed above the reservoir, said supporting means defining an imperforate surface above the heater; and

a baffle which extends downwardly from the supporting surface over the heater, said baffle shaped to define a partially enclosed region of the supporting surface in alignment with the heater;

said baffle effective to impede the outward flow of water, heated by the heater and splashed by the heater against the partially enclosed region, radially away from the partially enclosed region;

wherein the means for defining the reservoir further comprises means for defining a peripheral lip extending around the reservoir and wherein the supporting means further comprises a flange positioned adjacent the lip and shaped to form a labrynthian seal with the lip to impede the flow of water out of the reservoir.

* * * * *

# REEXAMINATION CERTIFICATE (2152nd)

## United States Patent [19]

Whittenburg et al.

[11] B1 4,509,412

[45] Certificate Issued     Jan. 11, 1994

[54] FOOD STEAMING DEVICE

[75] Inventors: Stephen L. Whittenburg, Overland Park, Kans.; David D. McCormick; William J. Tweed, both of Kansas City, Mo.; A. Aykut Ozgunay, Clinton, Mo.; James T. Williams, Sacramento, Calif.

[73] Assignee: Rival Manufacturing Company, Kansas City, Mo.

Reexamination Request:
   No. 90/003,005, Mar. 23, 1993

Reexamination Certificate for:
   Patent No.:   4,509,412
   Issued:       Apr. 9, 1985
   Appl. No.:    472,193
   Filed:        Mar. 4, 1983

[51] Int. Cl.³ .................................... A47J 27/04
[52] U.S. Cl. ......................... 99/331; 99/413; 99/446; 126/20; 126/369; 219/401; 219/441; 426/510
[58] Field of Search ............... 99/331, 413, 415, 446; 126/20, 369; 213/401, 441; 426/510

[56]                 References Cited
            U.S. PATENT DOCUMENTS .

| | | |
|---|---|---|
| D. 113,632 | 3/1939 | Howlett . |
| D. 230,933 | 3/1974 | Lloveras . |
| 244,180 | 7/1881 | Campbell . |
| 263,049 | 8/1882 | Krehbiel . |
| 279,956 | 6/1883 | Knous . |
| 282,387 | 8/1883 | Swink . |
| 354,240 | 12/1886 | Roberts . |
| 366,960 | 7/1887 | Johnson et al. . |
| 560,336 | 9/1896 | Willson . |
| 607,359 | 7/1898 | Mathy . |
| 636,328 | 11/1899 | Henderson . |
| 776,926 | 12/1904 | Mixener . |
| 780,851 | 1/1905 | Wilson . |
| 869,903 | 11/1907 | Harloe . |
| 907,154 | 12/1908 | Lewis et al. . |
| 925,781 | 6/1909 | Mathy . |
| 926,028 | 6/1909 | Smith . |
| 1,175,442 | 3/1916 | Hanks . |
| 1,603,395 | 11/1926 | Hensel et al. . |
| 2,089,411 | 8/1937 | Olson et al. . |
| 2,131,663 | 9/1938 | Hughes . |
| 2,143,263 | 9/1939 | Huntzinger et al. . |
| 2,554,412 | 5/1951 | Kavanagh . |
| 2,612,391 | 12/1952 | Bramberry . |
| 2,713,898 | 9/1951 | Michaelis et al. . |
| 2,718,842 | 9/1955 | Klemm . |
| 2,761,375 | 9/1956 | Jepson . |
| 2,766,366 | 10/1956 | Eckhoff . |
| 2,947,304 | 8/1960 | Ashley . |
| 3,078,783 | 2/1963 | Lee, Sr. . |
| 3,147,689 | 9/1964 | Sakamoto et al. . |
| 3,275,801 | 9/1966 | Curchill . |
| 3,435,163 | 2/1969 | Arita . |
| 3,659,584 | 5/1972 | Doyle et al. . |
| 3,869,593 | 3/1975 | Collins et al. . |
| 4,045,633 | 8/1977 | Soper et al. . |
| 4,032,590 | 10/1977 | Anderl et al. . |
| 4,115,918 | 9/1978 | Anderl et al. . |
| 4,141,250 | 4/1979 | Miki et al. . |
| 4,197,791 | 4/1980 | Vieceli et al. . |
| 4,452,132 | 6/1984 | Miller et al. . |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 73371 | 3/1919 | Austria . |
| 25389 | 10/1986 | Canada . |
| 270722 | 9/1912 | Fed. Rep. of Germany . |
| 271878 | 9/1912 | Fed. Rep. of Germany . |
| 271879 | 11/1912 | Fed. Rep. of Germany . |
| 1012456 | 12/1954 | France . |
| 2329 | of 1909 | United Kingdom . |
| 5969 | of 1912 | United Kingdom . |
| 7612 | of 1912 | United Kingdom . |
| 209721 | 11/1924 | United Kingdom . |

Primary Examiner—Timothy F. Simone

[57]                 ABSTRACT

A steam cooking utensil is disclosed which includes a base; a boiling water reservoir and a condensate trough defined by the base; and a heater disposed centrally to the boiling water reservoir, mounted in the base, and coupled to a thermostat also mounted in the base. The condensate trough is disposed in annular relationship to the boiling water reservoir. A food tray defining a imperforate central surface and an array of peripheral apertures is supported such that the imperforate sur-



B1 4,509,412

Page 2

face is vertically aligned with the boiling water reservoir and the array of peripheral apertures is vertically aligned with the condensate trough. A cover having a bottom opening defined by a rim is positioned over the food tray, condensate trough and boiling water reservoir, such that the rim cooperates with an outer peripheral lip of the condensate trough to form a seal. The disclosed steam cooking utensil operates to cook food quickly, cleanly and efficiently. The boiling water reservoir remains free from condensate residues even after boiling dry, and the food product remains free from excess moisture.

B1 4,509,412

1

2

## REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims 1–32 is confirmed.

* * * * *

10

15

20

25

30

35

40

45

50

55

60

65

1            **IN THE UNITED STATES DISTRICT COURT**
               **DISTRICT OF NEW JERSEY**

2

3  SEB S.A.,                   )

4              Plaintiff     )

5          v                )  Civil Action No.
                         )  98-1050 (WGB)

6  SUNBEAM CORP., SUNBEAM PRODUCTS, )

7  INC., WING SHING INT'L LTD. (BVI), )
   and PENTALPHA ENTERS., LTD.    )

8            Defendants      )

9  SUNBEAM CORP., SUNBEAM PRODUCTS, INC. )

10  Third-Party Plaintiffs/Counterdefts. )

11          v              )

12  WING SHING INT'L, LTD. (BVI), and  )
   GLOBAL-TECH APPLIANCES, INC.     )

13                         )
   Third-Party Defendants, and     )

14  PENTALPHA ENTERS., LTD        )

15  Third-Party Defendant/Counterclaimt. )

COPY

16             **DEPOSITION OF EYAL LIOR**

17

18        **Thursday, December 14th, 2000**
              **AT:  9.30 am**

19              **Taken at:**
        **The Mandarin Oriental Hotel**

20              **Hong Kong**

21

22  **REPORTED BY:    TRACEY O'SULLIVAN**

23      **Smith Bernal International (Asia) Ltd**
    **Suite One, 24th Floor, Lippo Centre Two**

24         **89 Queensway, Hong Kong**

25           **Tel: (852) 2522 1998**
           **Fax: (852) 2522 1575**

Page 1

```
 1                    A P P E A R A N C E S

 2      Appearing on behalf of THE PLAINTIFF:

 3
                    ROBERT L. BYMAN
 4
                    Jenner & Block
 5                  One IBM Plaza
                    Chicago
 6                  Illinois 60611-7062

 7
                    WILLIAM DUNNEGAN
 8
                    Perkins & Dunnegan
 9                  720 Fifth Avenue
                    New York, New York 10019
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

**Page 12**

[1] A: The business relationship was to form two
[2] corporations. One was a Pentalpha Enterprises US
[3] Incorporated and the other one was Wing Shing Marketing
[4] (BVI) Ltd, I believe.
[5] Q: Was it your idea to form those two entities?
[6] A: My idea was to form Pentalpha Enterprises US
[7] Incorporated and Mr Sham's idea was to form Wing Shung
[8] Marketing.
[9] Q: With respect to Pentalpha Enterprises US, was
[10] that an incorporated entity?
[11] A: 100 per cent, yes.
[12] Q: And of that 100 per cent, how were the shares
[13] owned?
[14] A: Actually, if I remember correct, Mr Sham
[15] wanted to set up the US entity as a subsidiary of the Wing
[16] Shing Marketing (BVI) Ltd, which I had no objection
[17] whatsoever, so as soon as the corporation was actually –
[18] was established, I sent all the books and records to
[19] Hong Kong without issuing any shares, although we had an
[20] agreement to incorporate in New Jersey and the percentage
[21] was 50/50 to incorporate in the state of New Jersey.
[22] Q: In addition to being a 50/50 owner of
[23] Pentalpha Enterprises US, did you hold any offices in that
[24] company?
[25] A: Yes.

**Page 13**

[1] Q: What offices?
[2] A: We had an office – I believe the address was
[3] 2125 Center Avenue in Fort Lee, New Jersey, where I had at
[4] that time 12 engineers.
[5] Q: You were talking about you had 12 engineers?
[6] A: That's correct. I am not sure if it was 11 or
[7] 12 at this moment, but at the time it was definitely 12
[8] engineers.
[9] Q: Were you an officer of Pentalpha Enterprises
[10] US?
[11] A: I was an officer and I was the President of
[12] the company, yes.
[13] Q: I am going to show you what has been
[14] previously marked, Sir, as exhibit 7 and ask you if you
[15] have ever seen that before. (Handed).
[16] A: Yes, I did. I am very familiar with it as a
[17] matter of fact.
[18] Q: Does your signature appear on it?
[19] A: Yes, it does.
[20] Q: And could you describe for the ladies and
[21] gentlemen of the jury what exhibit 7 is?
[22] A: Exhibit 7 is a product supply agreement that
[23] was established between the group so-called Pentalpha and
[24] Sunbeam which was to supply certain new products to Sunbeam
[25] and secure some existing old business that Pentalpha did

**Page 14**

[1] with Sunbeam.
[2] Q: Who negotiated the agreement on behalf of
[3] Pentalpha?
[4] A: I did.
[5] Q: Was anyone else involved on the Pentalpha
[6] side, other than you in the negotiation?
[7] A: On the negotiation, only myself, although
[8] every part of the negotiation was confirmed and informed to
[9] John Sham.
[10] Q: Did you have authority on behalf of the
[11] entities for whom you signed to execute this agreement?
[12] A: There is no doubt that I had 100 per cent
[13] authority in Wing Shing Marketing and Pentalpha Enterprises
[14] US Incorporated to sign, but with regards to Pentalpha
[15] Enterprises Incorporated there was a cover letter – I do
[16] not see it right now – from Charlie James. I believe it
[17] was dated some time in June. I can't remember exactly if
[18] it was June 27, 26 or 25th, stating that you must sign
[19] urgently the product supply agreement.
[20] I actually phoned Mr Sham at that time and
[21] advised him the situation, including the cover letter of
[22] Charlie James and he just asked me to go ahead and sign
[23] that day the supply agreement, also on behalf of Pentalpha
[24] Enterprises Incorporated. He said what the position is is
[25] expressed there.

**Page 15**

[1] Q: Mr Lior, was this agreement signed on or
[2] before June 27, 1997?
[3] A: Yes, it was.
[4] Q: And after you signed it on behalf of
[5] Pentalpha, did you forward it to Mr Sham?
[6] A: Absolutely.
[7] Q: Did you forward it in its entirety to Mr Sham?
[8] A: Its entirety, yes.
[9] Q: By that I mean did you include schedule A?
[10] A: Include everything I signed with Sunbeam,
[11] which means it includes schedule A too, yes.
[12] Q: And did it include the page that has a number
[13] P00116 entitled "Rider to Pentalpha/Sunbeam Product Supply
[14] Agreement"?
[15] A: Yes, I did.
[16] Q: Did you ever have any conversations with
[17] Mr Sham prior to the execution of the agreement?
[18] A: Yes, I had.
[19] Q: I was not quite done.
[20] A: I am sorry.
[21] Q: Did you ever have any conversations with
[22] Mr Sham prior to the execution of the agreement on the
[23] subject of the payment by Pentalpha to Sunbeam of
[24] $1 million?
[25] A: Yes, I did.

SEB S.A. v. SUNBE' CORP v.
WING SHING ENT CO
Case 9:02-cv-80527-KLR   Document 19   Entered on FLSD Docket 07/22/2002   Page 443 of 473
EYAL LIOR
December 14, 2000

**Page 16**

[1] MR DUNNEGAN: I object to the form.

[2] MR BYMAN: What is wrong with the form of that

[3] question.

[4] MR DUNNEGAN: You used Pentalpha. the agreement

[5] provides the payment by Pentalpha Enterprises US Limited

[6] and I think you should be specific before you get an

[7] answer.

[8] MR BYMAN: If that is your objection, I will

[9] stand with my question. Let me rephrase it, just so you

[10] will recall it, Mr Lior. Did you have any conversations

[11] with Mr Sham prior to the execution of exhibit 7 on the

[12] subject of the payment of $1 million to Sunbeam.

[13] MR DUNNEGAN: Objection.

[14] A: Yes, I had.

[15] MR BYMAN: When was the first time you had such

[16] a conversation with him?

[17] A: Before the contract was signed.

[18] Q: And was that in a face-to-face meeting or a

[19] telephone conversation?

[20] A: A telephone conversation.

[21] Q: Was anyone on the line other than you and

[22] Mr Sham?

[23] A: I cannot recall at this time but usually when

[24] I spoke to Mr Sham, nobody was on the line, not from my end

[25] and not from his end.

**Page 17**

[1] Q: To the best you can recall, what did you say

[2] to him and what did he say to you on the subject of the

[3] $1 million?

[4] A: Well, it all started when I came to Sunbeam

[5] and Sunbeam asked for $1 million rebate for the purchases

[6] that was done during 1997, and I wanted something in return

[7] for $1 million. You just don't give $1 million for nothing

[8] and they suggested to give us additional business and

[9] secure the entire business, I believe for four years, and

[10] at that time they gave me a list of products and they said

[11] pick up 50 per cent of those products and we will write it

[12] up into a supply agreement and I said "no, I would like to

[13] have all the products". Finally, after a full day of

[14] negotiation, they agreed and I said "before I go further,

[15] I would like to go back to my partner, which is John Sham,

[16] and discuss it with him and I can get back to you within a

[17] day". They asked me if I can back to them first thing in

[18] the morning, I said "yes. ", right now it is night in

[19] Hong Kong, I will go back to my hotel - which I believed

[20] I state at the Boca Marriott at that time, and I faxed it

[21] from there. Actually, the product - the suppliers, it

[22] says the product, and also I explained to him that in order

[23] to get this additional business we have to pay an extra

[24] $1 million to Sunbeam.

[25] Q: Let me show what you has been previously

**Page 18**

[1] marked as exhibit A. (Handed). Is that the list you just

[2] referred to?

[3] A: Yes.

[4] Q: And does that show by the fax header that you

[5] sent it from the Boca Marriott on June 20th, 1997?

[6] A: That's correct.

[7] Q: After you had sent this fax to Mr Sham and you

[8] told him that this was the expectation in return for the

[9] $1 million, what did Mr Sham say about the $1 million?

[10] A: Mr Sham was very, very excited of getting this

[11] business and he had no objection whatsoever about the

[12] $1 million.

[13] Q: During that conversation was anything said

[14] about Sunbeam's financial condition?

[15] A: Absolutely not.

[16] Q: Were any representations made to you by anyone

[17] from Sunbeam prior to June 27th, 1997, about Sunbeam's

[18] financial condition?

[19] A: Absolutely not. There was never ever a

[20] discussion about Sunbeam's financial situation or

[21] Pentalpha's financial situation.

[22] Q: After you had your conversation with Mr Sham.

[23] which I take it was some time between June 20, 1997 and

[24] June 27, 1997; is that right?

[25] A: Right.

**Page 19**

[1] Q: After you had that conversation, you then

[2] negotiated the agreement which is exhibit 7 and signed it;

[3] is that right?

[4] A: That's correct.

[5] Q: How soon after signing it did you send it to

[6] Mr Sham?

[7] A: The same day.

[8] Q: And again, just to make sure we are clear, you

[9] sent him both the rider and schedule A as part of that?

[10] A: That's correct.

[11] MR DUNNEGAN: I object to the form.

[12] Q: Whose idea was it to provide for the

[13] $1 million in a rider, as opposed to the body of the

[14] agreement?

[15] A: Actually, it was my idea, because I wanted to

[16] be protected and I figure out that I would like to make it

[17] a rider and actually add something in writing in return for

[18] the $1 million, that we get from Sunbeam and that was my

[19] idea and I asked a legal - I forgot how you - I asked

[20] somebody who is familiar with the legality to just draft it

[21] for me.

[22] Q: After you sent exhibit 7 to Mr Sham, at any

[23] time did he say to you that you did not have the authority

[24] to enter into that agreement?

[25] A: Absolutely not.

December 14, 200

**Page 20**

[1] Q: At any time did he say to you you did not have
[2] the authority to commit to the payment of $1 million?
[3] A: Absolutely not.
[4] Q: Was the $1 million ever paid, to your
[5] knowledge?
[6] A: Yes.
[7] Q: When was that?
[8] A: I believe the first payment was paid around
[9] August or September.
[10] Q: In what form was that payment made?
[11] A: I believe it was a deduction from bills that
[12] was owed to Sunbeam.
[13] Q: And did you make that deduction on your own,
[14] or did Mr Sham have anything to do with it?
[15] A: Mr Sham authorised the deduction because he
[16] was holding all the money of Pentalpha Enterprises
[17] Incorporated, Pentalpha Enterprises US Ltd and Wing Shung
[18] Marketing (BVT) Ltd, so I had no funds in my US operation
[19] to pay for it, so it had to come from the funds that was
[20] held by Mr John Sham.
[21] Q: Mr Lior, I would like to talk about your
[22] understanding of certain of the terms in the June 27, 1997
[23] agreement which is exhibit 7. Did the product supply
[24] agreement assure Pentalpha of any minimum quantity of
[25] sales?

**Page 21**

[1] A: No.
[2] Q: What was your understanding of exhibit A's
[3] relationship to exhibit 7: in other words, was Pentalpha
[4] assured of getting the same sales that were on exhibit A?
[5] MR DUNNEGAN: I object to the form.
[6] A: No. Actually, my understanding was that
[7] Sunbeam did not commit to any quantities, minimum
[8] quantities, and they actually presented us quantities that
[9] they bought the previous year and my understanding was as
[10] long as Sunbeam will market those products, Pentalpha will
[11] be the exclusive distributor for these products –
[12] exclusive supplier, excuse me.
[13] MR BYMAN: When you say "these products",
[14] schedule A to exhibit 7 lists a number of products: do you
[15] see that? It is two-sided, so you will have to turn the
[16] page.
[17] A: Yes, yes, yes, I do.
[18] Q: For example, the first product listed is air
[19] cleaner, and then there are a number of numbers after air
[20] cleaners, do you see that?
[21] A: Yes, I do.
[22] Q: What is your understanding of what the
[23] reference to air cleaners and these numbers means?
[24] A: My understanding was that we were going to get
[25] the numbers – model numbers. Actually those were Sunbeam

**Page 22**

[1] model numbers, 2586, 2587, 2588 and 2590 that were produced
[2] by Raymond.
[3] Q: Was it your understanding that Pentalpha was
[4] to get all air cleaners, or just these ones?
[5] A: Absolutely not, just those models who were
[6] produced by certain manufacturers – all these models that
[7] were produced by certain manufactures, which I believe at
[8] that time was Raymond.
[9] Q: Did this agreement cover air cleaners that
[10] were different in any way than 2586, 2587, 2588 or 2590?
[11] A: No.
[12] Q: And if I ask you the same question for each of
[13] the appliances that are listed, would your answer be the
[14] same?
[15] A: Yes. For product not currently produced by
[16] Pentalpha, yes. For instance, I can give you an example
[17] I know Sunbeam was buying irons from other suppliers
[18] besides 4014 and 4015, but they only gave us the 4014 and
[19] 4015, they didn't give us the other irons.
[20] Q: So there were two specific iron models?
[21] A: Yes.
[22] Q: Did you have any understanding as to how many
[23] different types of irons Sunbeam was buying at that time?
[24] A: Plenty. They were also manufacturing irons in
[25] the United States at that time.

**Page 23**

[1] Q: During the course of negotiating the product
[2] supply agreement, was anything said on the subject of what
[3] tooling Sunbeam owned?
[4] A: Yes. At that time they made it very clear
[5] that they can only confirm that they owned the air cleaners
[6] model 2586, 2587, 2588, 2590 and the rousserie, 4780,
[7] 4783. All the rest of the tools they were not sure if they
[8] owned part of the tools or they owned none and they suggest
[9] us as soon as we get them the quotation and the prices
[10] actually match with the existing price they are buying from
[11] current suppliers, we should go ahead and tool the unit.
[12] Q: Did you advise Mr Sham or anyone else back in
[13] Hong Kong or China that the only tooling Sunbeam owned was
[14] for the air cleaners and the rousseries?
[15] A: Absolutely.
[16] Q: Did Mr Sham say anything in response to that?
[17] A: No.
[18] Q: Mr Lior, I am going to show you what I have
[19] marked as exhibit 55 for identification. (Handed) Can you
[20] identify that for me?
[21] A: Yes.
[22] Q: What is it?
[23] A: Actually before I settle with John Sham, I sat
[24] down and calculate the cash advance that went to Joe Sasso,
[25] who is my partner, the cash advance that went to me, the

Case 9:02-cv-80543-KLR Document 19 Entered on FLSD Docket 07/22/2002 Page 445 of 473

**Page 140**

[1] A: I believe since Mr Dunlop came on board.

[2] Q: That would be approximately when?

[3] A: I don't remember when Mr Dunlop came on board.

[4] Q: If I told you it was June or July of 1996,

[5] would that ring a bell?

[6] A: Maybe yes, maybe not, I don't remember.

[7] Q: That is fine. In the period from early 1997

[8] to the middle of 1997, did you have any discussions with

[9] Mr Sham concerning Sunbeam being a rising star?

[10] A: Yes, I believe so.

[11] Q: When did you have those discussions?

[12] A: I can't remember, but on a few occasions, yes.

[13] Q: Do you remember whether any of them were

[14] before exhibit 7 was executed?

[15] A: Yes, it was all before exhibit 7 was executed.

[16] Q: I will not ask you specifically about each of

[17] those conversations, but generally, what did you say to

[18] Mr Sham and what did Mr Sham say to you?

[19] A: Mr Sham agreed with me. Actually Mr Sham

[20] wanted business to grow with Sunbeam and I wanted the

[21] business to grow with Sunbeam and we both agreed that it is

[22] a very good company to work with, very strong.

[23] Marketing-wise and financially.

[24] Q: When you say "financially", did you at any

[25] time before you signed this contract, meaning exhibit 7,

**Page 141**

[1] have any understanding of the profitability of Sunbeam?

[2] A: Sir, when we go to sell, we don't sell on open

[3] account. We don't give credit to companies. We don't care

[4] about the financial situation of a company. We sell the

[5] product, we look at quantities and profit, because the

[6] payment is coming before the customer can touch the

[7] merchandise. So we don't really care about the financial

[8] situation of the company when we sell the product. We only

[9] care about their capability of moving product, the value of

[10] the brand name.

[11] MR BYMAN: I think we have to change the tape

[12] and I need to make a phone call.

[13] MR DUNNEGAN: Fine, let's change the tape.

[14] (Videotape changed)

[15] THE VIDEOGRAPHER: We will start the new tape at

[16] 1549.

[17] MR DUNNEGAN: Sir, after you sent your comments

[18] or your draft back to Sunbeam the first time, do you

[19] remember any comments that Sunbeam had?

[20] A: I can't recall. There was communication back

[21] and forth for a few days at least. I can't remember, yes,

[22] they sent some comments or did not. There were comments

[23] going back and forth before the contract was executed.

[24] Q: If we were to take it up in until the time the

[25] contract was executed, is it fair to say you cannot provide

**Page 142**

[1] me with any more detail about what the negotiations

[2] involved?

[3] A: Besides language, no.

[4] Q: I am sorry, besides language?

[5] A: It was all language communicated, the terms

[6] Q: I understand. Do you recall having any

[7] discussions with John Sham about putting the $1 million

[8] provision in the rider?

[9] A: Absolutely.

[10] Q: What did you say to him and what did he say to

[11] you on the topic?

[12] A: I told him it is going to cost $1 million to

[13] have this contract.

[14] Q: Sir, the issue I was trying to focus on is do

[15] you recall having any discussions with him about whether

[16] the $1 million provision would be in a rider or in the body

[17] of the contract?

[18] A: I don't remember.

[19] Q: Other than Mr Sham, did you have any

[20] discussions with anyone at Pentalpha or Global-Tech

[21] concerning the negotiation of this agreement, exhibit 7?

[22] MR BYMAN: Did Global-Tech exist?

[23] A: Global-Tech did not exist at that time.

[24] MR DUNNEGAN: It did.

[25] MR BYMAN: Did it?

**Page 143**

[1] A: Well, if it exists, I was not aware that such

[2] a thing exists, which was very typical for John Sham.

[3] MR DUNNEGAN: As of the time you signed the

[4] agreement, on or about June 27th, 1997, how long had

[5] Pentalpha Enterprises US been in business?

[6] A: I believe since February of 1996.

[7] Q: As of June of 1997, how much profit did

[8] Pentalpha Enterprises US have?

[9] A: In reality or in the books that John Sham want

[10] to present. In reality, big profit.

[11] Q: When you say big profit, what do you mean by

[12] that?

[13] A: Exactly what you hear. When you ship that

[14] many products, let us say $50 million worth of merchandise,

[15] you don't ship them at a loss, you ship them at a profit.

[16] Q: Sir, in dollars, as best you can recall, how

[17] much money –

[18] A: As far as I am concerned, as far as I know the

[19] bill of material, as far as I know Pentalpha bill of lading

[20] note, just on bread makers alone I believe there was at

[21] least $8 profit per unit.

[22] Q: Let me try this a different way. As of June

[23] of 1997 did Pentalpha Enterprises US have any bank

[24] accounts?

[25] A: Yes.

1          UNITED STATES DISTRICT COURT
              DISTRICT OF NEW JERSEY
2   - - - - - - - - - - - - - - - - - -x
    SEB S.A.,
3                      Plaintiff,        :
                  v.                     :
4   SUNBEAM CORPORATION, SUNBEAM         :
    PRODUCTS, INC., WING SHING           :
5   INTERNATIONAL LTD. (BVI) and         :
    PENTALPHA ENTERPRISES, LTD.,         :
6                      Defendants.       :
    - - - - - - - - - - - - - - - - - -x
7   SUNBEAM CORPORATION, SUNBEAM         :
    PRODUCTS, INC.,                      :
8                      Third-Party       :
                       Plaintiffs        :
9                      Counterclaimants, :
                  v.                     :
10  WING SHING INTERNATIONAL, LTD.       :
    (bvi), AND GLOBAL-TECH               :
11  APPLIANCES INC.,                     :
                       Third-Party       :
12                     Defendants,       :
                  -and-                  :
13  PENTALPHA ENTERPRISES, LTD.,         :
                       Third-Party       :
14                     Defendant         :
                       Counterclaimant.  :
15  - - - - - - - - - - - - - - - - - -x

16                     Oral Deposition of GEORGE

17  TIMCHAL, taken pursuant to notice, at the

18  office of Gollatz, Griffin & Ewing, Two Penn

19  Center, 16th Floor, Philadelphia,

20  Pennsylvania, on Tuesday, August 22, 2000,

21  beginning at approximately 10:00 a.m., before

22  Jeanne Christian, Court Reporter-Notary

23  Public, there being present.

24                              - - -

25

2

1   APPEARANCES:

2                    PERKINS & DUNNEGAN
                     BY:   BLAKE PERKINS, ESQUIRE
3                    720 Fifth Avenue
                     New York, New York 10019
4                    Phone: (212) 397-7020
                     Representing Pentalpha
5
                     JENNER & BLOCK
6                    BY:   CLARK C. JOHNSON, ESQUIRE
                     One IBM Plaza
7                    Chicago, Illinois 60611
                     Phone: (312) 222-9350
8                    Representing Sunbeam

9                    ACKERMAN, LINK, SARTORY
                     BY:   DAVID P. ACKERMAN,
10                   ESQUIRE
                     222 Lakeview Avenue
11                   Suite 1250 - Esperante
                     West Palm Beach, Florida 33401
12                   Phone: (561) 838-4100
                     Representing the Witness
13
                     SKADDEN, ARPS, SLATE, MEAGHER,
14                   FLOM, LLP
                     BY:   CHRISTOPHER P. MALLOY,
15                   ESQUIRE
                     919 Third Avenue
16                   New York, New York 10022
                     Phone: (212) 735-3000
17                   Representing Sunbeam

18

19

20

21

22

23

24

25

KNIPES-COHEN SPHERION
400 MARKET ST. PHILA, PA 19106 (215)928-9300

1    projections for Sunbeam?

2                         MR. JOHNSON:  I object to

3    form.

4                         THE WITNESS:  You have

5    asked a different question.  The projections

6    that were given to Pentalpha, my understanding

7    of the process is that these were purchased

8    projections that Jim Nugent and folks in the

9    marketing department collaborated on and Jim

10   Nugent forwarded to Pentalpha.

11   BY MR. PERKINS:

12   Q     Who were the folks in the marketing

13   department?

14   A     They would have worked for Mr.

15   Haberman.  I don't know the details.

16   Q     Do you know whether the projections

17   given to Pentalpha were created specifically

18   for Pentalpha?

19   A     I could only make an assumption in that

20   case.  The purchase forecasting process was

21   universally applied to all products, finished

22   goods products and component material alike.

23   Those forecasts, those purchase forecasts,

24   would have been delivered to the appropriate

25   suppliers.  I don't know that there was any

95

```
 1  unique process for a given supplier in any of
 2  the products.
 3  Q   .  Were you aware of that there was ever a
 4  unique process for any given supplier?
 5  A     No.
 6  Q     Do you know whether the projections
 7  given to Pentalpha were created specifically
 8  in anticipation of negotiations over the terms
 9  of the product supply agreement?
10  A     Absolutely not.
11  Q     What did Sunbeam base the projections
12  on?  Do you know?
13  A     I can tell you, generally, the process
14  of planning and forecasting, you know, begins
15  with a marketing plan, converted to a sales
16  plan, converted to a purchase plan, which is
17  then kind of intersected with a manufacturing
18  and an inventory plan, and sooner or later,
19  you end up with a purchase forecast that you
20  can share with the supplier.
21              But the upfront piece
22  primarily happens in the selling and the
23  marketing organization, and in the back end,
24  we would have been involved in the procurement
25  side.
```

1  Q-     Do you know whether Sunbeam took into

2  account its sole supplier agreement with

3  Pentalpha in creating any of the projections

4  given to suppliers other than Pentalpha?

5  A      Say that again.

6  Q      Sure.

7              Do you know whether Sunbeam

8  took into account or factored in its

9  obligations under the sole supplier agreement

10  with Pentalpha in creating any projections

11  that it provided to other suppliers?

12              MR. JOHNSON:  I object to

13  form.

14              THE WITNESS:  I don't --

15  no, I don't understand the question.  And no.

16  BY MR. PERKINS:

17  Q      Well, you can't say no, if you don't

18  understand the question.

19              In the process of creating

20  any sales projections that were supplied to

21  its suppliers of appliances, did Sunbeam take

22  into account products that were manufactured

23  pursuant to the sole supplier agreement it had

24  with Pentalpha?

25  A      I don't know what you mean by take into

GEORGE T. CHAI

97

1    account.

2    Q      Did the sole supply agreement cause --

3    A      Influence?

4    Q      Influence, yes.

5    A      No, and I want to correct sales from

6    purchase, two entirely different forecasts,

7    absolutely two entirely different mechanisms.

8    Selling mechanisms, business plans versus

9    purchase forecasts, two separate and distinct

10   --

11   Q      Did --

12   A      But the answer to your question is no.

13   Q      So did purchases that Sunbeam

14   anticipated making under the sole supply

15   agreement influence Sunbeam's projections

16   given to any suppliers other than Pentalpha?

17   A      Not that I am aware of or would have

18   supported or knew of, no.  That's a

19   self-defeating process.

20   Q      In October 1997, did you personally have

21   any understanding whether the projections for

22   purchases under the product supply agreement

23   were reasonable?

24                 MR. JOHNSON:   I object to

25   the form.

**Page 1**

```
UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CIVIL ACTION NO. 98-1050 (WGB)

SEB S.A.,

        Plaintiff,

    vs.

SUNBEAM CORPORATION, SUNBEAM
PRODUCTS, INC., WING SHING
INTERNATIONAL LTD. (BVI) and
PENTALPHA ENTERPRISES, LTD.,

        Defendants.

SUNBEAM CORPORATION, SUNBEAM
PRODUCTS, INC.,

    Third-Party Plaintiffs
    Counterdefendants,

    v.

WING SHING INTERNATIONAL, LTD.
(BVI), and GLOBAL-TECH APPLIANCES
INC.,

    Third-Party Defendants.
```

DEPOSITION OF JAMES NUGENT
VOLUME I

Taken before Angela Sauter, Certified Professional Reporter and Notary Public in and for the State of Florida at Large, pursuant to notice of taking deposition filed by the Plaintiff in the above cause.

Tuesday, March 21, 2000
2255 Glades Road, Suite 419
Boca Raton, Florida

**Page 2**

9:10 a.m. - 5:10 p.m.

**Page 3**

APPEARANCES:

On behalf of the Plaintiff:
    JENNER & BLOCK
    One IBM Plaza
    Chicago, Illinois 60611-7602
    BY:  ROBERT L. BYMAN, ESQUIRE

On behalf of the Defendants:
    PERKIN & DUNNEGAN
    720 Fifth Avenue
    New York, New York 10019
    BY:  WILLIAM DUNNEGAN, ESQUIRE

**Page 4**

I N D E X

| WITNESS | DIRECT |
|---|---|
| JAMES NUGENT | |
| By Mr. Byman | 5 |
| | CROSS |
| By Mr. Dunnegan | 23 |
| | REDIRECT |
| By Mr. Byman | |

E X H I B I T S

| NUMBER | PAGE |
|---|---|
| Sunbeam No. 1 | 7 |
| Sunbeam No. 2 | 8 |
| Sunbeam No. 3 | 8 |
| Defendant's No. A | 28 |
| Defendant's No. B | 37 |
| Defendant's No. C | 37 |
| Defendant's No. D | 72 |
| Defendant's No. E | 112 |
| Defendant's No. F | 118 |
| Defendant's No. G | 118 |
| Defendant's No. H | 118 |
| Defendant's No. I | 118 |
| Defendant's No. J | 136 |
| Defendant's No. K | 148 |
| Defendant's No. L | 167 |
| Defendant's No. M | 188 |
| Defendant's No. N | 222 |

**9**

1    A.  Vicky Tai.
2    Q.  Is that a man or a woman?
3    A.  That's a gentleman.
4    Q.  And who is Mr. Tai?
5    A.  At that time he was the director of sales
6  and marketing for Pentalpha.
7    Q.  And what is Exhibit SB-3?
8    A.  That is a memorandum from Vicky Tai to me
9  of December 30, 1997.  Appears to be in response to
10  my December 24 memo.
11    Q.  What was the purpose of you sending the
12  December 24 memo to Mr. Tai?
13    A.  I wanted to give Vicki an update on the
14  status of the projects related to the document SB-1.
15    Q.  And that would be the status of the
16  various products that were covered?
17    A.  The status of the various products, yes.
18    Q.  Let's turn to schedule A of SB-1, which is
19  SB 00079, I would like to start first with the
20  products that are under the heading products
21  currently produced by Pentalpha.  Is that a
22  representation that as of the date that the product
23  supply agreement was entered into, that the products
24  listed there were already produced by Pentalpha?
25    A.  Correct.

**10**

1    Q.  At any time since the execution of the
2  product supply agreement, has Sunbeam purchased the
3  bread maker products 5814, 5815, 5839 or 5840 from
4  any source other than Pentalpha?
5    A.  No.
6    Q.  At any time since the execution of the
7  product supply agreement, has Sunbeam purchased the
8  food steamer product 4710, 4722, 5710 from any
9  source other than Pentalpha?
10    A.  No.
11    Q.  At any time since the execution of the
12  product supply agreement, has Sunbeam purchased the
13  travel iron 3939 product from any source other than
14  Pentalpha?
15    A.  No.
16    Q.  At any time since the execution of the
17  product supply agreement, has Sunbeam purchased rice
18  cooker models 3706 or 3708 from any source other
19  than Pentalpha?
20    A.  No.
21    Q.  At any time since the execution of the
22  products supply agreement, has Sunbeam purchased the
23  deep fryer products 3240, 3241, 3242 or 3243 from
24  any source other than Pentalpha?
25    A.  No.

**11**

1    Q.  Has Sunbeam purchased any model of bread
2  maker from any source other than Pentalpha since the
3  execution of the product supply agreement?
4    A.  Yes.
5    Q.  When did it first begin to do that?
6    A.  March of 1998.
7    Q.  Was the bread maker product that Sunbeam
8  purchased from a source other than Pentalpha
9  comparable or replacement for any of the products
10  that are listed in schedule A?
11    A.  I'm sorry, that requires definition of
12  "comparable."
13    Q.  Obviously they both make bread.
14    A.  Yes.
15    Q.  But are the models identical to one
16  another?
17    A.  No.
18    Q.  Just different models?
19    A.  No.
20    Q.  Can you describe in general the
21  differences between the bread maker that Sunbeam
22  purchased other than a source from Pentalpha and
23  these products?
24    A.  Entirely different in shape and industrial
25  design, size and substantially different in price.

**12**

1    Q.  Has Sunbeam purchased food steamers other
2  than the models listed on schedule A other than a
3  source from Pentalpha?
4    A.  No.
5    Q.  Has Sunbeam purchased travel irons?
6    A.  No.
7    Q.  Other than that than as listed on schedule
8  A?
9    A.  No.
10    Q.  Now, I see rice cookers are listed both in
11  products currently produced and products currently
12  not produced indicating different types of models.
13  Putting aside the RS series that are in
14  the upper part of schedule A, has Sunbeam purchased
15  any other rice cookers then the 4706, 4708 or the RS
16  series?
17    A.  Or the RS series.
18    You said put that aside for a minute.  I'm
19  not sure I understand correctly.
20    Q.  I should back up.  The product supply
21  agreement contemplated that they were both rice
22  cookers that were already produced and a series of
23  products that were not produced but were covered by
24  the product supply agreement; is that correct?
25    MR. DUNNEGAN:  Object to the form.

13

THE WITNESS: I'm sorry. I'm still not sure I understand the question.
BY MR. BYMAN:
Q. Let me ask a more basic question. Other than the rice cookers 4706 or 4708, has Sunbeam purchased any rice cooker products from a source other than Pentalpha?
A. Yes.
Q. And what type of products are those? How do they differ from the 4706 and 4708?
A. The entire construction is different.
Q. Other than the deep fryer products listed on schedule A, has Sunbeam purchased any deep fryers from a source other than Pentalpha?
A. Yes.
Q. When did it begin to do that?
A. I'm -- I don't have an exact date. I would say between April and June of 1998. It could be a little bit later than that, but I'm not positive.
Q. Was Sunbeam's purchase of deep fryers other than Pentalpha caused by any event to your knowledge?
A. Yes, there was suit filed against Sunbeam by SEB of Europe for patent infringement on these

14

deep fryers. And we were forced by that patent infringement to replace the product as quickly as possible.
Q. And, Mr. Nugent, let's turn to the products that are in the upper part of schedule A, the products not currently produced by Pentalpha. Did Pentalpha ever submit bids for air cleaner products 2585, 87, 88 or 90?
A. No.
Q. Did Pentalpha ever submit bids for the air filler replacement models that are listed in schedule A?
A. No.
Q. Did Pentalpha ever submit bids for the ultrasonic humidifier model 696 or 1281?
A. No.
Q. Did Pentalpha ever submit bids for the hand mixer products 4450 or 2603?
A. No.
Q. Did Pentalpha ever submit bids for any of the coffee maker products listed on schedule A?
A. They did not submit any quotations for models 5653, 5654, and 5655. They did submit quotations for all the remaining models starting with 3200.

15

Q. Were those quotations accepted by Sunbeam?
A. Yes.
Q. Did Pentalpha ever manufacture those models for Sunbeam?
A. No.
Q. Why not?
A. They did not submit a project plan that met the minimum criteria for a reasonable transfer of those products.
Q. Can you explain what you mean by that?
A. What I mean is these products that we are currently selling at this time, we can't be out of production, out of inventory for any length of time. So we need to develop a project plan which would allow us to transfer the tooling at a point in the project that would allow them to start production shortly thereafter. Which means you have to establish your production line setup, product qualification testing, to Sunbeam's product spec and standards, test standards, you have to seek, if you can get UL approval, which can be a very extensive period of time.
All of these things should take place prior to actually physically moving the tooling. Because once you actually physically move the tool

16

until you secure all the qualification test results acceptable to Sunbeam and UL approval, you cannot start production again.
Q. Let's talk a little bit about what tools Sunbeam had that it could have moved. Did it have tools for every part that was part of the coffee maker models?
A. No, Sunbeam owned only the large plastic, the tooling for the large plastic parts on the product. We did not own the tooling for all the metal parts, components in the product. So those needed to be retooled and requalified with the entire product again, which is why it required UL approval again as well.
Q. How would Pentalpha be able to make a sample to send for UL for approval without having the tooling for the large plastic parts?
A. Well, I would provide them plastic parts from the tools. They then would use their source components where purchase components were required and build tools for the metal parts in the product and produce their own samples for those for Sunbeam's qualification testing and for UL submittal for UL approval.
Q. Did you ever suggest to Pentalpha that the

17

1  plan that they had submitted for the transfer of
2  tooling and production was not acceptable?
3      A.  Yes.
4      Q.  And did they ever respond with an
5  acceptable plan?
6      A.  No.
7      Q.  Let's move on to the garment steamer.  Did
8  Pentalpha ever bid on the products 4026 and 4036?
9      A.  Yes.
10     Q.  And did Sunbeam ever purchase garment
11 steamers from Pentalpha?
12     A.  No.
13     Q.  Why not?
14     A.  The same project plan and UL, etc. issues
15 that we had with the coffee makers is the same
16 issues we had with the garment steamers.
17     Q.  Did Sunbeam own the tooling for every
18 component of the garment steamers?
19     A.  No.
20     Q.  What tooling did it own?
21     A.  Again, we only -- the plastic tools only,
22 oh, the heating element, safety devices, other metal
23 parts within the enclosure would have had to been
24 produced or tooled and requalified again and a new
25 UL approval granted.

18

1      Q.  Did you make the same offer to Pentalpha
2  to supply them with the parts for the tools which
3  Sunbeam did own so that they could submit for UL
4  approval?
5      MR. DUNNEGAN:  Object to the form.  Let me
6  interject for a moment, the witness is now
7  looking at a document in an apparent attempt to
8  refresh his recollection.  I don't have any
9  problem with him doing that as long as you know
10 we do it the usual way, just put on the record
11 that he's doing that.
12     THE WITNESS:  Um-hum.
13     MR. BYMAN:  Well, you've now just put on
14 the record that he's looking at Exhibits 2 and
15 3.
16     MR. DUNNEGAN:  I didn't know what he was
17 looking at.  Go ahead.
18     THE WITNESS:  I'm sorry, could you repeat
19 the question.
20 BY MR. BYMAN:
21     Q.  Sure.  The question was did you make the
22 same offer as for the coffee makers to supply parts
23 for the tools for which Sunbeam did own the tooling
24 so that Pentalpha could make a model for submission
25 for UL testing?

19

1      MR. DUNNEGAN:  Object to the form.
2      THE WITNESS:  To be honest with you. I
3  don't remember exactly.
4  BY MR. BYMAN:
5      Q.  Did you ever tell Pentalpha that its plan
6  for transition for garment steamers was not
7  acceptable?
8      A.  Well, what I stated was they did not
9  provide me with a project plan as of December 24,
10 1997.  And I clearly advised them that they needed
11 to proceed with UL approvals before I could move the
12 tooling.
13     Q.  And they did -- did they ever do that?
14     A.  It is obvious by that statement that they
15 would need to take plastic components that I could
16 supply them, and they would have to build samples
17 for that UL submittal.
18     Q.  Did they ever do that?
19     A.  No.
20     Q.  Let's move on to iron products 4014 and
21 4015, did Pentalpha ever bid on those products?
22     A.  No.
23     Q.  The rice cooker and RS models 0506, 07,
24 1525, 26 and 27, did Pentalpha ever bid on those?
25     A.  Yes.

20

1      Q.  Did Sunbeam ever purchase those products
2  from Pentalpha?
3      A.  No.
4      Q.  Why not?
5      A.  Their prices were higher than the prices
6  we had from the current supplier.
7      Q.  Do you recall how much higher?
8      A.  I don't recall except in my memo of
9  December 24 it indicates the prices were
10 substantially higher.
11     Q.  Let's skip rotisseries for a moment and
12 turn to toaster ovens, products 4831 4857, 4877 and
13 4878.  Did Pentalpha ever bid on those?
14     A.  No.
15     Q.  Now, let's go back to rotisserie products
16 4780 and 4783, did Pentalpha bid on those?
17     A.  Yes.
18     Q.  Did Sunbeam ever purchase those products
19 from Pentalpha?
20     A.  No.
21     Q.  Why not?
22     A.  Again, as indicated in my December 24,
23 1997 status memo, we needed to wait until January
24 1998 because we had current outstanding orders that
25 had to be completed.  We couldn't stop the

5 (Pages 17 to 20)

**21**

1 production run. By the time January or February,
2 whenever it was came around, I don't recall what
3 happened at that point. I know we were not moving
4 forward at that point.
5     Q. Were there issues with Pentalpha's
6 performance by early 1998 that had anything to do
7 with the transfer of the rotisserie?
8     A. There were several issues between Sunbeam
9 and Pentalpha separate from this agreement.
10     Q. And what were those issues?
11     A. We had substantial issues related to
12 litigation costs for patent litigation related to
13 the food steamers that we were purchasing from
14 Pentalpha. Long outstanding issues related to
15 Pentalpha not reimbursing Sunbeam's financial cost
16 of the litigations that they were responsible for.
17     In addition to that, we had a major issue
18 with air freight costs for shipment of deep fryers
19 in late 1997, that Pentalpha was responsible for
20 reimbursing to Sunbeam that was not being addressed
21 by Pentalpha.
22     Q. Was there any concern in the early part of
23 1998 about Pentalpha's failure to bid or failure to
24 have adequate transfer plans for the other
25 appliances?

**22**

1     MR. DUNNEGAN: Object to the form.
2 BY MR. BYMAN:
3     Q. The other appliances that we have been
4 talking about other than rotisserie?
5     A. Well, I continued to have concerns that
6 we needed an appropriate plan to transfer those
7 products they did bid on, did provide quotes on that
8 were acceptable quotes because their plans were not
9 what I felt was reasonable, reasonable transfer
10 plans.
11     Q. Let me show you what we've marked as SB-4
12 for identification, production numbers SB 000070 and
13 71. Can you identify that?
14     A. Yes, this is a memo that I wrote to John
15 Sham of Pentalpha, January 29, 1998. It's listing
16 several issues between our companies that were
17 very concerned about and needed to be addressed.
18     Q. Let me show you what we've marked as
19 Exhibit SB-5 for identification, production numbers
20 SB 000062 and 63. Would you identify that?
21     A. This is a memo written to John Sham again
22 dated February 5, 1998, stating our stance on the
23 fact that these outstanding issues must be
24 addressed.
25     Q. In the second paragraph of Exhibit SB-5,

**23**

1 you state, "there will not be any communications
2 from Sunbeam to Pentalpha on any issues or ongoing
3 business until such time as you personally contact
4 Sunbeam George Timchal to resolve the litigation
5 expenses."
6     Were the litigation expense issues
7 resolved?
8     A. They have not been resolved to this day.
9     MR. BYMAN: Thank you, Mr. Nugent, that's
10 all I have.
11     THE WITNESS: Is it appropriate to note
12 either on the record or off the record that I
13 do have pretty severe jet lag, and so the mind
14 is a little cloudy and it may take me longer to
15 answer questions than if I didn't have this jet
16 lag.
17     MR. BYMAN: Sure.
18     MR. DUNNEGAN: That's a great place to
19 start.
20     CROSS EXAMINATION
21 BY MR. DUNNEGAN:
22     Q. Did you come to Florida for this
23 deposition?
24     A. Yes.
25     Q. Did you have any other business purpose

**24**

1 other than this deposition?
2     A. No.
3     Q. And when did you arrive?
4     A. I arrived in Miami about 10:00 p.m. Sunday
5 night.
6     Q. And the difference between Hong Kong and
7 Miami time is approximately how many hours?
8     A. 13 hours.
9     Q. And you mentioned earlier that you were
10 jet lagged?
11     A. Um-hum.
12     Q. Do you feel well enough to testify at this
13 point?
14     A. Absolutely.
15     Q. If we get to the point where you get tired
16 and you don't feel like you can testify to the best
17 of your ability, will you tell me that?
18     A. I certainly will.
19     Q. If I ask a question that you don't
20 understand, will you tell me that also?
21     A. Absolutely.
22     Q. And if you want to take a break at any
23 point, will you tell me that?
24     A. Yes.
25     Q. Let me call your attention back to what

6 (Pages 21 to 24)

**25**

1   Mr. Byman has marked as SB-1. Do you recall when
2   that document was signed by you?
3     A. Approximately October, I believe it was
4   October 22, 1997.
5     Q. Where were you when you signed that
6   document?
7     A. Delray Beach, Florida.
8     Q. And was Mr. Timchal with you at that time?
9     A. Yes.
10     Q. When you signed that document, had it
11   already been signed by Mr. Sham?
12     A. Yes.
13     Q. Do you know how long you had had a version
14   of this document executed by Mr. Sham before
15   Mr. Timchal executed it and you executed it?
16     A. They both signed it in the same room at
17   the same time.
18     Q. Mr. Sham was in Florida for the signing of
19   this document?
20     A. Yes.
21     Q. As were you?
22     A. Yes.
23     Q. And it was done at Sunbeam's office?
24     A. Yes.
25     Q. Do you keep time sheets at the present

**26**

1   time?
2     A. No.
3     Q. Did you keep time sheets back in the
4   October 97 time frame?
5     A. Time sheets, no, I keep, I keep on my desk
6   a calendar, old meetings and notes or general notes.
7     Q. And each book I take it is for a one-year
8   time period?
9     A. Yes.
10     Q. I take it you still have your 2000 book?
11     A. 2000 book, yes.
12     Q. And you probably have your 1999 book also?
13     A. Yes.
14     Q. Do you know whether you have your '98 and
15   '97 books?
16     A. Yes, I do.
17     Q. And where are they located?
18     A. Hong Kong.
19     Q. And you regularly keep scheduled
20   appointments in those books?
21     A. Yes.
22     Q. Do you make logs of telephone calls?
23     A. No, I don't.
24     Q. Do you use e-mail?
25     A. Yes.

**27**

1     Q. When did you begin using e-mail?
2     A. 1995.
3     Q. And I take it in addition to using e-mail,
4   you also use telecopy to communicate with people?
5     A. Telecopy?
6     Q. Facsimile?
7     A. Yes.
8     Q. To communicate internally with other
9   employees of Sunbeam, do you usually use telecopy or
10   do you usually use e-mail today?
11     A. E-mail unless it requires pictures,
12   sketches, drawings, etc.
13     Q. Was the same true back in the October '97
14   time frame?
15     A. Yes.
16     Q. Now, before about October 22 of 1997, when
17   the document marked as SB-1 was signed, do you know
18   whether or not Sunbeam provided Pentalpha with any
19   sales projections of the units which were set forth
20   on Exhibit A to the agreement?
21     A. I'm not aware.
22     Q. If I could call your attention to SB-3.
23     A. Yes.
24     Q. I guess it's the third paragraph down
25   which says yes, we are unable to match your price as

**28**

1   your sales projection of October 24, 1997, much less
2   than initial forecast 170,000 pieces annually, do
3   you see that?
4     A. Yes.
5     Q. Do you know what that initial forecast
6   refers to?
7     A. No, I don't.
8     Q. Where are you staying this trip?
9     A. The Sheraton Hotel.
10     Q. Did you ever stay at the Boca Marriott?
11     A. Is that the one at Town Center?
12     Q. Yes, it is.
13     A. Yes, I have stayed there.
14     (Thereupon, Defendant's Exhibit No. A was
15   marked for identification.)
16   BY MR. DUNNEGAN:
17     Q. Let me show you a document which I've
18   marked as Exhibit A, which bears production No. SB
19   000297. Before today's deposition, have you ever
20   seen that document?
21     A. I think I have.
22     Q. When have you seen it?
23     A. I don't recall.
24     Q. Did you see it in preparation for today's
25   deposition?

7 (Pages 25 to 28)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SEB S.A., | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SUNBEAM CORP. SUNBEAM PRODUCTS, INC., | ) |
| WING SHING INT'L LTD. (BVI), and | ) |
| PENTALPHA ENTERS., LTD., | ) |
| | ) |
|      Defendants. | ) |
| ————————————————— | ) |
| | ) |
| SUNBEAM CORP., SUNBEAM PRODUCTS, INC., | ) |
| | ) |
|      Third-Party Plaintiffs/Counterdefendants, | ) |
| | ) |
| v. | ) |
| | ) |
| WING SHING INT'L, LTD. (BVI), and | ) |
| GLOBAL-TECH APPLIANCES, INC., | ) |
| | ) |
|      Third-Party Defendants, and | ) |
| | ) |
| PENTALPHA ENTERS., LTD., | ) |
| | ) |
|      Third-Party Defendant/Counterclaimant. | ) |

Civil Action No.
98-1050 (WGB)

| | |
|---|---|
| State of Florida | ) |
| County of Palm Beach | ) |

## AFFIDAVIT OF ALAN W. LaFEVRE

Alan W. LaFevre, being first duly sworn on oath, states as follows:

1.     I am the Senior Vice President and Chief Financial Officer for Sunbeam Products, Inc. I received a B.S. degree in Accounting from Valparaiso University and have been employed at Sunbeam Corporation for 4-1/2 years. I received my CPA license in 1983.

2.     It is my understanding that from the years 1998 to 2000, Sunbeam's total domestic Household manufacturing purchases remain relatively steady.

3.     In 1998, domestic Household purchases at standard inventory cost totaled $441.8 million.

4.     In 1999, domestic Household purchases at standard inventory cost totaled $440.0 million.

5.     In 2000, domestic Household purchases at standard inventory cost totaled $410.2 million.  The purchases for this year is down from 1999 due to licensing of retail clipper business ($26 million in 1998 and 1999) and cost reductions from outsourcing.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct.


*(signature)*

Alan W. LeFevre


Executed on this 22 day of October, 2001.


Subscribed and sworn to before me this 22 day of October, 2001.


*(signature)*

Notary Public

Tina L. Robinson
MY COMMISSION # CC773158 EXPIRES
October 25, 2002
BONDED THRU TROY FAIN INSURANCE, INC.


-2-

SEB S.A.,                              )     UNITED STATES DISTRICT COURT
                                       )     DISTRICT OF NEW JERSEY
        Plaintiffs,                    )
                                       )     Hon. Madeline Cox Arleo
    -vs-                               )
                                       )     Civil Action No. 98-1050 (WGB)
SUNBEAM CORP. SUNBEAM                  )
PRODUCTS, INC., WING SHING)
INT'L LTD. (BVI), and                  )
PENTALPHA ENTERS., LTD.,               )
                                       )
        Defendants,                    )
                                       )                    ORDER
                                       )
SUNBEAM CORP. SUNBEAM                  )     FILED
PRODUCTS, INC.,                        )
                                       )     MAY 24 2002
        Third-Party Plaintiffs         )
        and Counter-defendants,        )     AT 8:30 ............... M
                                       )        WILLIAM T. WALSH
    -vs-                               )             CLERK
                                       )
WING SHING INT'L LTD. (BVI),)
and GLOBALTECH APPLIANCES,             )
INC.                                   )
                                       )
        Third-Party Defendants,        )        ENTERED
        and                            )             ON
                                       )          THE DOCKET
PENTALPHA ENTERS., LTD.,               )         5/28 2002
                                       )
        Third-Party Defendant and)
        Counter-claimant.              )        WILLIAM T. WALSH, CLERK
                                       )     By _____
                                                      (Deputy Clerk)

And now, this 23 day of May, 2002, upon consideration of the
motion of defendant GlobalTech Appliances, Inc.'s ("GlobalTech")
motion to dismiss for lack of personal jurisdiction and Sunbeam
Corporation/Sunbeam Products, Inc.'s ("Sunbeam") reply; and third-
party plaintiffs Sunbeam's motion to transfer venue to the Southern
District of Florida; Pentalpha Enterprise Ltd.'s and GlobalTech's
opposition; Sunbeam's reply; and having heard the arguments of
counsel; and for good cause shown; it is hereby:

    ORDERED that GlobalTech's motion to dismiss for lack of

22

Docket as of September 4, 1999 8:09
am

# U.S. District Court

# Northern District of Illinois (Chicago)

# CIVIL DOCKET FOR CASE #: 95-CV-7488

# HP Intellecutal Corp, et al v. Sunbeam Prod Inc

Filed: 12/20/95
Assigned to: Hon. John A. Nordberg
Jury demand: Plaintiff
Demand: $0,000
Nature of Suit: 830
Lead Docket: None
Jurisdiction: Federal Question
Dkt# in other court: None
Cause: 28:1338 Patent Infringement

BLACK & DECKER INC
   plaintiff
  [term  10/08/98]

Raymond P. Niro
 [term  10/08/98]
[COR LD NTC A]
Robert Anthony Vitale, Jr.
 [term  10/08/98]
[COR]
Dean D. Niro
 [term  10/08/98]
[COR]
Niro, Scavone, Haller & Niro,
Ltd.
181 West Madison Street
Suite 4600
Chicago, IL 60602
(312) 236-0733
James P. Murphy
 [term  10/08/98]
[COR]
McAndrews, Held & Malloy, P.C.
Northwestern Atrium Center
500 West Madison Street
Suite 3400
Chicago, IL 60661
(312) 707-8889

HP INTELLECTUAL CORP.
   plaintiff
HOUSEHOLD PRODUCTS, INC.
   plaintiff
   v.
SUNBEAM PRODUCTS, INC.
   defendant

Kenneth J. Jurek
[COR LD NTC A]
Rosanne J. Faraci
[COR]
John G Bisbikis

```
                              [COR]
                              McDermott, Will & Emery
                              227 West Monroe Street
                              Suite 3100
                              Chicago, IL 60606-5096
                              (312) 372-2000
                              Rochelle Secemsky Dyme
                               [term  05/01/97]
                              [COR]
                              Lawrence R. Levin
                               [term  05/01/97]
                              [COR LD NTC A]
                              Vance L. Liebman
                               [term  05/01/97]
                              [COR]
                              Levin & Funkhouser, Ltd.
                              55 West Monroe Street
                              Suite 2410
                              Chicago, IL 60603
                              (312) 701-6800
                              Michael Joseph Kline  .
                              [COR NTC]
                              Paul D. Bangor, Jr.
                              [COR]
                              Thorp, Reed & Armstrong
                              One Riverfront Center
                              Pittsburgh, PA 15222
                              (412) 394-7725
                              Paul J Farrell
                               [term  05/01/97]
                              [COR NTC]
                              Peter DeLuca
                               [term  05/01/97]
                              [COR]
                              Dilworth & Barrese
                              333 Earle Ovington Boulevard
                              Uniondale, NY 11553
                              (516) 228-8484
SUNBEAM PRODUCTS, INC.        Rochelle Secemsky Dyme
   counter-claimant            [term  05/01/97]
                              [COR]
                              Lawrence R. Levin
                               [term  05/08/97]
                              [COR LD NTC A]
                              Vance L. Liebman
                               [term  05/01/97]
                              [COR]
                              Levin & Funkhouser, Ltd.
                              55 West Monroe Street
                              Suite 2410
                              Chicago, IL 60603
                              (312) 701-6800
                              Michael Joseph Kline
                              [COR NTC]
                              Paul D. Bangor, Jr.
                              [COR]
                              Thorp, Reed & Armstrong
                              One Riverfront Center
                              Pittsburgh, PA 15222
                              (412) 394-7725
      v.
BLACK & DECKER INC            Raymond P. Niro
   counter-defendant           [term  10/08/98]
  [term  10/08/98]            [COR LD NTC A]
```

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BLACK & DECKER INC.,            )
                                )
                Plaintiff,      )
                                )
        v.                      )     Civil Action No.
                                )
SUNBEAM PRODUCTS, INC.,         )     JURY TRIAL DEMANDED
                                )
                Defendant.      )

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Black & Decker Inc. ("Black & Decker"), complains of defendant, Sunbeam Products, Inc., formerly known as The Sunbeam Corporation and Sunbeam-Oster Co., Inc., and also doing business as Sunbeam Household Products and Sunbeam-Oster Household Products ("Sunbeam"), as follows:

1.    This is a claim for patent infringement and arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has jurisdiction over the subject matter of this claim under 28 U.S.C. § 1338(a).

2.    Plaintiff Black & Decker is a Delaware corporation, having a place of business at 701 East Joppa Road, Towson, Maryland 21286.

3.    Defendant Sunbeam is a Delaware corporation licensed to do business in this judicial district and which conducts substantial business in this judicial district, including that which it conducts through its principal offices and executive and administrative headquarters located in Schaumburg, Illinois.

4.    Black & Decker owns and has standing to sue for infringement of United States Patent No. 5,097,753, entitled "Steam

Cooking Utensil," which was duly and legally issued on March 24, 1992 ("the patent in suit") (Exhibit A).

5. Sunbeam has infringed the patent in suit by making, using and/or selling devices embodying the inventions claimed in the patent in suit, including its "Food Steamer/Rice Cooker" product, in this judicial district and elsewhere.

6. Venue in this judicial district is proper under 28 U.S.C. § 1400(b).

7. Sunbeam has been given actual and/or constructive notice of the patent in suit.

8. Sunbeam's infringement of the patent in suit is believed to be and to have been willful, intentional, deliberate and with full knowledge of the patent in suit.

9. Such infringement has caused, is causing and will continue to cause Black & Decker irreparable damage and injury unless and until it is enjoined by this Court.

WHEREFORE, Black & Decker prays for judgment against Sunbeam, and all persons in active participation with it, as follows:

A. Entry of a preliminary and permanent injunction prohibiting Sunbeam from further acts of infringement of the patent in suit;

B. An award to Black & Decker of such damages as it shall prove at trial against Sunbeam adequate to compensate Black & Decker for Sunbeam's infringement, but in no event less than a reasonable royalty;

C. An award to Black & Decker of all the damages so

- 2 -

determined and as provided for pursuant to 35 U.S.C. §§ 284 and 285, together with prejudgment interest;

     D.   An award to Black & Decker of its costs and reasonable attorneys' fees; and,

     E.   Such other and further relief as this Court and/or a jury may deem proper and just.

<div align="center">

**JURY DEMAND**

</div>

Plaintiff Black & Decker demands a trial by jury.

Raymond P. Niro
Robert A. Vitale, Jr.
Dean D. Niro
James P. Murphy
NIRO, SCAVONE, HALLER & NIRO
181 West Madison, Suite 4600
Chicago, Illinois  60602
(312) 236-0733

Attorneys for Plaintiff,
Black & Decker Inc.

<div align="center">

- 3 -

</div>

# United States Patent [19]

**Naft**

[11] **Patent Number:** **5,097,753**

[45] **Date of Patent:** **Mar. 24, 1992**

[54] **STEAM COOKING UTENSIL**

[75] Inventor: **Stuart Naft**, Stratford, Conn.

[73] Assignee: **Black & Decker Inc.**, Newark, Del.

[21] Appl. No.: **712,816**

[22] Filed: **Jun. 10, 1991**

[51] Int. Cl.⁵ ............................................. A47J 27/04

[52] U.S. Cl. .......................................... 99/341; 99/415;
99/417; 99/446; 99/450; 126/369; 219/401

[58] Field of Search ................. 99/339, 341, 345, 346,
99/410–418, 450, 448, 467, 473, 483, DIG. 15;
126/369; 219/401; 426/510

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 222,296 | 12/1879 | McMurray | 126/369 |
| 1,228,816 | 6/1917 | Peterson et al. | 99/450 |
| 1,651,442 | 12/1927 | Caskin | 126/369 |
| 2,145,263 | 1/1939 | Huntzinger et al. | 126/369 |
| 2,622,591 | 12/1952 | Bramberry | 126/369 |
| 3,314,358 | 4/1967 | Burns | 99/415 |
| 4,509,412 | 4/1985 | Whittenburg et al. | 99/413 |
| 4,676,151 | 6/1987 | Gorsuch et al. | 99/450 |
| 4,702,160 | 10/1987 | Manganese | 99/417 |

| | | | |
|---|---|---|---|
| 4,739,698 | 4/1988 | Allaire | 99/410 |
| 4,920,251 | 4/1990 | Whitenack et al. | 219/401 |

**FOREIGN PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 229565 | 2/1925 | United Kingdom | 99/417 |

*Primary Examiner*—Timothy F. Simone
*Attorney, Agent, or Firm*—Barry E. Deutsch

[57] **ABSTRACT**

A steam cooking utensil includes a base, a boiling liquid reservoir defined by the base, and a heater mounted in the base to heat liquid in the boiling liquid reservoir. A drip ring is supported in the base above the liquid reservoir. A cooking bowl is supported by the base and includes a bottom tray having an imperforate surface and a food support surface extending radially outwardly from the imperforate surface. The food support surface is defined by a plurality of alternating hill-like ridges and valley-like channels extending radially outwardly in concentrically spaced rings. The food support surface includes a plurality of vent holes for enabling steam generating in the reservoir to flow into the cooking bowl.

**8 Claims, 2 Drawing Sheets**





EXHIBIT

A

EXHIBIT 16