

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 02-CV-80527-CIV-RYSKAMP
Magistrate Judge Vitunac

SEB S.A.,

                                        Plaintiff,

        v.

SUNBEAM CORP., SUNBEAM PRODUCTS,
INC., WING SHING INT'L LTD. (BVI), and
PENTALPHA ENTERPRISES, LTD.,

                        Defendants.

_____

SUNBEAM CORP., SUNBEAM PRODUCTS, INC.,

        Third Party Plaintiffs/Counterdefendants,

                v.

WING SHING INTERNATIONAL LTD. (BVI),
and GLOBAL-TECH APPLIANCES, INC.,

        Third Party Defendants, and

PENTALPHA ENTERPRISES, LTD.,

        Third Party Defendant/Counterclaimant.

_____

MEMORANDUM OF GLOBAL-TECH APPLIANCES, INC. AND
PENTALPHA ENTERPRISES, LTD. IN OPPOSITION TO THE
MOTION OF SUNBEAM FOR SUMMARY JUDGMENT

William Dunnegan  (Pro hac vice)          John D. Boykin (Florida Bar No. 464406)
Ronald L. Zaslow (Pro hac vice)           BOOSE CASEY CIKLIN LUBITZ
PERKINS & DUNNEGAN                         MARTENS MCBANE & O'CONNELL
45 Rockefeller Plaza                       Northbridge Center, 19th Floor
New York, New York 10111                   515 North Flager Drive
(212) 332-8300                             West Palm Beach, Florida 33402
                                           (561) 832-5900

## Table of Contents

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

I.   SUNBEAM IS NOT ENTITLED TO SUMMARY JUDGMENT
     AGAINST PENTALPHA ON EITHER OF ITS INDEMNIFICATION
     CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

     A.   There Is A Genuine Issue Of Fact As To Whether Pentalpha
          Owes Sunbeam Any Money With Respect To The Food
          Steamer Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     B.   There Is A Genuine Issue Of Fact As To Whether
          Pentalpha Has Any Obligation To Provide Indemnity
          With Respect To The Deep Fryer . . . . . . . . . . . . . . . . . . . . . . . . . . .7

II.  SUNBEAM IS NOT ENTITLED TO SUMMARY JUDGMENT
     ON PENTALPHA'S CLAIMS FOR BREACH OF CONTRACT . . . . . . 10

     A.   Sunbeam Breached Its Obligation To
          Purchase Most Of The "New" Products
          On Schedule A From Pentalpha . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     B.   Sunbeam Breached Its Obligation
          To Purchase Certain "Existing" Products
          On Schedule A From Pentalpha . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     C.   Sunbeam Breached The Supply Agreement Because It
          Was Negotiating Rebates With The Suppliers That
          The Supply Agreement Required Sunbeam To Cut-off . . . . . . . .20

     D.   Sunbeam Has Admitted That It Did Not
          Perform The Supply Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . .21

III. SUNBEAM IS NOT ENTITLED TO SUMMARY JUDGMENT ON
     PENTALPHA'S CLAIMS FOR FRAUD IN THE INDUCEMENT . . . . .21

     A.   Pentalpha's Fraud Claim Concerning Sunbeam's
          Financial Condition Presents Genuine Issues
          Of Material Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

     B.   Pentalpha's Fraud Claim Concerning Sunbeam's Intent
          Not To Perform The Supply Agreement Presents Genuine
          Issues Of Material Fact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

IV.      SUNBEAM IS NOT ENTITLED TO SUMMARY JUDGMENT
         ON PENTALPHA'S CLAIM FOR FRAUD AFTER THE
         EXECUTION OF THE SUPPLY AGREEMENT . . . . . . . . . . . . . . . . . .31

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

<u>Table of Authorities</u>

<u>Allen v. Stephan Co.</u>,
784 So.2d 456 (Fla. Dist. Ct. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

<u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 255, 106 S. Ct. 2505 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

<u>Barnes v. Burger King Corp.</u>,
932 F. Supp. 1420  (S.D. Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

<u>Bradley v. Health Coalition, Inc.</u>,
687 So.2d 329 (Fl. Ct. App. 3d Dis. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

<u>Dantzler Lumber & Export Co. v. Bullington Lumber Co.</u>,
968 F. Supp. 1543 (M.D. Fla. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>Davis v. McDonald's Corp.</u>,
44 F. Supp.2d 1251 (N.D. Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .31

<u>Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.</u>,
1999 U.S. Dist. LEXIS 22434 (S.D. Fla. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

<u>Florida Power and Co. v. Westinghouse Electric Corp.</u>,
510 So.2d 899  (Fla. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

<u>Florida Software Sys. v. Columbia/HCA Healthcare Corp.</u>,
46 F. Supp.2d 1276 (M.D. Fla. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

<u>Gilchrist Timber Co. v. ITT Rayonier</u>,
127 F.3d 1390 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23, 25

<u>Golden v. Mobil Oil Corporation</u>,
882 F.2d 490 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

<u>Herzog v. Castle Rock Entertainment</u>,
193 F.3d 1241 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

<u>Hotels of Key Largo v. RHI Hotel, Inc.</u>,
694 So.2d 74, (Fla. Dist. Ct. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

<u>HTP, Ltd. v. Lineas Costarricenses</u>,
685 So.2d 1238 (Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

In re Firestone,
26 B.R. 706 (Bankr. S.D. Fla. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Jankovich v. Bowen,
844 F. Supp. 743 (S.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Johnson v. Davis,
480 So.2d 625 (Fla. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.,
162 F.3d 1290 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Madaus v. November Hill Farm, Inc.,
630 F.Supp. 1246 (W.D. Va. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Noack v. Blue Cross & Blue Shield, Inc.,
742 So.2d 433 (Fla. Dist. Ct. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 29

Ortiz v. Orchid Springs Dev. Corp.,
504 So.2d 510 (Fla. Dist. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .26

Raney v. Vinson Guard Service, Inc.,
120 F.3d 1192 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Saunders Leasing Sys., Inc. v. Gulf Cent. Dist.,
513 So.2d 1303 (Fla. Dist. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Schubot v. McDonalds Corporation,
757 F. Supp. 1351 (S.D. Fla. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Sunchase Apartments v. Sunbelt Service Corp.,
596 So.2d 119 (Fla. Dist. Ct. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

TSC Industries, Inc. v. Northway, Inc.,
426 U.S. 438, 96 S.Ct. 2126 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Warren v. Olco Oil Co.,
1988 U.S. Dist. LEXIS 3236 (N.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7, 8

Windsor Industries, Inc. v. EACA International Ltd.,
548 F. Supp. 635 (E.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

### Rules and Statutes

Federal Rule of Civil Procedure 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

UCC § 2-312(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

Third-Party Defendant Global-Tech Appliances, Inc. ("Global-Tech") and Third-Party Defendant/Counterclaimant Pentalpha Enterprises, Ltd. ("Pentalpha") respectfully submit this memorandum in opposition to the motion of plaintiffs Sunbeam Corporation and Sunbeam Products, Inc. (collectively, "Sunbeam") for summary judgment.

## Preliminary Statement

In July 1996, a financially struggling Sunbeam hired celebrated turnaround expert Al Dunlap as its CEO. To create the public appearance of a turnaround, "Chainsaw Al" closed factories and slashed jobs. He promised to deliver improved earnings per share, expecting that Wall Street would react favorably. Dunlap did announce improved earnings and Wall Street did react, sending Sunbeam's shares from about $10 at the time of Dunlap's hiring to over $50 by the Fall of 1997.

Dunlap's turnaround, however, was an accounting fraud. Dunlap and his cohorts had simply cooked the books and, according to Sunbeam's present CEO, created a "culture" in which "doing the wrong thing was perfectly acceptable." (Dunnegan Dec. Ex. B at 163/23-164/3)

By March of 1998, the scheme began to unravel. Even Dunlap's simultaneous acquisition of three public companies at the end of March 1998 could not mask Sunbeam's fraud. Sunbeam's shares plummeted in the Spring of 1998 to below $10. In June 1998, Sunbeam's Board fired Dunlap.

Current management immediately took control. In October 1998, based upon a report of Arthur Andersen, Sunbeam significantly restated its earnings for the last

quarter of 1996, all of 1997 and the first quarter of 1998.  By its restatement, Sunbeam effectively admitted its own fraud.

Sunbeam's fraud damaged not only its shareholders, but also Pentalpha. Sunbeam and Pentalpha executed a product supply agreement on October 23, 1997, dated as of July 1, 1997 ("Supply Agreement").  In exchange for Pentalpha's up front payment of $1 million, that flowed directly to Sunbeam's bottom line, Sunbeam agreed to make Pentalpha its exclusive supplier of certain household products.  Pentalpha believed that this Supply Agreement represented tens of millions of dollars in new business annually.

Sunbeam, however, soon breached the Supply Agreement. Despite its obligations, Sunbeam failed to (i) supply samples for ultrasonic humidifiers and handmixers, (ii) transfer tooling for coffeemakers, garment steamers and rotisseries, and (iii) respond to Pentalpha's bids on irons and rice cookers.  After accepting Pentalpha's $1 million rebate, Sunbeam purchased those household products from whomever it pleased.

The evidence demonstrates that Sunbeam never intended to purchase those products exclusively from Pentalpha, but signed the Supply Agreement a part of a broader scheme to shake down all of its suppliers for rebates that would puff-up its earnings.  At the same time the Supply Agreement required Sunbeam to transfer tooling to Pentalpha from its existing suppliers, Sunbeam was soliciting rebates from those same suppliers.  As of March 31, 1998, Sunbeam had a received a $1 million rebate from its existing supplier of handmixers and a $1 million rebate from its existing supplier of rotisseries.  If Sunbeam instructed them to transfer tooling to Pentalpha, those suppliers might have refused to pay the $1 million dollar rebates.  This was another result of a

2

"culture" in which "doing the wrong thing was perfectly acceptable." (Dunnegan Dec.
Ex. B at 163/23-164/3)

Pentalpha discussed a possible resolution of the matter with Sunbeam's
new management. Those discussions proved fruitless. Pentalpha counterclaimed in the
existing patent infringement action on December 15, 1999, alleging that Sunbeam
breached the Supply Agreement and defrauded Pentalpha in connection with it.
Substantial discovery had occurred by early 2001. Sunbeam, however, filed for
bankruptcy protection on February 6, 2001. The Bankruptcy Court lifted the stay by
order dated July 24, 2001.

The District Court in New Jersey allowed Sunbeam to move for summary
judgment, although Pentalpha objected because discovery was not complete. Sunbeam
served its motion on October 24, 2001. The Court scheduled oral argument on January
10, 2002, on that motion, as well as Sunbeam's motion to transfer filed on or about April
15, 2000. By order dated May 28, 2002, the Magistrate Judge granted Sunbeam's motion
to transfer the action to this District, but did not address the merits of the case.

Sunbeam filed a new set of motion papers in this Court on July 18, 2002.
While voluminous, Sunbeam's papers do not contain a single affidavit in support of its
motion.

### Statement of Facts

A reasonable jury could find the facts set forth in the accompanying
declarations of John C.K. Sham and William Dunnegan.

<u>Argument</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment

is appropriate only when the moving party can demonstrate that "there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law."

See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S.Ct. 2505, 2511 (1986); <u>Raney</u>

<u>v. Vinson Guard Service, Inc.</u>, 120 F.3d 1192, 1196 (11th Cir. 1997) ("At the summary

judgment stage, the court's function is not to weigh the evidence to determine the truth of the

matter, but to determine whether a genuine issue exists for trial.").

To support a motion for summary judgment, a party with the burden of

proof at trial on an issue must offer admissible evidence demonstrating that there is no

genuine issue of material fact as to that issue. Without offering evidence, that party

cannot shift to its adversary the burden of disproving the claim.   In <u>Herzog v. Castle</u>

<u>Rock Entertainment</u>, 193 F.3d 1241, 1246 (11th Cir. 1999), the Court of Appeals stated:

> "Moreover, the party opposing a motion for  summary judgment need not
> respond to it with any affidavits or other evidence unless and until the
> movant has properly supported the motion with sufficient evidence.... The
> moving party must demonstrate that the facts underlying all relevant legal
> questions raised by the pleadings or otherwise are not in dispute or else
> summary judgment will be denied notwithstanding that the non-moving
> party has introduced no evidence whatsoever."

I.

### SUNBEAM IS NOT ENTITLED TO SUMMARY JUDGMENT
### AGAINST PENTALPHA ON EITHER OF ITS INDEMNIFICATION CLAIMS

A.                   There Is A Genuine Issue Of Fact As To Whether Pentalpha
                     <u>Owes Sunbeam Any Money With Respect To The Food Steamer Claim.</u>

Pentalpha does not dispute, and has never disputed, that it has a

contractual obligation to indemnify Sunbeam for the expenses, including attorneys' fees,

4

for defending the patent infringement claims of Black & Decker and Rival concerning the food steamer. The only issue is whether Pentalpha has paid Sunbeam the full amount due.

Sunbeam has failed to present a prima facie case as to the amount due. Sunbeam has offered no admissible evidence that Pentalpha owes any amount concerning the food steamer. Sunbeam has not provided the Court with any bills, checks, or other documents indicating the costs that Sunbeam incurred in defending the lawsuits concerning the food steamer. Instead, Sunbeam submits its answers to interrogatories verified by its Intellectual Property Counsel, Steven Berreth. Mr. Berreth's verification, however, does not properly support Sunbeam's summary judgment motion. Rule 56(e) states: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Mr. Berreth's verification acknowledges that "...certain of the matters stated in the answers to interrogatories are not within his personal knowledge..." (Sunbeam's Appendix, Ex. 8, penultimate page)

Sunbeam has not consistently stated the amount of its claim for indemnification with respect to the food steamer cases. Based upon its answers to interrogatories served October 17, 2000, Sunbeam claims $1,351,392. (Sunbeam Appendix Ex. 8 at 6) Yet, Sunbeam initially answered the same interrogatory on September 1, 2000, stating:

"Response to Interrogatory No. 1:

Subject to the above-stated General Objections, Sunbeam states it is still incurring expenses for which it will seek indemnification from Pentalpha, and as such Sunbeam reserves the right to supplement its response to this interrogatory at the appropriate time. Based on information reasonably

5

available, Sunbeam intends to seek indemnification from Pentalpha of the following amounts for the following cases.

Rival / Black & Decker v. Sunbeam: $1,096,818.95

Black & Decker v. Sunbeam:         $  28,362.65"

(Dunnegan Dec. Ex. K)  Within 60 days, Sunbeam's statement of the amounts that it incurred defending the food steamer cases differed by $226,210.40.

Sunbeam's motion also fails to credit Pentalpha for amounts that Pentalpha paid Sunbeam in connection with the food steamer cases.  Pentalpha credited Sunbeam at least $579,043.10 for the food steamer cases.  (Sham Dec. Ex. N)  Pentalpha has attempted to discover Sunbeam's evidence concerning the amount Pentalpha paid, but Sunbeam has refused to provide it.  Pentalpha propounded the following interrogatory to Sunbeam and received the following response.

"Interrogatory No. 3.  State in detail all amounts that you admit Pentalpha paid or credited to Sunbeam with respect to each of the following cases:

Rival v. Sunbeam;

Black & Decker v. Sunbeam; and

SEB v. Sunbeam.

Response to Interrogatory No. 3   In addition to the above-stated General Objections, Sunbeam states that the burden of proving any credits against the amounts sought by Sunbeam for indemnification is Pentalpha's burden, not Sunbeam's.  As such, Sunbeam objects to Interrogatory No. 3 to the extent that the interrogatory does nothing more than seek to compel Sunbeam to perform a substantive review and coding for Pentalpha of the documents Sunbeam is producing or already has produced.  The burden of reviewing those produced documents is equal upon Pentalpha and Sunbeam." (Sunbeam Appendix, Ex. 8 at 7)

Accordingly, there is a genuine issue of fact as to the amount, if any, that Pentalpha owes Sunbeam in connection with the food steamer.

6

B.          There Is A Genuine Issue Of Fact As To
Whether Pentalpha Has Any Obligation To
<u>Provide Indemnity With Respect To The Deep Fryer.</u>

Unlike the food steamers, Sunbeam and Pentalpha did not have a written contract concerning deep fryers. Sunbeam nevertheless argues that Pentalpha has an obligation to indemnify it for SEB's claim of patent infringement based upon (i) the indemnity language on the back of some, but not all, of Sunbeam's purchase orders, and (ii) the UCC.

1.          There Is An Issue Of Fact As To Whether
Pentalpha Has A Contractual Obligation To
<u>Indemnify Sunbeam With Respect To The Deep Fryer.</u>

Sunbeam has offered 17 separate purchase orders annexed as Exhibit 10 to the Appendix to Sunbeam's motion. (Sunbeam's Appendix, Ex. 10) Thirteen of those purchase orders contain no indemnification language. Accordingly, Sunbeam has no claim for indemnification based upon deep fryers that Pentalpha sold pursuant to these thirteen purchase orders. The remaining four purchase orders purport to contain indemnification language on their second page. Sunbeam has offered no admissible evidence, however, that it transmitted the second page of these purchase orders to Pentalpha.

2.          There Is An Issue Of Fact As To Whether
Pentalpha Has An Obligation Under The UCC To
<u>Indemnify Sunbeam With Respect To The Deep Fryer.</u>

Sunbeam has offered no evidence or argument that the UCC applies to the sales of deep fryers manufactured in Asia. Courts will not apply the UCC to transactions which predominantly occur outside the United States. <u>George E. Warren Corp. v. Olco Oil Co.</u>, 1988 U.S. Dist. LEXIS 3236 at *12-*19 (N.D.N.Y. 1988) (applying Quebec law

where the contract's anticipated performance, defendant's place of business, the issuance of the letter of credit to pay for the goods, and issues concerning the plaintiff's performance emanated from Montreal); <u>Madaus v. November Hill Farm, Inc.</u>, 630 F.Supp. 1246, 1248-1249 (W.D. Va. 1986) (applying West German law where contract negotiations and formation, and delivery of the goods took place in West Germany); <u>Windsor Industries, Inc. v. EACA International, Ltd.</u>, 548 F. Supp. 635, 638 (E.D.N.Y. 1982) (applying Hong Kong law where contract negotiations, acceptance of the orders for the goods, and delivery took place in Hong Kong).   Most of Sunbeam's purchase orders for the deep fryers occurred before the execution of the Supply Agreement.

UCC 2-312(3), which Sunbeam fails to quote in its entirety, does not provide a basis for summary judgment.  It states:

> "(3)  Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by the way of infringement or the like but <u>a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.</u>" (Emphasis added.)

Sunbeam provided Pentalpha with specifications for the deep fryer. (Sham Dec. Ex. P)  Sunbeam has offered no evidence that Pentalpha could have altered the design and still met Sunbeam's specifications.   A question of fact as to whether Pentalpha could have complied with Sunbeam's specifications and still avoided infringement.

        3.      Sunbeam's Material Breach Of The Supply Agreement
                    <u>Eliminated Any Obligation Of Pentalpha To Provide Indemnity.</u>

As set forth in Point II, a genuine issue of material fact exists as to whether Sunbeam breached the Supply Agreement in the first half of 1998.

That material breach of the Supply Agreement released Pentalpha from any obligation to provide indemnity. Bradley v. Health Coalition, Inc., 687 So.2d 329, 333 (Fla. Dist. Ct. App. 1997)("[T]he general rule is that a material breach of the Agreement allows the non-breaching party to treat the breach as a discharge of his contract liability."); Sunbeam Memo at 14.

4.   There is An Issue Of Fact As To The Amount Of Sunbeam's Claim For Indemnification With Respect To The Deep Fryer.

Sunbeam has failed to provide any admissible evidence of the amount of its claim concerning the deep fryers for any amount beyond the $2 million that Sunbeam paid to SEB. The verification to Sunbeam's interrogatory responses, made by its attorney "upon information and belief" (Sunbeam Appendix Ex. 8, penultimate page), does not meet the evidentiary requirement of Rule 56(e).   Moreover, Sunbeam's assertion that it spent over $395,000 defending SEB's claims during an approximately 16 month period, involving neither depositions nor motion practice, appears unreasonable.   We suspect that amount includes Sunbeam's fees and expenses to defend Pentalpha's claim for breach of the Supply Agreement.

Because some of Sunbeam's purchase orders may have contained indemnity language while most did not, a question of fact exists as to how much of Sunbeam's $2 million payment is attributable to products sold under purchase orders that may have contained the indemnity language.

II.

## SUNBEAM IS NOT ENTITLED TO SUMMARY JUDGMENT
## ON PENTALPHA'S CLAIMS FOR BREACH OF CONTRACT

A jury could reasonably conclude that Sunbeam materially breached the Supply Agreement for both the "New" and "Existing" products listed on its Schedule A. (Sham Dec. Ex. A at 4)  Sunbeam had purchased the "New" products from other suppliers, but promised to purchase them exclusively from Pentalpha.  Sunbeam already purchased the "Existing" products from Pentalpha, and promised to continue to do so exclusively.

A.      Sunbeam Breached Its Obligation To Purchase Most
        Of The "New" Products On Schedule A From Pentalpha.

The Supply Agreement required Sunbeam to purchase the "New" products listed on Schedule A from Pentalpha "[i]f the quoted prices from Pentalpha are equal to or lower than Sunbeam's existing pricing ..." (Sham Dec. Ex. A at 1)

A reasonable jury could find that Sunbeam consistently breached that obligation to purchase the "New" products from Pentalpha.  For ultrasonic humidifiers and handmixers, Sunbeam refused to provide Pentalpha with the samples necessary to allow Pentalpha to bid.[1] For coffeemakers, garment steamers and rotisseries, Sunbeam refused to transfer the required tooling.  For irons and rice cookers, Sunbeam refused to respond to Pentalpha's bids.  Overall, Sunbeam did not transfer a single tool, or place a single purchase order, for these "New" products.  Instead, Sunbeam pocketed the $1 million that Pentalpha paid pursuant to the Supply Agreement, and kept purchasing the Schedule A products from its existing suppliers as if the Supply Agreement did not exist.

_____

[1]Pentalpha would not breach the Supply Agreement by not bidding on a product.  The Supply Agreement did not require Sunbeam to accept Pentalpha's bid unless it matched Sunbeam's "then existing price."  If Pentalpha could not match Sunbeam's then existing price, bidding would serve no purpose.

10

1.   <u>Ultrasonic Humidifiers</u>

     a.   Sunbeam Breached The Supply Agreement By Failing To
         <u>Supply Pentalpha With Samples Of The Ultrasonic Humidifiers.</u>

Before Pentalpha bid on any Schedule A Products, its employee, Vicki Tai, asked Sunbeam for samples of the "New" products. (Dunnegan Dec. Ex. I at 20/2-19)   As early as October 13, 1997, James Nugent, a Sunbeam employee, promised to send samples of the "New" products to Pentalpha. (Sham Dec. Ex. I)  Pentalpha again requested these samples during a meeting with Sunbeam representatives on October 16, 1997. (Sham Dec. Ex. J) Another Sunbeam employee, Eric Liu, confirmed that fact in his notes. (Dunnegan Dec. Ex. E)

Sunbeam never sent Pentalpha these samples. (Sham Dec. ¶ 25)  Neither James Nugent, (Dunnegan Dec. Ex. A at 92/18-93/21), Eric Liu  (Dunnegan Dec. Ex. D at 17/8-11), nor Charles James (Dunnegan Dec. Ex. G at 116/15-22), can remember sending Pentalpha the samples.

Without a sample, Pentalpha could bid not on a "New" product. (Sham Dec. ¶ 25)  Sunbeam's assertion that Pentalpha only had to "plunk down a few dollars" at a store to buy samples of these items is incorrect.  Pentalpha had no way to tell whether Sunbeam had changed the specifications for the model after the store had purchased it.   Sunbeam admits that it sold deep fryers under the same model number that were not identical.  (Sunbeam Memo at 13 n. 7)

Because Pentalpha could not bid on the ultrasonic humidifiers without samples, Sunbeam's argument on this issue (Sunbeam Appendix, Ex. 4 at 2), is irrelevant.

     b.   Sunbeam Purchased Ultrasonic
         <u>Humidifiers From Other Suppliers.</u>

From 1997 until 2000, Sunbeam breached the Supply Agreement by

purchasing ultrasonic humidifiers, including the 696 model listed on Schedule A, from other suppliers.  (Dunnegan Dec. Ex. Q)

       The Supply Agreement applies not only to the specific model numbers listed on Schedule A, but also to products sold under different model numbers that are either (i) identical or (ii) "similar or like" the model.  The parties agree that Sunbeam could not avoid the Supply Agreement by simply changing the model number of the product.  (Dunnegan Dec. Ex. G at 103/5-15)  The parties should agree that Sunbeam could not avoid the Supply Agreement by making a trivial change to the design of a model.  Sunbeam apparently argues that it can.  (Sunbeam Memo at 11-13)  In making that argument, Sunbeam ignores the second paragraph of the Supply Agreement which states "Pentalpha shall remain the exclusive supplier of said Products in accordance with the terms hererof so long as Sunbeam continues to market similar or like products of the type listed in Schedule A . . ."  Unless this means that "similar or like" products fall within the agreement, the phrase has no reasonable meaning.

       Sunbeam's witnesses conceded that determining whether product is "similar or like" a Schedule A product is an intensely factual question.   George Timchal, who helped negotiate the Supply Agreement on behalf of Sunbeam, testified:

> "Q.    What would you consider a product that was similar
> to one of the products listed in the second category
> on Schedule A?
>
> A.    I don't know.  We would have to be here with a specific
> product and tearing it apart and looking at the features
> and functions and price points."  (Dunnegan Dec. Ex. C at 81/18-24)

Sunbeam's Charles James engaged in a similar analysis, stating "a minor cosmetic change would not take it outside the scope of this agreement." (Dunnegan Dec.

Ex. G at 102/10-104/9)

Sunbeam's reliance upon the testimony of Eyal Lior to argue that the Supply Agreement concerned only the specific models on Schedule A is misplaced. (Sunbeam Memo at 12-13)   Lior never testified that he understood Sunbeam could make trivial changes in the Exhibit A models, buy those models from some other source and thereby avoid its obligations under the Supply Agreement.  Moreover, Mr. Lior had no involvement with the Supply Agreement.  His involvement ended with an earlier product supply agreement dated June 27, 1997 ("Lior Agreement").  In an agreement dated October 23, 1997, Sunbeam agreed "that the [Lior] Agreement was never effective and that it is of no force or effect."  (Sham Dec. ¶ 22; Ex. G)

Based upon the similarity of the model numbers alone, a jury could reasonably find that the additional ultrasonic humidifiers that Sunbeam sold were "similar" to the models listed on Schedule A.  For example, while the Supply Agreement covered model 696, Sunbeam also sold model numbers 693 and 694.  (Compare Sham Dec. Ex. A at 4 with Dunnegan Dec. Ex. Q at 14-15)

Sunbeam has not supplemented its discovery responses to provide the amount of its sales of Schedule A ultrasonic humidifiers after August 2000.  (Dunnegan Dec. ¶ 26)  In addition, despite Pentalpha's Rule 34 requests, Sunbeam has failed to supply Pentalpha with samples of the other models of ultrasonic humidifiers it sold during the term of the Supply Agreement.  (Dunnegan Dec. ¶ 28)  Because discovery on this issue is incomplete, summary judgment is inappropriate under Rule 56(f).

2.      Handmixers

      a.      Sunbeam Breached The Supply Agreement By
              Failing To Supply Pentalpha With Samples Of Handmixers.

Pentalpha asked Sunbeam for samples of the handmixers listed on Schedule A,

but did not receive them. (Sham Dec. ¶ 25)  Sunbeam's witnesses cannot remember sending

these samples to Pentalpha.  (Dunnegan Dec. Ex. A at 96/2-4; Ex. D at 19/19-20/5;  Ex. G at

116/15-22).    Without these samples, Pentalpha could not prepare a bid on the handmixers.

(Sham Dec. ¶ 25)

Sunbeam's argument that Pentalpha breached the Supply Agreement by not

bidding on the handmixers (Sunbeam's Appendix, Ex. 4, p. 2), ignores the fact that Sunbeam's

failure to provide samples prevented Pentalpha from making a bid.

      b.      There Are Issues Of Material Fact Concerning
              Whether Sunbeam Bought Handmixers From Other Suppliers.

From 1997 until August 2000, Sunbeam sold 2,803,293 handmixers that it

purchased from other suppliers.  (Dunnegan Dec. Ex. Q)  Based upon the similarity in the

model numbers, a jury could reasonably find that Sunbeam sold handmixers that were "similar"

to the handmixers on Schedule A.  For example, while the Supply Agreement covered model

2603, Sunbeam also sold model numbers 2520 and 2531.  (Compare Sham Dec. Ex. A at 4 with

Dunnegan Dec. Ex. Q at 13)

Sunbeam has not supplemented its discovery responses to provide the

amount of its sales of Schedule A handmixers after August 2000.  (Dunnegan Dec. ¶ 26)

In addition, despite Pentalpha's Rule 34 requests, Sunbeam has failed to provide

Pentalpha with samples of the other handmixers.  (Dunnegan Dec. ¶ 28)  Because

14

discovery on this issue is incomplete, summary judgment is also inappropriate under Rule 56(f).

      3.    <u>Coffeemakers</u>

          a.    Sunbeam Breached The Supply Agreement By Failing To <u>Provide Pentalpha With The Tooling For The Coffeemakers.</u>

Although Sunbeam accepted all of Pentalpha's bids on the 3200 Series coffeemakers (Dunnegan Dec. Ex. A at 14/20-15/2), Sunbeam never transferred the tooling for these products as the Supply Agreement required.  (Sham Dec. ¶ 29)

Sunbeam argues that Pentalpha breached the Supply Agreement by failing to provide a project plan for coffeemakers.  (Sunbeam Appendix Ex. 4 at 2-3)  That is incorrect. Pentalpha provided a production plan for coffeemakers on December 30, 1997.  (Sham Dec. Ex. L)  Sunbeam has offered no evidence that it communicated to Pentalpha that it considered that project plan inadequate.   In any event, the Supply Agreement does not require Pentalpha to supply a project plan.  (Sham Dec. Ex. A; Dunnegan Dec. Ex. A at 65/11-66/6)

          b.    Sunbeam Bought Coffeemakers <u>Listed On Schedule A From Other Suppliers.</u>

From 1997 until August 2000, Sunbeam sold 152,973 of the coffeemakers models listed on Schedule A.  (Dunnegan Dec. Ex. Q)  Sunbeam did not purchase any of these products from Pentalpha.  Sunbeam has not supplemented its discovery responses to provide the amount of its sales of Schedule A coffeemakers after August 2000.  (Dunnegan Dec. ¶ 26) Because discovery on this issue is incomplete, summary judgment is inappropriate under Rule 56(f).

4.       Garment Steamers

        a.       Sunbeam Breached The Supply Agreement By Failing To
             Supply Pentalpha With The Tooling For The Garment Seamers.

Although Sunbeam accepted Pentalpha's bid on Garment Steamers listed on Schedule A (Dunnegan Dec. Ex. A at 70/21-71/1), Sunbeam never transferred the necessary tooling to Pentalpha, as the Supply Agreement required. (Dunnegan Dec. Ex. A at 71/2-4)

Sunbeam claims that the same dispute that the parties had over coffeemakers, specifically the need to provide a project plan, arose with the garment steamers. (Dunnegan Dec. Ex. A at 17/10-16)  Sunbeam has presented no evidence that it ever asked Pentalpha for a project plan for the garment steamers. The Supply Agreement, moreover, does not require Pentalpha to supply a project plan. (Sham Dec. Ex. A; Dunnegan Dec. Ex. A at 65/11-66/6)

        b.       Sunbeam Bought Garment Steamers
             Listed  On Schedule A From Other Suppliers.

From 1997 until August of 2000, Sunbeam sold 231,282 of the models of garment steamers listed on Schedule A.  (Dunnegan Dec. Ex. Q)  Sunbeam did not purchase any of these products from Pentalpha.

Sunbeam has not supplemented its discovery responses to provide the amount of its sales of Schedule A garment steamers after August 2000.  (Dunnegan Dec. ¶ 26)  Because discovery on this issue is incomplete, summary judgment is inappropriate under Rule 56(f).

5.    <u>Irons</u>

        a.     Sunbeam Breached The Supply Agreement By Failing To
              <u>Respond To Pentalpha's Bid On The Irons Listed On Schedule A.</u>

By memorandum dated October 28, 1997, Pentalpha quoted the irons listed on Schedule A.  (Sham Dec. ¶ 24; Ex. H)  The prices Pentalpha quoted matched those of Sunbeam's existing supplier.  (Sham Dec. ¶ 24;  Ex. D)

By memorandum dated March 16, 1998, Pentalpha repeated its bid on these irons and also offered Sunbeam a better, less expensive iron.  (Sham Dec. Ex. M)  Sunbeam never responded.  (Sham Dec. ¶ 28)

Sunbeam's argument that Pentalpha never submitted an adequate bid on these irons (Sunbeam's Appendix, Ex. 4 at 3) is incorrect.

        b.     There Are Issues Of Fact As To Whether Sunbeam
              <u>Bought Irons On Schedule A From Other Suppliers.</u>

From 1997 through August 2000, Sunbeam sold 7,679,107 irons. (Dunnegan Dec. Ex. Q)  Based upon the similarity of the model numbers, a jury could reasonably infer that some of these irons were "similar" to the irons on Schedule A.  For example, while the Supply Agreement covered models 4014 and 4015, Sunbeam sold model numbers 4026 and 4030. (Compare Sham Dec. Ex. A at 4 with Dunnegan Dec. Ex. Q at 21)

Sunbeam has not supplemented its discovery responses to provide the amount of its sales of Schedule A irons after August 2000.  (Dunnegan Dec. ¶ 26)  In addition, despite Pentalpha's Rule 34 requests, Sunbeam has failed to provide Pentalpha with samples of the irons it sold.  (Dunnegan Dec. ¶ 28)  Because discovery on this issue is incomplete, summary judgment is inappropriate under Rule 56(f).

6.   <u>Rice Cookers</u>

a.   Sunbeam Breached The Supply Agreement By Failing To
<u>Respond To Pentalpha's Bid For The RS Series Rice Cookers.</u>

In October 1997, Pentalpha bid on the RS Series rice cookers listed on Schedule A, except for the RS-15.  (Sham Dec. Ex. H)  Pentalpha's quotes matched those of Sunbeam's existing supplier.  (Sham Dec. Ex. D)   Sunbeam nevertheless failed to accept this bid.  Sunbeam complained that Pentalpha's bid was higher than its bid a year earlier on a different model of rice cookers.  (Sham Dec. Ex. K)  That is irrelevant.

In March 1998, even though the Supply Agreement did not require it to do so, Pentalpha lowered its bids on the RS Series rice cookers.  (Sham Dec. Ex. M)  Sunbeam failed to accept these lower bids.  (Sham Dec. ¶ 28)  Because Pentalpha made two bids at or below Sunbeam's existing prices, Sunbeam's claim that it rejected Pentalpha's bid because it was too high (Appendix to Sunbeam's motion, Ex. 4, p. 4) is wrong.

b.   Issues Of Material Fact Exist As To Whether
<u>Sunbeam Purchased Rice Cookers From Other Suppliers.</u>

From 1997 through August 2000, Sunbeam sold 207,532 rice cookers.  (Dunnegan Dec. Ex. Q)  A jury could reasonably conclude that some of these rice cookers were "similar" to the rice cookers on Schedule A.

Sunbeam has not supplemented its discovery responses to provide the amount of its sales of Schedule A irons after August 2000.  (Dunnegan Dec. ¶ 26)  Moreover, despite Pentalpha's Rule 34 requests, Sunbeam has failed to provide Pentalpha with samples of these rice cookers.  (Dunnegan Dec. ¶ 28)  Because discovery on this issue is incomplete, summary judgment is inappropriate under Rule 56(f).

7.     Rotisseries

     a.     Sunbeam Breached The Supply Agreement By Failing To
           Provide Pentalpha With The Tooling For The Rotisseries.

Sunbeam accepted Pentalpha's bid for the rotisseries listed on Schedule A.

(Dunnegan Dec. Ex. A at 76/25-77/5)  Sunbeam, however, never sent Pentalpha any of the

tooling for the rotisseries.  (Sham Dec. ¶ 29)

Sunbeam claims that it did not transfer the tooling because Pentalpha had not

reimbursed Sunbeam for (i) litigation costs from a patent infringement case, and (ii) air freight

costs for deep fryers that Sunbeam needed to be shipped immediately.  These issues, however,

existed before the execution of the Supply Agreement and are not addressed in it.  (Sham Dec.

Ex. A at 2)  They therefore cannot provide an excuse for Sunbeam's non-performance.   Even

Mr. Nugent admits that these issues were separate from the Supply Agreement.  (Dunnegan

Dec. Ex. A at 21/5-21)

     b.     Sunbeam Purchased Rotisseries From Other Suppliers.

From 1997 until 2000, Sunbeam sold 491,216 rotisseries listed on

Schedule A.  (Dunnegan Dec. Ex. Q)  Sunbeam did not purchase any of these products

from Pentalpha.

Sunbeam has not supplemented its discovery responses to provide the

amount of its sales of Schedule A irons after August 2000.  (Dunnegan Dec. ¶ 26)

Because discovery on this issue is incomplete, summary judgment is inappropriate

under Rule 56(f).

B.        Sunbeam Breached Its Obligation To Purchase
             Certain "Existing" Products On Schedule A From Pentalpha.

       1.     Breadmakers

Sunbeam purchased breadmakers from Vesta in 1998. (Dunnegan Dec. Ex. A at 11/1-6; 197/14-24)  Mr. Nugent could not identify any functional difference between the breadmakers purchased from Vesta and the breadmakers purchased from Pentalpha. (Dunnegan Dec. A at 199/17- 200/2)  A jury could therefore reasonably find that they were "similar" to the models on Schedule A.

       2.     Deep Fryers

Sunbeam purchased deep fryers from Vesta, and possibly others, during the term of the Supply Agreement. (Dunnegan Dec. Ex. C at 98/19-25)  Sunbeam does not deny that the Supply Agreement covered these deep fryers. (Sunbeam Memo at 13, n. 7)

C.        Sunbeam Breached The Supply Agreement Because It
             Was Negotiating Rebates With The Suppliers That
             The Supply Agreement Required Sunbeam To Cut-Off.

Through discovery, Pentalpha has learned why Sunbeam breached the Supply Agreement. As of March 27, 1998, Sunbeam received a $1 million rebate from Tsann Kuen, Sunbeam's existing supplier of handmixers. (Dunnegan Dec. Ex. O)  As of March 31, 1998, Sunbeam received a $1 million rebate from Chiaphua Industries Limited, Sunbeam's existing supplier of rotisseries. (Dunnegan Dec. Ex. O)  Sunbeam frustrated Pentalpha's attempts to obtain any additional discovery concerning these rebates. (Dunnegan Dec. ¶ 15-22)

A jury could reasonably infer that (i) Sunbeam did not want to send Pentalpha the samples necessary to allow Pentalpha to bid on the handmixer because Sunbeam's efforts to negotiate a rebate from Tsann Kuen would have failed if Sunbeam

20

moved the handmixer business from Tsann Kuen, (ii) Sunbeam did not want to transfer

tooling for the rotisseries to Pentalpha because Sunbeam's efforts to negotiate a rebate

from Chiaphua would have failed if Sunbeam moved the rotisserie business from

Chiaphua, and (iii) Sunbeam has attempted to secure rebates from its other existing

suppliers by promising to purchase from them the same products that Sunbeam had

promised to purchase exclusively from Pentalpha.

D.        Sunbeam Has Admitted That It Did
          Not Perform The Supply Agreement.

          Sunbeam's auditors at Arthur Andersen did not allow Sunbeam to report as

income the $1 million Pentalpha paid to Sunbeam under the Supply Agreement because

Sunbeam did not earn it.  The Restatement Report of Arthur Andersen (Dunnegan Dec. Ex. L),

states at page 38:

> "A 1997 rebate for $1 million was paid through a credit memorandum:
> however, based on non-performance of the agreement by both the Company and
> vendor, the rebate will be returned to the supplier in 1998."  (Emphasis added.)

Sunbeam's Board of Directors adopted this Restatement Report on October 16, 1998.

(Dunnegan Dec. Ex. M)   If Pentalpha breached the Supply Agreement first, as Sunbeam now

contends, Sunbeam would have no reason to return the $1 million to Pentalpha.   Based upon

these admissions, Sunbeam's argument that it performed the Supply Agreement is disingenuous.

III.

SUNBEAM IS NOT ENTITLED TO SUMMARY JUDGMENT
ON PENTALPHA'S CLAIMS FOR FRAUD IN THE INDUCEMENT

          A jury could reasonably conclude that Sunbeam defrauded Pentalpha into

entering into the Supply Agreement, and paying Sunbeam $1 million, by falsely

representing that (i) Sunbeam was a financially strong and growing company, when that

apparent strength and growth resulted from a massive accounting fraud and (ii) Sunbeam intended to perform the Supply Agreement, when it had no such intention

Under Florida law, Pentalpha must prove four elements to sustain a fraud claim: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Johnson v. Davis, 480 So.2d 625, 627 (Fla. 1985).

A.        Pentalpha's Fraud Claim Concerning Sunbeam's
          Financial Condition Presents Genuine Issues Of Material Fact.

Pentalpha entered into the Supply Agreement because Sunbeam represented, and Pentalpha believed, that Sunbeam was a financially strong and growing company.  Sunbeam, however, had materially and fraudulently misrepresented its financial strength, including its earnings growth, beginning in the first quarter of 1997.  If Pentalpha had known these facts, which ultimately forced Sunbeam into bankruptcy, Pentalpha would not have entered into the Supply Agreement.

          1.        Sunbeam Made Materially False
                    Statements Concerning Its Financial Condition.

Sunbeam does not dispute that it made false statements concerning its financial condition, including its earnings, before Pentalpha entered into the Supply Agreement. (Dunnegan Dec. Ex. M)  If Sunbeam had accurately reported its earnings, neither Pentalpha nor Wall Street analysts would have perceived Sunbeam as a strong and growing company. Sunbeam does not dispute that a genuine issue of material fact exists as to whether these false statements would have "significantly altered the 'total mix' of information" available to

22

Pentalpha into deciding whether to enter in the Supply Agreement.  TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132 (1976).

Sunbeam's financial misrepresentations were material.  For example, Howard Kristol, as former member of Sunbeam's Board of Directors, admitted that Sunbeam's reporting of $.30 in earnings per share for the second quarter of 1997 was materially false, given Sunbeam's actual earnings of $.10 per share.  (Dunnegan Dec. Ex. F at 105/23-108/11)

Sunbeam argues that a representation cannot be regarded as material "unless it is included in the actual contract."  (Sunbeam Memo at 17)  That argument is wrong.  "[A] rule that a fact is not material if not included in the contract would effectively eliminate fraud in the inducement claims, which Florida recognizes."  Gilchrist Timber Co. v. ITT Rayonier, 127 F.3d 1390, 1395 (11th Cir. 1997).

Saunders Leasing Sys., Inc. v. Gulf Cent. Dist., 513 So.2d 1303 (Fla. Dist. Ct. App. 1987), does not hold that the absence of a representation from a contract renders it immaterial as a matter of law.  That case involved a trial, not a summary judgment motion.  On appeal, the court weighed the evidence presented at trial and concluded: "First, any misrepresentation regarding mileage or condition was not material because Saunders agreed to maintain the vehicles and provide substitute vehicles within four hours after notice that a given vehicle was not operational."  Saunders, 513 So.2d at 1306.  In addition, the court found no evidence of defendant's intent to defraud, stating "Second, there is no evidence that Whitson knew that the trucks that were to be delivered would have mileages in excess of 175,000 miles or would not comport with Gulf Central's desires as to condition."  Id.  Only then did the court state as a matter of fact that "if those terms were so material to Gulf Central's bargain, they would or should have been included in the contract."  Id. at 1306-07.

2.     Sunbeam Knew That Its Statements
       Concerning Its Financial Condition Were False.

Sunbeam does not dispute that a genuine issue of fact exists as to whether it intended to defraud Pentalpha by misrepresenting its financial condition.  Indeed, the weight of the evidence suggests that Sunbeam's senior executives were engaged in a massive scheme to fraudulently manipulate the appearance of Sunbeam's financial condition.  (Dunnegan Dec. Ex. B at 152/11-164/3)

3.     Sunbeam Intended To Induce Pentalpha To Rely Upon
       Its Representations Concerning Its Financial Condition.

Sunbeam does not dispute that there is a question of fact as to whether it intended to induce Pentalpha to enter into the Supply Agreement, based upon its misrepresentations concerning its financial condition.  The fact that Sunbeam arranged for John Sham's visit to its headquarters on October 22, 1997, to coincide with Sunbeam's release of "better than expected" third quarter earnings, demonstrates that.  (Sham Dec. ¶ 12)

John Sham, who made Pentalpha's decision to enter into the Supply Agreement, relied on Sunbeam earnings and growth in deciding to make an immediate payment to Sunbeam of $1 million.  He believed that a financially strong and growing company was more likely to survive over the long term and less likely to attempt to renegotiate the Supply Agreement. (Sham Dec. ¶ 18)  This evidence presents a question of fact.

Sunbeam argues that Pentalpha did not actually rely on Sunbeam's misrepresentations concerning its financial condition, based upon the testimony of Eyal Lior. Mr. Lior, however, had no role in negotiating the Supply Agreement.   Sunbeam and Pentalpha expressly rescinded the Lior Agreement dated July 27, 1997, in an agreement dated October 23,

1997, stating "Sunbeam accepts and agrees that the [Lior] Agreement was never effective and that it is of no force and effect." (Sham Dec. Ex. G)

Sunbeam also makes three arguments that Pentalpha's reliance was not reasonable.

First, Sunbeam argues that Pentalpha could not reasonably rely upon Sunbeam's representations concerning its financial condition, because the Supply Agreement contained no specific representation concerning Sunbeam's financial condition.  That argument is incorrect. Golden v. Mobil Oil Corporation, 882 F.2d 490, 495 (11th Cir. 1989)(reversing directed verdict for defendant, stating, "Mobil's offer of a three year lease instead of a trial franchise, its promise that Golden would have a 'tremendous future' with the company, and its referral to the proposed relationship as a 'marriage' could support a finding that Mobil induced Golden to enter into the lease by representing that the company intended to establish a long-term relationship with Golden" even though those representations were not contained in the contract.);  See Gilchrist Timber Co. v. ITT Rayonier, 127 F.3d 1390, 1395 (11th Cir. 1997).

Second, Sunbeam argues that the merger clause of the Supply Agreement prevents Pentalpha from reasonably relying upon Sunbeam's fraudulent representations concerning its financial condition.  That is incorrect.

A clause merging all prior agreements and representations does not provide a defense to a claim for fraud in the inducement. Noack v. Blue Cross & Blue Shield, Inc., 742 So.2d 433, 434 (Fla. Dist. Ct. App. 1999) ("Neither is the presence of a merger clause an impediment to a cause of action for fraud in the inducement."); Sunchase Apartments v. Sunbelt Service Corp., 596 So.2d 119, 122 (Fla. Dist. Ct. App. 1992)("We also recognize that the existence of a 'merger clause' (i.e., a clause which states that all oral representations or

agreements are merged into and subsumed by the written document of which the clause is a part) may not be asserted to bar evidence regarding alleged oral representations or agreements offered to prove that the document containing the 'merger clause' was procured by fraud."); Ortiz v. Orchid Springs Dev. Corp., 504 So.2d 510 (Fla. Dist. Ct. App. 1987)("[O]ral agreements or representations may be introduced into evidence to prove that a contract was procured by fraud notwithstanding such a merger clause.").

The merger clause in the Supply Agreement was even more limited.  That clause stated that the Supply Agreement contained all the agreements between the parties.  (Sham Dec. Ex. A)  It did not state that there were no other representations except as set forth in the Supply Agreement.

Cases concerning a party's reliance upon a representation that contradicts the written contract are distinguishable.  Barnes v. Burger King Corp., 932 F.Supp. 1420, 1428 (S.D. Fla. 1996)("The unambiguous terms of the subsequent Franchise Agreement between Barnes and Burger King clearly contradict with the terms of the July 21 letter."); Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc., 1999 U.S. Dist. LEXIS 22434 at *16-17 (S.D. Fla. 1999)("It is patently unreasonable for the Distributors to rely on a promise that the Agreement would be renewed annually *ad infinitum* based on performance where the Agreement specifically and unambiguously creates only a single renewal term based on performance."); Schubot v. McDonalds Corporation, 757 F. Supp. 1351 (S.D. Fla. 1990)(alleged representations regarding franchise exclusivity inconsistent with the written terms of the contract); Jankovich v. Bowen, 844 F. Supp. 743, 747-8 (S.D. Fla. 1994)("[T]he issue of registration rights was fully addressed in Paragraph seven (7) of the Agreement...")

26

Cases concerning reliance upon a promise, as opposed to a representation, not contained in a written contract containing merger clause are similarly distinguishable.  <u>Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.</u>, 162 F.3d 1290, 1315 (11th Cir. 1998)("[I]n light of the Section 22 merger clause...- we agree that as a matter of law it was unreasonable for JEJ to rely on an alleged oral guaranty that it chose not to reduce to writing.").

The fact that the Supply Agreement did not guaranty Pentalpha a minimum number of sales does not provide Sunbeam with a defense to Pentalpha's fraud claim.  Pentalpha assumed the risks, spelled out in Paragraph 1 of the Supply Agreement, that Sunbeam would manufacture the products domestically or that Sunbeam would decide not to sell them.  Pentalpha did not assume the risk that Sunbeam's apparent success and growth resulted from a massive accounting fraud.

Third, Sunbeam argues that Pentalpha could not rely upon the financial representations because they were made after the negotiation of the Supply Agreement.  That argument is incorrect.  The representations upon which Pentalpha relies were made before the execution of the Supply Agreement on October 23, 1997.  (Sham Dec. ¶¶ 13-18)  Sunbeam and Pentalpha expressly rescinded the Lior Agreement dated July 27, 1997, in an agreement dated October 23, 1997, stating "Sunbeam accepts and agrees that the [Lior] Agreement was never effective and that it is of no force and effect."  (Sham Dec. Ex. G).  Similarly, Pentalpha did not make the $1 million payment until after October 23, 1997.  (Sham Dec. ¶ 23)

4.     Pentalpha Suffered Damage By Relying Upon Sunbeam's <u>False Representations Concerning Its Financial Condition.</u>

Sunbeam admits at page 22 of its memo that "the financial frauds complained of

by Pentalpha may have affected Sunbeam's stock price and may have played a role in Sunbeam's need to seek chapter 11 reorganization..."  Similarly, there are genuine issues of fact as to whether Sunbeam's financial fraud also damaged Pentalpha.  Through August 2000, Sunbeam did not purchase from any source the number of certain Schedule A products that Pentalpha anticipated that it would purchase.  (Compare Sham Dec. Ex. D with Dunnegan Dec. Ex. Q)  A reasonable jury could find that this failure to buy the projected number of Schedule A products resulted from the same financial fraud.

B.      Pentalpha's Fraud Claim Concerning Sunbeam's Intent Not To
        Perform The Supply Agreement Presents Genuine Issues Of Material Fact.

        Pentalpha also entered into the Supply Agreement because Sunbeam represented that it would, subject to certain limited exceptions, purchase the Schedule A products exclusively from Pentalpha.  Sunbeam, however, intended to pocket Pentalpha's $1 million and purchase the Schedule A products from whomever it pleased.  If Pentalpha had known that Sunbeam did not intend to perform the Supply Agreement, Pentalpha would not have entered into it. (Sham Dec. ¶ 20).  The evidence creates genuine issues of material fact as to each of the four elements of this fraud claim.

                1.      Sunbeam Made Materially False Statements
                        Concerning Its Intent To Perform The Supply Agreement.

        In exchange for Pentalpha's promise to enter into the Supply Agreement, Sunbeam represented that it intended to make Pentalpha the exclusive supplier of the Schedule A products for the duration of the Supply Agreement.  Sunbeam made that representation not only in paragraph 2 of the Supply Agreement, but also in its unexecuted drafts  (Sham Dec. ¶ 14) and in the Lior Agreement dated June 27, 1997.  (Sham Dec. Ex. B)

Under Florida law, a party's misrepresentation concerning its intent to perform a contract at the time of its execution is a misrepresentation of an existing fact. <u>Noack v. Blue Cross & Blue Shield, Inc.</u>, 742 So.2d 433, 434 (Fla. Dist. Ct. App. 1999)("[A] promise may be actionable as fraud where it can be shown that the promissor had a specific intent not to perform the promise at the time the promise was made."); <u>Florida Software Sys. v. Columbia/HCA Healthcare Corp.</u>, 46 F. Supp.2d 1276, 1286 (M.D. Fla. 1999)("Florida law treats a promissor's intent as a material existing fact."); <u>In re Firestone</u>, 26 B.R. 706, 715 (Bankr. S.D. Fla. 1982)("[A] promissor's intent, or mental state, is generally treated as a material existing fact, and if the promise was made with a positive intent not to perform or without a present intent to perform, or made where the promisor knew or should have known of his prospective inability to perform, the misrepresentations can be found to be fraudulent.")

Sunbeam's promise of exclusivity for the Schedule A products provided the fundamental reason that Pentalpha entered into the Supply Agreement.  (Sham Dec. ¶ 20)  A jury could therefore reasonably conclude that Sunbeam's false representations concerning its intent to perform the Supply Agreement were material to Pentalpha's decision to enter into the Supply Agreement.

> 2.   Sunbeam Did Not Intend To Perform The
>        <u>Supply Agreement At The Time It Executed It.</u>

Sunbeam does not dispute that there is a genuine issue of material fact as to whether Sunbeam intended to perform the Supply Agreement at the time it executed it.  Indeed, the weight of the evidence suggests that Sunbeam actively searched for cheaper suppliers for the Schedule A products, both immediately before and immediately after the execution of the Supply Agreement on October 23, 1997. (Dunnegan Dec. Ex. D at 55/11-56/21, 68/21-72/12)

29

3.        Sunbeam Intended To Induce Pentalpha
                To Rely Upon Sunbeam's Representation
                That It Would Perform The Supply Agreement.

In entering into the Supply Agreement, Pentalpha reasonably relied upon Sunbeam's false representation that Sunbeam intended to purchase the Schedule A products exclusively from Pentalpha. (Sham Dec. ¶¶ 13-18) Sunbeam's intent to induce that reliance presents a question of fact.

4.        Pentalpha Suffered Damage By
                Relying Upon Sunbeam's False Representations.

Sunbeam purchased from other suppliers products that it should, under the Supply Agreement, have purchased from Pentalpha. (Dunnegan Dec. Ex. Q) As a result, Pentalpha sustained damages.

Sunbeam's argument that "If the parties had never done a bit of business with one another after signing the Agreement, it would nevertheless have been a commercial success for both parties" (Sunbeam Memo at 3) is only half right. Pentalpha lost not only the $1 million that it paid to Sunbeam, but millions more based upon Sunbeam's failure to perform the Supply Agreement. After receiving the $1 million rebate, however, Sunbeam received the full benefit of the Supply Agreement. (Dunnegan Dec. Ex. A at 170/2-24)

Sunbeam has failed to address this fraud claim. Sunbeam instead mischaracterized it, stating at pages 15-16 of its memo "Pentalpha asserts that Sunbeam falsely represented that...it would purchase certain minimum quantities of products." Pentalpha has asserted no such claim.

IV.

## SUNBEAM IS NOT ENTITLED TO SUMMARY JUDGMENT ON PENTALPHA'S CLAIM FOR FRAUD AFTER THE EXECUTION OF THE SUPPLY AGREEMENT

The jury could reasonably conclude that Sunbeam's fraudulent misrepresentations concerning its financial condition continued after the execution of the Supply Agreement; that Pentalpha suffered damage as a result of its reliance on those fraudulent misrepresentations; that the damage Pentalpha suffered is different from the damage it sustained based upon Sunbeam's breach of contract and fraud in the inducement; and that Pentalpha's injury resulted from its reliance upon Sunbeam's continued fraudulent misrepresentations about its financial condition, not from Sunbeam's failure to perform the Supply Agreement.

Florida law recognizes the tort of fraud after the execution of a contract. In <u>Davis v. McDonald's Corp.</u>, 44 F. Supp.2d 1251, 1261 (N.D. Fla. 1998), the court upheld a claim based upon alleged misrepresentations made after the execution of the contract, stating:

> "Initially, the alleged post-formation misrepresentations may be actionable under Florida law despite the fact that they concern future impact and profitability, as long as [Defendant] possessed superior knowledge of the underlying facts."

Pentalpha has sustained two types of damage as a result of Sunbeam's fraud after the execution of the Supply Agreement that Pentalpha may not be able to recover on its claims for breach of contract and fraud in the inducement.

First, in reliance on Sunbeam's misrepresentations, Pentalpha continued to invest invest in plant and equipment necessary not only to produce the Schedule A products, but also for additional business with Sunbeam. (Sham Dec. ¶ 33)  If Sunbeam

31

had not misrepresented its financial condition after the execution of the Supply

Agreement, Pentalpha could have avoided these costs.

Second, the price of Global-Tech's shares fell dramatically after the public

exposure of Sunbeam's fraud.  After an initial public offering on April 8, 1998 at $19 per

share, Global-Tech's shares traded below $10 in July 1998.  (Sham Dec. ¶ 35)  As a

result, Pentalpha, as one of Global-Tech's operating subsidiaries, sustained damage

because it lost an opportunity to demonstrate to the capital markets that it was part of a

healthy and growing entity.

Most of the cases Sunbeam cited did not involve fraud after the execution

of a contract. Hotels of Key Largo v. RHI Hotel, Inc., 694 So.2d 74, 75 (Fla. Dist. Ct.

App. 1997), addressed whether "the plaintiffs' fraudulent inducement claim is barred by

the economic loss doctrine." HTP, Ltd. v. Lineas Areas Costarricenses, S.A., 685 So.2d

1238, 1239 (Fla. 1996), involved the defendant's motion to dismiss the plaintiff's

"fraudulent inducement count . . ." Allen v. Stephan Co., 784 So.2d 456, 457 (Fla. Dist.

Ct. App. 2000), involved only fraud in the inducement, and specifically allegations that

the defendants "made knowing misrepresentations" and that the plaintiff "relied on those

representations in entering into that agreement. . . ." Florida Power and Co. v.

Westinghouse Electric Corp., 510 So.2d 899, 900 (Fla. 1987), addressed whether the

plaintiff could assert a negligence claim in addition to its contract claim.  In Dantzler

Lumber & Export Co. v. Bullington Lumber Co., 968 F. Supp. 1543, 1546 (M.D. Fla.

1997), the plaintiff's "injury resulted only from its reliance on the performance of

[defendant]" and not from its reliance upon a separate fraudulent representation.

Conclusion

For the reasons set forth above, Global-Tech and Pentalpha respectfully requests that the Court deny Sunbeam's motions for summary judgment.

Dated: August 22, 2002

                                          BOOSE CASEY CIKLIN LUBITZ
MARTENS McBANE & O'CONNELL
John D. Boykin, Esq.
Florida Bar No. 464406
Northbridge Center, 19th Floor
515 North Flager Drive
P.O. Box 4626
West Palm Beach, FL 33402
Telephone: (561) 832-5900
Facsimile: (561) 833-4209

PERKINS & DUNNEGAN

William Dunnegan  (Pro hac vice)
Ronald L. Zaslow (Pro hac vice)
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 332-8300
Facsimile:  (212) 332-8301

Attorneys for Third-Party Defendant
Global-Tech Appliances, Inc. and
Third-Party Defendant/Counterclaimant
Pentalpha Enterprises, Ltd.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the Memorandum of

Global-Tech Appliances, Inc. and Pentalpha Enterprises Ltd. In Opposition To The Motion

Of Sunbeam For Summary Judgment has been sent by U.S. Mail to Robert L. Byman, Jenner

& Block, LLC, One IBM Plaza, Chicago, IL 60611-7603, and Mark F. Bideau, Greenberg

Traurig, P.A., 777 South Flagler Drive – Suite 300E, West Palm Beach, FL 33401 on this

22nd day of August, 2002..

BOOSE CASEY CIKLIN LUBITZ
MARTENS McBANE & O'CONNELL
John D. Boykin, Esq.
 Florida Bar No. 464406
Northbridge Center, 19th Floor
515 North Flager Drive
P.O. Box 4626
West Palm Beach, FL 33402
Telephone: (561) 832-5900
Facsimile: (561) 833-4209

PERKINS & DUNNEGAN

William Dunnegan  (Pro hac vice)
Ronald L. Zaslow (Pro hac vice)
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 332-8300
Facsimile:  (212) 332-8301

Attorneys for Third-Party Defendant
 Global-Tech Appliances, Inc. and
 Third-Party Defendant/Counterclaimant
 Pentalpha Enterprises, Ltd.