UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH

Case No. 02-80527-CIV-RYSKAMP/VITUNAC

SEB S.A.,

                         Plaintiff,

v.

SUNBEAM CORP., SUNBEAM PRODUCTS,
INC., WING SHING INT'L LTD. (BVI) and
PENTALPHA ENTERS, LTD.,

                         Defendants.
_____/

SUNBEAM CORP., SUNBEAM PRODUCTS, INC.,

         Third-Party Plaintiffs/Counterdefendants,

v.

WING SHING INT'L LTD. (BVI) and
GLOBAL-TECH APPLIANCES, INC.,

         Third-Party Defendants,

v.

PENTALPHA ENTERS, LTD.,

         Third-Party Defendant/Counterclaimant.
_____/

### ORDER GRANTING IN PART AND DENYING IN PART
### SUNBEAM'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE comes before the Court upon the consolidated motion of Third-Party Plaintiffs Sunbeam Corporation and Sunbeam Products, Inc. (collectively, "Sunbeam") for summary judgment **[DE 15]**. Third-Party Defendant Pentalpha Enterprises., Ltd. (hereinafter "Pentalpha"), responded and Sunbeam replied. This Court heard oral argument from the parties on October 29, 2002. This issue is now ripe for adjudication.

### I. BACKGROUND

A. Procedural History

This case is before the Court on Sunbeam's motions for summary judgment against

Pentalpha on Sunbeam's claim for indemnification for a patent infringement settlement and on Pentalpha's counterclaims against Sunbeam. The cause was originally filed on March 10, 1998, in New Jersey by SEB S.A. (hereinafter "SEB"), a French corporation, against Sunbeam. SEB alleged that a deep fryer home appliance manufactured by Pentalpha for Sunbeam infringed SEB's patents. In turn, Sunbeam cross-claimed against Pentalpha for indemnification.

Pentalpha successfully challenged SEB's service of process. About the same time, Sunbeam, believing that SEB's suit was meritorious, settled with SEB. Instead of attempting to serve Pentalpha properly in New Jersey, SEB initiated a new and separate suit against Pentalpha in New York and secured injunctive relief against Pentalpha. *See SEB, S.A. v. Montgomery Ward & Co., Inc.*, 77 F.Supp. 2d 399 (S.D.N.Y. 1999), *aff'd* 243 F.3d 566 (Fed. Cir. 2000). Sunbeam filed its cross-claim against Pentalpha on November 4, 1998. Pentalpha initially attempted to dismiss the cross-claim for lack of personal jurisdiction. When its motion was denied, on December 15, 1999 Pentalpha filed an answer to Sunbeam's cross-claim and asserted counterclaims, alleging breach of contract and fraudulent inducement.

Sunbeam moved for summary judgment on its indemnification claims in October 2000. Subsequently, in January 2001, it moved for summary judgment on Pentalpha's counterclaims. On the same day, Sunbeam also moved to transfer the case to Florida. On May 24, 2002, the New Jersey District Court granted Sunbeam's motion to transfer this case to the Southern District of Florida, but did not address Sunbeam's motions for summary judgment.

B. Factual History

Pentalpha designed, manufactured, and supplied Sunbeam with various appliances throughout the 1990s. In 1997, the two companies entered a Product Supply Agreement (hereinafter "the Agreement" or "PSA") by which Pentalpha was made the sole supplier for Sunbeam of certain enumerated appliances. The agreement was beneficial for both companies in

several ways. Sunbeam was seeking to reduce its administrative expenses by contracting with fewer suppliers. Additionally, the agreement provided that Pentalpha would give Sunbeam a one million dollar rebate on its purchases.

About the same time, Pentalpha was engaged in an initial public offering (IPO) of their corporate stock seeking a cash infusion of over $80 million. (1998 Global-Tech Annual Report, Sunbeam Ex. 6 at BG 0662). Peter Howell, a consultant for Global Tech, testified in his deposition that the Agreement was critical to Global-Tech's efforts. (Howell Deposition., Sunbeam Ex. 5 at 9, 17, 21). Without the Agreement, it would have been extremely difficult to successfully achieve the initial public offering. (Id. at 22).

The Agreement was actually negotiated and renegotiated on two different occasions. Pentalpha and Sunbeam signed the first Agreement on June 27, 1997, which was to be effective from July 1, 1997 through June 30, 2001. Later that year, in order to clean up the language of the Agreement and conform it to the requirements of the IPO, John Sham conferred with Sunbeam and sought to redraft the Agreement. George Timchal, Sunbeam's Vice President of Purchasing, agreed. Sham came to Sunbeam's offices in Florida to renegotiate the Agreement. While the parties were renegotiating the Agreement, Sunbeam gave Sham a flyer indicating Sunbeam's economic status. Sunbeam also conducted a press conference detailing their economic status as compared to Wall Street projections. The next day, on October 23, Sham and Timchal signed the renegotiated Agreement.

The second Agreement was nearly identical to the first. The second agreement contained the same list of appliances and the same provisions with regard to the parties' obligations. One difference was that the million dollar rebate provision, which had been a rider in the first Agreement, was moved into the main text of the agreement. A merger clause was also added, providing that "[t]his Agreement embodies the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and

understandings between the parties with respect to the subject matter hereof." (Product Supply Agreement, Sunbeam Ex. 3).

Because so much of this conflict turns on what the Agreement does – and does not – contain, several pertinent portions bear notice. Pentalpha was to be the sole supplier to Sunbeam of the products listed in Schedule A "so long as Sunbeam continues to market similar or like products of the type listed in Schedule A." (*Id.*) The Agreement was not a guarantee by Sunbeam to purchase any specific quantity of product. Sunbeam could change or discontinue its product line such that it would no longer need to purchase the appliances from Pentalpha.

Pentalpha agreed to bid on all items Pentalpha did not then manufacture for Sunbeam "as soon as possible," but the contract did not explicitly require Sunbeam to provide specifications or samples. (*Id.*) If Pentalpha's bid was equal to or lower than Sunbeam's current price, "a project will be started to move tooling from the current supply source to Pentalpha no later than April 1, 1998." (*Id.*) The parties agreed that time was of the essence and that as much of the tooling as possible would be moved before the Chinese New Year holiday. Where Sunbeam did not own the required tooling, Pentalpha would make the new tooling after the parties agreed on pricing. Although the parties agreed that "a project will be started to move tooling" from the current supply source to Pentalpha, no specific "project plans" were explicitly required by the Agreement. (*Id.*) The parties agreed to interpret, enforce, and be bound by "the laws of the State of Florida as applied to contracts entered into between residents of Florida to be performed wholly in Florida." (*Id.*)

## II. DISCUSSION

### A. Standard of Review on Motions for Summary Judgment

Summary judgment is appropriate when there are no genuine disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

"*Some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in the original). For the Court to deem a factual issue to be genuine, it must have "a real basis in the record." *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). The Court will enter summary judgment if, after adequate time for discovery, a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(e).

In considering a motion for summary judgment the Court views the facts in the light most favorable to the nonmoving party. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473 (1962). The Court is not, however, permitted to consider inadmissible or incompetent evidence. *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) (court should disregard portion of evidence which contains legal conclusions or inadmissible evidence). The Court also may not consider conclusory allegations. *See id.* What are considered the "facts" at this stage may not turn out to be the actual facts if the case goes to trial, but these are the facts for summary judgment purposes. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

To defeat a motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party has made a showing that no material issues of fact are in dispute, mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion." *Quarles v. GMC*, 758 F.2d 839, 840 (2d Cir. 1985).

**B. Sunbeam's Motion for Summary Judgment on its Claims for Indemnification**

In order to come to a just resolution of this case, it must be recognized that patent infringement was the original cause of action. SEB SA sued Sunbeam and Pentalpha for violation of SEB's patent on deep fryers. Sunbeam cross-claimed against Pentalpha for indemnity. After Sunbeam settled with SEB for two million dollars, Sunbeam sought to recover that amount from Pentalpha.

Pentalpha has counterclaimed against Sunbeam, alleging breach of contract and fraud in the inducement and seeking damages therefor, as discussed below in Part C. Pentalpha has previously argued that it need not indemnify Sunbeam for Sunbeam's litigation over patent infringements, both with regard to the SEB suit and previous suits, until Sunbeam complies with the PSA. Pentalpha now contends that it *has* indemnified Sunbeam for the previous suits but that it need not and will not indemnify Sunbeam for the two million dollar SEB settlement because Sunbeam breached the PSA and fraudulently induced Pentalpha to sign the PSA. For the reasons set forth below, this Court finds that there is no issue of fact that Sunbeam did not fraudulently induce Pentalpha to sign the PSA, but that there are issues of fact with regard to who first breached the PSA. Completely apart from those findings, however, the Court finds that there is no issue of fact that Pentalpha must indemnify Sunbeam for Sunbeam's patent infringement litigation costs and its settlement with SEB. Sunbeam's performance of its contractual responsibilities under the PSA was not a prerequisite to Pentalpha's obligation to indemnify Sunbeam. Even if this Court were to find, as Pentalpha argues, that Sunbeam breached its contract under the PSA with Pentalpha, Pentalpha would nevertheless be required to indemnify Sunbeam for its litigation.

Sunbeam's motion for summary judgment with regard to Pentalpha's indemnity liability can be divided into two different areas: first, Sunbeam's earlier suits in the *Rival* and *Black & Decker* food steamer lawsuits, and second, with regard to the SEB litigation and settlement.

*1. Sunbeam's Right to Indemnification for Previous Suits*

Pentalpha does not now dispute that it must indemnify Sunbeam for Sunbeam's previous litigation.[1] Pentalpha has publically admitted that it must and will indemnify its customers in this situation. (Sunbeam Ex. 1 at 153-54; Ex. 6 at 689; Ex. 7 at 632). Most importantly, in its purchase agreement for the food steamers at issue in the *Rival* and *Black & Decker* food steamer lawsuits, Pentalpha specifically contracted with Sunbeam that it would indemnify Sunbeam for any liability incurred by patent infringement-related suits. (Sunbeam Ex. 9 at 223).

The only issue before the Court is how much Pentalpha owes Sunbeam and "whether Pentalpha has paid Sunbeam the full amount due." (Pentalpha's Resp. at 4-5). Sunbeam insists that Pentalpha owes it $1,351,392 to indemnify Sunbeam's costs for litigation in the food steamer cases. (Sunbeam Ex. 8 at 6). Pentalpha makes several arguments in response. It admits that although it had to indemnify Sunbeam for Sunbeam's reasonable expenses with regard to the food steamer cases, Pentalpha has indeed already done so, paying "all outstanding amounts due." (Sham Dec. ¶ 30, Sham Dec. Ex. N). Pentalpha argues that Sunbeam has not offered any "admissible evidence" that Pentalpha owes additional funds with regard to the food steamer and avers that interrogatory answers are insufficient to support a motion for summary judgment. (Pentalpha Resp. at 5, citing Sunbeam Ex. 8). Pentalpha alleges that Sunbeam has offered conflicting statements about the amount of indemnification sought. (Pentalpha Resp. at 5-6). Finally, Pentalpha argues Sunbeam fails to give Pentalpha credit for "at least" $579,043.10 which Pentalpha paid Sunbeam for the food steamer cases. (*Id.*, citing Sham Dec. Ex. N).

Pentalpha appears to distort the record with its claim that Sunbeam submitted conflicting amounts due; Sunbeam explains that the difference was solely between a "draft" version of its interrogatory answers and its final interrogatory answer. Furthermore, Pentalpha's exhibits

---

[1] Pentalpha executives have argued previously that they would not comply with aspects of the PSA and/or indemnify Sunbeam for these litigation expenses until Sunbeam complied with its obligations under the PSA. (Sham Decl., Ex. G).

supporting its payment of $579,043.10 are at best incomplete and ambiguous.[2] Nevertheless, Sunbeam has not submitted an affidavit specifying the indemnification amount it is owed for the food steamer litigation (as it did for the two million dollar settlement with SEB; *see* Sunbeam Ex. 12). Moreover, John Sham unequivocally stated that he believed Pentalpha had paid Sunbeam in full for the food steamer litigation. Because issues of fact therefore remain as to damages, Sunbeam's motion for summary judgment with regard to indemnification for the food steamer litigation is granted as to liability but must be denied as to damages.

*2. Sunbeam's Right to Indemnification for the* SEB SA v. Sunbeam *Litigation*

Sunbeam also moves for summary judgment with regard to its claim that Pentalpha must indemnify Sunbeam for its SEB settlement costs and expenses. Pentalpha asserts that there are no genuine issues of fact as to whether Pentalpha has any obligation to provide indemnity with regard to the deep fryer[3] and argues that there are several reasons summary judgment should not be granted. The Court restates these reasons as follows: First, Sunbeam's breach of the PSA eliminated any obligation of Pentalpha to provide indemnity. (Def. Resp. at pg. 8-9, 10-21; Sham Deposition. ¶ 32). Second, because Sunbeam provided the specifications for the deep fryer, Pentalpha need not indemnify Sunbeam for patent infringement. (Sham Deposition. ¶ 31). Third, Sunbeam did not establish that it transmitted its indemnity agreement to Pentalpha (Def. Resp. at 7). Fourth, Sunbeam has not provided supporting evidence for the amount of its indemnification claim (Id. at 9). Finally, Pentalpha originally argued in its Response that the U.C.C. does not apply to Pentalpha's sale of deep fryers made in Asia (Id. at 7-8), but conceded

---

[2] Without additional explanation, it is difficult to determine how Pentalpha reached the sum of $579,043.10 from the exhibits it provides, and Sunbeam accurately asserts that at least one of the receipts (the penultimate page) references additional pages not included in Sham's exhibits.

[3] Interestingly, while insisting "there is a genuine issue of fact" as to whether Pentalpha owes Sunbeam indemnity and merely noting that unlike the food steamers Sunbeam and Pentalpha did not have a written contract regarding the deep fryers, Pentalpha does not explicitly argue that it never agreed to indemnify Sunbeam for litigation regarding the deep fryers.

at oral argument that the U.C.C. and Florida law does apply. The Court will address these arguments in turn.

a.) Pentalpha argues that Sunbeam's breach of the PSA eliminated any obligation of Pentalpha to indemnify. As stated above, there are issues of fact as to who first breached the PSA, but there is no issue of fact that Pentalpha's agreement to indemnify Sunbeam for the deep fryers was not related to or dependent upon the PSA. If Pentalpha agreed to indemnify Sunbeam for the deep fryers, it is required to indemnify Sunbeam even if Sunbeam had breached the PSA. A breach of the PSA contract by Sunbeam would not eliminate Pentalpha's duty to indemnify Sunbeam.

b.) Pentalpha alleges that it should not indemnify Sunbeam because Sunbeam gave Pentalpha detailed specifications for the deep fryer. Moreover, Pentalpha argues that it could not have manufactured and sold Sunbeam a deep fryer that would not have violated the patent. Pentalpha thus essentially argues that Sunbeam, not Pentalpha, was at fault, and Pentalpha should not have to pay for Sunbeam's wrong. These arguments must be rejected.

First, the specifications that Sunbeam provided for Pentalpha concerned capabilities, capacities, appearance, etc., and not specific design instructions. The specifications did not require Pentalpha to manufacture the deep fryer in a way that violated SEB's patent.

Second, it is clear that Pentalpha itself designed the deep fryer. In his deposition, John Sham testified that Sunbeam never mentioned to Pentalpha that Sunbeam had a right to the design of the fryers. When questioned as to what elements of the design Sunbeam controlled, Sham answered that "Sunbeam gave us the specifications."

> Q. "Did Sunbeam specify how the pan was to be attached to the housing [of] the deep fryer?"
> A. "No."
> Q. "Who designed that feature of the deep fryer?"
> A. "Our company."

(Sunbeam Ex. 13, at 230). Despite the fact that Sunbeam gave Pentalpha the specifications for

Case 9:02-cv-80527-KLR   Document 46   Entered on FLSD Docket 02/20/2003   Page 10 of 16

Page 10                                                    UNITED STATES DISTRICT COURT
                                                           SOUTHERN DISTRICT OF FLORIDA

the deep fryer, Sham admits that Sunbeam did not specify how the pan was to be attached to the housing and that Pentalpha designed the feature which violated SEB's patent. It was Pentalpha's wrongdoing, not Sunbeam's, that led to SEB's patent infringement suit.

    c.) Pentalpha insists that Sunbeam has not established that it transmitted its indemnity agreement to Pentalpha. The sales agreement Sunbeam made with Pentalpha regarding the food steamers contained a clause in which Pentalpha explicitly agreed to indemnify Sunbeam for any patent infringement litigation. (Sunbeam Ex. 9, at 223). There is no evidence before the Court that Pentalpha and Sunbeam signed a similar agreement with regard to the deep fryers.

    In an attempt to establish that Pentalpha agreed to indemnify Sunbeam, Sunbeam points to language in the contract purportedly on the back of all its individual purchase orders which required the seller (Pentalpha) to "defend, protect, and save harmless the Buyer . . . from all damages, claims, and demands for actual or alleged infringement of any United States or foreign patent . . . [to] defend, protect, and save harmless the Buyer . . . against any suit or action which may be brought against the Buyer . . . by reason of any such actual or alleged infringement resulting from the purchase, sale, or use of the goods." (Sunbeam Ex. 10 at pg. 3, no. 12). Pentalpha has challenged Sunbeam to prove that the back side of the purchase order, and the contract contained therein, was transmitted to Pentalpha, and at oral argument, counsel for Sunbeam admitted the back sides cannot now be found.

    d.) Pentalpha avers that Sunbeam has not provided supporting evidence for the amount of its indemnification claim. Pentalpha concedes that Sunbeam has proffered sufficient evidence of its two million dollar settlement with SEB. (Resp. at 9; *see* Berreth Aff., Sunbeam Ex. 12, stating Sunbeam settled with SEB for $2 million). Pentalpha returns to its argument above that even if Sunbeam transmitted its indemnity agreement on the back of some but not all of its purchase orders, Pentalpha should have to indemnify Sunbeam only for the percent of the two million dollars in proportion to the number of times Sunbeam actually transmitted its indemnity

contract. Moreover, Pentalpha argues that Sunbeam has failed to submit admissible evidence of the amount of its attorney's fees and costs in defending against SEB's claims. (Resp. at 9).

e.) Because there was no explicit written contract regarding indemnification between the parties, and because the evidence is incomplete with regard to the indemnity agreement on the back of Sunbeam's purchase orders, U.C.C. section 2-312(3) is particularly helpful here:

> Unless otherwise agreed a seller who is a merchant regularly dealing in goods of the kind warrants that the goods shall be delivered free of the rightful claim of any third person by way of infringement or the like but a buyer who furnishes specifications to the seller must hold the seller harmless against any such claim which arises out of compliance with the specifications.

(Fla. Stat. § 672.312). Pentalpha regularly dealt in kitchen appliances, including deep fryers. When it sold deep fryers to Sunbeam, without making any agreement to the contrary, it therefore warranted that the goods (deep fryers) were "delivered free of the rightful claim of any third person." Because the sold goods did infringe upon the patent of SEB, Sunbeam has a right of indemnity against Pentalpha. Although Sunbeam gave Pentalpha the general specifications for the deep fryer, Sunbeam did not provide the detailed technical specifications responsible for the infringing design. Pentalpha was required, as a "merchant regularly dealing" in kitchen appliances such as deep fryers, to deliver to Sunbeam products "free of the rightful claim of any third person by way of infringement." Because Pentalpha delivered to Sunbeam a deep fryer which infringed on SEB's patents, it must indemnify Sunbeam for its litigation with SEB.

Finally, John Sham's own words indicate that he understood that Pentalpha had an obligation to indemnify Sunbeam for its deep fryer litigation. In a letter of November 11, 1998 to John Hamman, Sunbeam president of the household appliances division, Sham writes that "Pentalpha intends to indemnify Sunbeam for any potential infringement issues on the deep fryer provided that you will honor your commitments under our supply agreement." (Sham Decl. Ex. Q). Although arguably Sham was making an offer – "we will indemnify you if you fulfill your contract with us" – Sham clearly recognized Pentalpha's indemnification obligation and was

trying to use it as an incentive to compel Sunbeam to comply with the PSA.

Because there is no issue of fact that Pentalpha is liable to indemnify Sunbeam for its deep fryer-related expenditures, the Court shall grant summary judgment as to Pentalpha's *liability* to indemnify Sunbeam for its two million dollar settlement with SEB. Because there are issues of fact, however, as to the particular amount of indemnification for Sunbeam's attorney's fees and costs, Sunbeam's motion for summary judgment as to it its SEB litigation fees and costs shall be denied.

### C. Sunbeam's Motion for Summary Judgment on Pentalpha's Claims

Pentalpha makes two counterclaims in response to Sunbeam's indemnification claims: breach of contract and fraudulent inducement of a contract.

*1. Pentalpha's Counterclaim that Sunbeam breached the PSA*

In considering a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party. In this light, the Court determines that Pentalpha has established that there are genuine issues of fact which preclude summary judgment in Sunbeam's favor. Viewed in the light most favorable to Pentalpha, Sunbeam may have breached the Product Supply Agreement in several areas.

The Agreement provided that Pentalpha was to be the sole supplier to Sunbeam of the products listed in Schedule A "so long as Sunbeam continues to market similar or like products of the type listed in Schedule A." Sunbeam argues that Pentalpha's sole supplier status was limited to the specific model numbers listed in Schedule A. Although this could be the literal interpretation of the Agreement, Pentalpha persuasively argues that this interpretation would render meaningless the phrase "similar or like products." John Sham believed that Pentalpha would be able to bid on, manufacture, and sell "similar or like" products to Sunbeam as well as

the specific models listed. (Sham Declaration, ¶ 19). Sunbeam admits that it purchased "similar or like" products from other suppliers. (Sunbeam Memo. in Support of Motion at 11). A genuine issue of fact remains as to whether Sunbeam violated the PSA by purchasing "similar or like" products from other suppliers.

Pentalpha raises two issues which revolve around matters not specifically addressed in the PSA: project plans and providing samples. Pentalpha alleges that Sunbeam breached the PSA when it did not purchase items from Pentalpha even after Pentalpha fully complied with the contract requirements to bid on the specified products. Despite the fact that Pentalpha submitted the low bid on at least fourteen different items, Sunbeam alleges that it was not required to purchase these items from Pentalpha because Pentalpha "did not submit a project plan that met the minimum criteria for a reasonable transfer of those products." (Nugent Deposition., Sunbeam Ex. 18, at 15). Sunbeam argued that because it could not be out of production and out of inventory for any length of time for products currently being sold, Pentalpha needed to develop a project plan which would allow Sunbeam to transfer the tooling at a point in the project that would allow Pentalpha to start production shortly thereafter. (*See id.*) The production line setup had to be established, product qualification testing needed to be completed in accord with Sunbeam's product specifications, and UL approval needed to be obtained. (*See* Id. at 15-16). Moreover, when Pentalpha argued that the contract did not specifically require product plans to be submitted, Sunbeam responded that the first step where tooling is moved or where a new product is developed is to establish a project plan. (Id. at 78).

Nevertheless, Sham argued that Pentalpha *did* submit adequate product plans, including plans for a series of coffee makers on which it had placed the low bid. (Sham Declaration, ¶ 27 and Ex. L). The Court finds that, when viewed in the light most favorable to Pentalpha, there remains a genuine issue of material fact as to whether Sunbeam's failure to purchase items from Pentalpha when Pentalpha bid on and submitted project plans constituted a breach of the PSA.

Pentalpha also alleges that Sunbeam also breached the PSA by failing to submit samples upon which Pentalpha could make its bids. Sunbeam argues that the contract did not require it to submit samples, or, alternatively, that even if it were required to submit samples, Pentalpha could and should have mitigated by going to stores and purchasing samples off the shelf. Pentalpha responds that this was not possible because it had no assurance that Sunbeam had not changed the specifications for the model. (Sham Deposition., ¶ 25). Because Sunbeam failed to submit samples when Pentalpha requested them, there remains a genuine issue of material fact as to whether this failure breached the PSA.

### 2. *Pentalpha's Counterclaim for Fraudulent Inducement*

Pentalpha counterclaimed that Sunbeam defrauded Pentalpha into entering into the Product Supply Agreement and paying Sunbeam the one million dollars by falsely representing that Sunbeam was a financially strong and growing company and that it intended to perform the Agreement. (Pentalpha Resp. at 21-22). It argues that Sunbeam's apparent growth and strength actually rested on "a massive accounting fraud" and that Sunbeam had no intention of performing the Agreement.

As it must on summary judgment, the Court assumes Sunbeam made the representations alleged and that the representations were communicated to Pentalpha. Pentalpha's fraud counterclaim fails nonetheless. In order to prove fraud in the inducement, Florida law requires the claimant to show (1) that the respondent made a false representation of fact, (2) that the respondent knew was false when made, (3) that was made for the purpose of inducing the claimant to act in reliance on it, and (4) on which the claimant had a right to rely. *Mergens v. Dreyfoos*, No. 95-8793-CIV, 1997 WL 611576, at *8 (S.D.Fla. July 1, 1997), *aff'd* 166 F.3d 1114 (11th Cir. 1999). Additionally, Pentalpha must show that it *justifiably* relied on Sunbeam's representation. *See Hillcrest Pacific Corp. v. Yamamura*, 727 So. 2d 1053, 1055

(Fla. 4th DCA 1999). "[I]t is a basic tenet of contract law that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties." *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996); *Schubot v. McDonalds Corp.*, 757 F. Supp. 1351, 1355 (S.D. Fla. 1990) (holding plaintiff's claim was deficient as a matter of law because "[r]eliance upon oral representations, even if false, is unreasonable if the party enters into a subsequent agreement.") (citation omitted).

None of the representations that Pentalpha alleges were fraudulent were made before the parties signed the first PSA in June of 1997. The June PSA did not include in its terms any of the alleged misrepresentations. Moreover, the PSA the parties renegotiated and signed in October of 1997 did not include the alleged misrepresentations. As such, Pentalpha's fraudulent inducement counterclaim fails as a matter of law, and "[a]ny other conclusion would be contrary to the plain language of the agreement . . . and would run counter to basic contract principles." *See Barnes*, 932 F. Supp. at 1428-29; *see also Schubot*, 757 F. Supp. at 1356. Because there is no issue of fact that Pentalpha could justifiably rely on Sunbeam's representations, Sunbeam's motion for summary judgment as to Pentalpha's fraud in the inducement counterclaim is granted.

### III. CONCLUSION

The Court having considered Sunbeam's motion for summary judgment and its reply, Defendant's response, and the pertinent portions of the record, it is hereby ORDERED AND ADJUDGED that

1. Sunbeam's motion for summary judgment **[DE 15]** as to Pentalpha's liability to indemnify Sunbeam for its food steamer expenditures is **GRANTED** as to liability and **DENIED** as to damages. Sunbeam's motion for summary judgment with regard to indemnification for the two million dollar deep fryer settlement

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

paid to SEB is **GRANTED** as to liability and **DENIED** as to damages.

2. Sunbeam's motion for summary judgment **[DE 15]** with regard to Pentalpha's counterclaims is also **GRANTED** in part and **DENIED** in part. Sunbeam's motion for summary judgment with regard to Pentalpha's counterclaim for breach of contract is **DENIED**, but as to Pentalpha's counterclaim for fraudulent inducement it is **GRANTED**.

DONE AND ORDERED in Chambers at West Palm Beach, Florida, this 19 day of February, 2003.

KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE

copies provided:
Robert Byman, Esq.
Mark Bideau, Esq.
William Dunnegan, Esq.